**Certificate of Interested Persons and Corporate Disclosure Statement**

Pursuant to Local Rules 26.1-2, Plaintiff-Appellant certifies that the following persons have or may have an interest in the outcome of this case or appeal:

Bennett, Alexandria (Appellant)

EMW Law & Associates, LLC (Attorneys for Appellant)

Friedman, Dazzio & Zulanas, PC (Attorneys for Appellee)

Gordon, Gwendolyn A. (Attorney for Appellee)

Manasco, Anna M. (US District Judge, US District Court-ND of AL)

Walmart, Inc. (Sole Member of Wal-Mart Stores East, LLC)

Wal-Mart Stores East, LLC (Appellee and Sole Member of both WSE Management, LLC and WSE Investment, LLC)

Washington, Ellise (Attorney for Appellant)

WSE Investment, LLC (Sole Limited Partner of Wal-Mart Stores East, L.P.)

WSE Management, LLC (Sole General Partner of Wal-Mart Stores East, L.P)

Zulanas, Christopher J. (Attorney for Appellee

Submitted: October 21, 2024

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

| | | |
|---|---|---|
| ALEXANDRIA BENNETT, | ) | |
| | ) | |
| Appellant, | ) | Case 24-11199-J |
| | ) | |
| v. | ) | |
| | ) | |
| WALMART, INC., | ) | |
| | ) | |
| Appellee. | ) | |

_____

## MOTION TO SET ASIDE DISMISSAL AND REMEDY DEFAULT
_____

Comes now Alexandria Bennett, Appellant in the above-named case, and files this Motion to Set Aside Dismissal and Remedy Default pursuant to 11th Cir. R. 42-2(e).

Counsel for the Appellant filed the Appendix for the aforementioned case on September 20, 2024, before this case was reinstated on October 9, 2024, and again after it was reinstated on October 20, 2024.

Counsel for the Appellant is newly admitted to the 11th Circuit, and did not know that the Appendix filed on September 20, 2024, was not revived when the case was reinstated as there was no changes made to said appendix.

Counsel for the Appellant does not believe that any prejudice will result to any party from this brief delay.

/s/ Ellise M. Washignton /s/_____
Ellise M. Washington (ASB-1744-G16U)
**Counsel for the Appellant, Alexandria Bennett**
EMW LAW, LLC
2100 1ˢᵗ Ave. N., Suite 300
Birmingham, AL 35203
ellise@emwlawllc.com
P: 205-938-4369
F: 205-449-2171

## CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing document to be electronically filed and issued to counsel via electronic mail and/or CM/ECF notification on this date: October 21, 2024.

Gwendolyn A. Gordon
Christopher J. Zulanas
**Counsel for Appellee Wal-Mart, Inc.**
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
czulanas@friedman-lawyers.com
ggordon@friedman-lawyers.com

_____/s/ Ellise M. Washington_____
OF COUNSEL

No. 24-11199

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

Alexandria Bennett,

*Plaintiff-Appellant*,

v.

Walmart, Inc.

*Defendant-Appellee*

Appeal from the United States District Court for the Northern District of Alabama

No. 2:22-CV-01306

---

**APPELLANT'S APPENDIX
VOLUME 1**

---

Ellise M .Washington
2100 1st Ave. N. Suite 300
Birmingham, AL 35203
205-938-4369

*Attorney for Appellant*
Alexandria Bennett

**INDEX**

Docket/Tab #

**Volume 1**

District Court Docket Sheet…………………………………………………………... A

Complaint…………………………………………………………………………….. 1

Answer………………………………………………………………………………… 2

Defendant's Motion for Summary Judgment………………………………………….. 15

Exhibit B – Deposition Travel Transcript of Plaintiff Alexandria Bennett………….... 16-2

Exhibit C – Deposition Travel Transcript of Elizabeth Parker……………………… 16-3

Exhibit D – Affidavit of Elizabeth Parker……………………………………........ 16-4

Exhibit E – Photographs (Exhibits 6 and 7 to Bennett's Deposition)………………... 16-5

Defendant's Brief in Support of Its Motion for Summary Judgment…...………........... 17

**Volume 2**

Exhibits 1-7 and Portions of Exhibits 8-9 to Elizabeth Parker's Deposition Transcript. 18

Remaining portions of Exhibits 8 and 9, along with Exhibits 10 and 11 to Elizabeth
Parker's Deposition Transcript- SEALED…...………………………………….... 27

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment....... 29

Exhibit G – October 15, 2020, Video Surveillance Footage…………..…………….. 35

Exhibit H – Screenshots from Video Surveillance Footage (Exhibit G) ……………… 35

Exhibit I – Wal-Mart's Responses to Plaintiff's Interrogatories ……………………… 35

Defendant's Reply Brief in Support of Its Motion for Summary Judgment…………..... 36

Summary Judgment Order Appealed From…………………………………….......... 38

Certificate of Service

# DOCUMENT A

# U.S. District Court
## Northern District of Alabama (Southern)
## CIVIL DOCKET FOR CASE #: 2:22-cv-01306-AMM

| | |
|---|---|
| Bennett v. Walmart Inc | Date Filed: 10/11/2022 |
| Assigned to: Judge Anna M Manasco | Date Terminated: 03/19/2024 |
| Case in other court: 11th Circuit Court of Appeals, 24-11199-J | Jury Demand: Both |
| Cause: 28:1332 Diversity-Personal Injury | Nature of Suit: 360 P.I.: Other |
| | Jurisdiction: Diversity |

**Plaintiff**

**Alexandria Bennett**     represented by     **Ellise Montrell Washington**
EMW LAW, LLC
2100 1st Avenue North, Ste. 300
Suite 300
Birmingham, AL 35203
205-938-4369
Email: ellise@emwlawllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Walmart Inc**     represented by     **Christopher J Zulanas**
FRIEDMAN, DAZZIO & ZULANAS, PC
3800 Corporate Woods Drive
Birmingham, AL 35242
205-278-7000
Fax: 205-278-7001
Email: stacy@friedman-lawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Gwen K Arendall Gordon**
FRIEDMAN DAZZIO & ZULANAS PC
3800 Corporate Woods Drive
Birmingham, AL 35242
205-278-7000
Fax: 205-278-7001
Email: ggordon@friedman-lawyers.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/11/2022 | 1 | COMPLAINT against Walmart Inc, filed by Alexandria Bennett.(AKD) (Entered: 10/12/2022) |

| | | |
|---|---|---|
| 10/19/2022 | | Filing fee: $ 402.00, receipt number B-1731 (AKD) (Entered: 10/19/2022) |
| 11/21/2022 | 2 | ANSWER to 1 Complaint with Jury Demand *for Walmart Stores East, LP (incorrectly named as Walmart, Inc.)* by Walmart Inc.(Zulanas, Christopher) (Entered: 11/21/2022) |
| 11/22/2022 | 3 | INITIAL ORDER Governing All Further Proceedings - with Appendices I, II and III attached. Signed by Judge Anna M Manasco on 11/22/2022. (FNC) (Entered: 11/22/2022) |
| 01/04/2023 | 4 | ORDER. The Rule 26(f) Report is past due. Unless the report is filed on or before Thursday, January 12, 2023, a conference is scheduled for Friday, January 13, 2023 at 9:00 AM, fifth floor chambers, Hugo L. Black, United States Courthouse, Birmingham, Alabama, at which time counsel for all parties are ORDERED to attend for the sole purpose of delivering to the court the required report. Signed by Judge Anna M Manasco on 1/4/2023. (FNC) (Entered: 01/04/2023) |
| 01/04/2023 | 5 | REPORT of Rule 26(f) Planning Meeting. (Zulanas, Christopher) (Entered: 01/04/2023) |
| 01/05/2023 | 6 | QUALIFIED HIPAA PROTECTIVE ORDER. Signed by Judge Anna M Manasco on 1/5/2023. (FNC) (Entered: 01/05/2023) |
| 01/09/2023 | 7 | SCHEDULING ORDER. Certain deadlines apply, as set out further in this order. Discovery due by 7/3/2023; Dispositive Motions due by 8/14/2023; Joint Status Report due by 6/20/2023; Status Conference set for 6/26/2023 at 10:30 AM by Zoom, before Judge Anna M Manasco. The court will provide the zoom information to the parties by separate email. This case should be trial ready by October 2023. Signed by Judge Anna M Manasco on 1/9/2023. (FNC) (Entered: 01/09/2023) |
| 02/14/2023 | 8 | MOTION for Protective Order /*Agreed Confidentiality Order* by Walmart Inc. (Attachments: # 1 Text of Proposed Order Agreed Confidentiality Order)(Zulanas, Christopher) (Entered: 02/14/2023) |
| 02/15/2023 | 9 | AGREED PROTECTIVE/CONFIDENTIALITY ORDER. Signed by Judge Anna M Manasco on 2/15/2023. (FNC) (Entered: 02/15/2023) |
| 06/02/2023 | 10 | NOTICE by Walmart Inc *Notice of Taking Deposition of Plaintiff* (Zulanas, Christopher) (Entered: 06/02/2023) |
| 06/02/2023 | 11 | NOTICE to Take Deposition of Wal-Mart Stores East LP by Alexandria Bennett. (Washington, Ellise) (Entered: 06/02/2023) |
| 06/02/2023 | 12 | NOTICE to Take Deposition of Dr. William Krauss, DO by Alexandria Bennett. (Washington, Ellise) (Entered: 06/02/2023) |
| 06/20/2023 | 13 | STATUS REPORT *(Joint)* by Walmart Inc. filed by Walmart Inc (Zulanas, Christopher) (Entered: 06/20/2023) |
| 06/21/2023 | 14 | MEDIATION ORDER. Mediation shall be completed by August 1, 2023. The status conference set for June 26, 2023 is CANCELLED. Signed by Judge Anna M Manasco on 6/21/2023. (FNC) (Entered: 06/21/2023) |
| 08/11/2023 | 15 | MOTION for Summary Judgment by Walmart Inc. (Gordon, Gwen) (Entered: 08/11/2023) |
| 08/11/2023 | 16 | Evidentiary Material . (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Gordon, Gwen) (Entered: 08/11/2023) |
| 08/14/2023 | 17 | Brief re 15 MOTION for Summary Judgment . (Gordon, Gwen) (Entered: 08/14/2023) |
| 08/14/2023 | 18 | Evidentiary Material re: 15 MOTION for Summary Judgment , 17 Brief *Supplemental*. (Attachments: # 1 Exhibit Exhibits 1-9 to Parker Depo)(Gordon, Gwen) (Entered: 08/14/2023) |

| 08/14/2023 | 19 | MOTION to Seal *Certain Exhibits to Elizabeth Parker's Deposition* by Walmart Inc. (Attachments: # 1 Exhibit A)(Gordon, Gwen) (Entered: 08/14/2023) |
|---|---|---|
| 08/15/2023 | 20 | **TEXT ORDER:** Defendant Wal-Mart Stores East, L.P.'s motion for leave to file under seal, 19 , is **DENIED**. If Wal-Mart wishes to renew its motion, the motion must explain why the documents should be filed under seal consistent with *Romero v. Drummond Co.*, 480 F.3d 1234 (11th Cir. 2007). Signed by Judge Anna M Manasco on 08/15/2023. (AKD) (Entered: 08/15/2023) |
| 08/18/2023 | 21 | Unopposed MOTION to Seal *Renewed Motion to File Under Seal* by Walmart Inc. (Attachments: # 1 Exhibit A)(Gordon, Gwen) (Entered: 08/18/2023) |
| 08/18/2023 | 22 | First MOTION for Extension of Time to File Response/Reply as to 15 MOTION for Summary Judgment by Alexandria Bennett. (Washington, Ellise) (Entered: 08/18/2023) |
| 08/18/2023 | 23 | **TEXT ORDER:** Any response to the renewed motion for leave to file under seal, Doc. 22 , is due within **FOURTEEN (14) DAYS** of the issuance of this order. Any reply is due within **SEVEN (7) DAYS** of any response. The briefing on Defendants' motion for summary judgment, Doc. 15 , is **STAYED** pending the court's ruling on the renewed motion for leave to file exhibits under seal, see Doc. 21 . Accordingly, the Plaintiff's motion, Doc. 22 is **GRANTED**. Signed by Judge Anna M Manasco on 08/18/2023. (RMM) (Entered: 08/18/2023) |
| 08/21/2023 | 24 | Supplemental MOTION to Seal by Walmart Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Gordon, Gwen) (Entered: 08/21/2023) |
| 09/05/2023 | 25 | **TEXT ORDER;** Wal-Mart Stores East, L.P.'s Renewed Motion to File Certain Exhibits to Elizabeth Parker's Deposition Under Seal, 21 is GRANTED. Signed by Judge Anna M Manasco on 09/05/2023. (AKD) (Entered: 09/05/2023) |
| 09/11/2023 | 26 | **TEXT ORDER;** Pursuant to the lifting of the stay after the court granted the renewed motion for leave to file exhibits under seal, see 25 , the response to the motion for summary judgment, 15 , is due on 09/28/2023, and the reply is due on 10/12/2023. Signed by Judge Anna M Manasco on 09/11/2023. (AKD) (Entered: 09/11/2023) |
| 09/18/2023 | 27 | ***Document Sealed: Exhibit C to MOTION for Summary Judgment pursuant to Order 25 FILED UNDER SEAL. (Attachments: # 1 Exhibit C-1, # 2 Exhibit C-2, # 3 Exhibit C-3) (AKD) (Entered: 09/20/2023) |
| 09/28/2023 | 28 | Second MOTION for Extension of Time to File Response/Reply as to 15 MOTION for Summary Judgment , 26 Order, by Alexandria Bennett. (Washington, Ellise) (Entered: 09/28/2023) |
| 09/29/2023 | 29 | RESPONSE in Opposition re 15 MOTION for Summary Judgment filed by Alexandria Bennett. (Attachments: # 1 Exhibit A, # 2 Exhibit C, # 3 Exhibit D)(Washington, Ellise) (Entered: 09/29/2023) |
| 09/29/2023 | 30 | First MOTION to Seal Document by Alexandria Bennett. (Washington, Ellise) (Entered: 09/29/2023) |
| 10/02/2023 | 31 | TEXT ORDER. The court GRANTS 30 . The remaining portions of Exhibit D and all of Exhibits B and E of plaintiff's brief in opposition to defendant's motion for summary judgment shall be filed under seal. Signed by Judge Anna M Manasco on 10/2/2023. (FNC) (Entered: 10/02/2023) |
| 10/02/2023 | 32 | MOTION to Strike 28 Second MOTION for Extension of Time to File Response/Reply as to 15 MOTION for Summary Judgment , 26 Order, , 29 Response in Opposition to Motion by Walmart Inc. (Gordon, Gwen) (Entered: 10/02/2023) |

| | | |
|---|---|---|
| 10/09/2023 | [33](#) | REPLY to Response to Motion re [32](#) MOTION to Strike [28](#) Second MOTION for Extension of Time to File Response/Reply as to [15](#) MOTION for Summary Judgment , 26 Order, , [29](#) Response in Opposition to Motion filed by Alexandria Bennett. (Washington, Ellise) (Entered: 10/09/2023) |
| 10/12/2023 | [34](#) | Evidentiary Material re: [15](#) MOTION for Summary Judgment , [17](#) Brief *Second Supplement to include Exhibits G, H and I*. (Attachments: # [1](#) Exhibit G (surveillance video link), # [2](#) Exhibit H, # [3](#) Exhibit I)(Gordon, Gwen) (Entered: 10/12/2023) |
| 10/12/2023 | [35](#) | NOTICE of Conventional Filing by Walmart Inc re [34](#) Evidentiary Material *as to Exhibit G - surveillance video link* (Gordon, Gwen) Modified on 10/13/2023-Recieved CD labeled Exhibit G. Placed in file. (AKD). (Entered: 10/12/2023) |
| 10/12/2023 | [36](#) | REPLY Brief filed by Defendant Walmart Inc re: [29](#) Response in Opposition to Motion filed by Walmart Inc. (Gordon, Gwen) (Entered: 10/12/2023) |
| 03/19/2024 | [37](#) | MEMORANDUM OPINION. Signed by Judge Anna M Manasco on 03/19/2024. (AKD) (Entered: 03/19/2024) |
| 03/19/2024 | [38](#) | JUDGMENT-This case comes before the court on a motion for summary judgment filed by Defendant Walmart, Inc. [15](#) . For the reasons stated in the memorandum opinion entered contemporaneously herewith, the motion is GRANTED. Judgment is ENTERED in favor of Walmart and against Plaintiff Alexandria Bennett, costs taxed as paid. The Clerk of Court is DIRECTED to close the case. Signed by Judge Anna M Manasco on 03/19/2024. (AKD) (Entered: 03/19/2024) |
| 04/16/2024 | [39](#) | NOTICE OF APPEAL by Alexandria Bennett. Appeal Record due by 4/30/2024. (Washington, Ellise) (Entered: 04/16/2024) |
| 04/16/2024 | | USCA Appeal Fees received $ 605 receipt number B11084 re [39](#) Notice of Appeal filed by Alexandria Bennett (KAM) (Entered: 04/18/2024) |
| 04/18/2024 | [40](#) | Transmittal letter to 11th Circuit Court of Appeals re [39](#) Notice of Appeal (AKD) (Entered: 04/18/2024) |
| 04/18/2024 | [41](#) | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re [39](#) Notice of Appeal (AKD) (Entered: 04/18/2024) |
| 04/24/2024 | [42](#) | USCA Case Number 24-11199-J for [39](#) Notice of Appeal filed by Alexandria Bennett. (AKD) (Entered: 04/24/2024) |
| 09/05/2024 | [43](#) | USCA ORDER as to [39](#) Notice of Appeal filed by Alexandria Bennett; Pursuant to the 11th Cir. R. 42-2(c), this appeal is hereby DISMISSED for want of prosecution because the appellant Alexandria Bennett has failed to file an appellant's brief within the time fixed by the rules, effective September 05, 2024. (AKD) (Entered: 09/05/2024) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 09/07/2024 02:50:45 | | |
| **PACER Login:** | emwlawllc | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 2:22-cv-01306-AMM |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

# DOCUMENT 1



FILED

2022 Oct-12  AM 09:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALEXANDRIA BENNETT** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CASE NUMBER:** |
| | ) | |
| **WALMART INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

**COMES NOW**, Alexandria Bennett (hereinafter, "Plaintiff"), by and through counsel, and hereby sets forth the following as her Complaint against the Defendants and alleges causes of action as follows:

## PARTIES

1. Plaintiff Alexandria Bennett is an individual over the age of 21 years and a resident of Alabama.

2. Defendant Walmart Inc., (hereinafter referred to as "Walmart") is a Delaware corporation with its principal place of business in Arkansas doing business at all times pertinent hereto in Shelby County, Alabama.

## JURISDICTION AND VENUE

3. Plaintiff re-alleges all preceding paragraphs of the Complaint as if fully set forth herein.

4. This civil action arises under and is brought pursuant to 28 U.S.C. § 1332 based upon the diversity of citizenship of the parties, the Plaintiff being a resident citizen of Alabama and the Defendant being a Delaware Corporation with its principal place of business being in

Arkansas, and claims made by the Plaintiff against the Defendant for an amount in controversy that exceeds $75,000.

5. The Plaintiff resides in Jefferson County, Alabama, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Shelby County, Alabama. Venue is proper in the United States District Court for the Northern District of Alabama pursuant to 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2). Plaintiff asserts that the Birmingham Division is the proper Division of the United States District Court for the Northern District of Alabama for the filing of this action.

## COUNT I

## NEGLIGENCE

6. Plaintiff re-alleges all preceding paragraphs of the Complaint as if fully set forth herein.

7. Defendant Walmart owns and operates a retail shopping store in Helena, Shelby County, Alabama.

8. On or about October 15, 2020, Plaintiff Alexandria Bennett was shopping at Walmart store #4189 located in Helena, Alabama.

9. While in the store, Plaintiff fell in a pool of a slippery substance that was hidden behind stacked bottles of water on a wooden pallet.

10. There were no "wet floor" signs or other caution signage positioned in such a way as to warn or put Plaintiff on notice as to the existence of the liquid on the floor or the hazard that it created for Plaintiff and other store customers.

11. After the fall, Plaintiff remained on the wet floor as other customers attempted to render aid.

12. Plaintiff was approached by several Walmart employees who asked if she was okay and began to fill out an incident report but did not render aid.

13. Plaintiff remained on the wet floor for approximately thirty minutes while waiting for the emergency medical team to arrive.

14. Plaintiff was carried to a local emergency room via ambulance.

15. Defendant negligently maintained and/or inspected the floor where Plaintiff fell, by failing to clean the wet area.

16. Defendant further negligently failed to warn of the danger posed by the wet floor.

17. Defendant failed to use due care in the exercise of its duty in inspecting its premises and keeping the floors of its store free of hazards.

18. As a proximate result of Defendant's negligence, Plaintiff suffered serious injuries to her right ankle and hip including an avulsion fracture lateral talus.

19. Plaintiff has undergone extensive medical treatment including surgery on her right posterior ankle and subtalar joint where several bone fragments were removed from her ankle.

20. Further, this injury has caused Plaintiff to miss work and incur significant medical expenses presently and in the future.

21. Plaintiff avers that the negligence of the Defendant proximately caused the Plaintiff's injuries herein above alleged.

WHEREFORE, Plaintiff hereby demands of the Defendant, jointly and severally, compensatory and punitive damages in an amount in excess of the jurisdictional requirements of this Court, said amount to be determined by the court, plus costs.

## COUNT II

### WANTONNESS/RECKLESSNESS

22.   Plaintiff re-alleges all preceding paragraphs of the Complaint as if fully set forth herein.

23.   Defendant knew or should have known of the dangerous condition a slippery and wet floor posed to its customers and Defendant failed to warn its customers and/or take reasonable remedial actions.

24.   Defendant acted in a wanton and/or reckless manner by failing to provide a reasonably safe environment for its store's patrons, specifically Plaintiff.

25.   As a proximate result thereof, Plaintiff was caused to suffer serious injuries herein above alleged.

WHEREFORE, Plaintiff hereby demands of the Defendant, jointly and severally, compensatory and punitive damages in an amount in excess of the jurisdictional requirements of this Court, said amount to be determined by the court, plus costs.

## PLAINTIFF DEMANDS TRIAL BY STRUCK JURY ON ALL COUNTS

Respectfully submitted,

/s/ Ellise M. Washington
Ellise M. Washington
Attorney for Plaintiff

**Of Counsel:**
**EMW LAW**
2100 1st Avenue North
Birmingham, AL 35203
T: 205-938-4369
F: 205-449-2171
Ellise@emwlawllc.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 11, 2022, I filed the foregoing via the Pacer electronic filing system, and will serve the defendant via certified mail at the address listed below.

Walmart Inc.
c/o C T Corporation System
2 North Jackson St., Suite 605
Montgomery, AL 36104

/s/ Ellise M. Washington
Ellise M. Washington

# DOCUMENT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ALEXANDRIA BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case 2:22-cv-01306-AMM |
| | ) | |
| WALMART, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## ANSWER TO COMPLAINT ON BEHALF OF
## WAL-MART STORES EAST, L.P.

COMES NOW the Defendant in the above-styled action, **Wal-Mart Stores East, L.P. (incorrectly named in the Complaint as Walmart, Inc.)**, and for answer to the Complaint and each count and paragraph in it, separately and severally, sets forth and says as follows:

## FIRST DEFENSE

This defendant is not guilty of the allegations of wrongdoing set forth on behalf of the plaintiff in the Complaint.

## SECOND DEFENSE

There is no proximate cause between any action or inaction on the part of this defendant and the injuries and damages alleged on behalf of the plaintiff.

## THIRD DEFENSE

The plaintiff assumed the risk of any injuries and/or damages as alleged in the Complaint.

## FOURTH DEFENSE

The plaintiff was contributorily negligent and is therefore barred under Alabama law from making any recovery against this defendant.

## FIFTH DEFENSE

This defendant pleads the general issue.

## SIXTH DEFENSE

This defendant denies that the plaintiff is injured and damaged to the extent claimed in the Complaint and demands strict proof thereof.

## SEVENTH DEFENSE

The imposition of damages for mental anguish and/or emotional distress are unconstitutional both under the Constitution of the State of Alabama and Constitution of the United States. Based upon Alabama procedures relative to damages for mental anguish and emotional distress, which provide no objective, logical or reasonable standards or criteria which govern the award and the amount of the award of such damages, this defendant is denied due process and equal protection of the laws as guaranteed by the Fifth and Fourteenth Amendments to the

United States Constitution and Article I, §§ 1, 6, 10, 11, 13, and 22 of the Alabama Constitution, separately and severally.

## EIGHTH DEFENSE

Any award of damages in this case for emotional distress and mental anguish would be improper and unconstitutional, as there are no procedural safeguards for the imposition of such damages, and such damages are left to the standardless discretion of the jury.

## NINTH DEFENSE

Although this defendant reserves its right to amend this Answer to assert such other defenses, affirmative or otherwise, pursuant to the Alabama Rules of Civil Procedure and the Rules of this Court, this defendant asserts the following affirmative defenses as required under Rule 8(c), of the Alabama Rules of Civil Procedure to include: statute of limitations, contributory negligence, release, res judicata, payment, waiver, and collateral estoppel.

## TENTH DEFENSE

This defendant denies each and every material allegation made on behalf of the plaintiff in this case and particularly those allegations that this defendant negligently or wantonly failed to provide a safe place or that it was negligent or wanton in failing to warn or provide notice to the plaintiff of an alleged unsafe condition.

**ELEVENTH DEFENSE**

This defendant denies that the plaintiff has any right under Alabama law, the Constitution of the State of Alabama, and the United States Constitution to claim punitive damages against this defendant under the facts of this case.

**TWELFTH DEFENSE**

Alabama's law on joint and several liability and any award of punitive damages would be unconstitutional and would violate the rights of this defendant to due process, equal protection and other constitutional rights due to the fact that through joint and several liability exemplary damages may be awarded against multiple defendants without consideration of the extent or participation of a particular defendant in alleged joint wrongdoing with a net result being that various defendants may be lumped together in a joint verdict without regard for the degree of culpability of individual defendants.

**THIRTEENTH DEFENSE**

Any imposition of punitive damages in this case would contravene the Due Process clauses of the United States Constitution and the Constitution of the State of Alabama on the following grounds:

[A]    The procedures through which punitive damages are awarded fail to provide a reasonable limit on the amount of the award against this defendant.

[B]    The procedures through which punitive damages are awarded in Alabama are unconstitutionally vague.

[C]    The procedures through which punitive damages are awarded fail to provide specific standards for the assessment of punitive damages.

[D]    The procedures through which punitive damages are awarded in Alabama fail to provide specific standards for the amount of punitive damages.

[E]    The procedures through which punitive damages are awarded in Alabama fails to provide a clear appellate standard of review.

[F]    Any award of punitive damages would constitute an arbitrary and capricious taking of property of this defendant without due process of law.

[G]    This defendant denies that it is guilty of conduct referable to which punitive damages could or should be award and denies that the plaintiff has produced, or even alleged, clear and convincing evidence sufficient to support or sustain the imposition of punitive damages against this defendant.

## FOURTEENTH DEFENSE

This defendant contests the damages alleged by the plaintiff and demands strict proof thereof. Specifically, with regard to the claim for punitive damages, this defendant pleads that any award of punitive damages to the plaintiff in this case would be violative of the constitutional safeguards provided to the defendant under

the Constitution of the State of Alabama and the Constitution of the United States of America, as follows:

[A]   Due Process Clause Fourteenth Amendment to the United States Constitution: Punitive damages are vague and not rationally related to legitimate governmental interests.

[B]   Sixth Amendment to the United States Constitution: Punitive damages are penal in nature, and consequently, defendants are entitled to the same procedural safeguards accorded to criminal defendants.

[C]   Self-incrimination Clause of the Fifth Amendment to the United States Constitution:  It is violative to impose punitive damages against defendants, which are penal in nature, yet compel defendants to disclose potentially incriminating documents and evidence.

[D]   United States Constitution and Constitution of the State of Alabama: It is violative of the rights guaranteed to impose punitive damages against defendants which are penal in nature by placing a burden of proof on the plaintiff which is less than the "beyond a reasonable doubt" burden of proof in criminal cases.

## FIFTEENTH DEFENSE

The imposition of damages for mental anguish and/or emotional distress are unconstitutional both under the Constitution of the State of Alabama and Constitution of the United States.  Based upon Alabama procedures relative to

damages for mental anguish and emotional distress, which provide no objective, logical, or reasonable standards or criteria which govern the award and the amount of the award of such damages, this defendant is denied due process and equal protection of the laws as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article I, §§ 1, 6, 10, 11, 13, and 22 of the Alabama Constitution, separately and severally.

## SIXTEENTH DEFENSE

Any award of damages in this case for emotional distress and mental anguish would be improper and unconstitutional, as there are no procedural safeguards for the imposition of such damages, and such damages are left to the standardless discretion of the jury.

## SEVENTEENTH DEFENSE

This defendant pleads the protection provided by Ala. Code § 6-11-21.

## EIGHTEENTH DEFENSE

To allow a jury to award punitive damages would violate the due process guaranteed by the Fourteenth Amendment of the Constitution of the United States in Article 1, Section 13 of the Constitution of Alabama of 1901, and would also violate the Excessive Fines Provision of the Eighth Amendment of the Constitution of the United States in Article 1, Section 15 of the Constitution of Alabama.

## NINETEENTH DEFENSE

This Defendant asserts no duty was owed to the plaintiff under Alabama law under the circumstance of this case.

## TWENTIETH DEFENSE

This defendant asserts no hidden defective condition of which it had notice existed.

## TWENTY-FIRST DEFENSE

This defendant pleads the alleged condition was open and obvious.

## TWENTY-SECOND DEFENSE

This defendant denies it created any dangerous condition.

## TWENTY-THIRD DEFENSE

This defendant denies it had actual or constructive notice of any alleged dangerous condition.

NOW, therefore having answered the Complaint setting forth general and affirmative defenses, this Defendant sets forth the following response to each individually numbered count and paragraph contained in the complaint as follows:

## Parties

1.     This defendant is without sufficient information to admit or deny the allegations contained in this paragraph and therefore denies same and demands strict proof thereof.

2.      Admitted; however, denied Walmart, Inc. is a proper defendant.

## **Jurisdiction and Venue**

3.      This defendant adopts and incorporates by reference all previous paragraphs contained in this answer as if fully set forth herein.

4.      To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

5.      To the best of this defendant's knowledge, admitted.

## **COUNT I – Negligence**

6.      This defendant adopts and incorporates by reference all previous paragraphs contained in this answer as if fully set forth herein.

7.      Denied as Walmart, Inc. is not the proper defendant.

8.      To the best of this defendant's knowledge, admitted.

9.      To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

10.      To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

11.      This defendant is without sufficient information to admit or deny the allegations contained in this paragraph and therefore denies same and demands strict proof thereof.

12.    To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

13.    To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

14.    This defendant is without sufficient information to admit or deny the allegations contained in this paragraph and therefore denies same and demands strict proof thereof.

15.    To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

16.    To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

17.    To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

18.    To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

19.    To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

20.    To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

21.     To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

## COUNT II – Wantonness/Recklessness

22.     This defendant adopts and incorporates by reference all previous paragraphs contained in this answer as if fully set forth herein.

23.     To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

24.     To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

25.     To the extent this paragraph contains allegations against this defendant, they are denied and strict proof thereof is demanded.

## DEFENDANT DEMANDS TRIAL BY STRUCK JURY

Respectfully submitted,

s/ *Chris Zulanas*

Christopher J. Zulanas (ASB-1572-U82C)
Gwendolyn A. Gordon (ASB-2775-O74A)
*Counsel for Defendant, Wal-Mart Stores East, L.P. (incorrectly named in Complaint as Walmart, Inc.)*

OF COUNSEL:
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
czulanas@friedman-lawyers.com
ggordon@friedman-lawyers.com
P 205.278.7000 | F 205.278.7001

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused a copy of the foregoing document to be electronically filed and issued to counsel via electronic mail through CM/ECF notification on this date: November 21, 2022.

Ellise M. Washington
EMW LAW
2100 1st Avenue North
Birmingham, AL 35203
ellise@emwlawllc.com

_____s/ *Chris Zulanas*_____
OF COUNSEL

# DOCUMENT
# 15

FILED
2023 Aug-11  PM 03:41
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

ALEXANDRIA BENNETT,       )
                          )
    Plaintiff,            )       Case 2:22-cv-01306-AMM
                          )
v.                        )       ORAL ARGUMENT REQUESTED
                          )
WALMART, INC.,            )
                          )
    Defendants.           )

_____

**WAL-MART STORES EAST, L.P.'S
MOTION FOR SUMMARY JUDGMENT**

_____

COMES NOW the Defendant, Wal-Mart Stores East, LP, (hereinafter "Wal-Mart") and moves this Honorable Court to enter summary judgment in its favor as to each count and claim in the plaintiff's Complaint. As grounds for its motion, Wal-Mart states as follows:

1.    This is a premises liability case arising out of an alleged slip and fall which plaintiff claims occurred on October 15, 2020, at the Wal-Mart Neighborhood Market located in Helena, Alabama. (Doc. 1). Specifically, the plaintiff claims that as she was reaching for a bottle or jug of water, and while standing flatfooted, both of her feet suddenly slipped out from under her and thereby caused her to fall. Plaintiff further claims that, due to her fall, she suffered an injury to her right ankle.

2.      On October 12, 2022, plaintiff filed this lawsuit asserting negligence and wantonness/recklessness claims against Wal-Mart (incorrectly named in the Complaint as Walmart, Inc.). In her Complaint, plaintiff claims she "fell in a pool of slippery substance that was hidden behind stacked bottles of water on a wooden pallet." However, in her deposition, plaintiff clarified that the only liquid she observed was *in front* of the pallet. Plaintiff described the size of the liquid as "drips" which were located in a small area next to – but not under or hidden by – the pallet. There is no evidence of any "hidden" slippery substance on the subject aisle at the time of plaintiff's fall or immediately after her fall.

3.      Despite plaintiff's allegations, Wal-Mart is entitled to summary judgment for several reasons.

4.      First, plaintiff cannot meet her burden of proof with regard to her negligence claim. *See Ex parte Harold L. Distrib. Co., Inc.*, 769 So. 2d 313, 314 (Ala. 2000)("In [a] premises-liability case, the elements of negligence are the same as those in any tort litigation: duty, breach of duty, cause in fact, proximate or legal cause, and damages.").

5.      "To establish liability in a slip-and-fall case, a plaintiff must first prove that the defendant business had notice of the substance that caused the accident." *Knox v. U.S.*, 978 F.Supp. 2d 1203, 1209 (M.D. Ala. 2013)(citing *Maddox v. K-Mart Corp.*, 565 So. 2d 14, 16 (Ala. 1990)). To establish notice, a plaintiff must prove that

(1) the business had actual notice that the substance on which the plaintiff slipped was on the floor; (2) the substance had been on the floor a sufficient length of time to impute constructive notice; or (3) the business was delinquent in failing to discover and remove the substance. *Id.*

6.    Plaintiff admits she cannot be certain what caused her to fall. While plaintiff claims she noticed drips of a liquid on the floor after she fell, she admits she does not know the identity of the liquid drips she observed. Moreover, plaintiff admits she does not know the source or origin of the liquid drips. Plaintiff also admits she has no idea how long the liquid drips had been on the floor prior to her fall, and she admits she does not think Wal-Mart was aware of the drips prior to her fall.

7.    Even if this Court were to assume there were drips of a liquid substance on the floor of the subject aisle (and consequently assume plaintiff stepped in the liquid substance, it caused both of her feet to slip out from under her despite her standing flatfoot and wearing what she described as "sturdy shoes"), plaintiff still cannot meet her burden of proving Wal-Mart either created the alleged hazardous liquid drips, had notice of the drips or was delinquent in discovering the drips.

8.    In order for plaintiff to establish that a liquid substance was present on the floor of the subject aisle prior to her fall and that this liquid substance caused plaintiff to fall requires speculation and improper inferences. *See Moore v. Dean*, 520 F.Supp. 2d 1359, 1362-63 (N.D. Ala. 2007)("[A]n inference is not reasonable if

it is only a 'guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation.'")(quoting *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983)); *see also Systrends, Inc. v. Group 8760, LLC*, 959 So. 2d 1052, 1074 (Ala. 2006)(holding that "[A]n inference cannot be derived from another inference. An inference must be based on a known or proved fact."); *Garrison v. Sam's East, Inc.*, 787 Fed. Appx. 627, 630 (11th Cir. 2019)(affirming the district court's rejection of plaintiff's negligence claim where, "at the end of the day, she offered only her own speculation about the cause of the fall, and speculation is insufficient to overcome a summary judgment motion.")(citation omitted);

9.    Plaintiff cannot meet the requisite burden of proof to maintain her negligence because there is no evidence suggesting Wal-Mart had either actual or constructive notice of any alleged liquid or slippery substance on the subject aisle prior to plaintiff's alleged fall. Furthermore, the evidence shows that Wal-Mart implemented policies and procedures which confirm it was not delinquent in failing to discover any alleged liquid or slippery substance on the subject aisle prior to plaintiff's fall. Accordingly, Wal-Mart is entitled to summary judgment as a matter of law.

10.    Without notice of the liquid drips, Wal-Mart had no duty to warn plaintiff of the drips and therefore could not have breached any duty owed to plaintiff

with regard to the drips on which plaintiff's claims she slipped. Moreover, there is no evidence suggesting any act or failure to act on the part of Wal-Mart proximately caused plaintiff's alleged injuries. *Dolgencorp, Inc. v. Hall*, 890 So. 2d 98, 100 (Ala. 2003)(holding that the plaintiff in a premises liability case "must prove that the injury was proximately caused by the negligence of [the store owner] or one of its servants or employees")(quoting *Denmark v. Mercantile Stores Co.*, 844 So. 2d 1189, 1192 (Ala. 2002)).

11.     As discussed in more detail in Wal-Mart's brief in support of the instant Motion for Summary Judgment, plaintiff initially testified that the drips she observed on the white tile floor were "black" in color. However, plaintiff later admitted that photographs showing clear liquid drips accurately depicted the flooring as she observed it after her fall.

12.     Even if there was sufficient evidence of negligence on the part of Wal-Mart – which there is not – to the extent plaintiff claims the liquid drips she observed were *black* in color, plaintiff is precluded from recovery because any alleged *black* liquid substance on the *white* tile flooring constitutes an "open and obvious" condition such that Wal-Mart had no duty to warn plaintiff of the allegedly hazardous condition. *Sessions v. Nonnenmann,* 842 So. 2d 649, 652 (Ala. 2002)("The duty to keep an area safe for invitees is limited to hidden defects which are not known to the invitee and would not be discovered in the exercise of ordinary

5

care. . . A plaintiff may not recover if the injury he receives is caused by an obvious or known defect in the premises."); *see also Paige v. Wal-Mart Stores, Inc.*, 638 So. 2d 4 (Ala. Civ. App. 1994)(holding that Wal-Mart had no duty to warn an invitee plaintiff of an orange cord over which the invitee had claimed to have tripped because the presence of an orange cord on an off-white colored floor established the existence of a condition which was open and obvious). Plaintiff admits she had a clear view of the aisle, no other customers were on the aisle and that nothing blocked her view of the flooring before she walked down the subject aisle. In the exercise of reasonable care, plaintiff should have observed any black drips as they would have been in sharp contrast with the white tile flooring.

13.     Lastly, there exists no evidence of wantonness. *Shanklin v. New Pilgrim Towers, L.P.*, 58 So. 3d 1251, 1256 (Ala. Civ. App. 2010)("To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains.")(quoting *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994)). In this case, plaintiff cannot satisfy her burden because there is no evidence that Wal-Mart was aware of any alleged liquid drips on the subject aisle prior to plaintiff's fall. "Almost by definition Wal-Mart cannot have 'consciously,' "recklessly," or "intentionally" disregarded a safety hazard of which it was unaware

and had no notice." *Williams v. Wal-Mart Stores, Inc.*, 584 F.Supp.2d 1316, 1321 (M.D. Ala. 2008).

14.    Pursuant to *Fed. R. Civ. P.* 56, summary judgment is appropriate where there are no genuine issues as to any material fact and moving parties are entitled to a judgment as a matter of law. Mere allegations in a pleading are not enough to create a genuine issue of material fact against a showing of evidence contrary to the allegations. *Fed. R. Civ. P.* 56(e). Since the plaintiff cannot present substantial evidence to establish the required elements of her claims, these claims are due to be dismissed.

15.    For the reasons set forth above, and more fully in Wal-Mart's Brief in Support of Its Motion for Summary Judgment – along with all evidentiary submissions which will be filed contemporaneously with Wal-Mart's Motion for Summary Judgment – Wal-Mart is entitled to summary judgment as a matter of law as to each of plaintiff's claims.

WHEREFORE, PREMISES CONSIDERED, Defendant Wal-Mart Stores East, LP respectfully requests that this Honorable Court enter an Order granting Summary Judgment in its favor as there are no genuine issues of material fact. Further, there being no justifiable reason for delay, Defendant moves that said judgment be made final pursuant to Rule 54(b), *Fed. R. Civ. P.*

Respectfully submitted,

_____
        s/ *Gwen A. Gordon*
Christopher J. Zulanas (ASB-1572-U82C)
Gwendolyn A. Gordon (ASB-2775-O74A)
*Counsel for the Defendant, Wal-Mart Stores East, L.P. (incorrectly named as Walmart Inc. in complaint)*

<u>OF COUNSEL</u>:
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
czulanas@friedman-lawyers.com
ggordon@friedman-lawyers.com
P 205.278.7000 | F 205.278.7001

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have caused a copy of the foregoing document to be electronically filed and issued to counsel via electronic mail and/or CM/ECF notification on this date: August 11, 2023.

Ellise M. Washington
EMW LAW
2100 1st Avenue North
Birmingham, AL 35203
ellise@emwlawllc.com

_____
        s/ *Gwen A. Gordon*
OF COUNSEL

# DOCUMENT
# 16-2



FILED
2023 Aug-11  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit "B"

Alexandria Bennett                                      6/14/2023

Page 1

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER
2:22-CV-01306-AMM

ALEXANDRIA BENNETT,
        Plaintiff,
vs.
WALMART, INC.,
        Defendant.

DEPOSITION TESTIMONY OF:
ALEXANDRIA BENNETT

June 14, 2023
1:30 p.m.

COURT REPORTER:
DIANA B. WILLIAMS, CCR

Page 2

1        STIPULATION
2        IT IS STIPULATED AND AGREED by and
3   between the parties through their respective
4   counsel that the deposition of ALEXANDRIA
5   BENNETT, may be taken before Diana
6   B. Williams, Certified Shorthand Reporter
7   and Notary Public, State of Alabama at
8   Large, at the law offices of Friedman,
9   Dazzio & Zulanas, P.C., 3800 Corporate Woods
10  Drive, Vestavia Hills, Alabama, on
11  June 14, 2023, commencing at approximately
12  1:30 p.m.
13       IT IS FURTHER STIPULATED AND AGREED
14  that the signature to and the reading of the
15  deposition by the witness is waived, the
16  deposition to have the same force and effect
17  as if full compliance had been had with all
18  laws and rules of Court relating to the
19  taking of depositions.
20       IT IS FURTHER STIPULATED AND AGREED
21  that it shall not be necessary for any
22  objections to be made by counsel to any
23  questions, except as to form or leading

Page 3

1   questions, and that counsel for the parties
2   may make objections and assign grounds at
3   the time of trial or at the time said
4   deposition is offered in evidence, or prior
5   thereto.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

Page 4

1        INDEX
2
3   EXAMINATION BY:            PAGE NO.
4   MS. GORDON                7
5   MS. WASHINGTON            166
6   MS. GORDON                173
7   MS. WASHINGTON            174
8   CERTIFICATE               187
9
10       EXHIBITS
11
12  PLAINTIFF'S EXHIBITS:      PAGE NO.
13  1   Video              170
14
15  DEFENDANT'S EXHIBITS:      PAGE NO.
16  1   Pay statement          52
17  2   Photograph (color)     80
18  3   Photograph (color)     80
19  4   Photograph (color)     104
20  5   Customer Incident Report   114
21  6   Photographs (6 color)  123
22  7   Photograph (color)     127
23  8   Initial Disclosures    160

1 (Pages 1 to 4)

Alexandria Bennett                                    6/14/2023

Page 5

1            A P P E A R A N C E S
2
3    FOR THE PLAINTIFF:
4        Ellise M. Washington, Esq.
5        EMW LAW
6        2100 First Avenue North
7        Birmingham, Alabama 35203
8
9    FOR THE DEFENDANT:
10       Gwendolyn A. Gordon, Esq.
11       FRIEDMAN, DAZZIO & ZULANAS, P.C.
12       3800 Corporate Woods Drive
13       Vestavia Hills, Alabama 35242
14
15   ALSO PRESENT:
16       Charles Nash, Intern
17       Kelsie Green, Intern
18
19
20
21
22
23

Page 6

1        I, Diana B. Williams, a Certified
2    Shorthand Reporter of Birmingham, Alabama,
3    and a Notary Public for the State of Alabama
4    at Large, acting as Commissioner, certify
5    that on this date, pursuant to the Federal
6    Rules of Civil Procedure, and the foregoing
7    stipulation of counsel, there came before me
8    at the law offices of Friedman, Dazzio &
9    Zulanas, P.C., 3800 Corporate Woods Drive,
10   Vestavia Hills, Alabama, commencing at
11   approximately 1:30 p.m., on June 14, 2023,
12   ALEXANDRIA BENNETT, witness in the above
13   cause, for oral examination, whereupon the
14   following proceedings were had:
15
16       ALEXANDRIA BENNETT,
17   having been first duly sworn, was examined
18   and testified as follows:
19
20       COURT REPORTER:  Usual
21   stipulations?
22       MS. GORDON:  Yes.
23       MS. WASHINGTON:  Yes.

Page 7

1    EXAMINATION BY MS. GORDON:
2        Q.   Ms. Bennett, my name is Gwen
3    Gordon, and I represent Wal-Mart Stores
4    East, LP, in the lawsuit that you filed
5    against them.  And I'm here today to ask you
6    some questions about -- some about your
7    background and then about the claims you are
8    asserting and about any injuries you are
9    claiming as a result of the incident at
10   Wal-Mart.
11       Throughout our deposition, our
12   court reporter, Diana, is going to be taking
13   down everything you and I say.  And so it's
14   important to answer my questions out loud
15   rather than shake your head or nod your
16   head.  But if you forget, I will remind you.
17       And if you will, try to avoid
18   responses like uh-uh or uh-huh.  They appear
19   the same on the typed record, so it makes it
20   confusing.  But, once again, everybody seems
21   to do it, and so I will just correct you.
22   And I'm not picking on you.  It's just so we
23   can have a clear written record.

Page 8

1        If you need to take a break for
2    any reason, just let me know and we can do
3    that.  I want you to understand all of my
4    questions, so if I ask you something that
5    you don't understand, please let me know,
6    and I will rephrase it or try to explain it
7    to you so that you will understand it.  And
8    if you answer it, I will assume that you
9    understood it; is that fair?
10       A.   Yes, ma'am.
11       Q.   Okay.  And let me think if there
12   is anything else.  That's probably it.
13   It's, like, little ground rules.
14       Have you ever given a deposition
15   before?
16       A.   No, ma'am.
17       Q.   Okay.  Will you state your full
18   name for the record, please?
19       A.   Alexandria Lashun Bennett.
20       Q.   What name do you go by?
21       A.   Alexandria.
22       Q.   Have you ever gone by any other
23   names besides Alexandria?

                              2  (Pages 5 to 8)



Page 9

1    A.   Just Alex, for short.
2    Q.   And have you ever had any other
3  last names?
4    A.   No, ma'am.
5    Q.   Have you ever been married?
6    A.   No, ma'am.
7    Q.   Are you on any medication today
8  that would affect your ability to testify or
9  to recall past events?
10   A.   No, ma'am.
11   Q.   Are you suffering from any
12  medical conditions that would affect your
13  ability to testify or recall past events?
14   A.   No, ma'am.
15   Q.   Have you ever been involved in a
16  lawsuit, whether or not you gave a
17  deposition?
18   A.   No, ma'am.
19   Q.   And what is your current address?
20   A.   My current address is ███████
21  ████Homewood, Alabama 35209.
22   Q.   How long have you lived there?
23   A.   About a year.

Page 10

1    Q.   And does anyone live there with
2  you?
3    A.   My daughter.
4    Q.   What is her name?
5    A.   Her name is ██████.
6    Q.   ██████?
7    A.   ████████.
8    Q.   ███████.  Thank you.  What is the
9  last name, though?  Was it Allen?
10   A.   Yes, ma'am.
11   Q.   Okay.  How do you spell the Allen
12  part?
13   A.   A-l-l-e-n.
14   Q.   Thank you.  How old is she?
15   A.   She's nine.
16   Q.   I have a nine-year-old.  It's a
17  fun age.
18        And who is her dad?
19   A.   Her dad is Kevin ████.
20   Q.   Are you still in a relationship
21  with Kevin ████?
22   A.   No, ma'am.
23   Q.   Okay.  When did that end?

Page 11

1    A.   A few years ago.
2    Q.   Three years ago or a few?
3    A.   A few years ago.
4    Q.   Do you have any other children?
5    A.   No, ma'am.
6    Q.   Has anyone else lived at the
7  ███████ address with you and your
8  daughter?
9    A.   No, ma'am.
10   Q.   And where did you live before
11  ███████?
12   A.   I stayed in Ensley, Alabama.
13   Q.   Okay.  Do you remember your
14  address or where you lived there?
15   A.   It was ███████, Ensley.
16   Q.   Okay.  Was that an apartment or a
17  house?
18   A.   It was an apartment.
19   Q.   And who lived with you there, if
20  anyone?
21   A.   Me and my daughter.
22   Q.   How long were you at that
23  address?

Page 12

1    A.   About three -- three years.
2    Q.   I'm backing up, but the ███████
3  ████████, is that a house or an
4  apartment?
5    A.   It's an apartment.
6    Q.   All right.  And where did you
7  live before Ensley?
8    A.   I stayed in Homewood, Alabama.
9    Q.   Where were you in Homewood back
10  then?
11   A.   The ████████.
12   Q.   And how long were you there?
13   A.   I will say probably two years.
14  About two years.
15   Q.   Was it you and your daughter
16  there?
17   A.   Yes, ma'am.
18   Q.   Do you own any property?
19   A.   No, ma'am.
20   Q.   All right.  So what I have is the
21  date of the incident we are here about is
22  October 15, 2020.  Is that your recollection
23  as to when it happened?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023

---

Page 13

1   A.   Yes, ma'am.
2   Q.   Okay.  Where were you living
3  then?  Was that the Ensley address?
4   A.   No, ma'am.
5   Q.   Which one were you at back when
6  this happened?
7   A.   Homewood.
8   Q.   Okay.  ██████?
9   A.   Yes, ma'am.
10   Q.   Have you ever lived with Kevin
11  ████, or has he ever lived in one of your
12  apartments?
13   A.   He moved.  He was staying at
14  the -- when we were together, we were in
15  ████████████, but that's when we
16  split up as well.
17   Q.   Okay.  Was he living with y'all
18  back on October 15, 2020?
19   A.   We were -- we weren't together at
20  that time.
21   Q.   Okay.  So he had already moved
22  out?
23   A.   Yes, ma'am.

---

Page 14

1   Q.   Where does he live now, if you
2  know?
3   A.   Bessemer, Alabama.
4   Q.   Do you know his current phone
5  number?
6   A.   Not by heart.  I can --
7   Q.   You might have given it to me.
8  Let me see if this sounds familiar.  I have
9  it on something.
10   Does ████████ sound right?
11   A.   That's his old number.
12   Q.   Okay.  So he has a different one?
13   A.   Yes, ma'am.
14   Q.   Do you have it with you in your
15  phone?
16   A.   Yes, ma'am.
17   Q.   When we take a break, I will get
18  you to look it up for me, if you don't mind.
19   A.   Yes, ma'am.
20   Q.   Thank you.  Are you still in
21  regular contact with him?
22   A.   Yes, ma'am.
23   Q.   All right.  I'm going to ask

---

Page 15

1  you -- we will go off the record, but I'm
2  going to ask you what your social security
3  number is off the record.
4   MS. GORDON:  If we can go off.
5   (Whereupon, an off-the-record
6   discussion was held.)
7   MS. GORDON:  Back on the record.
8   Q.   (By Ms. Gordon)  What is your
9  birth date?
10   A.   ████████, 1993.
11   Q.   And your driver's license number?
12   A.   ████████
13   Q.   Is that an Alabama license?
14   A.   Yes, ma'am.
15   Q.   Have you ever held a license in
16  any other states?
17   A.   No, ma'am.
18   Q.   Do you have any restrictions on
19  your license, like, for contacts or --
20   A.   No, ma'am.
21   Q.   Okay.  Do you wear glasses or
22  contacts?
23   A.   I wear glasses.

---

Page 16

1   Q.   Are they reading glasses or
2  driving glasses?  Or when do you use them?
3   A.   I don't have to use them.
4   Q.   Okay.
5   A.   Yes, I don't have a prescription
6  for them or anything.
7   Q.   I see.  Have you ever been
8  prescribed eyeglasses or contacts?
9   A.   Yes, ma'am.
10   Q.   When was that?
11   A.   I will say I picked up a
12  prescription last year.
13   Q.   Okay.  Who was your eye doctor
14  then?
15   A.   They are located at Wal-Mart.
16   Q.   The one in Helena?
17   A.   No, ma'am.  The one in Pelham.
18   Q.   Okay.
19   A.   I would go over to them.
20   Q.   Do you remember if you were
21  diagnosed as nearsighted or farsighted?
22  Like, did you have trouble seeing things far
23  away or close-up?

4  (Pages 13 to 16)

Alexandria Bennett                                          6/14/2023

| Page 17 |
| --- |

1    A.  No, ma'am.
2    Q.  You don't remember which one?
3    A.  No, ma'am.
4    Q.  Okay.  That's fine.  Were you
5   wearing glasses or contacts on October 15,
6   2020, at Wal-Mart?
7    A.  I always wear my contacts.
8    Q.  So did you have them in that day?
9    A.  Yes, ma'am.
10    Q.  Okay.  Is the eye doctor at the
11   Wal-Mart in Pelham still your eye doctor?
12    A.  Yes, ma'am.  I haven't been to
13   them this year, though.
14    Q.  Okay.  Do you have any relatives
15   age 19 or older living in either Blount
16   County, Jefferson County, or Shelby County?
17    A.  Yes, ma'am.
18    Q.  Tell me who they are, please.
19    A.  My mom stays in Shelby County.
20    Q.  And what is her name?
21    A.  ████████.
22    Q.  Is she married?
23    A.  Yes, ma'am.

| Page 18 |
| --- |

1    Q.  What is her husband's name?
2    A.  ████████.
3    Q.  Do either of them work in Shelby
4   County?
5    A.  No, ma'am.
6    Q.  Any other relatives in either
7   Blount, Jefferson, or Shelby County?
8    A.  No, ma'am.
9    Q.  All right.  Where did you go to
10   high school?
11    A.  I went to Spain Park High School.
12    Q.  And what year did you graduate?
13    A.  2011.
14    Q.  All right.  Have you had any
15   other education since then?
16    A.  No, ma'am.
17    Q.  Is that a Hoover school?  Is
18   Spain Park Hoover?
19    A.  It's off Valleydale Road.
20    Q.  Okay.  Is that about where you
21   grew up, in that area?
22    A.  Yes, ma'am.
23    Q.  And have you lived in the

| Page 19 |
| --- |

1   Birmingham or nearby areas your whole life?
2    A.  No, ma'am.
3    Q.  Where else have you lived?
4    A.  We stayed in Hoover, Alabama.
5    Q.  Okay.
6    A.  My mom.
7    Q.  All right.  But have you been in
8   Alabama your whole life?
9    A.  Yes, ma'am.
10    Q.  Okay.  And are you currently
11   employed?
12    A.  Yes, ma'am.
13    Q.  Where do you work?
14    A.  I work at UAB.
15    Q.  What do you do there?
16    A.  I am a new patient scheduler.
17    Q.  Do you work with a particular
18   office there?
19    A.  Radiation oncology.
20    Q.  How long have you had that job?
21    A.  I just started this particular
22   job in May.
23    Q.  Of 2023?

| Page 20 |
| --- |

1    A.  Yes, ma'am.
2    Q.  Is that a desk job?
3    A.  Yes, ma'am.
4    Q.  And how many days a week do you
5   work?
6    A.  Monday through Friday.
7    Q.  What are your hours?
8    A.  Earliest I go in is 7 a.m.  The
9   latest I will stay is 6 p.m.
10    Q.  All right.  And what are you paid
11   there?
12    A.  $18 an hour.
13    Q.  And who is your supervisor?
14    A.  Ms. ████████.
15    Q.  Have you had any trouble
16   performing your job duties there as a result
17   of any injuries you relate to the incident
18   at Wal-Mart?
19    A.  No, ma'am.
20    Q.  Where did you work before UAB?
21    A.  I was working at UAB psychiatry.
22    Q.  And what was your job title
23   there?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                           6/14/2023

Page 21

1    A.   Patient service coordinator.
2    Q.   Did you work there right up until
3    you moved to the radiation department?
4    A.   I worked there up until, I think,
5    March of this year.
6    Q.   Okay.
7    A.   I was let go.
8    Q.   Did they give you a reason for
9    letting you go?
10   A.   I'm through a temp service.
11   Q.   Oh, I see.  Which temp service do
12   you work for?
13   A.   UAB Temp Services.
14   Q.   Is your current job also through
15   the temp service?
16   A.   Yes, ma'am.
17   Q.   So who do your paychecks come
18   from?
19   A.   UAB Temp Services.
20   Q.   And are you always guaranteed
21   employment through them?  I'm just not sure
22   how it works.
23   A.   The temp jobs is, like, you have

Page 22

1    got to do what you have got to do, you know,
2    or you can be let go.
3        So with UAB psychiatry, I was
4    about to be there -- well, I was there for a
5    year.  I was supposed to be hired on, and I
6    was let go.
7    Q.   Okay.  Sometimes you are hired on
8    for a permanent job through a temp job; is
9    that right?
10   A.   Yes, ma'am.
11   Q.   Okay.  And so now you have
12   started a new temp job and maybe in hopes of
13   it becoming a permanent job?
14   A.   Yes, ma'am.
15   Q.   Okay.  When did you start the UAB
16   psychiatry temp job?
17   A.   I believe about a year ago,
18   because March would have been -- March or
19   April would have been right around a year
20   for me.
21   Q.   Okay.  Did you being let go from
22   the UAB psychiatry temp job have anything to
23   do with any of the claims you are making in

Page 23

1    this lawsuit?
2    A.   No, ma'am.
3    Q.   Where did you work before UAB
4    psychiatry?
5    A.   I worked for Milo's Tea Company.
6    Q.   Milo's?
7    A.   Yes, ma'am.
8    Q.   Okay.  What did you do for them?
9    A.   Data entry clerk.
10   Q.   Is that at their corporate
11   office?
12   A.   Yes, ma'am.
13   Q.   Where is it?
14   A.   It's off of Morgan Road, but you
15   can also get there off of Lakeshore.
16   Q.   Okay.  All right.  When did that
17   job end?
18   A.   It was contracted.  I want to say
19   it ended before I worked for UAB.
20   Q.   Was it right before, or was there
21   a period where you were there without work?
22   A.   It was a period for me.
23   Q.   Do you remember if it was, like,

Page 24

1    one month?  Five months?  Any idea?
2    A.   I believe it was more than five
3    months.
4    Q.   Okay.  And did you leave the
5    Milo's job, or were you let go?  How did it
6    end?
7    A.   It was a contracted job.
8    Q.   Oh, it was a contracted start and
9    end date?
10   A.   Yes, ma'am.
11   Q.   Once you finished the work, it
12   was over?
13   A.   Yes, ma'am.  It was, really,
14   through -- you know, for the pandemic, we
15   would swab people's mouths and stuff like
16   that when they would come in and take their
17   temps.
18   Q.   Okay.
19   A.   So they didn't need us anymore.
20   Q.   About how long did that job last?
21   A.   I would say a few months.  At
22   least six -- six to seven months or so.
23   Q.   And was that in 2020, or was it

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                              6/14/2023

<table>
<tr><td colspan="2">Page 25</td></tr>
<tr><td>1</td><td>later after the pandemic started?</td></tr>
<tr><td>2</td><td>A. I think I was working for them,</td></tr>
<tr><td>3</td><td>like, around August of 2021.</td></tr>
<tr><td>4</td><td>Q. All right. And where were you</td></tr>
<tr><td>5</td><td>working before Milo's?</td></tr>
<tr><td>6</td><td>A. I had different temp service jobs</td></tr>
<tr><td>7</td><td>that I was let go from.</td></tr>
<tr><td>8</td><td>Q. Were you working through an</td></tr>
<tr><td>9</td><td>agency for those?</td></tr>
<tr><td>10</td><td>A. Yes, ma'am.</td></tr>
<tr><td>11</td><td>Q. Okay. What was the name of that</td></tr>
<tr><td>12</td><td>agency?</td></tr>
<tr><td>13</td><td>A. Going through different agencies</td></tr>
<tr><td>14</td><td>such as PrideStaff, Dedicated Personnel.</td></tr>
<tr><td>15</td><td>Off of my head, that's all I can think of.</td></tr>
<tr><td>16</td><td>Q. Okay. What type of jobs did</td></tr>
<tr><td>17</td><td>you -- temp jobs did you have through those</td></tr>
<tr><td>18</td><td>agencies?</td></tr>
<tr><td>19</td><td>A. I tried to do warehouse jobs, but</td></tr>
<tr><td>20</td><td>they don't work out.</td></tr>
<tr><td>21</td><td>Q. Why don't they work out?</td></tr>
<tr><td>22</td><td>A. I couldn't -- I couldn't perform</td></tr>
<tr><td>23</td><td>the work that they needed me to perform in</td></tr>
</table>

<table>
<tr><td colspan="2">Page 26</td></tr>
<tr><td>1</td><td>the warehouses.</td></tr>
<tr><td>2</td><td>Q. And why was that?</td></tr>
<tr><td>3</td><td>A. Because my ankle was messed up.</td></tr>
<tr><td>4</td><td>I couldn't walk. You know, the warehouses</td></tr>
<tr><td>5</td><td>are real big. So I couldn't perform those,</td></tr>
<tr><td>6</td><td>and I was let go.</td></tr>
<tr><td>7</td><td>Q. Which warehouse was that where</td></tr>
<tr><td>8</td><td>you had trouble performing your job duties?</td></tr>
<tr><td>9</td><td>A. I don't know the particular name</td></tr>
<tr><td>10</td><td>of them off the head, but I know some was</td></tr>
<tr><td>11</td><td>located in Pelham. It was -- I worked in,</td></tr>
<tr><td>12</td><td>like, the freezer section of that job. And</td></tr>
<tr><td>13</td><td>for, like, Mercedes, through Automation and</td></tr>
<tr><td>14</td><td>stuff.</td></tr>
<tr><td>15</td><td>Q. And those were jobs you had --</td></tr>
<tr><td>16</td><td>the warehouse jobs were jobs you got through</td></tr>
<tr><td>17</td><td>the temp agencies?</td></tr>
<tr><td>18</td><td>A. Yes, ma'am.</td></tr>
<tr><td>19</td><td>Q. And those would have been the</td></tr>
<tr><td>20</td><td>PrideStaff or the Dedicated Personnel</td></tr>
<tr><td>21</td><td>agencies?</td></tr>
<tr><td>22</td><td>A. Yes, ma'am.</td></tr>
<tr><td>23</td><td>Q. Did your paycheck come from</td></tr>
</table>

<table>
<tr><td colspan="2">Page 27</td></tr>
<tr><td>1</td><td>PrideStaff or Dedicated Personnel, or did it</td></tr>
<tr><td>2</td><td>come from the company for which you were</td></tr>
<tr><td>3</td><td>working?</td></tr>
<tr><td>4</td><td>A. It came from PrideStaff and</td></tr>
<tr><td>5</td><td>Dedicated Personnel.</td></tr>
<tr><td>6</td><td>Q. Okay. How long was that period</td></tr>
<tr><td>7</td><td>where you were trying to work for warehouses</td></tr>
<tr><td>8</td><td>through the temp agencies?</td></tr>
<tr><td>9</td><td>A. After I lost my job with Outback</td></tr>
<tr><td>10</td><td>and Pappadeaux.</td></tr>
<tr><td>11</td><td>Q. Was there a period of time where</td></tr>
<tr><td>12</td><td>you were unemployed after Outback and did</td></tr>
<tr><td>13</td><td>you say Pappadeaux?</td></tr>
<tr><td>14</td><td>A. Yes, ma'am.</td></tr>
<tr><td>15</td><td>Q. Okay. Was there a period of time</td></tr>
<tr><td>16</td><td>where you were unemployed after those jobs</td></tr>
<tr><td>17</td><td>ended?</td></tr>
<tr><td>18</td><td>A. Yes, ma'am.</td></tr>
<tr><td>19</td><td>Q. About how long?</td></tr>
<tr><td>20</td><td>A. Up until I was able to get the --</td></tr>
<tr><td>21</td><td>get the job with Milo's. So during that</td></tr>
<tr><td>22</td><td>gap, since -- you remember -- the accident</td></tr>
<tr><td>23</td><td>was in 2020. I didn't get a stable job</td></tr>
</table>

<table>
<tr><td colspan="2">Page 28</td></tr>
<tr><td>1</td><td>until 2021 of August when I worked for</td></tr>
<tr><td>2</td><td>Milo's Tea Company.</td></tr>
<tr><td>3</td><td>Q. Okay. When you were working</td></tr>
<tr><td>4</td><td>through the temp agencies at the warehouses</td></tr>
<tr><td>5</td><td>and realized that there were some things you</td></tr>
<tr><td>6</td><td>couldn't perform, did you talk to anybody</td></tr>
<tr><td>7</td><td>about maybe changing your job duties?</td></tr>
<tr><td>8</td><td>A. It doesn't work like that. When</td></tr>
<tr><td>9</td><td>you take the temp service job, they tell you</td></tr>
<tr><td>10</td><td>what you will be doing. So you have got to</td></tr>
<tr><td>11</td><td>do what they ask you to do when you get</td></tr>
<tr><td>12</td><td>there.</td></tr>
<tr><td>13</td><td>Q. And what was the reason your</td></tr>
<tr><td>14</td><td>warehouse jobs ended through the temp</td></tr>
<tr><td>15</td><td>service?</td></tr>
<tr><td>16</td><td>A. They don't tell you.</td></tr>
<tr><td>17</td><td>Q. Okay. So before the warehouse</td></tr>
<tr><td>18</td><td>jobs through the temp services, you were</td></tr>
<tr><td>19</td><td>working for both Outback and Pappadeaux?</td></tr>
<tr><td>20</td><td>A. Yes, ma'am.</td></tr>
<tr><td>21</td><td>Q. At the same time?</td></tr>
<tr><td>22</td><td>A. Yes, ma'am.</td></tr>
<tr><td>23</td><td>Q. Okay. When did you start --</td></tr>
</table>

7 (Pages 25 to 28)

Page 29

1    let's start with Outback first.  When did
2    you start there?
3        A.   I worked there for at least three
4    years, I know.
5        Q.   And which location?
6        A.   Hoover and the 280 location.
7        Q.   Did you just kind of go wherever
8    they needed you?
9        A.   No, ma'am.  I was at the Hoover
10   location first, and I managed the 280
11   location.
12       Q.   I see.  Okay.  So about three
13   years before the Outback job ended you
14   started at Hoover; is that right?
15       A.   Yes, ma'am.
16       Q.   And what was your job title when
17   you first started with Outback in Hoover?
18       A.   Prep cook.
19       Q.   And at that time, what were you
20   earning?
21       A.   I was making, like, $16 at
22   Outback, about $16.
23       Q.   Were you also given tips as a

Page 30

1    prep cook?
2        A.   No, ma'am.
3        Q.   Okay.  Who was your supervisor
4    when you were in that job position at
5    Hoover?
6        A.   Mario.
7        Q.   Do you remember his last name?
8        A.   No, ma'am.
9        Q.   That's okay.
10       A.   We called him Mario.
11       Q.   I understand.  Okay.  So at some
12   point -- when you were at the Hoover
13   Outback, did your job title ever change, or
14   were you always a prep cook at the Hoover
15   Outback?
16       A.   Yes, ma'am, it changed once I got
17   to the 280 one, because I managed that
18   store.
19       Q.   Okay.  How long were you at the
20   Hoover store?
21       A.   About a year, I would say.
22       Q.   And then you were -- I assume it
23   was a promotion as a manager at the 280

Page 31

1    store?
2        A.   I transferred with Mario to that
3    store, because he wanted me to come to that
4    store with him.
5        Q.   Okay.  When you moved to the 280
6    store, did your pay change at all?
7        A.   I got more hours and more
8    money.  I didn't start off with 16.  So I
9    probably -- I worked my way up to that.
10       Q.   Okay.  So when you were the
11   manager at the 280 store, you were getting
12   16 and probably a little less at the Hoover
13   store?
14       A.   Yes.  I was getting way less at
15   the Hoover store.
16       Q.   Okay.  All right.  I know I'm
17   jumping around.  I apologize.  But that's
18   the way my brain works sometimes.
19       A.   You're fine.  That's fine.
20       Q.   At the Hoover Outback store, how
21   often were you working there, how many days
22   a week and what were your hours?
23       A.   I worked every day.  I would work

Page 32

1    morning to night, open to close.
2        Q.   All right.  At the 280 Outback
3    store, you got a pay increase, and I think
4    you said your hours changed; is that right?
5        A.   I got more hours, yes.  I still
6    worked open to close with Outback.
7        Q.   Was it Monday through Friday or
8    weekends too?
9        A.   Weekends too.
10       Q.   Okay.  So seven days a week, open
11   to close?
12       A.   Yes, just about.
13       Q.   And was Mario still your
14   supervisor at the 280 store?
15       A.   Yes, ma'am.
16       Q.   As part of your job at the 280
17   Outback store, did you receive any paid
18   vacation or paid sick days?
19       A.   I had paid sick days, but I don't
20   think I took them or anything.  I think I
21   just -- you know how you put it in to get an
22   extra check or something like that.
23       Q.   Any idea how many paid sick days

Alexandria Bennett                                    6/14/2023

---

Page 33

1    you were given there?
2        A.   Uh-uh (negative).
3        Q.   Is that a yes or no?
4        A.   Oh, no, ma'am.
5        Q.   Thank you.
6        A.   I can't recall.
7        Q.   From the time you started at the
8    280 store until that job ended, did your job
9    title change at any point, or were you the
10   manager that entire time period?
11       A.   At the 280 store?
12       Q.   Yes.  Have you ever held any
13   other job titles at the 280 store besides
14   store manager or restaurant manager?
15       A.   No, ma'am.
16       Q.   Okay.  And did your pay stay the
17   same the entire time you were at the 280
18   Outback store?
19       A.   I got a raise at one point.
20   That's why I got up to 16.
21       Q.   What were you making back on
22   October 15, 2020, at Outback?
23       A.   I was making about 16.

---

Page 34

1        Q.   Did you receive any health
2    insurance through your job at Outback?
3        A.   I didn't have any health
4    insurance.
5        Q.   On October 15, 2020, you did not
6    have health insurance; is that right?
7        A.   Yes, ma'am.
8        Q.   All right.  When did your job at
9    the 280 or with Outback, either store, when
10   did that end?
11       A.   Right before the holidays.
12       Q.   Okay.  You never went back to the
13   Hoover store, did you?
14       A.   No, ma'am.
15       Q.   So the holidays of 2020?
16       A.   Yes, ma'am.
17       Q.   So it would have been the end of
18   the year of 2020?
19       A.   Yes, ma'am.
20       Q.   And why did your job end with
21   Outback back then?
22       A.   I wasn't able to perform like I
23   used to.

---

Page 35

1        Q.   Okay.  Specifically what job
2    duties were you unable to perform?
3        A.   I wasn't able to manage the
4    kitchen like I used to.  I wasn't able to
5    stand up for long periods of time anymore.
6    It was just hard to work so...
7        Q.   And what prevented you from
8    managing the kitchen like you had done
9    before?
10       A.   My ankle.
11       Q.   Is that also what prevented you
12   from standing up for long periods of time?
13       A.   Yes, ma'am.
14       Q.   When did it start becoming a
15   problem for you to do your job duties at the
16   280 Outback store?
17       A.   After the accident.
18       Q.   Immediately after it?
19       A.   Yes, ma'am.
20       Q.   Was Mario your supervisor the
21   entire time you were at the 280 location?
22       A.   Yes, ma'am.
23       Q.   Did you ever go to Mario and ask

---

Page 36

1    him if he could change some of your job
2    duties?
3        A.   Yes, ma'am.
4        Q.   Tell me how that went.
5        A.   I wasn't able to do the work as a
6    manager of the back of the house.  He would
7    come in and, you know, help out with getting
8    things done and stuff.  But I wasn't able to
9    manage like I used to.  I wasn't the same
10   anymore.
11       Q.   Are there any other job duties
12   that you couldn't perform after the
13   October 15, 2020, incident besides being
14   able to stand for long periods of time or
15   manage the kitchen the way you had?
16       A.   You said is there any more?
17       Q.   Sure.  I'm trying to figure out
18   -- if you can just tell me all of the job
19   duties that you were not able to perform
20   after October 15, 2020.  What were those
21   specific job duties that you were no longer
22   able to perform?
23       A.   So we said stand.  I wasn't able

---

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                    6/14/2023

---

Page 37

1   to move around.  I wasn't able to get my
2   recipes done in time enough like I was
3   supposed to.  I just wasn't able to work the
4   same, period.
5       Q.   And was it your ankle that caused
6   all of those problems?
7       A.   Yes, ma'am.
8       Q.   What about your ankle was it that
9   caused the problems?
10      A.   I was in pain.  I couldn't stand
11  up.  Also, you know, like, being the star of
12  the kitchen, I would, you know, try to still
13  do my job.  And I wasn't -- I knew I wasn't
14  the same anymore.
15      Q.   When you talk about not being
16  able to get recipes done on time, what was
17  that?  What were the recipes that you had to
18  do?
19      A.   Any recipes in the kitchen, as in
20  stuff that needed to be made by the time we
21  opened up or served to the customers.
22      Q.   Were you cooking?
23      A.   Yes, ma'am.

---

Page 38

1       Q.   Okay.  And had you been
2   performing those same job duties at the
3   Outback 280 store before October 15, 2020?
4       A.   Yes, ma'am.
5       Q.   Like the cooking and being on
6   your feet?
7       A.   Yes, ma'am.
8       Q.   Did you ever talk to Mario and
9   ask him if there was another job that you
10  could do that would allow you to sit more?
11      A.   Well, when you are managing or in
12  any position in a restaurant, it's really
13  not a sit-down job.
14      Q.   Did he tell you there weren't any
15  sit-down jobs available?
16      A.   We just decided to part ways.
17      Q.   And that's what I was going to
18  ask you about next.  Did you resign, or were
19  you let go from Outback?
20      A.   I was let go.
21      Q.   Were you given a reason as to why
22  they were letting you go?
23      A.   I wasn't the same anymore, so I

---

Page 39

1   knew I couldn't perform like I was supposed
2   to perform.  So that was the best decision.
3       Q.   Is that what you were told?
4       A.   Yes, ma'am.  I agreed with him.
5       Q.   Was it Mario that let you go?
6       A.   Yes, ma'am.
7       Q.   Following October 15, 2020, did
8   any of your doctors ever give you any work
9   restrictions?
10      A.   What does that mean?
11      Q.   Sure.  It would be -- first of
12  all, did they ever tell you you could not
13  return to work until X date?  Like, did they
14  ever tell you, Do not work until a certain
15  date?
16      A.   Are you talking about when I went
17  to the hospital for the --
18      Q.   Sure.  Just any time after
19  October 15, 2020.
20      A.   Well, I tried to get seen for it,
21  but I wasn't able to be seen because I
22  didn't have insurance.  So I tried to see
23  what was wrong.  I wasn't able to be seen.

---

Page 40

1       Q.   Okay.  Was there a doctor that
2   ever said, I don't want you to work until
3   another three months, or something like
4   that?
5       A.   During 2020?
6       Q.   Yes.  Or 2021.
7       A.   Yes, ma'am.
8       Q.   Okay.  Which doctor was that that
9   gave you a work restriction?
10      A.   Well, I wasn't supposed to work
11  when I had my surgery.
12      Q.   Okay.  For how long?
13      A.   I'm not sure.
14      Q.   At some point were you told that
15  you could return to work after the surgery?
16      A.   I'm not sure.
17      Q.   Were you ever told either not to
18  be on your feet or given any weight lifting
19  restrictions?
20      A.   With the ankle?
21      Q.   Right.  Or any of the injuries
22  that you relate to the incident at Wal-Mart.
23      A.   I couldn't be on my feet because,

---

10  (Pages 37 to 40)

Alexandria Bennett                                          6/14/2023

Page 41

1  when I was on my feet, I was in pain.
2      Q.   And I understand that. I'm just
3  wondering if any doctor ever said, I don't
4  want you on your feet for a period of three
5  weeks, three months, or whatever.
6      A.   Well, see, after the accident, I
7  went to the hospital. I was referred to the
8  orthopedic. But during that time, I didn't
9  have insurance, so it was hard for me to try
10  to be seen. I knew something was wrong.
11  But at the time, I didn't have insurance to
12  be seen and, you know, get the help that I
13  needed.
14      Q.   At some point did you get health
15  insurance?
16      A.   Yes, ma'am.
17      Q.   When did you get health
18  insurance?
19      A.   I finally got insurance the
20  following year in January.
21      Q.   So January of 2021?
22      A.   Yes, ma'am.
23      Q.   And was that provided through a

Page 42

1  job?
2      A.   No, ma'am.
3      Q.   Who was your health insurance
4  with when you got it in January '21?
5      A.   I went through the health market.
6      Q.   Are you the policyholder on the
7  health insurance?
8      A.   Yes, ma'am.
9      Q.   Do you know which insurance
10  company has the insurance?
11      A.   I'm not sure. I'm thinking Blue
12  Cross Blue Shield.
13      Q.   Have you had the same health
14  insurance policy since January of 2021?
15      A.   I don't have insurance.
16      Q.   Okay. How long did you have it
17  after you got it in January of 2021?
18      A.   I would say a few months. My mom
19  helped me pay for it since I was in between
20  jobs, trying to find a job. So she helped
21  me pay for it because she knew I needed to
22  see what was going on with the ankle.
23      MS. WASHINGTON: Can we pause and

Page 43

1  take a break?
2      MS. GORDON: Sure.
3      (Whereupon, a brief recess was
4      taken from 2:08 p.m. until
5      2:11 p.m.)
6      Q.   (By Ms. Gordon) Okay. Just to
7  clarify, since October of 2020, have you had
8  health insurance with any entity besides
9  Blue Cross Blue Shield?
10      A.   No, ma'am.
11      Q.   Okay. And you just had it for a
12  period of a few months; is that right?
13      A.   Yes, ma'am.
14      Q.   All right. Now tell me about
15  your job at Pappadeaux. When did you start
16  there?
17      A.   I will say I worked there for
18  about a year.
19      Q.   Which Outback location were you
20  working at when you also worked at
21  Pappadeaux?
22      A.   The 280.
23      Q.   All right. And what were your

Page 44

1  hours at Pappadeaux?
2      A.   I would work during the
3  nighttime.
4      Q.   About what time would you get
5  there and what time would you leave?
6      A.   I will say I was supposed to be
7  there around five and leave at closing time.
8      Q.   And how many days a week did you
9  do that?
10      A.   I will say probably about -- I
11  know the weekends. About four or five days
12  or three to four days. I'm not sure.
13      Q.   Was that the case the entire year
14  you worked there?
15      A.   Ma'am?
16      Q.   Was that the case the entire time
17  you worked there where you worked about
18  three to five days a week?
19      A.   Yes, ma'am.
20      Q.   And worked the nighttime hours?
21      A.   Yes, ma'am.
22      Q.   And who was your supervisor when
23  you worked at Pappadeaux?

11 (Pages 41 to 44)

Alexandria Bennett                                          6/14/2023

Page 45

1    A.   Mr. Warren.
2    Q.   What was your job title there?
3    A.   I only worked at the pantry
4    section -- station, I mean, I'm sorry.
5    Q.   Was that a stand-up job?
6    A.   Yes, ma'am.
7    Q.   And did you have any other jobs
8    at Pappadeaux?
9    A.   No, ma'am.
10   Q.   What did you earn there?
11   A.   I will say probably about 14 -- I
12   can't recall -- I believe.
13   Q.   Were you working at Pappadeaux on
14   October 15, 2020?
15   A.   I think I had stopped working
16   there by then.
17   Q.   And why did you stop working at
18   Pappadeaux?
19   A.   I went to be full-time with
20   Outback.
21   Q.   When you were working at
22   Pappadeaux, were you part-time with Outback?
23   A.   No.  I was still full-time.

Page 46

1    Q.   Okay.
2    A.   But you know when I said "morning
3    and night," I went back to work morning and
4    night with Outback.  So I gave up my nights
5    at one point and went to Pappadeaux.  And
6    then I stopped working with them, and I was
7    just full-time with Outback.
8    Q.   Okay.  And did your leaving
9    Pappadeaux have anything to do with any of
10   the claims you are making in this lawsuit?
11   A.   No, ma'am.
12   Q.   Because that happened before the
13   incident; is that right?
14   A.   Yes, ma'am.
15   Q.   All right.  After your job at
16   Outback ended, I believe you told me there
17   was a period of time where you were not
18   employed at all; is that correct?
19   A.   Yes, ma'am.
20   Q.   And then you started those temp
21   jobs with the warehouses; is that right?
22   A.   Yes, ma'am.
23   Q.   Okay.  Any other jobs in between

Page 47

1    Outback and when you started with Milo's?
2    A.   No, ma'am, I don't think so.
3    Q.   Were there any jobs that you
4    applied for but did not get in between that
5    time period?
6    A.   Yes, ma'am.
7    Q.   Tell me about those.
8    A.   I did numerous applications.
9    Q.   Were there places where you sent
10   in an application, and then you would get
11   called back for an interview?
12   A.   Yes, ma'am.
13   Q.   Did you make it to the interview
14   point for any of those jobs?
15   A.   Uh-huh (affirmative).
16   Q.   And what were you told at the
17   interviews?
18   A.   I would receive a call back or
19   something like that.
20   Q.   And then you didn't receive a
21   call?
22   A.   Uh-uh (negative).
23   Q.   Okay.  Do you remember where any

Page 48

1    of those jobs were that you applied for but
2    did not get?
3    A.   A lot of hospital jobs.  I tried
4    to get the sit-down jobs and stuff.
5    Q.   Now, are you claiming that you
6    missed time from work as a result of the
7    incident on October 15, 2020?
8    A.   Yes, ma'am.
9    Q.   Okay.  And that would have been
10   time that you missed from your job with
11   Outback on 280?
12   A.   Yes, ma'am.
13   Q.   Are you claiming that you missed
14   time from work with any other jobs as a
15   result of October 15, 2020?
16   A.   Yes, ma'am.
17   Q.   Okay.  Where else?
18   A.   I think I was let go because I
19   wasn't able to perform.  Like, all the temp
20   service jobs, I think I was let go because I
21   wasn't able to perform.
22   Q.   Okay.  What did you earn through
23   those temp jobs, the warehouses?

Alexandria Bennett                                          6/14/2023

Page 49

1      A.   The bare minimum, like, $12 to
2    $13.  Or sometimes 8 they -- they would say.
3           COURT REPORTER:  Did you say
4    "Sometimes 8?"
5      A.   Like, 8.75.
6      Q.   (By Ms. Gordon)  Did you resign
7    from any of the temp jobs that you had in
8    between Outback and Milo's?
9      A.   No, ma'am.
10     Q.   Any of them that ended, it was
11   because you were let go?
12     A.   Yes, ma'am.
13     Q.   And it's your testimony that you
14   were let go from those jobs because you
15   could not perform your job duties?
16     A.   Yes, ma'am.
17     Q.   And would it be PrideStaff and
18   Dedicated Personnel that would have any
19   payroll or attendance records for those temp
20   jobs?
21     A.   Yes, ma'am.
22     Q.   All right.  Tell me about any
23   time that you missed from work at Outback

Page 50

1    280 that you claim was a result of
2    October 15, 2020.
3      A.   Can you explain that question?
4      Q.   Sure.  Are you claiming that
5    there were days that you could not go to
6    work at Outback because of the incident at
7    Wal-Mart?
8      A.   I went to work.  I couldn't
9    perform the duties of the job like I was
10   supposed to, like I did before the accident.
11     Q.   Okay.  And I understand that your
12   testimony is that you were let go from there
13   because you could not perform the jobs; is
14   that right?
15     A.   Yes, ma'am.
16     Q.   Okay.  But before you were let
17   go, were there any days where you are
18   claiming you couldn't go to work because of
19   injuries you relate to the incident at
20   Wal-Mart?
21     A.   No, ma'am.
22     Q.   Or are you claiming that there
23   were days where you couldn't work a full day

Page 51

1    even though you were scheduled to work a
2    full day because of injuries you relate to
3    the incident at Wal-Mart?
4      A.   So are you saying, like, did
5    I decide to stay there even though I
6    couldn't -- I wasn't able to stand up or
7    something?
8      Q.   No.  It would be more, like, are
9    you claiming that there were days you had to
10   call in and say, I can't come because I am
11   in so much pain or --
12     A.   No, ma'am.  Because I had bills,
13   so I had to go to work.
14     Q.   Okay.  And you were not provided
15   health insurance through Outback; correct?
16     A.   No, ma'am.
17     Q.   That was a bad question.
18          Did Outback provide you with
19   health insurance?
20     A.   I didn't have health insurance.
21     Q.   Okay.  Have you ever applied for
22   unemployment benefits?
23     A.   No, because I was working during

Page 52

1    that time, so I couldn't apply.
2          By the time I was let go, I'm not
3    sure if I applied for it.  I don't think I
4    did.  I don't know.
5      Q.   Okay.  And before we move on to
6    another topic, I'm going to mark a pay stub
7    that you gave us as part of your document
8    production as Defendant's Exhibit 1.  And I
9    am going to give you a copy of it.  And I
10   think I have mine.
11          Is this one of your pay stubs
12   from when you worked at Outback?
13     A.   Yes, ma'am.
14          (Whereupon, Defendant's Exhibit
15          No. 1 was marked and is attached
16          to the original transcript.)
17     Q.   (By Ms. Gordon)  Okay.  And what
18   is the -- this was for the pay period of
19   June 3, 2019, through June 16, 2019; is that
20   correct?  It looks like the top right is
21   where I saw it.
22     A.   Yes, ma'am.
23     Q.   Okay.  And it says that -- so

13  (Pages 49 to 52)

Alexandria Bennett                                      6/14/2023

Page 53

1   that would have been before October 15,
2   2020; right?
3       A.   Uh-huh (affirmative).
4       Q.   Is that a yes?
5       A.   Yes, ma'am.
6       Q.   Okay.
7       A.   I'm sorry.
8       Q.   That's okay.  And in June of
9   2019, it looks like your pay rate was
10  $15.25.  Does that sound right to you?
11      A.   Yes, ma'am.
12      Q.   And you were paid on a biweekly
13  basis?
14      A.   Yes, ma'am.
15      Q.   Okay.  Do you think that your pay
16  changed between June of 2019 and October of
17  2020?
18      A.   Yes, ma'am.
19      Q.   All right.  Do you have a more
20  current pay statement from Outback or one
21  that was closer to October of 2020?
22      A.   No, ma'am.
23      Q.   Would your pay have increased

Page 54

1   between June of 2019 and October of 2020?
2       A.   I made a lot of hours at Outback.
3   So I think it would have probably been more
4   around the same.  How many hours are on
5   there?  Yeah, I worked a lot of hours there.
6       Q.   Yes, this one shows 36.5667.  So
7   would that be a typical week for you at
8   Outback?
9       A.   On 280, I was working overtime.
10  So I got more than 36 hours over there.
11      Q.   And it looks like this was the
12  280 one.  Do you see the unit?  It says
13  "Inverness."  Is that the 280 location?
14  Kind of top middle.
15      A.   Top middle?
16      Q.   Yes.  Let me point to it.  I saw
17  it right there (indicating).
18      A.   Yes, ma'am.
19      Q.   So does that mean this was a pay
20  statement from the 280 location?
21      A.   Yes, ma'am.
22      Q.   And it's for a pay period of
23  about 13 days.  So that would be about the

Page 55

1   two-week pay period; correct?
2       A.   Yes, ma'am.
3       Q.   So the total number of hours
4   worked would be for a two-week period; is
5   that right?
6       A.   Yes, ma'am.
7       Q.   So you worked about 36.5 hours
8   over a two-week period; is that right?
9       A.   Or more, yes, ma'am.
10      Q.   And it lists your -- in the
11  earnings section, it lists your job as
12  A.M. prep.  Do you know what that stands
13  for?
14      A.   Yes, ma'am.
15      Q.   What does it stand for?
16      A.   A.M. prep.
17      Q.   Like, morning prep?
18      A.   Yes, ma'am.
19      Q.   A prep cook?
20      A.   That's the job description that
21  they had me in as.
22      Q.   Did that job description ever
23  change on your pay statement when you became

Page 56

1   manager?
2       A.   No, ma'am.  They just changed the
3   pay, the pay rate.
4       Q.   Okay.  And your current job, have
5   you been told an end date, or is it just
6   kind of to be determined?
7       A.   It's a temp service so, you know,
8   it's temp to hire.
9       Q.   Okay.  What about have you ever
10  been arrested or convicted of a crime?
11      A.   No, ma'am.
12      Q.   Have you ever filed for
13  bankruptcy?
14      A.   No, ma'am.
15      Q.   Are you a member of any churches,
16  social clubs, or organizations in either
17  Jefferson, Blount, or Shelby County?
18      A.   Say that again.
19      Q.   Sure.
20      A.   Do I go to church?
21      Q.   I'm just asking -- this is just
22  for purposes of picking people for the jury.
23  I don't want some of your church members,

                        14  (Pages 53 to 56)

Alexandria Bennett                                          6/14/2023

Page 57

1    your friends, or friends from other
2    organizations on the jury, just like you
3    probably wouldn't want people that are
4    employed by Wal-Mart or something on the
5    jury.
6         But do you have any -- are you a
7    member of any churches, social clubs, or
8    organizations in either Jefferson, Shelby
9    County, or Blount County?
10        A.   No, ma'am.
11        Q.   Okay.  All right.  Before
12   October 15, 2020, were you taking any
13   medication on a regular basis?
14        A.   No, ma'am.
15        Q.   Were you suffering from any
16   chronic medical conditions before
17   October 15, 2020?
18        A.   No, ma'am.
19        Q.   Had you been diagnosed with
20   diabetes or high blood pressure, anything
21   like that, before October 15, 2020?
22        A.   No, ma'am.
23        Q.   Have you since been diagnosed

Page 58

1    with any chronic medical conditions?  And
2    that would be things that require you to
3    take medicine on a regular basis, like high
4    blood pressure or diabetes.
5         A.   No, ma'am.
6         Q.   Did you play any sports in high
7    school?
8         A.   I ran track.
9         Q.   Were you ever injured doing that?
10        A.   No, ma'am.
11        Q.   Have you ever suffered an
12   on-the-job injury?
13        A.   No, ma'am.
14        Q.   Have you ever filed for workers'
15   compensation benefits?
16        A.   No, ma'am.
17        Q.   Before October 15, 2020, were you
18   involved in any sports or exercise
19   activities?
20        A.   No, ma'am.
21        Q.   Before October 15, 2020 had you
22   ever suffered any injuries to your back?
23        A.   No, ma'am.

Page 59

1         Q.   Had you ever suffered any
2    injuries to either of your hips before
3    October 15, 2020?
4         A.   No, ma'am.
5         Q.   What about to either of your
6    ankles; had you ever suffered any injuries
7    to either of your ankles before October 15,
8    2020?
9         A.   Yes, ma'am.
10        Q.   Will you tell me about that,
11   please?
12        A.   I have been in a car accident
13   before.
14        Q.   Okay.  When was that?
15        A.   I believe -- I believe at the
16   beginning of 2020.
17        Q.   Okay.  Where were you when that
18   happened?
19        A.   Birmingham, Alabama.
20        Q.   Were you on the interstate or the
21   side road or -- where were you?
22        A.   I was on a regular road.
23        Q.   Okay.  What part of Birmingham?

Page 60

1         A.   I think it was Birmingham,
2    Alabama, like the west side or something.
3         Q.   Okay.  And tell me how the
4    accident happened.
5         A.   It was raining, and I lost
6    control of the vehicle.  A head collision --
7    a head-on collision.
8         Q.   With another car?
9         A.   Yes, ma'am.
10        Q.   You were the driver of your car?
11        A.   Yes, ma'am.
12        Q.   What type of car were you in?
13        A.   Hyundai Sonata.
14        Q.   Was anybody in the car with you?
15        A.   Yes, ma'am.
16        Q.   Who was with you?
17        A.   A friend.
18        Q.   What was his or her name?
19        A.   I don't know the last name.
20   Brandon.
21        Q.   Okay.  Was a police report
22   completed as a result of that accident?
23        A.   Yes, ma'am.

15  (Pages 57 to 60)

Alexandria Bennett                                          6/14/2023

Page 61

1     Q.   Do you remember which police
2  entity -- that's the best word I can come up
3  with -- completed it?
4     A.   No, ma'am.
5     Q.   Was it, like, the Birmingham
6  Police Department or a city police
7  department?
8     A.   I believe so.  Probably.
9     Q.   You think it was Birmingham?
10    A.   Yes, ma'am.
11    Q.   Were you given any citations or
12 tickets as a result of that accident?
13    A.   What does that mean?
14    Q.   Like, did they give you a ticket,
15 like, for no insurance or no seat belt or
16 speeding or DUI or anything like that?
17    A.   No, ma'am.
18    Q.   Okay.  Was the Hyundai damaged in
19 the accident?
20    A.   Yes, ma'am.
21    Q.   Was it totaled?
22    A.   Yes, ma'am.
23    Q.   Did you have automobile insurance

Page 62

1  back then?
2     A.   I'm not sure.
3     Q.   Do you have it now?
4     A.   Yes, ma'am.
5     Q.   Who is it with now?
6     A.   It's a funny name.  I can't
7  remember the name of it.
8     Q.   If you think of it, just feel
9  free to interrupt me and let me know.
10    A.   Yes, ma'am.
11    Q.   Okay.  Were you injured in the
12 automobile accident?
13    A.   Yes, ma'am.
14    Q.   How were you injured?
15    A.   My spleen was cracked internally.
16 My knee was saturated [sic].  And my ankle
17 was sprained.
18    Q.   Okay.  Which knee?
19    A.   The left -- left one.
20    Q.   And which ankle?
21    A.   Right.
22    Q.   Were you taken by ambulance from
23 the scene?

Page 63

1     A.   Yes, ma'am.
2     Q.   And which hospital were you taken
3  to?
4     A.   Grandview.
5     Q.   Were you diagnosed with any
6  fractures or broken bones at Grandview?
7     A.   No, ma'am.
8     Q.   Did you stay there overnight, or
9  did you go home the same day?
10    A.   I was in the hospital a few days
11 because I was bleeding internally from the
12 spleen.
13    Q.   Did you have surgery on your
14 spleen?
15    A.   No, ma'am.  They called it off.
16    Q.   Did you have to have surgery on
17 your knee or your ankle?
18    A.   No, ma'am.
19    Q.   Did you receive treatment from
20 anywhere else, besides Grandview, as a
21 result of the 2020 automobile accident?
22    A.   No, ma'am.
23    Q.   Did you ever have to see an

Page 64

1  orthopedic doctor for any injuries from the
2  automobile accident?
3     A.   No, ma'am.
4     Q.   Okay.  So after that initial ER
5  visit, there was no other treatment related
6  to the automobile accident?
7     A.   No, ma'am.
8     Q.   Did any lawsuits arise out of
9  that accident?
10    A.   No, ma'am.
11    Q.   You haven't been sued and you
12 haven't sued anybody about that?
13    A.   No, ma'am.
14    Q.   Any other injuries to either your
15 hip, back, or ankles before October 15,
16 2020?
17    A.   No, ma'am.
18    Q.   Okay.  And besides the treatment
19 at Grandview, had any doctors treated you
20 for any hip, back, or ankle pain or problems
21 before October 15, 2020?
22    A.   No, ma'am.
23    Q.   Were you given a specific

16  (Pages 61 to 64)

Alexandria Bennett                                    6/14/2023

Page 65

1    diagnosis with regard to your ankle
2    following the 2020 automobile accident?
3        A.   The biggest thing was my knee,
4    because it had saturated out -- and the
5    spleen -- because it was cracked internally.
6    They wanted the blood to stop, and it
7    stopped on its own.
8        Q.   Okay.  Did you have to wear any
9    braces on your knee or your ankle after
10   that?
11       A.   Uh-uh (negative).
12       Q.   Is that a no?
13       A.   No, ma'am.
14       Q.   Thank you.  Did the automobile
15   cause you -- accident cause you to have pain
16   in either your knee or your ankle?
17       A.   My knee was hurting, but I think
18   my ankle was sprung or something --
19   sprained.
20       Q.   How long did it take for your
21   knee pain to go away, if it did?
22       A.   Not long.
23       Q.   Like a few weeks?  A few months?

Page 66

1        A.   I will say a few weeks, I guess,
2    because I had to get it stitched up.
3        Q.   Did you miss some work as a
4    result of the automobile accident?
5        A.   Whatever time they told me to be
6    off, that's what I was off, and I went back
7    to work.
8        Q.   Okay.  And did your ankle hurt
9    you at all after the automobile accident?
10       A.   No, ma'am.
11       Q.   Did you report ankle pain at the
12   ER that day, the day of the automobile
13   accident?
14       A.   It was sprained.
15       Q.   Okay.  And did the pain go away
16   right after you left the emergency room, or
17   did it linger for some time?
18       A.   It didn't go right away, but I
19   think they said it was healed.  The biggest
20   -- the biggest thing was my knee and, on the
21   inside, my spleen.
22       Q.   And you didn't have to have any
23   follow-up treatment with anyone for any of

Page 67

1    those injuries?
2        A.   No, ma'am.
3        Q.   Had all of the injuries from the
4    automobile accident healed by the time the
5    incident at Wal-Mart happened?
6        A.   I believe so.
7        Q.   And when you went to the ER after
8    the automobile accident, did any of the
9    doctors there recommend that you seek any
10   additional treatment for any of your
11   injuries from the automobile accident?
12       A.   I'm not sure.  I'm not sure.
13       Q.   Was that ER visit something you
14   had to pay for out of pocket after the
15   automobile accident?
16       A.   I'm not sure.
17       Q.   Okay.  Did you have health
18   insurance back then when the automobile
19   accident happened?
20       A.   No, ma'am.
21       Q.   Have you been involved in any
22   other automobile accidents, whether you were
23   the driver or a passenger, before

Page 68

1    October 15, 2020?
2        A.   No, ma'am.
3        Q.   Okay.  Have you been in any
4    automobile accidents since October 15, 2020?
5        A.   No, ma'am.
6        Q.   Have you suffered any falls or
7    other injuries to either your hip, your
8    back, or your ankles since October 15, 2020?
9        A.   Does that mean, like, have I --
10   did I have continuous pain or something?
11       Q.   No.  I'm really asking more,
12   like, have there been any -- I know you are
13   claiming that you fell on October 15, 2020.
14       A.   Uh-huh (affirmative).
15       Q.   Since that date, have you fallen
16   on any other occasions or been involved in
17   any other sort of accidents that led to
18   injuries to your ankle, hip, or your back?
19       A.   No, ma'am.
20       Q.   Okay.  Were you given any
21   medication for the injuries caused by the
22   automobile accident?
23       A.   No, ma'am.  I can't recall.

17  (Pages 65 to 68)

Alexandria Bennett                                          6/14/2023

---

Page 69

1        Q.   Okay.  What was your pharmacy
2   back then when you had the automobile
3   accident?  Where did you get prescriptions
4   filled?
5        A.   Usually, I will go to the
6   Wal-Mart Pharmacy.
7        Q.   Which location?
8        A.   Or not -- well, if it was
9   Wal-Mart, it was the one in Pelham.
10       Q.   Okay.
11       A.   And I go to CVS.
12       Q.   And which CVS?
13       A.   It would have been the one, like,
14  between Montgomery Highway...
15       Q.   Okay.
16       A.   I think that's where it is.  In
17  Hoover.
18       Q.   All right.  Who do you consider
19  your primary care doctor today?
20       A.   Today?
21       Q.   Yes.
22       A.   No one.
23       Q.   If you thought you had the flu or

---

Page 70

1   strep throat or something like that, where
2   would you go?
3        A.   I would go to UAB's -- I'm sorry.
4   I think it's, like, Urgent Care or
5   something.
6        Q.   But it's affiliated with UAB?
7        A.   Yes, ma'am.
8        Q.   Okay.  And back when -- like,
9   back early 2020, who did you consider your
10  primary care doctor?
11       A.   I can't recall.
12       Q.   I saw somewhere there was a
13  mention of a Dr. Shelley, and the last name
14  started with a "W," like Weisen-something.
15  Does that ring any bells?
16       A.   I'm not sure.
17       Q.   That's fine.  I can't even
18  remember the last name.
19            Okay.  Sitting here today, do you
20  recall any of your prior primary care
21  doctors?
22       A.   No, ma'am.
23       Q.   Okay.  I know you have been

---

Page 71

1   treated at Grandview.  And then I am going
2   to get to the point where I talk to you
3   about where you were treated for injuries
4   you relate to the incident at Wal-Mart.
5            But have you been to any other
6   ERs besides Grandview -- had you been before
7   October 15, 2020?
8        A.   Any other ERs?
9        Q.   Yes, ma'am.
10       A.   Before 2020?
11       Q.   Yes.
12       A.   I mean, if I went to the
13  hospital, it would have been in Shelby, at
14  Shelby Baptist.
15       Q.   All right.  What about were there
16  any urgent cares where you went more than
17  once before October 15, 2020?
18       A.   No, ma'am.
19       Q.   Okay.
20       A.   I don't think so.
21       Q.   Where did you deliver your
22  daughter?
23       A.   I delivered her -- I was supposed

---

Page 72

1   to deliver her at Shelby, but I delivered
2   her at UAB.
3        Q.   Okay.  Had you undergone any
4   surgeries before October 15, 2020?
5        A.   No, ma'am.
6        Q.   Had you broken any bones before
7   October 15, 2020?
8        A.   No, ma'am.
9        Q.   Had you seen a chiropractor
10  before October 15, 2020?
11       A.   No, ma'am.
12       Q.   What about since October 15,
13  2020, have you seen any chiropractors?
14       A.   After?
15       Q.   Yes.
16       A.   I'm not sure.
17       Q.   Okay.  And have you suffered any
18  broken bones since October 15, 2020?
19       A.   You are talking about, like, have
20  I broke something else or something?
21       Q.   Yes.
22       A.   No, ma'am.
23       Q.   Okay.  Have you had an ER visit

---

18  (Pages 69 to 72)

Alexandria Bennett                                                    6/14/2023

---

Page 73

1  since the incident at Wal-Mart, not related
2  to that?
3      A.   No, ma'am.
4      Q.   Okay.
5      A.   But I had COVID.  I'm sorry.
6      Q.   I see.  Where were you treated
7  for that?
8      A.   I think UAB.  UAB told me I had
9  COVID.
10     Q.   Okay.  Are you doing okay, or do
11  you need a break?
12     A.   Can we take a break?
13     Q.   Sure.  It's a good stopping
14  point.  That's why I asked.
15     A.   Okay.
16          (Whereupon, a brief recess was
17          taken from 2:42 p.m. until
18          2:49 p.m.)
19     Q.   (By Ms. Gordon)  Okay.  How tall
20  are you?
21     A.   I will say probably, like,
22  five-four.
23     Q.   Five-four.  And now I want to ask

---

Page 74

1  you about October 15, 2020.  Tell me about
2  what time the incident we are here about
3  today happened.
4      A.   I know -- I know it was getting
5  towards nighttime.
6      Q.   And from the surveillance videos
7  that we got from Wal-Mart, it looks like --
8  well, they cover a big span.  But I think
9  the notes I have say it was around 7:20.
10  Does that sound right to you?
11     A.   Yes, ma'am.
12     Q.   Have you seen any of those
13  surveillance videos that I sent to your
14  lawyer?
15     A.   Yes, ma'am.
16     Q.   Okay.  Were you able to -- were
17  you shown on any of those videos?  Because I
18  tried to look for you, but I didn't know
19  what you looked like, so that made it hard.
20     A.   I've got the picture -- oh, no.
21  That was a picture then.  No.
22     Q.   Okay.  You haven't seen any of
23  the videos?

---

Page 75

1      A.   Uh-uh (negative).  I don't think
2  I've seen myself on a video.
3      Q.   Okay.
4      A.   But it was -- it was on, like,
5  the other side of something.
6      Q.   Well, and that's what -- I will
7  represent to you that they tried to find a
8  video.  There is no video on the aisle where
9  this happened.  And so --
10     A.   Yes, because I was surprised.  I
11  had -- I had heard that you-all didn't have
12  a camera on that -- on that aisle.
13     Q.   Correct.  And so they provided
14  the video footage from the cameras nearest
15  that aisle.
16     A.   Okay.
17     Q.   So those are the ones we have.
18  Those are the ones that I have sent to your
19  attorney.
20          And like I said, I looked through
21  them, and I couldn't identify you.  And I
22  was just curious if you were able -- if you
23  had looked at them and seen yourself shown

---

Page 76

1  on any of the videos.
2          Do you remember one way or the
3  other today if you are shown on any of those
4  videos?
5      A.   No, ma'am, because -- no, ma'am.
6      Q.   Okay.  That's fine.
7          All right.  So we think it was
8  about 7:20.  So towards the end of the day;
9  is that right?
10     A.   Yes, ma'am.
11     Q.   And you were living at The Pearl
12  at the time?
13     A.   Yes, ma'am.
14     Q.   And this was at the Wal-Mart in
15  Helena?
16     A.   Yes, ma'am.
17     Q.   Okay.  What had you been doing
18  that day?
19     A.   I was going in there shopping for
20  dinner.
21     Q.   Okay.  And from my recollection,
22  there is a Wal-Mart probably a little closer
23  to you in Homewood.  Were you in Helena for

---

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023

---

Page 77

1    a reason?  What were you doing in Helena?
2        A.    At that time, my daughter's
3    grandmother, they are, like, from there.
4    So, you know, you can go a way to Bessemer.
5    So we would go through that way and stop
6    right there at that -- in Helena going to
7    her grandma's house.
8        Q.   Okay.  And so when you say --
9    it's your daughter's grandmother?
10       A.   Uh-huh (affirmative).
11       Q.   So would it be Kevin's --
12       A.   Kevin's mom.
13       Q.   Kevin's mom?
14       A.   Yes, ma'am.
15       Q.   And she lives in Helena?
16       A.   She lives in Bessemer.
17       Q.   In Bessemer?
18       A.   Uh-huh (affirmative).
19       Q.   So where were you -- were you
20   driving to Bessemer when you stopped at the
21   Helena Wal-Mart?  Where were you coming from
22   and where were you headed when you stopped
23   at --

---

Page 78

1        A.   I believe I was going to get her.
2    That would have been the only way I was in
3    Helena, because Helena is right by Bessemer.
4    We will take that road right there to get to
5    Allyson's grandma's house.
6        Q.   Had you worked that day?
7        A.   I can't recall.
8        Q.   Okay.  But you think you were
9    probably coming from the Homewood area or
10   possibly from the Outback?
11       A.   I wasn't coming from the Homewood
12   area.  I'm not sure what I was -- where I
13   was coming from.
14       Q.   Okay.  But you think you ended up
15   in Helena because you were on your way to
16   Bessemer to get your daughter?
17       A.   Yes, ma'am.
18       Q.   Okay.  Had you already picked up
19   your daughter by the time you stopped at the
20   Helena Wal-Mart?
21       A.   No, ma'am.
22       Q.   Was anyone with you when you
23   stopped at the Helena Wal-Mart?

---

Page 79

1        A.   Yes, ma'am.
2        Q.   Who was with you?
3        A.   Kevin.
4        Q.   That's Kevin ████?
5        A.   Yes, ma'am.
6        Q.   Was it already dark outside when
7    you stopped there?
8        A.   I can't -- I don't remember.
9        Q.   And another test of your memory,
10   what was the weather like then?
11       A.   It was fine.
12       Q.   All right.  No rain?
13       A.   No, ma'am.
14       Q.   The parking lot wasn't wet as far
15   as you remember?
16       A.   No, ma'am.  It wasn't raining
17   that day.
18       Q.   And what were you stopping at
19   Wal-Mart for?
20       A.   To get a couple of items.
21       Q.   Do you remember what you were
22   getting?
23       A.   No, ma'am.

---

Page 80

1        Q.   All right.  Which -- is there
2    more than one entrance to that store?
3        A.   Yes, ma'am.
4        Q.   Do you remember which entrance
5    you went in?
6        A.   No, ma'am.
7        Q.   Did Kevin go inside with you?
8        A.   Yes, ma'am.
9        Q.   I took some screenshots from the
10   surveillance video so that maybe it would
11   refresh your recollection about which
12   entrance you went in.  And I will mark the
13   first one as Defendant's Exhibit 2 and the
14   second one as Defendant's Exhibit 3.
15            Do you recognize either of these
16   as being the entrance that you went in?
17       A.   I can't remember which entrance I
18   went in.
19            (Whereupon, Defendant's Exhibit
20            Nos. 2 and 3 were marked and are
21            attached to the original
22            transcript.)
23       Q.   (By Ms. Gordon)  That's fine.

---

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                    6/14/2023

Page 81

1        Okay.  So you went in an
2  entrance.  And once you got inside, where
3  did you go from there?
4        A.   I'm not sure.  I just know I went
5  in there to get a few items for dinner.  I
6  don't remember, like, everything I did.  I
7  don't remember.
8        Q.   Okay.  Where did the incident
9  happen?
10       A.   On the water aisle.
11       Q.   Like, where they sell the bottled
12  water?  Is that what you mean by "the water
13  aisle"?
14       A.   Yes, ma'am.
15       Q.   Did you and Kevin stay together
16  the entire time you were in Wal-Mart that
17  night?
18       A.   Yes, ma'am.
19       Q.   And did you have a buggy with
20  you, a cart, a grocery cart?
21       A.   I'm not sure.
22       Q.   Were you carrying anything like a
23  purse or a phone?

Page 82

1        A.   I know I probably had my purse
2  over my shoulder.
3        Q.   What were you wearing that
4  evening?
5        A.   I'm not sure, but I know I had
6  some burgundy -- or some colored hair.
7        Q.   Okay.  Any idea what shoes you
8  were wearing that evening?
9        A.   They were sturdy shoes.
10       Q.   Can you describe them for me?
11       A.   No, ma'am.
12       Q.   How long had you been in this
13  store before the fall happened?
14       A.   I don't believe I was in there
15  long.
16       Q.   Any estimate as to how long?
17       A.   I will probably say, I believe,
18  probably 10 to 15 minutes.
19       Q.   Did you go down other aisles
20  before you went down the water aisle, or did
21  you go straight to the water aisle when you
22  got there?
23       A.   No, ma'am.

Page 83

1        Q.   You went down some other aisles
2  first?
3        A.   Yes, ma'am.
4        Q.   Did you have any problems going
5  down those aisles?
6        A.   No, ma'am.
7        Q.   Did you observe anything on the
8  aisles you went down before the water aisle
9  that caused you any concern?
10       A.   No, ma'am.
11       Q.   Did you pass by any employees of
12  Wal-Mart that you remember before you went
13  down the water aisle?
14       A.   I don't remember.
15       Q.   Okay.  All right.  And if you
16  will, just describe for me in as much detail
17  as you can what happened that day on the
18  water aisle.
19       A.   I went to reach to get some
20  water, and I slipped and fell.
21       Q.   About how far down the water
22  aisle was it when this happened -- where
23  this happened?

Page 84

1        A.   I don't think I was down too far.
2        Q.   Like, had you made it halfway or
3  not even halfway?  Any idea?
4        A.   No, it wasn't halfway.
5        Q.   Did you enter the water aisle
6  from the front of the store or the back of
7  the store?
8        A.   It was the back of the store, I
9  think -- I believe.
10       Q.   Was anything blocking your view
11  of the water aisle before you walked down
12  it?
13       A.   No, ma'am.
14       Q.   Was there anything blocking your
15  view of the floor on the water aisle before
16  you walked down it?
17       A.   No, ma'am.
18       Q.   Were there any displays or
19  anything out in the middle of the aisle of
20  the water aisle that day?
21       A.   No, ma'am.
22       Q.   Okay.  Were you sick that day?
23       A.   No, ma'am.

21  (Pages 81 to 84)

Alexandria Bennett                                          6/14/2023

Page 85

1     Q.   And you had your contacts on;
2  right?
3     A.   Yes, ma'am.
4     Q.   Okay.  Did you see anything on
5  the floor of the water aisle before you
6  walked down it that day?
7     A.   I mean, the floor was -- you know
8  how you see, like, scuff marks?  The floor
9  was, like, real scuffed up there so -- you
10 know, besides the dirty scuff marks, I
11 didn't -- I didn't see anything.
12    Q.   Okay.  Had you been in the Helena
13 Wal-Mart store before October 15, 2020?
14    A.   Have I been there before?
15    Q.   Yes.
16    A.   Yes, ma'am.
17    Q.   Okay.  How often did you go there
18 before October 15th?
19    A.   Here and there.
20    Q.   Would you say you were familiar
21 with it before that date?  Like, if you went
22 in there, you knew where things were that
23 you were shopping for?

Page 86

1     A.   No, ma'am, not like every --
2  because sometimes I would go to the Pelham
3  Wal-Mart.
4     Q.   Okay.  But you had been in there
5  on at least one other occasion before
6  October 15, 2020?
7     A.   Yes, ma'am.
8     Q.   Had it been more than ten
9  occasions?
10    A.   I can't recall.
11    Q.   On any of the occasions on which
12 you went to Wal-Mart before the incident,
13 had you ever seen anything that concerned
14 you while you were shopping there?
15    A.   Have I -- have I -- can you
16 repeat that?
17    Q.   Sure.
18    A.   I'm sorry.
19    Q.   The trips that you made to the
20 Helena Wal-Mart before October 15, 2020, was
21 there ever anything you observed that
22 concerned you?
23    A.   No, ma'am.

Page 87

1     Q.   Anything that you thought --
2  anything you saw that you thought was a
3  safety hazard while you were there shopping
4  before October 15, 2020?
5     A.   No, ma'am.
6     Q.   Had you ever had any problems
7  shopping at that store before October 15,
8  2020?
9     A.   No, ma'am.
10    Q.   All right.  And on October 15,
11 2020, did you and Kevin enter the water
12 aisle at the same time?
13    A.   Yes, ma'am.
14    Q.   Were y'all walking side by side
15 or one in front of the other?  Do you
16 remember?
17    A.   Something like that.  Something
18 like that, yes, ma'am.  He was on the aisle.
19    Q.   He was on the aisle.  Okay.  And
20 y'all entered it at the same time?
21    A.   Yes, ma'am.
22    Q.   And you make it, what, about a
23 fourth of the way down the aisle?

Page 88

1     A.   Yes, ma'am.
2     Q.   And what were you looking for on
3  that aisle?
4     A.   I was shopping for some water,
5  getting some water.
6     Q.   Was there a certain brand you
7  were looking for?
8     A.   I don't -- I like certain brands
9  of water.  I will say that.
10    Q.   What type of brands do you like?
11    A.   I like alkaline water.  I like
12 Avadian water [sic].  I like Smartwater.
13    Q.   And I believe I saw somewhere
14 that you were maybe shopping for Smartwater.
15         Would that surprise you if you
16 had told somebody that's what you were
17 shopping for?
18    A.   Ma'am?
19    Q.   If you had told somebody that day
20 that you were shopping for Smartwater when
21 you fell, would that surprise you?
22    A.   I was shopping -- I was going in
23 just for a few items for dinner.

22  (Pages 85 to 88)

Alexandria Bennett                                          6/14/2023

Page 89

1        Q.   Right.  But you went down the
2    water aisle to get water; is that correct?
3        A.   Yes, ma'am.
4        Q.   Okay.  And were you looking for a
5    case of water or a single bottle of water?
6        A.   No, I wouldn't have picked up a
7    case.  I think it was probably, like, a jug
8    of water or, you know -- not a case, though.
9    Uh-uh (negative).
10       Q.   And sitting here today, do you
11   remember what kind you were shopping for on
12   October 15th -- what brand you were shopping
13   for on October 15th?
14       A.   No, ma'am.
15       Q.   All right.  And had you picked up
16   water off the shelf before you fell?
17       A.   I was going to reach for the
18   water, and I fell.
19       Q.   You fell in the process of
20   reaching for water?
21       A.   Yes, ma'am.
22       Q.   Okay.  And where was the water
23   located that you were reaching for when you

Page 90

1    fell?
2        A.   You are talking about my jug of
3    water or the water --
4        Q.   Right.  Like, where -- I assume
5    there are multiple shelves on the aisle; is
6    that right?
7        A.   Uh-uh (negative).
8        Q.   Is that a yes?
9        A.   Yes, ma'am.  I'm sorry.
10       Q.   Okay.  Do you remember which
11   shelf the water was located on, the one that
12   you were reaching for when you fell?
13       A.   The top shelf.
14       Q.   Okay.  Was the water bottle -- is
15   it fair to say it was a water bottle that
16   you were reaching for?  Is that accurate?
17   Or water jug?
18       A.   Yes, ma'am.
19       Q.   Okay.  Either one, whether you
20   were reaching for a water bottle or a water
21   jug, was that item sitting directly on the
22   shelf, or was it in a box or on a pallet?
23       A.   It was on the shelf.

Page 91

1        Q.   Sitting directly on the shelf?
2        A.   I believe, yes, ma'am.  I believe
3    so.
4        Q.   Was it at the edge of the shelf
5    or further back?
6        A.   No.  I just was going to reach
7    for some water and just fell.
8        Q.   Did you ever reach the water
9    before you fell?
10       A.   I'm not sure.
11       Q.   Okay.
12       A.   I'm not sure.
13       Q.   Did you have anything in your
14   hands when you fell?
15       A.   I don't think so.
16       Q.   All right.  And what caused you
17   to fall?
18       A.   I think it was dirty water on the
19   floor.
20       Q.   What makes you think that?
21       A.   Because once I was on the floor,
22   I seen it was water right there.  So you
23   know how I said "scuff marks"?  It was,

Page 92

1    like, dirty water, scuff marks.
2        Q.   Had you seen any dirty water on
3    the floor of the water aisle before you
4    fell?
5        A.   You said did I see any dirty
6    water?
7        Q.   Or any water or any liquid
8    substance on the floor of the water aisle
9    before you fell.
10       A.   No, ma'am.
11       Q.   All right.  Tell me what motion
12   your body -- what movements your body made
13   when it fell, like, how you landed and -- if
14   you can, describe for me how you fell.
15       A.   I just know I reached for that
16   water, and I was on the floor.  I don't
17   remember how I fell.  I just know I was on
18   the floor, because it was just shocking.
19       Q.   Did one or both of your feet
20   slip?  Or did your feet slip?
21       A.   I slipped.  I slipped and fell.
22       Q.   Did you feel your feet slip
23   before you fell?

Alexandria Bennett                                    6/14/2023

Page 93

```
 1        A.  It hit -- everything hit me so
 2   fast.  I mean, I just went to the floor.
 3        Q.  Okay.
 4        A.  Slipped and fell.
 5        Q.  And did you feel your feet slip
 6   before you fell?
 7            MS. WASHINGTON:  Objection.
 8   Asked and answered.  But you can answer.
 9   You can answer.  I just do that for the
10   record.
11        Q.  (By Ms. Gordon)  You can answer.
12        A.  Like, I slipped and fell.
13        Q.  Okay.  And that's what I am
14   asking.  Did you feel something slippery
15   under your feet?
16            MS. WASHINGTON:  Objection.
17   Answer.
18        A.  Yes.
19        Q.  (By Ms. Gordon)  Okay.  And did
20   you feel your feet go out from under you
21   before you fell?
22        A.  Yes, ma'am.
23        Q.  Was it one or both of your feet
```

Page 94

```
 1   that you felt something slippery under?
 2        A.  I'm not sure.
 3        Q.  And do you know if one or both of
 4   your feet went out from under you?
 5        A.  Yes, ma'am.  Both of them,
 6   because I fell to the floor.
 7        Q.  Okay.  Did any part of your body
 8   hit anything on the way to the floor?
 9        A.  No, ma'am.
10        Q.  And on what part of your body did
11   you land?
12        A.  Like, I'm not sure how I landed.
13   I know what was hurting.  I'm not sure how I
14   landed.  I landed on my bottom probably.
15   I'm not sure.
16        Q.  Was it your bottom that hit the
17   floor first?
18        A.  I'm guessing, yes, ma'am.
19        Q.  Was it a certain side of your
20   bottom or straight across?  I'm just trying
21   to understand the mechanism of the fall
22   since I wasn't there and we don't have a
23   video of it.
```

Page 95

```
 1        A.  My hip was hurting, so I'm not
 2   sure how I twisted or fell.  But it just all
 3   happened so fast.
 4        Q.  Okay.  So one minute you are
 5   reaching for the water, the next you feel
 6   your feet go out from under you, and then
 7   you are on your bottom; is that accurate?
 8        A.  Yes, ma'am.
 9        Q.  Are there any other details you
10   can tell me about the fall itself or what
11   caused you to fall?
12        A.  Any other details, like --
13        Q.  About how the fall happened or
14   any other details about the incident at
15   issue in this lawsuit.
16        A.  No, ma'am.
17        Q.  Okay.  And you mentioned earlier
18   that, after you fell, you noticed some water
19   on the floor.  Did I hear you right about
20   that?
21        A.  Yes, ma'am.
22        Q.  Okay.  Where did you notice the
23   water?  If you want to tell me in relation
```

Page 96

```
 1   to your body or in relation to the shelves,
 2   either way.
 3        A.  I noticed the water on the floor
 4   once I was down there on the floor.
 5        Q.  Okay.  Was it next to your body
 6   or next to the shelves?  Where was it on the
 7   aisle?
 8        A.  Next to the pallet.  It was a
 9   pallet down there.
10        Q.  Was the pallet under the shelving
11   unit?
12        A.  Yes, ma'am.
13        Q.  And did the pallet have some
14   bottled water on it?
15        A.  Yes, ma'am.
16        Q.  And the water was next to the
17   pallet that you saw on the floor?  This gets
18   confusing since it was on the water aisle.
19            The water that you saw on the
20   floor, was it by the pallet holding the
21   bottled water?
22        A.  Yes, ma'am.  I would -- I would
23   think so because the water was stacked up
```

24  (Pages 93 to 96)

Alexandria Bennett                                            6/14/2023

Page 97

1   on, like, a raggedy looking pallet thingy.
2        Q.   Okay.
3        A.   You know how they had cases of
4   water on there?  Like that.
5        Q.   Okay.  And you saw some water on
6   the floor next to that?
7        A.   Yes, ma'am.
8        Q.   About what size was the spot of
9   water that you saw on the floor next to the
10  pallet?
11       A.   Well, I noticed it was, like, a
12  lot of water when I was down there but -- go
13  ahead.  I'm sorry.
14       Q.   No.  Just was there more than one
15  spot of water that you noticed on the floor
16  after you fell?
17       A.   Down on the floor?
18       Q.   Yes.
19       A.   It was just around that area.
20  That area was dirty.  You know how you see
21  scuff marks on the floor?  So that's what
22  you would think it is, like, scuff marks.
23            But, like, down there, it's,

Page 98

1   like, the scuff marks and the dirty water
2   mixed, turned black.  You know what I am
3   saying?  Like that.  So you would think it's
4   just scuff marks.
5            But once I was down there, I was,
6   like, Oh, this is water.  Do you know what I
7   am saying?
8        Q.   Okay.  Was there more than one
9   area of water that you saw on the floor
10  after you fell?
11       A.   No, nothing besides the area that
12  I was in.
13       Q.   It was all contained in one area;
14  is that right?
15       A.   I believe so.
16       Q.   And about what size was that area
17  that the water was contained in?
18       A.   Are you talking about, like, what
19  size was the pallet?
20       Q.   I'm just trying to figure out how
21  much water you saw on the ground.  And I
22  think you have said there were --
23       A.   Like, drips, I'm guessing.  I'm

Page 99

1   not sure.
2        Q.   Okay.  You would describe it as
3   drips on the floor?
4        A.   Yes, ma'am.  Just water.
5        Q.   Okay.  And they were all in about
6   the same area, next to the pallet; is that
7   right?
8        A.   Yes, ma'am.
9        Q.   Were the drips -- was there any
10  color to the drips you saw on the floor?
11       A.   You said was there any color?
12       Q.   Yes, ma'am.
13       A.   Black.
14       Q.   Okay.  Do you know what the
15  substance was that was on the floor that you
16  saw after you fell?
17       A.   I think it was pronounced as
18  dirty water on the floor.
19       Q.   When you say "it was
20  pronounced," did somebody tell you that's
21  what it was?
22       A.   What do you mean?
23       Q.   What makes you think that it was

Page 100

1   dirty water on the floor?
2        A.   Because the scuff marks and how
3   they had the aisles kept and stuff like
4   that, how they keep up the place.
5        Q.   What do you mean, "how they keep
6   up the place"?
7        A.   Well, once I heard you-all didn't
8   have a camera or anything at the -- on the
9   aisle, I thought, you know, it was one.  So
10  I went to Wal-Mart to see if it was a camera
11  on that aisle.  And I just noticed how they
12  kept up the store and stuff during that
13  visit.
14       Q.   Okay.  What type of things are
15  you talking about that you noticed?
16       A.   Well, I noticed scuff marks
17  still.  And I noticed some bread that was
18  molded they had out on the shelf.  And I
19  noticed the dirty floor keeping up, you
20  know, with the -- it wasn't -- like, it's
21  not well taken care of in there.
22            And I did notice a wet spill,
23  too, when I went there as well.

25  (Pages 97 to 100)

Alexandria Bennett                                            6/14/2023

Page 101

1    Q.   Where was that?
2    A.   Where was it?  On that section,
3  on that side -- it wasn't on the side of the
4  water, so it was towards the left side of
5  the store where I seen that.
6         They had a little orange cone up,
7  but it was a spill on that -- up under that.
8    Q.   And when did you make that trip
9  back to the Wal-Mart to look around?
10   A.   I went there last month.
11   Q.   Last month.  Okay.  I want to ask
12 you some more about October 15, 2020.
13 Sitting here today, is there any way for you
14 to be certain that that was dirty water that
15 you saw on the floor after you fell?
16   A.   You said am I for certain?
17   Q.   Yes.
18   A.   Yes, ma'am.  I think I am for
19 certain it was dirty water.
20   Q.   Okay.  Do you know where it came
21 from?
22   A.   No, ma'am.
23   Q.   Do you have any information about

Page 102

1  how it got there?
2    A.   No, ma'am.
3    Q.   Any idea how long the water had
4  been there before you fell?
5    A.   No, ma'am.
6    Q.   Has anyone told you that they
7  know how long the water had been there
8  before you fell?
9    A.   No, ma'am.
10   Q.   Has anyone told you that they
11 know where the water came from that you saw
12 on the floor?
13   A.   No, ma'am.
14   Q.   Do you have any evidence or
15 reason to believe that Wal-Mart knew there
16 was water on the floor of the water aisle
17 before you fell?
18   A.   I can't -- I don't understand
19 that.  I'm sorry.
20   Q.   Okay.  Do you have any reason to
21 believe that any Wal-Mart employees knew
22 there was water on the floor of the water
23 aisle before you fell?

Page 103

1    A.   I don't think they knew.  I don't
2  know.
3    Q.   Did you take any photographs
4  after you fell or before you fell while you
5  were shopping that day?
6    A.   No, ma'am, I didn't take no
7  photos.
8    Q.   Did you take any videos after you
9  fell or while you were shopping that day?
10   A.   Kevin took the photos.
11   Q.   Okay.  And has Kevin given a copy
12 of any photos he took?
13   A.   If I do have them, I will have to
14 look for them or something or just ask him
15 about it.
16   Q.   How many did he take, if you
17 know?
18   A.   It was a couple.
19   Q.   Okay.  And you have provided one
20 photograph as part of your document
21 production that I will mark -- if I can find
22 it -- I will mark as Defendant's Exhibit 4.
23         Have you seen this photograph

Page 104

1  before?
2    A.   Yes, ma'am.
3         (Whereupon, Defendant's Exhibit
4         No. 4 was marked and is attached
5         to the original transcript.)
6    Q.   (By Ms. Gordon)  Is that one that
7  Kevin took, or do you know who took it?
8    A.   I don't know who took it.
9    Q.   Or how you got that picture?
10   A.   It was either from Kevin or the
11 lady that was sitting with me at the store.
12   Q.   Okay.  So let's back up.  After
13 you fall, you see the water in one area that
14 we've talked about; right?
15   A.   Uh-huh (affirmative).
16   Q.   Is that a yes?
17   A.   Yes, ma'am.  I'm sorry.
18   Q.   Okay.  Did anybody see you fall?
19   A.   Yes, ma'am.
20   Q.   Who saw you fall?
21   A.   Kevin.
22   Q.   Has he ever told you what he
23 thinks caused you to fall?

26  (Pages 101 to 104)

Alexandria Bennett                                    6/14/2023

---

Page 105

1    A.   The water caused me to fall.  The
2    dirty water.
3    Q.   Did he tell you that?
4    A.   If he took the pictures -- yes,
5    ma'am.  That's what we believed, once we
6    took the pictures.
7    Q.   And does the photograph that I
8    have marked as Defendant's Exhibit 4 depict
9    the floor as you saw it after you fell?  Did
10   it look like that after you fell?
11   A.   Yes, ma'am.
12   Q.   Okay.  Is that showing the area
13   of water that you told me about?
14   A.   Yes, ma'am.
15   Q.   Was there water in any other area
16   other than the area that is shown in
17   Exhibit 4?
18   A.   No, ma'am.
19   Q.   It looks like a part of maybe a
20   hand is -- can you recognize whether that's
21   yours or not?
22   A.   That's my hand.
23   Q.   Okay.  And I assume that's part

---

Page 106

1    of your bottom on the floor?
2    A.   Yes, ma'am.
3    Q.   Okay.  So was that photograph --
4    well, let me back up.  Looking at Exhibit 4,
5    are you able to determine when that
6    photograph was taken?
7    A.   No, ma'am.
8    Q.   How long did you remain on the
9    floor after you fell?
10   A.   About 30 to 40 minutes.
11   Q.   Have you and Kevin discussed the
12   fall since it happened?
13   A.   No, ma'am.
14   Q.   Has he ever told you anything
15   different than what you have told me today
16   about how it happened?
17   A.   No, ma'am.
18   Q.   He didn't see something else
19   happen that -- from what you have told me?
20   A.   No, ma'am.
21   Q.   Okay.
22   A.   No, ma'am.  I'm sorry.  I'm
23   talking so low.  No, ma'am.

---

Page 107

1    Q.   No.  You are doing great.  I know
2    it's going on, but we are getting through
3    it, I promise.
4        Okay.  So after you fell -- well,
5    did anyone else witness it besides Kevin,
6    your fall?
7    A.   Yes, ma'am.
8    Q.   Who else?
9    A.   It was a lady shopping in the
10   store.  I believe her name was Ms. Kellie.
11   Q.   All right.  And she told you that
12   she saw your fall?
13   A.   Yes, ma'am.
14   Q.   Did she tell you that she
15   observed anything else happen other than
16   what you have told me here today?
17   A.   I just know she was right there
18   with me.  And she was just saying that it's
19   dirty; the store is dirty.
20   Q.   Had you seen Ms. Kellie before
21   your fall?
22   A.   No, ma'am.
23   Q.   You hadn't seen her on that aisle

---

Page 108

1    before your fall?
2    A.   No, ma'am.
3    Q.   Okay.  And where was Kevin in
4    relation to you when you reached for that
5    water?
6    A.   He was on the aisle.
7    Q.   Okay.  Was he to your left?
8    Right?  Was he behind you?
9    A.   I think he would have been to my
10   left.
11   Q.   And how close was he to you?
12   A.   Not close.
13   Q.   Okay.  A few feet?  Ten feet?
14   A.   I believe so, yes, ma'am.
15   Q.   About ten feet, or a few feet, if
16   you know?
17   A.   Just a few feet.
18   Q.   Okay.
19   A.   Because, you know, you are just
20   walking down the aisle.
21   Q.   Were there any customers or
22   employees on the aisle besides Ms. Kellie
23   and Kevin at the time of your fall?

---

27  (Pages 105 to 108)

Alexandria Bennett                                          6/14/2023

Page 109

1    A.   I don't recall anybody, no,
2  ma'am.
3    Q.   Did you see any Wal-Mart
4  employees walk down the water aisle before
5  your fall?
6    A.   No, ma'am.
7    Q.   And after your fall, I believe
8  you said Ms. Kellie came to your aid; is
9  that right?
10   A.   Yes, ma'am.
11   Q.   Okay.  And what did she help you
12 do, if anything, after the fall, or how did
13 she aid you?
14   A.   She just tried to calm me down.
15 I think I was, like, hollering and
16 screaming.  She comforted me.
17   Q.   And was Kevin also there with you
18 after your fall?  Did he stay with you?
19   A.   No, ma'am.
20   Q.   Where did he go?
21   A.   He was trying to find someone in
22 the store, I believe.
23   Q.   Did anyone else come to your aid

Page 110

1  while Kevin was gone besides Ms. Kellie?
2    A.   No, ma'am.
3    Q.   All right.  When Kevin returned,
4  was anyone with him?
5    A.   I think he was saying he was
6  trying to find someone that worked there.
7  It took a minute to find someone.  Like, I
8  was down there 40 minutes so -- well, about
9  40 minutes, so it was a long time before I
10 got some help.
11   Q.   Did you see any Wal-Mart
12 employees after your fall?  Did you talk to
13 any Wal-Mart employees after your fall?
14   A.   No, ma'am.
15   Q.   Did any Wal-Mart employees come
16 to your aid after the fall?
17   A.   No, ma'am.
18   Q.   Okay.
19   A.   Are you saying, like, right then?
20   Q.   No.  I'm talking about anytime
21 after the fall.  Did any of them come to the
22 water aisle to speak with you?
23   A.   Yes, ma'am.  Like -- like,

Page 111

1  towards when the ambulance was getting
2  there.
3    Q.   Who called the ambulance?
4    A.   I'm not sure.
5    Q.   Okay.  Did you have a phone with
6  you that day?
7    A.   Yes, ma'am.
8    Q.   All right.  And were you using it
9  at the time of the fall?  Were you on your
10 phone?
11   A.   No, ma'am.
12   Q.   Did you make the call to 911?
13   A.   No, ma'am.
14   Q.   So did you tell someone that you
15 needed an ambulance?
16   A.   I needed -- yes.  Yes, ma'am.
17   Q.   Who did you tell that you needed
18 an ambulance?
19   A.   I'm guessing a worker that came
20 over at the time.
21   Q.   Okay.  So how long after your
22 fall was it that a Wal-Mart employee came to
23 you on the water aisle?

Page 112

1    A.   It was -- it was a little while.
2  Because Ms. Kellie was there with me.
3    Q.   She came first.  And then was it
4  a Wal-Mart employee that came next?
5    A.   I believe, yes, ma'am.
6    Q.   Any idea who it was?
7    A.   Uh-uh (negative).
8    Q.   Is that a no?
9    A.   No, ma'am.
10   Q.   Thank you.  Can you describe the
11 individual that came to you first, the first
12 Wal-Mart employee that came to you?
13   A.   No, ma'am.
14   Q.   Male or female?
15   A.   I can't remember.
16   Q.   Okay.  That's fine.
17       All right.  Was that person rude
18 to you at all?
19   A.   No, ma'am.  I just don't think
20 they moved as fast as they should in this
21 particular incident.
22   Q.   You believe it was the Wal-Mart
23 employee that asked you if you needed an

                            28  (Pages 109 to 112)

Alexandria Bennett                                    6/14/2023

Page 113

1  ambulance?
2      A.   I believe so.
3      Q.   Okay.  You think the ambulance
4  was called after the Wal-Mart employee
5  arrived?
6      A.   Yes.
7      Q.   Did you stay on the floor while
8  you waited on the ambulance?
9      A.   Yes, ma'am?
10     Q.   And did the EMTs come to you on
11 the water aisle?
12     A.   Yes, ma'am.
13     Q.   And you were taken from the store
14 by ambulance; is that right?
15     A.   Yes, ma'am.
16     Q.   Okay.  While you were still at
17 the store and on the floor, did anyone else
18 come to you or speak with you besides
19 Ms. Kellie and the first Wal-Mart employee?
20     A.   I'm not sure.  It may have been
21 another person.  I'm not sure.
22     Q.   Did you speak with any Wal-Mart
23 employee about completing an incident

Page 114

1  report?
2      A.   No, ma'am.
3      Q.   What did you tell them about what
4  had happened that day, or did they ask?
5      A.   If they did ask, I told them what
6  happened.  But I don't think I wrote a -- I
7  didn't write anything down or anything.  I
8  don't remember doing that.
9      Q.   Did they have an iPad with them?
10          Sometimes they complete them on
11 an iPad, and you will sign it on that.
12     A.   I'm not sure.
13     Q.   I have this incident report that
14 I will mark as Defendant's Exhibit 5.  Have
15 you ever seen this before?
16     A.   Yes, ma'am.
17          (Whereupon, Defendant's Exhibit
18          No. 5 was marked and is attached
19          to the original transcript.)
20     Q.   (By Ms. Gordon)  Is that your
21 signature on the bottom of it?
22     A.   Uh-huh (affirmative).
23     Q.   Is that a yes?

Page 115

1      A.   Yes, ma'am.
2      Q.   Okay.  Do you remember signing an
3  iPad or anything that day?  It may have been
4  some kind of electronic pad versus a paper
5  copy.
6      A.   I'm not -- I don't remember.
7      Q.   That's okay.
8          Does the description of the
9  incident sound accurate to you as it's
10 listed on there?
11     A.   Yes, ma'am.
12     Q.   All right.  And it lists -- I
13 think there is a little section -- there is
14 a section of witnesses, and it looks like it
15 listed a Kellie.  You think that's the
16 Ms. Kellie you were talking about?  Does
17 Kellie Daughtry sound familiar to you?
18     A.   Is that on this paper?
19     Q.   Yes.
20     A.   Whereabouts?
21     Q.   It's tiny.  Let me point it to
22 you.
23     A.   Okay.

Page 116

1      Q.   It's this tiny little -- okay.
2  We've got Kevin Allen listed --
3      A.   Okay.
4      Q.   -- and then Kellie Daughtry?
5      A.   Yes, ma'am.
6      Q.   Have you spoken with Ms. Kellie
7  since the fall?
8      A.   No, ma'am.
9      Q.   And did she stay with you until
10 the EMTs got there?
11     A.   Yes, ma'am.
12     Q.   Do you remember anything y'all
13 talked about while you were waiting on the
14 EMTs?
15     A.   No, ma'am.
16     Q.   Has anyone besides Ms. Kellie and
17 Kevin told you that they witnessed your
18 fall?
19     A.   No, ma'am.
20     Q.   When you fell, did you feel any
21 pain immediately upon your fall?
22     A.   Yes, ma'am.
23     Q.   Tell me what hurt when you fell.

                         29  (Pages 113 to 116)

Alexandria Bennett                                          6/14/2023

Page 117

1      A.   I'm sorry.
2      Q.   You are fine.
3      A.   My hip hurt, and my ankle was
4   hurting.
5      Q.   Which hip?
6      A.   I'm not sure.
7      Q.   Do you remember which ankle hurt?
8      A.   My right ankle.
9      Q.   And that was an immediate pain
10   that you felt when you fell?
11      A.   Yes, ma'am.
12      Q.   Do you know how your ankle was
13   injured in the fall, like, if it hit
14   something or if it twisted, if you know?
15      A.   No, ma'am.
16      Q.   Do you know how your hip was
17   injured in the fall?
18      A.   I had done fell.
19      Q.   I'm sorry?
20      A.   I fell.  So, you know, I'm kind
21   of big.  I'm kind of a big girl.  So I was,
22   like -- I was, like, I probably -- I don't
23   know.  Probably the weight of me.

Page 118

1      Q.   Any other pain immediately when
2   you fell?  Did you experience any other pain
3   right when you fell?
4      A.   I think my back was hurting as
5   well.
6      Q.   What part of your back?
7      A.   I'm not sure.
8      Q.   Did you speak with anyone else
9   besides the Wal-Mart employee, Ms. Kellie,
10   and Kevin before the EMTs arrived?
11      A.   I don't believe so.
12      Q.   And once the EMTs arrived, what
13   were your complaints at that time?
14      A.   The same.
15      Q.   The same.  Did you ask to be
16   taken to the hospital?
17      A.   They were taking me.
18      Q.   And which hospital did they take
19   you to?
20      A.   I think they took me to Shelby.
21      Q.   When you walked down the water
22   aisle right before your fall, was that your
23   first time on the water aisle that day?

Page 119

1      A.   Yes, ma'am.
2      Q.   Okay.  Was the lighting on the
3   water aisle -- did it seem bright enough to
4   you?
5      A.   I guess.
6      Q.   Like, you didn't have any trouble
7   seeing what you were looking for on the
8   water aisle, did you?
9      A.   No, ma'am.
10      Q.   Okay.  And were you able to reach
11   the water on the top shelf just reaching
12   your arm up and standing flatfooted?
13      A.   Yes, ma'am.
14      Q.   Did you have to stand on anything
15   to reach the water?
16      A.   No, ma'am.
17      Q.   Did you ever stand on anything
18   before you fell?
19      A.   No, ma'am.
20      Q.   Like, stand on a pallet or find a
21   stool or anything like that?
22      A.   No, ma'am.
23      Q.   You were standing flatfooted on

Page 120

1   the ground when you fell?
2      A.   Yes, ma'am.
3      Q.   Were you having to get up on your
4   tippy-toes to reach for it?
5      A.   No, ma'am.
6      Q.   Okay.  Did you have to be at the
7   grandmother's house by a certain time that
8   day to pick up your daughter?
9      A.   I'm not sure.
10      Q.   Were you in a rush or taking your
11   time at Wal-Mart?
12      A.   No, I wasn't in a rush.
13      Q.   And we talked briefly about the
14   shoes that you were wearing, and I think you
15   couldn't remember what style or brand they
16   were or anything; is that right?
17      A.   I know they weren't, like, no
18   slides or anything.
19      Q.   Do you remember what kind of sole
20   they had?
21      A.   What is that?
22      Q.   Like the bottom of the shoe, what
23   it was like.  Did it have a heel?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                        6/14/2023

| Page 121 | Page 123 |

**Page 121**

1    A.   No, ma'am.  Uh-uh (negative).
2    Q.   Okay.  Had you worn the shoes
3    before that day?
4    A.   Yes, ma'am.
5    Q.   Okay.  They weren't brand-new
6    shoes that you were wearing for the first
7    time?
8    A.   No, ma'am.
9    Q.   Do you still have the shoes that
10   you were wearing that day when you fell?
11   A.   I don't even recall what kind it
12   was.
13   Q.   Okay.  That's fair.
14        Before you fell, had you
15   overheard anyone talking about water on the
16   floor of the water aisle?
17   A.   No, ma'am.
18   Q.   Okay.  Did you observe any
19   warning signs or cones on the water aisle
20   before you fell?
21   A.   There weren't any.
22   Q.   Okay.  And afterwards, did you
23   observe any cones or warning signs on the

**Page 122**

1    water aisle?
2    A.   There weren't any.
3    Q.   Okay.  Did you point out the
4    water, to the Wal-Mart employee that you had
5    seen on the floor?
6    A.   I believe so.
7    Q.   Okay.  Did you observe any
8    cleaning efforts taking place after you
9    fell?
10   A.   You are saying did I see someone
11   come over and start cleaning up?
12   Q.   Yes.
13   A.   No, I didn't see that.
14   Q.   Okay.  And I'm going to show you
15   what I will mark as Defendant's Exhibit 6,
16   which is Bates-labeled Wal-Mart 11 through
17   15.
18        These are some photographs that
19   we produced in this lawsuit.  And I will
20   represent to you that they were provided to
21   us as a part of Wal-Mart's incident report.
22   A.   Okay.
23        (Whereupon, Defendant's Exhibit

**Page 123**

1    No. 6 was marked and is attached
2    to the original transcript.)
3    Q.   (By Ms. Gordon)  And if you will,
4    just flip through those.  And I will ask you
5    some questions about it after you have had a
6    chance to look at them.
7    A.   Okay.
8    Q.   And feel free to leave them
9    spread out.  However you want to do it is
10   fine.  We will gather them up at the end.
11   A.   Okay.
12   Q.   Okay.  Have you had a chance to
13   look at those?
14   A.   Uh-huh (affirmative).
15   Q.   Is that a yes?
16   A.   Yes, ma'am.
17   Q.   Okay.
18   A.   I'm sorry.
19   Q.   That's okay.
20        Do the photographs I have marked
21   as Defendant's Exhibit 6 show the area in
22   which you fell at the Wal-Mart that day?
23   A.   Yes, ma'am.

**Page 124**

1    Q.   Okay.  Do they show the substance
2    on which you claim you slipped that day?
3    A.   Yes, ma'am.
4    Q.   Okay.  Looking at the photographs
5    I have marked as Defendant's Exhibit 6, are
6    you able to identify the substance on which
7    you claim you slipped?
8    A.   Yes, ma'am.
9    Q.   Okay.  I'm going to give you a
10   blue Sharpie.  And if you will, circle that
11   substance.
12   A.   Like, circle all of it?
13   Q.   Oh, no.  That's fine.  I see what
14   you have done.  You have circled it in one
15   picture.  And, to me, it looks like those
16   are all photographs of the same area, just
17   different --
18   A.   Zooms.
19   Q.   Yes, different zooms.
20        Is that what it looks like to
21   you, too --
22   A.   Yes.
23   Q.   -- that it's just different

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                    6/14/2023

---

Page 125

1    zooms?
2        A.  Yes, ma'am.
3        Q.  Okay.  Did you see water in any
4    other area of the floor of the water aisle
5    besides the area you have circled on
6    Wal-Mart 14?
7        A.  You said do I see any other
8    water?
9        Q.  When you were on the floor, did
10   you see water on the floor in any other
11   areas besides the area you have circled in
12   Wal-Mart 14?
13       A.  No, ma'am.
14       Q.  Okay.  Do the photographs I have
15   marked as Defendant's Exhibit 6 accurately
16   show the way the floor looked to you on
17   October 15, 2020?
18       A.  Yes, ma'am.
19       Q.  Okay.  Have you ever seen any
20   other photographs of the area where you fell
21   taken on October 15, 2020, besides the ones
22   that we have looked at today that I have
23   marked as Defendant's Exhibit 6 and

---

Page 126

1    Defendant's Exhibit 4?
2        A.  This is Defendant's 4?
3        Q.  Yes.
4        A.  This is -- this is 6?
5        Q.  Right.  So they are photographs
6    that I have marked as Defendant's Exhibit 6,
7    and then I marked one earlier as Exhibit 4.
8            Have you seen any other
9    photographs that were taken that day?  Just,
10   like, before we got here today, have you
11   ever seen any other photographs?
12       A.  This?
13       Q.  I'm just talking about are you
14   aware of any other photographs of the area
15   where you fell besides those that are laid
16   out in front of you.
17       A.  No, ma'am --
18       Q.  Okay.
19       A.  -- than what Kevin took or
20   something.  Is that what you are saying?
21       Q.  Right.  Did the photographs that
22   Kevin took look any different than the
23   photographs we've marked as Defendant's

---

Page 127

1    Exhibit 4 or Defendant's Exhibit 6?
2        A.  No, ma'am.
3        Q.  Okay.  And I'm just remembering
4    that I have two other photographs.  I will
5    mark these as Defendant's Exhibit 7.
6            Have you ever seen these two
7    photographs before?
8        A.  Yes, ma'am.
9            (Whereupon, Defendant's Exhibit
10           No. 7 was marked and is attached
11           to the original transcript.)
12       Q.  (By Ms. Gordon)  All right.  Any
13   idea who took those?
14       A.  No, ma'am.
15       Q.  Do they show the substance on
16   which you claim you slipped that day?
17       A.  Yes, ma'am.
18       Q.  Will you circle that for me,
19   please?
20       A.  Okay.
21       Q.  And does the photograph with the
22   Exhibit 7 sticker on it, does this show the
23   position you landed --

---

Page 128

1        A.  Yes, ma'am.
2        Q.  -- or had you moved?
3        A.  Yes, ma'am, that shows the
4    position.
5        Q.  Okay.  So that's how you landed
6    as shown in Exhibit 7?
7        A.  Yes, ma'am.
8        Q.  And that's the red hair that you
9    mentioned earlier?
10       A.  Yes, ma'am.
11       Q.  I like that color.
12       A.  Thank you.
13       Q.  It looks like you were wearing
14   black, too, that day.  Does that refresh
15   your memory about what you were wearing?
16       A.  Yes, ma'am.
17       Q.  Okay.  October 15, 2020, either
18   before or after your fall, did you observe
19   water or a liquid substance on the floor in
20   any other areas besides those shown in the
21   photographs we have marked as Defendant's
22   Exhibits 4, 6, and 7?
23           So that would be, looking at all

---

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                        6/14/2023

| Page 129 | Page 131 |
|---|---|

**Page 129**

1  of these photographs, do they show the only
2  area of water that you observed that day?
3      A.   Yes, ma'am.
4      Q.   Okay.  There wasn't some other
5  area that wasn't photographed?
6      A.   No, ma'am.
7      Q.   Okay.  And are you claiming that
8  the liquid that you slipped on was in front
9  of the pallet?
10         It looks like the area you have
11  circled in Defendant's Exhibit 7 is in front
12  of the pallet.  Am I right?
13     A.   Yes, ma'am.
14     Q.   Okay.  So are you claiming that
15  the water that you slipped on was in front
16  of the pallet?
17         I just want to make sure you are
18  not claiming that there was some water
19  hidden under the pallet, behind the pallet,
20  or under anything else.
21     A.   I don't know if it was hidden
22  under there or not.
23     Q.   Okay.  The water that you have

**Page 130**

1  talked about today was out in front of the
2  pallet on the floor?
3      A.   Uh-huh (affirmative).
4      Q.   Is that right?
5      A.   Yes, ma'am.
6      Q.   Okay.  I just wanted to make sure
7  I was clear about that.
8          Was there any odor to the liquid
9  that you saw on the floor that you remember?
10     A.   I'm not sure.
11     Q.   Okay.  Were any portions of your
12  clothes wet after you fell?
13     A.   I'm not sure.
14     Q.   Did a police officer also come to
15  the store after the incident, or was it just
16  EMTs?
17     A.   I don't remember seeing a police
18  officer.
19     Q.   Did they bring the stretcher to
20  you on the water aisle?
21     A.   Yes, ma'am.
22     Q.   And you were taken out on the
23  stretcher?

**Page 131**

1      A.   Yes, ma'am.
2      Q.   Do you remember which exit you
3  went out on the stretcher?  I'm showing you
4  Defendant's Exhibits 2 and 3 again to see if
5  that helps you remember.
6      A.   I don't remember.
7      Q.   That's okay.
8          All right.  So did anyone ride in
9  the ambulance with you to the hospital?
10     A.   No, ma'am.
11     Q.   And once you got to Shelby, what
12  were your complaints then when you got to
13  the ER?
14     A.   The same.
15     Q.   Did anyone meet you at Shelby?
16     A.   Kevin.
17     Q.   Had your pain changed at all in
18  between the time you fell and when you got
19  to Shelby?
20     A.   No, ma'am.
21     Q.   All right.  What type of
22  treatment were you given at Shelby, if you
23  remember?

**Page 132**

1      A.   I believe I left out in crutches.
2      Q.   Did they do some X-rays?
3      A.   I believe so.
4      Q.   Were you given any diagnoses at
5  Shelby that day?
6      A.   I believe they did.
7      Q.   Do you remember what that was?
8      A.   No.
9      Q.   Okay.  And you think you left on
10  crutches?
11     A.   Yes, ma'am.
12     Q.   Did you leave with any bandages
13  or braces?
14     A.   I can't recall.
15     Q.   Were the crutches to help with
16  your ankle pain?
17     A.   Yes, ma'am.
18     Q.   To keep you off your ankle?
19     A.   Yes, ma'am.
20     Q.   And how did you leave the
21  hospital that night?  Did somebody pick you
22  up?
23     A.   Kevin was there.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                        6/14/2023

Page 133

1    Q.   When you left Shelby, where did
2  you go?
3    A.   I think I went home.
4    Q.   And that would be back to
5  The Pearl at that time?
6    A.   Well, I probably went to go get
7  Allyson or something, but I went home.
8    Q.   Did anyone in the emergency room
9  recommend that you seek any additional
10 treatment for the injuries you were there
11 about that day?
12   A.   Yes, ma'am.
13   Q.   And what did they tell you to do?
14   A.   I needed to follow up with an
15 orthopedic.  I think there was something
16 wrong.
17   Q.   Did they give you any
18 prescriptions for medication at the ER?
19   A.   I think so, yes, ma'am.
20   Q.   Was it like a pain medication, or
21 do you remember?
22   A.   I don't remember.
23   Q.   Did you get the prescriptions

Page 134

1  filled?
2    A.   Yes, ma'am.
3    Q.   How long were you on prescription
4  medication following the fall?
5    A.   I don't remember.  I'm sorry.
6    Q.   That's okay.  Where did you get
7  the prescriptions filled?
8    A.   I'm not sure.
9    Q.   All right.  When did you next
10 seek treatment for any of the injuries you
11 relate to your fall?
12   A.   Well, I was trying to get
13 treatment, but I was turned down by a couple
14 of people because I didn't have insurance.
15   Q.   Who turned you down?
16   A.   Orthopedics.
17   Q.   Do you remember which orthopedic
18 doctor or where their office was located?
19   A.   I don't remember.  I don't
20 remember which ones it was, but I know it
21 was a few, because they wouldn't see me
22 because I didn't have insurance.
23   Q.   Okay.  So did you eventually get

Page 135

1  somebody to see you?
2    A.   Yes, ma'am.
3    Q.   And who was that that you saw
4  next after the ER?
5    A.   I went to -- you mean who was I
6  seen by?
7    Q.   Right.
8    A.   I was seen by Southlake, I think.
9    Q.   Had you gotten the Blue Cross by
10 the time you went to Southlake?
11   A.   Yes, ma'am.
12   Q.   And any idea how long it was
13 after the fall that you went to Southlake
14 the first time?
15   A.   No, ma'am.
16   Q.   What were your complaints when
17 you went to Southlake the first time?
18   A.   Ankle pain.  And I think I was --
19 it was just going downhill from there,
20 basically.
21   Q.   Were you still experiencing pain
22 anywhere else besides your ankle when you
23 went to Southlake?

Page 136

1    A.   My hip pain wore off, but it was
2  just mainly my ankle.
3    Q.   About how long did the hip pain
4  last after the fall?
5    A.   I'm not sure.
6    Q.   Is the only treatment that you
7  received for the hip pain that treatment in
8  the ER the day of the fall?
9    A.   Yes, ma'am, I think so.
10   Q.   Okay.  What about your back; how
11 long did that pain last?
12   A.   I'm not sure.
13   Q.   Go ahead.
14   A.   I was trying to -- I just
15 couldn't see anyone.  No one would see me,
16 because I didn't have insurance.
17   Q.   Did you receive any other
18 treatment for your back besides that initial
19 ER visit at Shelby?
20   A.   No, ma'am.
21   Q.   So by the time you went to
22 Southlake, your complaint was the ankle
23 pain; is that right?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023

---

Page 137

1    A.   Yes, ma'am.
2    Q.   Okay.  And what did -- what kind
3  of treatment were you given by Southlake, or
4  diagnosis?
5    A.   I think he said it was broken or
6  something.
7    Q.   Okay.  Did they recommend any
8  additional treatment?
9    A.   He recommended surgery.
10   Q.   Did you schedule the surgery?
11   A.   Yes, ma'am.
12   Q.   And did you have the surgery
13  performed?
14   A.   Yes, ma'am.
15   Q.   When did you have the surgery
16  performed?
17       I might be able to help you out.
18  Let's see.
19       Was it July 30, 2021?  Does that
20  sound right?
21   A.   Yes, ma'am.
22   Q.   Okay.  Was that an outpatient
23  procedure, meaning you got to go home the

---

Page 138

1  same day it was performed?
2    A.   Yes, ma'am.
3    Q.   You weren't hospitalized
4  overnight?
5    A.   No, ma'am.
6    Q.   Between your first visit to
7  Southlake and the day you had the surgery
8  performed on your ankle, was there any other
9  treatment for any injuries you relate to the
10  fall?
11   A.   No, ma'am.
12   Q.   I assume there was an incision
13  from your surgery.  Was there?
14   A.   Ma'am?
15   Q.   Like, did they have to cut you
16  open to do your surgery?
17   A.   Yes, ma'am.
18   Q.   And did the incision heal
19  following the surgery?
20   A.   Did it heal?
21   Q.   Yes.  Did you have any problems
22  with infection or with the incision healing?
23   A.   No, ma'am.

---

Page 139

1    Q.   Did you receive any other
2  treatment following your surgery for your
3  ankle?
4    A.   No, ma'am.  I was supposed to do,
5  I think, physical therapy or something.  I'm
6  not sure.
7    Q.   Okay.  Did you attend physical
8  therapy?
9    A.   No, ma'am.
10   Q.   And why didn't you attend
11  physical therapy?
12   A.   I think I wasn't able to keep up
13  with the insurance by that time.
14   Q.   Okay.  Have you attended physical
15  therapy since the fall at Wal-Mart?
16   A.   No, ma'am.
17   Q.   Have you been back to Southlake
18  since your surgery was performed?
19   A.   I tried to schedule it, I think.
20  Yeah, I think so.
21   Q.   You did try to schedule another
22  appointment?
23   A.   Uh-huh (affirmative).

---

Page 140

1    Q.   After your surgery?
2    A.   Yes, ma'am.
3    Q.   Okay.  Do you have an appointment
4  scheduled?
5    A.   Not right now.
6    Q.   What happened with trying to
7  schedule one?
8    A.   I think it was an issue with
9  insurance.
10   Q.   I see.  Why do you want to
11  schedule another appointment with Southlake?
12   A.   Because I may have some issues --
13  well, he told me I -- I just believe it will
14  never be the same, my ankle.  So I was going
15  to schedule an appointment to see what was
16  going on, because I be having some pains and
17  stuff now.  But with me working through
18  temps, I don't have insurance through the
19  job or anything.  So I've got to figure my
20  way out with that one.
21   Q.   Have you seen any other
22  orthopedic doctors for injuries you relate
23  to the fall at Wal-Mart besides Southlake?

---

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                              6/14/2023

Page 141

```
1        A.  I tried, but they didn't see me.
2        Q.  Okay.  And that was before --
3        A.  They wouldn't see me.
4        Q.  Was that before you went to
5   Southlake?
6        A.  Yes, ma'am.
7        Q.  Did the Southlake doctors
8   recommend any further treatment for your
9   ankle after your surgery?
10       A.  I think it was supposed to be
11  physical therapy.
12       Q.  You mentioned that.  Okay.
13          Have you seen any other doctors
14  since your surgery for injuries that you
15  relate to your fall?
16       A.  No, ma'am.
17       Q.  Do you have any appointments
18  scheduled with any doctors for treatment of
19  injuries you relate to the fall?
20       A.  No, ma'am.
21       Q.  Do you have plans to seek any
22  additional treatment for injuries you relate
23  to the fall?
```

Page 142

```
1        A.  Yes, ma'am.
2        Q.  Okay.  And that's additional
3   treatment for your ankle?  Is that what you
4   were saying earlier?
5        A.  Yes, ma'am.
6        Q.  And you are just waiting until
7   you can get some insurance, and then you are
8   going to do that?
9        A.  Yes, ma'am.
10       Q.  Did the Southlake doctors or the
11  doctor who performed your ankle surgery give
12  you any sort of prognosis, like what you
13  could expect with your ankle in the future?
14       A.  I think it will never be the
15  same.
16       Q.  Did they tell you why they
17  thought that?
18       A.  I'm not sure.  He used a lot of
19  medical terminology.
20       Q.  I understand.
21          Were you having pain in your
22  ankle up until the time the surgery was
23  performed?
```

Page 143

```
1        A.  Yes, ma'am.
2        Q.  Had the pain lessened or worsened
3   between the fall and when you had your
4   surgery?
5        A.  It worsened.
6        Q.  Can you describe it for me, what
7   type of pain you were experiencing right
8   before the surgery?
9        A.  Like, every time I took a step on
10  that -- on that -- on this -- with my right
11  leg, it would hurt every time I took a step.
12       Q.  And after the surgery, did your
13  ankle pain change at all?
14       A.  Yes, ma'am.  It eased.
15       Q.  Okay.  Are you still experiencing
16  ankle pain today?
17       A.  Yes, ma'am.
18       Q.  How often do you experience ankle
19  pain?
20       A.  When I first wake up in the
21  morning.
22       Q.  How long does it last after you
23  wake up?
```

Page 144

```
1        A.  Once I get to going and getting
2   ready and stuff.
3        Q.  And does that happen every
4   morning when you wake up?
5        A.  Yes, ma'am.
6        Q.  Has that been the case ever since
7   the surgery?
8        A.  Well, it eased since -- it had
9   eased once -- when I had the surgery.  But,
10  like, now I noticed, you know, when I get up
11  in the morning, I will feel that pain.
12       Q.  So following the surgery, was
13  there a period of time where you didn't have
14  any ankle pain?
15       A.  Yes, ma'am.  It eased a whole
16  lot.
17       Q.  And about when did it return, how
18  long ago?
19       A.  I will say just a few months or
20  so.
21       Q.  Has anything changed in your
22  lifestyle?  Like, have you been more active
23  in the past few months or suffered any
```

36 (Pages 141 to 144)

Alexandria Bennett                                           6/14/2023

Page 145

1    injuries in the past few months that would
2    have caused the pain to return?
3        A.   Uh-uh (negative).  I haven't been
4    more active.
5        Q.   Okay.  Did it just seem to kind
6    of come out of nowhere?
7        A.   Yes, ma'am.
8        Q.   And besides trying to schedule an
9    appointment with Southlake, have you sought
10   any other treatment since that pain
11   returned?
12       A.   No, ma'am.
13       Q.   Was there a point where you were
14   given a boot to wear on your ankle?  Do you
15   remember that?
16       A.   Yes, ma'am.
17       Q.   Who gave you that?
18       A.   I'm not sure.
19       Q.   Okay.  Was that before your
20   surgery or after?
21       A.   I know I had a boot after
22   surgery.
23       Q.   Were you given any instructions

Page 146

1    on when or how often you should wear it?
2        A.   I was wearing it -- I was wearing
3    it -- like, I was wearing it during the day.
4    He told me, "You know you are supposed to
5    stay in your boot."  So I was wearing it,
6    like, when I would have to wake up and get
7    my daughter ready for school and stuff like
8    that.
9        Q.   Okay.  And were there times
10   during the day where you would take it off?
11       A.   When I would go to bed.
12       Q.   And was there a point where they
13   told you you could quit wearing it?
14       A.   I think so.  I think he gave me a
15   period of time.
16       Q.   Do you remember when that was --
17       A.   No, ma'am.
18       Q.   -- how long you were supposed to
19   wear it?
20       A.   No, ma'am.
21       Q.   Okay.  Were you given any other
22   sort of braces for injuries you relate to
23   your fall at Wal-Mart?

Page 147

1        A.   No, ma'am.
2        Q.   Had you ever been to physical
3    therapy before the fall at Wal-Mart for any
4    reason?
5        A.   No, ma'am.
6        Q.   The bills from the treatment that
7    you relate to the fall, have those been
8    paid?  Like, your bill from Grandview the
9    day you went to the ER, has that bill been
10   paid, or is it still out there?
11       A.   No, ma'am.
12       Q.   It has not been paid?
13       A.   No, ma'am.
14       Q.   Okay.  What about the ambulance
15   bill; has it been paid?
16       A.   No, ma'am.
17       Q.   And your bills from -- your
18   treatment at Southlake, have those been
19   paid?
20       A.   No, ma'am.
21       Q.   Did your insurance make any
22   payments towards the bills at Southlake or
23   your surgery?

Page 148

1        A.   I'm not sure.
2        Q.   Did you have -- did you have
3    health insurance in place when you had your
4    surgery?
5        A.   I think I did, yes, ma'am.
6        Q.   Okay.  Are there any injuries
7    that you relate to the fall which you
8    believe will be permanent?
9        A.   Yes, ma'am.
10       Q.   What's that?
11       A.   I think my ankle will always give
12   me problems.
13       Q.   Are there certain movements that
14   cause the pain to return in your ankle or to
15   flare up?
16       A.   No, ma'am.
17       Q.   Or certain activities that cause
18   it to hurt?
19       A.   I think it's just everyday life,
20   you know, with movement.
21       Q.   Do you take any medication for
22   ankle pain these days?
23       A.   No, ma'am.

                                    37  (Pages 145 to 148)

Alexandria Bennett                                          6/14/2023

Page 149

1      Q.   Are there any activities that you
2   could do before the fall at Wal-Mart that
3   you are no longer able to do?
4      A.   I never -- I can't -- you know
5   how you can close your toes all of the way,
6   I be noticing I can't do that.
7      Q.   Like, curl them under?
8      A.   Like -- yeah, like -- like that
9   (indicating).
10      Q.   Almost like you are making a fist
11   with your toes?
12      A.   Yes, ma'am.
13      Q.   Okay.  You can't do that anymore?
14      A.   No, ma'am.
15      Q.   Anything else that you were able
16   to do before the fall that you are not able
17   to do now?
18      A.   I was able to, you know, still
19   work in the cooking industry.  And I love to
20   cook.
21      Q.   Anything else like that?
22      A.   (Witness shakes head negatively.)
23      Q.   Okay.  Have you ever applied for

Page 150

1   social security disability benefits?
2      A.   No, ma'am.
3      Q.   Do you have any plans to apply
4   for them?
5      A.   No, ma'am, because I can't do
6   that right now.
7      Q.   Have you ever talked to any of
8   your doctors about giving you a disability
9   rating?
10      A.   No, ma'am.
11      Q.   Are you currently experiencing
12   any other pain other than the ankle pain you
13   have told me about that you relate to your
14   fall?
15      A.   No, ma'am.
16      Q.   Had you consumed any drugs or
17   alcohol in the 24 hours before your fall?
18      A.   No, ma'am.
19      Q.   Following that car accident, was
20   there a period of time where you had to use
21   crutches after that?
22      A.   No, ma'am.
23      Q.   Or any kind of brace?

Page 151

1      A.   No, ma'am.
2      Q.   We might have talked about that.
3           Are you claiming that the fall at
4   Wal-Mart has affected you mentally or
5   emotionally?
6      A.   Yes, ma'am.
7      Q.   Will you tell me about that,
8   please?
9      A.   I like to cook.  And I used to
10   always cook with my grandmother.  And my
11   grandmother just died last month.  So I
12   would be in the kitchen cooking with her and
13   stuff.  So it was -- it was painful to stop
14   doing what I like to do.
15           It was depressing to, you know,
16   be a young woman, and -- I was labeled "the
17   star" of the kitchen.
18           I think what was most painful was
19   how me and my daughter were affected because
20   we had to move from Homewood and move to the
21   ghetto, basically.  And we weren't used to
22   that.  And I wasn't used to have, you know,
23   her asking me questions, saying, "Mom, when

Page 152

1   are we going to move," and stuff like that.
2           But at that time, I had to try
3   to, you know, get my bills paid and try to
4   take care of her.  And I couldn't stop
5   working, so I had to keep on trying to find
6   a job.
7           And I was going through the temp
8   services, you know, not a stable job.  I
9   lost my job that I loved.  And I think the
10   most tragic was I lost it around the
11   holidays.  So she knows me.  It's, like,
12   it's going to be -- you know, it was going
13   to be surprising.
14           But I think that year I don't
15   think I was even able to get her anything.
16   I think my mom -- my mom and my stepdad
17   helped out.  So that was big.  I think the
18   mental abuse was big a lot.
19      Q.   And why was it that y'all had to
20   move?
21      A.   Because I wasn't able to pay my
22   rent over at The Pearl at Homewood, because
23   I was laid off.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                    6/14/2023



Page 153

1    Q.   And do you remember what you were
2  paying at ▓▓▓▓▓?
3    A.   Probably about -- I would say
4  about $800 or so or $1,000, one of the two.
5    Q.   And you moved from T▓▓▓▓▓▓▓
6  ▓ ▓▓▓▓▓▓▓▓▓ -- no, to --
7    A.   No, ma'am.  To Ensley.
8    Q.   To 31st Street?
9    A.   Yes, ma'am.
10   Q.   Okay.  That was also an
11 apartment?
12   A.   Yes, ma'am.
13   Q.   And what were you paying there?
14   A.   I think 600.
15   Q.   And you lived there for about
16 three years?
17   A.   About, yes, ma'am.
18   Q.   Are you more comfortable at the
19 ▓▓▓▓▓▓▓▓▓ address?
20   A.   Yes, ma'am.
21   Q.   Okay.  What do you pay there for
22 rent?
23   A.   I pay 1,200 a month.

Page 154

1    Q.   And you mentioned not being able
2  to cook.  What about the fall prevents you
3  from cooking now like you like to do?
4    A.   Well, I liked -- that's all I
5  knew how to do was cook, you know, with
6  working at Outback and Pappadeaux.  That's
7  all I knew how to do.  So once I figured,
8  like, "Hey, Alex, you've got to try to find
9  a job with less mobility" -- like, the
10 hospitals and stuff, they turned me down.  I
11 had to go through temp service because they
12 wouldn't hire me because that's all I had on
13 my application was, you know, Outback and
14 stuff, cooking and stuff.  So I didn't have
15 no experience in it.
16   Q.   And is it being on the feet that
17 is a problem for you now cooking in a
18 restaurant like you used to do?
19   A.   Or standing, yes, ma'am.
20   Q.   Okay.  Have you tried to work in
21 a cooking position since your job at
22 Outback?
23   A.   Uh-uh (negative).  I had to -- I

Page 155

1  had to switch fields, basically.
2    Q.   Have you discussed any of the
3  ways the fall has affected you mentally or
4  emotionally with any counselors,
5  psychiatrists, psychologists?  Anyone like
6  that?  Any medical providers?
7    A.   Did I go to a psychiatrist?
8    Q.   Yes.
9    A.   Yes, ma'am, at one point.
10   Q.   Okay.  Who did you see?
11   A.   I'm not sure.  But I think I will
12 be able to see who it was.  I can't think of
13 her name off of my head, but I --
14   Q.   Do you remember where her office
15 was?
16   A.   I want to say downtown or so.
17   Q.   And what was your reason for
18 going to see her the first time?
19   A.   To talk.  And I was just going
20 through a lot mentally.
21   Q.   Was it solely because of the fall
22 that you went to see her?
23   A.   Yes, ma'am.

Page 156

1    Q.   Were there any other things going
2  on in your life that were affecting you
3  emotionally at that time you went to see the
4  psychiatrist?
5    A.   No, ma'am.  It was a bad -- a bad
6  point in my life.
7    Q.   Do you remember when that was
8  when you went to see him or her the first
9  time?
10   A.   I'm not sure.
11   Q.   Was it before or after your
12 surgery?
13   A.   I'm not sure.
14   Q.   Did you see that individual on
15 more than one occasion?
16   A.   Uh-huh (affirmative).  I think I
17 seen her, like, twice or so.
18   Q.   And did you discuss the fall with
19 her when you went to see her?
20   A.   I'm not sure.  I don't know.
21   Q.   Have you ever been prescribed any
22 sort of antidepressant or antianxiety
23 medication since the fall?

Alexandria Bennett                                      6/14/2023

Page 157

1    A.   No, ma'am.
2    Q.   Had you been diagnosed with
3  depression or anxiety before the fall?
4    A.   No, ma'am.
5    Q.   Had you ever seen a psychiatrist
6  or psychologist before the fall?
7    A.   No, ma'am.
8    Q.   Has any of the emotional stress
9  that you relate to the fall caused you to
10 develop any physical symptoms?
11   A.   What is that?
12   Q.   Like, if -- I guess it would be
13 things, like, you know, the anxiety is
14 making you throw up or, like, not sleeping,
15 any kind of physical symptoms as a result of
16 emotional stress.
17   A.   I don't get that question.
18   Q.   Okay.  That's fine.
19        Let's do it this way:  Have you
20 told me about all of the ways the fall at
21 Wal-Mart has affected you mentally or
22 emotionally?
23   A.   I think I told you just about.

Page 158

1    Q.   Okay.  And are you claiming that
2  you had to take off an entire day of work at
3  Outback in order to attend doctors
4  appointments at Southlake?
5    A.   I didn't go to Southlake until
6  the next year; right?
7    Q.   Okay.  Where were you working in,
8  like, July and August of 2021, about when
9  you had your surgery?
10   A.   I think I was -- I was working
11 around -- with Milo's Tea Company, I think,
12 around that time.
13   Q.   Okay.  I think, if I have got --
14 my notes may be wrong.  But if I have my
15 notes right, I had you at Milo's -- yes,
16 Milo's starting August of 2021.  So the
17 warehouse jobs were before that?
18   A.   Yes, ma'am.
19   Q.   Okay.  So did you miss any time
20 from work at Milo's to attend doctors
21 visits?
22   A.   Yes, ma'am.
23   Q.   How much time did you miss?

Page 159

1    A.   I'm not sure.
2    Q.   If you had a doctor's
3  appointment, did you take the entire day off
4  from working at Milo's?
5    A.   Well, if I was -- if I was going
6  to a doctor's appointment -- I worked there
7  overnight.  So if it didn't interfere, then
8  it was okay, I guess.  I'm not sure.
9    Q.   What were your hours at Milo's?
10 I don't think I asked you that.
11   A.   It was overnight.  I had to take
12 that, because it was overnight.
13   Q.   Okay.  And were you working day
14 or night shifts when you did the warehouse
15 work?
16   A.   Those were jobs in the morning
17 time.
18   Q.   Did you miss any time at the
19 warehouse jobs to attend doctor's visits?
20   A.   If I was required to be there,
21 then -- if I did, then I did.  But if
22 not -- I'm not -- I'm not sure.
23   Q.   Okay.  All right.  Are you

Page 160

1  claiming that you incurred travel or mileage
2  expenses going to doctors visits?
3    A.   Yes, ma'am.
4    Q.   Okay.  All right.  I'm going to
5  show you what I have marked as Defendant's
6  Exhibit 8.  And I will represent to you that
7  these are the initial disclosures.  I think
8  there was just a little typo on the top that
9  says "Wal-Mart," but it was actually the
10 ones that we received from you on -- or your
11 lawyer at the beginning of this case.
12        And on the last page of this
13 document, it lists out the damages that you
14 are claiming in this lawsuit.  Have you ever
15 seen this chart before?  It's on the last
16 page.
17        Have you ever seen those numbers
18 before?
19   A.   I've seen my medical bills and
20 stuff.  Yes.
21        (Whereupon, Defendant's Exhibit
22        No. 8 was marked and is attached
23        to the original transcript.)

                          40  (Pages 157 to 160)

Alexandria Bennett                                          6/14/2023

Page 161

1    Q.   (By Ms. Gordon)  Okay.  Any idea
2  how you came up with the mileage amount?
3    A.   To and from places, gas.
4    Q.   Or how you came up with the lost
5  wages amount?
6    A.   The lost wages as in jobs and
7  stuff?
8    Q.   Right.  Yes.  Time missed from
9  work.
10   A.   Yes, ma'am.
11   Q.   Do you know how that was
12 calculated?
13   A.   I would just say about.
14   Q.   Okay.
15   A.   I think I --
16   Q.   What about the amount for pain
17 and suffering of $500,000; is that something
18 you came up with?
19   A.   Yes, ma'am.
20   Q.   Okay.  And how did you quantify
21 pain and suffering?
22   A.   Because it was a drastic change
23 for me and my daughter.

Page 162

1    Q.   Okay.  I promise I am almost
2  finished.
3    A.   Oh, no, you are fine.
4    Q.   Thank you for being patient.
5    A.   Do you want me to put these
6  together for you?
7    Q.   You can leave it.  We will do it
8  in a minute.
9    A.   Okay.
10   Q.   Did you ever see a Dr. Lloyd
11 Johnson at Alabama Bone & Joint?
12   A.   Lloyd Johnson?
13   Q.   Yes.
14   A.   I'm not sure.
15   Q.   All right.  Have you ever been
16 diagnosed with degenerative joint disease?
17   A.   I don't think so.  I'm not sure.
18   Q.   I've marked a couple of things,
19 but I think we've -- you listed as your --
20 listed your mother Erica Truitt as having
21 knowledge of the fall.  What type of
22 information does she have about the fall or
23 any of the claims you are making in this

Page 163

1  lawsuit?
2    A.   She helped me get my insurance
3  and stuff.
4    Q.   Okay.
5    A.   She was the one who helped with
6  bills at that point until she couldn't,
7  because, you know, she's got her own bills.
8    Q.   Sure.
9    A.   So she helped me with this
10 process.
11   Q.   She was not at Wal-Mart that day
12 when you fell, was she?
13   A.   No, ma'am.
14   Q.   Okay.  Have you applied for any
15 loans or advances for potential proceeds
16 from this lawsuit?
17   A.   Yes, ma'am.
18   Q.   You have?  With which company?
19   A.   OASIS.
20   Q.   Alexis?
21   A.   OASIS.
22   Q.   OASIS, I have heard of that.
23       All right.  Have you --

Page 164

1        MS. WASHINGTON:  I'm just going
2  to object just for relevance, but you can
3  answer the questions.
4    Q.   (By Ms. Gordon)  Have you told me
5  everything you remember about the incident
6  at Wal-Mart that's the basis of your
7  lawsuit?
8    A.   Yes, ma'am.
9    Q.   Okay.  And have you told me about
10 all of the injuries that you sustained as a
11 result of the incident at Wal-Mart?
12   A.   Yes, ma'am.
13   Q.   Have you told me about all of the
14 treatment that you received for the injuries
15 you relate to the fall?
16   A.   Yes, ma'am.
17   Q.   And have we talked about all of
18 the expenses -- well, let's summarize those.
19 I just want to make sure we've covered it
20 all.
21       The expenses that you relate to
22 the fall would be the medical bills, is that
23 right, from Grandview -- no, from Shelby and

41  (Pages 161 to 164)

Alexandria Bennett                                        6/14/2023

---

Page 165

1  Southlake and then the place you had your
2  surgery.  Are there any others?
3      A.  No, ma'am.
4      Q.  Okay.  And some of those may have
5  been paid by Blue Cross, some of them may
6  not.  Do you know one way or another?
7      A.  No, ma'am.
8      Q.  There is also a lost wages claim
9  for time you have missed from work; is that
10 right?
11     A.  Yes, ma'am.
12     Q.  And then you are claiming some
13 mileage expenses for travel to and from the
14 doctors appointments?
15     A.  Yes, ma'am.
16     Q.  And then we talked about your --
17 how it's affected you emotionally or
18 mentally.
19         Were there any other expenses
20 that you paid for out of your own pocket
21 that you relate to the fall?
22     A.  No, ma'am.
23     Q.  Okay.  Have we talked about all

---

Page 166

1  of the claims you are making in this
2  lawsuit?
3      A.  Yes, ma'am.
4         MS. GORDON:  All right.  That's
5  all that I have.  Thank you.
6
7  EXAMINATION BY MS. WASHINGTON:
8      Q.  I just have a few follow-up
9  questions.  I think we are going to be out
10 of here very quickly.  I just wanted to
11 address some things that were discussed
12 during your initial questioning.
13         As you know, I'm your attorney.
14 So we are here to talk about the incident at
15 Wal-Mart.  So I do want to talk about the
16 actual incident itself on October 15, 2020.
17 Is that the accurate date?
18     A.  Yes, ma'am.
19     Q.  All right.  So you noticed when
20 you went to get water -- do you recall what
21 kind of water you were attempting to get?
22 Was it a jug or a bottle?  Can you
23 distinguish between either of the two?

---

Page 167

1      A.  What now?
2      Q.  Do you know which one it was?
3  Was it a jug or a bottle that you reached
4  for when you -- when the incident happened
5  when you fell?
6      A.  It was either one of the two.
7      Q.  But you don't remember which one;
8  correct?
9      A.  I don't remember which one, no,
10 ma'am.
11     Q.  All right.  And then when
12 Attorney Gordon questioned you, you talked
13 about seeing water on the floor --
14     A.  Yes, ma'am.
15     Q.  -- or some liquid substance on
16 the floor?
17     A.  Yes, ma'am.
18     Q.  Did you do any testing of that
19 water that was on -- or that substance that
20 was on the floor when you fell, do you know
21 exactly what it was?
22     A.  No, ma'am.
23     Q.  Okay.  And then you said that --

---

Page 168

1  when was the first time you saw that liquid
2  substance on the floor at Wal-Mart?  When
3  was the first time you saw it?
4      A.  When I was on the floor.
5      Q.  Okay.  And so prior to your fall,
6  you didn't see any water; correct?
7      A.  No, ma'am.
8      Q.  And did you see any signage about
9  water?
10     A.  No, ma'am.
11     Q.  Did you see any signage at
12 Wal-Mart about any potential dangers?
13     A.  No, ma'am.
14     Q.  Okay.  And when you fell, how
15 long were you on the floor before you went
16 to the ambulance?
17     A.  About 30 to 40 minutes.
18     Q.  And during that time frame, did
19 you see anyone come place any signage or any
20 cones or any structures to warn others about
21 any dangers in that area?
22     A.  No, ma'am.
23     Q.  Okay.  Did anyone else come

---

42  (Pages 165 to 168)

Alexandria Bennett                                        6/14/2023

|  | Page 169 |
|---|---|

1  through that aisle while you were on the
2  floor?  Did you see any shoppers come
3  through that aisle as you were there for
4  30 to 40 minutes?
5       A.  No, ma'am.  I seen a lot of
6  commotion.
7       Q.  Okay.  But you don't recall the
8  exact happenings around that time, during
9  that 30- to 40-minute time frame?  You don't
10  recall anything?
11      A.  No, ma'am.
12      Q.  And so do you believe that
13  Wal-Mart took any steps to warn others about
14  any dangers in that area after your
15  accident?  Do you think they did anything to
16  warn against any dangers?
17          MS. GORDON:  Object to the form.
18      A.  No, ma'am.
19      Q.  (By Ms. Washington)  Okay.  And I
20  do want to show this video.  I know that we
21  are -- it's electronic.
22          MS. GORDON:  I will come over
23  there.

|  | Page 170 |
|---|---|

1          MS. WASHINGTON:  And I can share
2  this with you.
3          MS. GORDON:  That's fine.
4          MS. WASHINGTON:  I'm going to
5  mark this as Plaintiff's Exhibit 1.  So I
6  will share this via a link of sorts, if you
7  can't get email.
8          (Whereupon, Plaintiff's Exhibit
9          No. 1 was marked and is attached
10         to the original transcript.)
11      Q.  (By Ms. Washington)  But this is
12  the video.
13         MS. WASHINGTON:  Can you see it?
14         MS. GORDON:  Yes.
15         MS. WASHINGTON:  Okay.  Great.
16      Q.  (By Ms. Washington)  And so this
17  is the video.  Do you recall me showing you
18  this video during a Zoom meeting that you
19  and I had?
20      A.  Yes, ma'am.
21      Q.  Okay.  And do you recall if you
22  confirmed with this view which aisle you
23  were on --

|  | Page 171 |
|---|---|

1       A.  Yes, ma'am.
2       Q.  -- during the incident?
3           Can you point on the screen which
4  aisle you were on?
5       A.  That aisle (indicating).
6       Q.  Okay.  And so you believe you
7  were in this area where you pointed when the
8  incident occurred?
9       A.  Yes, ma'am.
10      Q.  Okay.  And so from your vantage
11  point, from what you can see here, is it
12  clear?  Can you clearly see anything?
13      A.  No, ma'am.
14      Q.  Okay.  So could you identify
15  yourself in this footage that I showed you?
16      A.  No, ma'am.
17      Q.  Could you identify Kevin, who was
18  with you, in this footage?
19          Let me go to the time.  Let me
20  pause.
21          During your testimony with
22  Attorney Gordon, did you state that the
23  incident occurred around 7:15, 7:20?  Does

|  | Page 172 |
|---|---|

1  that sound about right, about the time frame
2  in which this happened?
3       A.  Yes, ma'am.
4       Q.  So I'm going to actually
5  fast-forward to that time so we can see it.
6  That's 7:11.
7          MS. WASHINGTON:  Sorry, y'all.
8       Q.  (By Ms. Washington)  And so this
9  area, can you show us -- I'm sorry.  Can you
10  show us the area where the incident was
11  happening?  Do you think -- does it look
12  like some commotion on this video at this
13  time?
14      A.  Back in that area.
15      Q.  Okay.  So can you identify any of
16  the people in that footage?
17      A.  No, ma'am.
18         MS. WASHINGTON:  Okay.  And so
19  I'm going to pause.  And I just wanted to
20  verify what she could identify in that
21  footage.  Okay.  And I'm done with it for
22  now.
23

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                                6/14/2023

---

Page 173

1    REEXAMINATION BY MS. GORDON:
2        Q.   My only question is, just to
3    clarify the record, when you were talking
4    about the video and you were pointing to an
5    area of the screen, were you pointing to the
6    top right corner of the screen or top
7    right --
8        MS. WASHINGTON:  Yes, thank you
9    for that.
10       Q.   (By Ms. Gordon) Just since we
11   can't see where you were pointing --
12       MS. WASHINGTON:  Correct.
13       Q.   (By Ms. Gordon) -- is that an
14   accurate description of where you were
15   pointing?
16       A.   Yes, ma'am.
17       Q.   Okay.  And the aisle that is
18   shown clearly, which is labeled the liquor
19   and the beer aisle on the video that you
20   were shown, that is not the aisle you were
21   on; is that right?
22       Were you on the liquor and beer
23   aisle?

---

Page 174

1        A.   No.  No, ma'am.
2        Q.   No.  You were on the aisle to the
3    right of the liquor and beer aisle when you
4    fell?
5        A.   Yes, ma'am.
6        MS. GORDON:  Okay.  That's all
7    that I have.
8        MS. WASHINGTON:  Okay.  Thank
9    you, Gwen.
10       MS. GORDON:  Sure.
11       MS. WASHINGTON:  Thank you for
12   that.
13
14   REEXAMINATION BY MS. WASHINGTON:
15       Q.   And so from this, from what you
16   recall on the day of the incident, you spoke
17   with a shopper.  Do you know who you spoke
18   with while you were on the floor waiting for
19   treatment?
20       A.   Ms. Kellie.
21       Q.   Okay.  And what, if anything, did
22   Ms. Kellie tell you or did you-all talk
23   about?

---

Page 175

1        A.   I know she said that the store is
2    always dirty when she comes there.
3        Q.   Okay.
4        A.   It's not kept up.
5        Q.   And how long after you fell did a
6    Wal-Mart employee come to speak with you?
7        A.   It was quite a bit of time.
8        Q.   Do you have an estimate?  Do you
9    know how many minutes it was between the
10   time you fell and when they came?
11       A.   I'd probably say about
12   15 minutes, I believe.
13       Q.   Okay.  And in your previous
14   testimony, you said that Kevin went to find
15   someone to help after you fell?
16       A.   Yes, ma'am.
17       Q.   And so you think within that
18   15 minutes it took for them to come see you,
19   did Kevin -- do you recall him speaking with
20   someone before they came, or did they come
21   on their own?  Did Kevin prompt them to
22   come, or did they come on their own?
23       A.   I think he prompted them to come.

---

Page 176

1        Q.   Okay.  And that's all I have now
2    for the incident at Wal-Mart.  But I did
3    want to talk about the impact that the
4    injuries had on you and your family.
5        So did your injuries affect you
6    being able to care for your daughter at any
7    point?
8        A.   Yes, ma'am.
9        Q.   How so?
10       A.   I wasn't able to take care of her
11   and try to pay bills at the same time.  We
12   were struggling.
13       Q.   Okay.  And were you able to still
14   assist her with her day-to-day activities?
15       A.   It was very hard.
16       Q.   How old was your daughter at the
17   time that the incident occurred?
18       A.   I would say she was around six or
19   seven.
20       Q.   Okay.  So she was still school
21   age at that time?
22       A.   Yes, ma'am.
23       Q.   Was she going to school

---

44  (Pages 173 to 176)

Alexandria Bennett                                          6/14/2023

Page 177

1  physically, or she was homeschooled due to
2  the pandemic?
3     A.  She was homeschooled.
4     Q.  Okay.  And with her -- who
5  homeschooled her during the pandemic and
6  after the accident?
7     A.  Me and my mom.
8     Q.  Okay.  And so were you able to
9  assist her with her schoolwork the same
10  after the accident as you were before the
11  accident?
12     A.  No, ma'am.
13     Q.  What changed?  What were the
14  differences?
15     A.  I would have to get up with her
16  every morning and try to get her ready to be
17  at school on time.  And the morning time was
18  the worst because that's when my ankle hurt
19  the worse, when I first woke up.
20     Q.  Okay.  And so to get to school on
21  time, did that mean that she was being
22  supplemented through, like, a Zoom where she
23  had to be logged in to go to school?  Even

Page 178

1  though she was at home, she had to be
2  physically prepared to be on video?
3     A.  Yes, ma'am.
4     Q.  Okay.  And you had to assist her
5  with what in the morning?  Tell us your
6  average morning before the accident being
7  able to get your daughter ready for school.
8  How did that go?
9     A.  I had to get her up, get her
10  ready, hair, breakfast, make sure she does
11  what she is supposed to do, get her to where
12  she needed to be.
13     Q.  Okay.  And after the accident,
14  how did that change?  How did that affect
15  your ability to get her prepared to start
16  school?
17     A.  It was hard.
18     Q.  How?  How was it hard?
19     A.  Because I couldn't move like I
20  used to move.
21     Q.  Okay.  Did that mean you were
22  having issues with, I guess, getting her
23  settled to stop and do her hair and wash her

Page 179

1  face and --
2     A.  Yes, ma'am.
3     Q.  -- brush her teeth?
4     A.  Uh-huh (affirmative).
5     Q.  Okay.  And so did you yourself
6  have any anxiety?  Were you ever diagnosed
7  with anxiety, sleeplessness or anything like
8  that before the accident?
9     A.  I had a lot of sleepless and
10  restless nights.
11     Q.  Before the accident or after?
12     A.  After.
13     Q.  Okay.  But before the accident,
14  did you have any anxiety or restlessness or
15  sleeplessness?
16     A.  No, ma'am.
17     Q.  Okay.  I know, also, earlier you
18  talked about your work life before and after
19  the accident.  After the accident, why were
20  you let go from Outback Steakhouse?
21     A.  Because I wasn't able to perform
22  the duties of a back of the house kitchen
23  manager anymore like I was.

Page 180

1     Q.  And is that what your manager
2  told you was the reason he was letting you
3  go?
4     A.  Mainly, that's what it summed up
5  to be.
6     Q.  Okay.  And after that -- tell
7  us -- I guess, let's start with why you did
8  that.  You worked at Outback for how long
9  before the accident?  How long did you work
10  there?
11     A.  About three -- three to four
12  years.
13     Q.  Okay.  And did you like your job
14  at Outback?
15     A.  Yes, ma'am.
16     Q.  And you stated that you were
17  named the star of the kitchen at Outback
18  when you worked there; correct?
19     A.  Yes, ma'am.
20     Q.  And so did you have a good
21  working relationship with your coworkers?
22     A.  Yes, ma'am.
23     Q.  Okay.  And right after the

45  (Pages 177 to 180)

Alexandria Bennett                                    6/14/2023

Page 181

1    accident, did you try to go back to work at
2    Outback?
3        A.   Yes, ma'am.
4        Q.   Okay.  And I know you said when
5    you left the hospital you were given
6    crutches.  Did you ever have to go to work
7    at Outback with crutches?
8        A.   I had to go -- I had a boot.
9        Q.   You had a boot?
10       A.   Yes, ma'am.
11       Q.   Okay.  So when did you get a boot
12   after the accident?
13       A.   I'm not sure.
14       Q.   So when you went to Shelby
15   Baptist after -- when the ambulance took you
16   to Shelby Baptist, did they give you a boot
17   there?
18       A.   They may have.
19       Q.   Okay.  And so you remember going
20   to Outback with a boot on?
21       A.   Uh-huh (affirmative).
22       Q.   And how did that affect your
23   ability to perform your duties at Outback?

Page 182

1        A.   I wasn't able to move around, for
2    real, in a rush like I was supposed to.
3    Everything was --
4        Q.   Okay.  What do you mean?  What
5    kind of rush did you have to move around in?
6        A.   Everything was supposed to be,
7    like, fast-paced.  And stuff was supposed to
8    be done.
9             So, like you said, A.M. prep, I
10   would prep up everything that needed to be
11   done.  And sometimes I didn't have it -- I
12   didn't have it done.
13       Q.   Okay.  So you believe that you
14   were slower in getting things done because
15   of your mobility --
16       A.   Yes, ma'am.
17       Q.   -- is that accurate?
18            Okay.  Let's talk about when you
19   were let go.  Were you let go before
20   Thanksgiving of 2020 or after Thanksgiving
21   of 2020?
22       A.   Before.
23       Q.   Okay.  So you were unemployed

Page 183

1    before Thanksgiving and Christmas?
2        A.   Yes, ma'am.
3        Q.   Okay.  And when did you move from
4    your apartment in Homewood to the apartment
5    in Ensley?  Did you move before Christmas?
6        A.   I think so.  I'm not sure.
7        Q.   Do you recall if you spent
8    Christmas at the Ensley apartment or the
9    Homewood apartment?
10       A.   Ensley apartment, yes.
11       Q.   Okay.  So you did move to Ensley
12   before Christmas?
13       A.   Yes, ma'am.
14       Q.   And how was that for you and your
15   daughter being at the apartment in Ensley,
16   spending your holidays there?
17       A.   It was depressing.
18       Q.   How?
19       A.   Because Ensley is, like,
20   considered the -- you know, the ghetto over
21   there.  I wasn't brought up like that.  I
22   went to Hoover High School and Spain Park.
23   So I wasn't used to being in that type of

Page 184

1    living situation.
2             And when I say "living
3    situation," it was times where, you know,
4    it's rats running around there.  And me and
5    ▬▬▬▬ are on the couch, because both of us
6    are scared.  And, you know, it's just how it
7    is on that side of town.
8        Q.   Okay.  And you stated that after
9    your emergency room visit you tried to get
10   healthcare?
11       A.   Uh-huh (affirmative).
12       Q.   Why were you seeking treatment
13   after the accident?  Why were you looking to
14   get more treatment after the emergency room
15   visit?
16       A.   Because I knew something was
17   wrong.
18       Q.   How?  How did you know something
19   was wrong?
20       A.   It was hurting.  My ankle was
21   hurting every day.  I couldn't perform like
22   I was able to perform.
23       Q.   Okay.  So why didn't you get

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023

Page 185

1    treatment again after the emergency room
2    visit?
3        A.   Because I didn't have insurance.
4        Q.   Okay.  And how did you get
5    insurance when you finally did get insurance
6    after the accident?
7        A.   My mom helped me out.
8        Q.   So your mom helped you pay for
9    insurance?
10       A.   Yes, ma'am.
11       Q.   And did she help you pay for that
12   because she knew you needed some help with
13   that ankle?
14       A.   Yes, ma'am.
15       Q.   Okay.  And you did move from
16   Ensley back to Homewood in another apartment
17   around 2022; is that accurate?
18       A.   Yes, ma'am.
19       Q.   Why did you move -- how did you
20   move?  How were you able to move?
21       A.   I had switched fields.  And I
22   think I just moved by the grace of God
23   carrying me through this journey.

Page 186

1        Q.   Okay.  Do you still have issues
2    with not being able to work in the
3    restaurant industry anymore?
4        A.   Yes, ma'am.
5        Q.   And you want to go back to that
6    field?
7        A.   I like cooking.
8        Q.   Okay.  So once you get the
9    ability to do so, are you going to look for
10   ways to be able to return to that industry?
11       A.   I would like to, yes, ma'am.
12           MS. WASHINGTON:  Okay.  Well,
13   that's all I have for now.  Do you have
14   any --
15           MS. GORDON:  Nothing else.
16   That's it.  You are finished.
17           THE WITNESS:  Yes, ma'am.
18           MS. WASHINGTON:  All right.
19           (Whereupon, the deposition ended
20           at 4:45 p.m.)
21
22
23

Page 187

1                 CERTIFICATE
2
3    STATE OF ALABAMA)
4    JEFFERSON COUNTY)
5
6        I hereby certify that the above and
7    foregoing proceedings were taken down by me
8    in stenotype, and the questions and answers
9    thereto were reduced to computer print under
10   my supervision, and that the foregoing
11   represents a true and correct transcript of
12   the testimony given by said witness upon
13   said proceedings.
14       I further certify that I am neither of
15   counsel nor of kin to the parties to the
16   action, nor am I anywise interested in the
17   results of said cause.
18       Signed the 14th day of June, 2023.
19
20
     /s/ Diana B. Williams, CCR
21   DIANA B. WILLIAMS, CCR
     Alabama CCR No. 104, Expires 09/30/2023
22
     Commissioner for the State of Alabama at
23   Large, Commission expires 04/11/2027

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

**A**

**A-l-l-e-e-n** 10:6,13
**A-l-l-y-s-o-n**
  10:7
**a.m** 20:8 55:12
  55:16 182:9
**ability** 9:8,13
  178:15 181:23
  186:9
**able** 27:20 34:22
  35:3,4 36:5,8
  36:14,19,22,23
  37:1,3,16
  39:21,23 48:19
  48:21 51:6
  74:16 75:22
  106:5 119:10
  124:6 137:17
  139:12 149:3
  149:15,16,18
  152:15,21
  154:1 155:12
  176:6,10,13
  177:8 178:7
  179:21 182:1
  184:22 185:20
  186:2,10
**abuse** 152:18
**accident** 27:22
  35:17 41:6
  50:10 59:12
  60:4,22 61:12
  61:19 62:12
  63:21 64:2,6,9
  65:2,15 66:4,9
  66:13 67:4,8
  67:11,15,19
  68:22 69:3
  150:19 169:15
  177:6,10,11
  178:6,13 179:8
  179:11,13,19
  179:19 180:9
  181:1,12
  184:13 185:6

**accidents** 67:22
  68:4,17
**accurate** 90:16
  95:7 115:9
  166:17 173:14
  182:17 185:17
**accurately**
  125:15
**acting** 6:4
**action** 1:6
  187:16
**active** 144:22
  145:4
**activities** 58:19
  148:17 149:1
  176:14
**actual** 166:16
**additional** 67:10
  133:9 137:8
  141:22 142:2
**address** 9:19,20
  11:7,14,23
  12:3 13:3
  153:19 166:11
**advances** 163:15
**affect** 9:8,12
  176:5 178:14
  181:22
**affiliated** 70:6
**affirmative**
  47:15 53:3
  68:14 77:10,18
  104:15 114:22
  123:14 130:3
  139:23 156:16
  179:4 181:21
  184:11
**age** 10:17 17:15
  176:21
**agencies** 25:13
  25:18 26:17,21
  27:8 28:4
**agency** 25:9,12
**ago** 11:1,2,3
  22:17 144:18
**agreed** 2:2,13,20

  39:4
**ahead** 97:13
  136:13
**aid** 109:8,13,23
  110:16
**aisle** 75:8,12,15
  81:10,13 82:20
  82:21 83:8,13
  83:18,22 84:5
  84:11,15,19,20
  85:5 87:12,18
  87:19,23 88:3
  89:2 90:5 92:3
  92:8 96:7,18
  100:9,11
  102:16,23
  107:23 108:6
  108:20,22
  109:4 110:22
  111:23 113:11
  118:22,23
  119:3,8 121:16
  121:19 122:1
  125:4 130:20
  169:1,3 170:22
  171:4,5 173:17
  173:19,20,23
  174:2,3
**aisles** 82:19 83:1
  83:5,8 100:3
**Alabama** 1:2 2:7
  2:10 5:7,13 6:2
  6:3,10 9:21
  11:12 12:8
  14:3 15:13
  19:4,8 59:19
  60:2 162:11
  187:3,21,22
**alcohol** 150:17
**Alex** 9:1 154:8
**Alexandria** 1:9
  1:17 2:4 6:12
  6:16 8:19,21
  8:23
**Alexis** 163:20
**alkaline** 88:11

**Allen** 10:9,11,19
  10:21 13:11
  79:4 116:2
**allow** 38:10
**Allyson** 10:5,8
  133:7 184:5
**Allyson's** 78:5
**ambulance**
  62:22 111:1,3
  111:15,18
  113:1,3,8,14
  131:9 147:14
  168:16 181:15
**amount** 161:2,5
  161:16
**ankle** 26:3 35:10
  37:5,8 40:20
  42:22 62:16,20
  63:17 64:20
  65:1,9,16,18
  66:8,11 68:18
  117:3,7,8,12
  132:16,18
  135:18,22
  136:2,22 138:8
  139:3 140:14
  141:9 142:3,11
  142:13,22
  143:13,16,18
  144:14 145:14
  148:11,14,22
  150:12 177:18
  184:20 185:13
**ankles** 59:6,7
  64:15 68:8
**answer** 7:14 8:8
  93:8,9,11,17
  164:3
**answered** 93:8
**answers** 187:8
**antianxiety**
  156:22
**antidepressant**
  156:22
**anxiety** 157:3,13
  179:6,7,14

**anybody** 28:6
  60:14 64:12
  104:18 109:1
**anymore** 24:19
  35:5 36:10
  37:14 38:23
  149:13 179:23
  186:3
**anytime** 110:20
**anywise** 187:16
**apartment**
  11:16,18 12:4
  12:5 153:11
  183:4,4,8,9,10
  183:15 185:16
**apartments**
  13:12
**apologize** 31:17
**appear** 7:18
**application**
  47:10 154:13
**applications**
  47:8
**applied** 47:4
  48:1 51:21
  52:3 149:23
  163:14
**apply** 52:1 150:3
**appointment**
  139:22 140:3
  140:11,15
  145:9 159:3,6
**appointments**
  141:17 158:4
  165:14
**approximately**
  2:11 6:11
**April** 22:19
**area** 18:21 78:9
  78:12 97:19,20
  98:9,11,13,16
  99:6 104:13
  105:12,15,16
  123:21 124:16
  125:4,5,11,20
  126:14 129:2,5

129:10 168:21
169:14 171:7
172:9,10,14
173:5
**areas** 19:1
125:11 128:20
**arm** 119:12
**arrested** 56:10
**arrived** 113:5
118:10,12
**asked** 73:14
93:8 112:23
159:10
**asking** 56:21
68:11 93:14
151:23
**asserting** 7:8
**assign** 3:2
**assist** 176:14
177:9 178:4
**assume** 8:8
30:22 90:4
105:23 138:12
**attached** 52:15
80:21 104:4
114:18 123:1
127:10 160:22
170:9
**attempting**
166:21
**attend** 139:7,10
158:3,20
159:19
**attendance**
49:19
**attended** 139:14
**attorney** 75:19
166:13 167:12
171:22
**August** 25:3
28:1 158:8,16
**Automation**
26:13
**automobile**
61:23 62:12
63:21 64:2,6

65:2,14 66:4,9
66:12 67:4,8
67:11,15,18,22
68:4,22 69:2
**Avadian** 88:12
**available** 38:15
**Avenue** 5:6
**average** 178:6
**avoid** 7:17
**aware** 126:14

—————
**B**
**B** 1:23 2:6 6:1
187:20,21
**back** 12:9 13:5
13:18 15:7
33:21 34:12,21
36:6 46:3
47:11,18 58:22
62:1 64:15,20
66:6 67:18
68:8,18 69:2
70:8,9 84:6,8
91:5 101:9
104:12 106:4
118:4,6 133:4
136:10,18
139:17 172:14
179:22 181:1
185:16 186:5
**background** 7:7
**backing** 12:2
**bad** 51:17 156:5
156:5
**bandages**
132:12
**bankruptcy**
56:13
**Baptist** 71:14
181:15,16
**bare** 49:1
**basically** 135:20
151:21 155:1
**basis** 53:13
57:13 58:3
164:6

**Bates-labeled**
122:16
**becoming** 22:13
35:14
**bed** 146:11
**beer** 173:19,22
174:3
**beginning** 59:16
160:11
**believe** 22:17
24:2 45:12
46:16 59:15,15
61:8 67:6 78:1
82:14,17 84:9
88:13 91:2,2
98:15 102:15
102:21 107:10
108:14 109:7
109:22 112:5
112:22 113:2
118:11 122:6
132:1,3,6
140:13 148:8
169:12 171:6
175:12 182:13
**believed** 105:5
**bells** 70:15
**belt** 61:15
**benefits** 51:22
58:15 150:1
**Bennett** 1:9,17
2:5 6:12,16 7:2
8:19
**Bessemer** 14:3
77:4,16,17,20
78:3,16
**best** 39:2 61:2
**big** 26:5 74:8
117:21,21
152:17,18
**biggest** 65:3
66:19,20
**bill** 147:8,9,15
**bills** 51:12 147:6
147:17,22
152:3 160:19

163:6,7 164:22
176:11
**Birmingham**
5:7 6:2 19:1
59:19,23 60:1
61:5,9
**birth** 15:9
**bit** 175:7
**biweekly** 53:12
**black** 98:2 99:13
128:14
**bleeding** 63:11
**blocking** 84:10
84:14
**blood** 57:20 58:4
65:6
**Blount** 17:15
18:7 56:17
57:9
**blue** 42:11,12
43:9,9 124:10
135:9 165:5
**body** 92:12,12
94:7,10 96:1,5
**Bone** 162:11
**bones** 63:6 72:6
72:18
**boot** 145:14,21
146:5 181:8,9
181:11,16,20
**bottle** 89:5
90:14,15,20
166:22 167:3
**bottled** 81:11
96:14,21
**bottom** 94:14,16
94:20 95:7
106:1 114:21
120:22
**box** 90:22
**brace** 150:23
**braces** 65:9
132:13 146:22
**brain** 31:18
**brand** 88:6
89:12 120:15

**brand-new**
121:5
**Brandon** 60:20
**brands** 88:8,10
**bread** 100:17
**break** 8:1 14:17
43:1 73:11,12
**breakfast**
178:10
**brief** 43:3 73:16
**briefly** 120:13
**bright** 119:3
**bring** 130:19
**broke** 72:20
**broken** 63:6
72:6,18 137:5
**brought** 183:21
**brush** 179:3
**buggy** 81:19
**burgundy** 82:6

—————
**C**
**C** 5:1
**calculated**
161:12
**call** 47:18,21
51:10 111:12
**called** 30:10
47:11 63:15
111:3 113:4
**calm** 109:14
**camera** 75:12
100:8,10
**cameras** 75:14
**car** 59:12 60:8
60:10,12,14
150:19
**care** 69:19 70:4
70:10,20
100:21 152:4
176:6,10
**cares** 71:16
**carrying** 81:22
185:23
**cart** 81:20,20
**case** 44:13,16

89:5,7,8 144:6
160:11
**cases** 97:3
**cause** 6:13 65:15
65:15 148:14
148:17 187:17
**caused** 37:5,9
68:21 83:9
91:16 95:11
104:23 105:1
145:2 157:9
**CCR** 1:23
187:20,21,21
**certain** 39:14
88:6,8 94:19
101:14,16,19
120:7 148:13
148:17
**CERTIFICA...**
4:8 187:1
**Certified** 2:6 6:1
**certify** 6:4 187:6
187:14
**chance** 123:6,12
**change** 30:13
31:6 33:9 36:1
55:23 143:13
161:22 178:14
**changed** 30:16
32:4 53:16
56:2 131:17
144:21 177:13
**changing** 28:7
**Charles** 5:16
**chart** 160:15
**check** 32:22
**children** 11:4
**chiropractor**
72:9
**chiropractors**
72:13
**Christmas**
183:1,5,8,12
**chronic** 57:16
58:1
**church** 56:20,23

**churches** 56:15
57:7
**circle** 124:10,12
127:18
**circled** 124:14
125:5,11
129:11
**citations** 61:11
**city** 61:6
**Civil** 1:6 6:6
**claim** 50:1 124:2
124:7 127:16
165:8
**claiming** 7:9
48:5,13 50:4
50:18,22 51:9
68:13 129:7,14
129:18 151:3
158:1 160:1,14
165:12
**claims** 7:7 22:23
46:10 162:23
166:1
**clarify** 43:7
173:3
**cleaning** 122:8
122:11
**clear** 7:23 130:7
171:12
**clearly** 171:12
173:18
**clerk** 23:9
**close** 32:1,6,11
108:11,12
149:5
**close-up** 16:23
**closer** 53:21
76:22
**closing** 44:7
**clothes** 130:12
**clubs** 56:16 57:7
**collision** 60:6,7
**color** 4:17,18,19
4:21,22 99:10
99:11 128:11
**colored** 82:6

**come** 21:17
24:16 26:23
27:2 31:3 36:7
51:10 61:2
109:23 110:15
110:21 113:10
113:18 122:11
130:14 145:6
168:19,23
169:2,22 175:6
175:18,20,22
175:22,23
**comes** 175:2
**comfortable**
153:18
**comforted**
109:16
**coming** 77:21
78:9,11,13
**commencing**
2:11 6:10
**Commission**
187:23
**Commissioner**
6:4 187:22
**commotion**
169:6 172:12
**company** 23:5
27:2 28:2
42:10 158:11
163:18
**compensation**
58:15
**complaint**
136:22
**complaints**
118:13 131:12
135:16
**complete** 114:10
**completed** 60:22
61:3
**completing**
113:23
**compliance** 2:17
**computer** 187:9
**concern** 83:9

**concerned** 86:13
86:22
**conditions** 9:12
57:16 58:1
**cone** 101:6
**cones** 121:19,23
168:20
**confirmed**
170:22
**confusing** 7:20
96:18
**consider** 69:18
70:9
**considered**
183:20
**consumed**
150:16
**contact** 14:21
**contacts** 15:19
15:22 16:8
17:5,7 85:1
**contained** 98:13
98:17
**continuous**
68:10
**contracted**
23:18 24:7,8
**control** 60:6
**convicted** 56:10
**cook** 29:18 30:1
30:14 55:19
149:20 151:9
151:10 154:2,5
**cooking** 37:22
38:5 149:19
151:12 154:3
154:14,17,21
186:7
**coordinator**
21:1
**copy** 52:9
103:11 115:5
**corner** 173:6
**corporate** 2:9
5:12 6:9 23:10
**correct** 7:21

**46:18 51:15**
52:20 55:1
75:13 89:2
167:8 168:6
173:12 180:18
187:11
**couch** 184:5
**counsel** 2:4,22
3:1 6:7 187:15
**counselors**
155:4
**County** 17:16,16
17:16,19 18:4
18:7 56:17
57:9,9 187:4
**couple** 79:20
103:18 134:13
162:18
**court** 1:1,22
2:18 6:20 7:12
49:3
**cover** 74:8
**covered** 164:19
**COVID** 73:5,9
**coworkers**
180:21
**cracked** 62:15
65:5
**crime** 56:10
**Cross** 42:12
43:9 135:9
165:5
**crutches** 132:1
132:10,15
150:21 181:6,7
**Crystal** 20:14
**curious** 75:22
**curl** 149:7
**current** 9:19,20
14:4 21:14
53:20 56:4
**currently** 19:10
150:11
**Customer** 4:20
**customers** 37:21
108:21

cut 138:15
CVS 69:11,12

**D**

D 4:1
dad 10:18,19
damaged 61:18
damages 160:13
dangers 168:12
168:21 169:14
169:16
dark 79:6
Data 23:9
date 6:5 12:21
15:9 24:9
39:13,15 56:5
68:15 85:21
166:17
daughter 10:3
11:8,21 12:15
71:22 78:16,19
120:8 146:7
151:19 161:23
176:6,16 178:7
183:15
daughter's 77:2
77:9
Daughtry
115:17 116:4
day 17:8 31:23
50:23 51:2
63:9 66:12,12
76:8,18 78:6
79:17 83:17
84:20,22 85:6
88:19 103:5,9
111:6 114:4
115:3 118:23
120:8 121:3,10
123:22 124:2
126:9 127:16
128:14 129:2
132:5 133:11
136:8 138:1,7
146:3,10 147:9
158:2 159:3,13

163:11 174:16
184:21 187:18
day-to-day
176:14
days 20:4 31:21
32:10,18,19,23
44:8,11,12,18
50:5,17,23
51:9 54:23
63:10 148:22
Dazzio 2:9 5:11
6:8
decide 51:5
decided 38:16
decision 39:2
Dedicated 25:14
26:20 27:1,5
49:18
Defendant 1:13
5:9
Defendant's
4:15 52:8,14
80:13,14,19
103:22 104:3
105:8 114:14
114:17 122:15
122:23 123:21
124:5 125:15
125:23 126:1,2
126:6,23 127:1
127:5,9 128:21
129:11 131:4
160:5,21
degenerative
162:16
deliver 71:21
72:1
delivered 71:23
72:1
department
21:3 61:6,7
depict 105:8
deposition 1:16
2:4,15,16 3:4
7:11 8:14 9:17
186:19

depositions 2:19
depressing
151:15 183:17
depression
157:3
describe 82:10
83:16 92:14
99:2 112:10
143:6
description
55:20,22 115:8
173:14
desk 20:2
detail 83:16
details 95:9,12
95:14
determine 106:5
determined 56:6
develop 157:10
diabetes 57:20
58:4
diagnosed 16:21
57:19,23 63:5
157:2 162:16
179:6
diagnoses 132:4
diagnosis 65:1
137:4
Diana 1:23 2:5
6:1 7:12
187:20,21
died 151:11
differences
177:14
different 14:12
25:6,13 106:15
124:17,19,23
126:22
dinner 76:20
81:5 88:23
directly 90:21
91:1
dirty 85:10
91:18 92:1,2,5
97:20 98:1
99:18 100:1,19

101:14,19
105:2 107:19
107:19 175:2
disability 150:1
150:8
disclosures 4:23
160:7
discuss 156:18
discussed
106:11 155:2
166:11
discussion 15:6
disease 162:16
displays 84:18
distinguish
166:23
DISTRICT 1:1
1:2
DIVISION 1:3
doctor 16:13
17:10,11 40:1
40:8 41:3 64:1
69:19 70:10
134:18 142:11
doctor's 159:2,6
159:19
doctors 39:8
64:19 67:9
70:21 140:22
141:7,13,18
142:10 150:8
158:3,20 160:2
165:14
document 52:7
103:20 160:13
doing 28:10 58:9
73:10 76:17
77:1 107:1
114:8 151:14
downhill 135:19
downtown
155:16
Dr 70:13 162:10
drastic 161:22
drips 98:23 99:3
99:9,10

Drive 2:10 5:12
6:9 9:21 11:7
11:11 12:3
153:6,19
driver 60:10
67:23
driver's 15:11
driving 16:2
77:20
drugs 150:16
due 177:1
DUI 61:16
duly 6:17
duties 20:16
26:8 28:7 35:2
35:15 36:2,11
36:19,21 38:2
49:15 50:9
179:22 181:23

**E**

E 4:1 5:1,1
earlier 95:17
126:7 128:9
142:4 179:17
Earliest 20:8
early 70:9
earn 45:10
48:22
earning 29:20
earnings 55:11
eased 143:14
144:8,9,15
East 7:4
edge 91:4
education 18:15
effect 2:16
efforts 122:8
either 17:15
18:3,6 34:9
40:17 56:16
57:8 59:2,5,7
64:14 65:16
68:7 80:15
90:19 96:2
104:10 128:17

| | | | |
|---|---|---|---|
| 166:23 167:6 | 35:21 44:13,16 | **Exhibits** 4:10,12 | 147:3,7 148:7 |
| **electronic** 115:4 | 81:16 158:2 | 4:15 128:22 | 149:2,16 |
| 169:21 | 159:3 | 131:4 | 150:14,17 |
| **Ellise** 5:4 | **entity** 43:8 61:2 | **exit** 131:2 | 151:3 154:2 |
| **email** 170:7 | **entrance** 80:2,4 | **expect** 142:13 | 155:3,21 |
| **emergency** | 80:12,16,17 | **expenses** 160:2 | 156:18,23 |
| 66:16 133:8 | 81:2 | 164:18,21 | 157:3,6,9,20 |
| 184:9,14 185:1 | **entry** 23:9 | 165:13,19 | 162:21,22 |
| **emotional** 157:8 | **ER** 64:4 66:12 | **experience** | 164:15,22 |
| 157:16 | 67:7,13 72:23 | 118:2 143:18 | 165:21 168:5 |
| **emotionally** | 131:13 133:18 | 154:15 | **fallen** 68:15 |
| 151:5 155:4 | 135:4 136:8,19 | **experiencing** | **falls** 68:6 |
| 156:3 157:22 | 147:9 | 135:21 143:7 | **familiar** 14:8 |
| 165:17 | **Erica** 17:21 | 143:15 150:11 | 85:20 115:17 |
| **employed** 19:11 | 162:20 | **expires** 187:21 | **family** 176:4 |
| 46:18 57:4 | **ERs** 71:6,8 | 187:23 | **far** 16:22 79:14 |
| **employee** | **Esq** 5:4,10 | **explain** 8:6 50:3 | 83:21 84:1 |
| 111:22 112:4 | **estimate** 82:16 | **extra** 32:22 | **farsighted** 16:21 |
| 112:12,23 | 175:8 | **eye** 16:13 17:10 | **fast** 93:2 95:3 |
| 113:4,19,23 | **evening** 82:4,8 | 17:11 | 112:20 |
| 118:9 122:4 | **events** 9:9,13 | **eyeglasses** 16:8 | **fast-forward** |
| 175:6 | **eventually** | | 172:5 |
| **employees** 83:11 | 134:23 | _____ | **fast-paced** 182:7 |
| 102:21 108:22 | **everybody** 7:20 | **F** | **February** 15:10 |
| 109:4 110:12 | **everyday** 148:19 | **face** 179:1 | **Federal** 6:5 |
| 110:13,15 | **evidence** 3:4 | **fair** 8:9 90:15 | **feel** 62:8 92:22 |
| **employment** | 102:14 | 121:13 | 93:5,14,20 |
| 21:21 | **exact** 169:8 | **fall** 82:13 91:17 | 95:5 116:20 |
| **EMTs** 113:10 | **exactly** 167:21 | 94:21 95:10,11 | 123:8 144:11 |
| 116:10,14 | **examination** 4:3 | 95:13 104:13 | **feet** 38:6 40:18 |
| 118:10,12 | 6:13 7:1 166:7 | 104:18,20,23 | 40:23 41:1,4 |
| 130:16 | **examined** 6:17 | 105:1 106:12 | 92:19,20,22 |
| **EMW** 5:5 | **exercise** 58:18 | 107:6,12,21 | 93:5,15,20,23 |
| **ended** 23:19 | **Exhibit** 52:8,14 | 108:1,23 109:5 | 94:4 95:6 |
| 27:17 28:14 | 80:13,14,19 | 109:7,12,18 | 108:13,13,15 |
| 29:13 33:8 | 103:22 104:3 | 110:12,13,16 | 108:15,17 |
| 46:16 49:10 | 105:8,17 106:4 | 110:21 111:9 | 154:16 |
| 78:14 186:19 | 114:14,17 | 111:22 116:7 | **fell** 68:13 83:20 |
| **Ensley** 11:12,15 | 122:15,23 | 116:18,21 | 88:21 89:16,18 |
| 12:7 13:3 | 123:21 124:5 | 117:13,17 | 89:19 90:1,12 |
| 153:7 183:5,8 | 125:15,23 | 118:22 128:18 | 91:7,9,14 92:4 |
| 183:10,11,15 | 126:1,6,7 | 134:4,11 | 92:9,13,14,17 |
| 183:19 185:16 | 127:1,1,5,9,22 | 135:13 136:4,8 | 92:21,23 93:4 |
| **enter** 84:5 87:11 | 128:6 129:11 | 138:10 139:15 | 93:6,12,21 |
| **entered** 87:20 | 160:6,21 170:5 | 140:23 141:15 | 94:6 95:2,18 |
| **entire** 33:10,17 | 170:8 | 141:19,23 | 97:16 98:10 |
| | | 143:3 146:23 | |
| | | | 99:16 101:15 |
| | | | 102:4,8,17,23 |
| | | | 103:4,4,9 |
| | | | 105:9,10 106:9 |
| | | | 107:4 116:20 |
| | | | 116:23 117:10 |
| | | | 117:18,20 |
| | | | 118:2,3 119:18 |
| | | | 120:1 121:10 |
| | | | 121:14,20 |
| | | | 122:9 123:22 |
| | | | 125:20 126:15 |
| | | | 130:12 131:18 |
| | | | 163:12 167:5 |
| | | | 167:20 168:14 |
| | | | 174:4 175:5,10 |
| | | | 175:15 |
| | | | **felt** 94:1 117:10 |
| | | | **female** 112:14 |
| | | | **field** 186:6 |
| | | | **fields** 155:1 |
| | | | 185:21 |
| | | | **figure** 36:17 |
| | | | 98:20 140:19 |
| | | | **figured** 154:7 |
| | | | **filed** 7:4 56:12 |
| | | | 58:14 |
| | | | **filled** 69:4 134:1 |
| | | | 134:7 |
| | | | **finally** 41:19 |
| | | | 185:5 |
| | | | **find** 42:20 75:7 |
| | | | 103:21 109:21 |
| | | | 110:6,7 119:20 |
| | | | 152:5 154:8 |
| | | | 175:14 |
| | | | **fine** 17:4 31:19 |
| | | | 31:19 70:17 |
| | | | 76:6 79:11 |
| | | | 80:23 112:16 |
| | | | 117:2 123:10 |
| | | | 124:13 157:18 |
| | | | 162:3 170:3 |
| | | | **finished** 24:11 |
| | | | 162:2 186:16 |
| | | | **first** 5:6 6:17 |

29:1,10,17
39:11 80:13
83:2 94:17
112:3,11,11
113:19 118:23
121:6 135:14
135:17 138:6
143:20 155:18
156:8 168:1,3
177:19
**fist** 149:10
**five** 24:1,2 44:7
44:11,18
**five-four** 73:22
73:23
**flare** 148:15
**flatfooted**
119:12,23
**flip** 123:4
**floor** 84:15 85:5
85:7,8 91:19
91:21 92:3,8
92:16,18 93:2
94:6,8,17
95:19 96:3,4
96:17,20 97:6
97:9,15,17,21
98:9 99:3,10
99:15,18 100:1
100:19 101:15
102:12,16,22
105:9 106:1,9
113:7,17
121:16 122:5
125:4,9,10,16
128:19 130:2,9
167:13,16,20
168:2,4,15
169:2 174:18
**flu** 69:23
**follow** 133:14
**follow-up** 66:23
166:8
**following** 6:14
39:7 41:20
65:2 134:4

138:19 139:2
144:12 150:19
**follows** 6:18
**footage** 75:14
171:15,18
172:16,21
**force** 2:16
**foregoing** 6:6
187:7,10
**forget** 7:16
**form** 2:23
169:17
**four** 44:11,12
180:11
**fourth** 87:23
**fractures** 63:6
**frame** 168:18
169:9 172:1
**free** 62:9 123:8
**freezer** 26:12
**Friday** 20:6 32:7
**Friedman** 2:8
5:11 6:8
**friend** 60:17
**friends** 57:1,1
**front** 84:6 87:15
126:16 129:8
129:11,15
130:1
**full** 2:17 8:17
50:23 51:2
**full-time** 45:19
45:23 46:7
**fun** 10:17
**funny** 62:6
**further** 2:13,20
91:5 141:8
187:14
**future** 142:13

_____
**G**
**gap** 27:22
**gas** 161:3
**gather** 123:10
**getting** 31:11,14
36:7 74:4

79:22 88:5
107:2 111:1
144:1 178:22
182:14
**ghetto** 151:21
183:20
**girl** 117:21
**give** 21:8 39:8
52:9 61:14
124:9 133:17
142:11 148:11
181:16
**given** 8:14 14:7
29:23 33:1
38:21 40:18
61:11 64:23
68:20 103:11
131:22 132:4
137:3 145:14
145:23 146:21
181:5 187:12
**giving** 150:8
**glasses** 15:21,23
16:1,2 17:5
**go** 8:20 15:1,4
16:19 18:9
20:8 21:7,9
22:2,6,21 24:5
25:7 26:6 29:7
35:23 38:19,20
38:22 39:5
48:18,20 49:11
49:14 50:5,12
50:17,18 51:13
52:2 56:20
63:9 65:21
66:15,18 69:5
69:11 70:2,3
77:4,5 80:7
81:3 82:19,21
85:17 86:2
93:20 95:6
97:12 109:20
133:2,6 136:13
137:23 146:11
154:11 155:7

158:5 171:19
177:23 178:8
179:20 180:3
181:1,6,8
182:19,19
186:5
**God** 185:22
**going** 7:12 14:23
15:2 25:13
38:17 42:22
52:6,9 71:1
76:19 77:6
78:1 83:4
88:22 89:17
91:6 107:2
122:14 124:9
135:19 140:14
140:16 142:8
144:1 152:1,7
152:12,12
155:18,19
156:1 159:5
160:2,4 164:1
166:9 170:4
172:4,19
176:23 181:19
186:9
**good** 73:13
180:20
**Gordon** 4:4,6
5:10 6:22 7:1,3
15:4,7,8 43:2,6
49:6 52:17
73:19 80:23
93:11,19 104:6
114:20 123:3
127:12 161:1
164:4 166:4
167:12 169:17
169:22 170:3
170:14 171:22
173:1,10,13
174:6,10
186:15
**gotten** 135:9
**grace** 185:22

**graduate** 18:12
**grandma's** 77:7
78:5
**grandmother**
77:3,9 151:10
151:11
**grandmother's**
120:7
**Grandview** 63:4
63:6,20 64:19
71:1,6 147:8
164:23
**great** 107:1
170:15
**Green** 5:17
**grew** 18:21
**grocery** 81:20
**ground** 8:13
98:21 120:1
**grounds** 3:2
**guaranteed**
21:20
**guess** 66:1 119:5
157:12 159:8
178:22 180:7
**guessing** 94:18
98:23 111:19
**Gwen** 7:2 174:9
**Gwendolyn** 5:10

_____
**H**
**hair** 82:6 128:8
178:10,23
**halfway** 84:2,3,4
**hand** 105:20,22
**hands** 91:14
**happen** 81:9
106:19 107:15
144:3
**happened** 12:23
13:6 46:12
59:18 60:4
67:5,19 74:3
75:9 82:15
83:17,22,23
95:3,13 106:12

Alexandria Bennett                                          6/14/2023

106:16 114:4,6
140:6 167:4
172:2
**happening**
172:11
**happenings**
169:8
**hard** 35:6 41:9
74:19 176:15
178:17,18
**hazard** 87:3
**head** 7:15,16
25:15 26:10
60:6 149:22
155:13
**head-on** 60:7
**headed** 77:22
**heal** 138:18,20
**healed** 66:19
67:4
**healing** 138:22
**health** 34:1,3,6
41:14,17 42:3
42:5,7,13 43:8
51:15,19,20
67:17 148:3
**healthcare**
184:10
**hear** 95:19
**heard** 75:11
100:7 163:22
**heart** 14:6
**heel** 120:23
**held** 15:6,15
33:12
**Helena** 16:16
76:15,23 77:1
77:6,15,21
78:3,3,15,20
78:23 85:12
86:20
**help** 36:7 41:12
109:11 110:10
132:15 137:17
175:15 185:11
185:12

**helped** 42:19,20
152:17 163:2,5
163:9 185:7,8
**helps** 131:5
**Hey** 154:8
**hidden** 129:19
129:21
**high** 18:10,11
57:20 58:3,6
183:22
**Highway** 69:14
**Hills** 2:10 5:13
6:10
**hip** 64:15,20
68:7,18 95:1
117:3,5,16
136:1,3,7
**hips** 59:2
**hire** 56:8 154:12
**hired** 22:5,7
**hit** 93:1,1 94:8
94:16 117:13
**holding** 96:20
**holidays** 34:11
34:15 152:11
183:16
**hollering** 109:15
**home** 63:9 133:3
133:7 137:23
178:1
**homeschooled**
177:1,3,5
**Homewood** 9:21
12:8,9,11 13:7
13:15 76:23
78:9,11 151:20
152:22 183:4,9
185:16
**Hoover** 18:17,18
19:4 29:6,9,14
29:17 30:5,12
30:14,20 31:12
31:15,20 34:13
69:17 183:22
**hopes** 22:12
**hospital** 39:17

41:7 48:3 63:2
63:10 71:13
118:16,18
131:9 132:21
181:5
**hospitalized**
138:3
**hospitals** 154:10
**hour** 20:12
**hours** 20:7 31:7
31:22 32:4,5
44:1,20 54:2,4
54:5,10 55:3,7
150:17 159:9
**house** 11:17
12:3 36:6 77:7
78:5 120:7
179:22
**hurt** 66:8 116:23
117:3,7 143:11
148:18 177:18
**hurting** 65:17
94:13 95:1
117:4 118:4
184:20,21
**husband's** 18:1
**Hyundai** 60:13
61:18

---

## I

**idea** 24:1 32:23
82:7 84:3
102:3 112:6
127:13 135:12
161:1
**identify** 75:21
124:6 171:14
171:17 172:15
172:20
**immediate**
117:9
**immediately**
35:18 116:21
118:1
**impact** 176:3
**important** 7:14

**incident** 4:20
7:9 12:21
20:17 36:13
40:22 46:13
48:7 50:6,19
51:3 67:5 71:4
73:1 74:2 81:8
86:12 95:14
112:21 113:23
114:13 115:9
122:21 130:15
164:5,11
166:14,16
167:4 171:2,8
171:23 172:10
174:16 176:2
176:17
**incision** 138:12
138:18,22
**increase** 32:3
**increased** 53:23
**incurred** 160:1
**indicating** 54:17
149:9 171:5
**individual**
112:11 156:14
**industry** 149:19
186:3,10
**infection** 138:22
**information**
101:23 162:22
**initial** 4:23 64:4
136:18 160:7
166:12
**injured** 58:9
62:11,14
117:13,17
**injuries** 7:8
20:17 40:21
50:19 51:2
58:22 59:2,6
64:1,14 67:1,3
67:11 68:7,18
68:21 71:3
133:10 134:10
138:9 140:22

141:14,19,22
145:1 146:22
148:6 164:10
164:14 176:4,5
**injury** 58:12
**inside** 66:21
80:7 81:2
**instructions**
145:23
**insurance** 34:2,4
34:6 39:22
41:9,11,15,18
41:19 42:3,7,9
42:10,14,15
43:8 51:15,19
51:20 61:15,23
67:18 134:14
134:22 136:16
139:13 140:9
140:18 142:7
147:21 148:3
163:2 185:3,5
185:5,9
**interested**
187:16
**interfere** 159:7
**Intern** 5:16,17
**internally** 62:15
63:11 65:5
**interrupt** 62:9
**interstate** 59:20
**interview** 47:11
47:13
**interviews** 47:17
**Inverness** 54:13
**involved** 9:15
58:18 67:21
68:16
**iPad** 114:9,11
115:3
**issue** 95:15
140:8
**issues** 140:12
178:22 186:1
**item** 90:21
**items** 79:20 81:5

Alexandria Bennett                                      6/14/2023

Page 195

88:23

**J**

**January** 41:20
  41:21 42:4,14
  42:17
**Jefferson** 17:16
  18:7 56:17
  57:8 187:4
**job** 19:20,22
  20:2,16,22
  21:14 22:8,8
  22:12,13,16,22
  23:17 24:5,7
  24:20 26:8,12
  27:9,21,23
  28:7,9 29:13
  29:16 30:4,13
  32:16 33:8,8
  33:13 34:2,8
  34:20 35:1,15
  36:1,11,18,21
  37:13 38:2,9
  38:13 42:1,20
  43:15 45:2,5
  46:15 48:10
  49:15 50:9
  55:11,20,22
  56:4 140:19
  152:6,8,9
  154:9,21
  180:13
**jobs** 21:23 25:6
  25:16,17,19
  26:15,16,16
  27:16 28:14,18
  38:15 42:20
  45:7 46:21,23
  47:3,14 48:1,3
  48:4,14,20,23
  49:7,14,20
  50:13 158:17
  159:16,19
  161:6
**Johnson** 162:11
  162:12

**joint** 162:11,16
**journey** 185:23
**jug** 89:7 90:2,17
  90:21 166:22
  167:3
**July** 137:19
  158:8
**jumping** 31:17
**June** 1:19 2:11
  6:11 52:19,19
  53:8,16 54:1
  187:18
**jury** 56:22 57:2
  57:5

**K**

**keep** 100:4,5
  132:18 139:12
  152:5
**keeping** 100:19
**Kellie** 107:10,20
  108:22 109:8
  110:1 112:2
  113:19 115:15
  115:16,17
  116:4,6,16
  118:9 174:20
  174:22
**Kelsie** 5:17
**kept** 100:3,12
  175:4
**Kevin** 10:19,21
  13:10 79:3,4
  80:7 81:15
  87:11 103:10
  103:11 104:7
  104:10,21
  106:11 107:5
  108:3,23
  109:17 110:1,3
  116:2,17
  118:10 126:19
  126:22 131:16
  132:23 171:17
  175:14,19,21
**Kevin's** 77:11

77:12,13
**kin** 187:15
**kind** 29:7 54:14
  56:6 89:11
  115:4 117:20
  117:21 120:19
  121:11 137:2
  145:5 150:23
  157:15 166:21
  182:5
**kitchen** 35:4,8
  36:15 37:12,19
  151:12,17
  179:22 180:17
**knee** 62:16,18
  63:17 65:3,9
  65:16,17,21
  66:20
**knew** 37:13 39:1
  41:10 42:21
  85:22 102:15
  102:21 103:1
  154:5,7 184:16
  185:12
**know** 8:2,5 14:2
  14:4 22:1
  24:14 26:4,9
  26:10 29:4
  31:16 32:21
  36:7 37:11,12
  41:12 42:9
  44:11 46:2
  52:4 55:12
  56:7 60:19
  62:9 68:12
  70:23 74:4,4
  74:18 77:4
  81:4 82:1,5
  85:7,10 89:8
  91:23 92:15,17
  94:3,13 97:3
  97:20 98:2,6
  99:14 100:9,20
  101:20 102:7
  102:11 103:2
  103:17 104:7,8

107:1,17
  108:16,19
  117:12,14,16
  117:20,23
  120:17 129:21
  134:20 144:10
  145:21 146:4
  148:20 149:4
  149:18 151:15
  151:22 152:3,8
  152:12 154:5
  154:13 156:20
  157:13 161:11
  163:7 165:6
  166:13 167:2
  167:20 169:20
  174:17 175:1,9
  179:17 181:4
  183:20 184:3,6
  184:18
**knowledge**
  162:21
**knows** 152:11

**L**

**L** 2:1
**labeled** 151:16
  173:18
**lady** 104:11
  107:9
**laid** 126:15
  152:23
**Lakeshore**
  23:15
**land** 94:11
**landed** 92:13
  94:12,14,14
  127:23 128:5
**Large** 2:8 6:4
  187:23
**Lashun** 8:19
**latest** 20:9
**law** 2:8 5:5 6:8
**laws** 2:18
**lawsuit** 7:4 9:16
  23:1 46:10

95:15 122:19
  160:14 163:1
  163:16 164:7
  166:2
**lawsuits** 64:8
**lawyer** 74:14
  160:11
**leading** 2:23
**leave** 24:4 44:5
  44:7 123:8
  132:12,20
  162:7
**leaving** 46:8
**led** 68:17
**left** 62:19,19
  66:16 101:4
  108:7,10 132:1
  132:9 133:1
  181:5
**leg** 143:11
**lessened** 143:2
**let's** 29:1 104:12
  137:18 157:19
  164:18 180:7
  182:18
**letting** 21:9
  38:22 180:2
**license** 15:11,13
  15:15,19
**life** 19:1,8
  148:19 156:2,6
  179:18
**lifestyle** 144:22
**lifting** 40:18
**lighting** 119:2
**liked** 154:4
**linger** 66:17
**link** 170:6
**liquid** 92:7
  128:19 129:8
  130:8 167:15
  168:1
**liquor** 173:18,22
  174:3
**listed** 115:10,15
  116:2 162:19

Alexandria Bennett							6/14/2023

162:20
lists 55:10,11
	115:12 160:13
little 8:13 31:12
	76:22 101:6
	112:1 115:13
	116:1 160:8
live 10:1 11:10
	12:7 14:1
lived 9:22 11:6
	11:14,19 13:10
	13:11 18:23
	19:3 153:15
lives 77:15,16
living 13:2,17
	17:15 76:11
	184:1,2
Lloyd 162:10,12
loans 163:15
located 16:15
	26:11 89:23
	90:11 134:18
location 29:5,6
	29:10,11 35:21
	43:19 54:13,20
	69:7
logged 177:23
long 9:22 11:22
	12:12 19:20
	24:20 27:6,19
	30:19 35:5,12
	36:14 40:12
	42:16 65:20,22
	82:12,15,16
	102:3,7 106:8
	110:9 111:21
	134:3 135:12
	136:3,11
	143:22 144:18
	146:18 168:15
	175:5 180:8,9
longer 36:21
	149:3
look 14:18 74:18
	101:9 103:14
	105:10 123:6

123:13 126:22
	172:11 186:9
looked 74:19
	75:20,23
	125:16,22
looking 88:2,7
	89:4 97:1
	106:4 119:7
	124:4 128:23
	184:13
looks 52:20 53:9
	54:11 74:7
	105:19 115:14
	124:15,20
	128:13 129:10
lost 27:9 60:5
	152:9,10 161:4
	161:6 165:8
lot 48:3 54:2,5
	79:14 97:12
	142:18 144:16
	152:18 155:20
	169:5 179:9
loud 7:14
love 149:19
loved 152:9
low 106:23
LP 7:4

_____

**M**

M 5:4
ma'am 8:10,16
	9:4,6,10,14,18
	10:10,22 11:5
	11:9 12:17,19
	13:1,4,9,23
	14:13,16,19,22
	15:14,17,20
	16:9,17 17:1,3
	17:9,12,17,23
	18:5,8,16,22
	19:2,9,12 20:1
	20:3,19 21:16
	22:10,14 23:2
	23:7,12 24:10
	24:13 25:10

26:18,22 27:14
	27:18 28:20,22
	29:9,15 30:2,8
	30:16 32:15
	33:4,15 34:7
	34:14,16,19
	35:13,19,22
	36:3 37:7,23
	38:4,7 39:4,6
	40:7 41:16,22
	42:2,8 43:10
	43:13 44:15,19
	44:21 45:6,9
	46:11,14,19,22
	47:2,6,12 48:8
	48:12,16 49:9
	49:12,16,21
	50:15,21 51:12
	51:16 52:13,22
	53:5,11,14,18
	53:22 54:18,21
	55:2,6,9,14,18
	56:2,11,14
	57:10,14,18,22
	58:5,10,13,16
	58:20,23 59:4
	59:9 60:9,11
	60:15,23 61:4
	61:10,17,20,22
	62:4,10,13
	63:1,7,15,18
	63:22 64:3,7
	64:10,13,17,22
	65:13 66:10
	67:2,20 68:2,5
	68:19,23 70:7
	70:22 71:9,18
	72:5,8,11,22
	73:3 74:11,15
	76:5,5,10,13
	76:16 77:14
	78:17,21 79:1
	79:5,13,16,23
	80:3,6,8 81:14
	81:18 82:11,23
	83:3,6,10

84:13,17,21,23
	85:3,16 86:1,7
	86:23 87:5,9
	87:13,18,21
	88:1,18 89:3
	89:14,21 90:9
	90:18 91:2
	92:10 93:22
	94:5,9,18 95:8
	95:16,21 96:12
	96:15,22 97:7
	99:4,8,12
	101:18,22
	102:2,5,9,13
	103:6 104:2,17
	104:19 105:5
	105:11,14,18
	106:2,7,13,17
	106:20,22,23
	107:7,13,22
	108:2,14 109:2
	109:6,10,19
	110:2,14,17,23
	111:7,11,13,16
	112:5,9,13,19
	113:9,12,15
	114:2,16 115:1
	115:11 116:5,8
	116:11,15,19
	116:22 117:11
	117:15 119:1,9
	119:13,16,19
	119:22 120:2,5
	121:1,4,8,17
	123:16,23
	124:3,8 125:2
	125:13,18
	126:17 127:2,8
	127:14,17
	128:1,3,7,10
	128:16 129:3,6
	129:13 130:5
	130:21 131:1
	131:10,20
	132:11,17,19
	133:12,19

134:2 135:2,11
	135:15 136:9
	136:20 137:1
	137:11,14,21
	138:2,5,11,14
	138:17,23
	139:4,9,16
	140:2 141:6,16
	141:20 142:1,5
	142:9 143:1,14
	143:17 144:5
	144:15 145:7
	145:12,16
	146:17,20
	147:1,5,11,13
	147:16,20
	148:5,9,16,23
	149:12,14
	150:2,5,10,15
	150:18,22
	151:1,6 153:7
	153:9,12,17,20
	154:19 155:9
	155:23 156:5
	157:1,4,7
	158:18,22
	160:3 161:10
	161:19 163:13
	163:17 164:8
	164:12,16
	165:3,7,11,15
	165:22 166:3
	166:18 167:10
	167:14,17,22
	168:7,10,13,22
	169:5,11,18
	170:20 171:1,9
	171:13,16
	172:3,17
	173:16 174:1,5
	175:16 176:8
	176:22 177:12
	178:3 179:2,16
	180:15,19,22
	181:3,10
	182:16 183:2

183:13 185:10
185:14,18
186:4,11,17
**making** 22:23
29:21 33:21,23
46:10 149:10
157:14 162:23
166:1
**Male** 112:14
**manage** 35:3
36:9,15
**managed** 29:10
30:17
**manager** 30:23
31:11 33:10,14
33:14 36:6
56:1 179:23
180:1
**managing** 35:8
38:11
**March** 21:5
22:18,18
**Mario** 30:6,10
31:2 32:13
35:20,23 38:8
39:5
**mark** 52:6 80:12
103:21,22
114:14 122:15
127:5 170:5
**marked** 52:15
80:20 104:4
105:8 114:18
123:1,20 124:5
125:15,23
126:6,7,23
127:10 128:21
160:5,22
162:18 170:9
**market** 42:5
**marks** 85:8,10
91:23 92:1
97:21,22 98:1
98:4 100:2,16
**married** 9:5
17:22

**mean** 39:10 45:4
54:19 61:13
68:9 71:12
81:12 85:7
93:2 99:22
100:5 135:5
177:21 178:21
182:4
**meaning** 137:23
**mechanism**
94:21
**medical** 9:12
57:16 58:1
142:19 155:6
160:19 164:22
**medication** 9:7
57:13 68:21
133:18,20
134:4 148:21
156:23
**medicine** 58:3
**meet** 131:15
**meeting** 170:18
**member** 56:15
57:7
**members** 56:23
**memory** 79:9
128:15
**mental** 152:18
**mentally** 151:4
155:3,20
157:21 165:18
**mention** 70:13
**mentioned**
95:17 128:9
141:12 154:1
**Mercedes** 26:13
**messed** 26:3
**middle** 54:14,15
84:19
**mileage** 160:1
161:2 165:13
**Milo's** 23:5,6
24:5 25:5
27:21 28:2
47:1 49:8

158:11,15,16
158:20 159:4,9
**mind** 14:18
**mine** 52:10
**minimum** 49:1
**minute** 95:4
110:7 162:8
**minutes** 82:18
106:10 110:8,9
168:17 169:4
175:9,12,18
**missed** 48:6,10
48:13 49:23
161:8 165:9
**mixed** 98:2
**mobility** 154:9
182:15
**molded** 100:18
**mom** 17:19 19:6
42:18 77:12,13
151:23 152:16
152:16 177:7
185:7,8
**Monday** 20:6
32:7
**money** 31:8
**Montgomery**
69:14
**month** 24:1
101:10,11
151:11 153:23
**months** 24:1,3
24:21,22 40:3
41:5 42:18
43:12 65:23
144:19,23
145:1
**Morgan** 23:14
**morning** 32:1
46:2,3 55:17
143:21 144:4
144:11 159:16
177:16,17
178:5,6
**mother** 162:20
**motion** 92:11

**mouths** 24:15
**move** 37:1 52:5
151:20,20
152:1,20
178:19,20
182:1,5 183:3
183:5,11
185:15,19,20
185:20
**moved** 13:13,21
21:3 31:5
112:20 128:2
153:5 185:22
**movement**
148:20
**movements**
92:12 148:13
**multiple** 90:5

_____
**N**
**N** 2:1 4:1 5:1
**name** 7:2 8:18
8:20 10:4,5,9
17:20 18:1
25:11 26:9
30:7 60:18,19
62:6,7 70:13
70:18 107:10
155:13
**named** 180:17
**names** 8:23 9:3
**Nash** 5:16
**nearby** 19:1
**nearest** 75:14
**nearsighted**
16:21
**necessary** 2:21
**need** 8:1 24:19
73:11
**needed** 25:23
29:8 37:20
41:13 42:21
111:15,16,17
112:23 133:14
178:12 182:10
185:12

**negative** 33:2
47:22 65:11
75:1 89:9 90:7
112:7 121:1
145:3 154:23
**negatively**
149:22
**neither** 187:14
**never** 34:12
140:14 142:14
149:4
**new** 19:16 22:12
**night** 32:1 46:3
46:4 81:17
132:21 159:14
**nights** 46:4
179:10
**nighttime** 44:3
44:20 74:5
**nine** 10:15
**nine-year-old**
10:16
**nod** 7:15
**North** 5:6
**NORTHERN**
1:2
**Nos** 80:20
**Notary** 2:7 6:3
**notes** 74:9
158:14,15
**notice** 95:22
100:22
**noticed** 95:18
96:3 97:11,15
100:11,15,16
100:17,19
144:10 166:19
**noticing** 149:6
**number** 1:6 14:5
14:11 15:3,11
55:3
**numbers** 160:17
**numerous** 47:8

_____
**O**
**O** 2:1

Alexandria Bennett                                    6/14/2023

**OASIS** 163:19
  163:21,22
**object** 164:2
  169:17
**Objection** 93:7
  93:16
**objections** 2:22
  3:2
**observe** 83:7
  121:18,23
  122:7 128:18
**observed** 86:21
  107:15 129:2
**occasion** 86:5
  156:15
**occasions** 68:16
  86:9,11
**occurred** 171:8
  171:23 176:17
**October** 12:22
  13:18 17:5
  33:22 34:5
  36:13,20 38:3
  39:7,19 43:7
  45:14 48:7,15
  50:2 53:1,16
  53:21 54:1
  57:12,17,21
  58:17,21 59:3
  59:7 64:15,21
  68:1,4,8,13
  71:7,17 72:4,7
  72:10,12,18
  74:1 85:13,18
  86:6,20 87:4,7
  87:10 89:12,13
  101:12 125:17
  125:21 128:17
  166:16
**odor** 130:8
**off-the-record**
  15:5
**offered** 3:4
**office** 19:18
  23:11 134:18
  155:14

**officer** 130:14
  130:18
**offices** 2:8 6:8
**oh** 21:11 24:8
  33:4 74:20
  98:6 124:13
  162:3
**okay** 8:11,17
  10:11,23 11:13
  11:16 13:2,8
  13:17,21 14:12
  15:21 16:4,13
  16:18 17:4,10
  17:14 18:20
  19:5,10 21:6
  22:7,11,15,21
  23:8,16 24:4
  24:18 25:11,16
  27:6,15 28:3
  28:17,23 29:12
  30:3,9,11,19
  31:5,10,16
  32:10 33:16
  34:12 35:1
  38:1 40:1,8,12
  42:16 43:6,11
  46:1,8,23
  47:23 48:9,17
  48:22 50:11,16
  51:14,21 52:5
  52:17,23 53:6
  53:8,15 56:4,9
  57:11 59:14,17
  59:23 60:3,21
  61:18 62:11,18
  64:4,18 65:8
  66:8,15 67:17
  68:3,20 69:1
  69:10,15 70:8
  70:19,23 71:19
  72:3,17,23
  73:4,10,10,15
  73:19 74:16,22
  75:3,16 76:6
  76:17,21 77:8
  78:8,14,18

81:1,8 82:7
83:15 84:22
85:4,12,17
86:4 87:19
89:4,22 90:10
90:14,19 91:11
93:3,13,19
94:7 95:4,17
95:22 96:5
97:2,5 98:8
99:2,5,14,19
100:14 101:11
101:20 102:20
103:11,19
104:12,18
105:12,23
106:3,21 107:4
108:3,7,13,18
109:11 110:18
111:5,21
112:16 113:3
113:16 115:2,7
115:23 116:1,3
119:2,10 120:6
121:2,5,13,18
121:22 122:3,7
122:14,22
123:7,11,12,17
123:19 124:1,4
124:9 125:3,14
125:19 126:18
127:3,20 128:5
128:17 129:4,7
129:14,23
130:6,11 131:7
132:9 134:6,23
136:10 137:2,7
137:22 139:7
139:14 140:3
141:2,12 142:2
143:15 145:5
145:19 146:9
146:21 147:14
148:6 149:13
149:23 153:10
153:21 154:20

155:10 157:18
158:1,7,13,19
159:8,13,23
160:4 161:1,14
161:20 162:1,9
163:4,14 164:9
165:4,23
167:23 168:5
168:14,23
169:7,19
170:15,21
171:6,10,14
172:15,18,21
173:17 174:6,8
174:21 175:3
175:13 176:1
176:13,20
177:4,8,20
178:4,13,21
179:5,13,17
180:6,13,23
181:4,11,19
182:4,13,18,23
183:3,11 184:8
184:23 185:4
185:15 186:1,8
186:12
**old** 10:14 14:11
  176:16
**older** 17:15
**Olympia** 9:20
  11:7,11 12:2
  153:6,19
**on-the-job**
  58:12
**once** 7:20 24:11
  30:16 71:17
  81:2 91:21
  96:4 98:5
  100:7 105:5
  118:12 131:11
  144:1,9 154:7
  186:8
**oncology** 19:19
**ones** 75:17,18
  125:21 134:20

160:10
**open** 32:1,6,10
  138:16
**opened** 37:21
**oral** 6:13
**orange** 101:6
**order** 158:3
**organizations**
  56:16 57:2,8
**original** 52:16
  80:21 104:5
  114:19 123:2
  127:11 160:23
  170:10
**orthopedic** 41:8
  64:1 133:15
  134:17 140:22
**Orthopedics**
  134:16
**Outback** 27:9
  27:12 28:19
  29:1,13,17,22
  30:13,15 31:20
  32:2,6,17
  33:18,22 34:2
  34:9,21 35:16
  38:3,19 43:19
  45:20,22 46:4
  46:7,16 47:1
  48:11 49:8,23
  50:6 51:15,18
  52:12 53:20
  54:2,8 78:10
  154:6,13,22
  158:3 179:20
  180:8,14,17
  181:2,7,20,23
**outpatient**
  137:22
**outside** 79:6
**overheard**
  121:15
**overnight** 63:8
  138:4 159:7,11
  159:12
**overtime** 54:9

**P**

**P** 2:1 5:1,1
**P.C** 2:9 5:11 6:9
**p.m** 1:20 2:12
  6:11 20:9 43:4
  43:5 73:17,18
  186:20
**pad** 115:4
**page** 4:3,12,15
  160:12,16
**paid** 20:10 32:17
  32:18,19,23
  53:12 147:8,10
  147:12,15,19
  152:3 165:5,20
**pain** 37:10 41:1
  51:11 64:20
  65:15,21 66:11
  66:15 68:10
  116:21 117:9
  118:1,2 131:17
  132:16 133:20
  135:18,21
  136:1,3,7,11
  136:23 142:21
  143:2,7,13,16
  143:19 144:11
  144:14 145:2
  145:10 148:14
  148:22 150:12
  150:12 161:16
  161:21
**painful** 151:13
  151:18
**pains** 140:16
**pallet** 90:22 96:8
  96:9,10,13,17
  96:20 97:1,10
  98:19 99:6
  119:20 129:9
  129:12,16,19
  129:19 130:2
**pandemic** 24:14
  25:1 177:2,5
**pantry** 45:3

**paper** 115:4,18
**Pappadeaux**
  27:10,13 28:19
  43:15,21 44:1
  44:23 45:8,13
  45:18,22 46:5
  46:9 154:6
**Park** 18:11,18
  183:22
**parking** 79:14
**Parsons** 20:14
**part** 10:12 32:16
  38:16 52:7
  59:23 94:7,10
  103:20 105:19
  105:23 118:6
  122:21
**part-time** 45:22
**particular** 19:17
  19:21 26:9
  112:21
**parties** 2:3 3:1
  187:15
**pass** 83:11
**passenger** 67:23
**patient** 19:16
  21:1 162:4
**pause** 42:23
  171:20 172:19
**pay** 4:16 31:6
  32:3 33:16
  42:19,21 52:6
  52:11,18 53:9
  53:15,20,23
  54:19,22 55:1
  55:23 56:3,3
  67:14 152:21
  153:21,23
  176:11 185:8
  185:11
**paycheck** 26:23
**paychecks** 21:17
**paying** 153:2,13
**payments**
  147:22
**payroll** 49:19

**Pearl** 12:11 13:8
  13:15 76:11
  133:5 152:22
  153:2,5
**Pelham** 16:17
  17:11 26:11
  69:9 86:2
**people** 56:22
  57:3 134:14
  172:16
**people's** 24:15
**perform** 25:22
  25:23 26:5
  28:6 34:22
  35:2 36:12,19
  36:22 39:1,2
  48:19,21 49:15
  50:9,13 179:21
  181:23 184:21
  184:22
**performed**
  137:13,16
  138:1,8 139:18
  142:11,23
**performing**
  20:16 26:8
  38:2
**period** 23:21,22
  27:6,11,15
  33:10 37:4
  41:4 43:12
  46:17 47:5
  52:18 54:22
  55:1,4,8
  144:13 146:15
  150:20
**periods** 35:5,12
  36:14
**permanent** 22:8
  22:13 148:8
**person** 112:17
  113:21
**Personnel** 25:14
  26:20 27:1,5
  49:18
**pharmacy** 69:1

69:6
**phone** 14:4,15
  81:23 111:5,10
**photograph**
  4:17,18,19,22
  103:20,23
  105:7 106:3,6
  127:21
**photographed**
  129:5
**photographs**
  4:21 103:3
  122:18 123:20
  124:4,16
  125:14,20
  126:5,9,11,14
  126:21,23
  127:4,7 128:21
  129:1
**photos** 103:7,10
  103:12
**physical** 139:5,7
  139:11,14
  141:11 147:2
  157:10,15
**physically** 177:1
  178:2
**pick** 120:8
  132:21
**picked** 16:11
  78:18 89:6,15
**picking** 7:22
  56:22
**picture** 74:20,21
  104:9 124:15
**pictures** 105:4,6
**place** 100:4,6
  122:8 148:3
  165:1 168:19
**places** 47:9
  161:3
**Plaintiff** 1:10
  5:3
**Plaintiff's** 4:12
  170:5,8
**plans** 141:21

150:3
**play** 58:6
**please** 8:5,18
  17:18 59:11
  127:19 151:8
**pocket** 67:14
  165:20
**point** 30:12 33:9
  33:19 40:14
  41:14 46:5
  47:14 54:16
  71:2 73:14
  115:21 122:3
  145:13 146:12
  155:9 156:6
  163:6 171:3,11
  176:7
**pointed** 171:7
**pointing** 173:4,5
  173:11,15
**police** 60:21
  61:1,6,6
  130:14,17
**policy** 42:14
**policyholder**
  42:6
**portions** 130:11
**position** 30:4
  38:12 127:23
  128:4 154:21
**possibly** 78:10
**potential** 163:15
  168:12
**prep** 29:18 30:1
  30:14 55:12,16
  55:17,19 182:9
  182:10
**prepared** 178:2
  178:15
**prescribed** 16:8
  156:21
**prescription**
  16:5,12 134:3
**prescriptions**
  69:3 133:18,23
  134:7

**PRESENT** 5:15
**pressure** 57:20
  58:4
**prevented** 35:7
  35:11
**prevents** 154:2
**previous** 175:13
**PrideStaff** 25:14
  26:20 27:1,4
  49:17
**primary** 69:19
  70:10,20
**print** 187:9
**prior** 3:4 70:20
  168:5
**probably** 8:12
  12:13 31:9,12
  44:10 45:11
  54:3 57:3 61:8
  73:21 76:22
  78:9 82:1,17
  82:18 89:7
  94:14 117:22
  117:23 133:6
  153:3 175:11
**problem** 35:15
  154:17
**problems** 37:6,9
  64:20 83:4
  87:6 138:21
  148:12
**procedure** 6:6
  137:23
**proceedings**
  6:14 187:7,13
**proceeds** 163:15
**process** 89:19
  163:10
**produced**
  122:19
**production** 52:8
  103:21
**prognosis**
  142:12
**promise** 107:3
  162:1

**promotion**
  30:23
**prompt** 175:21
**prompted**
  175:23
**pronounced**
  99:17,20
**property** 12:18
**provide** 51:18
**provided** 41:23
  51:14 75:13
  103:19 122:20
**providers** 155:6
**psychiatrist**
  155:7 156:4
  157:5
**psychiatrists**
  155:5
**psychiatry**
  20:21 22:3,16
  22:22 23:4
**psychologist**
  157:6
**psychologists**
  155:5
**Public** 2:7 6:3
**purposes** 56:22
**purse** 81:23 82:1
**pursuant** 6:5
**put** 32:21 162:5

———————
     **Q**
———————
**quantify** 161:20
**question** 50:3
  51:17 157:17
  173:2
**questioned**
  167:12
**questioning**
  166:12
**questions** 2:23
  3:1 7:6,14 8:4
  123:5 151:23
  164:3 166:9
  187:8
**quickly** 166:10

**quit** 146:13
**quite** 175:7

———————
     **R**
———————
**R** 5:1
**radiation** 19:19
  21:3
**raggedy** 97:1
**rain** 79:12
**raining** 60:5
  79:16
**raise** 33:19
**ran** 58:8
**rate** 53:9 56:3
**rating** 150:9
**rats** 184:4
**reach** 83:19
  89:17 91:6,8
  119:10,15
  120:4
**reached** 92:15
  108:4 167:3
**reaching** 89:20
  89:23 90:12,16
  90:20 95:5
  119:11
**reading** 2:14
  16:1
**ready** 144:2
  146:7 177:16
  178:7,10
**real** 26:5 85:9
  182:2
**realized** 28:5
**really** 24:13
  38:12 68:11
**reason** 8:2 21:8
  28:13 38:21
  77:1 102:15,20
  147:4 155:17
  180:2
**recall** 9:9,13
  33:6 45:12
  68:23 70:11,20
  78:7 86:10
  109:1 121:11

132:14 166:20
  169:7,10
  170:17,21
  174:16 175:19
  183:7
**receive** 32:17
  34:1 47:18,20
  63:19 136:17
  139:1
**received** 136:7
  160:10 164:14
**recess** 43:3
  73:16
**recipes** 37:2,16
  37:17,19
**recognize** 80:15
  105:20
**recollection**
  12:22 76:21
  80:11
**recommend**
  67:9 133:9
  137:7 141:8
**recommended**
  137:9
**record** 7:19,23
  8:18 15:1,3,7
  93:10 173:3
**records** 49:19
**red** 128:8
**reduced** 187:9
**REEXAMIN...**
  173:1 174:14
**referred** 41:7
**refresh** 80:11
  128:14
**regard** 65:1
**regular** 14:21
  57:13 58:3
  59:22
**relate** 20:17
  40:22 50:19
  51:2 71:4
  134:11 138:9
  140:22 141:15
  141:19,22

**related** 64:5
  73:1
**relating** 2:18
**relation** 95:23
  96:1 108:4
**relationship**
  10:20 180:21
**relatives** 17:14
  18:6
**relevance** 164:2
**remain** 106:8
**remember**
  11:13 16:20
  17:2 23:23
  27:22 30:7
  47:23 61:1
  62:7 70:18
  76:2 79:8,15
  79:21 80:4,17
  81:6,7 83:12
  83:14 87:16
  89:11 90:10
  92:17 112:15
  114:8 115:2,6
  116:12 117:7
  120:15,19
  130:9,17 131:2
  131:5,6,23
  132:7 133:21
  133:22 134:5
  134:17,19,20
  145:15 146:16
  153:1 155:14
  156:7 164:5
  167:7,9 181:19
**remembering**
  127:3
**remind** 7:16
**rent** 152:22
  153:22
**repeat** 86:16
**rephrase** 8:6

report 4:20
  60:21 66:11
  114:1,13
  122:21
reporter 1:22
  2:6 6:2,20 7:12
  49:3
represent 7:3
  75:7 122:20
  160:6
represents
  187:11
require 58:2
required 159:20
resign 38:18
  49:6
respective 2:3
responses 7:18
restaurant
  33:14 38:12
  154:18 186:3
restless 179:10
restlessness
  179:14
restriction 40:9
restrictions
  15:18 39:9
  40:19
result 7:9 20:16
  48:6,15 50:1
  60:22 61:12
  63:21 66:4
  157:15 164:11
results 187:17
return 39:13
  40:15 144:17
  145:2 148:14
  186:10
returned 110:3
  145:11
ride 131:8
right 12:6,20
  14:10,23 18:9
  18:14 19:7
  20:10 21:2
  22:9,19 23:16

23:20 25:4
29:14 31:16
32:2,4 34:6,8
34:11 40:21
43:12,14,23
46:13,15,21
49:22 50:14
52:20 53:2,10
53:19 54:17
55:5,8 57:11
62:21 66:16,18
69:18 71:15
74:10 76:7,9
77:6 78:3,4
79:12 80:1
83:15 85:2
87:10 89:1,15
90:4,6 91:16
91:22 92:11
95:19 98:14
99:7 104:14
107:11,17
108:8 109:9
110:3,19 111:8
112:17 113:14
115:12 117:8
118:3,22
120:16 126:5
126:21 127:12
129:12 130:4
131:8,21 134:9
135:7 136:23
137:20 140:5
143:7,10 150:6
158:6,15
159:23 160:4
161:8 162:15
163:23 164:23
165:10 166:4
166:19 167:11
172:1 173:6,7
173:21 174:3
180:23 186:18
ring 70:15
road 18:19
23:14 59:21,22

78:4
Robert 18:2
room 66:16
  133:8 184:9,14
  185:1
rude 112:17
rules 2:18 6:6
  8:13
running 184:4
rush 120:10,12
  182:2,5

                S

S 2:1 5:1
s/ 187:20
safety 87:3
saturated 62:16
  65:4
saw 52:21 54:16
  70:12 87:2
  88:13 96:17,19
  97:5,9 98:9,21
  99:10,16
  101:15 102:11
  104:20 105:9
  107:12 130:9
  135:3 168:1,3
saying 51:4 98:3
  98:7 107:18
  110:5,19
  122:10 126:20
  142:4 151:23
says 52:23 54:12
  160:9
scared 184:6
scene 62:23
schedule 137:10
  139:19,21
  140:7,11,15
  145:8
scheduled 51:1
  140:4 141:18
scheduler 19:16
school 18:10,11
  18:17 58:7
  146:7 176:20

176:23 177:17
177:20,23
178:7,16
183:22
schoolwork
  177:9
screaming
  109:16
screen 171:3
  173:5,6
screenshots 80:9
scuff 85:8,10
  91:23 92:1
  97:21,22 98:1
  98:4 100:2,16
scuffed 85:9
seat 61:15
second 80:14
section 26:12
  45:4 55:11
  101:2 115:13
  115:14
security 15:2
  150:1
see 14:8 16:7
  21:11 29:12
  39:22 41:6
  42:22 54:12
  63:23 73:6
  85:4,8,11 92:5
  97:20 100:10
  104:13,18
  106:18 109:3
  110:11 122:10
  122:13 124:13
  125:3,7,10
  131:4 134:21
  135:1 136:15
  136:15 137:18
  140:10,15
  141:1,3 155:10
  155:12,18,22
  156:3,8,14,19
  162:10 168:6,8
  168:11,19
  169:2 170:13

171:11,12
172:5 173:11
175:18
seeing 16:22
  119:7 130:17
  167:13
seek 67:9 133:9
  134:10 141:21
seeking 184:12
seen 39:20,21,23
  41:10,12 72:9
  72:13 74:12,22
  75:2,23 86:13
  91:22 92:2
  101:5 103:23
  107:20,23
  114:15 122:5
  125:19 126:8
  126:11 127:6
  135:6,8 140:21
  141:3 156:17
  157:5 160:15
  160:17,19
  169:5
sell 81:11
sent 47:9 74:13
  75:18
served 37:21
service 21:1,10
  21:11,15 25:6
  28:9,15 48:20
  56:7 154:11
services 21:13
  21:19 28:18
  152:8
settled 178:23
seven 24:22
  32:10 176:19
shake 7:15
shakes 149:22
share 170:1,6
Sharpie 124:10
Shelby 17:16,19
  18:3,7 56:17
  57:8 71:13,14
  72:1 118:20

Alexandria Bennett                                        6/14/2023

Page 202

131:11,15,19
131:22 132:5
133:1 136:19
164:23 181:14
181:16
**shelf** 89:16
90:11,13,22,23
91:1,4 100:18
119:11
**Shelley** 70:13
**shelves** 90:5
96:1,6
**shelving** 96:10
**Shield** 42:12
43:9
**shifts** 159:14
**shocking** 92:18
**shoe** 120:22
**shoes** 82:7,9
120:14 121:2,6
121:9
**shopper** 174:17
**shoppers** 169:2
**shopping** 76:19
85:23 86:14
87:3,7 88:4,14
88:17,20,22
89:11,12 103:5
103:9 107:9
**short** 9:1
**Shorthand** 2:6
6:2
**shoulder** 82:2
**show** 122:14
123:21 124:1
125:16 127:15
127:22 129:1
160:5 169:20
172:9,10
**showed** 171:15
**showing** 105:12
131:3 170:17
**shown** 74:17
75:23 76:3
105:16 128:6
128:20 173:18

173:20
**shows** 54:6
128:3
**sic** 62:16 88:12
**sick** 32:18,19,23
84:22
**side** 59:21 60:2
75:5 87:14,14
94:19 101:3,3
101:4 184:7
**sign** 114:11
**signage** 168:8,11
168:19
**signature** 2:14
114:21
**Signed** 187:18
**signing** 115:2
**signs** 121:19,23
**single** 89:5
**sit** 38:10
**sit-down** 38:13
38:15 48:4
**sitting** 70:19
89:10 90:21
91:1 101:13
104:11
**situation** 184:1
184:3
**six** 24:22,22
176:18
**size** 97:8 98:16
98:19
**sleeping** 157:14
**sleepless** 179:9
**sleeplessness**
179:7,15
**slides** 120:18
**slip** 92:20,20,22
93:5
**slipped** 83:20
92:21,21 93:4
93:12 124:2,7
127:16 129:8
129:15
**slippery** 93:14
94:1

**slower** 182:14
**Smartwater**
88:12,14,20
**social** 15:2 56:16
57:7 150:1
**sole** 120:19
**solely** 155:21
**somebody** 88:16
88:19 99:20
132:21 135:1
**Sonata** 60:13
**sorry** 45:4 53:7
70:3 73:5
86:18 90:9
97:13 102:19
104:17 106:22
117:1,19
123:18 134:5
172:7,9
**sort** 68:17
142:12 146:22
156:22
**sorts** 170:6
**sought** 145:9
**sound** 14:10
53:10 74:10
115:9,17
137:20 172:1
**sounds** 14:8
**SOUTHERN**
1:3
**Southlake** 135:8
135:10,13,17
135:23 136:22
137:3 138:7
139:17 140:11
140:23 141:5,7
142:10 145:9
147:18,22
158:4,5 165:1
**Spain** 18:11,18
183:22
**span** 74:8
**speak** 110:22
113:18,22
118:8 175:6

**speaking** 175:19
**specific** 36:21
64:23
**Specifically** 35:1
**speeding** 61:16
**spell** 10:11
**spending** 183:16
**spent** 183:7
**spill** 100:22
101:7
**spleen** 62:15
63:12,14 65:5
66:21
**split** 13:16
**spoke** 174:16,17
**spoken** 116:6
**sports** 58:6,18
**spot** 97:8,15
**sprained** 62:17
65:19 66:14
**spread** 123:9
**sprung** 65:18
**stable** 27:23
152:8
**stacked** 96:23
**stand** 35:5 36:14
36:23 37:10
51:6 55:15
119:14,17,20
**stand-up** 45:5
**standing** 35:12
119:12,23
154:19
**stands** 55:12
**star** 37:11
151:17 180:17
**start** 22:15 24:8
28:23 29:1,2
31:8 35:14
43:15 122:11
178:15 180:7
**started** 19:21
22:12 25:1
29:14,17 33:7
46:20 47:1
70:14

**starting** 158:16
**state** 2:7 6:3
8:17 171:22
187:3,22
**stated** 180:16
184:8
**statement** 4:16
53:20 54:20
55:23
**states** 1:1 15:16
**station** 45:4
**stay** 20:9 33:16
51:5 63:8
81:15 109:18
113:7 116:9
146:5
**stayed** 11:12
12:8 19:4
**staying** 13:13
**stays** 17:19
**Steakhouse**
179:20
**stenotype** 187:8
**step** 143:9,11
**stepdad** 152:16
**steps** 169:13
**sticker** 127:22
**STIPULATED**
2:2,13,20
**stipulation** 6:7
**stipulations**
6:21
**stitched** 66:2
**stool** 119:21
**stop** 45:17 65:6
77:5 151:13
152:4 178:23
**stopped** 45:15
46:6 65:7
77:20,22 78:19
78:23 79:7
**stopping** 73:13
79:18
**store** 30:18,20
31:1,3,4,6,11
31:13,15,20

32:3,14,17
33:8,11,13,14
33:18 34:9,13
35:16 38:3
80:2 82:13
84:6,7,8 85:13
87:7 100:12
101:5 104:11
107:10,19
109:22 113:13
113:17 130:15
175:1
**Stores** 7:3
**straight** 82:21
94:20
**Street** 11:15
153:8
**strep** 70:1
**stress** 157:8,16
**stretcher** 130:19
130:23 131:3
**structures**
168:20
**struggling**
176:12
**stub** 52:6
**stubs** 52:11
**stuff** 24:15
26:14 36:8
37:20 48:4
100:3,12
140:17 144:2
146:7 151:13
152:1 154:10
154:14,14
160:20 161:7
163:3 182:7
**sturdy** 82:9
**style** 120:15
**substance** 92:8
99:15 124:1,6
124:11 127:15
128:19 167:15
167:19 168:2
**sued** 64:11,12
**suffered** 58:11

58:22 59:1,6
68:6 72:17
144:23
**suffering** 9:11
57:15 161:17
161:21
**summarize**
164:18
**summed** 180:4
**supervision**
187:10
**supervisor**
20:13 30:3
32:14 35:20
44:22
**supplemented**
177:22
**supposed** 22:5
37:3 39:1
40:10 44:6
50:10 71:23
139:4 141:10
146:4,18
178:11 182:2,6
182:7
**sure** 21:21 36:17
39:11,18 40:13
40:16 42:11
43:2 44:12
50:4 52:3
56:19 62:2
67:12,12,16
70:16 72:16
73:13 78:12
81:4,21 82:5
86:17 91:10,12
94:2,12,13,15
95:2 99:1
111:4 113:20
113:21 114:12
117:6 118:7
120:9 129:17
130:6,10,13
134:8 136:5,12
139:6 142:18
145:18 148:1

155:11 156:10
156:13,20
159:1,8,22
162:14,17
163:8 164:19
174:10 178:10
181:13 183:6
**surgeries** 72:4
**surgery** 40:11
40:15 63:13,16
137:9,10,12,15
138:7,13,16,19
139:2,18 140:1
141:9,14
142:11,22
143:4,8,12
144:7,9,12
145:20,22
147:23 148:4
156:12 158:9
165:2
**surprise** 88:15
88:21
**surprised** 75:10
**surprising**
152:13
**surveillance**
74:6,13 80:10
**sustained**
164:10
**swab** 24:15
**switch** 155:1
**switched** 185:21
**sworn** 6:17
**symptoms**
157:10,15

———————
**T**
**T** 2:1,1
**take** 8:1 14:17
24:16 28:9
43:1 58:3
65:20 73:12
78:4 103:3,6,8
103:16 118:18
146:10 148:21

152:4 158:2
159:3,11
176:10
**taken** 2:5 43:4
62:22 63:2
73:17 100:21
106:6 113:13
118:16 125:21
126:9 130:22
187:7
**talk** 28:6 37:15
38:8 71:2
110:12 155:19
166:14,15
174:22 176:3
182:18
**talked** 104:14
116:13 120:13
130:1 150:7
151:2 164:17
165:16,23
167:12 179:18
**talking** 39:16
72:19 90:2
98:18 100:15
106:23 110:20
115:16 121:15
126:13 173:3
**tall** 73:19
**Tea** 23:5 28:2
158:11
**teeth** 179:3
**tell** 17:18 28:9
28:16 36:4,18
38:14 39:12,14
43:14 47:7
49:22 59:10
60:3 74:1
92:11 95:10,23
99:20 105:3
107:14 111:14
111:17 114:3
116:23 133:13
142:16 151:7
174:22 178:5
180:6

**temp** 21:10,11
21:13,15,19,23
22:8,12,16,22
25:6,17 26:17
27:8 28:4,9,14
28:18 46:20
48:19,23 49:7
49:19 56:7,8
152:7 154:11
**temps** 24:17
140:18
**ten** 86:8 108:13
108:15
**terminology**
142:19
**test** 79:9
**testified** 6:18
**testify** 9:8,13
**testimony** 1:16
49:13 50:12
171:21 175:14
187:12
**testing** 167:18
**thank** 10:8,14
14:20 33:5
65:14 112:10
128:12 162:4
166:5 173:8
174:8,11
**Thanksgiving**
182:20,20
183:1
**therapy** 139:5,8
139:11,15
141:11 147:3
**thereto** 3:5
187:9
**thing** 65:3 66:20
**things** 16:22
28:5 36:8 58:2
85:22 100:14
156:1 157:13
162:18 166:11
182:14
**thingy** 97:1
**think** 8:11 21:4

25:2,15 32:3
32:20,20 45:15
47:2 48:18,20
52:3,10 53:15
54:3 60:1 61:9
62:8 65:17
66:19 69:16
70:4 71:20
73:8 74:8 75:1
76:7 78:8,14
84:1,9 89:7
91:15,18,20
96:23 97:22
98:3,22 99:17
99:23 101:18
103:1 108:9
109:15 110:5
112:19 113:3
114:6 115:13
115:15 118:4
118:20 120:14
132:9 133:3,15
133:19 135:8
135:18 136:9
137:5 139:5,12
139:19,20
140:8 141:10
142:14 146:14
146:14 148:5
148:11,19
151:18 152:9
152:14,15,16
152:17 153:14
155:11,12
156:16 157:23
158:10,11,13
159:10 160:7
161:15 162:17
162:19 166:9
169:15 172:11
175:17,23
183:6 185:22
**thinking** 42:11
**thinks** 104:23
**thought** 69:23
  87:1,2 100:9

142:17
**three** 11:2 12:1
  12:1 29:3,12
  40:3 41:4,5
  44:12,18
  153:16 180:11
  180:11
**throat** 70:1
**throw** 157:14
**ticket** 61:14
**tickets** 61:12
**time** 3:3,3 13:20
  27:11,15 28:21
  29:19 33:7,10
  33:17 35:5,12
  35:21 36:14
  37:2,16,20
  39:18 41:8,11
  44:4,5,7,16
  46:17 47:5
  48:6,10,14
  49:23 52:1,2
  66:5,17 67:4
  74:2 76:12
  77:2 78:19
  81:16 87:12,20
  108:23 110:9
  111:9,20
  118:13,23
  120:7,11 121:7
  131:18 133:5
  135:10,14,17
  136:21 139:13
  142:22 143:9
  143:11 144:13
  146:15 150:20
  152:2 155:18
  156:3,9 158:12
  158:19,23
  159:17,18
  161:8 165:9
  168:1,3,18
  169:8,9 171:19
  172:1,5,13
  175:7,10
  176:11,17,21

177:17,17,21
**times** 146:9
  184:3
**tiny** 115:21
  116:1
**tippy-toes** 120:4
**tips** 29:23
**title** 10:22 29:16
  30:13 33:9
  45:2
**titles** 33:13
**today** 7:5 9:7
  69:19,20 70:19
  74:3 76:3
  89:10 101:13
  106:15 107:16
  125:22 126:10
  130:1 143:16
**toes** 149:5,11
**told** 39:3 40:14
  40:17 46:16
  47:16 56:5
  66:5 73:8
  88:16,19 102:6
  102:10 104:22
  105:13 106:14
  106:15,19
  107:11,16
  114:5 116:17
  140:13 146:4
  146:13 150:13
  157:20,23
  164:4,9,13
  180:2
**top** 52:20 54:14
  54:15 90:13
  119:11 160:8
  173:6,6
**topic** 52:6
**total** 55:3
**totaled** 61:21
**town** 184:7
**track** 58:8
**tragic** 152:10
**transcript** 52:16
  80:22 104:5

114:19 123:2
127:11 160:23
170:10 187:11
**transferred** 31:2
**travel** 160:1
  165:13
**treated** 64:19
  71:1,3 73:6
**treatment** 63:19
  64:5,18 66:23
  67:10 131:22
  133:10 134:10
  134:13 136:6,7
  136:18 137:3,8
  138:9 139:2
  141:8,18,22
  142:3 145:10
  147:6,18
  164:14 174:19
  184:12,14
  185:1
**trial** 3:3
**tried** 25:19
  39:20,22 48:3
  74:18 75:7
  109:14 139:19
  141:1 154:20
  184:9
**trip** 101:8
**trips** 86:19
**trouble** 16:22
  20:15 26:8
  119:6
**true** 187:11
**Truitt** 17:21
  18:2 162:20
**try** 7:17 8:6
  37:12 41:9
  139:21 152:2,3
  154:8 176:11
  177:16 181:1
**trying** 27:7
  36:17 42:20
  94:20 98:20
  109:21 110:6
  134:12 136:14

140:6 145:8
152:5
**turned** 98:2
  134:13,15
  154:10
**twice** 156:17
**twisted** 95:2
**two** 12:13,14
  127:4,6 153:4
  166:23 167:6
**two-week** 55:1,4
  55:8
**type** 25:16 60:12
  88:10 100:14
  131:21 143:7
  162:21 183:23
**typed** 7:19
**typical** 54:7
**typo** 160:8

---

**U**

**U** 2:1
**UAB** 19:14
  20:20,21 21:13
  21:19 22:3,15
  22:22 23:3,19
  70:6 72:2 73:8
  73:8
**UAB's** 70:3
**uh-huh** 7:18
  47:15 53:3
  68:14 77:10,18
  104:15 114:22
  123:14 130:3
  139:23 156:16
  179:4 181:21
  184:11
**uh-uh** 7:18 33:2
  47:22 65:11
  75:1 89:9 90:7
  112:7 121:1
  145:3 154:23
**unable** 35:2
**undergone** 72:3
**understand** 8:3

Alexandria Bennett

6/14/2023

Page 205

| | | | | |
|---|---|---|---|---|
| 8:5,7 30:11 | 159:19 160:2 | **walked** 84:11,16 | 35:3,4 36:5,8,9 | 128:19 129:2 |
| 41:2 50:11 | **vs** 1:11 | 85:6 118:21 | 36:23 37:1,3 | 129:15,18,23 |
| 94:21 102:18 | | **walking** 87:14 | 37:13,13 38:23 | 130:20 166:20 |
| 142:20 | **W** | 108:20 | 39:21,23 40:10 | 166:21 167:13 |
| **understood** 8:9 | **W** 70:14 | **WALMART** | 48:19,21 51:6 | 167:19 168:6,9 |
| **unemployed** | **wages** 161:5,6 | 1:12 | 78:11 79:14,16 | **way** 31:9,14,18 |
| 27:12,16 | 165:8 | **want** 8:3 23:18 | 84:4 94:22 | 36:15 76:2 |
| 182:23 | **waited** 113:8 | 40:2 41:4 | 100:20 101:3 | 77:4,5 78:2,15 |
| **unemployment** | **waiting** 116:13 | 56:23 57:3 | 120:12 129:4,5 | 87:23 94:8 |
| 51:22 | 142:6 174:18 | 73:23 95:23 | 139:12 151:22 | 96:2 101:13 |
| **unit** 54:12 96:11 | **waived** 2:15 | 101:11 123:9 | 152:21 176:10 | 125:16 140:20 |
| **UNITED** 1:1 | **wake** 143:20,23 | 129:17 140:10 | 179:21 182:1 | 149:5 157:19 |
| **urgent** 70:4 | 144:4 146:6 | 155:16 162:5 | 183:21,23 | 165:6 |
| 71:16 | **Wal-Mart** 7:3 | 164:19 166:15 | **water** 81:10,12 | **ways** 38:16 |
| **use** 16:2,3 | 7:10 16:15 | 169:20 176:3 | 81:12 82:20,21 | 155:3 157:20 |
| 150:20 | 17:6,11 20:18 | 186:5 | 83:8,13,18,20 | 186:10 |
| **Usual** 6:20 | 40:22 50:7,20 | **wanted** 31:3 | 83:21 84:5,11 | **we've** 104:14 |
| **Usually** 69:5 | 51:3 57:4 67:5 | 65:6 130:6 | 84:15,20 85:5 | 116:2 126:23 |
| | 69:6,9 71:4 | 166:10 172:19 | 87:11 88:4,5,9 | 162:19 164:19 |
| **V** | 73:1 74:7 | **warehouse** | 88:11,12 89:2 | **wear** 15:21,23 |
| **vacation** 32:18 | 76:14,22 77:21 | 25:19 26:7,16 | 89:2,5,5,8,16 | 17:7 65:8 |
| **Valleydale** | 78:20,23 79:19 | 28:14,17 | 89:18,20,22 | 145:14 146:1 |
| 18:19 | 81:16 83:12 | 158:17 159:14 | 90:3,3,11,14 | 146:19 |
| **vantage** 171:10 | 85:13 86:3,12 | 159:19 | 90:15,17,20,20 | **wearing** 17:5 |
| **vehicle** 60:6 | 86:20 100:10 | **warehouses** | 91:7,8,18,22 | 82:3,8 120:14 |
| **verify** 172:20 | 101:9 102:15 | 26:1,4 27:7 | 92:1,2,3,6,7,8 | 121:6,10 |
| **versus** 115:4 | 102:21 109:3 | 28:4 46:21 | 92:16 95:5,18 | 128:13,15 |
| **Vestavia** 2:10 | 110:11,13,15 | 48:23 | 95:23 96:3,14 | 146:2,2,3,5,13 |
| 5:13 6:10 | 111:22 112:4 | **warn** 168:20 | 96:16,18,19,21 | **weather** 79:10 |
| **video** 4:13 75:2 | 112:12,22 | 169:13,16 | 96:23 97:4,5,9 | **week** 20:4 31:22 |
| 75:8,8,14 | 113:4,19,22 | **warning** 121:19 | 97:12,15 98:1 | 32:10 44:8,18 |
| 80:10 94:23 | 118:9 120:11 | 121:23 | 98:6,9,17,21 | 54:7 |
| 169:20 170:12 | 122:4,16 | **Warren** 45:1 | 99:4,18 100:1 | **weekends** 32:8,9 |
| 170:17,18 | 123:22 125:6 | **wash** 178:23 | 101:4,14,19 | 44:11 |
| 172:12 173:4 | 125:12 139:15 | **Washington** 4:5 | 102:3,7,11,16 | **weeks** 41:5 |
| 173:19 178:2 | 140:23 146:23 | 4:7 5:4 6:23 | 102:16,22,22 | 65:23 66:1 |
| **videos** 74:6,13 | 147:3 149:2 | 42:23 93:7,16 | 104:13 105:1,2 | **weight** 40:18 |
| 74:17,23 76:1 | 151:4 157:21 | 164:1 166:7 | 105:13,15 | 117:23 |
| 76:4 103:8 | 160:9 163:11 | 169:19 170:1,4 | 108:5 109:4 | **Weisen-somet...** |
| **view** 84:10,15 | 164:6,11 | 170:11,13,15 | 110:22 111:23 | 70:14 |
| 170:22 | 166:15 168:2 | 170:16 172:7,8 | 113:11 118:21 | **went** 18:11 |
| **visit** 64:5 67:13 | 168:12 169:13 | 172:18 173:8 | 118:23 119:3,8 | 34:12 36:4 |
| 72:23 100:13 | 175:6 176:2 | 173:12 174:8 | 119:11,15 | 39:16 41:7 |
| 136:19 138:6 | **Wal-Mart's** | 174:11,14 | 121:15,16,19 | 42:5 45:19 |
| 184:9,15 185:2 | 122:21 | 186:12,18 | 122:1,4 125:3 | 46:3,5 50:8 |
| **visits** 158:21 | **walk** 26:4 109:4 | **wasn't** 34:22 | 125:4,8,10 | 66:6 67:7 |

71:12,16 80:5
80:12,16,18
81:1,4 82:20
83:1,8,12,19
85:21 86:12
89:1 93:2 94:4
100:10,23
101:10 131:3
133:3,6,7
135:5,10,13,17
135:23 136:21
141:4 147:9
155:22 156:3,8
156:19 166:20
168:15 175:14
181:14 183:22
**weren't** 13:19
38:14 120:17
121:5,21 122:2
138:3 151:21
**west** 60:2
**wet** 79:14
100:22 130:12
**Whereabouts**
115:20
**Williams** 1:23
2:6 6:1 187:20
187:21
**witness** 2:15
6:12 107:5
149:22 186:17
187:12
**witnessed**
116:17
**witnesses**
115:14
**woke** 177:19
**woman** 151:16
**wondering** 41:3
**Woods** 2:9 5:12
6:9
**word** 61:2
**wore** 136:1
**work** 18:3 19:13
19:14,17 20:5
20:20 21:2,12

23:3,21 24:11
25:20,21,23
27:7 28:8
31:23 35:6
36:5 37:3 39:8
39:13,14 40:2
40:9,10,15
44:2 46:3 48:6
48:14 49:23
50:6,8,18,23
51:1,13 66:3,7
149:19 154:20
158:2,20
159:15 161:9
165:9 179:18
180:9 181:1,6
186:2
**worked** 21:4
23:5,19 26:11
28:1 29:3 31:9
31:23 32:6
43:17,20 44:14
44:17,17,20,23
45:3 52:12
54:5 55:4,7
78:6 110:6
159:6 180:8,18
**worker** 111:19
**workers'** 58:14
**working** 20:21
25:2,5,8 27:3
28:3,19 31:21
43:20 45:13,15
45:17,21 46:6
51:23 54:9
140:17 152:5
154:6 158:7,10
159:4,13
180:21
**works** 21:22
31:18
**worn** 121:2
**worse** 177:19
**worsened** 143:2
143:5
**worst** 177:18

**wouldn't** 57:3
89:6 134:21
141:3 154:12
**write** 114:7
**written** 7:23
**wrong** 39:23
41:10 133:16
158:14 184:17
184:19
**wrote** 114:6

---
### X
**X** 4:1 39:13
**X-rays** 132:2

---
### Y
**y'all** 13:17 87:14
87:20 116:12
152:19 172:7
**yeah** 54:5
139:20 149:8
**year** 9:23 16:12
17:13 18:12
21:5 22:5,17
22:19 30:21
34:18 41:20
43:18 44:13
152:14 158:6
**years** 11:1,2,3
12:1,13,14
29:4,13 153:16
180:12
**you-all** 75:11
100:7 174:22
**young** 151:16

---
### Z
**Zoom** 170:18
177:22
**zooms** 124:18,19
125:1
**Zulanas** 2:9
5:11 6:9

---
### 0
04/11/2027

187:23
**09/30/2023**
187:21

---
### 1
**1** 4:13,16 52:8
52:15 170:5,9
**1,000** 153:4
**1,200** 153:23
**1:30** 1:20 2:12
6:11
**10** 82:18
**104** 4:19 187:21
**11** 122:16
**114** 4:20
**12** 49:1
**123** 4:21
**127** 4:22
**13** 49:2 54:23
**135** 9:20
**14** 1:19 2:11
6:11 45:11
125:6,12
**14th** 187:18
**15** 12:22 13:18
17:5 33:22
34:5 36:13,20
38:3 39:7,19
45:14 48:7,15
50:2 53:1
57:12,17,21
58:17,21 59:3
59:7 64:15,21
68:1,4,8,13
71:7,17 72:4,7
72:10,12,18
74:1 82:18
85:13 86:6,20
87:4,7,10
101:12 122:17
125:17,21
128:17 166:16
175:12,18
**15.25** 53:10
**15th** 85:18 89:12
89:13

**16** 29:21,22 31:8
31:12 33:20,23
52:19
**160** 4:23
**166** 4:5
**170** 4:13
**173** 4:6
**174** 4:7
**18** 20:12
**187** 4:8
**19** 17:15
**1993** 15:10

---
### 2
**2** 4:17 80:13,20
131:4
**2:08** 43:4
**2:11** 43:5
**2:22-CV-0130...**
1:7
**2:42** 73:17
**2:49** 73:18
**2011** 18:13
**2019** 52:19,19
53:9,16 54:1
**2020** 12:22
13:18 17:6
24:23 27:23
33:22 34:5,15
34:18 36:13,20
38:3 39:7,19
40:5 43:7
45:14 48:7,15
50:2 53:2,17
53:21 54:1
57:12,17,21
58:17,21 59:3
59:8,16 63:21
64:16,21 65:2
68:1,4,8,13
70:9 71:7,10
71:17 72:4,7
72:10,13,18
74:1 85:13
86:6,20 87:4,8
87:11 101:12

Alexandria Bennett

6/14/2023

Page 207

125:17,21
128:17 166:16
182:20,21
**2021** 25:3 28:1
40:6 41:21
42:14,17
137:19 158:8
158:16
**2022** 185:17
**2023** 1:19 2:11
6:11 19:23
187:18
**205)396-6607**
14:10
**21** 42:4
**2100** 5:6
**2312** 11:15
**24** 150:17
**280** 29:6,10
30:17,23 31:5
31:11 32:2,14
32:16 33:8,11
33:13,17 34:9
35:16,21 38:3
43:22 48:11
50:1 54:9,12
54:13,20

**3**

**3** 4:18 52:19
80:14,20 131:4
**30** 106:10
137:19 168:17
169:4
**30-** 169:9
**31st** 11:15 153:8
**35203** 5:7
**35209** 9:21
**35242** 5:13
**36** 54:10
**36.5** 55:7
**36.5667** 54:6
**3800** 2:9 5:12
6:9

**4**

**4** 4:19 103:22
104:4 105:8,17
106:4 126:1,2
126:7 127:1
128:22
**4:45** 186:20
**40** 106:10 110:8
110:9 168:17
169:4
**40-minute** 169:9

**5**

**5** 4:20 114:14,18
**500,000** 161:17
**52** 4:16

**6**

**6** 4:21,21 20:9
122:15 123:1
123:21 124:5
125:15,23
126:4,6 127:1
128:22
**600** 153:14

**7**

**7** 4:4,22 20:8
127:5,10,22
128:6,22
129:11
**7:11** 172:6
**7:15** 171:23
**7:20** 74:9 76:8
171:23

**8**

**8** 4:23 49:2,4
160:6,22
**8.75** 49:5
**80** 4:17,18
**800** 153:4
**8273156** 15:12

**9**

**911** 111:12
**9th** 15:10

# DOCUMENT
# 16-3

FILED

2023 Aug-11  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit "C"

Alexandria Bennett vs Walmart
PARKER, ELIZABETH on 06/22/2023

```
 1              IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF ALABAMA

 3                   SOUTHERN DIVISION

 4   _____

 5   Alexandria Bennett

 6          Plaintiff,

 7      v.                              Case No.

 8   Walmart, Inc.,                     2:22-cv-01306-AMM

 9          Defendant.

10   _____

11        AUDIOVISUAL DEPOSITION OF ELIZABETH PARKER

12   DATE:

13   TIME:

14   LOCATION:      Zoom, Remote

15   REPORTED BY:   Freya Amis, Remote Online Notary Public

16   JOB No.:       12416

17

18

19

20

21

22

23

24

25
```

```
 1           A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF:
 3       ELLISE WASHINGTON, ESQUIRE
 4       EMS LAW, LLC
 5       2100 First Avenue, North, Suite 300
 6       Birmingham, Alabama, 35203
 7       ellise@emwlawllc.com
 8       (205)938-4369
 9
10   ON BEHALF OF DEFENDANTS:
11       GWENDOLYN GORDON, ESQUIRE
12       Friendman, Dazzio & Zulanas, P.C.
13       3800 Corporate Woods Drive
14       Birmingham, Alabama 35242
15       ggordon@friedman-lawyers.com
16       (205) 278-7000
17
18   ALSO PRESENT:
19       Louise Palker, Observer
20       Charles Nash, Observer
21       Rivers Dorey, Observer
22
23
24
25
```

```
 1              I N D E X
 2   EXAMINATION:                             PAGE
 3     By Ms. Washington                    5 / 61
 4     By Ms. Gordon                            59
 5
 6            E X H I B I T S
 7   NO.      DESCRIPTION                    PAGE
 8   1   Customer Incident Report             26
 9   2   Photos                               32
10   3   Witness Statement - Kevin Allen      39
11   4   Witness Statement - Kellie Daughtry  38
12   5   Witness Statement - Glenda Washburn  37
13   6   Witness Statement - Roman Cooper     36
14   7   Claim Report                         39
15   8   Bennett Letter                       42
16   9   Incident Procedures                  45
17   10  Workplace Safety                     52
18   11  Spill Cleanup                        52
19          (Exhibits attached.)
20
21
22
23
24
25
```

```
 1           P R O C E E D I N G
 2       THE REPORTER:  We are on the record.
 3   Today's date is June 22, 2023, and the time is now
 4   10:04 a.m., Central Standard Time.
 5       Good morning.  My name is Freya Amis.  I'm
 6   the officer designated by DepoDirect to take the
 7   record of this proceeding.  I request all parties
 8   stipulate and agree that by video conference
 9   technology, this will be the remote deposition of
10   Elizabeth Parker in the matter of Alexandria Bennett
11   versus Walmart, Inc., Case No. 2:22-cv-01306-AMM.
12       Counsel, will you please state your
13   appearance for the record, your firm, who you
14   represent, and that you agree to stipulate that I may
15   place this witness under oath and report this
16   proceeding remotely.
17       MS. WASHINGTON:  I'm attorney Ellise
18   Washington.  I represent the plaintiff in this action,
19   Ms. Alexandria Bennett, and I do consent to placing
20   the witness under oath and the usual stipulations to
21   be put in place.
22       MS. GORDON:  Gwen Gordon for Walmart Stores
23   East LP, and I also consent to putting the witness
24   under oath and usual stipulations.
25       THE REPORTER:  Thank you.  Before going on
```

```
 1   the record, the witness positively identified herself
 2   as Elizabeth Parker by driver's license issued in
 3   Alabama State, and the witness is presently located in
 4   Birmingham, Alabama.
 5   WHEREUPON,
 6           ELIZABETH PARKER,
 7   called as a witness, and having been first duly sworn
 8   to tell the truth, the whole truth and nothing but the
 9   truth, was examined and testified as follows:
10       THE REPORTER:  Thank you.  The witness is
11   sworn in, and this proceeding may begin.
12       MS. WASHINGTON:  Okay.  Great.
13           EXAMINATION
14   BY MS. WASHINGTON:
15       Q   Again, I am Ellise Washington.  I represent
16   Ms. Bennett, the plaintiff in this action.  And before
17   we get started, I wanted to go through a few ground
18   rules, depositions with you, just so that we're on the
19   same page; is that okay, Ms. Parker?
20       A   Yes.
21       Q   So the court reporter is going to take down
22   everything we say.  And it's important that you answer
23   with words, rather than with a nod or shake of the
24   head, do you understand?
25       A   Yes.
```

1    Q   So I just want to prequalify that if I ask
2  you to make a verbal statement, it's not me being
3  rude, it's just to conserve the record.
4    A   Okay.
5    Q   Okay.  Also, it's going to be very important
6  that you and I do not speak over one another.  So it's
7  important that you wait for me to finish asking the
8  question before answering, do you understand?
9    A   I do.
10   Q   And if you don't understand any of my
11 questions, please let me know, and I'll rephrase it;
12 is that okay?
13   A   Yes.
14   Q   And if you need to take a break, let me
15 know, and we can take a break, you understand?
16   A   I do.
17   Q   All right.  So are you prepared to answer my
18 questions today?
19   A   Yes, ma'am.
20   Q   Is there any reason that you won't be able
21 to give me full, complete, and truthful answers to my
22 questions today?
23   A   No, ma'am.
24   Q   All right.  And you understand that you are
25 under oath and sworn to tell the truth and that your

1  testimony provided here today has the same force and
2  effect as if we were in front of a judge or jury, do
3  you understand that?
4    A   Yes.
5    Q   All right.  So just to get started, I want
6  to ask you a few preliminary questions, such as where
7  do you currently live?
8    A   I live in Bedford, Alabama.
9    Q   And how close do you live to the Helena
10 Walmart location where the incident in this case
11 happened?
12   A   Approximately 35 minutes.
13   Q   Okay.  And have you ever given a deposition
14 before?
15   A   I have not.
16   Q   Okay.  And did you review any documents to
17 prepare for this deposition today?
18   A   Yes, ma'am.
19   Q   Can you tell me, generally, what documents
20 you reviewed to prepare?
21   A   I reviewed the information that we provided,
22 the incident report, the photographs, the video, and
23 the policies that we have.
24   Q   Okay.  And what policies do you -- what
25 policies did you review that you, and I'm assuming

1  you're meaning Walmart, have?  What policies exactly
2  did you review?
3    A   I reviewed our safety policy, our accident
4  reporting policy.
5    Q   Okay.  Are those the only two policies you
6  reviewed in preparation for today?
7    A   That I remember, yes.
8    Q   Oh, just that you recall at this time.
9  Okay.  That's not a problem.  And so were you at the
10 Helena Walmart location when this accident occurred?
11   A   I work there.  I wasn't physically at the
12 store when it happened.
13   Q   Okay.  What was your title at the time of
14 this incident on October 5th -- I'm so sorry, October
15 15th, 2020, what was your title at Walmart at the
16 time?
17   A   I was the store manager.
18   Q   Okay.  And who all did you speak to who was
19 present at the location about this accident?
20   A   I spoke to Roman Cooper who was the manager
21 on duty at the time who took the report.
22   Q   Okay.  Did you speak to any other employees
23 of Walmart about the incident who were there that day?
24   A   Not that I remember.
25   Q   Okay.  So before we go into too much more

1  detail about the incident and what happened that day,
2  I wanted to get some more information about Walmart's
3  policies and your role there.
4        So how long have you been employed with
5  Walmart?
6    A   Twenty-three years.
7    Q   Okay.  And have you always been at the
8  Helena location?
9    A   No, ma'am.  I've been there since 2017.
10   Q   Okay.  And what other Walmart locations have
11 you worked at?
12   A   I've worked at Sylacauga, Trussville,
13 Talladega, Gardendale, Leeds, and Vestavia.
14   Q   Oh, so over the course of over 20 years,
15 what all roles did you play at Walmart, what all
16 positions did you hold?
17   A   I've worked in the shoe department; I've
18 been a cashier; I've been a manager on the front end;
19 I've been assistant manager; I worked DSD, which is
20 the back door; I was a co-manager and a store manager.
21   Q   Okay.  And so the progression of your
22 employment positions, I guess, the most recent is the
23 highest position you've held at Walmart?
24   A   The store manager?
25   Q   Yes.

1    A    Yes, ma'am.
2    Q    Okay.  And how long have you been a store
3  manager, not just at Helena, but just at any store?
4  How long have you been a store manager at a Walmart?
5    A    Eight years.
6    Q    Okay.  And what all stores have you been a
7  store manager at?
8    A    Helena and Vestavia Hills.
9    Q    Okay.  And I understand that the Helena
10  location is a neighborhood market Walmart location?
11    A    Yes, ma'am.
12    Q    And is the Vestavia Hills location also a
13  neighborhood market location?
14    A    Yes, ma'am.
15    Q    And so can you tell me about your duties as
16  a store manager, what are your roles?
17    A    Basically, overseeing the entire store and
18  ensuring that, you know, we do the day-to-day duties
19  of the store.  Whether that's stocking the shelves,
20  ringing people up at the front.  Whatever, you know,
21  is necessary in the day-to-day operations.  I'm in
22  charge of all of it.
23    Q    And what kind of training were you required
24  if any to go through to be a store manager?
25    A    I don't know that I had a -- I had on-the-

1  job training, you know, shadowing other people.  And I
2  had a mentor that came in and worked with me some.  I
3  didn't go to any official store manager training
4  besides being a co-manager, which was kind of a step
5  between an assistant and a store manager, where you
6  learn how do to run the store.
7    Q    Okay.  Are there any employment handbooks or
8  manuals that you have for being a store manager?
9    A    There are -- we have e-learners that are
10  specific to store managers, which are computer-based
11  learning that I completed.  And there -- back when I
12  got promoted, I think I did a training plan on the
13  computer as well.
14    Q    Okay.  And these computer trainings, do you
15  get any type of written material before or after these
16  trainings to retain for your own records?
17    A    Not that I recall.  I'm sure there's
18  something that I could print out, but I don't know
19  that I have anything.
20    Q    Okay.  And I want to talk about just your
21  employment generally with Walmart.  Do you all have a
22  Walmart employee handbook or manual or policies-and-
23  procedures book that is in writing that's given to
24  employees?
25    A    We do have a new hire orientation guide that

1  they get on their first day of employment.
2    Q    Okay.  And what information is contained in
3  that document?
4    A    As far as I recall, I mean, it had their
5  information that they're going to need to, like, log
6  into the computers and stuff.  It has information on
7  benefit.  It has a few policies in it.
8    Q    And what kind of policies are in it?
9    A    Off the top of my head, I know it has
10  alcohol and drug free workplace policies.  And
11  there's, like, an equal opportunity employment policy,
12  but that's probably all I remember.
13    Q    Okay.  And so you don't recall there being
14  any policies on daily tasks or worksheets that must be
15  completed during shifts or anything like that?
16    A    Not that they get in orientation, no.
17    Q    Okay.  And they'd get an orientation, can
18  you walk me through the orientation process?
19    A    I can walk you through it right now if
20  that's okay?
21    Q    Okay.
22    A    Like, current.  Okay.  So, basically, their
23  very first day of Walmart they're going to come to
24  work, and they're going to prove that they are allowed
25  to work in the United States by completing an I-9.

1  And then they have a couple of hours where they go
2  through this handbook with the people lead, and they
3  talk about policies.
4         Then they do a safety tour with a member of
5  management, which is going to be a tour of the
6  building, point out emergency exits, talk about what
7  to do for different things that could happen.  And
8  then they're going to spend a couple of hours with a
9  team lead, like, kind of shadowing them.
10    Q    Okay.  And are there any, I guess,
11  checklists that the orientation leaders use to check
12  off evidence and that someone completed these
13  trainings?
14    A    The only thing that we would have that we
15  retain right now is the safety checklist.  When they
16  walk around, they check once they learn certain
17  things, and then they sign it.
18    Q    Okay.  And do you all maintain those records
19  for set amounts of time?  Are they placed in -- or are
20  they placed in employees' personnel records?
21    A    They are.  They're downloaded into a digital
22  toolbox for that associate.
23    Q    So you all have access to the sheets that
24  evidence their completion of that safety worklist?
25    A    For current associates, yes.

1      Q    For current.  But so if someone is, I guess,
2  terminated or they resigned from their position, then
3  their personnel file is also destroyed?
4      A    I'm sure it's somewhere in corporate, but I
5  don't have access to it.
6      Q    Okay.  So you have access to current
7  employees' personnel files?
8      A    Yes, ma'am.
9      Q    All right.  And can you tell me about that
10  safety checklist, what all is included on that
11  checklist?
12      A    So we point out spill stations, which are
13  throughout the store and are to be stocked with
14  certain supplies:  pocket pads, the spill cleanup
15  stuff, a broom, a dustpan, a safety phone.  And, you
16  know, we talk about what to do when we see a spill.
17  You don't leave it.  You -- if you can clean it up
18  right then, you clean it up.  If not, you stand with
19  it until you can get someone to help you clean it up.
20          We point out all the fire exits in the
21  building and talk about what to do in the event of a
22  fire or another emergency when we have to evacuate.
23  We go to the hazmat station, which is -- we have
24  different color buckets that we have to dispose of
25  different items in, so we about how to dispose of

1  different things.
2          We go to the compactor and the baler to talk
3  about how to use those.  And we talk about top stock
4  safety, which is the shelf on the tops of the
5  counters.  And about how we don't stack things too
6  high on there, and we don't put heavy things on there
7  because all of this can be dangerous to customers or
8  associates.
9          THE REPORTER:  May I just interrupt, I'm
10  sorry.  What microphone are you using?  It's just a
11  little muddled where I'm just not getting a few --
12  there's a couple words I'm not hearing well.  Are you
13  close to it?  Or --
14          MS. GORDON:  She's about 12 inches from it,
15  yeah.  It's sitting on the table.  It's one that sits
16  on the table.  I'm not sure if I can get it any
17  closer.
18          THE REPORTER:  Okay.  You can't use the one
19  from Zoom, like a computer one?
20          MS. GORDON:  We have it up on a screen.
21          THE REPORTER:  Okay.
22          MS. GORDON:  We're all connected, the
23  speaker, and everything else.
24          THE WITNESS:  I can try to talk more into it
25  if that helps?

1          MS. WASHINGTON:  I was having a few issues
2  with hearing as well.  Like, some words they sound a
3  little muddled.
4          MS. GORDON:  Yeah.  This is the tricky part
5  about Zoom.  You can't ever count on it.  I don't know
6  how to get it any closer.  I mean --
7          THE REPORTER:  Okay.
8          MS. GORDON:  I don't know.
9          THE REPORTER:  We'll keep going forward.
10          MS. GORDON:  It's up here in front of her.
11  And so I don't know how to --
12          MS. WASHINGTON:  If I have a question where
13  I didn't understand the answer.  I think I'm
14  understanding just enough to, you know, go from here.
15  I think we'll be fine, but I may ask you to repeat if
16  it gets too much of an issue; is that okay?
17          MS. GORDON:  Sure.  That's fine.
18          MS. WASHINGTON:  And I do want to make one
19  stipulation on the record.  I am the full-time
20  caregiver for my father, and he is currently having a
21  procedure done.  So I am on-call.  So if I get a phone
22  call, I am definitely -- that's the only reason I
23  would answer.
24          MS. GORDON:  That's fine.
25          MS. WASHINGTON:  Okay.  All right.  So going

1  back -- thank you so much for going over those safety
2  checklist that you all maintain.
3  BY MS. WASHINGTON:
4      Q    Moving forward, as far as reporting spills.
5  I do want to ask specifically about that.  Is there a
6  particular chain of command that spills are reported?
7  Can you go over just in detail how those are reported
8  and handled and resolved?
9      A    Basically, any associate who sees a spill is
10  pretty much trained to clean it up if they can.  You
11  know, if it's a small spill, you know, they should
12  have a pocket pad, which is a little orange, 3 by 5, I
13  guess, absorbent pad.  It cleans up an awful lot of
14  moisture.  And so if they have that and they can clean
15  it easily, they're to do that.
16          If it's larger and they can't clean it up
17  themselves, they can call someone else to help them,
18  to assist them.  And, you know, we can use paper
19  towels, if it's, you know -- if that's good enough.
20  Or we can use the All-Absorb that I talked earlier.
21  It's basically this kind of clumping stuff that you
22  just sprinkle over your spill, and then you can just
23  sweep it up.
24      Q    Okay.  And do you all have any written logs
25  for spills, where spills were reported to someone?

A    No, ma'am.

Q    Okay.  Do you all have a, I guess, store policy on maintenance or cleaning or repairs, do you all keep any written policies on that?

MS. GORDON:  Object to the form.

MS. WASHINGTON:  She objected to form, but you can still answer, or did you understand or need me to rephrase?

THE WITNESS:  Can you rephrase it?

MS. WASHINGTON:  Sure.

BY MS. WASHINGTON:

Q    So do you all maintain written logs of maintenance, repairs, or requests for maintenance or repairs?

MS. GORDON:  Object to the form.  Are you talking about just with regard to floors, or I just -- can you narrow it a little bit, or are you talking about the whole store maintenance?

MS. WASHINGTON:  I'm starting generally, and I am going to kind of niche in --

MS. GORDON:  Okay.

MS. WASHINGTON:  -- as we go forward, but I wanted a general response.

MS. GORDON:  Sure.

THE WITNESS:  We have a portal, I guess,

and as needed.  Carts are gotten off the lot as needed.  So it's not really something based on a set time just everything is done as it's needed.

Q    Okay.  And as far as the standard of cleanliness for the store, are there certain, I guess, check marks of cleanliness that must be made?  Such as dust levels or, I guess, the floors, are they to be buffed or moped?  What are you all's cleaning standards when it comes to just the upkeep of the store?

MS. GORDON:  Object to the form.

THE WITNESS:  Can you rephrase the question?

MS. GORDON:  Sure.

BY MS. WASHINGTON:

Q    Like, what would you say is the level of cleanliness that you all require?  Or if any, do you all require that the floors are kept to, like I said, they are there to be buffed, or are they to be mopped on a consistent basis?  Is there, like, a no stickiness policy for, you know, regular wear and tear?  I just wanted a general response as to what are you all's cleanliness policy, if any?

MS. GORDON:  Object to the form.  Answer if you have an answer.

THE WITNESS:  There's not really a

that we use to request maintenance, and I have a technician that comes in and fixes things that are broken.

MS. WASHINGTON:  Okay.

BY MS. WASHINGTON:

Q    And who is responsible for cleaning the Helena store?

A    We have maintenance associates that do basic maintenance tasks.  And then, you know, things like dusting or cleaning shelves, pretty much everybody's responsible for doing certain parts.  Say if you change an end cap, you're responsible for cleaning the end cap.

Q    Are those individuals who are responsible for the cleaning tasked with doing so at set intervals?

A    No, not necessarily.

Q    So how are they tasked with -- how often or in what manner are they tasked with doing those duties?

A    Mostly as needed.  I mean, the floors get swept and scrubbed -- now it's every night; it used to be every morning.  But we didn't have overnight back in 2020, we do now.

I mean, the registers are cleaned once a day

cleanliness policy.  The store is, you know, cleaned every morning before we open.  And then as needed, throughout the day, if somebody notices something, we stop and fix it.

MS. WASHINGTON:  Okay.

BY MS. WASHINGTON:

Q    As far as spills as well, I know that you stated that spills are to be cleaned, if possible, immediately by whatever employee sees it first; is that correct?

A    Yes.  But not if possible, like, they're responsible.  If you see it, you're responsible for it.  So you're not going to leave it.  If you can't clean it up, you're going to call somebody to help you.

Q    And how do you call someone to help you?

A    Either with a walkie-talkie or -- some associates don't have a walkie-talkie.  They all have cell phones; they can reach out.  We have a Me@Walmart system that associates can use to communicate with each other in an app.  Or often people just walk by us.

Q    Okay.  And are there any, I guess, procedures that will require the placement of warning signs or I guess warning devices to warn customers

1  about potential hazards?
2      A    We do have wet floor signs.  You know, say
3  we just mopped or something, and the floor may be a
4  little slippery, we would put a wet floor sign out.
5  But, usually, we can dry the floor, and we don't need
6  that.
7      Q    Okay.  You can dry -- I'm sorry, I couldn't
8  hear that.  You said that you could dry the floor?
9      A    You can dry it.  You can just use a wet mop
10 and then a dry mop, and it's usually dry.
11     Q    Thank you.  And so as far as spills that are
12 large and, I guess, require significant cleanup
13 endeavors, how do you all handle those particular
14 areas?
15     A    We have a scrubber, a big machine that will
16 kind of go through and suck up water, so or, you know,
17 kind of liquid.  So if we had something big, we could
18 use that.
19     Q    Now I want to switch to, I guess, slip-and-
20 fall incidents at this particular Helena store.  Are
21 you aware of the number of slip-and-falls that have
22 happened at this particular location since you've been
23 employed there?
24          MS. GORDON:  Object to the form.
25          THE WITNESS:  I'm not aware of the total

1  number.  No, ma'am.
2  BY MS. WASHINGTON:
3      Q    But are you aware of some slip-and-falls
4  that have occurred since you've been employed at the
5  Helena Walmart location?
6      A    I am.
7      Q    Okay.  About how many do you recall?
8      A    Probably three.
9      Q    Okay.  And can you give me -- I guess, let's
10 talk about them generally, can you tell me how those
11 happened.
12     A    I don't remember specifics.  I remember two
13 in 2020.  There was one in October, I think, where
14 somebody just fell.
15     Q    Okay.  I know that Ms. Bennett's fall
16 happened in October 2020, do you remember if there was
17 another incident of a fall in October of 2020?
18     A    Not that I recall.
19     Q    Okay.  So the one you recall from October of
20 2020 is the one of Ms. Bennett?
21     A    Yes, ma'am.
22     Q    All right.  Have you ever been at the store
23 when a slip-and-fall occurred?
24     A    I'm sure I have.
25     Q    Okay.  And when slip-and-falls occur at the

1  store, are they resolved?  How long does it take for
2  them to be, I guess, resolved?
3      A    What do you mean by resolved?
4      Q    How long does it take to, I guess, address
5  the slip-and-fall and to ensure that, you know, any
6  injuries have been addressed, an incident report made
7  and, I guess, the cause cleaned up or cleared so that,
8  you know, no further injuries occur?
9          MS. GORDON:  Object to the form.
10         THE WITNESS:  I mean, when we -- when we
11 hear about it, we get a tablet and take an incident
12 report.  Our first concern would be for the customer
13 to make sure that, you know, they're okay.  Once we've
14 done that, we would clean up the spill.
15         MS. WASHINGTON:  Okay.
16 BY MS. WASHINGTON:
17     Q    And I understand that as a part of you all's
18 procedures on addressing slip-and-falls, employees are
19 to take an incident report, correct?
20     A    Yes, ma'am.
21     Q    Okay.  And that incident report is taken
22 electronically?
23     A    Yes, ma'am.
24     Q    Okay.  And how long are those reports kept
25 in you all's records?

1      A    I don't know.  We send it to our claims
2  agency.  And it's  -- I mean, there's an incident
3  number, and I'm sure they can look it up for however
4  long, but I don't know how long it would be.
5      Q    Okay.  And the claims agency, is it an
6  internal Walmart claims agency or some external agency
7  that you're submitting this to?
8      A    It's Walmart.  It's Walmart's clients.
9      Q    Okay.  All right.  And so all reports are
10 just submitted to that claims agency, which is with
11 Walmart Corporate; is that correct?
12     A    Yes.
13     Q    Okay.  So do you all have access to those
14 reports internally, like, can you personally, as store
15 manager, look up those reports?
16     A    I personally cannot, no.
17     Q    Is there anyone else in your store who does
18 have access to those records?
19     A    No.
20         MS. WASHINGTON:  Okay.  So sorry.  My
21 computer just froze.  I'm trying to pull up some
22 records.  Give me one second.
23         MS. GORDON:  You're fine.  Can we go off the
24 record one second?  Let me see if I can figure out how
25 to make you bigger so that when you share the -- right

1  now, you're just one of the tiles, and I was going to
2  try to expand you so that we can see the records you
3  put up.
4        MS. WASHINGTON: Okay.
5        THE REPORTER: Yes. So I have the witness
6  spotlighted for our firm has that. And then when she
7  shows a -- shares her screen, it'll take up the whole
8  screen.
9        MS. GORDON: Perfect. Thank you so much.
10       MS. WASHINGTON: Okay. All right. Here we
11  go. I am going to share my screen to present what is
12  being admitted as Plaintiff's Exhibit 1. It is the
13  accident report that you all submitted to us in your
14  initial disclosures.
15       (Plaintiff's Exhibit 1 marked for
16  identification.)
17  BY MS. WASHINGTON:
18       Q   So does this form look familiar?
19       A   Yes, ma'am.
20       Q   Okay. And so on this is when -- it states
21  here that, "Describe in your own words the events
22  leading up to this incident." This particular
23  statement is written by the actual, I guess, person
24  who was involved in the accident, or is this written
25  by a Walmart employee as told to them by the

1  in contact with either of them?
2       A   No, ma'am.
3       Q   Could you get in contact with either of
4  them?
5       A   Yes, ma'am. If I needed to, I could.
6       Q   Okay. Do you recall speaking with either of
7  them or both of them after this incident?
8       A   No, ma'am, I don't.
9       Q   Okay. I'm going to stop sharing my screen
10  here. So I guess I want to ask, after the report is
11  made, you know, after an incident occurs, is there any
12  meeting between associates who were involved in the
13  reporting of the incident and store management?
14       A   Well, the highest earnings manager on duty
15  would take the report, so sometimes there's not. But
16  in this case, there would have been because we would
17  have had to pull video; neither of them would have had
18  access to the video.
19       So somebody would have talked to them about
20  what happened and found out more details so that we
21  could pull the video and, you know, get all --
22  everything sent out to the claims people that we
23  talked about earlier.
24       Q   Okay. And do you know who that particular
25  person was in this case, that spoke with Glenda or

1  individual?
2       A   It could be either one. Either the customer
3  will take the tablet and type in what they say, or
4  sometimes they dictate it to the manager on duty and
5  they type it.
6       Q   Okay. And in Ms. Bennett's incident report
7  form here, do you know which of those happened? Do
8  you know if she typed this in or if one of your
9  employees typed it in?
10       A   No, ma'am, I don't know.
11       Q   It has two names listed here as the
12  associates who the incident was reported to or who
13  were in the area, are you familiar with Glenda
14  Washnurn or Roman Cooper?
15       A   Yes, ma'am.
16       Q   Okay. And is Glenda's name here correct,
17  Washnurn, or is it Washburn?
18       A   It's Washburn with a B.
19       Q   Okay. Okay. Just want to verify that's the
20  same person that we had seen in other documents. Did
21  you speak with either -- first, do both of them still
22  work at the Helena store?
23       A   No, ma'am. Neither of them are employed
24  anymore.
25       Q   Either of them are employed. Are you still

1  Roman?
2       A   I know that Nathan French burned the video.
3       Q   Nathan French did what to the video, I'm
4  sorry?
5       A   He made the video, DVD disc.
6       Q   Okay. And I am going to be doing some flip
7  flopping with the questions here. I know that we're
8  talking about Walmart procedures, this particular
9  incident, what happened at the store. So please bear
10  with me as I do this.
11       So when it comes to video surveillance at
12  the Helena location, are there video surveillance
13  cameras that can see down every aisle at the store?
14       A   No.
15       Q   Okay. Are you aware of all of the aisles
16  that are not, I guess, viewable in video surveillance?
17       A   Not off the top of my head, no.
18       Q   So do you all keep a, I guess -- I guess, do
19  you all keep any internal communications that list
20  those particular aisles that are not within video
21  surveillance view?
22       A   Not that I know of.
23       Q   Okay. And do you know why there aren't
24  video surveillance?
25       A   No, ma'am.

1    Q    Have you ever, as store manager, requested
2  that there be video surveillance on every aisle?
3    A    I have asked my market asset protection
4  manager if we could possibly get more video.
5    Q    And when did you ask that asset protection
6  person that?
7    A    I don't know.
8    Q    Oh, I mean, what was their response?
9    A    That we couldn't add any more.
10   Q    Okay.  Did he give you a reason as to why
11 they could not add any more?
12   A    Not that I remember.
13   Q    Okay.  And so in Ms. Bennett's case on
14 October 15, 2020, did she fall in the, I guess, water
15 aisle?
16   A    That is --
17        MS. GORDON:  Object to the form.  You can
18 answer, if you know.
19        THE WITNESS:  That is what the report says,
20 yes, ma'am.
21 BY MS. WASHINGTON:
22   Q    Okay.  Do you know what aisle -- like, what
23 the aisle is called?  Because I call it the water
24 aisle because there were pallets of water bottles
25 there and jugs and such, but do you all have an

1  internal name for particular aisle?
2    A    I call it the water aisle.
3    Q    Okay.  And so in relation to video
4  surveillance cameras, where is the nearest camera to
5  that aisle?
6    A    I believe the nearest one would be on the
7  beer aisle, which is the next aisle.
8    Q    Okay.  So if I am facing the back of the
9  store.  So when I walk into the Helena store, and I'm
10 facing the back towards where the refrigerators are in
11 the very back --
12   A    Uh-huh.
13   Q    -- would that aisle be to the left or right
14 of the water aisle?
15   A    To the left.
16   Q    Okay.  And would that camera be facing the
17 front of the store or the back of the store?
18   A    The back, I believe.
19   Q    Okay.  And how much of the water aisle, if
20 any, does that nearest camera capture?
21   A    Not much to the best of my memory.
22   Q    And so, would it be safe to say that there
23 is no video surveillance footage of Ms. Bennett's fall
24 from Walmart's surveillance camera?
25   A    Not that we found, no, ma'am.

1    Q    Did you all receive any photos or videos
2  from others in the store that day?
3    A    Not that I'm aware of.
4        MS. WASHINGTON:  Okay.  I am going to share
5  my screen again, you all.  And this is going to show
6  what has been marked as Plaintiff's Exhibit No. 2.
7  And it is photos that were sent to the plaintiff in
8  the defendant's initial disclosures.
9        (Plaintiff's Exhibit 2 marked for
10 identification.)
11 BY MS. WASHINGTON:
12   Q    Do any of these photos look familiar to you?
13   A    I think those are the pictures that we
14 submitted with the accident report.
15   Q    Okay.  Do you know who took these pictures?
16   A    Not a hundred percent, but I would think it
17 was Roman.
18   Q    Okay.  And why do you think it was Roman?
19   A    Because Roman took the report.
20   Q    Glenda also was listed on that report, could
21 these potentially have been taken by Glenda as well?
22   A    They could have.
23   Q    Okay.  And so I want to kind of go through
24 each photo.  There are five of them that were
25 submitted.  This first one, do you believe this

1  depicts the area where or nearby where Ms. Bennett
2  fell that day?  Is this photo from that actual day?
3        MS. GORDON:  Object to the form.  Answer if
4  you know.
5        THE WITNESS:  I don't know when the photo is
6  from, but that is the water aisle.
7        MS. WASHINGTON:  Okay.
8  BY MS. WASHINGTON:
9    Q    And do you know if these -- I guess I'm
10 going to go through all five of them, that first one,
11 but we confirmed that they're all from the water
12 aisle.  But do you believe these were taken on the day
13 of the incident?
14        MS. GORDON:  Object to the form.
15        THE WITNESS:  If they were in the incident
16 report, then they would have been taken the day of the
17 incident.
18        MS. WASHINGTON:  Okay.
19 BY MS. WASHINGTON:
20   Q    So they are potentially taken on the day of
21 the incident.  And can you tell me, in this second
22 photo that's on your screen  -- and I don't know if
23 you see my cursor circling this area by what appears
24 to be wetness in the area.  Can you see that, the area
25 where I'm circling with my cursor?

| | |
|---|---|
| 1     A    I can. | 1     Q    Okay.  And so is this, I guess, dirt that |

```
 1      A    I can.
 2      Q    Okay.  Was it noted anywhere in you all's
 3 files or told to anyone verbally what this wet
 4 substance was on the floor?
 5      A    Do you mean before the accident happened or
 6 after?
 7      Q    Yes.  From on the photos, I don't know about
 8 when, where, how, I'm just asking.  The substance that
 9 we see on this photo, do you know if it was clearly
10 identified as a particular type of liquid?
11      MS. GORDON:  Object to the form.
12      THE WITNESS:  Not that I know of off the top
13 of my head.
14      MS. WASHINGTON:  Okay.
15 BY MS. WASHINGTON:
16      Q    Was this substance referred to as water by
17 anyone at Walmart?
18      A    It could have been.
19      Q    Okay.  And in this area, where the photos is
20 taken, do you know what this is, what this particular
21 substance on the floor is?
22      A    It looks like dirt.  It was the end of the
23 day -- well, it was toward the end of the day.  It's a
24 high-traffic aisle, so it looks like the floor was
25 dirty and needed to be scrubbed.
```

```
 1      Q    Okay.  And so is this, I guess, dirt that
 2 you've stated, is any of this permanent, or is any of
 3 this permanent on the floor?
 4      MS. GORDON:  Object to the form.
 5      THE WITNESS:  That shouldn't be permanent.
 6 Sometimes that comes off with scrubbing or mopping
 7 even, but not usually.  It usually takes the scrubber.
 8 Sometimes, the floor has to be waxed to get marks out
 9 of the floor.
10      MS. WASHINGTON:  Okay.  And do you know --
11 I'll come back to that.  I'm going to finish sharing
12 my screen on this, but we will return to the status of
13 the floor at some point.  I'm sorry, you guys, had to
14 get back to my screen.  I don't know why when I switch
15 applications on my computer today, it freezes, like,
16 from application to application.  So sorry.  Okay.
17 BY MS. WASHINGTON:
18      Q    So going back to the -- I guess, the day of
19 the incident, you were not there, but you did review
20 the reports and statements that were made that day,
21 correct?
22      A    Yes, ma'am.
23      MS. WASHINGTON:  Okay.  I am going to share
24 my screen, and I'm going to have quite a few
25 statements here that were taken by you all.  They're
```

```
 1 going to be exhibits:  3, is going to be a statement
 2 from Roman Cooper, Walmart associate; there's going to
 3 be Plaintiff's Exhibit 4, which is a witness statement
 4 from customer Kellie ███████; there's going to be
 5 Exhibit 5, which is a statement by Walmart Associate
 6 Glenda Washburn; and there is going to be -- no,
 7 Exhibit 3 is going to be a statement by customer Kevin
 8 Allen, and Exhibit 6 is going to be a statement by
 9 Walmart Associate Roman Cooper.  I have those correct
10 now.
11      All right.  So I want to start with the
12 associates.  So this is going to be Exhibit 6, Roman
13 Cooper.
14      (Plaintiff's Exhibit 6 marked for
15 identification.)
16 BY MS. WASHINGTON:
17      Q    Do you recall reviewing this statement?
18      A    I don't have, like, memory of it, but I'm
19 certain I looked at it and read it.
20      Q    Okay.  And his role in the incident is
21 listed as reporter, correct?
22      A    Yes, ma'am.
23      Q    Okay.  And there are a few typos, but I
24 think we can kind of surmise that he says in his
25 observation, when he arrived at the scene at the
```

```
 1 incident, "The customer in question was on the floor
 2 and in considerable discomfort and was unable to move
 3 her ankle."
 4      So to your knowledge, did Roman Cooper
 5 actually see the incident occur?
 6      A    No, ma'am, I don't believe he did.
 7      Q    Okay.  And moving on to Glenda Washburn.
 8 Her observation here says that she observed the
 9 customer sitting on the floor complaining of right hip
10 and ankle pain.  And she said, "She was reaching for
11 water on the top shelf, slipped, and hit her hip
12 against a water pallet and twisted her ankle.  I did
13 see water on the floor.  The customer had on sturdy
14 running shoes and shorts."
15      And so based on this report and from -- in
16 your knowledge, do you believe that Ms. Washburn
17 actually saw the incident occur?
18      (Plaintiff's Exhibit 5 marked for
19 identification.)
20      THE WITNESS:  No, ma'am.  I don't think she
21 saw it occur.
22 BY MS. WASHINGTON:
23      Q    Okay.  I'm moving on to the incident report
24 of witness Kellie ███████.  It is my understanding
25 that -- is Ms. ███████ a Walmart associate?
```

1      (Plaintiff's Exhibit 4 marked for
2  identification.)
3          THE WITNESS:  No, ma'am.
4  BY MS. WASHINGTON:
5      Q    Okay.  And was she a customer at the store
6  that day?
7      A    Yes, ma'am, I believe so.
8      Q    Okay.  It just says here that her
9  observation was that the fall had just happened as she
10  was passing by.  "It was in front of the bottled
11  water.  Water was on the floor, and the young lady
12  slipped and hit her hip on a crate on the way down.
13  She was in pain and crying.  She said her hip and
14  ankle were hurting."
15          So based on this report, does it appear to
16  you that Kellie actually saw the fall happen?
17          MS. GORDON:  Object to the form.
18          THE WITNESS:  No, ma'am, it doesn't appear
19  that she saw it happen.
20          MS. WASHINGTON:  Okay.
21  BY MS. WASHINGTON:
22      Q    And last but certainly not least is Kevin
23  ████.  His observation just says, "She slipped and
24  fell after trying to pick up water from aisle."
25          So from his statement, can you tell if Kevin

---

1  saw the fall happening?
2      (Plaintiff's Exhibit 3 marked for
3  identification.)
4      A    From his statement, I wouldn't know.
5      Q    Yes.  So that's what I'm asking.  Does it
6  appear from his statement to you that he saw the fall
7  happen?
8          MS. GORDON:  Object to the form.
9          THE WITNESS:  I can't make a determination
10  from what he wrote.
11          MS. WASHINGTON:  Okay.  I am going to stop
12  sharing my screen.  And I want to ask about -- so
13  sorry, you guys.  When I switch, this just get ready
14  for a freeze.  It's going to happen.  Every time I
15  switch it out, it's going to freeze.  So let's let it
16  recoup, and now my fan is going super fast on my
17  computer.  So let's see if this works.  Okay.  Here we
18  go, unfrozen.
19          All right.  We're almost done, Ms. Parker, I
20  promise you.  And I thank you so much for your
21  patience here with us today.  This is what's being
22  marked as Plaintiff's Exhibit 7, it is the claim
23  report submitted by the defendant in their initial
24  disclosures.
25      (Plaintiff's Exhibit 7 marked for

---

1  identification.)
2  BY MS. WASHINGTON:
3      Q    Does this claim report look familiar to you?
4      A    Yes, ma'am.
5      Q    Okay.  And I just wanted to go over certain
6  components that I don't know if it was completely
7  filled out or if not.  So I wanted to ask particular
8  questions about it.  In the section here entitled,
9  "Slip-and-Fall Information," do you know why these
10  items are blank?
11      A    I think -- I don't remember when we started
12  taking reports on the tablet, but that -- this is the
13  old way we did reports, kind of, and the tablet is the
14  new way we do reports.  And I -- I think in 2020, we
15  were just starting to use the tablets, and I think
16  that's -- it didn't ask him for all that, but it's
17  still on the old reporting, if that makes sense.
18      Q    No, it does.  So you're saying that this
19  information is generated in the report even though it
20  wasn't asked to the person who filled it out
21  initially.  So it comes out blank; is that --
22      A    That's what I think happened, yes.
23      Q    Thank you so much.  I mean, that's a
24  possibility as to why it's blank, so thank you for
25  that.  Sorry, I'm going down because the pages are

---

1  different sizes, so we're having to go here.
2          And so this is generated from tablet
3  prompts, correct?
4      A    Yes.
5      Q    Okay.  Then I would say the first two pages
6  are, correct?
7      A    Yes.
8      Q    And so this incident reporting system page
9  here on the third page of my document, where it lists
10  the claim number, and there is QR -- I guess a barcode
11  here where you can scan internally or something like
12  that.  Is this form also automatically generated from
13  those tablet prompts?
14      A    Yes, ma'am.
15      Q    Okay.  And they contain primarily the same
16  information, correct?
17      A    Yes, ma'am.
18          MS. WASHINGTON:  Okay.  All right.  I'm
19  going to stop sharing screen on that one.  Okay.  I'm
20  also going to -- I don't know why this won't open on
21  that -- share my screen again.  This is going to be
22  Plaintiff's Exhibit 8, which was submitted, not in the
23  initial disclosure, but in Walmart's response to our
24  request for production of documents.  And it appears
25  to be -- my screen froze again, y'all.  Give me one

Alexandria Bennett vs Walmart
PARKER, ELIZABETH on 06/22/2023                                    Pages 42..45

1  second.  Okay.
2          Tell me if you all see this.
3          THE WITNESS:  Yes.
4          MS. WASHINGTON:  Okay.  This is a letter
5  that was, I guess, sent to Ms. Bennett.  It's dated
6  for October 16, 2020.  And it's in relation to the
7  claim, and it gives her, you know, ways in which she,
8  I guess, follows up with this.
9          (Plaintiff's Exhibit 8 marked for
10 identification.)
11 BY MS. WASHINGTON:
12     Q     Do you all also at the actual store receive
13 a copy of this particular letter?
14     A     No, ma'am.
15         MS. WASHINGTON:  Okay.  Stop sharing my
16 screen for now.  All right.  I just need to call back
17 my brother about something, he just called me.  Can I
18 take a quick three-, five-minute recess?
19         MS. GORDON:  Sure.
20         MS. WASHINGTON:  All right.
21         THE REPORTER:  We'll go off the record.  The
22 time is 10:56 a.m., Central Standard Time.
23         (Off the record.)
24         THE REPORTER:  We are back on the record.
25 It is 11:06 a.m., Eastern Standard Time.

1          MS. WASHINGTON:  Okay.  So I'm going to
2  share my screen and kind of go over some of the things
3  we discussed.  Just, I guess, illustrating some of the
4  procedures that you mentioned based on documents
5  Walmart shared with us.  So give me one second.
6  BY MS. WASHINGTON:
7      Q     So does this form look correct?  This is the
8  What To Do In The Event Of A Customer Incident Form
9  that was submitted to the plaintiff by the defendant.
10 Is this a complete and accurate depiction of you all's
11 procedures on what to do in the event of a customer
12 incident, Ms. Parker?
13     A     Yes, it looks like it.
14     Q     Okay.  And so I'm not going to read through
15 this and go over it in detail, but there are certain
16 parts of it that I wanted to, I guess, mention and
17 break down, and see if you could tell us if this
18 happened in Ms. Bennett's case, okay?
19     A     Okay.
20     Q     So here it says that in addition to caring
21 for the customer, which is what I believe you said is
22 the first thing you all do; is that correct?
23     A     Yes, ma'am.
24     Q     Okay.  And then there is this section where
25 it says, "Lockdown the accident scene."  I want to

1  talk about that.  What it means to secure the area,
2  what does that mean from your -- in your knowledge, to
3  your training, what does secure the area mean?
4      A     I mean, you want to make sure that you don't
5  have people just going through it constantly so that
6  you can get the photos that you need.
7      Q     Okay.  And it says, "Take photos," which is
8  pretty self-evident.  And, "Describe the scene on the
9  Reversible File Folder," do you know if the scene was
10 described in the Reversible File Folder?
11     A     We don't use the file folders anymore since
12 we started using the tablet.
13     Q     Okay.  And so the description of the scene
14 on the Reversible File Folder, is there a prompt on
15 the tablet that requests you all to describe the scene
16 on the -- describe the scene?
17     A     I don't remember.  I don't -- I don't
18 remember.
19     Q     Okay.  This is what I believe is the
20 incident report, is this, all of this information,
21 requested via the tablet?
22     A     Yes, ma'am.  That's an old incident report.
23 That's what we used before we used the tablet.
24     Q     So --
25     A     So you write that out with, like, pen and

1  paper.
2          MS. WASHINGTON:  So we already looked at
3  this.  Hold on one second, y'all.  So you're seeing
4  what I've been going through every couple of seconds.
5  So I'm sorry.  It's going to do that for whatever
6  reason.  Let me stop my screen share because maybe
7  that'll let me fix it.  I do apologize.
8          THE REPORTER:  Did you want to mark this as
9  Plaintiff's Exhibit 9 or --
10         MS. WASHINGTON:  I do.  I do.  Can you
11 assist me in keeping those numbers right because I
12 think I'm going out of order now than what I
13 intentionally planned.  So we can keep those, and I'll
14 make sure I do that with you to kind of level up.
15         THE REPORTER:  Absolutely.
16         MS. WASHINGTON:  All right.
17         (Plaintiff's Exhibit 9 marked for
18 identification.)
19 BY MS. WASHINGTON:
20     Q     So this is the form that is automatically
21 generated from the tablet, correct?  Of course, it's
22 not a blank copy, this is the one for Ms. Bennett, but
23 this is the information that is requested in the
24 tablet, correct?
25     A     That's -- so the old form that you've just

1  had up, we would write everything on, and then we
2  would key it into the incident reporting screen, which
3  would then generate that that you just  -- that you
4  had up again.  Yes.  So that --
5        Q     Okay.
6        A     -- they would fill everything out, and we
7  would go to the computer, and we would type it all in.
8        Q     Okay.
9        A     Then the screen with a smiley face on it is
10 what we would get.
11       Q     Okay.  All right.  So this form is old and
12 out of date.  So this is not what's completed, but the
13 information here is what's asked of you all on the
14 tablet to complete, and this is what is shot out at
15 the end, right?
16       A     Kind of.  The next two pages are actually
17 what came out of the tablet.
18       Q     This?
19       A     Yes.
20       Q     Okay.
21       A     The first two pages are going to be --
22 sorry.
23       Q     Not so fast.
24       A     See right there.  Yes.  So that would have
25 been what we printed to send in with the video so that

1  we weren't just sending a disk.
2        Q     Okay.  So this is an internal document that
3  is basically attached to your video request?
4        A     Yes.
5        Q     It's the information that is the product of
6  what's input into the tablet when a claim is made?
7        A     Yes.
8        Q     Thank you for that clarification.  Because I
9  was confused when I was reading it because I didn't
10 know if, you know, you all just had different
11 duplicative reports made, etcetera.  So now that we
12 have that, I'm good with that.  Thank you so much.
13       A     You're welcome.
14       Q     I guess, let's go back to this and try to
15 clarify what was in place at the time of the incident.
16 So at the time of Ms. Bennett's incident, you
17 obviously were using the tablet, correct?
18       A     Correct.
19       Q     And the prompt to describe the scene on the
20 Reversible File Folder is void?
21       A     I believe so, yes.  I know there's no file
22 folder.
23       Q     Okay.  But in you all's policy on what to do
24 in the event of a customer incident is describing the
25 scene of the incident still important or plays a role

1  in some way?
2        A     Yes.  And, I mean, Glenda did describe the
3  scene, didn't she, on her statement?
4        Q     Back to Glenda's statement.  I'm sorry.  I'm
5  getting confused about my broken tidbits.  I know what
6  I can do because I have hers parcel out.  Give me one
7  second.  Here is Glenda's.  She gave her observation
8  of what happened, but I don't think she described the
9  scene.  It says that she saw water on the floor --
10       A     Okay.
11       Q     -- in it.  But she didn't do a complete
12 scene description, from my knowledge.  Have you seen
13 another document where she may have provided a
14 description of the scene?
15       A     No.  This is what I've seen.
16       Q     Okay.  Going back.  Next up on the what to
17 do in the event of a customer incident, it says,
18 "Alert management."  So members are to notify a
19 salaried member of management.
20       A     So -- go ahead.
21       Q     Oh, you can go ahead.
22       A     In neighborhood markets, at the time, 2020,
23 we had two salaried members of management in the
24 building.  So that's not actually applicable to our
25 store because we leave our leads as the manager on

1  duty.  So it would be to notify the manager on duty,
2  which would have been Roman.
3        Q     That makes sense.  Thank you for that
4  clarification because that was going to be my very
5  next question to ask.  So that was well clarified.
6  And so after we've locked down the scene, alerted
7  management, cared for the customer, we move into the
8  investigation.  But before I do that, I want to kind
9  of go back to the lockdown of the scene.
10             Do you know if the accident scene was locked
11 down?
12       A     No, ma'am, I'm not aware.
13       Q     Okay.  So during the investigation, these
14 particular -- again, I'm not going to read all to you
15 the who, what, whens, wheres, and whys.  The
16 investigation includes these particular matters, are
17 you aware that the investigation points here were all
18 completed in Ms. Bennett's case?
19       A     As far as I know, yes.
20       Q     Okay.  Next up is to make the report, we
21 know that a report was made, and then you save and
22 submit evidence.  So saving evidence.  You mentioned
23 earlier a portal that you all use to submit this
24 information, is the information saved to that portal,
25 or is it saved to a different location?

1    A    It goes into the accident app.  It's not --
2  it's not saved on that tablet or anything.  It goes to
3  claims management.
4    Q    Okay.  So it's submitted via the Internet?
5    A    Via the app, yes, ma'am.
6    Q    So the application on the tablet which has
7  Internet access, and it is submitted or transmitted to
8  that location you mentioned?
9    A    Yes.
10    Q    Okay.  Just wanted to verify that.  Okay.
11  So I kind of want to go back to the safety training
12  that all associates receive.  And I'm not going to go
13  into detail about how you're to maintain your stations
14  and all that.  I just wanted to speak about a few
15  applicable situations here, and I want to talk about
16  the standard operating procedure.
17         Is this particular step an action required
18  what is involved in the safety training that you
19  mentioned earlier for associates?
20    A    So that's an -- a standard operating
21  procedure.  That wouldn't have been -- I mean, we
22  would have discussed it in a safety tour.  And then
23  associates -- that's on OneWalmart, which is our
24  online portal, I guess.
25    Q    Okay.

1    A    And any associate has access to go search
2  for SOPs or -- now they're called process guides, to
3  learn how to do pretty much anything in the store.
4    Q    Okay.  So that is the just SOP, the standard
5  operating procedure for that particular matter, but it
6  is not a checklist or point of reference during the
7  safety training --
8         MS. GORDON:  Object to the form.
9         THE WITNESS:  It's not -- I mean, they don't
10  have to sign it or anything or check anything off, but
11  they do hear about how to clean up spills.
12         MS. WASHINGTON:  Okay.
13  BY MS. WASHINGTON:
14    Q    And so, obviously, the course module here
15  that's on workplace safety, is this model animated?
16  Because I see where it says, "2470 plus 8 minutes of
17  video," can you tell me about this module on safety?
18    A    Sure.  It's going to be part of your
19  computer learning, which every associate does.
20  Basically, you sit down at the computer, you have
21  headphones, and there's going to be things you read,
22  and there's going to be videos.  A lot of times there
23  are questions during the module, and sometimes there's
24  a test at the end that they have to pass.
25         MS. WASHINGTON:  And so for, I guess, the

1  court reporter, this is going to be our next exhibit,
2  and it is the printout of the workplace safety
3  learning module that was given to the plaintiff and
4  the defendant's responses to our request for
5  production of documents.
6         THE REPORTER:  Okay.
7         (Plaintiff's Exhibit 10 marked for
8  identification.)
9         MS. WASHINGTON:  Okay.  Next up, we are
10  going to go over some more of safety and spill-related
11  procedures that must be handled -- or, you know, is
12  how it's shown.  I wanted to look at this diagram.
13  This is also going to be an exhibit.
14         (Plaintiff's Exhibit 11 marked for
15  identification.)
16  BY MS. WASHINGTON:
17    Q    Is this diagram provided to employees at the
18  Walmart Helena store?
19    A    We have that at the spill stations.
20    Q    Okay.  So this is posted at the spill
21  stations in the store?
22    A    Yes.  It's supposed to be.
23    Q    Okay.  Do you know if it was posted the day
24  of Ms. Bennett's accident?
25    A    I mean, I don't know 100 percent.  It should

1  have been.
2    Q    Okay.  And I know you mentioned the -- I'll
3  go back to that.
4         So we've talked about different types of
5  spills earlier.  But can you tell us, I guess, about
6  spill cleanup procedures and the training that is done
7  on those procedures with you all's associates.  So is
8  this particular safety awareness and education an
9  online learning module as well, or is this done in
10  some other way?
11         MS. GORDON:  Object to the form.
12         THE WITNESS:  I don't think that's an online
13  learning.  I think that's in the process guide or an
14  SOP.  But it -- I mean, they learn about spill
15  cleanups in the u-learn, and also during the safety
16  tour, like, we talk about it.
17  BY MS. WASHINGTON:
18    Q    Okay.  So during the safety tour that you
19  all do in person at the store location, certain
20  aspects of this is discussed?
21    A    Correct.
22    Q    So we don't have to go into detail about
23  those particular items.  Thank you.  I'm going to stop
24  sharing my screen here.  All right.  And we are almost
25  done, Ms. Parker, but I did want to go back to you

Alexandria Bennett vs Walmart
PARKER, ELIZABETH on 06/22/2023

Pages 54..57

1  all's store.
2          And so to your knowledge, the flooring in
3  the water aisle, does it contain permanent scuff marks
4  that are on the floor?
5          MS. GORDON:  Object to the form.
6          THE WITNESS:  I can answer?
7          MS. GORDON:  If you can, yes.
8          THE WITNESS:  I think there are some marks
9  on the floor that are burn marks that we can't get
10  out.
11  BY MS. WASHINGTON:
12      Q    And do those marks sometimes obscure, I
13  guess, other substances that may be on the floor?
14          MS. GORDON:  Object to the form.
15          THE WITNESS:  Not that I know of.
16          MS. WASHINGTON:  Okay.
17  BY MS. WASHINGTON:
18      Q    And what about the condition of the pallets
19  that contain -- that hold the water in that aisle, are
20  you aware of the condition of those pallets at the
21  time of Ms. Bennett's accident?
22      A    No, ma'am, I'm not.
23      Q    Okay.  I do want to go back, I guess, to the
24  photos.  I'm going to share my screen again.  These
25  were previously shown to you earlier, but I want to

1  kind of just -- kind of look at these pallets a little
2  closer.  So here, this pallet that's on the screen
3  now, does it appear like a jagged edge to the pallet?
4          MS. GORDON:  Object to the form.
5          THE WITNESS:  It appears that there's a
6  small piece out of the front.
7          MS. WASHINGTON:  That there's a small piece
8  out of the front, okay.
9  BY MS. WASHINGTON:
10      Q    And do you think that this affects the
11  safety of that pallet at all with that chunk of -- a
12  piece, not chunk.  I'm sorry, that was my terminology
13  -- but the piece missing?
14          MS. GORDON:  Object to the form.  Answer if
15  you know.
16          THE WITNESS:  I don't think so.
17          MS. WASHINGTON:  Okay.
18  BY MS. WASHINGTON:
19      Q    And are you aware of customers complaining
20  about the cleanliness of this store?
21      A    When?
22      Q    On any --
23      A    I mean, some customers have complained about
24  cleaning on certain days.
25      Q    Okay.  And how often would you say spills

1  happen on the store on a daily basis, how often would
2  you say there are spills?
3          MS. GORDON:  Object to the form.
4          THE WITNESS:  I don't know.  I mean, I
5  wouldn't say that we have spills every single day.
6          MS. WASHINGTON:  Okay.
7  BY MS. WASHINGTON:
8      Q    Are you aware of any structural issues with
9  you all's building?
10      A    None that I'm aware of, no, ma'am.
11      Q    Okay.  Are you aware of any leaking lights
12  or ceiling?
13      A    No, ma'am, not that I'm aware of.
14      Q    Are you aware of any leaking refrigerators?
15      A    No, ma'am.
16      Q    Okay.  And in the event that you became
17  aware of a leaking refrigerator or a leaking roof,
18  what would be your next steps to resolve that issue?
19      A    If a refrigerated case is leaking, we take
20  the product out and clean it and clean the fan to make
21  sure there's nothing wrong with it and see if that
22  helps.  If not, we open a ticket and get our
23  refrigeration people out.
24          If the roof is leaking, we open a ticket.
25  We put a bucket to collect any water that's dripping

1  and put in a ticket so that someone can come out and
2  repair the roof.
3      Q    Okay.  And do you all put up any cautionary
4  signs or materials like cones or --
5      A    Yes.  If you couldn't, like, clean
6  everything, we would put a cone out to alert
7  customers.
8      Q    Okay.  And do you recall anyone stating
9  anything about the weather the day of this incident,
10  what the weather was like?  Have you seen any
11  statements or reports mentioning the weather the day
12  of Ms. Bennett's accident?
13      A    No, ma'am, I have not.
14      Q    Okay.  Are you aware of any investigations
15  that looked for or, I guess, try to uncover the source
16  of the water that was on the floor when Ms. Bennett
17  fell?
18      A    No, ma'am, I'm not aware of any.
19      Q    And are you aware of any statement as to how
20  the water got on the floor when Ms. Bennett fell?
21      A    No, ma'am.
22      Q    And do you know if Walmart is self-insured?
23      A    Yes.  We are self-insured up to something.
24      Q    Okay.  Could you find that amount or --
25      A    I probably --

1    Q    -- are you ever made aware of that amount
2    that you all are self-insured for?
3    A    I could probably find it if I called
4    somebody, called CMI or somebody.
5    Q    Okay.  And who is that?
6    A    That's our claims department.
7    Q    Okay.  And does your store have a particular
8    claims manager or claims handler?
9    A    Usually, we have the same people for -- one
10   for customer incidents and one for associate, I
11   believe.
12   Q    Okay.  And do you know who that person is
13   for a customer?
14   A    No, ma'am, not off the top of my head.  I
15   did see Matthew Fowler's name on that letter you
16   showed earlier.
17   Q    Okay.  And are you familiar with Mr. Fowler?
18   A    I'm sure I've spoken to him before, but
19   beyond talking to him on the phone, not really.
20   Q    Okay.  But generally, when you all have
21   incidents, you deal with the same handlers?
22   A    Pretty much, yes.
23        MS. WASHINGTON:  Okay.  All right.  I
24   believe that's all the questions that I have for you
25   at this time.

1         MS. GORDON:  And I just have a few
2    questions.
3         THE REPORTER:  Okay.
4         MS. GORDON:  Let me sit over here so you're
5    still facing them.
6                   EXAMINATION
7    BY MS. GORDON:
8    Q    All right.  Ms. Parker, before Plaintiff
9    reported her fall on October 15th, 2020, had anyone
10   notified you about any water or liquid substance on
11   the floor of the water aisle?
12   A    No.
13   Q    Has any employee ever told you that they
14   were notified of water or a liquid substance on the
15   floor of the water aisle before Plaintiff's fall on
16   October 15, 2020?
17   A    No.
18   Q    Has anyone told you they observed water or a
19   liquid substance on the water aisle before Plaintiff's
20   fall on October 15, 2020?
21   A    No.
22   Q    Before Plaintiff's fall on October 15, 2020,
23   had others been down the water aisle that day?
24   A    Yes.  I'm sure other people were down the
25   aisle.

1    Q    Had there been vendors down that aisle
2    before her fall?
3    A    Yes.  Coke and Pepsi would have stocked
4    their pallets that day.
5    Q    Did any of the vendors report to you any
6    safety concerns on the water aisle?
7    A    No.
8    Q    Have they reported safety concerns to you in
9    the past?
10   A    Yes.
11   Q    What about, had other employees been down
12   the water aisle before Plaintiff's fall on October 15,
13   2020?
14   A    Yes.
15   Q    And none of the employees reported any water
16   or liquid substance on the aisle --
17   A    No, ma'am.
18   Q    -- or any safety concerns?
19   A    No, ma'am.
20   Q    And I assume there've been other customers
21   throughout the day on that aisle?
22   A    Yes.
23   Q    It was later in the day, correct?
24   A    Yes, ma'am.
25   Q    What time did y'all open that morning?

1    A    6 a.m., I believe.
2    Q    So probably a full day's worth of customers
3    before the incident happened?
4    A    Yes.
5    Q    Were you notified of any other customer
6    incidents, either slips, falls, or injuries on the
7    water aisle on October 15, 2020, besides Plaintiff's?
8    A    No, ma'am.
9    Q    Were you aware of any leaks on the water
10   aisle prior to Plaintiff's fall on October 15, 2020?
11   A    No.
12   Q    You aware of any roof leaks or refrigerator
13   leaks that would have breached the water aisle around
14   October 15, 2020?
15   A    No.
16        MS. GORDON:  That's all that I have.
17        THE REPORTER:  Okay.  Any further questions,
18   Ms. Washington?
19        MS. WASHINGTON:  Yeah.  I have a few follow
20   ups, and I promise it's going to be short.
21                   EXAMINATION
22   BY MS. WASHINGTON:
23   Q    As far as the reports to employees, are you
24   aware of any other employees who were notified of a
25   leak in the water aisle before Ms. Bennett's fall?

1    A    No, ma'am.

2    Q    Do you know how long it took an associate to
3  see Ms. Bennett after her incident?

4    A    No, ma'am, I'm not aware.

5    Q    Okay.  And do you know if any precautionary
6  measures were taken to prevent others from falling
7  after Ms. Bennett's fall?

8    A    After her fall and she left, we -- Roman
9  would have cleaned up the water so that there was no
10 more water in the floor, and there were no more risks
11 of anyone falling.

12   Q    Okay.  But you believe after she left, the
13 area was cleaned?

14   A    Yes, ma'am, I do.

15   Q    And while Ms. Bennett was there, was there
16 anything done to prevent other falls?

17   A    I'm not sure.  But I'm sure that, you know,
18 they were focused on taking care of her, and then they
19 also had to take photographs.  But as far as I could
20 tell from the video that I saw, there were a lot of
21 people on the aisle, so nobody was going to go on that
22 aisle anyway.

23   Q    You believe no one would have gone on that
24 aisle anyway?

25   A    Correct.

1    Q    But there are chances that people, despite
2  commotion, would still wander down that aisle?

3    A    It could happen.

4    Q    And as far as the matters to prevent others
5  from falling and cleaning the spill, that did not
6  occur until after Ms. Bennett had left the store,
7  correct?

8    A    Well, if associates are there with her
9  still, we always warn customers, hey, be careful,
10 there's something in the floor here.

11   Q    Do you know if that was done?

12   A    As Roman was standing there, he would have
13 told people not to walk through the water or to be
14 careful.

15   Q    He would have, but do you know if he did
16 that?  Is there any indication from any of your
17 statements with Roman or any of the written reports
18 that we've shown here today where that was done?

19        MS. GORDON:  Object to the form.  Answer if
20 you know.

21        THE WITNESS:  I don't.  I don't know if he
22 did or didn't, but that's what he was trying to do.

23        MS. WASHINGTON:  Correct.

24 BY MS. WASHINGTON:

25   Q    But are you aware of anyone other than Roman

1  who would have warned others of the situation --

2        MS. GORDON:  Object --

3        MS. WASHINGTON:  -- where it was located?

4  No, you're fine.

5        THE WITNESS:  I don't know who was on the
6  aisle with Glenda and Roman.

7        MS. WASHINGTON:  Okay.  So that's all I
8  have.  Thank you so much for speaking with me today.

9        MS. GORDON:  Thank you, Ellise.

10       MS. WASHINGTON:  Thank you.

11       THE REPORTER:  Okay.  Just before going off
12 the record, Ms. Washington, did you want to order a
13 transcript of this proceeding?

14       MS. WASHINGTON:  Oh, of course.

15       THE REPORTER:  Yes?  Okay.

16       MS. WASHINGTON:  Yes.

17       THE REPORTER:  And Ms. Gordon?

18       MS. GORDON:  We just need the e-transcript.

19       THE REPORTER:  E-transcript?

20       MS. GORDON:  Thank you.

21       THE REPORTER:  Okay.  Thank you.  We are
22 going off the record.  The time is now 11:36 a.m.,
23 Central Standard Time.

24       (Signature Waived.)

25       (Whereupon, at 11:36 a.m., the proceeding

1  was concluded.)

Alexandria Bennett vs Walmart
PARKER, ELIZABETH on 06/22/2023                                                    Pages 66..67

| | |
|---|---|
| 1         CERTIFICATE OF NOTARY PUBLIC | 1         CERTIFICATE OF TRANSCRIBER |

1          CERTIFICATE OF NOTARY PUBLIC

2       I, Freya Amis, A Remote Online Notary of the

3 State of Ohio, duly authorized to administer oaths, do

4 hereby certify:

5       That I am a disinterested person herein;

6 that the witness, Elizabeth Parker, named in the

7 foregoing deposition, was by me duly sworn to testify

8 the truth, the whole truth, and nothing but the truth;

9 that the deposition was reported by me, Freya Amis,

10 and is a true and correct record of the testimony so

11 given.

12       IN WITNESS WHEREOF, I hereby certify this

13 transcript at my office in the State of Ohio on this

14 29th day of June 2023.

15

16

17

18

19                 Freya Amis

20       Remote Online Notary Public in and for the

21                     State of Ohio

22

23

24

25

---

1          CERTIFICATE OF TRANSCRIBER

2       I, FREYA AMIS, do hereby certify that this

3 transcript was prepared from the digital audio

4 recording of the foregoing proceeding, that said

5 transcript is a true and accurate record of the

6 proceedings to the best of my knowledge, skills, and

7 ability; that I am neither counsel for, related to,

8 nor employed by any of the parties to the action in

9 which this was taken; and, further, that I am not a

10 relative or employee of any counsel or attorney

11 employed by the parties hereto, nor financially or

12 otherwise interested in the outcome of this action.

13

14

15

16

17                     FREYA AMIS

18

19

20

21

22

23

24

25

# DOCUMENT
# 16-4

FILED

2023 Aug-11  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit "D"

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ALEXANDRIA BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case 2:22-cv-01306-AMM |
| | ) | |
| WALMART, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF ELIZABETH PARKER

Personally, appeared before the undersigned attesting officer duly authorized to administer oaths, **Elizabeth Parker**, who being sworn, deposes and says the within statements are true and correct.

1.    I am over the age of eighteen (18), and I am otherwise competent to give this Affidavit. I have personal knowledge of the matters contained in this Affidavit.

2.    I am the store manager for the Wal-Mart Neighborhood Market located in Helena, Alabama, and have been in this position at all times relevant to the above-referenced lawsuit.

3.    All employees are trained to constantly monitor for potential hazards in the store - including but not limited to spills - as they perform their daily duties which

1

cause them to walk throughout the store. This training occurs through in-person training and computer module training.

4.     On October 15, 2020, the Helena store had approximately 67 employees who were on duty for various shifts from the time the store opened until the subject incident occurred.

5.     Two of these employees were maintenance associates who performed regular walks throughout the store, monitoring for potential hazards.

6.     The subject store is approximately 47,750 square feet.

7.     I personally measured the distance from the tile floor to the top shelf on the aisle where plaintiff's fall occurred and this distance equaled six feet, two inches.

Sworn and subscribed to this the 11 day of August 2023.

**SIGNATURE PAGE TO FOLLOW**

_Elizabeth A. Parker_
**Elizabeth Parker**

STATE OF ALABAMA                    )
Jefferson     COUNTY              )

    I, Noelle D. Boyd  , a Notary Public in and for said County and State, hereby certify that **Elizabeth Parker**, whose name is signed to the foregoing and who is known to me, acknowledged before me this day, that being informed of the contents thereof, voluntarily executed the same on the day of its date.

    Given under my hand and seal this the 11th day of August, 2023.

_Noelle D. Boyd_
Notary Public

My Commission Expires: 2-15-27

NOELLE D BOYD
Notary Public
Alabama State at Large

3

FILED

2023 Aug-11  PM 03:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Exhibit "E"



DEFENDANT'S
EXHIBIT
6
Bennett





Walmart_0013







DEFENDANT'S
EXHIBIT
7



# DOCUMENT 17



FILED

2023 Aug-14  PM 12:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ALEXANDRIA BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | Case 2:22-cv-01306-AMM |
| | ) | |
| v. | ) | ORAL ARGUMENT REQUESTED |
| | ) | |
| WALMART, INC., | ) | |
| | ) | |
| Defendants. | ) | |

---

## WAL-MART STORES EAST, L.P.'S BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

---

COMES NOW the Defendant in the above-styled action, Wal-Mart Stores East, LP (hereinafter "Wal-Mart"), and submits the following legal memorandum brief in support of its previously filed Motion for Summary Judgment (Doc. 15) and corresponding Evidentiary Submission (Doc. 16), pursuant to Rule 56, *Fed. R. Civ. P.*

i

# **TABLE OF CONTENTS**

I.   STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS .......1

   A.   THE ALLEGED INCIDENT .................................................1

   B.   WAL-MART'S SLIP AND FALL PREVENTION POLICIES
       AND TRAINING ....................................................6

II.   SUMMARY JUDGMENT STANDARD......................................8

III.   DISCUSSION OF RELEVANT LEGAL AUTHORITIES ...........................9

   A.   PLAINTIFF SPECULATES AS TO WHAT CAUSED
       HERE TO FALL ....................................................9

   B.   PLAINTIFF'S NEGLIGENCE CLAIM IS DUE TO BE
       DISMISSED AS A MATTER OF LAW .................................14

      1.   WAL-MART DID NOT CREATE THE ALLEGED HAZARD ...16

      2.   WAL-MART DID NOT HAVE ACTUAL NOTICE....................19

      3.   CONSTRUCTIVE NOTICE CANNOT BE IMPUTED TO
         WAL-MART ....................................................20

      4.   WAL-MART WAS NOT DELINQUENT.....................................24

   C.   IF THE DRIPS OF LIQUID WERE BLACK, THEY WERE AN
       OPEN AND OBVIOUS CONDITION ..................................27

   D.   PLAINTIFF'S WANTONNESS CLAIM IS DUE TO BE
       DISMISSED AS A MATTER OF LAW .................................29

IV.   CONCLUSION .................................................31

# I.  STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS

## A.    THE ALLEGED INCIDENT

1.      On October 15, 2020, Plaintiff Alexandria Bennett and her boyfriend Kevin Allen visited the Wal-Mart Neighborhood Market in Helena, Alabama. (Exhibit A, Complaint (Docs. 1, 16-1) ¶8; Exhibit B, Bennett Depo. (Doc. 16-2), 76:14-16, 78:22-23, 79:1-5; Exhibit C, Parker Depo. (Doc. 16-3), 8:8-17, 10:9-11.

2.      While on the bottled water aisle (hereinafter "the subject aisle"), plaintiff allegedly slipped and fell onto the floor around 7:20 p.m. (Docs. 1, 16-1; Doc. 16-2, 76:6-10, 81:8-14). Plaintiff described the subject incident as follows: "I went to reach to get some water, and I slipped and fell." (Doc. 16-2, 83:15-20).

3.      Plaintiff claims that, while standing flatfooted, both feet suddenly went out from under her, causing her to fall to the ground. (Doc. 16-2, 92:19-23, 93:1-23, 94:1-6, 119:23, 120:1-2).

4.      Plaintiff's body did not hit anything as she fell, and plaintiff believes she landed on her bottom. (Doc. 16-2, 94:7-9, 94:10-18).

5.      Plaintiff is not certain what caused her to fall, but speculates as follows:

Q.      All right. And what caused you to fall?

A.      I think it was dirty water on the floor.

Q.      What makes you think that?

A.      Because once I was on the floor, I seen it was water right there. So you know I said "scuff marks"? It was like, dirty water, scuff

marks.

(Doc. 16-2, 91:16-23, 92:1).

6.     Plaintiff admits she was reaching for a bottle or jug of water, located on the top shelf, when she fell. (Doc. 16-2, 89:15-23, 90:1-13).

7.     Plaintiff is five feet, four inches tall and the top shelf on the subject aisle is six feet, two inches from the ground. (Doc. 16-2, 73:19-22; Exhibit D, Affidavit of Parker (Doc. 16-4), ¶7).

8.     Plaintiff was wearing what she described as flat, "sturdy shoes" at the time of the subject incident. (Doc. 16-2, 82:7-11, 120:13-23, 121:1-8). She had worn these shoes on prior occasions. *Id.*

9.     Plaintiff does not recall her clothes being wet after she fell and landed on the floor. (Doc. 16-2, 130:11-13).

10.    Plaintiff denies seeing any liquid on the floor prior to her fall but testified as follows:

Q.     Was there anything blocking your view of the water aisle before you walked down it?

A.     No, ma'am.

Q.     Was there anything blocking your view of the floor on the water aisle before you walked down it?

A.     No, ma'am.

Q.     Were there any displays or anything out in the middle of the aisle of the water aisle that day?

A.      No, ma'am.

(Doc. 16-2, 84:10-21).

* * *

Q.      Okay. Was the lighting on the water aisle - - did it seem bright
        enough to you?

A.      I guess.

Q.      Like, you didn't have any trouble seeing what you were looking
        for on the water aisle, did you?

A.      No, ma'am.

(Doc. 16-2, 119:2-9).

* * *

Q.      Okay. Did you see anything on the floor of the water aisle before
        you walked down it that day?

A.      I mean, the floor was - - you know how you see, like, scuff
        marks? The floor was, like, real scuffed up there so - - you now,
        besides the dirty scuff marks, I didn't - - I didn't see anything.

(Doc. 16-2, 85: 4-11, 92:2-10).

11.     When asked to describe the amount of liquid substance she observed

on the floor after she fell, plaintiff testified that there were "drips" contained in one

area. (Doc. 16-2, 98:8-23, 99:1-8). During her deposition, plaintiff reviewed the

photographs attached as Exhibits 6 and 7 to her deposition and circled – in blue

marker - the substance on which she claims she slipped. (Doc. 16-2, 123: 19-23,

124:1-23, 125:1-18, 127:3-20, 128:17-23, 129:1-13; Exhibit E, Photographs (Doc. 16-5)). Plaintiff admits the circled areas shown in the photographs accurately depict the liquid drips as she saw them after she fell and show the *entire* area of liquid drips she observed. *Id.*

12.    Despite the allegations in her complaint, plaintiff admits the only liquid drips she observed after her fall were located *in front* of the pallet holding bottled water. (Doc. 16-2, 129:23, 130:1-5). She is *not* aware of any liquid substance hiding by the pallet or located under the pallet. *Id.*

13.    Plaintiff admits she does not know the identity of the substance forming the drips she observed on the floor after she fell. Specifically, plaintiff testified:

Q.    All right. And then when Attorney Gordon questioned you, you talked about seeing water on the floor - -

A.    Yes, ma'am.

Q.    - - or some liquid substance on the floor.

A.    Yes, ma'am.

Q.    Did you do any testing of that water that was - - or that substance that was on the floor when you fell, **do you know exactly what it was?**

A.    **No, ma'am.**

(Doc. 16-2, 167:11-22)(emphasis added).

14.    Further concerning the mystery liquid drips, plaintiff admits:

Q.    **Okay. Do you know where it came from?**

A.    **No, ma'am.**

Q.    **Do you have any information about how it got there?**

A.    **No, ma'am.**

Q.    **Any idea how long the water had been there before you fell?**

A.    **No, ma'am.**

Q.    Has anyone told you that they know how long the water had been there before you fell?

A.    No, ma'am.

Q.    Has anyone told you that they know where the water came from that you saw on the floor?

A.    No, ma'am.

(Doc. 16-2, 101:20-23, 102:1-13)(emphasis added).

15.    Plaintiff further testified:

Q.    **Do you have any reason to believe that any Wal-Mart employees knew there was water on the floor of the water aisle before you fell?**

A.     **I don't think they knew.** I don't know.

(Doc. 16-2, 102:20-23, 103:1-2)(emphasis added).

16.    Vendors, customers and employees traversed the subject aisle during the hours immediately preceding plaintiff's alleged fall, and no one reported any wet and/or slippery substance on the floor of the subject aisle. (Doc. 16-3, 59:8-25, 60:1-25, 61:1-8). In fact, the store had been open for more than twelve (12) hours prior to

plaintiff's fall and no one had reported liquid on the floor of the subject aisle and there had been no other reports of injury at the subject store that day. (Doc. 16-3, 59:8-25, 60:1-25, 61:1-8, 23-25, 62:1)

17.    Similarly, plaintiff had been in the subject store for 10-15 minutes before she fell and observed nothing that caused her concern. (Doc. 16-2, 82:12-23, 83:1-6).

18.    It was not raining at the time of the subject incident and the parking lot was not wet when plaintiff entered the subject store on October 15, 2020. (Doc. 16-2, 78:9-17).

19.    There were no structural problems with the subject building and no roof leaks or other leaks in the area where plaintiff fell. (Doc. 16-3, 56:8-15).

20.    The subject incident was not caught on Wal-Mart's surveillance video. (Doc. 16-3, 31:22-25).

**B.    WAL-MART'S SLIP AND FALL PREVENTION POLICIES AND TRAINING**

21.    Once hired, employees are given a new hire orientation guide with store policies, and they are taken on safety tours during which they receive training aimed at the prevention of slips, trips and falls. (Doc. 16-3, 11:20-25, 12:1-12, 14:9-25, 15:1-8, 50:10-25, 51:1-24, 52:1-8, 53:2-21). Wal-Mart's store policies are also available to all associates at all times on the employee portal, OneWalmart. (Doc. 16-3, 50:10-25, 51:1-12).

22.     All employees at the subject Wal-Mart store receive additional training *via* computer modules which require employees to pass a subject-related test before the module is marked complete, as well as on-the-job training and mentoring. (Doc. 16-3, 10:23-25, 11:1-19, 12:17-25, 13:1-9, 50:10-25, 51:1-25, 52:1-8). Through each of these mechanisms, Wal-Mart employees receive training aimed at the prevention of slips, trips, and falls. (Doc. 16-3, 14:9-25, 15:1-8, 50:10-25, 51:1-24, 52:1-8, 53:2-21).

23.     The subject store is cleaned every morning before opening and on an as-needed basis throughout the day. (Doc. 16-3, 19:18-25, 20:1-3, 20:15-25, 21:1-4). There are maintenance associates assigned to perform basic cleaning tasks in addition to all employees maintaining areas in which they are working. (Doc. 16-3, 19:6-13). The floors are scrubbed, and sometimes waxed, at the end of each day. (Doc. 16-3, 35:1-9).

24.     Wal-Mart requires all employees and trains all employees to constantly monitor for spills or other potential hazards as they perform their daily duties which take them throughout the store. (Doc. 16-3, 17:4-23, 19:6-13, 19:18-25, 20:1-3, 21:7-22; Doc. 16-4, ¶3).

25.     Wal-Mart further requires all employees and trains all employees to take immediate action if a spill or other potential hazard is observed. (Doc. 16-3, 17:4-23, 19:6-13, 19:18-25, 20:1-3, 21:7-22). When a potential hazard cannot be

removed immediately upon discovery, Wal-Mart employees are trained to call for help and remain with the hazard until it can be removed. (Doc. 16-3, 17:4-23, 21:7-22).

26.    On October 15, 2020, approximately sixty-seven (67) employees clocked in at various times to work various shifts at the subject store. (Doc. 16-4, ¶4). Two of these employees were maintenance associates who performed regular walks throughout the store, monitoring for potential hazards. (Doc. 16-4, ¶5).

27.    In a further effort to prevent slip and fall incidents, there are "spill stations" located throughout the subject store which contain spill cleanup supplies, a broom, a dustpan, pocket pads, a safety phone, and a flip chart with spill removal instructions. (Doc. 16-3, 14:9-25, 15:1-8, 52:9-22).

28.    If a customer reports an injury at the store, Wal-Mart's policy requires the highest paid salaried employee to complete an investigation and corresponding incident report. (Doc. 16-3, 24:4-25, 28:9-23).

29.    Wal-Mart completed an investigation – which involved speaking with plaintiff, as well as employees, and photographing the scene – following plaintiff's reported injury on October 15, 2020. (Doc. 16-3, 43:7-25, 44:1-25, 45:1-18; Exhibit F, Wal-Mart's Incident Report (Doc. 16-6)).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where the moving party shows "that

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed. R. Civ. P.* Rule 56(c). The United States Supreme Court has explained the standard for summary judgment as follows:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Once a properly supported Motion for Summary Judgment has been made, the burden shifts to the non-moving party to demonstrate by specific facts and by competent evidence that genuine issue of material fact exists. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 249. "Mere conclusions and unsupported factual allegations are legally insufficient to create a dispute to defeat summary judgment." *Bald Mtn. Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989).

### III. <u>DISCUSSION OF RELEVANT LEGAL AUTHORITIES</u>

### A. <u>PLAINTIFF SPECULATES AS TO WHAT CAUSED HER TO FALL</u>

When questioned about the cause of her fall, plaintiff testified: "I think it was the dirty water on the floor . . . [b]ecause once I was on the floor I seen [sic] it was

water right there." (Doc. 16-2, 91:16-23, 92:1). However, plaintiff admits she did not see any liquid substance on the floor prior to her fall and did not recall her clothes being wet after her fall. (Doc. 16-2, 92:2-10, 130:11-13). Moreover, plaintiff cannot identify the source/origin of any liquid drips on the floor of the subject aisle or state with any certainty what substance formed the drips. (Doc. 16-2, 101:20-23, 102:1-13, 167:11-23). In other words, plaintiff can only speculate that she stepped in the drips of the unidentified substance and that these drips caused both of her feet to suddenly slip out from under her while she was standing flatfooted, reaching for water on the top shelf. (Doc. 16-2, 89:15-23, 90:1-13, 92:19-23, 93:1-23, 94:1-6, 119:23, 120:1-2)

Even where there is proof that a plaintiff fell or was otherwise injured on a defendant's premises, this is not enough in and of itself to establish negligence. *See e.g., Katrensky v. U.S.*, 732 F.Supp.2d 1194, 1198 (S.D. Ala. 2010)(citations omitted); *Lowe's Home Ctrs., Inc. v. Laxson,* 655 So. 2d 943, 946 (Ala. 1994)("No presumption of negligence arises from the mere fact of an injury to an invitee...."); *Burlington Coat Factory of Alabama, LLC v. Butler*, 156 So. 3d 963, 970 (Ala. Civ. App. 2014)(holding "that 'a plaintiff in a premises-liability action must present evidence that the condition of which it complains is defective' is well settled.")(quoting *Miller ex rel. Miller v. Liberty Park Joint Venture, LLC,* 84 So. 3d 88, 93 (Ala. Civ. App. 2011)). Plaintiff must, even at the summary judgment stage,

support her claims with more than allegations. *See Ex parte Harold L. Martin Distrib. Co., Inc.*, 769 So. 2d 313, 314 (Ala. 2000)(holding that at summary judgment, "the plaintiff bears the burden of presenting substantial evidence as to each disputed element of her claim."); *Tice v. Tice*, 361 So. 2d 1051, 1052 (Ala. 1978)(holding that plaintiff's belief that a toy on the ground may have caused her fall was not enough to defeat defendant's summary judgment motion); *Garrison v. Sam's East, Inc.*, 787 Fed. Appx. 627, 630 (11th Cir. 2019)(affirming the district court's rejection of plaintiff's negligence claim where, "at the end of the day, she offered only her own speculation about the cause of the fall, and speculation is insufficient to overcome a summary judgment motion.")(citations omitted); *see also Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)("[U]nsupported speculation ... does not meet a party's burden of producing some defense to a summary judgment motion. Speculation does not create a *genuine* issue of fact; instead it creates a false issue, the demolition of which is a primary goal of summary judgment.")(emphasis and ellipses in original).

In *Garrison*, 787 Fed. Appx. at 630, the Eleventh Circuit Court of Appeals recognized that "[t]he district court correctly concluded that "[plaintiff's] theory of liability" – that a Sam's employee's cleaning supplies spread from behind the counter to the customer area – "does not rise above the level of speculation and guesswork, which is insufficient to survive summary judgment." *Garrison*, 787 Fed.

11

Appx. at 630. The appellate court further held that **"[b]ecause [plaintiff] cannot identify the source of the liquid or how long it had been on the floor, let alone who is responsible for the spill, her claim for negligence fails."** *Id.*(emphasis added)*; see also Long v. R & L Foods, LLC*, 2013 WL 757639 (M.D. Ala. 2013)(granting summary judgment for Defendant where plaintiff did not know what caused her to slip but speculated that it was rainwater since it rained earlier in the day); *Gulledge v. Wal-Mart Inc.*, 2019 WL 3413659 (N.D. Ala. July 29, 2019)(granting summary judgment for Defendant where plaintiff did not know what caused her to slip and court found plaintiff's proposition that it could have been newly waxed floors because floors looked cleaner than usual was based on multiple inferences and speculation); *Ervin v. Excel Properties, Inc.*, 831 So. 2d 38 (Ala. Civ. App. 2001)(granting summary judgment for Defendant where plaintiff fell on a set of stairs but did not know what condition caused her to fall, even in light of defendant's acknowledgement that stairs needed repair); *Mooney v. Logan's Roadhouse, Inc.*, 2007 WL 9711455 (N.D. Ala. 2007)(granting summary judgment for Defendant where plaintiff fell outside a restaurant and alleged that rain and a peanut hull lodged in her shoe caused her fall. Court found there was no evidence as to how long the hull was there or how it got there, and there was no evidence as to the walkway being unreasonably maintained.); *Oliver v. Columbia Sussex Corp.*, 391 F. App'x 840 (11th Cir. 2010)(agreeing with Georgia courts that, "Where the

plaintiff does not know of a cause or cannot prove the cause [of his slip and fall], there can be no recovery because an essential element of negligence cannot be proven"); *Williams v. QuikTrip Corp.*, 817 F. App'x 743 (11th Cir. 2020)(granting summary judgment for Defendant where plaintiff could only speculate as to what caused him to fall, even where evidence included a photograph of the scene – taken before plaintiff's fall - depicted a dangerous condition).

In short, the plaintiff is only able to offer her own speculation about the cause of her fall. As such, **the inquiry should end here** because speculation is not sufficient to support her claims against Wal-Mart. Here, multiple assumptions must be made to even assess Wal-Mart's potential liability; namely, plaintiff asks the Court to assume that: the drips of unidentified liquid substance on the floor created a slippery condition; that plaintiff stepped in the drips of liquid; the drips of liquid caused both of plaintiff's feet to suddenly go out from under her despite her wearing sturdy shoes and standing flatfooted; and there was no memorable liquid on plaintiff's clothes despite her landing on her bottom. *See Moore v. Dean*, 520 F.Supp. 2d 1359, 1362-63 (N.D. Ala. 2007)("[A]n inference is not reasonable if it is only a 'guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation.'")(quoting *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983)); *see also Systrends, Inc. v. Group 8760, LLC*, 959 So. 2d 1052, 1074 (Ala. 2006)(holding that "[A]n inference cannot be derived

from another inference. An inference must be based on a known or proved fact."). Based on this alone, plaintiff's negligence and wantonness claims against Wal-Mart are due to be dismissed as a matter of law; however, should this Honorable Court disagree, further analysis of plaintiff's claims is provided herein.

## B.   PLAINTIFF'S NEGLIGENCE CLAIM IS DUE TO BE DISMISSED AS A MATTER OF LAW

Under Alabama law, the elements of negligence in a premises liability case such as this "are the same as those in any tort litigation: duty, breach of duty, cause in fact, proximate or legal cause, and damages."[1] *Sessions v. Nonnenmann,* 842 So. 2d 649, 651 (Ala. 2002)(citations and quotations omitted).

The duty owed by Wal-Mart to plaintiff was to exercise reasonable care to provide and maintain a reasonably safe premises. *Mendez v. Walgreen Co.*, 2015 WL 3767218, at *2 (N.D. Ala. June 17, 2015)(citing *Landreau*, 75 F.Supp. 2d at 1321-22). "*[I]f* the premises is in a dangerous condition, ***and the business knew or should have known of the condition***, the business owner has a duty 'to give sufficient warning so that an invitee might avoid danger by the use of ordinary care.'" *Knox v. U.S.*, 978 F.Supp. 2d 1203, 1209 (M.D. Ala. 2013)(citing *Banks. v. Bayou Bend II, Ltd.,* 552 So. 2d 1070, 1071 (Ala. 1989))(emphasis added). "But a store owner is not an insurer of a customer's safety and is liable only if it negligently

[1] Because this Court is exercising diversity jurisdiction, the laws of the State of Alabama apply. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)(holding that a federal court exercising diversity jurisdiction must apply the choice of law rules of the forum state).

fails to keep the premises in a reasonably safe condition." *Knox*, 978 F.Supp. 2d at 1209 (citing *Dolgencorp, Inc. v. Hall,* 890 So.2d 98, 101 (Ala. 2003))*.* "The standard is reasonableness, not strict liability." *Dalton v. Target Corp.*, 2019 WL 3574733 at *5 (N.D. Ala. 2019). "The burden rests upon the plaintiff to show that the injury was proximately caused by the negligence of the storekeeper or one of its servants or employees" and "[a]ctual or constructive notice of the presence of the offending substance must be proven before the proprietor can be held responsible for the injury." *Vargo v. Warehouse Groceries Mgt., Inc.*, 529 So. 2d 986 (Ala. 1988)(quoting *Cash v. Winn-Dixie Montgomery, Inc.*, 418 So. 2d 874, 876 (Ala. 1982)). In other words, "[t]o establish liability in a slip-and-fall case, a plaintiff must first prove that the defendant business had notice of the substance that caused the accident." *Knox*, 978 F.Supp. 2d at 1209 (citing *Maddox v. K-Mart Corp.*, 565 So. 2d 14, 16 (Ala. 1990)).

To establish notice, a plaintiff must prove that (1) the business had actual notice that the substance on which the plaintiff slipped was on the floor; (2) the substance had been on the floor a sufficient length of time to impute constructive notice; or (3) the business was delinquent in failing to discover and remove the substance. *Id.* If a plaintiff cannot establish notice, then a business's superior knowledge is lacking, and that business cannot be held liable for the plaintiff's injuries. *Fowler v. CEC Entm't*, 921 So. 2d 428, 432-33 (Ala. Civ. App. 2005). "[I]n

situations where the plaintiff has presented substantial evidence indicating that the defendant storekeeper has created the hazardous condition, the plaintiff is not required to prove that the storekeeper had actual or constructive notice of the hazardous condition; in such situations notice is presumed." *Rutledge v. Wings of Tuscaloosa, Inc.*, 848 So. 2d 1005, 1007 (Ala. Civ. App. 2002)(citations omitted). However, conjecture and speculation are not sufficient to satisfy plaintiff's burden of proving *via **substantial evidence*** that the storekeeper had notice of or created a hazardous condition. *See e.g., Hale v. Kroger Ltd. P'ship I*, 28 So. 3d 772, 780-81 (Ala. Civ. App. 2009)(citations omitted).

### 1. <u>Wal-Mart did not create the alleged hazard.</u>

Plaintiff admits she does not know the identity of the drips on which she claims she slipped. (Doc. 16-2, 167:11-22). Plaintiff further admits she does not know the origin of any drips of liquid on the floor of the subject aisle. (Doc. 16-2, 101:20-23, 102:1-13). Any proposition that Wal-Mart created or was otherwise responsible for the drips of the unknown substance plaintiff observed after her fall requires pure speculation to reasonably reach such a conclusion.

Without substantial evidence of the alleged spill's source, then plaintiff's claims fail. *See Patrick v. Publix Super Mrkts., Inc.*, 2017 WL 1159104, *4-7 (S.D. Ala. 2017)(granting summary judgment for the defendant where plaintiff could not present sufficient evidence demonstrating an issue of fact as to whether the

defendant affirmatively created the spill on which the plaintiff slipped, presenting only speculation about the cause of the fall).

In *Patrick, supra.*, the District Court for the Southern District of Alabama considered facts like those in the instant matter. In that case, the plaintiff slipped on a clear liquid near the entrance of the store's produce section. 2017 WL 1159104, *2. The plaintiff argued that she could present evidence from which a reasonable inference could be drawn that the defendant affirmatively created the "liquid patch" on which plaintiff slipped such that notice was imputed to the defendant. In support of her theory, plaintiff argued that her fall occurred near an area where store employees cut fruit, that liquid is naturally produced when cutting fruit, and that there were no other viable sources of liquid in the area. *Id.* at *4. The court rejected the plaintiff's argument, holding that the plaintiff failed to provide any authority to support her theory. *Id.* at *6 (citing *Williams v. Wal-Mart Stores, Inc.*, 584 F. Supp. 2d 1316, 1320 (M.D. Ala. 2008)). The Court further explained that "there is no evidence that a Publix employee was working cutting fruit in that section prior to the plaintiff's fall" and the testimony that "the cut fruit section was the only viable source of the liquid does not arise above mere speculation, which is insufficient to create a genuine issue of material fact." *Id.* at *6.

Similarly, the plaintiff in the instant case cannot produce sufficient evidence demonstrating a genuine issue of material fact as to whether Wal-Mart

"affirmatively created" the unknown condition which allegedly caused plaintiff to fall. Even if there were drips of liquid on the floor of the subject aisle prior to plaintiff's fall, there is no evidence establishing the source of any such drips, much less substantial evidence of the same. Here, plaintiff has not even offered any theories as to how the drips of liquid came to be on the floor of the subject aisle, much less substantial evidence of the same. Instead, just like in *Patrick*, the plaintiff admits that she does not know the source of the drips of water which allegedly caused her to fall. (Doc. 16-2, 101:20-23, 102:1-13, 167:11-22).

The undisputed evidence shows that there had been no mopping performed in the subject area the day of the plaintiff's fall, there were no leaks in the area of plaintiff's fall and no reported spills. (Doc. 16-3, 56:8-15, 59:8-25, 60:1-25, 61:1-15). There is no evidence of any specific act by Wal-Mart that could be tied to the creation drips of water on the subject aisle. The liquid drips could have just as easily come from a customer or the plaintiff herself. *See Turner v. Azalea Box Co.*, 508 So. 2d 253, 254 (Ala. 1987)("[w]hen evidence points equally to inferences that are favorable and to inferences that are unfavorable to the moving party, the evidence lacks probative value; and the evidence may not be used to support one inference over another because such use is mere conjecture and speculation.")).

Accordingly, Wal-Mart's notice of the drips of water is **not presumed**; rather, plaintiff must show *via* substantial evidence that Wal-Mart had either actual or

constructive notice of the alleged hazard.

**2.  <u>Wal-Mart did not have actual notice</u>.**

There is no evidence that Wal-Mart had actual notice of any water drips on the floor of the subject aisle before plaintiff's fall. In fact, plaintiff testified that she does not think Wal-Mart knew about the drips of water before her fall. (Doc. 16-2, 102:20-23, 103:1-2). Plaintiff further admits she has no knowledge as to how long the drips of liquid had been on the floor prior to her fall. (Doc. 16-2: 101:20-23, 102:1-13). There is no evidence of customer or vendor complaints to Wal-Mart employees about any type of liquid substance on the floor of the subject aisle before the plaintiff's fall. (Doc. 16-3, 59:8-25, 60:1-25, 61:1-8). The evidence further shows that Wal-Mart was not notified of any substance on the subject aisle until after plaintiff's incident occurred and then the only notice was provided by plaintiff. *Id.*; *see Knox*, 978 F.Supp. 2d 1203 at 1210 (finding no triable issue as to whether Defendant had actual notice where plaintiff did not observe the spill before her fall, a nearby employee did not observe the spill before plaintiff's fall and there was no evidence of customer complaints prior to the fall); *see also*, *East v. Wal–Mart Stores, Inc.,* 577 So. 2d 459 (Ala.1991)(affirming a summary judgment for the defendant where the plaintiff and her only witness testified that they did not know how long the substance had been on the floor and that they did not believe that the defendant had any notice the substance was there until after the accident).

19

Without evidence of actual notice on the part of Wal-Mart, plaintiff must show *via* substantial evidence that Wal-Mart had constructive notice of the alleged substance or that Wal-Mart was delinquent in failing to discover it. Otherwise, plaintiff's claims fail as a matter of law. Here, they fail as a matter of law because of the complete lack of any such evidence of notice.

### 3. <u>Constructive notice cannot be imputed to Wal-Mart</u>.

"Under Alabama law, '[a] storekeeper is charged with knowledge of a hazard if the evidence shows that the hazard has existed on the premises for such a length of time that a reasonably prudent storekeeper would have discovered and removed it.'" *Tunstall v. Captain D's LLC*, 2020 WL 362845 (N.D. Ala. 2020)(quoting *Hale*, 28 So. 3d at 779)(citations omitted). "The main thrust of Alabama case law in this area is to presume constructive knowledge of a hazard **only if the hazard persists 'for . . . an inordinate length of time.'"** *Id.* (citing *Cash*, 418 So. 2d at 876 (emphasis added). To show that a defendant had constructive notice, **"the plaintiff must present evidence about the source of the substance that caused the slip and fall and not rely on 'speculation, conjecture or guess.'"** *Rhodes v. U.S.A.,* 2007 WL 2710385, at *3 (M.D. Ala. Sept. 13, 2007) (quoting *Riverview Reg'l Med. Ctr., Inc. v. Williams*, 667 So. 2d 46, 48 (Ala. 1995)).

Here, the plaintiff cannot establish constructive notice on the part of Wal-Mart. In her deposition, plaintiff reviewed photographs - originally attached as

Exhibits 6 and 7 to her deposition - and circled the liquid on which she claims she slipped. (Doc. 16-2, 123:19-23, 124:1-23, 125:1-18, 127:3-20, 128:17-23, 129:1-13; Doc. 16-5). Any liquid in these photographs appears clear and undisturbed. (Doc. 16-5).

However, even if plaintiff claims the liquid drips were dirty or black in color, there is still no evidence as to how long the unidentified substance had been there and plaintiff admits this much. (Doc. 16-2, 101:20-23, 102:1-13). Plaintiff further admits she does not actually know the identity of the liquid substance. (Doc. 16-2, 167:11-22). Accordingly, it would be impossible for plaintiff to offer testimony as to whether the substance was "dirty" or not. *See Ex parte Wal-Mart Stores, Inc. (Re Wal-Mart Stores, Inc. v. Fannie Irby)*, 806 So. 2d 1247, 1252 (Ala. 2001)(even where plaintiff knew the substance on which she slipped was shampoo, the Court found no constructive notice, holding that plaintiff "filed to present evidence demonstrating under what conditions coconut-based shampoo tends to become 'sticky' and 'clear,' her statements that the shampoo was 'sticky' and 'clear' are merely conclusory).

In *Hose v. Winn-Dixie Montgomery, Inc.*, 658 So. 2d 403 (Ala. 1995), plaintiff filed an affidavit to rebut Winn-Dixie's prima facie showing that it had no actual or constructive notice of the liquid which allegedly caused plaintiff to fall. *Hose*, 658 So. 2d at 405. In her affidavit, plaintiff stated that "the liquid was murky, and she

claimed this evidence gave rise to an inference that people had walked through the liquid." *Id.* "The trial court held that her affidavit consisted of mere allegations or speculation and was sufficient to rebut Winn-Dixie's *prima facie* showing; the supreme court affirmed the summary judgment in favor of Winn-Dixie." *Id.*

Similarly, in *McCarroll v. Wal-Mart Stores, Inc.*, 2012 WL 1659179 (S.D. Ala. 2012), the plaintiff alleged that the puddle of water in which she allegedly slipped may have had track marks going through it, maybe from a shopping cart. McCarroll, 2012 WL 1659179 at *2. However, plaintiff McCarroll admitted she did not know how the water came to be on the floor, how long it had been on the floor before she fell, or whether Wal–Mart knew of its presence on the floor. *Id.* at *3-4. The District Court for the Southern District of Alabama held that "[e]ven if we assume *arguendo* that [plaintiff] saw 'track marks in the area' and there was 'a definitive streak of dirt [was] on her white shoe[,]' this does not advance the cause of imputing notice to Wal–Mart." *Id.* at *3. The Court further held that:

> Viewing the evidence in the light most favorable to McCarroll, there is no direct evidence as to how long the puddle of water was on the floor in the freezer aisle prior to the incident. Additionally, there is insufficient circumstantial evidence of notice as to how long the puddle of water had been on the floor. At best, McCarroll's notice allegations amount to little more than speculation or conjecture such that Wal–Mart is entitled to summary judgment.

*Id.* at *4 (citing *Speer v. Pin Palace Bowling Alley,* 599 So. 2d 1140, 1143–1144 (Ala. 1992); *Henderson v. Dollar Gen'l. Gorp.,* 2009 WL 959560, at *6 (S.D. Ala.

2009)); *see also Vargo,* 529 So.2d 986 (affirming a summary judgment for the defendant where the plaintiff and her only witness testified that they had no idea how long the puddle of water on which the plaintiff had slipped had been on the floor, except that it 'looked like it had been there for a while,' and where there was no other evidence as to how long the water had been present or that the defendant had notice of it).

In sum, the evidence demonstrates that no one knows how long any alleged drips of liquid were on the floor prior to the plaintiff's fall. Plaintiff has not offered any evidence showing the origin or source of any alleged drips. Just as in *McCarroll* and *Vargo*, there is no evidence regarding when the spill occurred or how long it remained on the floor before plaintiff fell. Further, the absence of any evidence indicating that someone saw the drips of liquid on the subject aisle prior to the plaintiff's fall militates against imputing constructive notice of its existence to Wal-Mart. As the Court held *Tunstall*, 2020 WL 362845,

> **It would be pure speculation . . . to infer from the evidence that the substance had been there long enough to impute constructive knowledge of the hazard on Defendant. There are too many assumptions that need to be made and Alabama law does not permit such speculation. To charge Defendant with constructive notice on the facts presented here would be to make a premises owner a de facto insurer of the invitees' safety and that is clearly not the state of the law in Alabama.** *See Ex parte Harold L. Martin Distrib. Co.*, 769 So. 2d 313, 314 (Ala. 2000) (internal quotations omitted); *see also Hale*, 28 So. 3d at 781-82 ("Given the absence of any evidence indicating that the size and location of the spill should have alerted [defendant] employees in the area to its presence in the

23

relatively short period between the spill and [plaintiff's] fall . . . [plaintiff] did not present substantial evidence . . . indicating that [defendant] had constructive knowledge of the hazard.").

*Id.* at *5(emphasis added); *see also Tidd v. Walmart Stores, Inc.,* 757 F. Supp. 1322, 1323 (N.D. Ala. 1991)(refusing to impute constructive notice absent any evidence of the identity of the foreign substance on which plaintiff fell prior to the fall); *Dalton*, 2019 WL 3574733 at *4(holding that no evidence as to the identity of the offending substance makes it "impossible for the court or a jury to do anything other than to speculate regarding the rest of Plaintiff's testimony concerning the substance.").

Absent evidence of Wal-Mart's constructive notice, there can be no finding that Wal-Mart breached its duty to the plaintiff, and, therefore, no *prima facie* case can be established. *See Knox*, 978 F.Supp. 2d at 1210 (citing *Tidd,* 757 F.Supp. at 1324).

### 4.  **Wal-Mart was not delinquent.**

The evidence in this case shows that Wal-Mart did not negligently fail to discover the existence of any liquid on the subject aisle prior to plaintiff's fall. Rather, the evidence indicates that Wal-Mart maintained its premises in a reasonably safe condition. Wal-Mart had implemented a policy whereby employees were charged with constant monitoring for potential safety hazards. (Doc. 16-3, 14:4-23, 19:6-13, 18-25, 20:1-3; Doc. 16-4, ¶3). Wal-Mart employees were trained to clean

as they go. *Id.* In other words, they were trained to never walk past debris or a spill without immediately remedying the situation. *Id.* The store was stocked with spill stations and employees are instructed to keep a towel in their pockets for quick removal of any spills. (Doc. 16-3, 14:9-25, 15:1-8, 17:4-23, 52:9-22). They were further trained to remain guard over spills until they could be removed. (Doc. 16-3, 17:4-23, 21:7-22). Maintenance personnel performed regular walks through the store monitoring for potential hazards and all employees are charged with continuous monitoring for potential safety hazards as they perform their job duties which take them throughout the store. (Doc. 16-3, 14:4-23, 19:6-13, 18-25, 20:1-3; Doc. 16-4, ¶3, 5).

Plaintiff has not presented any evidence to indicate that Wal-Mart's inspection or cleaning procedures were inadequate or that they were performed inadequately on the day of plaintiff's fall. In fact, the evidence in this case shows the opposite; namely, the evidence shows that multiple employees, vendors and customers had been on the subject aisle prior to plaintiff's fall, and no one reported any drips of liquid on the flooring. (Doc. 16-3, 59:8-25, 60:1-25, 61:1-8). Even if there were drips of a liquid substance discovered after plaintiff's fall, this does not automatically create a genuine issue of material fact regarding whether Wal-Mart's inspection was adequate. "Rather, under Alabama law, **the mere presence of an offending substance does not automatically give rise to liability.**" *Hale*, 28 So. 3d at 783

(citation omitted). Wal-Mart exercised its slip and fall prevention practices the day of plaintiff's fall - as shown by the undisputed evidence - and was not delinquent in failing to discover drips of water on the subject aisle.

In the end, plaintiff cannot offer evidence raising a material question of fact warranting a trial on whether Wal-Mart had actual notice of the drips, had constructive notice of it, or was otherwise delinquent in failing to discover and remove it. There is no evidence indicating that Wal-Mart knew drips were on the floor or that Wal-Mart was engaging in a practice that would likely or probably result in plaintiff's injury. There is also no evidence indicating that Wal-Mart created the alleged hazard or that it had, or should have had, notice of the drips prior to plaintiff's fall. As noted *supra*, plaintiff testified that she does not know the identity of the substance forming the drips, how the drips came to be on the floor, how long they had been on the floor, or whether Wal-Mart had any notice there were drips on the floor. (Doc. 16-2, 101:20-23, 102:1-13, 167:11-22).

Therefore, summary judgment is due to be granted as to plaintiff's negligence claim. *See e.g., Williams*, 584 F.Supp. 2d 1316; *see also Powell v. Wal-Mart Stores, East, L.P.*, 2019 WL 1422721, at *4 (S.D. Ala. 2019)(holding that "[w]ithout evidence explaining how the water came to be under the mat or how long it had been there before her fall - - that Walmart had actual or constructive notice of the hazardous condition which caused the damage - - summary judgment cannot be

avoided.")(citing *Duncan v. Wal-Mart La., L.L.C.*, 863 F.3d 406, 409-410 (5th Cir. 2017)(Walmart did not have actual or constructive notice of the condition where its employee slipped and fell on a mat, got up, noticed the mat shifted, saw water under the mat, but offered not evidence to explain how the water got under the mat or how long it had been there.)).

### C.   IF THE DRIPS OF LIQUID WERE BLACK, THEY WERE AN OPEN AND OBVIOUS CONDITION

Under Alabama law, "[t]he owner of premises has no duty to warn an invitee of open and obvious defects in the premises which the invitee is aware of, or should be aware of, in the exercise of reasonable care on the invitee's part." *Ex parte Mtn. Top Indoor Flea Mkt.*, 699 So. 2d 158, 161 (Ala. 1997)(quoting *Shaw v. City of Lipscomb*, 380 So. 2d 812, 814 (Ala. 1980)). "The duty to keep an area safe for invitees is limited to hidden defects which are not known to the invitee and would not be discovered in the exercise of ordinary care. . . A plaintiff may not recover if the injury he receives is caused by an obvious or known defect in the premises." *Sessions*, 842 So. 2d at 652. Moreover, the test for determining whether a hazard is open and obvious "is an objective one." *Ex parte Mtn. Top*, 699 So. 2d at 161 (citations omitted).

As discussed in *Sessions, supra.*, the question is whether the danger should have been observed, not whether in fact it was consciously appreciated:

'[I]n order for a defendant-invitor in a premises-liability case to win a

summary judgment or a judgment as a matter of law grounded on the absence of a duty on the invitor to eliminate open and obvious hazards or to warn the invitee about them, *the record need not contain undisputed evidence that the plaintiff-invitee consciously appreciated the danger at the moment of the mishap. . .* This Court has expressly rejected the notion that an invitor owes a duty to eliminate open and obvious hazards or to warn the invitee about them if the invitor '*should anticipate the harm despite such knowledge or obviousness.*'

*Sessions, supra*, at 653-54 (internal citations omitted)(emphasis in original).

To the extent plaintiff claims the drips on which she allegedly slipped were black in color, they were an open and obvious condition of which Wal-Mart had no duty to warn. No evidence has been presented indicating that the drips of water on the subject aisle were in any way obscured or hidden from view; rather, the plaintiff testified that there was nothing blocking her view of the subject aisle and that all of the liquid drips were in front of the pallet and centralized in the area circled in the photographs. (Doc. 16-2, 84:10-21, 119:2-9, 85:4-11, 92:2-10, 123:19-23, 124:1-23, 125:1-18, 127:3-20, 128:17-23, 129:1-13, 23, 130:1-5; Doc. 16-5). If the drips of water were black, they would have been easily visible on the white tile. (Doc. 16-5); *see e.g., Paige v. Wal-Mart Stores, Inc.*, 638 So. 2d 4 (Ala. Civ. App. 1994)(holding that "the presence of an orange cord on an off-white colored floor established the existence of a condition that was 'open and obvious' as a matter of law"); *Sheikh v. Lakeshore Foundation*, 64 So. 3d 1055 (Ala. Civ. App. 2010)(upholding the trial court's ruling that certain cables – which contrasted "distinctively with the color of the underlying carpet" – over which the plaintiff tripped were open and obvious as

a matter of law, negating a duty to warn); *Melton v. Kroger*, 2019 WL 3208367 (M.D. Ala. 2019)(holding that an electrical outlet was an open and obvious condition where the outlet was a different color than the floor (the outlet was gold and the floor was grey cement), the outlet was located in the middle of the aisle, the cover for the outlet was six inches in diameter, the outlet was unobstructed, and there was no evidence of poor lighting in the area); *Browder v. Food Giant, Inc.*, 854 So. 2d 594 (Ala. Civ. App. 2002)(affirming the trial court's entry of summary judgment in favor of the defendant where nothing obstructed plaintiff's view of a depression in the asphalt - which was noted to reveal red dirt in contrast with the black pavement – and holding the condition was discoverable through the use of ordinary care).

The application of an objective standard compels the conclusion that such a hazard was open and obvious. Plaintiff even admits she observed black scuff marks on the white flooring of the subject aisle prior to walking down that aisle. (Doc. 16-2, 85:4-11). Accordingly, if there were drips of black water on the white tile, Wal-Mart owed the plaintiff no duty to eliminate the potential hazard or to warn her of the potential hazard. It follows that the plaintiff's negligence claim further fails as a matter of law.

## D.   PLAINTIFF'S WANTONNESS CLAIM IS DUE TO BE DISMISSED AS A MATTER OF LAW

"To establish wantonness, the plaintiff must prove that the defendant, with reckless indifference to the consequences, consciously and intentionally did some

wrongful act or omitted some known duty. To be actionable, that act or omission must proximately cause the injury of which the plaintiff complains." *Shanklin v. New Pilgrim Towers, L.P.*, 58 So. 3d 1251, 1256 (Ala. Civ. App. 2010)(quoting *Martin v. Arnold*, 643 So. 2d 564, 567 (Ala. 1994)).

Plaintiff's wantonness claim fails for the same reasons plaintiff's negligence claim fails. "Although wantonness under Alabama law is not merely a higher degree of culpability than negligence,' . . . the fact that [plaintiff] has not brought forward any evidence tending to show Defendants' knowledge of the spill is equally conclusive of both claims." *Garrison*, 787 Fed. Appx. at 27 (quoting *Ex parte Anderson*, 682 So. 2d 467, 470 (Ala. 1996)). Wal-Mart's "'knowledge of a dangerous condition, prior to the accident is the most crucial element of wantonness.'" *Id.* (quoting *Christian v. Kenneth Chandler Constr. Co., Inc.*, 658 So. 2d 408, 411 (Ala. 1995)); *Powell*, 2019 WL 1422721, at *5 (holding that "[g]iven the lack of evidence of Walmart's notice of the alleged hazardous condition prior to the accident, the Court cannot conclude that Walmart acted with a conscious and reckless disregard of the rights and safety of others.").

Plaintiff has not established a genuine issue of material fact warranting a trial on her wantonness claim. In fact, beyond raising it in her Complaint, plaintiff has not identified any facts to support a claim of wantonness. Here, there is no evidence suggesting that Wal-Mart consciously or recklessly disregarded the safety of others.

30

*Ex parte Harold L. Martin Distrib. Co., Inc.*, 769 So. 2d at 314 ("In order to overcome a defendant's properly supported summary-judgment motion, the plaintiff bears the burden of presenting substantial evidence as to each disputed element of her claim."). Therefore, plaintiff's wantonness claim is due to be dismissed as a matter of law. *See e.g., McDonald v. Lighami Development Co., LLC*, 962 So. 2d 847, 852 (Ala. Civ. App. 2006)(holding despite evidence landlord knew stepping stones were slippery when wet and that the tenant had previously injured herself on the stepping stones, the evidence was not sufficient to support a claim of wantonness and summary judgment as to this count was proper).

## IV. <u>CONCLUSION</u>

Pursuant to *Fed. R. Civ. P.* 56, summary judgment is appropriate where there are no genuine issues as to any material fact and moving parties are entitled to a judgment as a matter of law. Mere allegations in a pleading are not enough to create a genuine issue of material fact against a showing of evidence contrary to the allegations. *Fed. R. Civ. P.* 56(e). Since the plaintiff cannot provide substantial evidence as to any genuine issue of material fact as to the claims against Wal-Mart, Wal-Mart is entitled to summary judgment as a matter of law.

WHEREFORE, PREMISES CONSIDERED, Defendant Wal-Mart Stores East, LP respectfully requests that this Honorable Court enter an Order granting Summary Judgment in its favor as there are no genuine issues of material fact.

Further, there being no justifiable reason for delay, Defendant moves that said

judgment be made final pursuant to Rule 54(b), *Fed. R. Civ. P.*

Respectfully submitted,

_____
s/ *Gwen A. Gordon*
Christopher J. Zulanas (ASB-1572-U82C)
Gwendolyn A. Gordon (ASB-2775-O74A)
*Counsel for the Defendant, Wal-Mart Stores East, L.P. (incorrectly named as Walmart Inc. in complaint)*

OF COUNSEL:
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
czulanas@friedman-lawyers.com
ggordon@friedman-lawyers.com
P 205.278.7000 | F 205.278.7001

## **CERTIFICATE OF SERVICE**

I hereby certify that I have caused a copy of the foregoing document to be electronically filed and issued to counsel via electronic mail and/or CM/ECF notification on this date: August 14, 2023.

Ellise M. Washington
EMW LAW
2100 1st Avenue North
Birmingham, AL 35203
ellise@emwlawllc.com

_____
s/ *Gwen A. Gordon*
OF COUNSEL

## Certificate of Service

I hereby certify that on September 20, 2024, I electronically filed and mailed two copies of the Appellant's Appendix to the clerk of court via USPS certified mail, and one copy to all counsel of record including the following:

Gwendolyn A. Gordon
Christopher J. Zulanas
***Counsel for Appellee Wal-Mart, Inc.***
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
czulanas@friedman-lawyers.com
ggordon@friedman-lawyers.com

Ellise M. Washington, Esq.
*Attorney for Appellant Alexandria Bennett*

Dated: September 20, 2024

No. 24-11199

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

Alexandria Bennett,

*Plaintiff-Appellant*,

v.

Walmart, Inc.

*Defendant-Appellee*

Appeal from the United States District Court for the Northern District of Alabama

No. 2:22-CV-01306

**APPELLANT'S APPENDIX
VOLUME 2**

Ellise M .Washington
2100 1st Ave. N. Suite 300
Birmingham, AL 35203
205-938-4369

*Attorney for Appellant*
Alexandria Bennett

## INDEX

Docket/Tab #

**Volume 1**

District Court Docket Sheet…………………………………………………………... A

Complaint…………………………………………………………………………….. 1

Answer……………………………………………………………………………… 2

Defendant's Motion for Summary Judgment………………………………………… 15

Exhibit B – Deposition Travel Transcript of Plaintiff Alexandria Bennett………….. 16-2

Exhibit C – Deposition Travel Transcript of Elizabeth Parker………………………. 16-3

Exhibit D – Affidavit of Elizabeth Parker…………………………………….......... 16-4

Exhibit E – Photographs (Exhibits 6 and 7 to Bennett's Deposition)……………….. 16-5

Defendant's Brief in Support of Its Motion for Summary Judgment…...………......... 17

**Volume 2**

Exhibits 1-7 and Portions of Exhibits 8-9 to Elizabeth Parker's Deposition Transcript. 18

Remaining portions of Exhibits 8 and 9, along with Exhibits 10 and 11 to Elizabeth
Parker's Deposition Transcript- SEALED…...…………………………………….... 27

Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment....... 29

Exhibit G – October 15, 2020, Video Surveillance Footage…………...…………….. 35

Exhibit H – Screenshots from Video Surveillance Footage (Exhibit G) ……………… 35

Exhibit I – Wal-Mart's Responses to Plaintiff's Interrogatories ……………………… 35

Defendant's Reply Brief in Support of Its Motion for Summary Judgment………….... 36

Summary Judgment Order Appealed From………………………………………........ 38

Certificate of Service

# DOCUMENT 18

FILED

2023 Aug-14  PM 02:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ALEXANDRIA BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case 2:22-cv-01306-AMM |
| | ) | |
| WALMART, INC., | ) | |
| | ) | |
| Defendants. | ) | |

_____

**WAL-MART STORES EAST, L.P.'S SUPLEMENT TO ITS EVIDENTIARY
SUBMISSION IN SUPPORT OF ITS MOTION FOR SUMMARY
JUDGMENT**
_____

COMES NOW the Defendant in the above-styled action, Wal-Mart Stores

East, L.P. (hereinafter "Wal-Mart"), and submits the attached supplement to its

previously filed Evidentiary Submission (Doc. 16) in Support of its Motion for

Summary Judgment (Docs. 15 and 17).

1.      This supplement includes Exhibits 1-7, as well as portions of Exhibits

8 and 9, to Elizabeth Parker's Deposition Transcript (Doc. 16-3).

2.      Due to the proprietary nature of certain documents contained in

Exhibits 8-11, counsel for this defendant is withholding the remaining portion of

Exhibits 8 and 9, along with Exhibits 10 and 11 to Ms. Parker's deposition, pending

this Court's ruling on its Motion to File Certain Exhibits Under Seal, which will be

filed later today.

Respectfully submitted,

_____
s/ *Gwen A. Gordon*
Christopher J. Zulanas (ASB-1572-U82C)
Gwendolyn A. Gordon (ASB-2775-O74A)
*Counsel for the Defendant, Wal-Mart Stores*
*East, L.P. (incorrectly named as Walmart*
*Inc. in complaint)*

OF COUNSEL:
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
czulanas@friedman-lawyers.com
ggordon@friedman-lawyers.com
P 205.278.7000 | F 205.278.7001

## **CERTIFICATE OF SERVICE**

I hereby certify that I have caused a copy of the foregoing document to be electronically filed and issued to counsel via electronic mail and/or CM/ECF notification on this date: August 14, 2023.

Ellise M. Washington
EMW LAW
2100 1st Avenue North
Birmingham, AL 35203
ellise@emwlawllc.com

_____
s/ *Gwen A. Gordon*
OF COUNSEL

FILED
2023 Aug 14 PM 12:00
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Customer Incident Report



**I N C R**

**PLAINTIFF'S EXHIBIT 1**
6/22/2023, 1:13 PM

| Facility #:<br>4189 | Date of Incident:<br>10 / 15 / 2020 | Time of Incident:<br>07:20     am / pm X |
|---|---|---|

| Legal Name:<br>Alexandra Bennett |
|---|

| Date of Birth:<br>   /    / | SSN: |
|---|---|

| Mailing Address:<br>████████████ |
|---|

| City:<br>Calera | State:<br>AL | Zip Code:<br>35040 |
|---|---|---|

| Home Phone #:<br>████████ | Cell Phone #:<br>████████ | Alternate Phone #:<br>████████ |
|---|---|---|

| Email Address: |
|---|

Describe in your own words, the events leading up to the incident:

Reaching for water on shelf slipped and fell on floor pain in right hip and ankle. Hip hit pallet

Identify and describe the location of the incident:

DEPT92-DRY GROCERY

List name, address, and phone number of any witness(es) to the incident:

Kevin Allen: ████████     Kellie Daughtry: ████████
Bessemer,AL 35020     Helena,AL 35080

Name of associate the incident was reported to and/or other associates in the area:

Glenda Washnurn, Roman Cooper

**IT IS UNLAWFUL FOR ANY PERSON TO OBTAIN ANY BENEFIT BY FRAUD. ANY PERSON KNOWINGLY DOING SO MAY BE EXPOSED TO POTENTIAL CRIMINAL AND/OR CIVIL PENALTIES.**

Customer Signature: _____    Date: 2020-10-15

Management Signature: _____    Date: 2020-10-15

A copy of this statement will be made available to you upon request.

Revised: 11/20/2019

PLAINTIFF'S EXHIBIT 2
6/22/2023, 1:15 PM











**PLAINTIFF'S EXHIBIT 3**

6/22/2023, 1:18 PM

# Witness Statement



---

First Name: Kevin

Last Name: ████

Address

████████████

Bessemer, AL 35020

Contact Information

    Phone Number:     ████████

    Alternate Contact Number:   ()

    E-Mail Address:

    Best Contact Time(s):   X Morning     Afternoon     Evening

Physical Injury

    Signs of Physical Injury:   X Yes     No

    Description of Injury:

      Pain in ankle and hip unsure of extent of injury

    Observation:

      She slipped and fell after trying to pick up water from it aisle

*It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to potential criminal and/or civil penalties.*

Witness Signature:



Fri, 16 Oct 2020 00:50:08 UTC               Page 1 of 1

**PLAINTIFF'S EXHIBIT 4**

**6/22/2023, 1:46 PM**

## Witness Statement



First Name:    Kellie

Last Name:    ███████

Address

███████████████

Helena, AL 35080

Contact Information

Phone Number:    ████████████

Alternate Contact Number:    ()

E-Mail Address:    kdaughtry4@bellsouth.net

Best Contact Time(s):    Morning    X  Afternoon    X  Evening

Physical Injury

Signs of Physical Injury:    X  Yes    No

Description of Injury:

And ground showing discomfort and pain very shakey and scared

Observation:

The fall had just happened as i was passing by. It was in front of the bottled waters. Water was on the floor and the young lady slipped and hit her hip on a crate on the way down. She was in pain and crying. Said her hip and ankle were hurting.

*It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to potential criminal and/or civil penalties.*

Witness Signature:



Fri, 16 Oct 2020 01:03:23 UTC                                                         Page 1 of 1

**PLAINTIFF'S EXHIBIT 5**

6/22/2023, 1:47 PM

## Associate Witness Statement



---

First Name:     Glenda

Last Name:     Washnurn

Associate Title:     CSM CLERK

Role in Incident:     firstOnScene, additionalWitness

Contact Information

    Phone Number:     ███████████

    E-Mail Address:

Work Shifts:          Morning        X  Afternoon        X  Evening

Best Contact Time(s):     Morning        X  Afternoon        X  Evening

Physical Injury

    Signs of Physical Injury:     X  Yes                     No

    Description of Injury:

        The customer was not able to move her ankle or put weight on the ankle.

    Observation:

        Customer was sitting on the floor complaining of right hip and right ankle pain. She
said she was reaching for water on the top shelf, slipped and hit her hip against a
water pallet and twisted her ankle. I did see water on the floor. The customer had on
sturdy running shoes and shorts

***It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to
potential criminal and/or civil penalties.***

Witness Signature:



Fri, 16 Oct 2020 01:20:42 UTC                                                                 Page 1 of 1

**PLAINTIFF'S EXHIBIT 6**

**6/22/2023, 1:48 PM**

## Associate Witness Statement



First Name:   Roman

Last Name:   Cooper

Associate Title:   SUPPORT MGR

Role in Incident:   reporter

Contact Information

    Phone Number:   ████████████

    E-Mail Address:

Work Shifts:          Morning          Afternoon          X  Evening

Best Contact Time(s):   Morning      X  Afternoon      X  Evening

Physical Injury

    Signs of Physical Injury:      X  Yes                    No

    Description of Injury:

        Customer was in discomfort on the floor and was unable to move her ankle

    Observation:

        When i arrived at the inncident the customer in question was on the floor in
        considerable discomfort and was unable to move her ankle

*It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to potential criminal and/or civil penalties.*

Witness Signature:

Fri, 16 Oct 2020 01:23:43 UTC

Page 1 of 1

PLAINTIFF'S EXHIBIT 7
6/22/2023, 1:50 PM

# Claim # L0415226

- Your form has been sent to the claims division.
- Please PRINT THIS FORM for your records before returning to main screen.



## STORE TYPE

Store/Location number : 4189
Base division number : 01 - WAL-MART STORES INC.

## STORE/LOCATION INFORMATION

Address : 335 HELENA MARKETPLACE,HELENA,AL,35080
Phone : 205-624-1640
Manager : GARDNER, ELIZABETH
Division charged :
Section code :

## CLAIM TYPE

Type of Incident : SLIP/FALL/TRIP Claim involving a customer/member that alleges slip, fall, or trip.

## SLIP/FALL INFORMATION

Type of floor :
Defects ? —
Number of photos taken :
Was surface clean ? —
Description :
Was surface dry ? —
Description :
Obstructions ? —
Description :
If obstruction merchandise, its UPC# :
Item# :
Substance :
Source of substance :
Amount :
Condition of substance :
Customer wearing glasses ? —
Carrying bundles/objects ? —
Pushing cart ? —
Shoe type :
Weather conditions ?

## INCIDENT GENERAL INFORMATION

Date of loss : 10/15/2020 7:20:00 PM
Date facility notified of loss : 10/15/2020
Accident State : AL
Claim description : The customer was reaching to grab some water off the shelf and slipped and fell hitting her hip on the pallet and feeling pain in her hip and ankle
Does incident involve BI, PD, or both ? Bodily Injury
Was medical treatment sought at time of incident or mentioned by the customer/member ? __

### Incident Location Information

Did incident happen on premises ? Yes
Address where injury occurred : 335 HELENA MARKETPLACE,HELENA,AL,35080
Phone :

### Witness Information

Name : Kevin
Address : ▮▮▮▮▮Bessemer,AL,35020
Phone : ▮▮▮▮▮

### Associate with facts relating to loss

Name : Washnurn,Glenda
Title : CSM CLERK

### Associate first on scene

Name : Washnurn,Glenda

Title : CSM CLERK

**Store Contact Information**

Name :

Shift : —

Work Phone :

**Preparer**

Name : Cooper,Roman

Title : SUPPORT MGR

Shift : —

**Claimant # 1**

Name :

Associate ? —

Sex :

Address : ███████████,Calera,AL,35040

Home Phone # :

Work Phone # :

Birthdate :

Driver's License # :

Did customer continue to shop ?

Was Claimant a Minor ? No

Type of Injuries/Complaints : Pain in hip and ankle unkown extent of injury

Was ambulance called ? Yes

Was MD or hospital involved ? —

**Companion Information**

Did claimant have a companion ? No

Companion Name : —

Address :

Phone :

**Medical Provider Information**

Medical provider name :

Address :

Phone :

Back

Case 2:22-cv-01306-AMM   Document 18-1   Filed 08/14/23   Page 13 of 102





201021235

# Claim # L0415226

- **You must <u>immediately search for and preserve</u> any and all information and evidence related to this incident. Please follow the guidelines on the Evidence Collection Sheet and Document Preservation Directive.**

- **Your form has been sent to the claims division.**
- **Please PRINT THIS FORM for your records before returning to main screen.**

## STORE TYPE

Store/Location Number : 4189
Base Division Number : 01 - WAL-MART STORES INC.

## STORE LOCATION INFORMATION

Address : 335 HELENA MARKETPLACE , HELENA , AL, 35080
Phone : 205-624-1640
Manager : GARDNER, ELIZABETH

## Claim Type

Type of Incident : SF - SLIP/FALL/TRIP Claim involving a customer/member that alleges slip, fall, or trip.

## Incident General Information

Date of Incident : 10/15/2020 7:20:00 PM
When was the incident first reported to the company ? 10/15/2020
Incident Type : Slip/Fall Same Level
Incident State : AL
Description of Incident : The customer was reaching to grab some water off the shelf and slipped and fell hitting her hip on the pallet and feeling pain in her hip and ankle
What caused the incident : Water
Location in facility where incident occured : DEPT92-DRY GROCERY
Does incident involve BI, PD, or both ? Bodily Injury

## Incident Location Information

Did incident happen on premises ? Yes
Address where injury occurred : 335 HELENA MARKETPLACE , HELENA , AL, 35080

## Witness Information

Was there a customer that witnessed the incident ? Yes
Name : ███ Kevin
Address : ███████ Bessemer , AL, 35020
Phone : ███████

## Associate with Facts Relating to Incident

Name : Washnurn,Glenda
Title : CSM CLERK

10/21/2020

**Normal Work Hours :** —

**Associate First on Scene**

**Name :** Washnurn,Glenda

**Title :** CSM CLERK

**Associate Who Took the Report**

**Name :** —, —

**Normal Work Hours :** —

**Work Phone :** —

**Associate Entering Claim into Incident Reporting System**

**Name :** Cooper , Cooper

**Title :** SUPPORT MGR

**Normal Work Hours :** THIRD_SHIFT

**UserID :** r0c01di

## CLAIMANT #1

**Name :** Bennett, Alexandra

**Address :** ██████████ Calera, AL, 35040

**Phone Number :** ██████████

**Email Address :** —

**Did the claimant mention seeking medical attention ?** Yes

**Did the claimant mention wanting something from Walmart/Sam's Club ?** No

**Was Claimant a minor ?** No

**Type of Injuries/Complaints :** Pain in hip and ankle unkown extent of injury

**Did an ambulance respond to the incident ?** Yes

**Does claimant have an attorney or was an attorney mentioned ?** No

**Companion Information**

**Companion Name :**

**Address :** —, —, —, —

**Phone :** —

Goto Main Screen

WIRE Knowhow          Help          Terms and Conditions



PLAINTIFF'S EXHIBIT 8
6/22/2023, 1:55 PM



**Walmart** Claims Services

| **My incident has been reported to WCS and a case manager has been assigned.  What happens next?** | The case manager will collect information such as statements from you, the facility, and potential witnesses. The case manager may also collect photos, video, any other evidence related to the incident. |
| --- | --- |

October 16, 2020

|Alexandra Bennett

Calera, AL  35040|

RE:          Alexandra Bennett
File Number:   9365640
Date of Loss:   10/15/2020
Facility #:      4189
Entity Name:   Walmart Inc.

Dear Alexandra Bennett:

Walmart/Sam's Club values you as a customer/member and regrets that your shopping experience was impacted by the incident/injury you reported while visiting the store/club.

Walmart Claims Services, Inc. administers claims on behalf of the Walmart family of brands ("Walmart") and their insurers.  Your incident was referred to me for review.   It is my responsibility to review the specific facts surrounding your incident to determine if it is payable under the applicable insurance policy.

I hope we have communicated before you receive this letter. If we have not, please call or email me at your earliest opportunity.  If you have call blocking, or a similar feature on your telephone, please allow it to accept calls from my phone number listed below.  Also, on the back of this letter you will find an FAQ section that will provide additional information about the claims process.

I look forward to assisting you and please feel free to reach out to me anytime you have additional information, questions, or concerns.

Thank you for being a loyal Walmart/Sam's Club customer/member.


Sincerely,


**Matt Fowler** - *Case Manager I, Gene*
Phone: 800-527-0566+57776
Fax: 1-877-219-0742
Email: Matthew.Fowler@walmart.com


Reference #:9365640

---

**Walmart Claims Services, Inc.**
**P. O. Box 14731 – Lexington,  KY – 40512-4731**

# FREQUENTLY ASKED QUESTIONS

| | |
|---|---|
| **The collection and review of information has been completed, what is the next step?** | The case manager will contact you and communicate the outcome. This process usually takes between 7-21 days; however, depending on the specific circumstances surrounding the incident, it may take longer. |
| **How is it determined if a payment will be offered to me for my claim?** | If our investigation determines Walmart may have responsibility, a settlement may be offered. |
| **I need to seek medical treatment, what do I do?** | There is no medical payment provision attached to Walmart's insurance policy.  This means that we do not pay providers directly.  You are responsible for the coordination of your medical treatment and the payment of your medical bills. |
| **What happens if the incident/injury IS covered/payable under the policy?** | The case manager may ask you to provide documentation of your damages such as: receipts for repair, medical bills, records and/or sign a Medical Authorization Release form in order to collect medical bills and records.  Once the supporting documentation is received and reviewed, the case manager will contact you to discuss reimbursement of your related expenses which will be in the form of a one-time payment. |
| **I have Medicare, Medicaid, Tricare, private health insurance, or some other form of medical coverage, how do I proceed?** | If it is determined that your claim is covered under the applicable policy, arrangements will be made to reimburse your insurance.<br>We can only consider charges that are reasonable, related, and medically necessary. |
| **What happens if the incident IS NOT covered/payable under the policy?** | A case manager will contact you to explain why the incident is not covered. |
| **How do I handle my vehicle repairs and bills?** | You do not need prior authorization from Walmart Claims Services, Inc to repair your vehicle.  However, we may need to inspect the damages to determine if they are reasonable and related.  Walmart's general liability policy is not like personal auto insurance.  You should handle your repair bills as you normally would. If it is later determined that a settlement offer will be made on your claim for the related damages, arrangements will be made to reimburse you under the policy. |
| **Why are my receipts required if payments are not made directly to the repair shop?** | We review the bills and diagnosis you receive to determine what damages were related to the incident and determine if the damages are covered under the policy. It is helpful if you can collect and provide copies of all your bills and receipts to your case manager. We can only consider damages that are reasonable, related and necessary. |
| **How long do I have to pursue reimbursement for damages?** | Each state has a specific timeframe to pursue reimbursement for damages in absence of litigation.  This period is legally referred to as the Statute of Limitations.  The state of AK has a 2 Year Statute of Limitations from the date of incident. |
| **Do I need to hire an attorney?** | This is a personal decision and we cannot provide guidance to you; most claims we handle are done so without legal representation or litigation.<br>The policy does not provide reimbursement for attorney's fees. |



December 3, 2020

|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|

RE:          Alexandra Bennett
File Number:   9365640
Date of Loss:   10/15/2020
Facility #:      4189
Entity Name:   Walmart Inc.

Dear **Ellise Washington**:

As you know, Walmart Claims Services (WCS) administers liability claims on the behalf of the Walmart family of retail brands and their insurers.

I would like to hear how your client is doing so I may understand the recent status of this claim. If you believe the claim can be resolved at this time, please contact me at your earliest convenience.

If you are unable to contact me via phone, please complete the appropriate responses below and fax back to me at: 1-877-219-0742:

Current Medical Specials: _____   Current Lost Wages: _____

Is the Customer Still Treating?   ☐ YES  ☐ NO    Treating For (condition): _____

If yes, what type of treatment is the customer receiving? _____

Have Medical Records and Bills Been Requested? ☐ YES  ☐ NO

Has Demand Package Been Sent: ☐ YES  ☐ NO    Date Demand Sent (or Will Send): _____

Requested follow up time: ☐ 2 Weeks  ☐ 30 Days  ☐ 60 Days

Sincerely,

**Matt Fowler** - *Case Manager I, Gene*
Phone: 800-527-0566+57776
Fax: 1-877-219-0742
Email: Matthew.Fowler@walmart.com



February 3, 2021


|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|


RE:            Alexandra Bennett
File Number:   9365640
Date of Loss:  10/15/2020
Facility #:    4189
Entity Name:   Walmart Inc.

Dear **Elise Washington**:

As you know, Walmart Claims Services (WCS) administers liability claims on the behalf of the Walmart
family of retail brands and their insurers.

I would like to hear how your client is doing so I may understand the recent status of this claim. If you
believe the claim can be resolved at this time, please contact me at your earliest convenience.

If you are unable to contact me via phone, please complete the appropriate responses below and fax
back to me at: 1-877-219-0742:

Current Medical Specials: _____   Current Lost Wages: _____

Is the Customer Still Treating?      ☐ YES  ☐ NO    Treating For (condition): _____

If yes, what type of treatment is the customer receiving?   _____

Have Medical Records and Bills Been Requested? ☐ YES  ☐ NO

Has Demand Package Been Sent: ☐ YES  ☐ NO   Date Demand Sent (or Will Send): _____

Requested follow up time: ☐ 2 Weeks ☐ 30 Days ☐ 60 Days

Sincerely,


**Matt Fowler** - *Case Manager I, Gene*
Phone: 800-527-0566+57776
Fax: 1-877-219-0742
Email: Matthew.Fowler@walmart.com



May 6, 2021


|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|


RE:          Alexandra Bennett
File Number:   9365640
Date of Loss:   10/15/2020
Facility #:      4189
Entity Name:   Walmart Inc.

Dear          :

As you know, Walmart Claims Services (WCS) administers liability claims on the behalf of the Walmart family of retail brands and their insurers.

Review of my file shows that our last contact with you was on          .  I would like to hear how your client is doing so I may understand the recent status of this claim. If you believe the claim can be resolved at this time, please contact me at your earliest convenience.

If you are unable to contact me via phone, please complete the appropriate responses below and fax back to me at: 1-877-219-0742:

Current Medical Specials:  _____   Current Lost Wages:  _____

Is the Customer Still Treating?      ☐ YES   ☐ NO    Treating For (condition):  _____

If yes, what type of treatment is the customer receiving?  _____

Have Medical Records and Bills Been Requested? ☐ YES   ☐ NO

Has Demand Package Been Sent: ☐ YES   ☐ NO    Date Demand Sent (or Will Send):  _____

Requested follow up time: ☐ 2 Weeks  ☐ 30 Days  ☐ 60 Days

Sincerely,


**Matt Fowler** - *Case Manager I*
Phone: 800-527-0566+57776
Fax: 1-877-219-0742
Email: Matthew.Fowler@walmart.com



June 30, 2021


|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|


RE:           Alexandra Bennett
File Number:   9365640
Date of Loss:  10/15/2020
Facility #:    4189
Entity Name:   Walmart Inc.

Dear        :

As you know, Walmart Claims Services (WCS) administers liability claims on the behalf of the Walmart family of retail brands and their insurers.

Review of my file shows that our last contact with you was on          .  I would like to hear how your client is doing so I may understand the recent status of this claim. If you believe the claim can be resolved at this time, please contact me at your earliest convenience.

If you are unable to contact me via phone, please complete the appropriate responses below and fax back to me at: 1-877-219-0742:

Current Medical Specials: _____   Current Lost Wages: _____

Is the Customer Still Treating?      ☐ YES  ☐ NO   Treating For (condition): _____

If yes, what type of treatment is the customer receiving? _____

Have Medical Records and Bills Been Requested? ☐ YES  ☐ NO

Has Demand Package Been Sent: ☐ YES  ☐ NO   Date Demand Sent (or Will Send): _____

Requested follow up time: ☐ 2 Weeks ☐ 30 Days ☐ 60 Days

Sincerely,


**Matt Fowler** - *Case Manager I*
Phone: 800-527-0566+57776
Fax: 1-877-219-0742
Email: Matthew.Fowler@walmart.com



April 6, 2022


|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|


RE:            Alexandra Bennett
File #:         9365640
Date of Loss:   10/15/2020
Facility #:      4189
Entity Name:    Walmart Inc.

Dear          :

Walmart Claims Services (WCS) has administered retail customer injury and property damage claims for Walmart and its related companies and their insurance companies since 1993. Our company believes in treating customers fairly and in providing excellent customer service. We have been informed that you represent the customer referenced above in a liability claim against one of the Walmart family of retail brands.

The above referenced file has been transferred to me. In order to move forward to resolve this claim in a timely manner, I would like to speak with you at your earliest convenience.

Thank you for your cooperation and assistance in bringing this matter to a close.


Sincerely,


**Yolanda Reyes** - *Case Manager II*
Phone: 800-527-0566+58079
Fax: 877-219-0742
Email: Yolanda.Reyes@walmart.com

---

**Walmart Claims Services, Inc.** - P. O. Box 14731, Lexington,  KY  – 40512-4731

*Walmart Claims Services, Inc. is the administrator for the Walmart family of brands and for certain insurers, including: Walmart Inc..*



May 4, 2022


|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|


RE:            Alexandra Bennett
File Number:   9365640
Date of Loss:  10/15/2020
Facility #:     4189
Entity Name:   Walmart Inc.

Dear Attorney:

Walmart Claims Services Inc. (WCS) administers liability claims on behalf of the Walmart family of retail brands and their insurers.

In an attempt to resolve this matter we would like to extend an offer in the amount of $19,000.00. Additionally, I want to inform you that our settlement release will include a confidentiality clause.

Please send written correspondence of your intention to accept or refuse this offer on or before 05-20-2022.   If we do not receive a reply by this date we will presume the offer has been declined and the offer will be withdrawn.

Thank you for your cooperation and assistance in bringing this matter to a close.  If you have any questions, please feel free to contact me.

Sincerely,


**Yolanda Reyes** - *Case Manager II*
Phone: 800-527-0566+58079
Fax: 877-219-0742
Email: Yolanda.Reyes@walmart.com

**Walmart Claims Services, Inc.** - P. O. Box 14731, Lexington,  KY  – 40512-4731

*Walmart Claims Services, Inc. is the administrator for the Walmart family of brands and for certain insurers, including:*
*Walmart Inc..*

















# Customer Incident Report

| Facility #:<br>4189 | Date of Incident:<br>10 / 15 / 2020 | Time of Incident:<br>07:20 | X<br>am / pm |
|---|---|---|---|

| Legal Name:<br>Alexandra Bennett | |
|---|---|
| Date of Birth:<br>/ / | SSN: |

| Mailing Address:<br>████████████ | | |
|---|---|---|
| City:<br>Calera | State:<br>AL | Zip Code:<br>35040 |

| Home Phone #:<br>████████ | Cell Phone #:<br>████████ | Alternate Phone #:<br>████████ |
|---|---|---|
| Email Address: | | |

Describe in your own words, the events leading up to the incident:

Reaching for water on shelf slipped and fell on floor pain in right hip and ankle. Hip hit pallet

Identify and describe the location of the incident:

DEPT92-DRY GROCERY

List name, address, and phone number of any witness(es) to the incident:

Kevin Allen: ████████  Kellie Daughtry: ████████
Bessemer,AL 35020          Helena,AL 35080

Name of associate the incident was reported to and/or other associates in the area:

Glenda Washnurn, Roman Cooper

**IT IS UNLAWFUL FOR ANY PERSON TO OBTAIN ANY BENEFIT BY FRAUD. ANY PERSON KNOWINGLY DOING SO MAY BE EXPOSED TO POTENTIAL CRIMINAL AND/OR CIVIL PENALTIES.**

Customer Signature: _____  Date: 2020-10-15

Management Signature: _____  Date: 2020-10-15

A copy of this statement will be made available to you upon request.

Revised: 11/20/2019



# Witness Statement

**Walmart**

First Name:   Kevin

Last Name:   ███

Address

███████████████

Bessemer, AL 35020

Contact Information

Phone Number:                    ███████████

Alternate Contact Number:        ()

E-Mail Address:

Best Contact Time(s):        X  Morning          Afternoon              Evening

Physical Injury

Signs of Physical Injury:     X  Yes                        No

Description of Injury:

Pain in ankle and hip unsure of extent of injury

Observation:

She slipped and fell after trying to pick up water from it aisle

*It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to potential criminal and/or civil penalties.*

Witness Signature:



Fri, 16 Oct 2020 00:50:08 UTC                                        Page 1 of 1

# Witness Statement

**Walmart**

First Name:   Kellie

Last Name:   ███████

Address

███████████████████████

Helena, AL 35080

Contact Information

Phone Number:   ███████████

Alternate Contact Number:   ()

E-Mail Address:   ███████████████████

Best Contact Time(s):   Morning   X Afternoon   X Evening

Physical Injury

Signs of Physical Injury:   X Yes   No

Description of Injury:

And ground showing discomfort and pain very shakey and scared

Observation:

The fall had just happened as i was passing by. It was in front of the bottled waters. Water was on the floor and the young lady slipped and hit her hip on a crate on the way down. She was in pain and crying. Said her hip and ankle were hurting.

*It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to potential criminal and/or civil penalties.*

Witness Signature:



Fri, 16 Oct 2020 01:03:23 UTC

Page 1 of 1

# Associate Witness Statement

**Walmart**

First Name:   Glenda

Last Name:   Washnurn

Associate Title:   CSM CLERK

Role in Incident:   firstOnScene, additionalWitness

Contact Information

   Phone Number:   ▮▮▮▮▮▮

   E-Mail Address:

Work Shifts:   Morning   X Afternoon   X Evening

Best Contact Time(s):   Morning   X Afternoon   X Evening

Physical Injury

   Signs of Physical Injury:   X Yes   No

   Description of Injury:

      The customer was not able to move her ankle or put weight on the ankle.

   Observation:

      Customer was sitting on the floor complaining of right hip and right ankle pain. She said she was reaching for water on the top shelf, slipped and hit her hip against a water pallet and twisted her ankle. I did see water on the floor. The customer had on sturdy running shoes and shorts

*It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to potential criminal and/or civil penalties.*

Witness Signature:



Fri, 16 Oct 2020 01:20:42 UTC

Page 1 of 1

# Associate Witness Statement

**Walmart**

First Name:   Roman

Last Name:   Cooper

Associate Title:   SUPPORT MGR

Role in Incident:   reporter

Contact Information

Phone Number:   ████████

E-Mail Address:

| | | | |
|---|---|---|---|
| Work Shifts: | Morning | Afternoon | X Evening |
| Best Contact Time(s): | Morning | X Afternoon | X Evening |

Physical Injury

Signs of Physical Injury:   X Yes        No

Description of Injury:

Customer was in discomfort on the floor and was unable to move her ankle

Observation:

When i arrived at the inncident the customer in question was on the floor in considerable discomfort and was unable to move her ankle

*It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to potential criminal and/or civil penalties.*

Witness Signature:

*[signature]*

Fri, 16 Oct 2020 01:23:43 UTC

Page 1 of 1

## Evidence Collection Sheet



***

### Is surveillance video of the incident available?

Capture minimum of one-hour before and one-hour after which depicts the area where the incident occurred and any condition (e.g., pallet, end-cap, cart) involved. If an identified substance is involved, collect video from the area where the substance was displayed/sold. If no video exists for the area of incident, capture video footage of customer/associate navigating the facility.

Yes    X    No

If surveillance video is not available for this incident, explain here:

I am unsure if there is a camera that goes down said isle

### Is physical evidence for this incident available?

Relating to the incident (e.g., shelf, product, cart). Customers should retain product if they purchased it. Otherwise, the facility should take steps to secure and preserve the product, if possible.

X    Yes      No

Please describe the physical evidence retained:

Water was on floor where the inncident happend

### Are there any additional documents that are related to this incident available?

Examples include; associate medical authorization, work status report, service / maintenance or other associates in the area, vendor presence / involvement, and emergency response services, including related reports, etc.

Yes    X    No

Signature:

_Karan Corn_

Fri, 16 Oct 2020 01:28:19 UTC

Case 2:22-cv-01306-AMM   Document 18-1   Filed 08/14/23   Page 36 of 102

```
** INBOUND NOTIFICATION : FAX RECEIVED SUCCESSFULLY **
```

| TIME RECEIVED | REMOTE CSID | DURATION | PAGES | STATUS |
|---|---|---|---|---|
| August 20, 2021 at 2:58:22 PM EDT | 12054492171 | 2555 | 28 | Received |

To: +18772190742          Page: 01 of 28          2021-08-20 18:15:38 GMT          12054492171          From: Ellise M. Washington

# FAX COVER SHEET

| | |
|---|---|
| TO | Matt Fowler |
| COMPANY | Walmart |
| FAX NUMBER | 18772190742 |
| FROM | Ellise M. Washington |
| DATE | 2021-08-20 18:14:55 GMT |
| RE | almart Case #9365640: Alexandria Bennett's Demand Package Part 3 |

## COVER MESSAGE

See attached for part 3.

[Chart][Alexandria Bennett][262555]

NAME: _Alexandria Bennett_          Room # _A4_

GW#: _264 555_

DOB: ███████████

REFERRED BY: _Candice Harris_

PCP: _Shelly Weisenfeld_

Flu Fx
RT ankle
9 month
S/10

Bone Bruise

MRI

8/20/2021



**ProviderPortal**

# Order Request Summary

## Order ID: 182935134

Request Status:
**Authorized**

Health Plan:
**SCBSAL**

Valid Dates:
**07/14/2021 - 09/11/2021**
Scheduled Date of Service:
**07/14/2021**

Member Information:
**BENNETT , ALEXANDRIA**
Member #: BEG819567794

CALERA , AL 350401136
Date of Birth:
Phone: (000)000-0000

Ordering Provider:
**KRAUSS , BILL**
3686 GRANDVIEW PKWY
STE 430
BIRMINGHAM , AL
352433326
**Phone: (205)503-4060**
Fax: (205)235-9595
NPI: 1780639492

Servicing Provider:
✎ Edit
**BCBS IMAGING PROVIDER**
BCBS IMAGING PROVIDER

BIRMINGHAM , AL 35244-
0000
**Phone:**
Fax:
NPI:
TIN: A12345214

The information below was obtained from the Ordering Provider and has not been independently verified by
AIM. AIM assumes no responsibility for the accuracy of this information or for its consistency with the patient's
medical record.

Please call 866-789-6254 for all Urgent Requests.

REQUESTED EXAMS

| EXAM | REQUEST STATUS | REASON | ACTION |
|---|---|---|---|
| **Lower Extremity Joint/Nonjoint - MRI** Without Contrast Right Ankle | Authorized | Criteria Met | Review Withdraw Exam   Exam |

⚠️❌ = Multiple Decisions Rendered

The Order Number covers one of the following applicable codes when the outcome is Authorized or Completed.

## CPT GROUP DETAILS

| CPT GROUP | CPT DESCRIPTION | CPT GROUP DESCRIPTION |
|---|---|---|
| 73718 | MRI lwr extrm no jnt w/o contrast | Lower Extremity Joint/Nonjoint - MRI |
| 73719 | MRI lwr extrm no jnt w/contrast | Lower Extremity Joint/Nonjoint - MRI |
| 73720 | MRI, lower extremity other than joint; w | Lower Extremity Joint/Nonjoint - MRI |
| 73721 | MRI, lower extremity any joint; wo contr | Lower Extremity Joint/Nonjoint - MRI |
| 73722 | MRI lwr extrm joint, with contrast | Lower Extremity Joint/Nonjoint - MRI |
| 73723 | MRI lwr extr jnt w/o cntrst fwd cnt | Lower Extremity Joint/Nonjoint - MRI |

Total Records Found : 6

The issuance of an Order ID is not a guarantee of benefits; payment is subject to the member's eligibility and plan provisions in effect at the time of service.

**8/20/2021**

Case 2:22-cv-01306-AMM Document 18-1 Filed 08/14/23 Page 40 of 102

** INBOUND NOTIFICATION : FAX RECEIVED SUCCESSFULLY **

| TIME RECEIVED | REMOTE CSID | DURATION | PAGES | STATUS |
|---|---|---|---|---|
| August 24, 2021 at 3:05:06 AM EDT | 12054492171 | 3767 | 51 | Received |

To: +18772190742          Page: 01 of 51          2021-08-24 06:02:09 GMT          12054492171          From: Ellise M. Washington

# FAX COVER SHEET

| TO | Matt Fowler |
|---|---|
| COMPANY | Walmart |
| FAX NUMBER | 18772190742 |
| FROM | Ellise M. Washington |
| DATE | 2021-08-24 06:01:08 GMT |
| RE | Part 2 Alexandria Bennet Demand Package |

## COVER MESSAGE

See attached

8/24/2021

From: Ellise M. Washington     12054492171     2021-08-24 06:02:09 GMT     Page: 02 of 51     To: +18772190742

**Bennett, Alexandria L.  [262555]**

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All

**Show: Expanded Details**

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 51

| | | | | | |
|---|---|---|---|---|---|
| Page: | 51 |
| Date: | 08/06/2021 |
| Time: | 3:45:10 PM |

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 03/17/2021 | | HM | APPLIED TO CHARGE:    Contractual Adjustment [65.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 714920 | ($65.00) | |
| 03/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [136.00] Bcbs Of Alabama; Check; 216033004656868; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 714920<br>PI97: The benefit for this service is included in the payment/allowance for another service/procedure that has already been adjudicated. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. | $0.00 | |
| 03/10/2021 | | * | CLAIM NOTE: Submitted Claim# 714920 to Insurance Plan: Bcbs Of Alabama: $417.00 : Batch# 21102: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 03/10/2021 | 03/09/2021 | LRS | G8427 [0.00 x 1] Billable; Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21; S92.101A] CoPay: $0.00; Visit Type: Office; Visit ID: 618818; Stmt Recipient: Alexandria Bennett<br>Eligible clinician attests to documenting in the medical record | $0.00 | $0.00 |
| 03/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [136.00] Bcbs Of Alabama; Check; 216033004656868; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 714920 | $0.00 | |
| 03/10/2021 | | * | CLAIM NOTE: Submitted Claim# 714920 to Insurance Plan: Bcbs Of Alabama: $417.00 : Batch# 21102: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 03/10/2021 | 03/09/2021 | LRS | G8417 [0.00 x 1] Billable; Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21; S92.101A] CoPay: $0.00; Visit Type: Office; Visit ID: 618818; Stmt Recipient: Alexandria Bennett<br>BMI is documented above normal parameters and a follow-up plan i | $0.00 | $0.00 |
| 03/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [136.00] Bcbs Of Alabama; Check; 216033004656868; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 714920 | $0.00 | |
| 03/10/2021 | | * | CLAIM NOTE: Submitted Claim# 714920 to Insurance Plan: Bcbs Of Alabama: $417.00 : Batch# 21102: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 03/10/2021 | 03/09/2021 | LRS | G9903 [0.00 x 1] Billable; Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21; S92.101A] CoPay: $0.00; Visit Type: Office; Visit ID: 618818; Stmt Recipient: Alexandria Bennett<br>Patient screened for tobacco use and identified as a tobacco non | $0.00 | $0.00 |

From: Ellise M. Washington

12054492171

2021-08-24 06:02:09 GMT

Page: 03 of 51

To: +18772190742

8/24/2021

**Bennett, Alexandria L.  [262555]**

**Southlake Orthopaedics**
**Account Information Report**
**Include:All**

Show: Expanded Details

Calera, AL 35040

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 52
Page:    03 of 51
Date:    08/06/2021
Time:    3:45:10 PM

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 03/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [136.00] Bcbs Of Alabama; Check; 216033004656868; Insurance Plan ID: 1004 (ERA) ClaimID: 714920 | $0.00 | |
| 03/10/2021 | | * | CLAIM NOTE: Submitted Claim# 714920 to Insurance Plan: Bcbs Of Alabama: $417.00 : Batch# 21102: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 03/09/2021 | | BC | NOTE: Printed Demand Statement (3/9/2021) | | |
| 03/09/2021 | | RU | Patient Payment [25.00]; Credit Card - Master Card; CoPay VisitID: 618818 | ($25.00) | |
| 03/10/2021 | 03/09/2021 | LRS | SERVICE LINE TRANSFER - APPLIED TO CHARGE: 99212-25 [71.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP [825.21; S92.101A] CoPay: $25.00; Visit Type: Office; Visit ID: 618818; Stmt Recipient: Alexandria Bennett OFFICE/OUTPATIENT VISIT EST | $25.00 | |
| 03/10/2021 | | LRS | UNAPPLIED FROM PRE-PAY CREDIT  [DUE TO SERVICE LINE TRANSFER] | ($25.00) | |
| 03/09/2021 | | RU | APPLIED TO PRE-PAY CREDIT | $25.00 | |
| 02/17/2021 | | AU | NOTE: Patient included in system generated statement export file on 2/17/2021 | | |
| 02/17/2021 | | HM | Contractual Adjustment [505.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA) Batch: 34305 | ($505.00) | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    73721-RT [1,020.00 x 1] Billable: Wear, Shane  MD, Rendering: Wear, Shane MD Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Krauss, William DO [719.47; M25.571] CoPay: $0.00; Visit Type: MRI; Visit ID: 612003; Stmt Recipient: Alexandria Bennett MRI JNT OF LWR EXTRE W/O DYE ClaimID: 706371 | $505.00 | |
| 02/17/2021 | | HM | Insurance Payment [365.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA) Batch: 34305 | ($365.00) | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    73721-RT [1,020.00 x 1] Billable: Wear, Shane  MD, Rendering: Wear, Shane MD Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Krauss, William DO [719.47; M25.571] CoPay: $0.00; Visit Type: MRI; Visit ID: 612003; Stmt Recipient: Alexandria Bennett MRI JNT OF LWR EXTRE W/O DYE ClaimID: 706371; Deductible: $0.00 ; Co-Pay: $150.00 ; Co-Ins: $0.00 PR3: | $365.00 | |
| 02/17/2021 | | HM | Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA) Batch: 34305 | ($124.00) | |

From: Ellise M. Washington

12054492171

2021-08-24 06:02:09 GMT

Page: 04 of 51

To: +18772190742

8/24/2021

Bennett, Alexandria L.  [262555]

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All
**Show: Expanded Details**

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    G9903 [0.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Patient screened for tobacco use and identified as a tobacco non<br>ClaimID: 706370 | $0.00 | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    99072 [20.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Addtl supplies & time to stop spread of COVID<br>ClaimID: 706370 PI97: The benefit for this service is included in the payment/allowance for another service/procedure that has already been adjudicated. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. | $0.00 | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    G8417 [0.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>BMI is documented above normal parameters and a follow-up plan i<br>ClaimID: 706370 | $0.00 | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    G8427 [0.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Eligible clinician attests to documenting in the medical record<br>ClaimID: 706370 | $0.00 | |

From: Ellise M. Washington

**Bennett, Alexandria L.  [262555]**

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All
Show: Expanded Details

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 54
Page:       56
Date:       08/06/2021
Time:       3:45:10 PM

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:     73610-RT [121.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>X-RAY EXAM OF ANKLE<br>ClaimID: 706370 | $45.00 | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:     99204 [279.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $25.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>OFFICE/OUTPATIENT VISIT NEW<br>ClaimID: 706370; Deductible: $0.00 ; Co-Pay: $25.00 ; Co-Ins: $0.00 | $79.00 | |
| 02/17/2021 | | HM | Contractual Adjustment [175.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>Batch: 34305 | ($175.00) | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:     99204 [279.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $25.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>OFFICE/OUTPATIENT VISIT NEW<br>ClaimID: 706370 | $175.00 | |
| 02/17/2021 | | HM | Contractual Adjustment [76.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>Batch: 34305 | ($76.00) | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:     73610-RT [121.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>X-RAY EXAM OF ANKLE<br>ClaimID: 706370 | $76.00 | |
| 02/17/2021 | | HM | Contractual Adjustment [20.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>Batch: 34305 | ($20.00) | |

12054492171

2021-08-24 06:02:09 GMT

To: +18772190742

8/24/2021

From: Ellise M. Washington

12054492171

2021-08-24 06:02:09 GMT

Page: 06 of 51

To: +18772190742

8/24/2021

Bennett, Alexandria L.  [262555]

███████████████

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All

Show: Expanded Details

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    99072 [20.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Addtl supplies & time to stop spread of COVID<br>ClaimID: 706370 | $20.00 | |
| 02/10/2021 | 02/09/2021 | LRS | 99204 [279.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $25.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>OFFICE/OUTPATIENT VISIT NEW | $279.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Contractual Adjustment [175.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | ($175.00) | |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370; Deductible: $0.00 ; Co-Pay: $25.00 ; Co-Ins: $0.00 | ($79.00) | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 02/10/2021 | | LRS | SERVICE LINE TRANSFER - APPLIED TO CHARGE: Patient Payment [25.00]; Credit Card - Master Card; BCBS; CoPay VisitID: 611928 | ($25.00) | |
| 02/10/2021 | 02/09/2021 | LRS | 73610-RT [121.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>X-RAY EXAM OF ANKLE | $121.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Contractual Adjustment [76.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | ($76.00) | |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | ($45.00) | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |

From: Ellise M. Washington     12054492171     2021-08-24 06:02:09 GMT     Page: 07 of 51     To: +18772190742

**Bennett, Alexandria L.  [262555]**

█████████████

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All

Show: Expanded Details

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 56
Page: 20
Date: 08/06/2021
Time: 3:45:10 PM

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/10/2021 | 02/09/2021 | LRS | G8427 [0.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Eligible clinician attests to documenting in the medical record | $0.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:     Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | $0.00 | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 02/10/2021 | 02/09/2021 | LRS | G8417 [0.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>BMI is documented above normal parameters and a follow-up plan i | $0.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:     Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | $0.00 | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 02/10/2021 | 02/09/2021 | LRS | 99072 [20.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Addtl supplies & time to stop spread of COVID | $20.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:     Contractual Adjustment [20.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | ($20.00) | |
| 02/17/2021 | | HM | APPLIED TO CHARGE:     Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370<br>PI97: The benefit for this service is included in the payment/allowance for another service/procedure that has already been adjudicated. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. | $0.00 | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |

8/24/2021

Bennett, Alexandria L. [262555]

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All
Show: Expanded Details

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 57

| | | |
|---|---|---|
| Page: | | 29 |
| Date: | | 08/06/2021 |
| Time: | | 3:45:10 PM |

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/10/2021 | 02/09/2021 | LRS | G9903 [0.00 x 1] Billable: Krauss, William DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Patient screened for tobacco use and identified as a tobacco non | $0.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | $0.00 | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 02/10/2021 | 02/09/2021 | TH | 73721-RT [1,020.00 x 1] Billable: Wear, Shane  MD; Rendering: Wear, Shane MD<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Krauss, William DO<br>[719.47; M25.571] CoPay: $0.00; Visit Type: MRI; Visit ID: 612003; Stmt Recipient: Alexandria Bennett<br>MRI JNT OF LWR EXTRE W/O DYE | $1,020.00 | $37.50 |
| 07/06/2021 | | HM | SERVICE LINE TRANSFER - APPLIED TO CHARGE: Patient Payment [37.50]; Credit Card - Master Card; | ($37.50) | |
| 07/06/2021 | | HM | UNAPPLIED FROM CHARGE [DUE TO VOID] (VOIDED) Collections Adjustment [75.00] | $75.00 | |
| 05/13/2021 | | KSW | APPLIED TO CHARGE:    (VOIDED) Collections Adjustment [75.00] | ($75.00) | |
| 02/17/2021 | | HM | SERVICE LINE TRANSFER - APPLIED TO CHARGE: Patient Payment [75.00]; Credit Card - Master Card; BCBS | ($75.00) | |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Contractual Adjustment [505.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706371 | ($505.00) | |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [365.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706371; Deductible: $0.00 ; Co-Pay: $150.00 ; Co-Ins: $0.00<br>PR3; | ($365.00) | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706371 to Insurance Plan: Bcbs Of Alabama: $1,020.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 02/09/2021 | | RU | Patient Payment [75.00]; Credit Card - Master Card; BCBS | ($75.00) | |
| 02/17/2021 | 02/09/2021 | HM | SERVICE LINE TRANSFER - APPLIED TO CHARGE: 73721-RT [1,020.00 x 1] Billable: Wear, Shane  MD; Rendering: Wear, Shane MD<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Krauss, William DO<br>[719.47; M25.571] CoPay: $0.00; Visit Type: MRI; Visit ID: 612003; Stmt Recipient: Alexandria Bennett<br>MRI JNT OF LWR EXTRE W/O DYE | $75.00 | |
| 02/17/2021 | | HM | UNAPPLIED FROM PRE-PAY CREDIT  [DUE TO SERVICE LINE TRANSFER] | ($75.00) | |

From: Ellise M. Washington

Bennett, Alexandria L. [262555]

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All
Show: Expanded Details

| | | | | | |
|---|---|---|---|---|---|
| | | | | **Date:** | 08/06/2021 |
| | | | | **Time:** | 3:45:10 PM |

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/09/2021 | | KSW | RE-APPLIED TO PRE-PAY CREDIT [DUE TO CREDIT DETAIL EDIT]; | $75.00 | |
| 02/09/2021 | | KSW | UNAPPLIED FROM PRE-PAY CREDIT | ($75.00) | |
| 02/09/2021 | | RU | APPLIED TO PRE-PAY CREDIT | $75.00 | |
| 02/09/2021 | | RU | Patient Payment [25.00]; Credit Card - Master Card; BCBS; CoPay VisitID: 611928 | ($25.00) | |
| 02/10/2021 | 02/09/2021 | LRS | SERVICE LINE TRANSFER - APPLIED TO CHARGE: 99204 [279.00 x 1] Billable: Krauss, William DO; Rendering: Krauss, William DO Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP [825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $25.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett OFFICE/OUTPATIENT VISIT NEW | $25.00 | |
| 02/10/2021 | | LRS | UNAPPLIED FROM PRE-PAY CREDIT [DUE TO SERVICE LINE TRANSFER] | ($25.00) | |
| 02/09/2021 | | RU | APPLIED TO PRE-PAY CREDIT | $25.00 | |

12054492171

2021-08-24 06:02:09 GMT

To: +18772190742

8/24/2021

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 59



# INVOICE

## Acton Corporation
104 Foothills Parkway
Chelsea, AL 35043

205-408-6030

info@actoncorporation.com

**Invoice #:** 146907
**Invoice Date:** 8/10/2021
**Reference #:** Alexandria Bennett-SLO
**Patient:** ALEXANDRIA2 BENNETT
**Pages:** 22

**Invoice To:**
EMW Law and Associates
info@emwlawllc.com
No Attention Name

**Records From:** SOUTHLAKE ORTHOPEDICS

| Description | Price |
|---|---|
| $ 1.00 Per Page for pages 0 to 22 | $22.00 |
| Processing | $5.00 |
| **Total:** | **$27.00** |

**Invoice Notes**
cw/emailed

## Additional Invoice Language
When paying by check please include your invoice # to ensure proper payment is applied. Please remit payment to: Acton Corporation 104 Foothills Parkway Chelsea, AL 35043 Phone 205-408-6030. To make payment online please visit https://directrelease.net or actoncorporation.com. Acton is unable to cancel or revise records once the submitted request has been processed. TAX ID# 72-1355541.

# INVOICE



**Acton Corporation**
104 Foothills Parkway
Chelsea, AL 35043

205-408-6030

info@actoncorporation.com

**Invoice #:** 146908
**Invoice Date:** 8/10/2021
**Reference #:** Alexandria Bennett-SLo
**Patient:** ALEXANDRIA BENNETT
**Pages:** 64

## Invoice To:
EMW Law and Associates
elise@emwlawllc.com
Elise Washington

## Records From:   SOUTHLAKE ORTHOPEDICS

| Description | Price |
|---|---|
| $ 1.00 Per Page for pages 0 to 25 | $25.00 |
| $ 0.50 Per Page for pages 25 to 64 | $19.50 |
| Processing | $5.00 |
| **Total:** | **$49.50** |

## Invoice Notes
kg/emailed link

## Additional Invoice Language
When paying by check please include your invoice # to ensure proper payment is
applied. Please remit payment to: Acton Corporation 104 Foothills Parkway Chelsea,
AL 35043 Phone 205-408-6030. To make payment online please visit
https://directrelease.net or actoncorporation.com. Acton is unable to cancel or revise
records once the submitted request has been processed. TAX ID# 72-1355541.

8/24/2021

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 61

# Cover Page

|  |  |
|---|---|
| **Practice Name:** | Southlake Orthopaedics Sports Medicine and Spine Center PC |
| **Practice Address:** | 4517 Southlake Parkway |
|  | Birmingham, AL 35244-3280 |
| **Practice Phone:** | (205) 985-4111 |
| **Patient Name:** | Alexandria L. Bennett |
| **Patient ID:** | 262555 |
| **Other ID:** |  |
| **Patient DOB:** | ▮▮▮▮▮ |
| **Date Type:** | Visit Date |
| **Date Range:** | '10/15/2020' - '08/06/2021' |
| **Document Types:** | ALL |
| **User ID:** | 1404 |
| **Page Count:** | 66 |

[Page 1 of 66]

Case 2:22-cv-01306-AMM  Document 18-1  Filed 08/14/23  Page 52 of 102

Alexandria Bennett Wade 6/2021 Page# 35862D
Demand Package Page# 62

## Medication History     Alphabetical  View

### bupropion HCl SR 100 mg tablet,12 hr sustained-release                    **Discontinued**

| 01/07/2021 | **Prescribed** | null | Provider: CANDACE HARRIS |
| | | Est. Completion: -- | User: lbohorfoush |
| | | Created: 02/09/2021 12:00AM | |
| 07/26/2021 | **Discontinued** | Discontinued by Patient | Provider: CANDACE HARRIS |
| | | Medication Intolerance | User: lbohorfoush |
| | | Created: 07/26/2021  4:46PM | |

### fluconazole 100 mg tablet                    **Discontinued**

| 01/07/2021 | **Prescribed** | null | Provider: CANDACE HARRIS |
| | | Est. Completion: -- | User: lbohorfoush |
| | | Created: 02/09/2021 12:00AM | |
| 07/26/2021 | **Discontinued** | Discontinued by Patient | Provider: CANDACE HARRIS |
| | | Medication Intolerance | User: lbohorfoush |
| | | Created: 07/26/2021  4:46PM | |

### hydrocodone 7.5 mg-acetaminophen 325 mg tablet                    **Active**

**SIG:** take 1 tablet by oral route every 6 hours as needed for pain

| 07/30/2021 | **Prescribed** | DISP: (28) Tablet with 0 refills | Provider: William Krauss DO |
| | | Est. Completion: -- | User: lbohorfoush |
| | | Created: 07/30/2021  8:03AM | |
| | | Printed: 07/30/2021 | |

### ketorolac 10 mg tablet                    **Active**

**SIG:** take 1 tablet (10 mg) by oral route every 6 hours as needed not to exceed 40mg in 24hrs for up to 5 days total  use

| 08/06/2021 | **Prescribed** | DISP: (20) Tablet with 0 refills | Provider: William Krauss DO |
| | | Est. Completion: -- | User: rrood |
| | | Created: 08/06/2021 11:32AM | |

### meloxicam 15 mg tablet                    **Discontinued**

| 01/25/2021 | **Prescribed** | null | Provider: |
| | | Est. Completion: -- | User: lbohorfoush |
| | | Created: 02/09/2021 12:00AM | |
| 07/26/2021 | **Discontinued** | Discontinued by Patient | Provider: -- |
| | | Medication Intolerance | User: lbohorfoush |
| | | Created: 07/26/2021  4:46PM | |

### metronidazole 500 mg tablet                    **Discontinued**

| 01/07/2021 | **Prescribed** | null | Provider: CANDACE HARRIS |
| | | Est. Completion: -- | User: lbohorfoush |

[Page 2 of 66]

8/24/2021

Case 2:22-cv-01306-AMM   Document 18-1   Filed 08/14/23   Page 53 of 102

[Chart][Alexandria Bennett][262555]

Alexandria Bennett Walk-In Center#5-63632D
Demand Package Page# 63

Created: 02/09/2021 12:00AM

| | | | |
|---|---|---|---|
| 07/26/2021 | **Discontinued** | Discontinued by Patient | Provider: CANDACE HARRIS |
| | | Medication Intolerance | User: lbohorfoush |
| | | Created: 07/26/2021  4:46PM | |

[Page 3 of 66]

**8/24/2021**

Case 2:22-cv-01306-AMM   Document 18-1   Filed 08/14/23   Page 54 of 102

[Chart][Alexandria Bennett][262555]

Alexandria Bennett Walker (236/2021) Page# 64
Demand Package Page# 64

**Allergy Shot Record** : none listed

**8/24/2021**



# Claim # L0415226

- **Your form has been sent to the claims division.**
- **Please PRINT THIS FORM for your records before returning to main screen.**



## STORE TYPE

Store/Location number : 4189
Base division number : 01 - WAL-MART STORES INC.

## STORE/LOCATION INFORMATION

Address : 335 HELENA MARKETPLACE,HELENA,AL,35080
Phone : 205-624-1640
Manager : GARDNER, ELIZABETH
Division charged :
Section code :

## CLAIM TYPE

Type of Incident : SLIP/FALL/TRIP Claim involving a customer/member that alleges slip, fall, or trip.

## SLIP/FALL INFORMATION

Type of floor :
Defects ? —
Number of photos taken :
Was surface clean ? —
Description :
Was surface dry ? —
Description :
Obstructions ? —
Description :
If obstruction merchandise, its UPC# :
Item# :
Substance :
Source of substance :
Amount :
Condition of substance :
Customer wearing glasses ? —
Carrying bundles/objects ? —
Pushing cart ? —
Shoe type :
Weather conditions ?

## INCIDENT GENERAL INFORMATION

Date of loss : 10/15/2020 7:20:00 PM
Date facility notified of loss : 10/15/2020
Accident State : AL
Claim description : The customer was reaching to grab some water off the shelf and slipped and fell hitting her hip on the pallet and feeling pain in her hip and ankle
Does incident involve BI, PD, or both ? Bodily Injury
Was medical treatment sought at time of incident or mentioned by the customer/member ? —

### Incident Location Information

Did incident happen on premises ? Yes
Address where injury occurred : 335 HELENA MARKETPLACE,HELENA,AL,35080
Phone :

### Witness Information

Name : ████. Kevin
Address : ████████████████████
Phone : ████████████

### Associate with facts relating to loss

Name : Washnurn,Glenda
Title : CSM CLERK

### Associate first on scene

Name : Washnurn,Glenda

Title : CSM CLERK

**Store Contact Information**

Name :

Shift : —

Work Phone :

**Preparer**

Name : Cooper,Roman

Title : SUPPORT MGR

Shift : —

**Claimant # 1**

Name :

Associate ? —

Sex :

Address : ███████████████████████

Home Phone # : ██████████

Work Phone # :

Birthdate :

Driver's License # :

Did customer continue to shop ?

Was Claimant a Minor ? No

Type of Injuries/Complaints : Pain in hip and ankle unkown extent of injury

Was ambulance called ? Yes

Was MD or hospital involved ?

**Companion Information**

Did claimant have a companion ? No

Companion Name : —

Address :

Phone :

**Medical Provider Information**

Medical provider name :

Address :

Phone :

[ Back ]

Incident Reporting System



My Favorites    Email     Directory    Me@Wal-Mart    ...ledge
Center         Search     Logout


201021235

# Claim # L0415226

- **You must <u>immediately search for and preserve</u> any and all information and evidence related to this incident. Please follow the guidelines on the Evidence Collection Sheet and Document Preservation Directive.**

- **Your form has been sent to the claims division.**
- **Please PRINT THIS FORM for your records before returning to main screen.**

**STORE TYPE**

Store/Location Number : **4189**
Base Division Number : **01 - WAL-MART STORES INC.**

**STORE LOCATION INFORMATION**

Address : **335 HELENA MARKETPLACE , HELENA , AL, 35080**
Phone : **205-624-1640**
Manager : **GARDNER, ELIZABETH**

**Claim Type**

Type of Incident : **SF - SLIP/FALL/TRIP Claim involving a customer/member that alleges slip, fall, or trip.**

**Incident General Information**

Date of Incident : **10/15/2020 7:20:00 PM**
When was the incident first reported to the company ? **10/15/2020**
Incident Type : **Slip/Fall Same Level**
Incident State : **AL**
Description of Incident : **The customer was reaching to grab some water off the shelf and slipped and fell hitting her hip on the pallet and feeling pain in her hip and ankle**
What caused the incident : **Water**
Location in facility where incident occured : **DEPT92-DRY GROCERY**
Does incident involve BI, PD, or both ? **Bodily Injury**

**Incident Location Information**

Did incident happen on premises ? **Yes**
Address where injury occurred : **335 HELENA MARKETPLACE , HELENA , AL, 35080**

**Witness Information**

Was there a customer that witnessed the incident ? **Yes**
Name : ▓▓▓ **Kevin**
Address : ▓▓▓▓▓▓▓▓▓ **Bessemer , AL, 35020**
Phone : ▓▓▓▓▓▓▓▓

**Associate with Facts Relating to Incident**

Name : **Washnurn,Glenda**
Title : **CSM CLERK**

1.2

**10/21/2020**

**Normal Work Hours : —**
**Associate First on Scene**
**Name : Washnurn,Glenda**
**Title : CSM CLERK**
**Associate Who Took the Report**
**Name : —, —**
**Normal Work Hours : —**
**Work Phone : —**
**Associate Entering Claim into Incident Reporting System**
**Name : Cooper , Cooper**
**Title : SUPPORT MGR**
**Normal Work Hours : THIRD_SHIFT**
**UserID : r0c01di**

**CLAIMANT #1**

**Name : Bennett, Alexandra**
**Address : ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Calera, AL, 35040**
**Phone Number : ▮▮▮▮▮▮▮▮**
**Email Address : —**
**Did the claimant mention seeking medical attention ?** Yes
**Did the claimant mention wanting something from Walmart/Sam's Club ?** No
**Was Claimant a minor ?** No
**Type of Injuries/Complaints :** Pain in hip and ankle unkown extent of injury
**Did an ambulance respond to the incident ?** Yes
**Does claimant have an attorney or was an attorney mentioned ?** No
**Companion Information**
**Companion Name :**
**Address : —, —, —, —**
**Phone : —**

Goto Main Screen

WIRE Knowhow          Help          Terms and Conditions



**PLAINTIFF'S EXHIBIT 8**
**6/22/2023, 1:55 PM**



## Walmart Claims Services

| My incident has been reported to WCS and a case manager has been assigned.  What happens next? | The case manager will collect information such as statements from you, the facility, and potential witnesses. The case manager may also collect photos, video, any other evidence related to the incident. |
|---|---|

October 16, 2020

|Alexandra Bennett

Calera, AL  35040|

RE:          Alexandra Bennett
File Number:   9365640
Date of Loss:   10/15/2020
Facility #:      4189
Entity Name:   Walmart Inc.

Dear Alexandra Bennett:

Walmart/Sam's Club values you as a customer/member and regrets that your shopping experience was impacted by the incident/injury you reported while visiting the store/club.

Walmart Claims Services, Inc. administers claims on behalf of the Walmart family of brands ("Walmart") and their insurers.  Your incident was referred to me for review.   It is my responsibility to review the specific facts surrounding your incident to determine if it is payable under the applicable insurance policy.

I hope we have communicated before you receive this letter. If we have not, please call or email me at your earliest opportunity.  If you have call blocking, or a similar feature on your telephone, please allow it to accept calls from my phone number listed below.  Also, on the back of this letter you will find an FAQ section that will provide additional information about the claims process.

I look forward to assisting you and please feel free to reach out to me anytime you have additional information, questions, or concerns.

Thank you for being a loyal Walmart/Sam's Club customer/member.


Sincerely,


**Matt Fowler** - *Case Manager I, Gene*
Phone: 800-527-0566+57776
Fax: 1-877-219-0742
Email: Matthew.Fowler@walmart.com




Reference #:9365640

# FREQUENTLY ASKED QUESTIONS

| | |
|---|---|
| **The collection and review of information has been completed, what is the next step?** | The case manager will contact you and communicate the outcome. This process usually takes between 7-21 days; however, depending on the specific circumstances surrounding the incident, it may take longer. |
| **How is it determined if a payment will be offered to me for my claim?** | If our investigation determines Walmart may have responsibility, a settlement may be offered. |
| **I need to seek medical treatment, what do I do?** | There is no medical payment provision attached to Walmart's insurance policy.  This means that we do not pay providers directly.  You are responsible for the coordination of your medical treatment and the payment of your medical bills. |
| **What happens if the incident/injury IS covered/payable under the policy?** | The case manager may ask you to provide documentation of your damages such as: receipts for repair, medical bills, records and/or sign a Medical Authorization Release form in order to collect medical bills and records.  Once the supporting documentation is received and reviewed, the case manager will contact you to discuss reimbursement of your related expenses which will be in the form of a one-time payment. |
| **I have Medicare, Medicaid, Tricare, private health insurance, or some other form of medical coverage, how do I proceed?** | If it is determined that your claim is covered under the applicable policy, arrangements will be made to reimburse your insurance.<br>We can only consider charges that are reasonable, related, and medically necessary. |
| **What happens if the incident IS NOT covered/payable under the policy?** | A case manager will contact you to explain why the incident is not covered. |
| **How do I handle my vehicle repairs and bills?** | You do not need prior authorization from Walmart Claims Services, Inc to repair your vehicle.  However, we may need to inspect the damages to determine if they are reasonable and related.  Walmart's general liability policy is not like personal auto insurance.  You should handle your repair bills as you normally would. If it is later determined that a settlement offer will be made on your claim for the related damages, arrangements will be made to reimburse you under the policy. |
| **Why are my receipts required if payments are not made directly to the repair shop?** | We review the bills and diagnosis you receive to determine what damages were related to the incident and determine if the damages are covered under the policy. It is helpful if you can collect and provide copies of all your bills and receipts to your case manager. We can only consider damages that are reasonable, related and necessary. |
| **How long do I have to pursue reimbursement for damages?** | Each state has a specific timeframe to pursue reimbursement for damages in absence of litigation.  This period is legally referred to as the Statute of Limitations.  The state of AK has a 2 Year Statute of Limitations from the date of incident. |
| **Do I need to hire an attorney?** | This is a personal decision and we cannot provide guidance to you; most claims we handle are done so without legal representation or litigation.<br>The policy does not provide reimbursement for attorney's fees. |



December 3, 2020

|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|


RE:            Alexandra Bennett
File Number:   9365640
Date of Loss:  10/15/2020
Facility #:    4189
Entity Name:   Walmart Inc.

Dear **Ellise Washington**:

As you know, Walmart Claims Services (WCS) administers liability claims on the behalf of the Walmart
family of retail brands and their insurers.

I would like to hear how your client is doing so I may understand the recent status of this claim. If you
believe the claim can be resolved at this time, please contact me at your earliest convenience.

If you are unable to contact me via phone, please complete the appropriate responses below and fax
back to me at: 1-877-219-0742:

Current Medical Specials: _____   Current Lost Wages: _____

Is the Customer Still Treating?        ☐ YES  ☐ NO    Treating For (condition): _____

If yes, what type of treatment is the customer receiving? _____

Have Medical Records and Bills Been Requested? ☐ YES  ☐ NO

Has Demand Package Been Sent: ☐ YES  ☐ NO   Date Demand Sent (or Will Send): _____

Requested follow up time: ☐ 2 Weeks  ☐ 30 Days  ☐ 60 Days

Sincerely,


**Matt Fowler** - *Case Manager I, Gene*
Phone: 800-527-0566+57776
Fax: 1-877-219-0742
Email: Matthew.Fowler@walmart.com



February 3, 2021


|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|


RE:          Alexandra Bennett
File Number:   9365640
Date of Loss:   10/15/2020
Facility #:      4189
Entity Name:   Walmart Inc.

Dear **Elise Washington**:

As you know, Walmart Claims Services (WCS) administers liability claims on the behalf of the Walmart family of retail brands and their insurers.

I would like to hear how your client is doing so I may understand the recent status of this claim. If you believe the claim can be resolved at this time, please contact me at your earliest convenience.

If you are unable to contact me via phone, please complete the appropriate responses below and fax back to me at: 1-877-219-0742:

Current Medical Specials: _____   Current Lost Wages: _____

Is the Customer Still Treating?   ☐ YES  ☐ NO   Treating For (condition): _____

If yes, what type of treatment is the customer receiving? _____

Have Medical Records and Bills Been Requested? ☐ YES  ☐ NO

Has Demand Package Been Sent: ☐ YES  ☐ NO   Date Demand Sent (or Will Send): _____

Requested follow up time: ☐ 2 Weeks ☐ 30 Days ☐ 60 Days

Sincerely,


**Matt Fowler** - *Case Manager I, Gene*
Phone: 800-527-0566+57776
Fax: 1-877-219-0742
Email: Matthew.Fowler@walmart.com

---



May 6, 2021

|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|

RE:          Alexandra Bennett
File Number:   9365640
Date of Loss:  10/15/2020
Facility #:     4189
Entity Name:   Walmart Inc.

Dear          :

As you know, Walmart Claims Services (WCS) administers liability claims on the behalf of the Walmart family of retail brands and their insurers.

Review of my file shows that our last contact with you was on          .  I would like to hear how your client is doing so I may understand the recent status of this claim. If you believe the claim can be resolved at this time, please contact me at your earliest convenience.

If you are unable to contact me via phone, please complete the appropriate responses below and fax back to me at: 1-877-219-0742:

Current Medical Specials: _____   Current Lost Wages: _____

Is the Customer Still Treating?     ☐ YES   ☐ NO    Treating For (condition): _____

If yes, what type of treatment is the customer receiving?   _____

Have Medical Records and Bills Been Requested? ☐ YES   ☐ NO

Has Demand Package Been Sent: ☐ YES   ☐ NO    Date Demand Sent (or Will Send): _____

Requested follow up time: ☐ 2 Weeks  ☐ 30 Days  ☐ 60 Days

Sincerely,

**Matt Fowler** - *Case Manager I*
Phone: 800-527-0566+57776
Fax: 1-877-219-0742
Email: Matthew.Fowler@walmart.com



June 30, 2021


|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|


RE:          Alexandra Bennett
File Number:    9365640
Date of Loss:   10/15/2020
Facility #:      4189
Entity Name:    Walmart Inc.

Dear          :

As you know, Walmart Claims Services (WCS) administers liability claims on the behalf of the Walmart family of retail brands and their insurers.

Review of my file shows that our last contact with you was on        .  I would like to hear how your client is doing so I may understand the recent status of this claim. If you believe the claim can be resolved at this time, please contact me at your earliest convenience.

If you are unable to contact me via phone, please complete the appropriate responses below and fax back to me at: 1-877-219-0742:

Current Medical Specials: _____   Current Lost Wages: _____

Is the Customer Still Treating?      ☐ YES  ☐ NO   Treating For (condition): _____

If yes, what type of treatment is the customer receiving?   _____

Have Medical Records and Bills Been Requested? ☐ YES  ☐ NO

Has Demand Package Been Sent: ☐ YES  ☐ NO   Date Demand Sent (or Will Send): _____

Requested follow up time: ☐ 2 Weeks ☐ 30 Days ☐ 60 Days

Sincerely,


**Matt Fowler** - *Case Manager I*
Phone: 800-527-0566+57776
Fax: 1-877-219-0742
Email: Matthew.Fowler@walmart.com



April 6, 2022


|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|


RE:          Alexandra Bennett
File #:       9365640
Date of Loss:  10/15/2020
Facility #:    4189
Entity Name:   Walmart Inc.

Dear         :

Walmart Claims Services (WCS) has administered retail customer injury and property damage claims for Walmart and its related companies and their insurance companies since 1993. Our company believes in treating customers fairly and in providing excellent customer service. We have been informed that you represent the customer referenced above in a liability claim against one of the Walmart family of retail brands.

The above referenced file has been transferred to me. In order to move forward to resolve this claim in a timely manner, I would like to speak with you at your earliest convenience.

Thank you for your cooperation and assistance in bringing this matter to a close.

Sincerely,


**Yolanda Reyes** - *Case Manager II*
Phone: 800-527-0566+58079
Fax: 877-219-0742
Email: Yolanda.Reyes@walmart.com

**Walmart Claims Services, Inc.** - P. O. Box 14731, Lexington,  KY  – 40512-4731

*Walmart Claims Services, Inc. is the administrator for the Walmart family of brands and for certain insurers, including:
Walmart Inc..*



May 4, 2022


|Ellise Washington
EWI Law
2100 1st Ave North
BIRMINGHAM, AL  35203|


RE:            Alexandra Bennett
File Number:   9365640
Date of Loss:  10/15/2020
Facility #:    4189
Entity Name:   Walmart Inc.

Dear Attorney:

Walmart Claims Services Inc. (WCS) administers liability claims on behalf of the Walmart family of retail brands and their insurers.

In an attempt to resolve this matter we would like to extend an offer in the amount of $19,000.00. Additionally, I want to inform you that our settlement release will include a confidentiality clause.

Please send written correspondence of your intention to accept or refuse this offer on or before 05-20-2022.   If we do not receive a reply by this date we will presume the offer has been declined and the offer will be withdrawn.

Thank you for your cooperation and assistance in bringing this matter to a close.  If you have any questions, please feel free to contact me.

Sincerely,


**Yolanda Reyes** - *Case Manager II*
Phone: 800-527-0566+58079
Fax: 877-219-0742
Email: Yolanda.Reyes@walmart.com

---

**Walmart Claims Services, Inc.** - P. O. Box 14731, Lexington,  KY  – 40512-4731

*Walmart Claims Services, Inc. is the administrator for the Walmart family of brands and for certain insurers, including: Walmart Inc..*

















# Customer Incident Report



| Facility #:<br>4189 | Date of Incident:<br>10 / 15 / 2020 | Time of Incident:<br>07:20 | X<br>am / pm |
|---|---|---|---|

| Legal Name:<br>Alexandra Bennett | |
|---|---|
| Date of Birth:<br>/ / | SSN: |

| Mailing Address:<br>██████████████ | | |
|---|---|---|
| City:<br>Calera | State:<br>AL | Zip Code:<br>35040 |

| Home Phone #:<br>██████████ | Cell Phone #:<br>██████████ | Alternate Phone #:<br>██████████ |
|---|---|---|

| Email Address: |
|---|

Describe in your own words, the events leading up to the incident:

Reaching for water on shelf slipped and fell on floor pain in right hip and ankle. Hip hit pallet

Identify and describe the location of the incident:

DEPT92-DRY GROCERY

List name, address, and phone number of any witness(es) to the incident:

Kevin Allen: ██████████  Kellie Daughtry: ██████████
Bessemer,AL 35020  Helena,AL 35080

Name of associate the incident was reported to and/or other associates in the area:

Glenda Washnurn, Roman Cooper

**IT IS UNLAWFUL FOR ANY PERSON TO OBTAIN ANY BENEFIT BY FRAUD. ANY PERSON KNOWINGLY DOING SO MAY BE EXPOSED TO POTENTIAL CRIMINAL AND/OR CIVIL PENALTIES.**

Customer Signature: _____  Date: 2020-10-15

Management Signature: _____  Date: 2020-10-15

A copy of this statement will be made available to you upon request.

Revised: 11/20/2019

# Witness Statement

First Name:   Kevin

Last Name:   ███

Address

███████████

Bessemer, AL 35020

Contact Information

    Phone Number:   ████████

    Alternate Contact Number:   ()

    E-Mail Address:

    Best Contact Time(s):   X Morning      Afternoon      Evening

Physical Injury

    Signs of Physical Injury:   X Yes                No

    Description of Injury:

        Pain in ankle and hip unsure of extent of injury

    Observation:

        She slipped and fell after trying to pick up water from it aisle

*It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to potential criminal and/or civil penalties.*

Witness Signature:



Fri, 16 Oct 2020 00:50:08 UTC

Page 1 of 1

## Witness Statement

**Walmart** ✳

---

First Name:  Kellie

Last Name:  ███████

Address

███████████████████

Helena, AL 35080

Contact Information

  Phone Number:  ████████████

  Alternate Contact Number:  ()

  E-Mail Address:  ████████████████████

  Best Contact Time(s):      Morning    X Afternoon       X Evening

Physical Injury

  Signs of Physical Injury:    X Yes              No

  Description of Injury:

  And ground showing discomfort and pain very shakey and scared

  Observation:

  The fall had just happened as i was passing by. It was in front of the bottled waters.
  Water was on the floor and the young lady slipped and hit her hip on a crate on the
  way down. She was in pain and crying. Said her hip and ankle were hurting.

*It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to potential criminal and/or civil penalties.*

Witness Signature:



Fri, 16 Oct 2020 01:03:23 UTC

Page 1 of 1

# Associate Witness Statement

**Walmart**

First Name:   Glenda

Last Name:   Washnurn

Associate Title:   CSM CLERK

Role in Incident:   firstOnScene, additionalWitness

Contact Information

   Phone Number:   ███████

   E-Mail Address:

Work Shifts:                          Morning           X Afternoon           X Evening

Best Contact Time(s):          Morning           X Afternoon           X Evening

Physical Injury

   Signs of Physical Injury:          X Yes                          No

   Description of Injury:

     The customer was not able to move her ankle or put weight on the ankle.

   Observation:

     Customer was sitting on the floor complaining of right hip and right ankle pain. She
said she was reaching for water on the top shelf, slipped and hit her hip against a
water pallet and twisted her ankle. I did see water on the floor. The customer had on
sturdy running shoes and shorts

***It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to
potential criminal and/or civil penalties.***

Witness Signature:



Fri, 16 Oct 2020 01:20:42 UTC

Page 1 of 1

# Associate Witness Statement

**Walmart**

First Name:   Roman

Last Name:   Cooper

Associate Title:   SUPPORT MGR

Role in Incident:   reporter

Contact Information

Phone Number:   ██████████

E-Mail Address:

| Work Shifts: | Morning | Afternoon | X Evening |
| --- | --- | --- | --- |
| Best Contact Time(s): | Morning | X Afternoon | X Evening |

Physical Injury

Signs of Physical Injury:   X Yes          No

Description of Injury:

Customer was in discomfort on the floor and was unable to move her ankle

Observation:

When i arrived at the inncident the customer in question was on the floor in considerable discomfort and was unable to move her ankle

*It is unlawful for any person to obtain any benefit by fraud. Any person knowingly doing so may be exposed to potential criminal and/or civil penalties.*

Witness Signature:

Fri, 16 Oct 2020 01:23:43 UTC

Page 1 of 1

## Evidence Collection Sheet 

### Is surveillance video of the incident available?

Capture minimum of one-hour before and one-hour after which depicts the area where the incident occurred and any condition (e.g., pallet, end-cap, cart) involved. If an identified substance is involved, collect video from the area where the substance was displayed/sold. If no video exists for the area of incident, capture video footage of customer/associate navigating the facility.

Yes    X    No

If surveillance video is not available for this incident, explain here:

I am unsure if there is a camera that goes down said isle

### Is physical evidence for this incident available?

Relating to the incident (e.g., shelf, product, cart). Customers should retain product if they purchased it. Otherwise, the facility should take steps to secure and preserve the product, if possible.

X    Yes         No

Please describe the physical evidence retained:

Water was on floor where the inncident happend

### Are there any additional documents that are related to this incident available?

Examples include; associate medical authorization, work status report, service / maintenance or other associates in the area, vendor presence / involvement, and emergency response services, including related reports, etc.

Yes    X    No

Signature:

Fri, 16 Oct 2020 01:28:19 UTC

Case 2:22-cv-01306-AMM  Document 18-1  Filed 08/14/23  Page 80 of 102

** INBOUND NOTIFICATION : FAX RECEIVED SUCCESSFULLY **

| TIME RECEIVED | REMOTE CSID | DURATION | PAGES | STATUS |
|---|---|---|---|---|
| August 20, 2021 at 2:58:22 PM EDT | 12054492171 | 2555 | 28 | Received |

To: +18772190742          Page: 01 of 28          2021-08-20 18:15:38 GMT          12054492171          From: Ellise M. Washington

# FAX COVER SHEET

| TO | Matt Fowler |
|---|---|
| COMPANY | Walmart |
| FAX NUMBER | 18772190742 |
| FROM | Ellise M. Washington |
| DATE | 2021-08-20 18:14:55 GMT |
| RE | almart Case # 9365640: Alexandria Bennett's Demand |

Package Part 3

## COVER MESSAGE

See attached for part 3.

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 101

NAME: *Alexandria Bennett*          Room # A4

GW#: *264 555*

DOB: ▮▮▮▮▮▮▮▮▮▮

REFERRED BY: *Candace Harris*

PCP: *shelly weisenfield*

Flu Fx
RT ankle
9 month
S/p

Bone Bruise

MRI

8/20/2021



@ProviderPortal.

# Order Request Summary

Order ID: **182935134**

**Request Status:**
Authorized

**Health Plan:**
BCBSAL

**Valid Dates:**
07/14/2021 - 09/11/2021
Scheduled Date of Service:
07/14/2021

**Member Information:**
BENNETT , ALEXANDRIA
Member #: BEG819567794

CALERA , AL 350401135
Date of Birth:
Phone: (000)000-0000

**Ordering Provider:**
KRAUSS , BILL
3686 GRANDVIEW PKWY
STE 430
BIRMINGHAM , AL
352433326
**Phone: (205)503-4060**
Fax: (205)235-9595
NPI: 1780639492

**Servicing Provider:**
✎ Edit
**BCBS IMAGING PROVIDER**
BCBS IMAGING PROVIDER

BIRMINGHAM , AL 35244-0000
**Phone:**
Fax:
NPI:
TIN: A12345214

The information below was obtained from the Ordering Provider and has not been independently verified by AIM. AIM assumes no responsibility for the accuracy of this information or for its consistency with the patient's medical record.

Please call 866-789-6254 for all Urgent Requests.

REQUESTED EXAMS

| EXAM | REQUEST STATUS | REASON | ACTION |
|---|---|---|---|
| **Lower Extremity Joint/Nonjoint - MRI** Without Contrast Right Ankle | Authorized | Criteria Met | Review Withdraw Exam Exam |

⚠❌ = Multiple Decisions Rendered

The Order Number covers one of the following applicable codes when the outcome is Authorized or Completed.

8/20/2021

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 103

## CPT GROUP DETAILS

| CPT GROUP | CPT DESCRIPTION | CPT GROUP DESCRIPTION |
|---|---|---|
| 73718 | MRI lwr extrm no jnt w/o contrast | Lower Extremity Joint/Nonjoint – MRI |
| 73719 | MRI lwr extrm no jnt w/contrast | Lower Extremity Joint/Nonjoint – MRI |
| 73720 | MRI, lower extremity other than joint; w | Lower Extremity Joint/Nonjoint – MRI |
| 73721 | MRI, lower extremity any joint; wo contr | Lower Extremity Joint/Nonjoint – MRI |
| 73722 | MRI lwr extrm joint, with contrast | Lower Extremity Joint/Nonjoint – MRI |
| 73723 | MRI lwr extr jnt w/o cntrst fwd cnt | Lower Extremity Joint/Nonjoint – MRI |

Total Records Found : 6

The issuance of an Order ID is not a guarantee of benefits; payment is subject to the member's eligibility and plan provisions in effect at the time of service.

8/20/2021

| TIME RECEIVED | REMOTE CSID | DURATION | PAGES | STATUS |
|---|---|---|---|---|
| August 24, 2021 at 3:05:06 AM EDT | 12054492171 | 3767 | 51 | Received |

# FAX COVER SHEET

| | |
|---|---|
| TO | Matt Fowler |
| COMPANY | Walmart |
| FAX NUMBER | 18772190742 |
| FROM | Ellise M. Washington |
| DATE | 2021-08-24 06:01:08 GMT |
| RE | Part 2 Alexandria Bennet Demand Package |

## COVER MESSAGE

See attached

From: Ellise M. Washington          12054492171          2021-08-24 06:02:09 GMT          Page: 02 of 51          To: +18772190742

**Bennett, Alexandria L. [262555]**

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All

Show: Expanded Details

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 51

| | | | | | |
|---|---|---|---|---|---|
| Page: | 15 |
| Date: | 08/06/2021 |
| Time: | 3:45:10 PM |

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 03/17/2021 | | HM | APPLIED TO CHARGE:   Contractual Adjustment [65.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 714920 | ($65.00) | |
| 03/17/2021 | | HM | APPLIED TO CHARGE:   Insurance Payment [136.00] Bcbs Of Alabama; Check; 216033004656868; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 714920<br>PI97: The benefit for this service is included in the payment/allowance for another service/procedure that has already been adjudicated. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. | $0.00 | |
| 03/10/2021 | | * | CLAIM NOTE: Submitted Claim# 714920 to Insurance Plan: Bcbs Of Alabama: $417.00 : Batch# 21102: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 03/10/2021 | 03/09/2021 | LRS | G8427 [0.00 x 1] Billable; Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21; S92.101A] CoPay: $0.00; Visit Type: Office; Visit ID: 618818; Stmt Recipient: Alexandria Bennett<br>Eligible clinician attests to documenting in the medical record | $0.00 | $0.00 |
| 03/17/2021 | | HM | APPLIED TO CHARGE:   Insurance Payment [136.00] Bcbs Of Alabama; Check; 216033004656868; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 714920 | $0.00 | |
| 03/10/2021 | | * | CLAIM NOTE: Submitted Claim# 714920 to Insurance Plan: Bcbs Of Alabama: $417.00 : Batch# 21102: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 03/10/2021 | 03/09/2021 | LRS | G8417 [0.00 x 1] Billable; Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21; S92.101A] CoPay: $0.00; Visit Type: Office; Visit ID: 618818; Stmt Recipient: Alexandria Bennett<br>BMI is documented above normal parameters and a follow-up plan i | $0.00 | $0.00 |
| 03/17/2021 | | HM | APPLIED TO CHARGE:   Insurance Payment [136.00] Bcbs Of Alabama; Check; 216033004656868; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 714920 | $0.00 | |
| 03/10/2021 | | * | CLAIM NOTE: Submitted Claim# 714920 to Insurance Plan: Bcbs Of Alabama: $417.00 : Batch# 21102: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 03/10/2021 | 03/09/2021 | LRS | G9903 [0.00 x 1] Billable; Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21; S92.101A] CoPay: $0.00; Visit Type: Office; Visit ID: 618818; Stmt Recipient: Alexandria Bennett<br>Patient screened for tobacco use and identified as a tobacco non | $0.00 | $0.00 |

**Bennett, Alexandria L.  [262555]**

████████████████

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All

Show: Expanded Details

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 52
Page:     16
Date:     08/06/2021
Time:     3:45:10 PM

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 03/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [136.00] Bcbs Of Alabama; Check; 216033004656868; Insurance Plan ID: 1004 (ERA) ClaimID: 714920 | $0.00 | |
| 03/10/2021 | | * | CLAIM NOTE: Submitted Claim# 714920 to Insurance Plan: Bcbs Of Alabama: $417.00 : Batch# 21102: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 03/09/2021 | | BC | NOTE: Printed Demand Statement (3/9/2021) | | |
| 03/09/2021 | | RU | Patient Payment [25.00]; Credit Card - Master Card; CoPay VisitID: 618818 | ($25.00) | |
| 03/10/2021 | 03/09/2021 | LRS | SERVICE LINE TRANSFER - APPLIED TO CHARGE: 99212-25 [71.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21; S92.101A] CoPay: $5.00; Visit Type: Office; Visit ID: 618818; Stmt Recipient: Alexandria Bennett<br>OFFICE/OUTPATIENT VISIT EST | $25.00 | |
| 03/10/2021 | | LRS | UNAPPLIED FROM PRE-PAY CREDIT  [DUE TO SERVICE LINE TRANSFER] | ($25.00) | |
| 03/09/2021 | | RU | APPLIED TO PRE-PAY CREDIT | $25.00 | |
| 02/17/2021 | | AU | NOTE: Patient included in system generated statement export file on 2/17/2021 | | |
| 02/17/2021 | | HM | Contractual Adjustment [505.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA) Batch: 34305 | ($505.00) | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    73721-RT [1,020.00 x 1] Billable: Wear, Shane  MD, Rendering: Wear, Shane MD<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Krauss, William DO<br>[719.47; M25.571] CoPay: $0.00; Visit Type: MRI; Visit ID: 612003; Stmt Recipient: Alexandria Bennett<br>MRI JNT OF LWR EXTRE W/O DYE<br>ClaimID: 706371 | $505.00 | |
| 02/17/2021 | | HM | Insurance Payment [365.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA) Batch: 34305 | ($365.00) | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    73721-RT [1,020.00 x 1] Billable: Wear, Shane  MD; Rendering: Wear, Shane MD<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Krauss, William DO<br>[719.47; M25.571] CoPay: $0.00; Visit Type: MRI; Visit ID: 612003; Stmt Recipient: Alexandria Bennett<br>MRI JNT OF LWR EXTRE W/O DYE<br>ClaimID: 706371; Deductible: $0.00 ; Co-Pay: $150.00 ; Co-Ins: $0.00 PR3: | $365.00 | |
| 02/17/2021 | | HM | Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA) Batch: 34305 | ($124.00) | |

From: Ellise M. Washington    12054492171    2021-08-24 06:02:09 GMT    Page: 03 of 51    To: +18772190742    8/24/2021

From: Ellise M. Washington

Bennett, Alexandria L. [262555]

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All
**Show: Expanded Details**

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE: G9903 [0.00 x 1] Billable: Krauss, William DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Patient screened for tobacco use and identified as a tobacco non<br>ClaimID: 706370 | $0.00 | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE: 99072 [20.00 x 1] Billable: Krauss, William DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Addtl supplies & time to stop spread of COVID<br>ClaimID: 706370 PI97: The benefit for this service is included in the payment/allowance for another service/procedure that has already been adjudicated. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. | $0.00 | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE: G8417 [0.00 x 1] Billable: Krauss, William DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>BMI is documented above normal parameters and a follow-up plan i<br>ClaimID: 706370 | $0.00 | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE: G8427 [0.00 x 1] Billable: Krauss, William DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Eligible clinician attests to documenting in the medical record<br>ClaimID: 706370 | $0.00 | |

12054492171   2021-08-24 06:02:09 GMT   Page: 04 of 51   To: +18772190742   8/24/2021

From: Ellise M. Washington

**Bennett, Alexandria L.  [262555]**

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All

Show: Expanded Details

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    73610-RT [121.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>X-RAY EXAM OF ANKLE<br>ClaimID: 706370 | $45.00 | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    99204 [279.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $25.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>OFFICE/OUTPATIENT VISIT NEW<br>ClaimID: 706370; Deductible: $0.00 ; Co-Pay: $25.00 ; Co-Ins: $0.00 | $79.00 | |
| 02/17/2021 | | HM | Contractual Adjustment [175.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>Batch: 34305 | ($175.00) | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    99204 [279.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $25.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>OFFICE/OUTPATIENT VISIT NEW<br>ClaimID: 706370 | $175.00 | |
| 02/17/2021 | | HM | Contractual Adjustment [76.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>Batch: 34305 | ($76.00) | |
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:    73610-RT [121.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>X-RAY EXAM OF ANKLE<br>ClaimID: 706370 | $76.00 | |
| 02/17/2021 | | HM | Contractual Adjustment [20.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>Batch: 34305 | ($20.00) | |

12054492171

2021-08-24 06:02:09 GMT

Page: 05 of 51

To: +18772190742

8/24/2021

From: Ellise M. Washington

**Bennett, Alexandria L.  [262555]**

~~[redacted]~~

~~Calera, AL 35040~~

**Southlake Orthopaedics**
**Account Information Report**
Include:All

Show: Expanded Details

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/17/2021 | 02/09/2021 | HM | APPLIED TO CHARGE:     99072 [20.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Addtl supplies & time to stop spread of COVID<br>ClaimID: 706370 | $20.00 | |
| 02/10/2021 | 02/09/2021 | LRS | 99204 [279.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $25.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>OFFICE/OUTPATIENT VISIT NEW | $279.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:     Contractual Adjustment [175.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | ($175.00) | |
| 02/17/2021 | | HM | APPLIED TO CHARGE:     Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370; Deductible: $0.00 ; Co-Pay: $25.00 ; Co-Ins: $0.00 | ($79.00) | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 02/10/2021 | | LRS | SERVICE LINE TRANSFER - APPLIED TO CHARGE: Patient Payment [25.00]; Credit Card - Master Card; BCBS; CoPay VisitID: 611928 | ($25.00) | |
| 02/10/2021 | 02/09/2021 | LRS | 73610-RT [121.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>X-RAY EXAM OF ANKLE | $121.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:     Contractual Adjustment [76.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | ($76.00) | |
| 02/17/2021 | | HM | APPLIED TO CHARGE:     Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | ($45.00) | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |

12054492171

2021-08-24 06:02:09 GMT

Page: 06 of 51

To: +18772190742

8/24/2021

From: Ellise M. Washington     12054492171     2021-08-24 06:02:09 GMT     Page: 07 of 51     To: +18772190742

**Bennett, Alexandria L.  [262555]**

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All

Show: Expanded Details

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/10/2021 | 02/09/2021 | LRS | G8427 [0.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Eligible clinician attests to documenting in the medical record | $0.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | $0.00 | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 02/10/2021 | 02/09/2021 | LRS | G8417 [0.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>BMI is documented above normal parameters and a follow-up plan i | $0.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | $0.00 | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 02/10/2021 | 02/09/2021 | LRS | 99072 [20.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Addtl supplies & time to stop spread of COVID | $20.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Contractual Adjustment [20.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | ($20.00) | |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370<br>PI97: The benefit for this service is included in the payment/allowance for another service/procedure that has already been adjudicated. Usage: Refer to the 835 Healthcare Policy Identification Segment (loop 2110 Service Payment Information REF), if present. | $0.00 | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |

From: Ellise M. Washington

**Bennett, Alexandria L.  [262555]**

[black redaction bar]

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All

Show: Expanded Details

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/10/2021 | 02/09/2021 | LRS | G9903 [0.00 x 1] Billable: Krauss, William  DO; Rendering: Krauss, William DO<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP<br>[825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $0.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett<br>Patient screened for tobacco use and identified as a tobacco non | $0.00 | $0.00 |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [124.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706370 | $0.00 | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706370 to Insurance Plan: Bcbs Of Alabama: $420.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 02/10/2021 | 02/09/2021 | TH | 73721-RT [1,020.00 x 1] Billable: Wear, Shane  MD; Rendering: Wear, Shane MD<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Krauss, William DO<br>[719.47; M25.571] CoPay: $0.00; Visit Type: MRI; Visit ID: 612003; Stmt Recipient: Alexandria Bennett<br>MRI JNT OF LWR EXTRE W/O DYE | $1,020.00 | $37.50 |
| 07/06/2021 | | HM | SERVICE LINE TRANSFER - APPLIED TO CHARGE: Patient Payment [37.50]; Credit Card - Master Card; | ($37.50) | |
| 07/06/2021 | | HM | UNAPPLIED FROM CHARGE [DUE TO VOID] (VOIDED) Collections Adjustment [75.00] | $75.00 | |
| 05/13/2021 | | KSW | APPLIED TO CHARGE:    (VOIDED) Collections Adjustment [75.00] | ($75.00) | |
| 02/17/2021 | | HM | SERVICE LINE TRANSFER - APPLIED TO CHARGE: Patient Payment [75.00]; Credit Card - Master Card; BCBS | ($75.00) | |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Contractual Adjustment [505.00] Bcbs Of Alabama; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706371 | ($505.00) | |
| 02/17/2021 | | HM | APPLIED TO CHARGE:    Insurance Payment [365.00] Bcbs Of Alabama; Check; 216033004627476; Insurance Plan ID: 1004 (ERA)<br>ClaimID: 706371; Deductible: $0.00 ; Co-Pay: $150.00 ; Co-Ins: $0.00<br>PR3; | ($365.00) | |
| 02/10/2021 | | * | CLAIM NOTE: Submitted Claim# 706371 to Insurance Plan: Bcbs Of Alabama: $1,020.00 : Batch# 20864: Successful Submission: E-File Plan: Navicure 5010: E-File Plan Format: 837-P 5010 | | |
| 02/09/2021 | | RU | Patient Payment [75.00]; Credit Card - Master Card; BCBS | ($75.00) | |
| 02/17/2021 | 02/09/2021 | HM | SERVICE LINE TRANSFER - APPLIED TO CHARGE: 73721-RT [1,020.00 x 1] Billable: Wear, Shane  MD; Rendering: Wear, Shane MD<br>Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Krauss, William DO<br>[719.47; M25.571] CoPay: $0.00; Visit Type: MRI; Visit ID: 612003; Stmt Recipient: Alexandria Bennett<br>MRI JNT OF LWR EXTRE W/O DYE | $75.00 | |
| 02/17/2021 | | HM | UNAPPLIED FROM PRE-PAY CREDIT  [DUE TO SERVICE LINE TRANSFER] | ($75.00) | |

12054492171

2021-08-24 06:02:09 GMT

Page: 06 of 51

To: +18772190742

8/24/2021

From: Ellise M. Washington

**Bennett, Alexandria L.  [262555]**

Calera, AL 35040

**Southlake Orthopaedics**
**Account Information Report**
Include:All

**Show: Expanded Details**

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 58

| | | | | Page: | 22 |
|---|---|---|---|---|---|
| | | | | **Date:** | 08/06/2021 |
| | | | | **Time:** | 3:45:10 PM |

| Posting Date | Service Date | User | Description | Amount | Balance |
|---|---|---|---|---|---|
| 02/09/2021 | | KSW | RE-APPLIED TO PRE-PAY CREDIT [DUE TO CREDIT DETAIL EDIT]; | $75.00 | |
| 02/09/2021 | | KSW | UNAPPLIED FROM PRE-PAY CREDIT | ($75.00) | |
| 02/09/2021 | | RU | APPLIED TO PRE-PAY CREDIT | $75.00 | |
| 02/09/2021 | | RU | Patient Payment [25.00]; Credit Card - Master Card; BCBS; CoPay VisitID: 611928 | ($25.00) | |
| 02/10/2021 | 02/09/2021 | LRS | SERVICE LINE TRANSFER - APPLIED TO CHARGE: 99204 [279.00 x 1] Billable: Krauss, William DO; Rendering: Krauss, William DO Practice Location: Southlake Orthopaedics Grandview; Service Location: Southlake Orthopaedics Grandview; Referring: Roach-Davis, Ramona NP [825.21, 718.87, 732.7; S92.101A, M25.371, M93.20] CoPay: $25.00; Visit Type: Office; Visit ID: 611928; Stmt Recipient: Alexandria Bennett OFFICE/OUTPATIENT VISIT NEW | $25.00 | |
| 02/10/2021 | | LRS | UNAPPLIED FROM PRE-PAY CREDIT  [DUE TO SERVICE LINE TRANSFER] | ($25.00) | |
| 02/09/2021 | | RU | APPLIED TO PRE-PAY CREDIT | $25.00 | |

12054492171

2021-08-24 06:02:09 GMT

Page: 09 of 51

To: +18772190742

8/24/2021

Alexandria Bennett Walmart Case# 9365640
Demand Package Page# 59

Case 2:22-cv-01306-AMM   Document 18-1   Filed 08/14/23   Page 93 of 102



# INVOICE

**Acton Corporation**
104 Foothills Parkway
Chelsea, AL 35043

205-408-6030

info@actoncorporation.com

| | |
|---:|:---|
| **Invoice #:** | 146907 |
| **Invoice Date:** | 8/10/2021 |
| **Reference #:** | Alexandria Bennett-SLO |
| **Patient:** | ALEXANDRIA2 BENNETT |
| **Pages:** | 22 |

**Invoice To:**
EMW Law and Associates
info@emwlawllc.com
No Attention Name

**Records From:**   SOUTHLAKE ORTHOPEDICS

| Description | Price |
|:---|---:|
| $ 1.00 Per Page for pages 0 to 22 | $22.00 |
| Processing | $5.00 |
| **Total:** | **$27.00** |

**Invoice Notes**
cw/emailed

## Additional Invoice Language

When paying by check please include your invoice # to ensure proper payment is applied. Please remit payment to: Acton Corporation 104 Foothills Parkway Chelsea, AL 35043 Phone 205-408-6030. To make payment online please visit https://directrelease.net or actoncorporation.com. Acton is unable to cancel or revise records once the submitted request has been processed. TAX ID# 72-1355541.

**8/24/2021**

# INVOICE



**Acton Corporation**
104 Foothills Parkway
Chelsea, AL 35043

205-408-6030

info@actoncorporation.com

| | |
|---:|:---|
| **Invoice #:** | 146908 |
| **Invoice Date:** | 8/10/2021 |
| **Reference #:** | Alexandria Bennett-SLo |
| **Patient:** | ALEXANDRIA BENNETT |
| **Pages:** | 64 |

## Invoice To:
EMW Law and Associates
elise@emwlawllc.com
Elise Washington

## Records From:   SOUTHLAKE ORTHOPEDICS

| Description | Price |
|:---|:---|
| $ 1.00 Per Page for pages 0 to 25 | $25.00 |
| $ 0.50 Per Page for pages 25 to 64 | $19.50 |
| Processing | $5.00 |
| **Total:** | **$49.50** |

## Invoice Notes
kg/emailed link

## Additional Invoice Language
When paying by check please include your invoice # to ensure proper payment is applied. Please remit payment to: Acton Corporation 104 Foothills Parkway Chelsea, AL 35043 Phone 205-408-6030. To make payment online please visit https://directrelease.net or actoncorporation.com. Acton is unable to cancel or revise records once the submitted request has been processed. TAX ID# 72-1355541.

Case 2:22-cv-01306-AMM   Document 18-1   Filed 08/14/23   Page 95 of 102

# Cover Page

| | |
|---|---|
| **Practice Name:** | Southlake Orthopaedics Sports Medicine and Spine Center PC |
| **Practice Address:** | 4517 Southlake Parkway |
| | Birmingham, AL 35244-3280 |
| **Practice Phone:** | (205) 985-4111 |
| **Patient Name:** | Alexandria L. Bennett |
| **Patient ID:** | 262555 |
| **Other ID:** | |
| **Patient DOB:** | ▇▇▇▇ |
| **Date Type:** | Visit Date |
| **Date Range:** | '10/15/2020' - '08/06/2021' |
| **Document Types:** | ALL |
| **User ID:** | 1404 |
| **Page Count:** | 66 |

8/24/2021

Case 2:22-cv-01306-AMM  Document 18-1  Filed 08/14/23  Page 96 of 102

**Medication History**   Alphabetical  View

---

### bupropion HCl SR 100 mg tablet,12 hr sustained-release                        **Discontinued**

| 01/07/2021 | **Prescribed** | null | Provider: CANDACE HARRIS |
| | | Est. Completion: -- | User: lbohorfoush |
| | | Created: 02/09/2021 12:00AM | |
| 07/26/2021 | **Discontinued** | Discontinued by Patient | Provider: CANDACE HARRIS |
| | | Medication Intolerance | User: lbohorfoush |
| | | Created: 07/26/2021  4:46PM | |

---

### fluconazole 100 mg tablet                        **Discontinued**

| 01/07/2021 | **Prescribed** | null | Provider: CANDACE HARRIS |
| | | Est. Completion: -- | User: lbohorfoush |
| | | Created: 02/09/2021 12:00AM | |
| 07/26/2021 | **Discontinued** | Discontinued by Patient | Provider: CANDACE HARRIS |
| | | Medication Intolerance | User: lbohorfoush |
| | | Created: 07/26/2021  4:46PM | |

---

### hydrocodone 7.5 mg-acetaminophen 325 mg tablet                        **Active**

**SIG:** take 1 tablet by oral route every 6 hours as needed for pain

| 07/30/2021 | **Prescribed** | DISP: (28) Tablet with 0 refills | Provider: William Krauss DO |
| | | Est. Completion: -- | User: lbohorfoush |
| | | Created: 07/30/2021  8:03AM | |
| | | Printed: 07/30/2021 | |

---

### ketorolac 10 mg tablet                        **Active**

**SIG:** take 1 tablet (10 mg) by oral route every 6 hours as needed not to exceed 40mg in 24hrs for up to 5 days total  use

| 08/06/2021 | **Prescribed** | DISP: (20) Tablet with 0 refills | Provider: William Krauss DO |
| | | Est. Completion: -- | User: rrood |
| | | Created: 08/06/2021 11:32AM | |

---

### meloxicam 15 mg tablet                        **Discontinued**

| 01/25/2021 | **Prescribed** | null | Provider: |
| | | Est. Completion: -- | User: lbohorfoush |
| | | Created: 02/09/2021 12:00AM | |
| 07/26/2021 | **Discontinued** | Discontinued by Patient | Provider: -- |
| | | Medication Intolerance | User: lbohorfoush |
| | | Created: 07/26/2021  4:46PM | |

---

### metronidazole 500 mg tablet                        **Discontinued**

| 01/07/2021 | **Prescribed** | null | Provider: CANDACE HARRIS |
| | | Est. Completion: -- | User: lbohorfoush |

**8/24/2021**

Case 2:22-cv-01306-AMM   Document 18-1   Filed 08/14/23   Page 97 of 102

[Chart][Alexandria Bennett][262555]

Alexandria Bennett Warren Case #3636261D
Demand Package Page# 63

Created: 02/09/2021 12:00AM

| | | | |
|---|---|---|---|
| 07/26/2021 | **Discontinued** | Discontinued by Patient | Provider: CANDACE HARRIS |
| | | Medication Intolerance | User: lbohorfoush |
| | | Created: 07/26/2021  4:46PM | |

[Page 3 of 66]

**8/24/2021**

Case 2:22-cv-01306-AMM   Document 18-1   Filed 08/14/23   Page 98 of 102
[Chart][Alexandria Bennett][262555]

Alexandria Bennett Warren Case #36361D
Demand Package Page# 64

**Allergy Shot Record** : none listed

**8/24/2021**



## Claim # L0415226



- Your form has been sent to the claims division.
- Please PRINT THIS FORM for your records before returning to main screen.

### STORE TYPE

Store/Location number : 4189
Base division number : 01 - WAL-MART STORES INC.

### STORE/LOCATION INFORMATION

Address : 335 HELENA MARKETPLACE,HELENA,AL,35080
Phone : 205-624-1640
Manager : GARDNER, ELIZABETH
Division charged :
Section code :

### CLAIM TYPE

Type of Incident : SLIP/FALL/TRIP Claim involving a customer/member that alleges slip, fall, or trip.

### SLIP/FALL INFORMATION

Type of floor :
Defects ? —
Number of photos taken :
Was surface clean ? —
Description :
Was surface dry ? —
Description :
Obstructions ? —
Description :
If obstruction merchandise, its UPC# :
Item# :
Substance :
Source of substance :
Amount :
Condition of substance :
Customer wearing glasses ? —
Carrying bundles/objects ? —
Pushing cart ? —
Shoe type :
Weather conditions ?

### INCIDENT GENERAL INFORMATION

Date of loss : 10/15/2020 7:20:00 PM
Date facility notified of loss : 10/15/2020
Accident State : AL
Claim description : The customer was reaching to grab some water off the shelf and slipped and fell hitting her hip on the pallet and feeling pain in her hip and ankle
Does incident involve BI, PD, or both ? Bodily Injury
Was medical treatment sought at time of incident or mentioned by the customer/member ? —

#### Incident Location Information

Did incident happen on premises ? Yes
Address where injury occurred : 335 HELENA MARKETPLACE,HELENA,AL,35080
Phone :

#### Witness Information

Name : ▮▮▮▮, Kevin
Address : ▮▮▮▮▮▮▮ Bessemer,AL,35020
Phone : ▮▮▮▮▮▮

#### Associate with facts relating to loss

Name : Washnurn,Glenda
Title : CSM CLERK

#### Associate first on scene

Name : Washnurn,Glenda

Title : CSM CLERK

**Store Contact Information**

Name :

Shift : —

Work Phone :

**Preparer**

Name : Cooper,Roman

Title : SUPPORT MGR

Shift : —

**Claimant # 1**

Name :

Associate ? —

Sex :

Address : █████████████,Calera,AL,35040

Home Phone # : ████████████

Work Phone # :

Birthdate :

Driver's License # :

Did customer continue to shop ?

Was Claimant a Minor ? No

Type of Injuries/Complaints : Pain in hip and ankle unkown extent of injury

Was ambulance called ? Yes

Was MD or hospital involved ?

**Companion Information**

Did claimant have a companion ? No

Companion Name : —

Address :

Phone :

**Medical Provider Information**

Medical provider name :

Address :

Phone :

Back

Incident Reporting System



My Favorites **Email** **Directory** Me@Wal-Mart ...ledge
Center **Search** **Logout**



# Claim # L0415226

- **You must <u>immediately search for and preserve</u> any and all information and evidence related to this incident. Please follow the guidelines on the Evidence Collection Sheet and Document Preservation Directive.**

- **Your form has been sent to the claims division.**
- **Please PRINT THIS FORM for your records before returning to main screen.**

## STORE TYPE

Store/Location Number : **4189**
Base Division Number : **01 - WAL-MART STORES INC.**

## STORE LOCATION INFORMATION

Address : **335 HELENA MARKETPLACE , HELENA , AL, 35080**
Phone : **205-624-1640**
Manager : **GARDNER, ELIZABETH**

## Claim Type

Type of Incident : **SF - SLIP/FALL/TRIP Claim involving a customer/member that alleges slip, fall, or trip.**

## Incident General Information

Date of Incident : **10/15/2020 7:20:00 PM**
When was the incident first reported to the company ? **10/15/2020**
Incident Type : **Slip/Fall Same Level**
Incident State : **AL**
Description of Incident : **The customer was reaching to grab some water off the shelf and slipped and fell hitting her hip on the pallet and feeling pain in her hip and ankle**
What caused the incident : **Water**
Location in facility where incident occured : **DEPT92-DRY GROCERY**
Does incident involve BI, PD, or both ? **Bodily Injury**

## Incident Location Information

Did incident happen on premises ? **Yes**
Address where injury occurred : **335 HELENA MARKETPLACE , HELENA , AL, 35080**

## Witness Information

Was there a customer that witnessed the incident ? **Yes**
Name : ▮▮▮▮, **Kevin**
Address : ▮▮▮▮▮▮▮▮▮ **Bessemer , AL, 35020**
Phone : ▮▮▮▮▮▮▮

## Associate with Facts Relating to Incident

Name : **Washnurn,Glenda**
Title : **CSM CLERK**

1,2

10/18/2020                                    Incident Reporting System

**Normal Work Hours : —**
**Associate First on Scene**
**Name : Washnurn, Glenda**
**Title : CSM CLERK**
**Associate Who Took the Report**
**Name : —, —**
**Normal Work Hours : —**
**Work Phone : —**
**Associate Entering Claim into Incident Reporting System**
**Name : Cooper , Cooper**
**Title : SUPPORT MGR**
**Normal Work Hours : THIRD_SHIFT**
**UserID : r0c01di**

**CLAIMANT #1**

**Name : Bennett, Alexandra**
**Address :** ███████████████ **, Calera, AL, 35040**
**Phone Number :** ███████████
**Email Address : —**
**Did the claimant mention seeking medical attention ?** Yes
**Did the claimant mention wanting something from Walmart/Sam's Club ?** No
**Was Claimant a minor ?** No
**Type of Injuries/Complaints :** Pain in hip and ankle unkown extent of injury
**Did an ambulance respond to the incident ?** Yes
**Does claimant have an attorney or was an attorney mentioned ?** No

**Companion Information**

**Companion Name :**
**Address : —, —, —, —**
**Phone : —**

Goto Main Screen

WIRE Knowhow              Help              Terms and Conditions

**10/21/2020**



DOCUMENT 27
SEALED

# DOCUMENT 29

FILED
2023 Sep-29  PM 03:48
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ALEXANDRIA BENNETT, | ) | |
| | ) | |
| Plaintiff, | ) | Case 2:22-cv-01306-AMM |
| | ) | |
| v. | ) | |
| | ) | |
| WALMART, INC., | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Comes Now Plaintiff Alexandria Bennett, pursuant to Rule 56 of the Alabama Rules of Civil Procedure, and files this response in opposition to Defendant Walmart's Motion for Summary Judgment.

### Narrative of Undisputed Facts

Alexandria Bennett went into the Helena Walmart Neighborhood Store to buy groceries for dinner. (Ex. A, Alexandria Bennet depo. p. 76). As Ms. Bennett went down an aisle, she slipped and fell hard. (Ex. A, Bennett depo. p. 89). There were no signs in the area of the fall warning of a wet floor or other dangers. (Ex. A, Bennett depo. P. 121). Ms. Bennett's friend Kevin Allen went to look for Walmart employees to assist Ms. Bennett and another Walmart customer who saw the fall tried to aid Ms. Bennett after the fall. (Ex. A, Bennett depo. p. 109).  No one on Walmart's staff

came to address Ms. Bennett's fall for approximately 40 minutes. (Ex. A, Bennett depo. p. 110). Ms. Bennett did not see the water on the floor near the chipped pallets holding the cases of bottled water before she fell. (Ex. A, Bennett depo. p. 92). The water was dirty and difficult to differentiate from the numerous skid marks on the floor. (Ex. A, Bennett depo. pp. 91-92). There is no surveillance camera covering the water aisle where Ms. Bennett fell, and although the Helena store Manager Elizabeth Parker asked her asset protection manager if the store could get more cameras, Ms. Parker was told inexplicably that the store could not get more cameras. (Ex. D, Elizabeth Parker depo. pp. 31-32).

Ms. Bennett was transported from Walmart by ambulance to the hospital with complaints of pain in her hip and ankle. (Ex. A, Bennett depo. p. 113). She required ankle surgery in July 2021 as a result of the subject fall. (Ex. A, Bennett depo. p. 137). The surgery did not resolve her pain and Ms. Bennett was still having ankle problems on the date of her 2023 deposition. (Ex. A, Bennett depo. p. 143). She will never be 100% healed. (Ex. A, Bennett depo. p. 140). Ms. Bennett also experienced anxiety and sleeplessness caused by her pain and inability to perform everyday tasks. (Ex. A, Bennett depo. p. 179).

In order to prevent hazards like slip and falls in a Walmart store, Walmart's policies, procedures, and training manuals mandate that stores "periodically perform a sweep of [each] department or area so that you can correct hazards as soon as

possible." (Ex. B, Walmart's policies and procedures produced in discovery, p. 31). When a slip and fall occurs in a Walmart store, Walmart's policies, procedures and training manuals mandate that store management "Determines how and why the accident occurred. Identify the root cause, and determine the steps to take in order to prevent the same or similar accidents from happening.... accident reviews are fact-finding missions." (Ex. B, Walmart's policies and procedures produced in discovery, p. 70). In semi compliance therewith, Roman Cooper, the Support Manager on duty at the time of the subject slip and fall, reported that Ms. Bennett "slipped and fell on floor" (Ex. C, part of "Customer Statement" produced by Walmart, p. 1). As to the root cause of the accident, no one from Walmart ever made any effort to find out why there were puddles of water on the floor in the water aisle (Ex. D, Parker depo. p. 57).

If Walmart's written policies and procedures had been followed, Ms. Bennett's slip and fall would have been prevented.

Within 6 months of Ms. Bennett's incident, there were 3 reported slip and falls at the Helena Neighborhood Walmart. (Ex. E, part of Walmart's Responses to Plaintiff's Interrogatories, p. 6).   In April of 2020, a customer fell in a puddle of water in the checkout lane, and just a few weeks before Ms. Bennett's incident, in September 2020, a customer reported falling on a pink substance in the dairy aisle. (Ex. E, part of Walmart's Responses to Plaintiff's Interrogatories, p. 6).

According to Walmart's written policies and procedures, the Helena store (like all others) should have a "Safety Team". (Ex. B, Walmart's policies and procedures produced in discovery, p. 34). This is allegedly because "'Walmart takes injuries very seriously, as any slip, trip or fall could cause the kind of injury that affects someone's life forever... Any unsafe floor condition can cause an injury that has a serious affect on someone's life forever". (Ex. B, Walmart's policies and procedures produced in discovery, p. 30).

The actual functioning of the Safety Team is vastly different from what Walmart's policies, procedures and handbooks state should happen. Elizabeth Parker was a longtime Walmart employee and store manager at the time of the October 15, 2020, slip and fall and she stated during her 2023 deposition that the Associates receive computer training and an in person safety tour of the store, but she doesn't mention anything about a safety team, safety team meetings, or safety team leadership. (Ex. D, Parker depo. pp. 50-53). The internal mechanism, the Safety Team, publicly designated by Walmart to prevent slip and falls, was never even mentioned to be in existence at the Helena Walmart. Ms. Bennett's injury could have been prevented if there was a functioning Safety Team that did its mandated job (investigating and determining the causes of slip and fall hazards and eliminating that danger) or if the Walmart home office had put these subjects on their topic lists

to be discussed by store management.[1]

## Standard of Review

Walmart correctly cites the applicable law in its brief as to the Standard of Review. The following principals are also appropriate for consideration: The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in her favor. *Mendez v. Walgreen Company*, 061715 ALNDC, 5:15-cv-01136-HGD (2015) citing Tipton GMBH-Siegen, 965 F.2d 994, 998-99 (11th Cir. 1992); *Anderson v. Libertv Lobbv*, 477 U.S. 242, 255 (1986). In evaluating the argument of the moving party, the court must view all evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in her favor. *Alsip v. Wal-Mart Stores East. LP*, 111615 ALSDC, 14-476-CG-N (2015) citing Burton v. Citv of Belle Glade, 178 F.3d 1175, 1187 (11 Cir. 1999). If reasonable minds could differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Gordon v. Wal-Marl Supercenter*, 082809 ALSDC, 08-00527-CG-C (2009) citing *Miranda v. B&B Cash Grocery Store. Inc*., 975 F.2d 1518, 1534 (11th Cir. 1992). A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v.*

---

[1] With thousands of Walmart stores, it is a reasonable inference that if one location experienced spills, many other locations also experienced spills. It is also a reasonable inference that the Walmart home office did not want a local store Safety Team to address issues involving maintenance or inspections (proactive maintenance) because that was its job - it only wanted the local Walmart to clean up spills and repair leaks as they happened (reactive maintenance).

*Liberty Lobby Inc*., 477 U.S. 242, 248 (1986).

## Argument

I.    PLAINTIFF'S CLAIMS ARE IN PART BASED ON "DEFECTIVE CONDITIONS" IN THE SUBJECT WALMART, I.E., A CHIPPED PALLET HOLDING CASES OF WATER BOTTLES. AS SUCH, ONCE A DEFECT IS PROVEN, THE INVITEE'S CLAIMS ARE DUE TO BE SUBMITTED TO THE JURY.

In *Winn-Dixie Montgomery. Inc. v. Weeks*, 504 So. 2d 1210 (Ala. 1987) a two-year-old child in a wobbly shopping cart reached for candy on a display rack.  The shopping cart then tilted over and the child's cheek was impaled on a broken wire sticking up on the candy rack. The jury award based on negligence and wantonness was affirmed on appeal. In so holding the court stated:

> "Matthew [the child] and his mother were business invitees in the Winn-Dixie grocery store. The duty owed them by Winn-Dixie was to keep the premises reasonably safe for customers. Questions of whether the shopping cart and candy rack were defective, and, if so, whether they had been so for such a period of time that Win-Dixie should have discovered the defects, were properly left to the jury. *Great Atlantic & Pacific Tea Co. v. Popkins*, 260 Ala. 97, 69 So. 2d 274 (1953); *First National Bank of Birmingham v. Lowerv*, 263 Ala. 36, 81 So. 2d 284 (1955); *Hill Grocery Co. v. Hameker*, 18 Ala. App. 84, 89 So. 850 (1921 ); *Western Railway of Alabama v. Still*, 352 So.2d 1092 (Ala. 1977).
>
> "The evidence in this case was susceptible of several inferences. One inference that could be drawn by a jury was that the cart provided was defective, and that the defect caused it to collapse when a child tried to reach candy placed within a child's reach at the check-out counter...

504. So. 2d at 1211. In the instant case, one inference that could be drawn by a jury was that the chipped pallet holding the cases of water bottles pierced the cases of

water bottles it was holding and that this defect caused the cases of water bottles to leak onto the floor near the pallets.

*Norris v. Wal-Mart Stores. Inc*., 628 So. 2d 475 (Ala. 1983) involved a case where a store customer was injured when a box of toothpaste fell from a shelf causing injuries. There was no evidence as to why the box fell other than that the shelf did not have railings. The lower court granted a directed verdict for Walmart. Relying in part on *Mims*, the Alabama Supreme Court reversed the directed verdict noting that once --a defect in a part of the premises'" has caused injury, the issue of constructive knowledge is for the jury. 628 So.2d at 478.

ln this case, Walmart, in passing, has stated that Ms. Bennett's injuries were caused by the water on the floor and not directly by the defective parts of the store, i.e. the chipped pallet holding the cases of bottled water. This "splitting of the hairs" theory has not been argued herein as a basis for Walmart's motion for summary judgment. If Walmart attempts to present this theory in its reply brief, however, current case law does not require that the invitee be injured directly by contact with the defective item. An invitee must only show that the injury was "caused by a defect or instrumentality ... located on the premises..." *Bates v. United State of America,* 073115 ALSDC, 13-00051-KD-C (U.S. Dist. Ct., Southern Dist. Of Ala. 2015). The law involving defects is not hinged on whether or not the invitee came into physical contact with the defective item; it is grounded on the law that parts of the store (like

a display rack, shopping cart, or chipped pallet) require ordinary and reasonable maintenance in order to provide safe premises for the store customers. *Bates v. United State of America,* 073115 ALSDC, 13-00051-KD-C (U.S. Dist. Ct., Southern Dist. Of Ala. 2015). At the very least, this is a jury issue.

II.  ADDITIONALLY, AND INDEPENDENTLY, PLAINTIFF IS ENTITLED TO RECOVER BECAUSE WALMART FAILED TO PERFORM REASONABLE INSPECTIONS AN/OR MAINTENANCE OF ITS AISLES AND PALLETS TO DISCOVER OR PREVENT THE DANGEROUS CONDITION OF WATER ON THE FLOOR.

*Wal-Mart Stores v. Tuck*, 671 So. 2d 101 (Ala. Civ. App. 1995) involved a case where an invitee tripped over on a piece of shelf fencing that was on the floor. Walmart surmised that another customer must have hit the fencing with a shopping cart causing it to dislodge. Walmart introduced evidence that its employees had conducted a "safety sweep" about an hour before the injury, its employees were trained to remove items on the floors and its employees found nothing on the floor. Additionally, the Walmart assistant manager, who filled out the incident report, did not note in the report any witnesses or question any employees about what happened, the safety sweeps, etc. There was no video footage of the incident because there was no surveillance camera on the aisle where the incident occurred.

In Ms. Bennett's case, while Walmart doesn't argue that it conducted any safety sweeps of its Helena store on the date of Ms. Bennett's fall, they do state that they didn't receive any reports of spills from customers, vendors, or employees and they

did not conduct any investigation as to why or how the spill occurred. This failure to perform reasonable inspections and/or maintenance of its aisles and pallets is enough to necessitate this case being presented to a jury.

III.   DUE TO THE "RECURRING INCIDENTS" OF SPILLS (3 OVER 6 MONTHS) CREATES A GENUINE ISSUE OF FACT AS TO WALMART'S KNOWLEDGE OF THE DANGEROUS CONDITIONS POSED BY THESE PREMISES DEFECTS.

In another case against Walmart, (*Ferguson v. Wal-Mart Stores East*, 082411 TNEDC, 2:10- CV-245, U.S. District Court, E.D. TN, 2011) an invitee was injured when she slipped and fell on a pool of liquid. Walmart sought a summary judgment contending that there was no evidence as to the "length of time" the substance was on the floor and therefore it could not have had constructive knowledge of the danger the liquid posed. In denying Walmart's motion for summary judgment, the federal judge held:

> "[P]laintiffs may prove that a premises owner had constructive notice of the presence of a dangerous condition by showing a pattern of conduct, a recurring incident, or a general or continuing condition indicating the dangerous condition's existence. This approach focuses directly on a principle firmly established in our case law- that a premises owner's duty to remedy a condition, not directly caused by the owner, is based on that owner's actual or constructive knowledge of the existence of the condition. It simply recognizes the logical conclusion that, when a dangerous condition occurs regularly, the premises owner is on a constructive notice of the condition's existence. This places a duty on that owner to take reasonable steps to remedy this commonly dangerous condition. Allowing plaintiffs to prove constructive notice in this manner relieves plaintiffs of the difficult burden of showing the duration of a particular occurrence so

> long as plaintiffs can show that the dangerous condition was part of a
> "pattern of conduct, a recurring incident or a general or continuing
> condition·', such that its presence was reasonably foreseeable to the
> premises owner:' (Emphasis added).

The injured customer submitted evidence showing that there had been an incident

two and one half months before her fall where another customer fell on water "from

a roof leak". Walmart records showed that there were roof repairs made involving

the prior referenced incident. The court noted:

> "This evidence, viewed in the light most favorable to Plaintiff, raises at
> least a genuine issue of fact as to whether Walmart was on notice of the
> possibility of dangerously slippery floors in Action alley.
>
> "Based on both the general evidence of the recurring condition of
> slippery floors during rainstorms, and the specific evidence of a leaky
> roof over Action alley, the Court finds there is a genuine issue of
> material fact as to whether Wal-Mart had constructive notice of the
> slippery floor condition prior to Plaintiffs accident."

In the Bennett case, 2 aisle spills causing injuries were documented in the 6 month

period before Ms. Bennett's fall - one just a few weeks before. These "recurring

incidents" are sufficient to have the constructive notice issue submitted to the jury.

In *Kmart Corp. v. Peek*, (757 so 2d 1138 (Ala. l 999) a store customer was

injured when an automatic door closed on him. This was caused by sensors in the

doorway being inoperative. A jury awarded the invitee damages based on negligence

and wantonness. Kmart appealed contending that the trial court errored in allowing

the introduction into evidence of two other incidents involving automatic door

malfunctions because, it is alleged, all of the incidents involved three separate doors.

In affirming the admissibility of the evidence, the Alabama Supreme Court stated:

> "The general rule is that [i]n an action for injury, allegedly caused by the defendant's negligently keeping or maintaining a dangerous place or instrumentality, evidence of notice to the defendant, prior to the accident in suit, of the alleged dangerousness or defectiveness is material or consequential in a negligence action. Charles W. Gamble, McElroy's Alabama Evidence §64.04(1), at 290 (6th ed. 1996) (emphasis added). Consequently, in a negligence action, 'the plaintiff may prove the occurrence of other accidents at such place or with such instrumentality if relevant to show notice or knowledge of such defect or danger.'"

757 So. 2d at 1140.41. The Supreme Court also affirmed the submission of the

wantonness claim to the Jury.

> "However. to establish wantonness, the plaintiff must 'prove that the defendant caused harm by the conscious doing of some act or the conscious omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act injury would likely or probably result.'"

757 So. 2d at 1144. The plaintiff argued that Kmart failed to inspect the automatic

doors as often as reasonably required (daily in that case). The Court held that "Kmart

cannot rely on its own malfeasance to avoid liability for malfeasance." 757 So. 2d at

1144. See also *Moore v. Winn-Dixie Stores*, 406 So. 2d 347 (Ala. 1981), a slip and

fall case where a wantonness claim properly went to the jury because there was

evidence that the defendant had knowledge of a prior fall but it never attempted to

investigate or remedy the defect that caused the injury.

In *McCorvy v. Alabama River Cellulose*, 101014 ALSDC, 13-0118-WS-N (U.S. Dist. Ct., S.D. Ala.) the plaintiff was injured when a piece of wood shot out of the defendant's machinery. There was evidence that there were other instances where wood was shot out but no one had ever been hurt. Defendant argued that its premises were reasonably safe "because there is no evidence that anyone has ever been injured by a log from the Powerfeed 'in the area where plaintiff supposedly fell'". i.e., it denied constructive notice. In denying defendant's motion for summary judgment, the court stated:

> "Most curious is the defendant's argument that these incidents could not impart the required notice because no drivers were hurt in these incidents. The question, again, is whether the defendant was on notice that wood expelled from the Powerfeed risked injury
>
> to drivers in the area, and wood that flies far enough, and with enough force, to damage log trucks is wood that flies far enough, and with enough force, to injure any driver in that area, regardless of whether a driver has been unfortunate enough to be struck. The defendant identifies no authority for its proposed "one free injury" rule, which the Court rejects."

In *Kirksev v. Schinder Elevator Corp.*, 060716 ALSDC 15-0115-WS-N (U.S. Dist. Ct., S.D. AL 2016), a child was injured when he fell from an escalator at Sears. The court held that a reasonable fact finder could consider three other escalator falls at Sears Stores (2005 incident in Hawaii; 2008 incident in California; and 2013 incident in Chicago) to show that Sears had notice of the danger that existed by the defective part of its premises.

In Ms. Bennett's case, a reasonable fact finder could consider the two other slip and falls in areas where liquid items are sold to show that Walmart had notice of the danger that existed on its premises.

IV.   WALMART'S ASSERTION THAT IT FOLLOWED ITS SAFETY PROCEDURES DOES NOT INSULATE IT FROM LIABILITY AS BENNETT IS NOT REQUIRED TO SHOW THAT THE SPILL CAUSING THE SLIP AND FALL SPILLED ON A PRIOR OCCASION IF THERE IS EVIDENCE OF OTHER SPILLS ON THE PREMISES.

In *Fetzer v. Wal-Mart Stores,* 030116 ILNDC, 13 C 9312 (U.S. Dist Ct., N.D. IL 2016), a  Walmart  customer  fell in  water caused  by drips from  the ceiling. Similar to the instant case, Walmart defended by offering evidence that it had not received complaints of water in the area of the slip and fall prior to the fall and that it had conducted safety sweeps.   In opposition, the customer presented evidence that there had been roof leaks in "unspecified areas of the store", a variety of roof repairs were requested and completed and the store manager 'was aware of 'multiple leaks' located throughout the store" and "that on unspecified dates, the roof leaked unpredictably in different places; it did not leak consistently from the same locations'".  Walmart sought a summary judgment regarding the plaintiffs negligence and wantonness claims. Citing law almost identical to Alabama law, the federal court held:

"Walmart is responsible for the condition of the roof at the Crystal

> Lake store, and its safety programs do not insulate it from potential liability based on an alleged failure to maintain its roof properly... A jury will have to determine what weight to give evidence relating to other leaks…"

In Ms. Bennett's case, although Walmart does not argue that its employees conducted periodic safety sweeps of the water aisle as their own policies and procedures required on the date in question, they do argue that no one had reported a spill before Ms. Bennett's fall. Because Walmart is responsible for the condition of its premises, including its pallets and floors, all alleged failures to properly maintain these premises should be submitted to a jury.

## V.   WALMART CREATED THE HAZARDOUS CONDITION

Wal-Mart's employees created the dangerous condition which caused Ms. Bennett to fall and injure her ankle, resulting in an extensive surgery. Where, "'the defendant or his employees have affirmatively created the dangerous condition, [the] plaintiff need not introduce evidence that [the] defendant had actual or constructive knowledge of the hazard. Under such circumstances, the courts presume notice.'" *Wal-Mart Stores, Inc. v. Rolin*, 813 So. 2d 861, 864 (Ala. 2001) (quoting *Wal-Mart Stores, Inc. v. McClinton*, 631 So. 2d 232,234 (Ala.1993). Wal-Mart argues that Ms. Bennett's claims fail as a matter of law. This case falls directly in-line with *Rolin*, 813 So. 2d at 861 and McClinton, 631 So. 2d at 232, such that Ms. Bennett is not required to establish on summary judgment, or at trial, that Wal-Mart and its

employees had actual or constructive knowledge of the dangerous condition of the chipped wooden pallets holding containers of bottled water that were leaking. In *Rolin*, the Supreme Court of Alabama held that a customer who tripped over a barbecue grill that was protruding from a box was not required to establish Wal-Mart's actual or constructive knowledge of the hazardous condition because "there [was] evidence to indicate that the hazardous condition was created by employees of the premises owner." 813 So. 2d at 865. The court cited *Wal-Mart Stores. Inc. v. McClinton*, supra, in support of its holding.

In *McClinton*, there was also evidence to indicate that Wal-Mart's employees created a hazardous condition -- a gun cabinet that was protruding into the store aisle. The Supreme Court of Alabama held that "Wal-Mart created the dangerous condition by allowing the gun cabinet, with its extended molding, to protrude into the aisle. Thus, notice of the hazardous condition [was] imputed to Wal-Mart." *McClinton*, 631 So. 2d at 234. Similarly, in *Denmark v.* Mercantile Stores Co., 844 So. 2d 1189, 1194 (Ala. 2002), there was evidence indicating that the premises owner's employees had left a large roll of plastic shopping bags in a place where customers were likely to trip on it.

Based on the foregoing facts, and case law, it is for a jury to decide the issues as to whether Wal-Mart created the hazard which caused Ms. Bennett to fall, and whether Wal-Mart should be held accountable.

## VI.   THE WATER SPILLS WERE NOT OPEN AND OBVIOUS

Wal-Mart argues that it is entitled to judgment as a matter of law because the liquid droplets were open and obvious to Ms. Bennet. Wal-Mart attempts to pull the proverbial wool over this Court's eyes by arguing that "if there were drips of black water on the white tile, Wal-Mart owed the plaintiff no duty to eliminate the potential hazard or to warn her of the potential hazard."

Wal-Mart's argument that the condition that caused Ms. Bennett's fall was open and obvious is an affirmative defense, on which Wal-Mart bears the ultimate burden of proof. *Denmark v. Mercantile Stores Co., Inc*., 844 So. 2d 1189, 1194 (Ala. 2002). "Only 'when there is no genuine issue of material fact as to any element of an affirmative defense, ... and it is shown that the defendant is entitled to a judgment as a matter of law' is a summary judgment proper." *Id*. (quoting *Wal-Mart Stores, Inc. v. Smitherman*, 743 So. 2d 442,445 (Ala. 1999)). The Alabama Supreme Court has observed that "questions of openness and obviousness of a defect or danger and of an [invitee's] knowledge are generally not to be resolved on a motion for summary judgment." *Harding v. Pierce Hardy Real Estate*, 628 So. 2d 461, 463 (Ala. 1993). Additionally, the Supreme Court of Alabama has "indicated that even though a defect is open and obvious, an injured invitee is not barred from recovery where the invitee, acting reasonably, did not appreciate the danger of the defect." *Young v. La*

*Quinta Inns. Inc*., 682 So. 2d 402, 404 (Ala. 1996) (citing *Furgerson v. Dresser Industries, Inc.,* 438 So. 2d 928

Wal-Mart has failed to carry its burden as a matter of law. Ms. Bennett testified that she couldn't tell the difference between the dirty water and the dark scuff marks on the floor. Thus, it is not evident that she knew, or should have known, or that she appreciated, the danger caused by the water on the floor.

VII.    THERE IS A GENUINE ISSUE OF FACT AS TO WHETHER WALMART'S CONDUCT WAS WANTON, I.E., IF IT CONSCIOUSLY ACTED, OR FAILED TO ACT, WITH RECKLESS OR CONSCIOUS DISREGARD OF THE SAFETY OF ITS INVITEES AND WALMART WAS AWARE THAT HARM WOULD LIKELY OR PROBABLY RESULT.

There is substantial evidence that Walmart acted with reckless or conscious disregard of its customers' safety. Walmart knew that the subject Helena store had unpredictable spills in different locations where liquid items were sold twice within 6 months of the subject slip and fall; it never tried to find the "root cause of the spill; Walmart knew that periodic safety sweeps should be conducted throughout the day, but it did not due so; it violated its own policy by not having a  Safety team; it used chipped pallets with jagged edges to hold cases of plastic bottled water,  despite knowing of the history of unpredictable leaks and/or spills in areas housing liquid items; Walmart's home office never allowed or suggested that a local Safety Team (whose mission it was to prevent slips and falls and remedy conditions that create

risks of slips and falls) to even discuss why the Helena store kept having these unpredictable spills; and instead of honoring the store manager's request for more video surveillance to cover all aisles of the store, Walmart's asset protection manager inexplicable denied the store manager's request which could have explained the root cause of all these inexplicable leaks. All of these facts, and the reasonable inferences to be drawn therefrom, are sufficient for a jury to conclude that Walmart acted recklessly or in conscious disregard of the safety of its customers. The evidence supports the inference that Walmart did the above to save money (stopped the purchase of additional video surveillance cameras).

The last element, awareness that harm will likely or probably result, is easy. Walmart's internal policies, procedures and handbooks involving safety consistently stress the dangers posed by water on the floor. It is undisputed that Walmart knew that the Helena store had a history of spills in areas housing liquid items and it knew that these spills and/or leaks posed a significant risk of a slip and fall injury. Despite this, it never tried to find out why there were spills and leaks in these areas before they caused an injury. Instead, in order to save money by not purchasing more video surveillance cameras to better investigate the root causes of these spills and leaks, Walmart chose to simply clean the spills after they happened. It ignored its own policy and industry standards of regular inspections.

The facts in the Bennett case are more egregious than many of those in the above cited cases. Ms. Bennett was the victim of a calculated risk taken by Walmart, at the safety of its invitees, to save money. This is a case about safety versus greed, and Alexandria Bennett deserves to have a jury hear about Walmart's wrongdoings.

## CONCLUSION

Where there are  defects in the premises (leaking roof, wobbly shopping carts, chipped pallets housing containers of liquid items, etc.) or a  failure  to inspect  a part  of the premises  (inspect  the condition of the pallets  at  least annually  and  every time reactive work is done); o r a failure to follow policies (Walmart's  failure  to  inspect  the  condition  of  its  pallets,  conduct  safety sweeps, assemble a safety team, maintain sufficient video surveillance of its stores, and fully investigate the root cause of all slip and fall incidents); o r recurring incidents spills and slip and falls (3 over 6 months); or that Walmart failed to reasonably maintain its pallets that hold liquid items. The issue of Walmart's  knowledge of the defect or dangerous condition is required to be submitted  to  the  jury.   Walmart's  allegation  that  it  followed  all  safety procedures  is  for  the  jury  to  consider -  it  is  not  sufficient  to  warrant  a summary judgment.

Respectfully submitted,

/s/ Ellise M. Washington

Ellise M. Washington (ASB-1744-G16U)
*Counsel for the Plaintiff, Alexandria Bennett*

OF COUNSEL:
EMW LAW, LLC
2100 1ˢᵗ Ave. N., Suite 300
Birmingham, AL 35203
ellise@emwlawllc.com
P: 205-938-4369
F: 205-449-2171

## **CERTIFICATE OF SERVICE**

I hereby certify that I have caused a copy of the foregoing document to be electronically filed and issued to counsel via electronic mail and/or CM/ECF notification on this date: September 29, 2023.

Gwendolyn A. Gordon
Christopher J. Zulanas
***Counsel for Defendant Wal-Mart Stores East LP***
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
czulanas@friedman-lawyers.com
ggordon@friedman-lawyers.com

_____ /s/ Ellise M. Washington _____
OF COUNSEL

Alexandria Bennett

6/14/2023

**Page 1**

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CIVIL ACTION NUMBER
2:22-CV-01306-AMM

ALEXANDRIA BENNETT,
    Plaintiff,
vs.
WALMART, INC.,
    Defendant.

DEPOSITION TESTIMONY OF:
ALEXANDRIA BENNETT

June 14, 2023
1:30 p.m.

COURT REPORTER:
DIANA B. WILLIAMS, CCR

**Page 2**

1       S T I P U L A T I O N
2     IT IS STIPULATED AND AGREED by and
3  between the parties through their respective
4  counsel that the deposition of ALEXANDRIA
5  BENNETT, may be taken before Diana
6  B. Williams, Certified Shorthand Reporter
7  and Notary Public, State of Alabama at
8  Large, at the law offices of Friedman,
9  Dazzio & Zulanas, P.C., 3800 Corporate Woods
10  Drive, Vestavia Hills, Alabama, on
11  June 14, 2023, commencing at approximately
12  1:30 p.m.
13     IT IS FURTHER STIPULATED AND AGREED
14  that the signature to and the reading of the
15  deposition by the witness is waived, the
16  deposition to have the same force and effect
17  as if full compliance had been had with all
18  laws and rules of Court relating to the
19  taking of depositions.
20     IT IS FURTHER STIPULATED AND AGREED
21  that it shall not be necessary for any
22  objections to be made by counsel to any
23  questions, except as to form or leading

**Page 3**

1  questions, and that counsel for the parties
2  may make objections and assign grounds at
3  the time of trial or at the time said
4  deposition is offered in evidence, or prior
5  thereto.

**Page 4**

1       I N D E X
2
3  EXAMINATION BY:        PAGE NO.
4  MS. GORDON        7
5  MS. WASHINGTON        166
6  MS. GORDON        173
7  MS. WASHINGTON        174
8  CERTIFICATE        187
9
10       EXHIBITS
11
12  PLAINTIFF'S EXHIBITS:        PAGE NO.
13  1   Video        170
14
15  DEFENDANT'S EXHIBITS:        PAGE NO.
16  1   Pay statement      52
17  2   Photograph (color)      80
18  3   Photograph (color)      80
19  4   Photograph (color)      104
20  5   Customer Incident Report   114
21  6   Photographs (6 color)     123
22  7   Photograph (color)      127
23  8   Initial Disclosures     160

1 (Pages 1 to 4)

Alexandria Bennett                                            6/14/2023

Page 5

```
 1         A P P E A R A N C E S
 2
 3   FOR THE PLAINTIFF:
 4         Ellise M. Washington, Esq.
 5         EMW LAW
 6         2100 First Avenue North
 7         Birmingham, Alabama 35203
 8
 9   FOR THE DEFENDANT:
10         Gwendolyn A. Gordon, Esq.
11         FRIEDMAN, DAZZIO & ZULANAS, P.C.
12         3800 Corporate Woods Drive
13         Vestavia Hills, Alabama 35242
14
15   ALSO PRESENT:
16         Charles Nash, Intern
17         Kelsie Green, Intern
18
19
20
21
22
23
```

Page 6

```
 1         I, Diana B. Williams, a Certified
 2   Shorthand Reporter of Birmingham, Alabama,
 3   and a Notary Public for the State of Alabama
 4   at Large, acting as Commissioner, certify
 5   that on this date, pursuant to the Federal
 6   Rules of Civil Procedure, and the foregoing
 7   stipulation of counsel, there came before me
 8   at the law offices of Friedman, Dazzio &
 9   Zulanas, P.C., 3800 Corporate Woods Drive,
10   Vestavia Hills, Alabama, commencing at
11   approximately 1:30 p.m., on June 14, 2023,
12   ALEXANDRIA BENNETT, witness in the above
13   cause, for oral examination, whereupon the
14   following proceedings were had:
15
16         ALEXANDRIA BENNETT,
17   having been first duly sworn, was examined
18   and testified as follows:
19
20         COURT REPORTER:  Usual
21   stipulations?
22         MS. GORDON:  Yes.
23         MS. WASHINGTON:  Yes.
```

Page 7

```
 1   EXAMINATION BY MS. GORDON:
 2       Q.   Ms. Bennett, my name is Gwen
 3   Gordon, and I represent Wal-Mart Stores
 4   East, LP, in the lawsuit that you filed
 5   against them.  And I'm here today to ask you
 6   some questions about -- some about your
 7   background and then about the claims you are
 8   asserting and about any injuries you are
 9   claiming as a result of the incident at
10   Wal-Mart.
11         Throughout our deposition, our
12   court reporter, Diana, is going to be taking
13   down everything you and I say.  And so it's
14   important to answer my questions out loud
15   rather than shake your head or nod your
16   head.  But if you forget, I will remind you.
17         And if you will, try to avoid
18   responses like uh-uh or uh-huh.  They appear
19   the same on the typed record, so it makes it
20   confusing.  But, once again, everybody seems
21   to do it, and so I will just correct you.
22   And I'm not picking on you.  It's just so we
23   can have a clear written record.
```

Page 8

```
 1         If you need to take a break for
 2   any reason, just let me know and we can do
 3   that.  I want you to understand all of my
 4   questions, so if I ask you something that
 5   you don't understand, please let me know,
 6   and I will rephrase it or try to explain it
 7   to you so that you will understand it.  And
 8   if you answer it, I will assume that you
 9   understood it; is that fair?
10       A.   Yes, ma'am.
11       Q.   Okay.  And let me think if there
12   is anything else.  That's probably it.
13   It's, like, little ground rules.
14         Have you ever given a deposition
15   before?
16       A.   No, ma'am.
17       Q.   Okay.  Will you state your full
18   name for the record, please?
19       A.   Alexandria Lashun Bennett.
20       Q.   What name do you go by?
21       A.   Alexandria.
22       Q.   Have you ever gone by any other
23   names besides Alexandria?
```

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023



Page 9

1    A.   Just Alex, for short.
2    Q.   And have you ever had any other
3    last names?
4    A.   No, ma'am.
5    Q.   Have you ever been married?
6    A.   No, ma'am.
7    Q.   Are you on any medication today
8    that would affect your ability to testify or
9    to recall past events?
10   A.   No, ma'am.
11   Q.   Are you suffering from any
12   medical conditions that would affect your
13   ability to testify or recall past events?
14   A.   No, ma'am.
15   Q.   Have you ever been involved in a
16   lawsuit, whether or not you gave a
17   deposition?
18   A.   No, ma'am.
19   Q.   And what is your current address?
20   A.   My current address is
21   Homewood, Alabama 35209.
22   Q.   How long have you lived there?
23   A.   About a year.

Page 10

1    Q.   And does anyone live there with
2    you?
3    A.   My daughter.
4    Q.   What is her name?
5    A.   Her name is              .
6    Q.             ?
7    A.             .
8    Q.             .  Thank you.  What is the
9    last name, though?  Was it Allen?
10   A.   Yes, ma'am.
11   Q.   Okay.  How do you spell the Allen
12   part?
13   A.   A-l-l-e-n.
14   Q.   Thank you.  How old is she?
15   A.   She's nine.
16   Q.   I have a nine-year-old.  It's a
17   fun age.
18        And who is her dad?
19   A.   Her dad is Kevin          .
20   Q.   Are you still in a relationship
21   with Kevin          ?
22   A.   No, ma'am.
23   Q.   Okay.  When did that end?

Page 11

1    A.   A few years ago.
2    Q.   Three years ago or a few?
3    A.   A few years ago.
4    Q.   Do you have any other children?
5    A.   No, ma'am.
6    Q.   Has anyone else lived at the
7             address with you and your
8    daughter?
9    A.   No, ma'am.
10   Q.   And where did you live before
11             ?
12   A.   I stayed in Ensley, Alabama.
13   Q.   Okay.  Do you remember your
14   address or where you lived there?
15   A.   It was            , Ensley.
16   Q.   Okay.  Was that an apartment or a
17   house?
18   A.   It was an apartment.
19   Q.   And who lived with you there, if
20   anyone?
21   A.   Me and my daughter.
22   Q.   How long were you at that
23   address?

Page 12

1    A.   About three -- three years.
2    Q.   I'm backing up, but the
3             , is that a house or an
4    apartment?
5    A.   It's an apartment.
6    Q.   All right.  And where did you
7    live before Ensley?
8    A.   I stayed in Homewood, Alabama.
9    Q.   Where were you in Homewood back
10   then?
11   A.   The            .
12   Q.   And how long were you there?
13   A.   I will say probably two years.
14   About two years.
15   Q.   Was it you and your daughter
16   there?
17   A.   Yes, ma'am.
18   Q.   Do you own any property?
19   A.   No, ma'am.
20   Q.   All right.  So what I have is the
21   date of the incident we are here about is
22   October 15, 2020.  Is that your recollection
23   as to when it happened?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023

Page 13

```
 1      A.  Yes, ma'am.
 2      Q.  Okay.  Where were you living
 3  then?  Was that the Ensley address?
 4      A.  No, ma'am.
 5      Q.  Which one were you at back when
 6  this happened?
 7      A.  Homewood.
 8      Q.  Okay.  ████████?
 9      A.  Yes, ma'am.
10      Q.  Have you ever lived with Kevin
11  ████, or has he ever lived in one of your
12  apartments?
13      A.  He moved.  He was staying at
14  the -- when we were together, we were in
15  ███████████████, but that's when we
16  split up as well.
17      Q.  Okay.  Was he living with y'all
18  back on October 15, 2020?
19      A.  We were -- we weren't together at
20  that time.
21      Q.  Okay.  So he had already moved
22  out?
23      A.  Yes, ma'am.
```

Page 14

```
 1      Q.  Where does he live now, if you
 2  know?
 3      A.  Bessemer, Alabama.
 4      Q.  Do you know his current phone
 5  number?
 6      A.  Not by heart.  I can --
 7      Q.  You might have given it to me.
 8  Let me see if this sounds familiar.  I have
 9  it on something.
10      Does ██████████ sound right?
11      A.  That's his old number.
12      Q.  Okay.  So he has a different one?
13      A.  Yes, ma'am.
14      Q.  Do you have it with you in your
15  phone?
16      A.  Yes, ma'am.
17      Q.  When we take a break, I will get
18  you to look it up for me, if you don't mind.
19      A.  Yes, ma'am.
20      Q.  Thank you.  Are you still in
21  regular contact with him?
22      A.  Yes, ma'am.
23      Q.  All right.  I'm going to ask
```

Page 15

```
 1  you -- we will go off the record, but I'm
 2  going to ask you what your social security
 3  number is off the record.
 4          MS. GORDON:  If we can go off.
 5          (Whereupon, an off-the-record
 6          discussion was held.)
 7          MS. GORDON:  Back on the record.
 8      Q.  (By Ms. Gordon)  What is your
 9  birth date?
10      A.  ██████████, 1993.
11      Q.  And your driver's license number?
12      A.  ███████
13      Q.  Is that an Alabama license?
14      A.  Yes, ma'am.
15      Q.  Have you ever held a license in
16  any other states?
17      A.  No, ma'am.
18      Q.  Do you have any restrictions on
19  your license, like, for contacts or --
20      A.  No, ma'am.
21      Q.  Okay.  Do you wear glasses or
22  contacts?
23      A.  I wear glasses.
```

Page 16

```
 1      Q.  Are they reading glasses or
 2  driving glasses?  Or when do you use them?
 3      A.  I don't have to use them.
 4      Q.  Okay.
 5      A.  Yes, I don't have a prescription
 6  for them or anything.
 7      Q.  I see.  Have you ever been
 8  prescribed eyeglasses or contacts?
 9      A.  Yes, ma'am.
10      Q.  When was that?
11      A.  I will say I picked up a
12  prescription last year.
13      Q.  Okay.  Who was your eye doctor
14  then?
15      A.  They are located at Wal-Mart.
16      Q.  The one in Helena?
17      A.  No, ma'am.  The one in Pelham.
18      Q.  Okay.
19      A.  I would go over to them.
20      Q.  Do you remember if you were
21  diagnosed as nearsighted or farsighted?
22  Like, did you have trouble seeing things far
23  away or close-up?
```

                                    4  (Pages 13 to 16)

Alexandria Bennett                                        6/14/2023

| Page 17 | Page 19 |
|---|---|

**Page 17**

1    A.   No, ma'am.
2    Q.   You don't remember which one?
3    A.   No, ma'am.
4    Q.   Okay.  That's fine.  Were you
5  wearing glasses or contacts on October 15,
6  2020, at Wal-Mart?
7    A.   I always wear my contacts.
8    Q.   So did you have them in that day?
9    A.   Yes, ma'am.
10   Q.   Okay.  Is the eye doctor at the
11  Wal-Mart in Pelham still your eye doctor?
12   A.   Yes, ma'am.  I haven't been to
13  them this year, though.
14   Q.   Okay.  Do you have any relatives
15  age 19 or older living in either Blount
16  County, Jefferson County, or Shelby County?
17   A.   Yes, ma'am.
18   Q.   Tell me who they are, please.
19   A.   My mom stays in Shelby County.
20   Q.   And what is her name?
21   A.   ████████.
22   Q.   Is she married?
23   A.   Yes, ma'am.

**Page 18**

1    Q.   What is her husband's name?
2    A.   ████████.
3    Q.   Do either of them work in Shelby
4  County?
5    A.   No, ma'am.
6    Q.   Any other relatives in either
7  Blount, Jefferson, or Shelby County?
8    A.   No, ma'am.
9    Q.   All right.  Where did you go to
10  high school?
11   A.   I went to Spain Park High School.
12   Q.   And what year did you graduate?
13   A.   2011.
14   Q.   All right.  Have you had any
15  other education since then?
16   A.   No, ma'am.
17   Q.   Is that a Hoover school?  Is
18  Spain Park Hoover?
19   A.   It's off Valleydale Road.
20   Q.   Okay.  Is that about where you
21  grew up, in that area?
22   A.   Yes, ma'am.
23   Q.   And have you lived in the

**Page 19**

1  Birmingham or nearby areas your whole life?
2    A.   No, ma'am.
3    Q.   Where else have you lived?
4    A.   We stayed in Hoover, Alabama.
5    Q.   Okay.
6    A.   My mom.
7    Q.   All right.  But have you been in
8  Alabama your whole life?
9    A.   Yes, ma'am.
10   Q.   Okay.  And are you currently
11  employed?
12   A.   Yes, ma'am.
13   Q.   Where do you work?
14   A.   I work at UAB.
15   Q.   What do you do there?
16   A.   I am a new patient scheduler.
17   Q.   Do you work with a particular
18  office there?
19   A.   Radiation oncology.
20   Q.   How long have you had that job?
21   A.   I just started this particular
22  job in May.
23   Q.   Of 2023?

**Page 20**

1    A.   Yes, ma'am.
2    Q.   Is that a desk job?
3    A.   Yes, ma'am.
4    Q.   And how many days a week do you
5  work?
6    A.   Monday through Friday.
7    Q.   What are your hours?
8    A.   Earliest I go in is 7 a.m.  The
9  latest I will stay is 6 p.m.
10   Q.   All right.  And what are you paid
11  there?
12   A.   $18 an hour.
13   Q.   And who is your supervisor?
14   A.   Ms. ████████.
15   Q.   Have you had any trouble
16  performing your job duties there as a result
17  of any injuries you relate to the incident
18  at Wal-Mart?
19   A.   No, ma'am.
20   Q.   Where did you work before UAB?
21   A.   I was working at UAB psychiatry.
22   Q.   And what was your job title
23  there?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                    6/14/2023

Page 21

1      A.   Patient service coordinator.
2      Q.   Did you work there right up until
3   you moved to the radiation department?
4      A.   I worked there up until, I think,
5   March of this year.
6      Q.   Okay.
7      A.   I was let go.
8      Q.   Did they give you a reason for
9   letting you go?
10     A.   I'm through a temp service.
11     Q.   Oh, I see.  Which temp service do
12  you work for?
13     A.   UAB Temp Services.
14     Q.   Is your current job also through
15  the temp service?
16     A.   Yes, ma'am.
17     Q.   So who do your paychecks come
18  from?
19     A.   UAB Temp Services.
20     Q.   And are you always guaranteed
21  employment through them?  I'm just not sure
22  how it works.
23     A.   The temp jobs is, like, you have

Page 22

1   got to do what you have got to do, you know,
2   or you can be let go.
3          So with UAB psychiatry, I was
4   about to be there -- well, I was there for a
5   year.  I was supposed to be hired on, and I
6   was let go.
7      Q.   Okay.  Sometimes you are hired on
8   for a permanent job through a temp job; is
9   that right?
10     A.   Yes, ma'am.
11     Q.   Okay.  And so now you have
12  started a new temp job and maybe in hopes of
13  it becoming a permanent job?
14     A.   Yes, ma'am.
15     Q.   Okay.  When did you start the UAB
16  psychiatry temp job?
17     A.   I believe about a year ago,
18  because March would have been -- March or
19  April would have been right around a year
20  for me.
21     Q.   Okay.  Did you being let go from
22  the UAB psychiatry temp job have anything to
23  do with any of the claims you are making in

Page 23

1   this lawsuit?
2      A.   No, ma'am.
3      Q.   Where did you work before UAB
4   psychiatry?
5      A.   I worked for Milo's Tea Company.
6      Q.   Milo's?
7      A.   Yes, ma'am.
8      Q.   Okay.  What did you do for them?
9      A.   Data entry clerk.
10     Q.   Is that at their corporate
11  office?
12     A.   Yes, ma'am.
13     Q.   Where is it?
14     A.   It's off of Morgan Road, but you
15  can also get there off of Lakeshore.
16     Q.   Okay.  All right.  When did that
17  job end?
18     A.   It was contracted.  I want to say
19  it ended before I worked for UAB.
20     Q.   Was it right before, or was there
21  a period where you were there without work?
22     A.   It was a period for me.
23     Q.   Do you remember if it was, like,

Page 24

1   one month?  Five months?  Any idea?
2      A.   I believe it was more than five
3   months.
4      Q.   Okay.  And did you leave the
5   Milo's job, or were you let go?  How did it
6   end?
7      A.   It was a contracted job.
8      Q.   Oh, it was a contracted start and
9   end date?
10     A.   Yes, ma'am.
11     Q.   Once you finished the work, it
12  was over?
13     A.   Yes, ma'am.  It was, really,
14  through -- you know, for the pandemic, we
15  would swab people's mouths and stuff like
16  that when they would come in and take their
17  temps.
18     Q.   Okay.
19     A.   So they didn't need us anymore.
20     Q.   About how long did that job last?
21     A.   I would say a few months.  At
22  least six -- six to seven months or so.
23     Q.   And was that in 2020, or was it

6  (Pages 21 to 24)

Alexandria Bennett                                    6/14/2023

Page 25

1    later after the pandemic started?
2        A.   I think I was working for them,
3    like, around August of 2021.
4        Q.   All right.  And where were you
5    working before Milo's?
6        A.   I had different temp service jobs
7    that I was let go from.
8        Q.   Were you working through an
9    agency for those?
10       A.   Yes, ma'am.
11       Q.   Okay.  What was the name of that
12   agency?
13       A.   Going through different agencies
14   such as PrideStaff, Dedicated Personnel.
15   Off of my head, that's all I can think of.
16       Q.   Okay.  What type of jobs did
17   you -- temp jobs did you have through those
18   agencies?
19       A.   I tried to do warehouse jobs, but
20   they don't work out.
21       Q.   Why don't they work out?
22       A.   I couldn't -- I couldn't perform
23   the work that they needed me to perform in

Page 26

1    the warehouses.
2        Q.   And why was that?
3        A.   Because my ankle was messed up.
4    I couldn't walk.  You know, the warehouses
5    are real big.  So I couldn't perform those,
6    and I was let go.
7        Q.   Which warehouse was that where
8    you had trouble performing your job duties?
9        A.   I don't know the particular name
10   of them off the head, but I know some was
11   located in Pelham.  It was -- I worked in,
12   like, the freezer section of that job.  And
13   for, like, Mercedes, through Automation and
14   stuff.
15       Q.   And those were jobs you had --
16   the warehouse jobs were jobs you got through
17   the temp agencies?
18       A.   Yes, ma'am.
19       Q.   And those would have been the
20   PrideStaff or the Dedicated Personnel
21   agencies?
22       A.   Yes, ma'am.
23       Q.   Did your paycheck come from

Page 27

1    PrideStaff or Dedicated Personnel, or did it
2    come from the company for which you were
3    working?
4        A.   It came from PrideStaff and
5    Dedicated Personnel.
6        Q.   Okay.  How long was that period
7    where you were trying to work for warehouses
8    through the temp agencies?
9        A.   After I lost my job with Outback
10   and Pappadeaux.
11       Q.   Was there a period of time where
12   you were unemployed after Outback and did
13   you say Pappadeaux?
14       A.   Yes, ma'am.
15       Q.   Okay.  Was there a period of time
16   where you were unemployed after those jobs
17   ended?
18       A.   Yes, ma'am.
19       Q.   About how long?
20       A.   Up until I was able to get the --
21   get the job with Milo's.  So during that
22   gap, since -- you remember -- the accident
23   was in 2020.  I didn't get a stable job

Page 28

1    until 2021 of August when I worked for
2    Milo's Tea Company.
3        Q.   Okay.  When you were working
4    through the temp agencies at the warehouses
5    and realized that there were some things you
6    couldn't perform, did you talk to anybody
7    about maybe changing your job duties?
8        A.   It doesn't work like that.  When
9    you take the temp service job, they tell you
10   what you will be doing.  So you have got to
11   do what they ask you to do when you get
12   there.
13       Q.   And what was the reason your
14   warehouse jobs ended through the temp
15   service?
16       A.   They don't tell you.
17       Q.   Okay.  So before the warehouse
18   jobs through the temp services, you were
19   working for both Outback and Pappadeaux?
20       A.   Yes, ma'am.
21       Q.   At the same time?
22       A.   Yes, ma'am.
23       Q.   Okay.  When did you start --

                                  7  (Pages 25 to 28)

Alexandria Bennett                                        6/14/2023

Page 29

1    let's start with Outback first.  When did
2    you start there?
3        A.   I worked there for at least three
4    years, I know.
5        Q.   And which location?
6        A.   Hoover and the 280 location.
7        Q.   Did you just kind of go wherever
8    they needed you?
9        A.   No, ma'am.  I was at the Hoover
10   location first, and I managed the 280
11   location.
12       Q.   I see.  Okay.  So about three
13   years before the Outback job ended you
14   started at Hoover; is that right?
15       A.   Yes, ma'am.
16       Q.   And what was your job title when
17   you first started with Outback in Hoover?
18       A.   Prep cook.
19       Q.   And at that time, what were you
20   earning?
21       A.   I was making, like, $16 at
22   Outback, about $16.
23       Q.   Were you also given tips as a

Page 30

1    prep cook?
2        A.   No, ma'am.
3        Q.   Okay.  Who was your supervisor
4    when you were in that job position at
5    Hoover?
6        A.   Mario.
7        Q.   Do you remember his last name?
8        A.   No, ma'am.
9        Q.   That's okay.
10       A.   We called him Mario.
11       Q.   I understand.  Okay.  So at some
12   point -- when you were at the Hoover
13   Outback, did your job title ever change, or
14   were you always a prep cook at the Hoover
15   Outback?
16       A.   Yes, ma'am, it changed once I got
17   to the 280 one, because I managed that
18   store.
19       Q.   Okay.  How long were you at the
20   Hoover store?
21       A.   About a year, I would say.
22       Q.   And then you were -- I assume it
23   was a promotion as a manager at the 280

Page 31

1    store?
2        A.   I transferred with Mario to that
3    store, because he wanted me to come to that
4    store with him.
5        Q.   Okay.  When you moved to the 280
6    store, did your pay change at all?
7        A.   I got more hours and more
8    money.  I didn't start off with 16.  So I
9    probably -- I worked my way up to that.
10       Q.   Okay.  So when you were the
11   manager at the 280 store, you were getting
12   16 and probably a little less at the Hoover
13   store?
14       A.   Yes.  I was getting way less at
15   the Hoover store.
16       Q.   Okay.  All right.  I know I'm
17   jumping around.  I apologize.  But that's
18   the way my brain works sometimes.
19       A.   You're fine.  That's fine.
20       Q.   At the Hoover Outback store, how
21   often were you working there, how many days
22   a week and what were your hours?
23       A.   I worked every day.  I would work

Page 32

1    morning to night, open to close.
2        Q.   All right.  At the 280 Outback
3    store, you got a pay increase, and I think
4    you said your hours changed; is that right?
5        A.   I got more hours, yes.  I still
6    worked open to close with Outback.
7        Q.   Was it Monday through Friday or
8    weekends too?
9        A.   Weekends too.
10       Q.   Okay.  So seven days a week, open
11   to close?
12       A.   Yes, just about.
13       Q.   And was Mario still your
14   supervisor at the 280 store?
15       A.   Yes, ma'am.
16       Q.   As part of your job at the 280
17   Outback store, did you receive any paid
18   vacation or paid sick days?
19       A.   I had paid sick days, but I don't
20   think I took them or anything.  I think I
21   just -- you know how you put it in to get an
22   extra check or something like that.
23       Q.   Any idea how many paid sick days

                                8  (Pages 29 to 32)

Alexandria Bennett                                              6/14/2023

Page 33

1    you were given there?
2        A.   Uh-uh (negative).
3        Q.   Is that a yes or no?
4        A.   Oh, no, ma'am.
5        Q.   Thank you.
6        A.   I can't recall.
7        Q.   From the time you started at the
8    280 store until that job ended, did your job
9    title change at any point, or were you the
10   manager that entire time period?
11       A.   At the 280 store?
12       Q.   Yes.  Have you ever held any
13   other job titles at the 280 store besides
14   store manager or restaurant manager?
15       A.   No, ma'am.
16       Q.   Okay.  And did your pay stay the
17   same the entire time you were at the 280
18   Outback store?
19       A.   I got a raise at one point.
20   That's why I got up to 16.
21       Q.   What were you making back on
22   October 15, 2020, at Outback?
23       A.   I was making about 16.

Page 34

1        Q.   Did you receive any health
2    insurance through your job at Outback?
3        A.   I didn't have any health
4    insurance.
5        Q.   On October 15, 2020, you did not
6    have health insurance; is that right?
7        A.   Yes, ma'am.
8        Q.   All right.  When did your job at
9    the 280 or with Outback, either store, when
10   did that end?
11       A.   Right before the holidays.
12       Q.   Okay.  You never went back to the
13   Hoover store, did you?
14       A.   No, ma'am.
15       Q.   So the holidays of 2020?
16       A.   Yes, ma'am.
17       Q.   So it would have been the end of
18   the year of 2020?
19       A.   Yes, ma'am.
20       Q.   And why did your job end with
21   Outback back then?
22       A.   I wasn't able to perform like I
23   used to.

Page 35

1        Q.   Okay.  Specifically what job
2    duties were you unable to perform?
3        A.   I wasn't able to manage the
4    kitchen like I used to.  I wasn't able to
5    stand up for long periods of time anymore.
6    It was just hard to work so...
7        Q.   And what prevented you from
8    managing the kitchen like you had done
9    before?
10       A.   My ankle.
11       Q.   Is that also what prevented you
12   from standing up for long periods of time?
13       A.   Yes, ma'am.
14       Q.   When did it start becoming a
15   problem for you to do your job duties at the
16   280 Outback store?
17       A.   After the accident.
18       Q.   Immediately after it?
19       A.   Yes, ma'am.
20       Q.   Was Mario your supervisor the
21   entire time you were at the 280 location?
22       A.   Yes, ma'am.
23       Q.   Did you ever go to Mario and ask

Page 36

1    him if he could change some of your job
2    duties?
3        A.   Yes, ma'am.
4        Q.   Tell me how that went.
5        A.   I wasn't able to do the work as a
6    manager of the back of the house.  He would
7    come in and, you know, help out with getting
8    things done and stuff.  But I wasn't able to
9    manage like I used to.  I wasn't the same
10   anymore.
11       Q.   Are there any other job duties
12   that you couldn't perform after the
13   October 15, 2020, incident besides being
14   able to stand for long periods of time or
15   manage the kitchen the way you had?
16       A.   You said is there any more?
17       Q.   Sure.  I'm trying to figure out
18   -- if you can just tell me all of the job
19   duties that you were not able to perform
20   after October 15, 2020.  What were those
21   specific job duties that you were no longer
22   able to perform?
23       A.   So we said stand.  I wasn't able

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                    6/14/2023

Page 37

1    to move around.  I wasn't able to get my
2    recipes done in time enough like I was
3    supposed to.  I just wasn't able to work the
4    same, period.
5        Q.   And was it your ankle that caused
6    all of those problems?
7        A.   Yes, ma'am.
8        Q.   What about your ankle was it that
9    caused the problems?
10       A.   I was in pain.  I couldn't stand
11   up.  Also, you know, like, being the star of
12   the kitchen, I would, you know, try to still
13   do my job.  And I wasn't -- I knew I wasn't
14   the same anymore.
15       Q.   When you talk about not being
16   able to get recipes done on time, what was
17   that?  What were the recipes that you had to
18   do?
19       A.   Any recipes in the kitchen, as in
20   stuff that needed to be made by the time it
21   opened up or served to the customers.
22       Q.   Were you cooking?
23       A.   Yes, ma'am.

Page 38

1        Q.   Okay.  And had you been
2    performing those same job duties at the
3    Outback 280 store before October 15, 2020?
4        A.   Yes, ma'am.
5        Q.   Like the cooking and being on
6    your feet?
7        A.   Yes, ma'am.
8        Q.   Did you ever talk to Mario and
9    ask him if there was another job that you
10   could do that would allow you to sit more?
11       A.   Well, when you are managing or in
12   any position in a restaurant, it's really
13   not a sit-down job.
14       Q.   Did he tell you there weren't any
15   sit-down jobs available?
16       A.   We just decided to part ways.
17       Q.   And that's what I was going to
18   ask you about next.  Did you resign, or were
19   you let go from Outback?
20       A.   I was let go.
21       Q.   Were you given a reason as to why
22   they were letting you go?
23       A.   I wasn't the same anymore, so I

Page 39

1    knew I couldn't perform like I was supposed
2    to perform.  So that was the best decision.
3        Q.   Is that what you were told?
4        A.   Yes, ma'am.  I agreed with him.
5        Q.   Was it Mario that let you go?
6        A.   Yes, ma'am.
7        Q.   Following October 15, 2020, did
8    any of your doctors ever give you any work
9    restrictions?
10       A.   What does that mean?
11       Q.   Sure.  It would be -- first of
12   all, did they ever tell you you could not
13   return to work until X date?  Like, did they
14   ever tell you, Do not work until a certain
15   date?
16       A.   Are you talking about when I went
17   to the hospital for the --
18       Q.   Sure.  Just any time after
19   October 15, 2020.
20       A.   Well, I tried to get seen for it,
21   but I wasn't able to be seen because I
22   didn't have insurance.  So I tried to see
23   what was wrong.  I wasn't able to be seen.

Page 40

1        Q.   Okay.  Was there a doctor that
2    ever said, I don't want you to work until
3    another three months, or something like
4    that?
5        A.   During 2020?
6        Q.   Yes.  Or 2021.
7        A.   Yes, ma'am.
8        Q.   Okay.  Which doctor was that that
9    gave you a work restriction?
10       A.   Well, I wasn't supposed to work
11   when I had my surgery.
12       Q.   Okay.  For how long?
13       A.   I'm not sure.
14       Q.   At some point were you told that
15   you could return to work after the surgery?
16       A.   I'm not sure.
17       Q.   Were you ever told either not to
18   be on your feet or given any weight lifting
19   restrictions?
20       A.   With the ankle?
21       Q.   Right.  Or any of the injuries
22   that you relate to the incident at Wal-Mart.
23       A.   I couldn't be on my feet because,

10  (Pages 37 to 40)

Alexandria Bennett                                          6/14/2023

Page 41

1    when I was on my feet, I was in pain.
2        Q.  And I understand that.  I'm just
3    wondering if any doctor ever said, I don't
4    want you on your feet for a period of three
5    weeks, three months, or whatever.
6        A.  Well, see, after the accident, I
7    went to the hospital.  I was referred to the
8    orthopedic.  But during that time, I didn't
9    have insurance, so it was hard for me to try
10   to be seen.  I knew something was wrong.
11   But at the time, I didn't have insurance to
12   be seen and, you know, get the help that I
13   needed.
14       Q.  At some point did you get health
15   insurance?
16       A.  Yes, ma'am.
17       Q.  When did you get health
18   insurance?
19       A.  I finally got insurance the
20   following year in January.
21       Q.  So January of 2021?
22       A.  Yes, ma'am.
23       Q.  And was that provided through a

Page 42

1    job?
2        A.  No, ma'am.
3        Q.  Who was your health insurance
4    with when you got it in January '21?
5        A.  I went through the health market.
6        Q.  Are you the policyholder on the
7    health insurance?
8        A.  Yes, ma'am.
9        Q.  Do you know which insurance
10   company has the insurance?
11       A.  I'm not sure.  I'm thinking Blue
12   Cross Blue Shield.
13       Q.  Have you had the same health
14   insurance policy since January of 2021?
15       A.  I don't have insurance.
16       Q.  Okay.  How long did you have it
17   after you got it in January of 2021?
18       A.  I would say a few months.  My mom
19   helped me pay for it since I was in between
20   jobs, trying to find a job.  So she helped
21   me pay for it because she knew I needed to
22   see what was going on with the ankle.
23           MS. WASHINGTON:  Can we pause and

Page 43

1    take a break?
2            MS. GORDON:  Sure.
3            (Whereupon, a brief recess was
4            taken from 2:08 p.m. until
5            2:11 p.m.)
6        Q.  (By Ms. Gordon)  Okay.  Just to
7    clarify, since October of 2020, have you had
8    health insurance with any entity besides
9    Blue Cross Blue Shield?
10       A.  No, ma'am.
11       Q.  Okay.  And you just had it for a
12   period of a few months; is that right?
13       A.  Yes, ma'am.
14       Q.  All right.  Now tell me about
15   your job at Pappadeaux.  When did you start
16   there?
17       A.  I will say I worked there for
18   about a year.
19       Q.  Which Outback location were you
20   working at when you also worked at
21   Pappadeaux?
22       A.  The 280.
23       Q.  All right.  And what were your

Page 44

1    hours at Pappadeaux?
2        A.  I would work during the
3    nighttime.
4        Q.  About what time would you get
5    there and what time would you leave?
6        A.  I will say I was supposed to be
7    there around five and leave at closing time.
8        Q.  And how many days a week did you
9    do that?
10       A.  I will say probably about -- I
11   know the weekends.  About four or five days
12   or three to four days.  I'm not sure.
13       Q.  Was that the case the entire year
14   you worked there?
15       A.  Ma'am?
16       Q.  Was that the case the entire time
17   you worked there where you worked about
18   three to five days a week?
19       A.  Yes, ma'am.
20       Q.  And worked the nighttime hours?
21       A.  Yes, ma'am.
22       Q.  And who was your supervisor when
23   you worked at Pappadeaux?

11  (Pages 41 to 44)

Alexandria Bennett                                          6/14/2023

Page 45

1    A.   Mr. Warren.
2    Q.   What was your job title there?
3    A.   I only worked at the pantry
4  section -- station, I mean, I'm sorry.
5    Q.   Was that a stand-up job?
6    A.   Yes, ma'am.
7    Q.   And did you have any other jobs
8  at Pappadeaux?
9    A.   No, ma'am.
10   Q.   What did you earn there?
11   A.   I will say probably about 14 -- I
12 can't recall -- I believe.
13   Q.   Were you working at Pappadeaux on
14 October 15, 2020?
15   A.   I think I had stopped working
16 there by then.
17   Q.   And why did you stop working at
18 Pappadeaux?
19   A.   I went to be full-time with
20 Outback.
21   Q.   When you were working at
22 Pappadeaux, were you part-time with Outback?
23   A.   No.  I was still full-time.

Page 46

1    Q.   Okay.
2    A.   But you know when I said "morning
3  and night," I went back to work morning and
4  night with Outback.  So I gave up my nights
5  at one point and went to Pappadeaux.  And
6  then I stopped working with them, and I was
7  just full-time with Outback.
8    Q.   Okay.  And did your leaving
9  Pappadeaux have anything to do with any of
10 the claims you are making in this lawsuit?
11   A.   No, ma'am.
12   Q.   Because that happened before the
13 incident; is that right?
14   A.   Yes, ma'am.
15   Q.   All right.  After your job at
16 Outback ended, I believe you told me there
17 was a period of time where you were not
18 employed at all; is that correct?
19   A.   Yes, ma'am.
20   Q.   And then you started those temp
21 jobs with the warehouses; is that right?
22   A.   Yes, ma'am.
23   Q.   Okay.  Any other jobs in between

Page 47

1  Outback and when you started with Milo's?
2    A.   No, ma'am, I don't think so.
3    Q.   Were there any jobs that you
4  applied for but did not get in between that
5  time period?
6    A.   Yes, ma'am.
7    Q.   Tell me about those.
8    A.   I did numerous applications.
9    Q.   Were there places where you sent
10 in an application, and then you would get
11 called back for an interview?
12   A.   Yes, ma'am.
13   Q.   Did you make it to the interview
14 point for any of those jobs?
15   A.   Uh-huh (affirmative).
16   Q.   And what were you told at the
17 interviews?
18   A.   I would receive a call back or
19 something like that.
20   Q.   And then you didn't receive a
21 call?
22   A.   Uh-uh (negative).
23   Q.   Okay.  Do you remember where any

Page 48

1  of those jobs were that you applied for but
2  did not get?
3    A.   A lot of hospital jobs.  I tried
4  to get the sit-down jobs and stuff.
5    Q.   Now, are you claiming that you
6  missed time from work as a result of the
7  incident on October 15, 2020?
8    A.   Yes, ma'am.
9    Q.   Okay.  And that would have been
10 time that you missed from your job with
11 Outback on 280?
12   A.   Yes, ma'am.
13   Q.   Are you claiming that you missed
14 time from work with any other jobs as a
15 result of October 15, 2020?
16   A.   Yes, ma'am.
17   Q.   Okay.  Where else?
18   A.   I think I was let go because I
19 wasn't able to perform.  Like, all the temp
20 service jobs, I think I was let go because I
21 wasn't able to perform.
22   Q.   Okay.  What did you earn through
23 those temp jobs, the warehouses?

12  (Pages 45 to 48)

Alexandria Bennett                                    6/14/2023

Page 49

1      A.   The bare minimum, like, $12 to
2  $13.  Or sometimes 8 they -- they would say.
3         COURT REPORTER:  Did you say
4  "Sometimes 8?"
5      A.   Like, 8.75.
6      Q.   (By Ms. Gordon)  Did you resign
7  from any of the temp jobs that you had in
8  between Outback and Milo's?
9      A.   No, ma'am.
10      Q.   Any of them that ended, it was
11  because you were let go?
12      A.   Yes, ma'am.
13      Q.   And it's your testimony that you
14  were let go from those jobs because you
15  could not perform your job duties?
16      A.   Yes, ma'am.
17      Q.   And would it be PrideStaff and
18  Dedicated Personnel that would have any
19  payroll or attendance records for those temp
20  jobs?
21      A.   Yes, ma'am.
22      Q.   All right.  Tell me about any
23  time that you missed from work at Outback

Page 50

1  280 that you claim was a result of
2  October 15, 2020.
3      A.   Can you explain that question?
4      Q.   Sure.  Are you claiming that
5  there were days that you could not go to
6  work at Outback because of the incident at
7  Wal-Mart?
8      A.   I went to work.  I couldn't
9  perform the duties of the job like I was
10  supposed to, like I did before the accident.
11      Q.   Okay.  And I understand that your
12  testimony is that you were let go from there
13  because you could not perform the jobs; is
14  that right?
15      A.   Yes, ma'am.
16      Q.   Okay.  But before you were let
17  go, were there any days where you are
18  claiming you couldn't go to work because of
19  injuries you relate to the incident at
20  Wal-Mart?
21      A.   No, ma'am.
22      Q.   Or are you claiming that there
23  were days where you couldn't work a full day

Page 51

1  even though you were scheduled to work a
2  full day because of injuries you relate to
3  the incident at Wal-Mart?
4      A.   So are you saying, like, did
5  I decide to stay there even though I
6  couldn't -- I wasn't able to stand up or
7  something?
8      Q.   No.  It would be more, like, are
9  you claiming that there were days you had to
10  call in and say, I can't come because I am
11  in so much pain or --
12      A.   No, ma'am.  Because I had bills,
13  so I had to go to work.
14      Q.   Okay.  And you were not provided
15  health insurance through Outback; correct?
16      A.   No, ma'am.
17      Q.   That was a bad question.
18         Did Outback provide you with
19  health insurance?
20      A.   I didn't have health insurance.
21      Q.   Okay.  Have you ever applied for
22  unemployment benefits?
23      A.   No, because I was working during

Page 52

1  that time, so I couldn't apply.
2         By the time I was let go, I'm not
3  sure if I applied for it.  I don't think I
4  did.  I don't know.
5      Q.   Okay.  And before we move on to
6  another topic, I'm going to mark a pay stub
7  that you gave us as part of your document
8  production as Defendant's Exhibit 1.  And I
9  am going to give you a copy of it.  And I
10  think I have mine.
11         Is this one of your pay stubs
12  from when you worked at Outback?
13      A.   Yes, ma'am.
14         (Whereupon, Defendant's Exhibit
15         No. 1 was marked and is attached
16         to the original transcript.)
17      Q.   (By Ms. Gordon)  Okay.  And what
18  is the -- this was for the pay period of
19  June 3, 2019, through June 16, 2019; is that
20  correct?  It looks like the top right is
21  where I saw it.
22      A.   Yes, ma'am.
23      Q.   Okay.  And it says that -- so

13  (Pages 49 to 52)

Alexandria Bennett                                      6/14/2023

Page 53

1    that would have been before October 15,
2    2020; right?
3        A.   Uh-huh (affirmative).
4        Q.   Is that a yes?
5        A.   Yes, ma'am.
6        Q.   Okay.
7        A.   I'm sorry.
8        Q.   That's okay.  And in June of
9    2019, it looks like your pay rate was
10   $15.25.  Does that sound right to you?
11       A.   Yes, ma'am.
12       Q.   And you were paid on a biweekly
13   basis?
14       A.   Yes, ma'am.
15       Q.   Okay.  Do you think that your pay
16   changed between June of 2019 and October of
17   2020?
18       A.   Yes, ma'am.
19       Q.   All right.  Do you have a more
20   current pay statement from Outback or one
21   that was closer to October of 2020?
22       A.   No, ma'am.
23       Q.   Would your pay have increased

Page 54

1    between June of 2019 and October of 2020?
2        A.   I made a lot of hours at Outback.
3    So I think it would have probably been more
4    around the same.  How many hours are on
5    there?  Yeah, I worked a lot of hours there.
6        Q.   Yes, this one shows 36.5667.  So
7    would that be a typical week for you at
8    Outback?
9        A.   On 280, I was working overtime.
10   So I got more than 36 hours over there.
11       Q.   And it looks like this was the
12   280 one.  Do you see the unit?  It says
13   "Inverness."  Is that the 280 location?
14   Kind of top middle.
15       A.   Top middle?
16       Q.   Yes.  Let me point to it.  I saw
17   it right there (indicating).
18       A.   Yes, ma'am.
19       Q.   So does that mean this was a pay
20   statement from the 280 location?
21       A.   Yes, ma'am.
22       Q.   And it's for a pay period of
23   about 13 days.  So that would be about the

Page 55

1    two-week pay period; correct?
2        A.   Yes, ma'am.
3        Q.   So the total number of hours
4    worked would be for a two-week period; is
5    that right?
6        A.   Yes, ma'am.
7        Q.   So you worked about 36.5 hours
8    over a two-week period; is that right?
9        A.   Or more, yes, ma'am.
10       Q.   And it lists your -- in the
11   earnings section, it lists your job as
12   A.M. prep.  Do you know what that stands
13   for?
14       A.   Yes, ma'am.
15       Q.   What does it stand for?
16       A.   A.M. prep.
17       Q.   Like, morning prep?
18       A.   Yes, ma'am.
19       Q.   A prep cook?
20       A.   That's the job description that
21   they had me in as.
22       Q.   Did that job description ever
23   change on your pay statement when you became

Page 56

1    manager?
2        A.   No, ma'am.  They just changed the
3    pay, the pay rate.
4        Q.   Okay.  And your current job, have
5    you been told an end date, or is it just
6    kind of to be determined?
7        A.   It's a temp service so, you know,
8    it's temp to hire.
9        Q.   Okay.  What about have you ever
10   been arrested or convicted of a crime?
11       A.   No, ma'am.
12       Q.   Have you ever filed for
13   bankruptcy?
14       A.   No, ma'am.
15       Q.   Are you a member of any churches,
16   social clubs, or organizations in either
17   Jefferson, Blount, or Shelby County?
18       A.   Say that again.
19       Q.   Sure.
20       A.   Do I go to church?
21       Q.   I'm just asking -- this is just
22   for purposes of picking people for the jury.
23   I don't want some of your church members,

Alexandria Bennett                                    6/14/2023

Page 57

1    your friends, or friends from other
2    organizations on the jury, just like you
3    probably wouldn't want people that are
4    employed by Wal-Mart or something on the
5    jury.
6         But do you have any -- are you a
7    member of any churches, social clubs, or
8    organizations in either Jefferson, Shelby
9    County, or Blount County?
10   A.   No, ma'am.
11   Q.   Okay.  All right.  Before
12   October 15, 2020, were you taking any
13   medication on a regular basis?
14   A.   No, ma'am.
15   Q.   Were you suffering from any
16   chronic medical conditions before
17   October 15, 2020?
18   A.   No, ma'am.
19   Q.   Had you been diagnosed with
20   diabetes or high blood pressure, anything
21   like that, before October 15, 2020?
22   A.   No, ma'am.
23   Q.   Have you since been diagnosed

Page 58

1    with any chronic medical conditions?  And
2    that would be things that require you to
3    take medicine on a regular basis, like high
4    blood pressure or diabetes.
5    A.   No, ma'am.
6    Q.   Did you play any sports in high
7    school?
8    A.   I ran track.
9    Q.   Were you ever injured doing that?
10   A.   No, ma'am.
11   Q.   Have you ever suffered an
12   on-the-job injury?
13   A.   No, ma'am.
14   Q.   Have you ever filed for workers'
15   compensation benefits?
16   A.   No, ma'am.
17   Q.   Before October 15, 2020, were you
18   involved in any sports or exercise
19   activities?
20   A.   No, ma'am.
21   Q.   Before October 15, 2020 had you
22   ever suffered any injuries to your back?
23   A.   No, ma'am.

Page 59

1    Q.   Had you ever suffered any
2    injuries to either of your hips before
3    October 15, 2020?
4    A.   No, ma'am.
5    Q.   What about to either of your
6    ankles; had you ever suffered any injuries
7    to either of your ankles before October 15,
8    2020?
9    A.   Yes, ma'am.
10   Q.   Will you tell me about that,
11   please?
12   A.   I have been in a car accident
13   before.
14   Q.   Okay.  When was that?
15   A.   I believe -- I believe at the
16   beginning of 2020.
17   Q.   Okay.  Where were you when that
18   happened?
19   A.   Birmingham, Alabama.
20   Q.   Were you on the interstate or the
21   side road or -- where were you?
22   A.   I was on a regular road.
23   Q.   Okay.  What part of Birmingham?

Page 60

1    A.   I think it was Birmingham,
2    Alabama, like the west side or something.
3    Q.   Okay.  And tell me how the
4    accident happened.
5    A.   It was raining, and I lost
6    control of the vehicle.  A head collision --
7    a head-on collision.
8    Q.   With another car?
9    A.   Yes, ma'am.
10   Q.   You were the driver of your car?
11   A.   Yes, ma'am.
12   Q.   What type of car were you in?
13   A.   Hyundai Sonata.
14   Q.   Was anybody in the car with you?
15   A.   Yes, ma'am.
16   Q.   Who was with you?
17   A.   A friend.
18   Q.   What was his or her name?
19   A.   I don't know the last name.
20   Brandon.
21   Q.   Okay.  Was a police report
22   completed as a result of that accident?
23   A.   Yes, ma'am.

15  (Pages 57 to 60)

Alexandria Bennett                                            6/14/2023

Page 61

1      Q.   Do you remember which police
2   entity -- that's the best word I can come up
3   with -- completed it?
4      A.   No, ma'am.
5      Q.   Was it, like, the Birmingham
6   Police Department or a city police
7   department?
8      A.   I believe so.  Probably.
9      Q.   You think it was Birmingham?
10     A.   Yes, ma'am.
11     Q.   Were you given any citations or
12  tickets as a result of that accident?
13     A.   What does that mean?
14     Q.   Like, did they give you a ticket,
15  like, for no insurance or no seat belt or
16  speeding or DUI or anything like that?
17     A.   No, ma'am.
18     Q.   Okay.  Was the Hyundai damaged in
19  the accident?
20     A.   Yes, ma'am.
21     Q.   Was it totaled?
22     A.   Yes, ma'am.
23     Q.   Did you have automobile insurance

Page 62

1   back then?
2      A.   I'm not sure.
3      Q.   Do you have it now?
4      A.   Yes, ma'am.
5      Q.   Who is it with now?
6      A.   It's a funny name.  I can't
7   remember the name of it.
8      Q.   If you think of it, just feel
9   free to interrupt me and let me know.
10     A.   Yes, ma'am.
11     Q.   Okay.  Were you injured in the
12  automobile accident?
13     A.   Yes, ma'am.
14     Q.   How were you injured?
15     A.   My spleen was cracked internally.
16  My knee was saturated [sic].  And my ankle
17  was sprained.
18     Q.   Okay.  Which knee?
19     A.   The left -- left one.
20     Q.   And which ankle?
21     A.   Right.
22     Q.   Were you taken by ambulance from
23  the scene?

Page 63

1      A.   Yes, ma'am.
2      Q.   And which hospital were you taken
3   to?
4      A.   Grandview.
5      Q.   Were you diagnosed with any
6   fractures or broken bones at Grandview?
7      A.   No, ma'am.
8      Q.   Did you stay there overnight, or
9   did you go home the same day?
10     A.   I was in the hospital a few days
11  because I was bleeding internally from the
12  spleen.
13     Q.   Did you have surgery on your
14  spleen?
15     A.   No, ma'am.  They called it off.
16     Q.   Did you have to have surgery on
17  your knee or your ankle?
18     A.   No, ma'am.
19     Q.   Did you receive treatment from
20  anywhere else, besides Grandview, as a
21  result of the 2020 automobile accident?
22     A.   No, ma'am.
23     Q.   Did you ever have to see an

Page 64

1   orthopedic doctor for any injuries from the
2   automobile accident?
3      A.   No, ma'am.
4      Q.   Okay.  So after that initial ER
5   visit, there was no other treatment related
6   to the automobile accident?
7      A.   No, ma'am.
8      Q.   Did any lawsuits arise out of
9   that accident?
10     A.   No, ma'am.
11     Q.   You haven't been sued and you
12  haven't sued anybody about that?
13     A.   No, ma'am.
14     Q.   Any other injuries to either your
15  hip, back, or ankles before October 15,
16  2020?
17     A.   No, ma'am.
18     Q.   Okay.  And besides the treatment
19  at Grandview, had any doctors treated you
20  for any hip, back, or ankle pain or problems
21  before October 15, 2020?
22     A.   No, ma'am.
23     Q.   Were you given a specific

16  (Pages 61 to 64)

Alexandria Bennett                                          6/14/2023

Page 65

1    diagnosis with regard to your ankle
2    following the 2020 automobile accident?
3        A.   The biggest thing was my knee,
4    because it had saturated out -- and the
5    spleen -- because it was cracked internally.
6    They wanted the blood to stop, and it
7    stopped on its own.
8        Q.   Okay.  Did you have to wear any
9    braces on your knee or your ankle after
10   that?
11       A.   Uh-uh (negative).
12       Q.   Is that a no?
13       A.   No, ma'am.
14       Q.   Thank you.  Did the automobile
15   cause you -- accident cause you to have pain
16   in either your knee or your ankle?
17       A.   My knee was hurting, but I think
18   my ankle was sprung or something --
19   sprained.
20       Q.   How long did it take for your
21   knee pain to go away, if it did?
22       A.   Not long.
23       Q.   Like a few weeks?  A few months?

Page 66

1        A.   I will say a few weeks, I guess,
2    because I had to get it stitched up.
3        Q.   Did you miss some work as a
4    result of the automobile accident?
5        A.   Whatever time they told me to be
6    off, that's what I was off, and I went back
7    to work.
8        Q.   Okay.  And did your ankle hurt
9    you at all after the automobile accident?
10       A.   No, ma'am.
11       Q.   Did you report ankle pain at the
12   ER that day, the day of the automobile
13   accident?
14       A.   It was sprained.
15       Q.   Okay.  And did the pain go away
16   right after you left the emergency room, or
17   did it linger for some time?
18       A.   It didn't go right away, but I
19   think they said it was healed.  The biggest
20   -- the biggest thing was my knee and, on the
21   inside, my spleen.
22       Q.   And you didn't have to have any
23   follow-up treatment with anyone for any of

Page 67

1    those injuries?
2        A.   No, ma'am.
3        Q.   Had all of the injuries from the
4    automobile accident healed by the time the
5    incident at Wal-Mart happened?
6        A.   I believe so.
7        Q.   And when you went to the ER after
8    the automobile accident, did any of the
9    doctors there recommend that you seek any
10   additional treatment for any of your
11   injuries from the automobile accident?
12       A.   I'm not sure.  I'm not sure.
13       Q.   Was that ER visit something you
14   had to pay for out of pocket after the
15   automobile accident?
16       A.   I'm not sure.
17       Q.   Okay.  Did you have health
18   insurance back then when the automobile
19   accident happened?
20       A.   No, ma'am.
21       Q.   Have you been involved in any
22   other automobile accidents, whether you were
23   the driver or a passenger, before

Page 68

1    October 15, 2020?
2        A.   No, ma'am.
3        Q.   Okay.  Have you been in any
4    automobile accidents since October 15, 2020?
5        A.   No, ma'am.
6        Q.   Have you suffered any falls or
7    other injuries to either your hip, your
8    back, or your ankles since October 15, 2020?
9        A.   Does that mean, like, have I --
10   did I have continuous pain or something?
11       Q.   No.  I'm really asking more,
12   like, have there been any -- I know you are
13   claiming that you fell on October 15, 2020.
14       A.   Uh-huh (affirmative).
15       Q.   Since that date, have you fallen
16   on any other occasions or been involved in
17   any other sort of accidents that led to
18   injuries to your ankle, hip, or your back?
19       A.   No, ma'am.
20       Q.   Okay.  Were you given any
21   medication for the injuries caused by the
22   automobile accident?
23       A.   No, ma'am.  I can't recall.

17  (Pages 65 to 68)

Alexandria Bennett                                        6/14/2023

---

Page 69

1     Q.   Okay.  What was your pharmacy
2  back then when you had the automobile
3  accident?  Where did you get prescriptions
4  filled?
5     A.   Usually, I will go to the
6  Wal-Mart Pharmacy.
7     Q.   Which location?
8     A.   Or not -- well, if it was
9  Wal-Mart, it was the one in Pelham.
10    Q.   Okay.
11    A.   And I go to CVS.
12    Q.   And which CVS?
13    A.   It would have been the one, like,
14 between Montgomery Highway...
15    Q.   Okay.
16    A.   I think that's where it is.  In
17 Hoover.
18    Q.   All right.  Who do you consider
19 your primary care doctor today?
20    A.   Today?
21    Q.   Yes.
22    A.   No one.
23    Q.   If you thought you had the flu or

---

Page 70

1  strep throat or something like that, where
2  would you go?
3     A.   I would go to UAB's -- I'm sorry.
4  I think it's, like, Urgent Care or
5  something.
6     Q.   But it's affiliated with UAB?
7     A.   Yes, ma'am.
8     Q.   Okay.  And back when -- like,
9  back early 2020, who did you consider your
10 primary care doctor?
11    A.   I can't recall.
12    Q.   I saw somewhere there was a
13 mention of a Dr. Shelley, and the last name
14 started with a "W," like Weisen-something.
15 Does that ring any bells?
16    A.   I'm not sure.
17    Q.   That's fine.  I can't even
18 remember the last name.
19        Okay.  Sitting here today, do you
20 recall any of your prior primary care
21 doctors?
22    A.   No, ma'am.
23    Q.   Okay.  I know you have been

---

Page 71

1  treated at Grandview.  And then I am going
2  to get to the point where I talk to you
3  about where you were treated for injuries
4  you relate to the incident at Wal-Mart.
5        But have you been to any other
6  ERs besides Grandview -- had you been before
7  October 15, 2020?
8     A.   Any other ERs?
9     Q.   Yes, ma'am.
10    A.   Before 2020?
11    Q.   Yes.
12    A.   I mean, if I went to the
13 hospital, it would have been in Shelby, at
14 Shelby Baptist.
15    Q.   All right.  What about were there
16 any urgent cares where you went more than
17 once before October 15, 2020?
18    A.   No, ma'am.
19    Q.   Okay.
20    A.   I don't think so.
21    Q.   Where did you deliver your
22 daughter?
23    A.   I delivered her -- I was supposed

---

Page 72

1  to deliver her at Shelby, but I delivered
2  her at UAB.
3     Q.   Okay.  Had you undergone any
4  surgeries before October 15, 2020?
5     A.   No, ma'am.
6     Q.   Had you broken any bones before
7  October 15, 2020?
8     A.   No, ma'am.
9     Q.   Had you seen a chiropractor
10 before October 15, 2020?
11    A.   No, ma'am.
12    Q.   What about since October 15,
13 2020, have you seen any chiropractors?
14    A.   After?
15    Q.   Yes.
16    A.   I'm not sure.
17    Q.   Okay.  And have you suffered any
18 broken bones since October 15, 2020?
19    A.   You are talking about, like, have
20 I broke something else or something?
21    Q.   Yes.
22    A.   No, ma'am.
23    Q.   Okay.  Have you had an ER visit

---

18  (Pages 69 to 72)

Alexandria Bennett                                        6/14/2023

Page 73

1  since the incident at Wal-Mart, not related
2  to that?
3      A.   No, ma'am.
4      Q.   Okay.
5      A.   But I had COVID.  I'm sorry.
6      Q.   I see.  Where were you treated
7  for that?
8      A.   I think UAB.  UAB told me I had
9  COVID.
10     Q.   Okay.  Are you doing okay, or do
11 you need a break?
12     A.   Can we take a break?
13     Q.   Sure.  It's a good stopping
14 point.  That's why I asked.
15     A.   Okay.
16          (Whereupon, a brief recess was
17          taken from 2:42 p.m. until
18          2:49 p.m.)
19     Q.   (By Ms. Gordon)  Okay.  How tall
20 are you?
21     A.   I will say probably, like,
22 five-four.
23     Q.   Five-four.  And now I want to ask

Page 74

1  you about October 15, 2020.  Tell me about
2  what time the incident we are here about
3  today happened.
4      A.   I know -- I know it was getting
5  towards nighttime.
6      Q.   And from the surveillance videos
7  that we got from Wal-Mart, it looks like --
8  well, they cover a big span.  But I think
9  the notes I have say it was around 7:20.
10 Does that sound right to you?
11     A.   Yes, ma'am.
12     Q.   Have you seen any of those
13 surveillance videos that I sent to your
14 lawyer?
15     A.   Yes, ma'am.
16     Q.   Okay.  Were you able to -- were
17 you shown on any of those videos?  Because I
18 tried to look for you, but I didn't know
19 what you looked like, so that made it hard.
20     A.   I've got the picture -- oh, no.
21 That was a picture then.  No.
22     Q.   Okay.  You haven't seen any of
23 the videos?

Page 75

1      A.   Uh-uh (negative).  I don't think
2  I've seen myself on a video.
3      Q.   Okay.
4      A.   But it was -- it was on, like,
5  the other side of something.
6      Q.   Well, and that's what -- I will
7  represent to you that they tried to find a
8  video.  There is no video on the aisle where
9  this happened.  And so --
10     A.   Yes, because I was surprised.  I
11 had -- I had heard that you-all didn't have
12 a camera on that -- on that aisle.
13     Q.   Correct.  And so they provided
14 the video footage from the cameras nearest
15 that aisle.
16     A.   Okay.
17     Q.   So those are the ones we have.
18 Those are the ones that I have sent to your
19 attorney.
20          And like I said, I looked through
21 them, and I couldn't identify you.  And I
22 was just curious if you were able -- if you
23 had looked at them and seen yourself shown

Page 76

1  on any of the videos.
2          Do you remember one way or the
3  other today if you are shown on any of those
4  videos?
5      A.   No, ma'am, because -- no, ma'am.
6      Q.   Okay.  That's fine.
7          All right.  So we think it was
8  about 7:20.  So towards the end of the day;
9  is that right?
10     A.   Yes, ma'am.
11     Q.   And you were living at The Pearl
12 at the time?
13     A.   Yes, ma'am.
14     Q.   And this was at the Wal-Mart in
15 Helena?
16     A.   Yes, ma'am.
17     Q.   Okay.  What had you been doing
18 that day?
19     A.   I was going in there shopping for
20 dinner.
21     Q.   Okay.  And from my recollection,
22 there is a Wal-Mart probably a little closer
23 to you in Homewood.  Were you in Helena for

19 (Pages 73 to 76)

Alexandria Bennett                                    6/14/2023

---

Page 77

1   a reason?  What were you doing in Helena?
2       A.   At that time, my daughter's
3   grandmother, they are, like, from there.
4   So, you know, you can go a way to Bessemer.
5   So we would go through that way and stop
6   right there at that -- in Helena going to
7   her grandma's house.
8       Q.   Okay.  And so when you say --
9   it's your daughter's grandmother?
10      A.   Uh-huh (affirmative).
11      Q.   So would it be Kevin's --
12      A.   Kevin's mom.
13      Q.   Kevin's mom?
14      A.   Yes, ma'am.
15      Q.   And she lives in Helena?
16      A.   She lives in Bessemer.
17      Q.   In Bessemer?
18      A.   Uh-huh (affirmative).
19      Q.   So where were you -- were you
20  driving to Bessemer when you stopped at the
21  Helena Wal-Mart?  Where were you coming from
22  and where were you headed when you stopped
23  at --

---

Page 78

1       A.   I believe I was going to get her.
2   That would have been the only way I was in
3   Helena, because Helena is right by Bessemer.
4   We will take that road right there to get to
5   Allyson's grandma's house.
6       Q.   Had you worked that day?
7       A.   I can't recall.
8       Q.   Okay.  But you think you were
9   probably coming from the Homewood area or
10  possibly from the Outback?
11      A.   I wasn't coming from the Homewood
12  area.  I'm not sure what I was -- where I
13  was coming from.
14      Q.   Okay.  But you think you ended up
15  in Helena because you were on your way to
16  Bessemer to get your daughter?
17      A.   Yes, ma'am.
18      Q.   Okay.  Had you already picked up
19  your daughter by the time you stopped at the
20  Helena Wal-Mart?
21      A.   No, ma'am.
22      Q.   Was anyone with you when you
23  stopped at the Helena Wal-Mart?

---

Page 79

1       A.   Yes, ma'am.
2       Q.   Who was with you?
3       A.   Kevin.
4       Q.   That's Kevin ███?
5       A.   Yes, ma'am.
6       Q.   Was it already dark outside when
7   you stopped there?
8       A.   I can't -- I don't remember.
9       Q.   And another test of your memory,
10  what was the weather like then?
11      A.   It was fine.
12      Q.   All right.  No rain?
13      A.   No, ma'am.
14      Q.   The parking lot wasn't wet as far
15  as you remember?
16      A.   No, ma'am.  It wasn't raining
17  that day.
18      Q.   And what were you stopping at
19  Wal-Mart for?
20      A.   To get a couple of items.
21      Q.   Do you remember what you were
22  getting?
23      A.   No, ma'am.

---

Page 80

1       Q.   All right.  Which -- is there
2   more than one entrance to that store?
3       A.   Yes, ma'am.
4       Q.   Do you remember which entrance
5   you went in?
6       A.   No, ma'am.
7       Q.   Did Kevin go inside with you?
8       A.   Yes, ma'am.
9       Q.   I took some screenshots from the
10  surveillance video so that maybe it would
11  refresh your recollection about which
12  entrance you went in.  And I will mark the
13  first one as Defendant's Exhibit 2 and the
14  second one as Defendant's Exhibit 3.
15          Do you recognize either of these
16  as being the entrance that you went in?
17      A.   I can't remember which entrance I
18  went in.
19          (Whereupon, Defendant's Exhibit
20          Nos. 2 and 3 were marked and are
21          attached to the original
22          transcript.)
23      Q.   (By Ms. Gordon)  That's fine.

---

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                           6/14/2023

Page 81

1    Okay.  So you went in an
2  entrance.  And once you got inside, where
3  did you go from there?
4    A.  I'm not sure.  I just know I went
5  in there to get a few items for dinner.  I
6  don't remember, like, everything I did.  I
7  don't remember.
8    Q.  Okay.  Where did the incident
9  happen?
10   A.  On the water aisle.
11   Q.  Like, where they sell the bottled
12  water?  Is that what you mean by "the water
13  aisle"?
14   A.  Yes, ma'am.
15   Q.  Did you and Kevin stay together
16  the entire time you were in Wal-Mart that
17  night?
18   A.  Yes, ma'am.
19   Q.  And did you have a buggy with
20  you, a cart, a grocery cart?
21   A.  I'm not sure.
22   Q.  Were you carrying anything like a
23  purse or a phone?

Page 82

1    A.  I know I probably had my purse
2  over my shoulder.
3    Q.  What were you wearing that
4  evening?
5    A.  I'm not sure, but I know I had
6  some burgundy -- or some colored hair.
7    Q.  Okay.  Any idea what shoes you
8  were wearing that evening?
9    A.  They were sturdy shoes.
10   Q.  Can you describe them for me?
11   A.  No, ma'am.
12   Q.  How long had you been in this
13  store before the fall happened?
14   A.  I don't believe I was in there
15  long.
16   Q.  Any estimate as to how long?
17   A.  I will probably say, I believe,
18  probably 10 to 15 minutes.
19   Q.  Did you go down other aisles
20  before you went down the water aisle, or did
21  you go straight to the water aisle when you
22  got there?
23   A.  No, ma'am.

Page 83

1    Q.  You went down some other aisles
2  first?
3    A.  Yes, ma'am.
4    Q.  Did you have any problems going
5  down those aisles?
6    A.  No, ma'am.
7    Q.  Did you observe anything on the
8  aisles you went down before the water aisle
9  that caused you any concern?
10   A.  No, ma'am.
11   Q.  Did you pass by any employees of
12  Wal-Mart that you remember before you went
13  down the water aisle?
14   A.  I don't remember.
15   Q.  Okay.  All right.  And if you
16  will, just describe for me in as much detail
17  as you can what happened that day on the
18  water aisle.
19   A.  I went to reach to get some
20  water, and I slipped and fell.
21   Q.  About how far down the water
22  aisle was it when this happened -- where
23  this happened?

Page 84

1    A.  I don't think I was down too far.
2    Q.  Like, had you made it halfway or
3  not even halfway?  Any idea?
4    A.  No, it wasn't halfway.
5    Q.  Did you enter the water aisle
6  from the front of the store or the back of
7  the store?
8    A.  It was the back of the store, I
9  think -- I believe.
10   Q.  Was anything blocking your view
11  of the water aisle before you walked down
12  it?
13   A.  No, ma'am.
14   Q.  Was there anything blocking your
15  view of the floor on the water aisle before
16  you walked down it?
17   A.  No, ma'am.
18   Q.  Were there any displays or
19  anything out in the middle of the aisle of
20  the water aisle that day?
21   A.  No, ma'am.
22   Q.  Okay.  Were you sick that day?
23   A.  No, ma'am.

21  (Pages 81 to 84)

Alexandria Bennett                                    6/14/2023

Page 85

1    Q.   And you had your contacts on;
2  right?
3    A.   Yes, ma'am.
4    Q.   Okay.  Did you see anything on
5  the floor of the water aisle before you
6  walked down it that day?
7    A.   I mean, the floor was -- you know
8  how you see, like, scuff marks?  The floor
9  was, like, real scuffed up there so -- you
10 know, besides the dirty scuff marks, I
11 didn't -- I didn't see anything.
12   Q.   Okay.  Had you been in the Helena
13 Wal-Mart store before October 15, 2020?
14   A.   Have I been there before?
15   Q.   Yes.
16   A.   Yes, ma'am.
17   Q.   Okay.  How often did you go there
18 before October 15th?
19   A.   Here and there.
20   Q.   Would you say you were familiar
21 with it before that date?  Like, if you went
22 in there, you knew where things were that
23 you were shopping for?

Page 86

1    A.   No, ma'am, not like every --
2  because sometimes I would go to the Pelham
3  Wal-Mart.
4    Q.   Okay.  But you had been in there
5  on at least one other occasion before
6  October 15, 2020?
7    A.   Yes, ma'am.
8    Q.   Had it been more than ten
9  occasions?
10   A.   I can't recall.
11   Q.   On any of the occasions on which
12 you went to Wal-Mart before the incident,
13 had you ever seen anything that concerned
14 you while you were shopping there?
15   A.   Have I -- have I -- can you
16 repeat that?
17   Q.   Sure.
18   A.   I'm sorry.
19   Q.   The trips that you made to the
20 Helena Wal-Mart before October 15, 2020, was
21 there ever anything you observed that
22 concerned you?
23   A.   No, ma'am.

Page 87

1    Q.   Anything that you thought --
2  anything you saw that you thought was a
3  safety hazard while you were there shopping
4  before October 15, 2020?
5    A.   No, ma'am.
6    Q.   Had you ever had any problems
7  shopping at that store before October 15,
8  2020?
9    A.   No, ma'am.
10   Q.   All right.  And on October 15,
11 2020, did you and Kevin enter the water
12 aisle at the same time?
13   A.   Yes, ma'am.
14   Q.   Were y'all walking side by side
15 or one in front of the other?  Do you
16 remember?
17   A.   Something like that.  Something
18 like that, yes, ma'am.  He was on the aisle.
19   Q.   He was on the aisle.  Okay.  And
20 y'all entered it at the same time?
21   A.   Yes, ma'am.
22   Q.   And you make it, what, about a
23 fourth of the way down the aisle?

Page 88

1    A.   Yes, ma'am.
2    Q.   And what were you looking for on
3  that aisle?
4    A.   I was shopping for some water,
5  getting some water.
6    Q.   Was there a certain brand you
7  were looking for?
8    A.   I don't -- I like certain brands
9  of water.  I will say that.
10   Q.   What type of brands do you like?
11   A.   I like alkaline water.  I like
12 Avadian water [sic].  I like Smartwater.
13   Q.   And I believe I saw somewhere
14 that you were maybe shopping for Smartwater.
15        Would that surprise you if you
16 had told somebody that's what you were
17 shopping for?
18   A.   Ma'am?
19   Q.   If you had told somebody that day
20 that you were shopping for Smartwater when
21 you fell, would that surprise you?
22   A.   I was shopping -- I was going in
23 just for a few items for dinner.

22  (Pages 85 to 88)

Alexandria Bennett                                           6/14/2023

Page 89

1      Q.   Right.  But you went down the
2  water aisle to get water; is that correct?
3      A.   Yes, ma'am.
4      Q.   Okay.  And were you looking for a
5  case of water or a single bottle of water?
6      A.   No, I wouldn't have picked up a
7  case.  I think it was probably, like, a jug
8  of water or, you know -- not a case, though.
9  Uh-uh (negative).
10      Q.   And sitting here today, do you
11  remember what kind you were shopping for on
12  October 15th -- what brand you were shopping
13  for on October 15th?
14      A.   No, ma'am.
15      Q.   All right.  And had you picked up
16  water off the shelf before you fell?
17      A.   I was going to reach for the
18  water, and I fell.
19      Q.   You fell in the process of
20  reaching for water?
21      A.   Yes, ma'am.
22      Q.   Okay.  And where was the water
23  located that you were reaching for when you

Page 90

1  fell?
2      A.   You are talking about my jug of
3  water or the water --
4      Q.   Right.  Like, where -- I assume
5  there are multiple shelves on the aisle; is
6  that right?
7      A.   Uh-uh (negative).
8      Q.   Is that a yes?
9      A.   Yes, ma'am.  I'm sorry.
10      Q.   Okay.  Do you remember which
11  shelf the water was located on, the one that
12  you were reaching for when you fell?
13      A.   The top shelf.
14      Q.   Okay.  Was the water bottle -- is
15  it fair to say it was a water bottle that
16  you were reaching for?  Is that accurate?
17  Or water jug?
18      A.   Yes, ma'am.
19      Q.   Okay.  Either one, whether you
20  were reaching for a water bottle or a water
21  jug, was that item sitting directly on the
22  shelf, or was it in a box or on a pallet?
23      A.   It was on the shelf.

Page 91

1      Q.   Sitting directly on the shelf?
2      A.   I believe, yes, ma'am.  I believe
3  so.
4      Q.   Was it at the edge of the shelf
5  or further back?
6      A.   No.  I just was going to reach
7  for some water and just fell.
8      Q.   Did you ever reach the water
9  before you fell?
10      A.   I'm not sure.
11      Q.   Okay.
12      A.   I'm not sure.
13      Q.   Did you have anything in your
14  hands when you fell?
15      A.   I don't think so.
16      Q.   All right.  And what caused you
17  to fall?
18      A.   I think it was dirty water on the
19  floor.
20      Q.   What makes you think that?
21      A.   Because once I was on the floor,
22  I seen it was water right there.  So you
23  know how I said "scuff marks"?  It was,

Page 92

1  like, dirty water, scuff marks.
2      Q.   Had you seen any dirty water on
3  the floor of the water aisle before you
4  fell?
5      A.   You said did I see any dirty
6  water?
7      Q.   Or any water or any liquid
8  substance on the floor of the water aisle
9  before you fell.
10      A.   No, ma'am.
11      Q.   All right.  Tell me what motion
12  your body -- what movements your body made
13  when it fell, like, how you landed and -- if
14  you can, describe for me how you fell.
15      A.   I just know I reached for that
16  water, and I was on the floor.  I don't
17  remember how I fell.  I just know I was on
18  the floor, because it was just shocking.
19      Q.   Did one or both of your feet
20  slip?  Or did your feet slip?
21      A.   I slipped.  I slipped and fell.
22      Q.   Did you feel your feet slip
23  before you fell?

23  (Pages 89 to 92)

Alexandria Bennett                                    6/14/2023

Page 93

1      A.   It hit -- everything hit me so
2  fast.  I mean, I just went to the floor.
3      Q.   Okay.
4      A.   Slipped and fell.
5      Q.   And did you feel your feet slip
6  before you fell?
7          MS. WASHINGTON:  Objection.
8  Asked and answered.  But you can answer.
9  You can answer.  I just do that for the
10  record.
11      Q.   (By Ms. Gordon)  You can answer.
12      A.   Like, I slipped and fell.
13      Q.   Okay.  And that's what I am
14  asking.  Did you feel something slippery
15  under your feet?
16          MS. WASHINGTON:  Objection.
17  Answer.
18      A.   Yes.
19      Q.   (By Ms. Gordon)  Okay.  And did
20  you feel your feet go out from under you
21  before you fell?
22      A.   Yes, ma'am.
23      Q.   Was it one or both of your feet

Page 94

1  that you felt something slippery under?
2      A.   I'm not sure.
3      Q.   And do you know if one or both of
4  your feet went out from under you?
5      A.   Yes, ma'am.  Both of them,
6  because I fell to the floor.
7      Q.   Okay.  Did any part of your body
8  hit anything on the way to the floor?
9      A.   No, ma'am.
10      Q.   And on what part of your body did
11  you land?
12      A.   Like, I'm not sure how I landed.
13  I know what was hurting.  I'm not sure how I
14  landed.  I landed on my bottom probably.
15  I'm not sure.
16      Q.   Was it your bottom that hit the
17  floor first?
18      A.   I'm guessing, yes, ma'am.
19      Q.   Was it a certain side of your
20  bottom or straight across?  I'm just trying
21  to understand the mechanism of the fall
22  since I wasn't there and we don't have a
23  video of it.

Page 95

1      A.   My hip was hurting, so I'm not
2  sure how I twisted or fell.  But it just all
3  happened so fast.
4      Q.   Okay.  So one minute you are
5  reaching for the water, the next you feel
6  your feet go out from under you, and then
7  you are on your bottom; is that accurate?
8      A.   Yes, ma'am.
9      Q.   Are there any other details you
10  can tell me about the fall itself or what
11  caused you to fall?
12      A.   Any other details, like --
13      Q.   About how the fall happened or
14  any other details about the incident at
15  issue in this lawsuit.
16      A.   No, ma'am.
17      Q.   Okay.  And you mentioned earlier
18  that, after you fell, you noticed some water
19  on the floor.  Did I hear you right about
20  that?
21      A.   Yes, ma'am.
22      Q.   Okay.  Where did you notice the
23  water?  If you want to tell me in relation

Page 96

1  to your body or in relation to the shelves,
2  either way.
3      A.   I noticed the water on the floor
4  once I was down there on the floor.
5      Q.   Okay.  Was it next to your body
6  or next to the shelves?  Where was it on the
7  aisle?
8      A.   Next to the pallet.  It was a
9  pallet down there.
10      Q.   Was the pallet under the shelving
11  unit?
12      A.   Yes, ma'am.
13      Q.   And did the pallet have some
14  bottled water on it?
15      A.   Yes, ma'am.
16      Q.   And the water was next to the
17  pallet that you saw on the floor?  This gets
18  confusing since it was on the water aisle.
19          The water that you saw on the
20  floor, was it by the pallet holding the
21  bottled water?
22      A.   Yes, ma'am.  I would -- I would
23  think so because the water was stacked up

                              24  (Pages 93 to 96)

Alexandria Bennett                                          6/14/2023

Page 97

1   on, like, a raggedy looking pallet thingy.
2       Q.   Okay.
3       A.   You know how they had cases of
4   water on there?  Like that.
5       Q.   Okay.  And you saw some water on
6   the floor next to that?
7       A.   Yes, ma'am.
8       Q.   About what size was the spot of
9   water that you saw on the floor next to the
10  pallet?
11      A.   Well, I noticed it was, like, a
12  lot of water when I was down there but -- go
13  ahead.  I'm sorry.
14      Q.   No.  Just was there more than one
15  spot of water that you noticed on the floor
16  after you fell?
17      A.   Down on the floor?
18      Q.   Yes.
19      A.   It was just around that area.
20  That area was dirty.  You know how you see
21  scuff marks on the floor?  So that's what
22  you would think it is, like, scuff marks.
23          But, like, down there, it's,

Page 98

1   like, the scuff marks and the dirty water
2   mixed, turned black.  You know what I am
3   saying?  Like that.  So you would think it's
4   just scuff marks.
5          But once I was down there, I was,
6   like, Oh, this is water.  Do you know what I
7   am saying?
8       Q.   Okay.  Was there more than one
9   area of water that you saw on the floor
10  after you fell?
11      A.   No, nothing besides the area that
12  I was in.
13      Q.   It was all contained in one area;
14  is that right?
15      A.   I believe so.
16      Q.   And about what size was that area
17  that the water was contained in?
18      A.   Are you talking about, like, what
19  size was the pallet?
20      Q.   I'm just trying to figure out how
21  much water you saw on the ground.  And I
22  think you have said there were --
23      A.   Like, drips, I'm guessing.  I'm

Page 99

1   not sure.
2       Q.   Okay.  You would describe it as
3   drips on the floor?
4       A.   Yes, ma'am.  Just water.
5       Q.   Okay.  And they were all in about
6   the same area, next to the pallet; is that
7   right?
8       A.   Yes, ma'am.
9       Q.   Were the drips -- was there any
10  color to the drips you saw on the floor?
11      A.   You said was there any color?
12      Q.   Yes, ma'am.
13      A.   Black.
14      Q.   Okay.  Do you know what the
15  substance was that was on the floor that you
16  saw after you fell?
17      A.   I think it was pronounced as
18  dirty water on the floor.
19      Q.   When you say "it was
20  pronounced," did somebody tell you that's
21  what it was?
22      A.   What do you mean?
23      Q.   What makes you think that it was

Page 100

1   dirty water on the floor?
2       A.   Because the scuff marks and how
3   they had the aisles kept and stuff like
4   that, how they keep up the place.
5       Q.   What do you mean, "how they keep
6   up the place"?
7       A.   Well, once I heard you-all didn't
8   have a camera or anything at the -- on the
9   aisle, I thought, you know, it was one.  So
10  I went to Wal-Mart to see if it was a camera
11  on that aisle.  And I just noticed how they
12  kept up the store and stuff during that
13  visit.
14      Q.   Okay.  What type of things are
15  you talking about that you noticed?
16      A.   Well, I noticed scuff marks
17  still.  And I noticed some bread that was
18  molded they had out on the shelf.  And I
19  noticed the dirty floor keeping up, you
20  know, with the -- it wasn't -- like, it's
21  not well taken care of in there.
22          And I did notice a wet spill,
23  too, when I went there as well.

25  (Pages 97 to 100)

Alexandria Bennett                                    6/14/2023

Page 101

1    Q.   Where was that?
2    A.   Where was it?  On that section,
3  on that side -- it wasn't on the side of the
4  water, so it was towards the left side of
5  the store where I seen that.
6        They had a little orange cone up,
7  but it was a spill on that -- up under that.
8    Q.   And when did you make that trip
9  back to the Wal-Mart to look around?
10   A.   I went there last month.
11   Q.   Last month.  Okay.  I want to ask
12 you some more about October 15, 2020.
13 Sitting here today, is there any way for you
14 to be certain that that was dirty water that
15 you saw on the floor after you fell?
16   A.   You said am I for certain?
17   Q.   Yes.
18   A.   Yes, ma'am.  I think I am for
19 certain it was dirty water.
20   Q.   Okay.  Do you know where it came
21 from?
22   A.   No, ma'am.
23   Q.   Do you have any information about

Page 102

1  how it got there?
2    A.   No, ma'am.
3    Q.   Any idea how long the water had
4  been there before you fell?
5    A.   No, ma'am.
6    Q.   Has anyone told you that they
7  know how long the water had been there
8  before you fell?
9    A.   No, ma'am.
10   Q.   Has anyone told you that they
11 know where the water came from that you saw
12 on the floor?
13   A.   No, ma'am.
14   Q.   Do you have any evidence or
15 reason to believe that Wal-Mart knew there
16 was water on the floor of the water aisle
17 before you fell?
18   A.   I can't -- I don't understand
19 that.  I'm sorry.
20   Q.   Okay.  Do you have any reason to
21 believe that any Wal-Mart employees knew
22 there was water on the floor of the water
23 aisle before you fell?

Page 103

1    A.   I don't think they knew.  I don't
2  know.
3    Q.   Did you take any photographs
4  after you fell or before you fell while you
5  were shopping that day?
6    A.   No, ma'am, I didn't take no
7  photos.
8    Q.   Did you take any videos after you
9  fell or while you were shopping that day?
10   A.   Kevin took the photos.
11   Q.   Okay.  And has Kevin given a copy
12 of any photos he took?
13   A.   If I do have them, I will have to
14 look for them or something or just ask him
15 about it.
16   Q.   How many did he take, if you
17 know?
18   A.   It was a couple.
19   Q.   Okay.  And you have provided one
20 photograph as part of your document
21 production that I will mark -- if I can find
22 it -- I will mark as Defendant's Exhibit 4.
23        Have you seen this photograph

Page 104

1  before?
2    A.   Yes, ma'am.
3        (Whereupon, Defendant's Exhibit
4        No. 4 was marked and is attached
5        to the original transcript.)
6    Q.   (By Ms. Gordon)  Is that one that
7  Kevin took, or do you know who took it?
8    A.   I don't know who took it.
9    Q.   Or how you got that picture?
10   A.   It was either from Kevin or the
11 lady that was sitting with me at the store.
12   Q.   Okay.  So let's back up.  After
13 you fall, you see the water in one area that
14 we've talked about; right?
15   A.   Uh-huh (affirmative).
16   Q.   Is that a yes?
17   A.   Yes, ma'am.  I'm sorry.
18   Q.   Okay.  Did anybody see you fall?
19   A.   Yes, ma'am.
20   Q.   Who saw you fall?
21   A.   Kevin.
22   Q.   Has he ever told you what he
23 thinks caused you to fall?

Alexandria Bennett                                          6/14/2023

Page 105

1      A.   The water caused me to fall.  The
2   dirty water.
3      Q.   Did he tell you that?
4      A.   If he took the pictures -- yes,
5   ma'am.  That's what we believed, once we
6   took the pictures.
7      Q.   And does the photograph that I
8   have marked as Defendant's Exhibit 4 depict
9   the floor as you saw it after you fell?  Did
10  it look like that after you fell?
11     A.   Yes, ma'am.
12     Q.   Okay.  Is that showing the area
13  of water that you told me about?
14     A.   Yes, ma'am.
15     Q.   Was there water in any other area
16  other than the area that is shown in
17  Exhibit 4?
18     A.   No, ma'am.
19     Q.   It looks like a part of maybe a
20  hand is -- can you recognize whether that's
21  yours or not?
22     A.   That's my hand.
23     Q.   Okay.  And I assume that's part

Page 106

1   of your bottom on the floor?
2      A.   Yes, ma'am.
3      Q.   Okay.  So was that photograph --
4   well, let me back up.  Looking at Exhibit 4,
5   are you able to determine when that
6   photograph was taken?
7      A.   No, ma'am.
8      Q.   How long did you remain on the
9   floor after you fell?
10     A.   About 30 to 40 minutes.
11     Q.   Have you and Kevin discussed the
12  fall since it happened?
13     A.   No, ma'am.
14     Q.   Has he ever told you anything
15  different than what you have told me today
16  about how it happened?
17     A.   No, ma'am.
18     Q.   He didn't see something else
19  happen that -- from what you have told me?
20     A.   No, ma'am.
21     Q.   Okay.
22     A.   No, ma'am.  I'm sorry.  I'm
23  talking so low.  No, ma'am.

Page 107

1      Q.   No.  You are doing great.  I know
2   it's going on, but we are getting through
3   it, I promise.
4           Okay.  So after you fell -- well,
5   did anyone else witness it besides Kevin,
6   your fall?
7      A.   Yes, ma'am.
8      Q.   Who else?
9      A.   It was a lady shopping in the
10  store.  I believe her name was Ms. Kellie.
11     Q.   All right.  And she told you that
12  she saw your fall?
13     A.   Yes, ma'am.
14     Q.   Did she tell you that she
15  observed anything else happen other than
16  what you have told me here today?
17     A.   I just know she was right there
18  with me.  And she was just saying that it's
19  dirty; the store is dirty.
20     Q.   Had you seen Ms. Kellie before
21  your fall?
22     A.   No, ma'am.
23     Q.   You hadn't seen her on that aisle

Page 108

1   before your fall?
2      A.   No, ma'am.
3      Q.   Okay.  And where was Kevin in
4   relation to you when you reached for that
5   water?
6      A.   He was on the aisle.
7      Q.   Okay.  Was he to your left?
8   Right?  Was he behind you?
9      A.   I think he would have been to my
10  left.
11     Q.   And how close was he to you?
12     A.   Not close.
13     Q.   Okay.  A few feet?  Ten feet?
14     A.   I believe so, yes, ma'am.
15     Q.   About ten feet, or a few feet, if
16  you know?
17     A.   Just a few feet.
18     Q.   Okay.
19     A.   Because, you know, you are just
20  walking down the aisle.
21     Q.   Were there any customers or
22  employees on the aisle besides Ms. Kellie
23  and Kevin at the time of your fall?

                          27 (Pages 105 to 108)

Alexandria Bennett                                              6/14/2023

Page 109

1      A.   I don't recall anybody, no,
2  ma'am.
3      Q.   Did you see any Wal-Mart
4  employees walk down the water aisle before
5  your fall?
6      A.   No, ma'am.
7      Q.   And after your fall, I believe
8  you said Ms. Kellie came to your aid; is
9  that right?
10     A.   Yes, ma'am.
11     Q.   Okay.  And what did she help you
12 do, if anything, after the fall, or how did
13 she aid you?
14     A.   She just tried to calm me down.
15 I think I was, like, hollering and
16 screaming.  She comforted me.
17     Q.   And was Kevin also there with you
18 after your fall?  Did he stay with you?
19     A.   No, ma'am.
20     Q.   Where did he go?
21     A.   He was trying to find someone in
22 the store, I believe.
23     Q.   Did anyone else come to your aid

Page 110

1  while Kevin was gone besides Ms. Kellie?
2      A.   No, ma'am.
3      Q.   All right.  When Kevin returned,
4  was anyone with him?
5      A.   I think he was saying he was
6  trying to find someone that worked there.
7  It took a minute to find someone.  Like, I
8  was down there 40 minutes so -- well, about
9  40 minutes, so it was a long time before I
10 got some help.
11     Q.   Did you see any Wal-Mart
12 employees after your fall?  Did you talk to
13 any Wal-Mart employees after your fall?
14     A.   No, ma'am.
15     Q.   Did any Wal-Mart employees come
16 to your aid after the fall?
17     A.   No, ma'am.
18     Q.   Okay.
19     A.   Are you saying, like, right then?
20     Q.   No.  I'm talking about anytime
21 after the fall.  Did any of them come to the
22 water aisle to speak with you?
23     A.   Yes, ma'am.  Like -- like,

Page 111

1  towards when the ambulance was getting
2  there.
3      Q.   Who called the ambulance?
4      A.   I'm not sure.
5      Q.   Okay.  Did you have a phone with
6  you that day?
7      A.   Yes, ma'am.
8      Q.   All right.  And were you using it
9  at the time of the fall?  Were you on your
10 phone?
11     A.   No, ma'am.
12     Q.   Did you make the call to 911?
13     A.   No, ma'am.
14     Q.   So did you tell someone that you
15 needed an ambulance?
16     A.   I needed -- yes.  Yes, ma'am.
17     Q.   Who did you tell that you needed
18 an ambulance?
19     A.   I'm guessing a worker that came
20 over at the time.
21     Q.   Okay.  So how long after your
22 fall was it that a Wal-Mart employee came to
23 you on the water aisle?

Page 112

1      A.   It was -- it was a little while.
2  Because Ms. Kellie was there with me.
3      Q.   She came first.  And then was it
4  a Wal-Mart employee that came next?
5      A.   I believe, yes, ma'am.
6      Q.   Any idea who it was?
7      A.   Uh-uh (negative).
8      Q.   Is that a no?
9      A.   No, ma'am.
10     Q.   Thank you.  Can you describe the
11 individual that came to you first, the first
12 Wal-Mart employee that came to you?
13     A.   No, ma'am.
14     Q.   Male or female?
15     A.   I can't remember.
16     Q.   Okay.  That's fine.
17          All right.  Was that person rude
18 to you at all?
19     A.   No, ma'am.  I just don't think
20 they moved as fast as they should in this
21 particular incident.
22     Q.   You believe it was the Wal-Mart
23 employee that asked you if you needed an

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                    6/14/2023

Page 113

1    ambulance?
2       A.   I believe so.
3       Q.   Okay.  You think the ambulance
4    was called after the Wal-Mart employee
5    arrived?
6       A.   Yes.
7       Q.   Did you stay on the floor while
8    you waited on the ambulance?
9       A.   Yes, ma'am?
10      Q.   And did the EMTs come to you on
11   the water aisle?
12      A.   Yes, ma'am.
13      Q.   And you were taken from the store
14   by ambulance; is that right?
15      A.   Yes, ma'am.
16      Q.   Okay.  While you were still at
17   the store and on the floor, did anyone else
18   come to you or speak with you besides
19   Ms. Kellie and the first Wal-Mart employee?
20      A.   I'm not sure.  It may have been
21   another person.  I'm not sure.
22      Q.   Did you speak with any Wal-Mart
23   employee about completing an incident

Page 114

1    report?
2       A.   No, ma'am.
3       Q.   What did you tell them about what
4    had happened that day, or did they ask?
5       A.   If they did ask, I told them what
6    happened.  But I don't think I wrote a -- I
7    didn't write anything down or anything.  I
8    don't remember doing that.
9       Q.   Did they have an iPad with them?
10           Sometimes they complete them on
11   an iPad, and you will sign it on that.
12      A.   I'm not sure.
13      Q.   I have this incident report that
14   I will mark as Defendant's Exhibit 5.  Have
15   you ever seen this before?
16      A.   Yes, ma'am.
17           (Whereupon, Defendant's Exhibit
18           No. 5 was marked and is attached
19           to the original transcript.)
20      Q.   (By Ms. Gordon)  Is that your
21   signature on the bottom of it?
22      A.   Uh-huh (affirmative).
23      Q.   Is that a yes?

Page 115

1       A.   Yes, ma'am.
2       Q.   Okay.  Do you remember signing an
3    iPad or anything that day?  It may have been
4    some kind of electronic pad versus a paper
5    copy.
6       A.   I'm not -- I don't remember.
7       Q.   That's okay.
8            Does the description of the
9    incident sound accurate to you as it's
10   listed on there?
11      A.   Yes, ma'am.
12      Q.   All right.  And it lists -- I
13   think there is a little section -- there is
14   a section of witnesses, and it looks like it
15   listed a Kellie.  You think that's the
16   Ms. Kellie you were talking about?  Does
17   Kellie Daughtry sound familiar to you?
18      A.   Is that on this paper?
19      Q.   Yes.
20      A.   Whereabouts?
21      Q.   It's tiny.  Let me point it to
22   you.
23      A.   Okay.

Page 116

1       Q.   It's this tiny little -- okay.
2    We've got Kevin Allen listed --
3       A.   Okay.
4       Q.   -- and then Kellie Daughtry?
5       A.   Yes, ma'am.
6       Q.   Have you spoken with Ms. Kellie
7    since the fall?
8       A.   No, ma'am.
9       Q.   And did she stay with you until
10   the EMTs got there?
11      A.   Yes, ma'am.
12      Q.   Do you remember anything y'all
13   talked about while you were waiting on the
14   EMTs?
15      A.   No, ma'am.
16      Q.   Has anyone besides Ms. Kellie and
17   Kevin told you that they witnessed your
18   fall?
19      A.   No, ma'am.
20      Q.   When you fell, did you feel any
21   pain immediately upon your fall?
22      A.   Yes, ma'am.
23      Q.   Tell me what hurt when you fell.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023

Page 117

```
 1      A.   I'm sorry.
 2      Q.   You are fine.
 3      A.   My hip hurt, and my ankle was
 4   hurting.
 5      Q.   Which hip?
 6      A.   I'm not sure.
 7      Q.   Do you remember which ankle hurt?
 8      A.   My right ankle.
 9      Q.   And that was an immediate pain
10   that you felt when you fell?
11      A.   Yes, ma'am.
12      Q.   Do you know how your ankle was
13   injured in the fall, like, if it hit
14   something or if it twisted, if you know?
15      A.   No, ma'am.
16      Q.   Do you know how your hip was
17   injured in the fall?
18      A.   I had done fell.
19      Q.   I'm sorry?
20      A.   I fell.  So, you know, I'm kind
21   of big.  I'm kind of a big girl.  So I was,
22   like -- I was, like, I probably -- I don't
23   know.  Probably the weight of me.
```

Page 118

```
 1      Q.   Any other pain immediately when
 2   you fell?  Did you experience any other pain
 3   right when you fell?
 4      A.   I think my back was hurting as
 5   well.
 6      Q.   What part of your back?
 7      A.   I'm not sure.
 8      Q.   Did you speak with anyone else
 9   besides the Wal-Mart employee, Ms. Kellie,
10   and Kevin before the EMTs arrived?
11      A.   I don't believe so.
12      Q.   And once the EMTs arrived, what
13   were your complaints at that time?
14      A.   The same.
15      Q.   The same.  Did you ask to be
16   taken to the hospital?
17      A.   They were taking me.
18      Q.   And which hospital did they take
19   you to?
20      A.   I think they took me to Shelby.
21      Q.   When you walked down the water
22   aisle right before your fall, was that your
23   first time on the water aisle that day?
```

Page 119

```
 1      A.   Yes, ma'am.
 2      Q.   Okay.  Was the lighting on the
 3   water aisle -- did it seem bright enough to
 4   you?
 5      A.   I guess.
 6      Q.   Like, you didn't have any trouble
 7   seeing what you were looking for on the
 8   water aisle, did you?
 9      A.   No, ma'am.
10      Q.   Okay.  And were you able to reach
11   the water on the top shelf just reaching
12   your arm up and standing flatfooted?
13      A.   Yes, ma'am.
14      Q.   Did you have to stand on anything
15   to reach the water?
16      A.   No, ma'am.
17      Q.   Did you ever stand on anything
18   before you fell?
19      A.   No, ma'am.
20      Q.   Like, stand on a pallet or find a
21   stool or anything like that?
22      A.   No, ma'am.
23      Q.   You were standing flatfooted on
```

Page 120

```
 1   the ground when you fell?
 2      A.   Yes, ma'am.
 3      Q.   Were you having to get up on your
 4   tippy-toes to reach for it?
 5      A.   No, ma'am.
 6      Q.   Okay.  Did you have to be at the
 7   grandmother's house by a certain time that
 8   day to pick up your daughter?
 9      A.   I'm not sure.
10      Q.   Were you in a rush or taking your
11   time at Wal-Mart?
12      A.   No, I wasn't in a rush.
13      Q.   And we talked briefly about the
14   shoes that you were wearing, and I think you
15   couldn't remember what style or brand they
16   were or anything; is that right?
17      A.   I know they weren't, like, no
18   slides or anything.
19      Q.   Do you remember what kind of sole
20   they had?
21      A.   What is that?
22      Q.   Like the bottom of the shoe, what
23   it was like.  Did it have a heel?
```

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023

---

Page 121

```
 1        A.   No, ma'am.  Uh-uh (negative).
 2        Q.   Okay.  Had you worn the shoes
 3   before that day?
 4        A.   Yes, ma'am.
 5        Q.   Okay.  They weren't brand-new
 6   shoes that you were wearing for the first
 7   time?
 8        A.   No, ma'am.
 9        Q.   Do you still have the shoes that
10   you were wearing that day when you fell?
11        A.   I don't even recall what kind it
12   was.
13        Q.   Okay.  That's fair.
14             Before you fell, had you
15   overheard anyone talking about water on the
16   floor of the water aisle?
17        A.   No, ma'am.
18        Q.   Okay.  Did you observe any
19   warning signs or cones on the water aisle
20   before you fell?
21        A.   There weren't any.
22        Q.   Okay.  And afterwards, did you
23   observe any cones or warning signs on the
```

Page 122

```
 1   water aisle?
 2        A.   There weren't any.
 3        Q.   Okay.  Did you point out the
 4   water, to the Wal-Mart employee that you had
 5   seen on the floor?
 6        A.   I believe so.
 7        Q.   Okay.  Did you observe any
 8   cleaning efforts taking place after you
 9   fell?
10        A.   You are saying did I see someone
11   come over and start cleaning up?
12        Q.   Yes.
13        A.   No, I didn't see that.
14        Q.   Okay.  And I'm going to show you
15   what I will mark as Defendant's Exhibit 6,
16   which is Bates-labeled Wal-Mart 11 through
17   15.
18             These are some photographs that
19   we produced in this lawsuit.  And I will
20   represent to you that they were provided to
21   us as a part of Wal-Mart's incident report.
22        A.   Okay.
23             (Whereupon, Defendant's Exhibit
```

Page 123

```
 1             No. 6 was marked and is attached
 2             to the original transcript.)
 3        Q.   (By Ms. Gordon)  And if you will,
 4   just flip through those.  And I will ask you
 5   some questions about it after you have had a
 6   chance to look at them.
 7        A.   Okay.
 8        Q.   And feel free to leave them
 9   spread out.  However you want to do it is
10   fine.  We will gather them up at the end.
11        A.   Okay.
12        Q.   Okay.  Have you had a chance to
13   look at those?
14        A.   Uh-huh (affirmative).
15        Q.   Is that a yes?
16        A.   Yes, ma'am.
17        Q.   Okay.
18        A.   I'm sorry.
19        Q.   That's okay.
20             Do the photographs I have marked
21   as Defendant's Exhibit 6 show the area in
22   which you fell at the Wal-Mart that day?
23        A.   Yes, ma'am.
```

Page 124

```
 1        Q.   Okay.  Do they show the substance
 2   on which you claim you slipped that day?
 3        A.   Yes, ma'am.
 4        Q.   Okay.  Looking at the photographs
 5   I have marked as Defendant's Exhibit 6, are
 6   you able to identify the substance on which
 7   you claim you slipped?
 8        A.   Yes, ma'am.
 9        Q.   Okay.  I'm going to give you a
10   blue Sharpie.  And if you will, circle that
11   substance.
12        A.   Like, circle all of it?
13        Q.   Oh, no.  That's fine.  I see what
14   you have done.  You have circled it in one
15   picture.  And, to me, it looks like those
16   are all photographs of the same area, just
17   different --
18        A.   Zooms.
19        Q.   Yes, different zooms.
20             Is that what it looks like to
21   you, too --
22        A.   Yes.
23        Q.   -- that it's just different
```

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023

Page 125

1    zooms?
2        A.   Yes, ma'am.
3        Q.   Okay.  Did you see water in any
4    other area of the floor of the water aisle
5    besides the area you have circled on
6    Wal-Mart 14?
7        A.   You said do I see any other
8    water?
9        Q.   When you were on the floor, did
10   you see water on the floor in any other
11   areas besides the area you have circled in
12   Wal-Mart 14?
13       A.   No, ma'am.
14       Q.   Okay.  Do the photographs I have
15   marked as Defendant's Exhibit 6 accurately
16   show the way the floor looked to you on
17   October 15, 2020?
18       A.   Yes, ma'am.
19       Q.   Okay.  Have you ever seen any
20   other photographs of the area where you fell
21   taken on October 15, 2020, besides the ones
22   that we have looked at today that I have
23   marked as Defendant's Exhibit 6 and

Page 126

1    Defendant's Exhibit 4?
2        A.   This is Defendant's 4?
3        Q.   Yes.
4        A.   This is -- this is 6?
5        Q.   Right.  So they are photographs
6    that I have marked as Defendant's Exhibit 6,
7    and then I marked one earlier as Exhibit 4.
8             Have you seen any other
9    photographs that were taken that day?  Just,
10   like, before we got here today, have you
11   ever seen any other photographs?
12       A.   This?
13       Q.   I'm just talking about are you
14   aware of any other photographs of the area
15   where you fell besides those that are laid
16   out in front of you.
17       A.   No, ma'am --
18       Q.   Okay.
19       A.   -- than what Kevin took or
20   something.  Is that what you are saying?
21       Q.   Right.  Did the photographs that
22   Kevin took look any different than the
23   photographs we've marked as Defendant's

Page 127

1    Exhibit 4 or Defendant's Exhibit 6?
2        A.   No, ma'am.
3        Q.   Okay.  And I'm just remembering
4    that I have two other photographs.  I will
5    mark these as Defendant's Exhibit 7.
6             Have you ever seen these two
7    photographs before?
8        A.   Yes, ma'am.
9             (Whereupon, Defendant's Exhibit
10            No. 7 was marked and is attached
11            to the original transcript.)
12       Q.   (By Ms. Gordon)  All right.  Any
13   idea who took those?
14       A.   No, ma'am.
15       Q.   Do they show the substance on
16   which you claim you slipped that day?
17       A.   Yes, ma'am.
18       Q.   Will you circle that for me,
19   please?
20       A.   Okay.
21       Q.   And does the photograph with the
22   Exhibit 7 sticker on it, does this show the
23   position you landed --

Page 128

1        A.   Yes, ma'am.
2        Q.   -- or had you moved?
3        A.   Yes, ma'am, that shows the
4    position.
5        Q.   Okay.  So that's how you landed
6    as shown in Exhibit 7?
7        A.   Yes, ma'am.
8        Q.   And that's the red hair that you
9    mentioned earlier?
10       A.   Yes, ma'am.
11       Q.   I like that color.
12       A.   Thank you.
13       Q.   It looks like you were wearing
14   black, too, that day.  Does that refresh
15   your memory about what you were wearing?
16       A.   Yes, ma'am.
17       Q.   Okay.  October 15, 2020, either
18   before or after your fall, did you observe
19   water or a liquid substance on the floor in
20   any other areas besides those shown in the
21   photographs we have marked as Defendant's
22   Exhibits 4, 6, and 7?
23            So that would be, looking at all

32  (Pages 125 to 128)

Alexandria Bennett                                          6/14/2023

| Page 129 |
|---|

1   of these photographs, do they show the only
2   area of water that you observed that day?
3        A.   Yes, ma'am.
4        Q.   Okay.  There wasn't some other
5   area that wasn't photographed?
6        A.   No, ma'am.
7        Q.   Okay.  And are you claiming that
8   the liquid that you slipped on was in front
9   of the pallet?
10           It looks like the area you have
11  circled in Defendant's Exhibit 7 is in front
12  of the pallet.  Am I right?
13       A.   Yes, ma'am.
14       Q.   Okay.  So are you claiming that
15  the water that you slipped on was in front
16  of the pallet?
17           I just want to make sure you are
18  not claiming that there was some water
19  hidden under the pallet, behind the pallet,
20  or under anything else.
21       A.   I don't know if it was hidden
22  under there or not.
23       Q.   Okay.  The water that you have

| Page 130 |
|---|

1   talked about today was out in front of the
2   pallet on the floor?
3        A.   Uh-huh (affirmative).
4        Q.   Is that right?
5        A.   Yes, ma'am.
6        Q.   Okay.  I just wanted to make sure
7   I was clear about that.
8            Was there any odor to the liquid
9   that you saw on the floor that you remember?
10       A.   I'm not sure.
11       Q.   Okay.  Were any portions of your
12  clothes wet after you fell?
13       A.   I'm not sure.
14       Q.   Did a police officer also come to
15  the store after the incident, or was it just
16  EMTs?
17       A.   I don't remember seeing a police
18  officer.
19       Q.   Did they bring the stretcher to
20  you on the water aisle?
21       A.   Yes, ma'am.
22       Q.   And you were taken out on the
23  stretcher?

| Page 131 |
|---|

1        A.   Yes, ma'am.
2        Q.   Do you remember which exit you
3   went out on the stretcher?  I'm showing you
4   Defendant's Exhibits 2 and 3 again to see if
5   that helps you remember.
6        A.   I don't remember.
7        Q.   That's okay.
8            All right.  So did anyone ride in
9   the ambulance with you to the hospital?
10       A.   No, ma'am.
11       Q.   And once you got to Shelby, what
12  were your complaints then when you got to
13  the ER?
14       A.   The same.
15       Q.   Did anyone meet you at Shelby?
16       A.   Kevin.
17       Q.   Had your pain changed at all in
18  between the time you fell and when you got
19  to Shelby?
20       A.   No, ma'am.
21       Q.   All right.  What type of
22  treatment were you given at Shelby, if you
23  remember?

| Page 132 |
|---|

1        A.   I believe I left out in crutches.
2        Q.   Did they do some X-rays?
3        A.   I believe so.
4        Q.   Were you given any diagnoses at
5   Shelby that day?
6        A.   I believe they did.
7        Q.   Do you remember what that was?
8        A.   No.
9        Q.   Okay.  And you think you left on
10  crutches?
11       A.   Yes, ma'am.
12       Q.   Did you leave with any bandages
13  or braces?
14       A.   I can't recall.
15       Q.   Were the crutches to help with
16  your ankle pain?
17       A.   Yes, ma'am.
18       Q.   To keep you off your ankle?
19       A.   Yes, ma'am.
20       Q.   And how did you leave the
21  hospital that night?  Did somebody pick you
22  up?
23       A.   Kevin was there.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                    6/14/2023

Page 133

1    Q.    When you left Shelby, where did
2  you go?
3    A.    I think I went home.
4    Q.    And that would be back to
5  The Pearl at that time?
6    A.    Well, I probably went to go get
7  Allyson or something, but I went home.
8    Q.    Did anyone in the emergency room
9  recommend that you seek any additional
10  treatment for the injuries you were there
11  about that day?
12    A.    Yes, ma'am.
13    Q.    And what did they tell you to do?
14    A.    I needed to follow up with an
15  orthopedic.  I think there was something
16  wrong.
17    Q.    Did they give you any
18  prescriptions for medication at the ER?
19    A.    I think so, yes, ma'am.
20    Q.    Was it like a pain medication, or
21  do you remember?
22    A.    I don't remember.
23    Q.    Did you get the prescriptions

Page 134

1  filled?
2    A.    Yes, ma'am.
3    Q.    How long were you on prescription
4  medication following the fall?
5    A.    I don't remember.  I'm sorry.
6    Q.    That's okay.  Where did you get
7  the prescriptions filled?
8    A.    I'm not sure.
9    Q.    All right.  When did you next
10  seek treatment for any of the injuries you
11  relate to your fall?
12    A.    Well, I was trying to get
13  treatment, but I was turned down by a couple
14  of people because I didn't have insurance.
15    Q.    Who turned you down?
16    A.    Orthopedics.
17    Q.    Do you remember which orthopedic
18  doctor or where their office was located?
19    A.    I don't remember.  I don't
20  remember which ones it was, but I know it
21  was a few, because they wouldn't see me
22  because I didn't have insurance.
23    Q.    Okay.  So did you eventually get

Page 135

1  somebody to see you?
2    A.    Yes, ma'am.
3    Q.    And who was that that you saw
4  next after the ER?
5    A.    I went to -- you mean who was I
6  seen by?
7    Q.    Right.
8    A.    I was seen by Southlake, I think.
9    Q.    Had you gotten the Blue Cross by
10  the time you went to Southlake?
11    A.    Yes, ma'am.
12    Q.    And any idea how long it was
13  after the fall that you went to Southlake
14  the first time?
15    A.    No, ma'am.
16    Q.    What were your complaints when
17  you went to Southlake the first time?
18    A.    Ankle pain.  And I think I was --
19  it was just going downhill from there,
20  basically.
21    Q.    Were you still experiencing pain
22  anywhere else besides your ankle when you
23  went to Southlake?

Page 136

1    A.    My hip pain wore off, but it was
2  just mainly my ankle.
3    Q.    About how long did the hip pain
4  last after the fall?
5    A.    I'm not sure.
6    Q.    Is the only treatment that you
7  received for the hip pain that treatment in
8  the ER the day of the fall?
9    A.    Yes, ma'am, I think so.
10    Q.    Okay.  What about your back; how
11  long did that pain last?
12    A.    I'm not sure.
13    Q.    Go ahead.
14    A.    I was trying to -- I just
15  couldn't see anyone.  No one would see me,
16  because I didn't have insurance.
17    Q.    Did you receive any other
18  treatment for your back besides that initial
19  ER visit at Shelby?
20    A.    No, ma'am.
21    Q.    So by the time you went to
22  Southlake, your complaint was the ankle
23  pain; is that right?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                        6/14/2023

---

Page 137

1    A.   Yes, ma'am.
2    Q.   Okay.  And what did -- what kind
3  of treatment were you given by Southlake, or
4  diagnosis?
5    A.   I think he said it was broken or
6  something.
7    Q.   Okay.  Did they recommend any
8  additional treatment?
9    A.   He recommended surgery.
10   Q.   Did you schedule the surgery?
11   A.   Yes, ma'am.
12   Q.   And did you have the surgery
13 performed?
14   A.   Yes, ma'am.
15   Q.   When did you have the surgery
16 performed?
17      I might be able to help you out.
18 Let's see.
19      Was it July 30, 2021?  Does that
20 sound right?
21   A.   Yes, ma'am.
22   Q.   Okay.  Was that an outpatient
23 procedure, meaning you got to go home the

---

Page 138

1  same day it was performed?
2    A.   Yes, ma'am.
3    Q.   You weren't hospitalized
4  overnight?
5    A.   No, ma'am.
6    Q.   Between your first visit to
7  Southlake and the day you had the surgery
8  performed on your ankle, was there any other
9  treatment for any injuries you relate to the
10 fall?
11   A.   No, ma'am.
12   Q.   I assume there was an incision
13 from your surgery.  Was there?
14   A.   Ma'am?
15   Q.   Like, did they have to cut you
16 open to do your surgery?
17   A.   Yes, ma'am.
18   Q.   And did the incision heal
19 following the surgery?
20   A.   Did it heal?
21   Q.   Yes.  Did you have any problems
22 with infection or with the incision healing?
23   A.   No, ma'am.

---

Page 139

1    Q.   Did you receive any other
2  treatment following your surgery for your
3  ankle?
4    A.   No, ma'am.  I was supposed to do,
5  I think, physical therapy or something.  I'm
6  not sure.
7    Q.   Okay.  Did you attend physical
8  therapy?
9    A.   No, ma'am.
10   Q.   And why didn't you attend
11 physical therapy?
12   A.   I think I wasn't able to keep up
13 with the insurance by that time.
14   Q.   Okay.  Have you attended physical
15 therapy since the fall at Wal-Mart?
16   A.   No, ma'am.
17   Q.   Have you been back to Southlake
18 since your surgery was performed?
19   A.   I tried to schedule it, I think.
20 Yeah, I think so.
21   Q.   You did try to schedule another
22 appointment?
23   A.   Uh-huh (affirmative).

---

Page 140

1    Q.   After your surgery?
2    A.   Yes, ma'am.
3    Q.   Okay.  Do you have an appointment
4  scheduled?
5    A.   Not right now.
6    Q.   What happened with trying to
7  schedule one?
8    A.   I think it was an issue with
9  insurance.
10   Q.   I see.  Why do you want to
11 schedule another appointment with Southlake?
12   A.   Because I may have some issues --
13 well, he told me I -- I just believe it will
14 never be the same, my ankle.  So I was going
15 to schedule an appointment to see what was
16 going on, because I be having some pains and
17 stuff now.  But with me working through
18 temps, I don't have insurance through the
19 job or anything.  So I've got to figure my
20 way out with that one.
21   Q.   Have you seen any other
22 orthopedic doctors for injuries you relate
23 to the fall at Wal-Mart besides Southlake?

---

35  (Pages 137 to 140)

Alexandria Bennett                                              6/14/2023

Page 141

1      A.   I tried, but they didn't see me.
2      Q.   Okay.  And that was before --
3      A.   They wouldn't see me.
4      Q.   Was that before you went to
5  Southlake?
6      A.   Yes, ma'am.
7      Q.   Did the Southlake doctors
8  recommend any further treatment for your
9  ankle after your surgery?
10     A.   I think it was supposed to be
11  physical therapy.
12     Q.   You mentioned that.  Okay.
13          Have you seen any other doctors
14  since your surgery for injuries that you
15  relate to your fall?
16     A.   No, ma'am.
17     Q.   Do you have any appointments
18  scheduled with any doctors for treatment of
19  injuries you relate to the fall?
20     A.   No, ma'am.
21     Q.   Do you have plans to seek any
22  additional treatment for injuries you relate
23  to the fall?

Page 142

1      A.   Yes, ma'am.
2      Q.   Okay.  And that's additional
3  treatment for your ankle?  Is that what you
4  were saying earlier?
5      A.   Yes, ma'am.
6      Q.   And you are just waiting until
7  you can get some insurance, and then you are
8  going to do that?
9      A.   Yes, ma'am.
10     Q.   Did the Southlake doctors or the
11  doctor who performed your ankle surgery give
12  you any sort of prognosis, like what you
13  could expect with your ankle in the future?
14     A.   I think it will never be the
15  same.
16     Q.   Did they tell you why they
17  thought that?
18     A.   I'm not sure.  He used a lot of
19  medical terminology.
20     Q.   I understand.
21          Were you having pain in your
22  ankle up until the time the surgery was
23  performed?

Page 143

1      A.   Yes, ma'am.
2      Q.   Had the pain lessened or worsened
3  between the fall and when you had your
4  surgery?
5      A.   It worsened.
6      Q.   Can you describe it for me, what
7  type of pain you were experiencing right
8  before the surgery?
9      A.   Like, every time I took a step on
10  that -- on that -- on this -- with my right
11  leg, it would hurt every time I took a step.
12     Q.   And after the surgery, did your
13  ankle pain change at all?
14     A.   Yes, ma'am.  It eased.
15     Q.   Okay.  Are you still experiencing
16  ankle pain today?
17     A.   Yes, ma'am.
18     Q.   How often do you experience ankle
19  pain?
20     A.   When I first wake up in the
21  morning.
22     Q.   How long does it last after you
23  wake up?

Page 144

1      A.   Once I get to going and getting
2  ready and stuff.
3      Q.   And does that happen every
4  morning when you wake up?
5      A.   Yes, ma'am.
6      Q.   Has that been the case ever since
7  the surgery?
8      A.   Well, it eased since -- it had
9  eased once -- when I had the surgery.  But,
10  like, now I noticed, you know, when I get up
11  in the morning, I will feel that pain.
12     Q.   So following the surgery, was
13  there a period of time where you didn't have
14  any ankle pain?
15     A.   Yes, ma'am.  It eased a whole
16  lot.
17     Q.   And about when did it return, how
18  long ago?
19     A.   I will say just a few months or
20  so.
21     Q.   Has anything changed in your
22  lifestyle?  Like, have you been more active
23  in the past few months or suffered any

36  (Pages 141 to 144)

Alexandria Bennett                                                6/14/2023

Page 145

1  injuries in the past few months that would
2  have caused the pain to return?
3      A.  Uh-uh (negative).  I haven't been
4  more active.
5      Q.  Okay.  Did it just seem to kind
6  of come out of nowhere?
7      A.  Yes, ma'am.
8      Q.  And besides trying to schedule an
9  appointment with Southlake, have you sought
10 any other treatment since that pain
11 returned?
12     A.  No, ma'am.
13     Q.  Was there a point where you were
14 given a boot to wear on your ankle?  Do you
15 remember that?
16     A.  Yes, ma'am.
17     Q.  Who gave you that?
18     A.  I'm not sure.
19     Q.  Okay.  Was that before your
20 surgery or after?
21     A.  I know I had a boot after
22 surgery.
23     Q.  Were you given any instructions

Page 146

1  on when or how often you should wear it?
2      A.  I was wearing it -- I was wearing
3  it -- like, I was wearing it during the day.
4  He told me, "You know you are supposed to
5  stay in your boot."  So I was wearing it,
6  like, when I would have to wake up and get
7  my daughter ready for school and stuff like
8  that.
9      Q.  Okay.  And were there times
10 during the day where you would take it off?
11     A.  When I would go to bed.
12     Q.  And was there a point where they
13 told you you could quit wearing it?
14     A.  I think so.  I think he gave me a
15 period of time.
16     Q.  Do you remember when that was --
17     A.  No, ma'am.
18     Q.  -- how long you were supposed to
19 wear it?
20     A.  No, ma'am.
21     Q.  Okay.  Were you given any other
22 sort of braces for injuries you relate to
23 your fall at Wal-Mart?

Page 147

1      A.  No, ma'am.
2      Q.  Had you ever been to physical
3  therapy before the fall at Wal-Mart for any
4  reason?
5      A.  No, ma'am.
6      Q.  The bills from the treatment that
7  you relate to the fall, have those been
8  paid?  Like, your bill from Grandview the
9  day you went to the ER, has that bill been
10 paid, or is it still out there?
11     A.  No, ma'am.
12     Q.  It has not been paid?
13     A.  No, ma'am.
14     Q.  Okay.  What about the ambulance
15 bill; has it been paid?
16     A.  No, ma'am.
17     Q.  And your bills from -- your
18 treatment at Southlake, have those been
19 paid?
20     A.  No, ma'am.
21     Q.  Did your insurance make any
22 payments towards the bills at Southlake or
23 your surgery?

Page 148

1      A.  I'm not sure.
2      Q.  Did you have -- did you have
3  health insurance in place when you had your
4  surgery?
5      A.  I think I did, yes, ma'am.
6      Q.  Okay.  Are there any injuries
7  that you relate to the fall which you
8  believe will be permanent?
9      A.  Yes, ma'am.
10     Q.  What's that?
11     A.  I think my ankle will always give
12 me problems.
13     Q.  Are there certain movements that
14 cause the pain to return in your ankle or to
15 flare up?
16     A.  No, ma'am.
17     Q.  Or certain activities that cause
18 it to hurt?
19     A.  I think it's just everyday life,
20 you know, with movement.
21     Q.  Do you take any medication for
22 ankle pain these days?
23     A.  No, ma'am.

37 (Pages 145 to 148)

Alexandria Bennett                                    6/14/2023

Page 149

1    Q.   Are there any activities that you
2    could do before the fall at Wal-Mart that
3    you are no longer able to do?
4    A.   I never -- I can't -- you know
5    how you can close your toes all of the way,
6    I be noticing I can't do that.
7    Q.   Like, curl them under?
8    A.   Like -- yeah, like -- like that
9    (indicating).
10   Q.   Almost like you are making a fist
11   with your toes?
12   A.   Yes, ma'am.
13   Q.   Okay.  You can't do that anymore?
14   A.   No, ma'am.
15   Q.   Anything else that you were able
16   to do before the fall that you are not able
17   to do now?
18   A.   I was able to, you know, still
19   work in the cooking industry.  And I love to
20   cook.
21   Q.   Anything else like that?
22   A.   (Witness shakes head negatively.)
23   Q.   Okay.  Have you ever applied for

Page 150

1    social security disability benefits?
2    A.   No, ma'am.
3    Q.   Do you have any plans to apply
4    for them?
5    A.   No, ma'am, because I can't do
6    that right now.
7    Q.   Have you ever talked to any of
8    your doctors about giving you a disability
9    rating?
10   A.   No, ma'am.
11   Q.   Are you currently experiencing
12   any other pain other than the ankle pain you
13   have told me about that you relate to your
14   fall?
15   A.   No, ma'am.
16   Q.   Had you consumed any drugs or
17   alcohol in the 24 hours before your fall?
18   A.   No, ma'am.
19   Q.   Following that car accident, was
20   there a period of time where you had to use
21   crutches after that?
22   A.   No, ma'am.
23   Q.   Or any kind of brace?

Page 151

1    A.   No, ma'am.
2    Q.   We might have talked about that.
3    Are you claiming that the fall at
4    Wal-Mart has affected you mentally or
5    emotionally?
6    A.   Yes, ma'am.
7    Q.   Will you tell me about that,
8    please?
9    A.   I like to cook.  And I used to
10   always cook with my grandmother.  And my
11   grandmother just died last month.  So I
12   would be in the kitchen cooking with her and
13   stuff.  So it was -- it was painful to stop
14   doing what I like to do.
15   It was depressing to, you know,
16   be a young woman, and -- I was labeled "the
17   star" of the kitchen.
18   I think what was most painful was
19   how me and my daughter were affected because
20   we had to move from Homewood and move to the
21   ghetto, basically.  And we weren't used to
22   that.  And I wasn't used to have, you know,
23   her asking me questions, saying, "Mom, when

Page 152

1    are we going to move," and stuff like that.
2    But at that time, I had to try
3    to, you know, get my bills paid and try to
4    take care of her.  And I couldn't stop
5    working, so I had to keep on trying to find
6    a job.
7    And I was going through the temp
8    services, you know, not a stable job.  I
9    lost my job that I loved.  And I think the
10   most tragic was I lost it around the
11   holidays.  So she knows me.  It's, like,
12   it's going to be -- you know, it was going
13   to be surprising.
14   But I think that year I don't
15   think I was even able to get her anything.
16   I think my mom -- my mom and my stepdad
17   helped out.  So that was big.  I think the
18   mental abuse was big a lot.
19   Q.   And why was it that y'all had to
20   move?
21   A.   Because I wasn't able to pay my
22   rent over at The Pearl at Homewood, because
23   I was laid off.

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023



Page 153

1    Q.   And do you remember what you were
2  paying at _____?
3    A.   Probably about -- I would say
4  about $800 or so or $1,000, one of the two.
5    Q.   And you moved from T_____
6  _____ -- no, to --
7    A.   No, ma'am.  To Ensley.
8    Q.   To 31st Street?
9    A.   Yes, ma'am.
10   Q.   Okay.  That was also an
11 apartment?
12   A.   Yes, ma'am.
13   Q.   And what were you paying there?
14   A.   I think 600.
15   Q.   And you lived there for about
16 three years?
17   A.   About, yes, ma'am.
18   Q.   Are you more comfortable at the
19 _____ address?
20   A.   Yes, ma'am.
21   Q.   Okay.  What do you pay there for
22 rent?
23   A.   I pay 1,200 a month.

Page 154

1    Q.   And you mentioned not being able
2  to cook.  What about the fall prevents you
3  from cooking now like you like to do?
4    A.   Well, I liked -- that's all I
5  knew how to do was cook, you know, with
6  working at Outback and Pappadeaux.  That's
7  all I knew how to do.  So once I figured,
8  like, "Hey, Alex, you've got to try to find
9  a job with less mobility" -- like, the
10 hospitals and stuff, they turned me down.  I
11 had to go through temp service because they
12 wouldn't hire me because that's all I had on
13 my application was, you know, Outback and
14 stuff, cooking and stuff.  So I didn't have
15 no experience in it.
16   Q.   And is it being on the feet that
17 is a problem for you now cooking in a
18 restaurant like you used to do?
19   A.   Or standing, yes, ma'am.
20   Q.   Okay.  Have you tried to work in
21 a cooking position since your job at
22 Outback?
23   A.   Uh-uh (negative).  I had to -- I

Page 155

1  had to switch fields, basically.
2    Q.   Have you discussed any of the
3  ways the fall has affected you mentally or
4  emotionally with any counselors,
5  psychiatrists, psychologists?  Anyone like
6  that?  Any medical providers?
7    A.   Did I go to a psychiatrist?
8    Q.   Yes.
9    A.   Yes, ma'am, at one point.
10   Q.   Okay.  Who did you see?
11   A.   I'm not sure.  But I think I will
12 be able to see who it was.  I can't think of
13 her name off of my head, but I --
14   Q.   Do you remember where her office
15 was?
16   A.   I want to say downtown or so.
17   Q.   And what was your reason for
18 going to see her the first time?
19   A.   To talk.  And I was just going
20 through a lot mentally.
21   Q.   Was it solely because of the fall
22 that you went to see her?
23   A.   Yes, ma'am.

Page 156

1    Q.   Were there any other things going
2  on in your life that were affecting you
3  emotionally at that time you went to see the
4  psychiatrist?
5    A.   No, ma'am.  It was a bad -- a bad
6  point in my life.
7    Q.   Do you remember when that was
8  when you went to see him or her the first
9  time?
10   A.   I'm not sure.
11   Q.   Was it before or after your
12 surgery?
13   A.   I'm not sure.
14   Q.   Did you see that individual on
15 more than one occasion?
16   A.   Uh-huh (affirmative).  I think I
17 seen her, like, twice or so.
18   Q.   And did you discuss the fall with
19 her when you went to see her?
20   A.   I'm not sure.  I don't know.
21   Q.   Have you ever been prescribed any
22 sort of antidepressant or antianxiety
23 medication since the fall?

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                          6/14/2023

Page 157

1      A.   No, ma'am.
2      Q.   Had you been diagnosed with
3   depression or anxiety before the fall?
4      A.   No, ma'am.
5      Q.   Had you ever seen a psychiatrist
6   or psychologist before the fall?
7      A.   No, ma'am.
8      Q.   Has any of the emotional stress
9   that you relate to the fall caused you to
10  develop any physical symptoms?
11     A.   What is that?
12     Q.   Like, if -- I guess it would be
13  things, like, you know, the anxiety is
14  making you throw up or, like, not sleeping,
15  any kind of physical symptoms as a result of
16  emotional stress.
17     A.   I don't get that question.
18     Q.   Okay.  That's fine.
19          Let's do it this way:  Have you
20  told me about all of the ways the fall at
21  Wal-Mart has affected you mentally or
22  emotionally?
23     A.   I think I told you just about.

Page 158

1      Q.   Okay.  And are you claiming that
2   you had to take off an entire day of work at
3   Outback in order to attend doctors
4   appointments at Southlake?
5      A.   I didn't go to Southlake until
6   the next year; right?
7      Q.   Okay.  Where were you working in,
8   like, July and August of 2021, about when
9   you had your surgery?
10     A.   I think I was -- I was working
11  around -- with Milo's Tea Company, I think,
12  around that time.
13     Q.   Okay.  I think, if I have got --
14  my notes may be wrong.  But if I have my
15  notes right, I had you at Milo's -- yes,
16  Milo's starting August of 2021.  So the
17  warehouse jobs were before that?
18     A.   Yes, ma'am.
19     Q.   Okay.  So did you miss any time
20  from work at Milo's to attend doctors
21  visits?
22     A.   Yes, ma'am.
23     Q.   How much time did you miss?

Page 159

1      A.   I'm not sure.
2      Q.   If you had a doctor's
3   appointment, did you take the entire day off
4   from working at Milo's?
5      A.   Well, if I was -- if I was going
6   to a doctor's appointment -- I worked there
7   overnight.  So if it didn't interfere, then
8   it was okay, I guess.  I'm not sure.
9      Q.   What were your hours at Milo's?
10  I don't think I asked you that.
11     A.   It was overnight.  I had to take
12  that, because it was overnight.
13     Q.   Okay.  And were you working day
14  or night shifts when you did the warehouse
15  work?
16     A.   Those were jobs in the morning
17  time.
18     Q.   Did you miss any time at the
19  warehouse jobs to attend doctor's visits?
20     A.   If I was required to be there,
21  then -- if I did, then I did.  But if
22  not -- I'm not -- I'm not sure.
23     Q.   Okay.  All right.  Are you

Page 160

1   claiming that you incurred travel or mileage
2   expenses going to doctors visits?
3      A.   Yes, ma'am.
4      Q.   Okay.  All right.  I'm going to
5   show you what I have marked as Defendant's
6   Exhibit 8.  And I will represent to you that
7   these are the initial disclosures.  I think
8   there was just a little typo on the top that
9   says "Wal-Mart," but it was actually the
10  ones that we received from you on -- or your
11  lawyer at the beginning of this case.
12          And on the last page of this
13  document, it lists out the damages that you
14  are claiming in this lawsuit.  Have you ever
15  seen this chart before?  It's on the last
16  page.
17          Have you ever seen those numbers
18  before?
19     A.   I've seen my medical bills and
20  stuff.  Yes.
21          (Whereupon, Defendant's Exhibit
22          No. 8 was marked and is attached
23          to the original transcript.)

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                                6/14/2023

Page 161

1     Q.   (By Ms. Gordon)  Okay.  Any idea
2   how you came up with the mileage amount?
3     A.   To and from places, gas.
4     Q.   Or how you came up with the lost
5   wages amount?
6     A.   The lost wages as in jobs and
7   stuff?
8     Q.   Right.  Yes.  Time missed from
9   work.
10    A.   Yes, ma'am.
11    Q.   Do you know how that was
12  calculated?
13    A.   I would just say about.
14    Q.   Okay.
15    A.   I think I --
16    Q.   What about the amount for pain
17  and suffering of $500,000; is that something
18  you came up with?
19    A.   Yes, ma'am.
20    Q.   Okay.  And how did you quantify
21  pain and suffering?
22    A.   Because it was a drastic change
23  for me and my daughter.

Page 162

1     Q.   Okay.  I promise I am almost
2   finished.
3     A.   Oh, no, you are fine.
4     Q.   Thank you for being patient.
5     A.   Do you want me to put these
6   together for you?
7     Q.   You can leave it.  We will do it
8   in a minute.
9     A.   Okay.
10    Q.   Did you ever see a Dr. Lloyd
11  Johnson at Alabama Bone & Joint?
12    A.   Lloyd Johnson?
13    Q.   Yes.
14    A.   I'm not sure.
15    Q.   All right.  Have you ever been
16  diagnosed with degenerative joint disease?
17    A.   I don't think so.  I'm not sure.
18    Q.   I've marked a couple of things,
19  but I think we've -- you listed as your --
20  listed your mother Erica Truitt as having
21  knowledge of the fall.  What type of
22  information does she have about the fall or
23  any of the claims you are making in this

Page 163

1   lawsuit?
2     A.   She helped me get my insurance
3   and stuff.
4     Q.   Okay.
5     A.   She was the one who helped with
6   bills at that point until she couldn't,
7   because, you know, she's got her own bills.
8     Q.   Sure.
9     A.   So she helped me with this
10  process.
11    Q.   She was not at Wal-Mart that day
12  when you fell, was she?
13    A.   No, ma'am.
14    Q.   Okay.  Have you applied for any
15  loans or advances for potential proceeds
16  from this lawsuit?
17    A.   Yes, ma'am.
18    Q.   You have?  With which company?
19    A.   OASIS.
20    Q.   Alexis?
21    A.   OASIS.
22    Q.   OASIS, I have heard of that.
23         All right.  Have you --

Page 164

1          MS. WASHINGTON:  I'm just going
2   to object just for relevance, but you can
3   answer the questions.
4     Q.   (By Ms. Gordon)  Have you told me
5   everything you remember about the incident
6   at Wal-Mart that's the basis of your
7   lawsuit?
8     A.   Yes, ma'am.
9     Q.   Okay.  And have you told me about
10  all of the injuries that you sustained as a
11  result of the incident at Wal-Mart?
12    A.   Yes, ma'am.
13    Q.   Have you told me about all of the
14  treatment that you received for the injuries
15  you relate to the fall?
16    A.   Yes, ma'am.
17    Q.   And have we talked about all of
18  the expenses -- well, let's summarize those.
19  I just want to make sure we've covered it
20  all.
21         The expenses that you relate to
22  the fall would be the medical bills, is that
23  right, from Grandview -- no, from Shelby and

41  (Pages 161 to 164)

Alexandria Bennett                                          6/14/2023

---

Page 165

1  Southlake and then the place you had your
2  surgery.  Are there any others?
3       A.  No, ma'am.
4       Q.  Okay.  And some of those may have
5  been paid by Blue Cross, some of them may
6  not.  Do you know one way or another?
7       A.  No, ma'am.
8       Q.  There is also a lost wages claim
9  for time you have missed from work; is that
10 right?
11      A.  Yes, ma'am.
12      Q.  And then you are claiming some
13 mileage expenses for travel to and from the
14 doctors appointments?
15      A.  Yes, ma'am.
16      Q.  And then we talked about your --
17 how it's affected you emotionally or
18 mentally.
19          Were there any other expenses
20 that you paid for out of your own pocket
21 that you relate to the fall?
22      A.  No, ma'am.
23      Q.  Okay.  Have we talked about all

---

Page 166

1  of the claims you are making in this
2  lawsuit?
3       A.  Yes, ma'am.
4           MS. GORDON:  All right.  That's
5  all that I have.  Thank you.
6
7  EXAMINATION BY MS. WASHINGTON:
8       Q.  I just have a few follow-up
9  questions.  I think we are going to be out
10 of here very quickly.  I just wanted to
11 address some things that were discussed
12 during your initial questioning.
13          As you know, I'm your attorney.
14 So we are here to talk about the incident at
15 Wal-Mart.  So I do want to talk about the
16 actual incident itself on October 15, 2020.
17 Is that the accurate date?
18      A.  Yes, ma'am.
19      Q.  All right.  So you noticed when
20 you went to get water -- do you recall what
21 kind of water you were attempting to get?
22 Was it a jug or a bottle?  Can you
23 distinguish between either of the two?

---

Page 167

1       A.  What now?
2       Q.  Do you know which one it was?
3  Was it a jug or a bottle that you reached
4  for when you -- when the incident happened
5  when you fell?
6       A.  It was either one of the two.
7       Q.  But you don't remember which one;
8  correct?
9       A.  I don't remember which one, no,
10 ma'am.
11      Q.  All right.  And then when
12 Attorney Gordon questioned you, you talked
13 about seeing water on the floor --
14      A.  Yes, ma'am.
15      Q.  -- or some liquid substance on
16 the floor?
17      A.  Yes, ma'am.
18      Q.  Did you do any testing of that
19 water that was on -- or that substance that
20 was on the floor when you fell, do you know
21 exactly what it was?
22      A.  No, ma'am.
23      Q.  Okay.  And then you said that --

---

Page 168

1  when was the first time you saw that liquid
2  substance on the floor at Wal-Mart?  When
3  was the first time you saw it?
4       A.  When I was on the floor.
5       Q.  Okay.  And so prior to your fall,
6  you didn't see any water; correct?
7       A.  No, ma'am.
8       Q.  And did you see any signage about
9  water?
10      A.  No, ma'am.
11      Q.  Did you see any signage at
12 Wal-Mart about any potential dangers?
13      A.  No, ma'am.
14      Q.  Okay.  And when you fell, how
15 long were you on the floor before you went
16 to the ambulance?
17      A.  About 30 to 40 minutes.
18      Q.  And during that time frame, did
19 you see anyone come place any signage or any
20 cones or any structures to warn others about
21 any dangers in that area?
22      A.  No, ma'am.
23      Q.  Okay.  Did anyone else come

---

42  (Pages 165 to 168)

Alexandria Bennett                                    6/14/2023

Page 169

1  through that aisle while you were on the
2  floor?  Did you see any shoppers come
3  through that aisle as you were there for
4  30 to 40 minutes?
5        A.  No, ma'am.  I seen a lot of
6  commotion.
7        Q.  Okay.  But you don't recall the
8  exact happenings around that time, during
9  that 30- to 40-minute time frame?  You don't
10  recall anything?
11        A.  No, ma'am.
12        Q.  And so do you believe that
13  Wal-Mart took any steps to warn others about
14  any dangers in that area after your
15  accident?  Do you think they did anything to
16  warn against any dangers?
17        MS. GORDON:  Object to the form.
18        A.  No, ma'am.
19        Q.  (By Ms. Washington) Okay.  And I
20  do want to show this video.  I know that we
21  are -- it's electronic.
22        MS. GORDON:  I will come over
23  there.

Page 170

1        MS. WASHINGTON:  And I can share
2  this with you.
3        MS. GORDON:  That's fine.
4        MS. WASHINGTON:  I'm going to
5  mark this as Plaintiff's Exhibit 1.  So I
6  will share this via a link of sorts, if you
7  can't get email.
8        (Whereupon, Plaintiff's Exhibit
9        No. 1 was marked and is attached
10        to the original transcript.)
11        Q.  (By Ms. Washington) But this is
12  the video.
13        MS. WASHINGTON:  Can you see it?
14        MS. GORDON:  Yes.
15        MS. WASHINGTON:  Okay.  Great.
16        Q.  (By Ms. Washington) And so this
17  is the video.  Do you recall me showing you
18  this video during a Zoom meeting that you
19  and I had?
20        A.  Yes, ma'am.
21        Q.  Okay.  And do you recall if you
22  confirmed with this view which aisle you
23  were on --

Page 171

1        A.  Yes, ma'am.
2        Q.  -- during the incident?
3        Can you point on the screen which
4  aisle you were on?
5        A.  That aisle (indicating).
6        Q.  Okay.  And so you believe you
7  were in this area where you pointed when the
8  incident occurred?
9        A.  Yes, ma'am.
10        Q.  Okay.  And so from your vantage
11  point, from what you can see here, is it
12  clear?  Can you clearly see anything?
13        A.  No, ma'am.
14        Q.  Okay.  So could you identify
15  yourself in this footage that I showed you?
16        A.  No, ma'am.
17        Q.  Could you identify Kevin, who was
18  with you, in this footage?
19        Let me go to the time.  Let me
20  pause.
21        During your testimony with
22  Attorney Gordon, did you state that the
23  incident occurred around 7:15, 7:20?  Does

Page 172

1  that sound about right, about the time frame
2  in which this happened?
3        A.  Yes, ma'am.
4        Q.  So I'm going to actually
5  fast-forward to that time so we can see it.
6  That's 7:11.
7        MS. WASHINGTON:  Sorry, y'all.
8        Q.  (By Ms. Washington) And so this
9  area, can you show us -- I'm sorry.  Can you
10  show us the area where the incident was
11  happening?  Do you think -- does it look
12  like some commotion on this video at this
13  time?
14        A.  Back in that area.
15        Q.  Okay.  So can you identify any of
16  the people in that footage?
17        A.  No, ma'am.
18        MS. WASHINGTON:  Okay.  And so
19  I'm going to pause.  And I just wanted to
20  verify what she could identify in that
21  footage.  Okay.  And I'm done with it for
22  now.
23

43  (Pages 169 to 172)

Alexandria Bennett                                        6/14/2023

---

Page 173

1    REEXAMINATION BY MS. GORDON:
2         Q.   My only question is, just to
3    clarify the record, when you were talking
4    about the video and you were pointing to an
5    area of the screen, were you pointing to the
6    top right corner of the screen or top
7    right --
8              MS. WASHINGTON:  Yes, thank you
9    for that.
10        Q.   (By Ms. Gordon) Just since we
11   can't see where you were pointing --
12             MS. WASHINGTON:  Correct.
13        Q.   (By Ms. Gordon) -- is that an
14   accurate description of where you were
15   pointing?
16        A.   Yes, ma'am.
17        Q.   Okay.  And the aisle that is
18   shown clearly, which is labeled the liquor
19   and the beer aisle on the video that you
20   were shown, that is not the aisle you were
21   on; is that right?
22             Were you on the liquor and beer
23   aisle?

---

Page 174

1         A.   No.  No, ma'am.
2         Q.   No.  You were on the aisle to the
3    right of the liquor and beer aisle when you
4    fell?
5         A.   Yes, ma'am.
6              MS. GORDON:  Okay.  That's all
7    that I have.
8              MS. WASHINGTON:  Okay.  Thank
9    you, Gwen.
10             MS. GORDON:  Sure.
11             MS. WASHINGTON:  Thank you for
12   that.
13
14   REEXAMINATION BY MS. WASHINGTON:
15        Q.   And so from this, from what you
16   recall on the day of the incident, you spoke
17   with a shopper.  Do you know who you spoke
18   with while you were on the floor waiting for
19   treatment?
20        A.   Ms. Kellie.
21        Q.   Okay.  And what, if anything, did
22   Ms. Kellie tell you or did you-all talk
23   about?

---

Page 175

1         A.   I know she said that the store is
2    always dirty when she comes there.
3         Q.   Okay.
4         A.   It's not kept up.
5         Q.   And how long after you fell did a
6    Wal-Mart employee come to speak with you?
7         A.   It was quite a bit of time.
8         Q.   Do you have an estimate?  Do you
9    know how many minutes it was between the
10   time you fell and when they came?
11        A.   I'd probably say about
12   15 minutes, I believe.
13        Q.   Okay.  And in your previous
14   testimony, you said that Kevin went to find
15   someone to help after you fell?
16        A.   Yes, ma'am.
17        Q.   And so you think within that
18   15 minutes it took for them to come see you,
19   did Kevin -- do you recall him speaking with
20   someone before they came, or did they come
21   on their own?  Did Kevin prompt them to
22   come, or did they come on their own?
23        A.   I think he prompted them to come.

---

Page 176

1         Q.   Okay.  And that's all I have now
2    for the incident at Wal-Mart.  But I did
3    want to talk about the impact that the
4    injuries had on you and your family.
5              So did your injuries affect you
6    being able to care for your daughter at any
7    point?
8         A.   Yes, ma'am.
9         Q.   How so?
10        A.   I wasn't able to take care of her
11   and try to pay bills at the same time.  We
12   were struggling.
13        Q.   Okay.  And were you able to still
14   assist her with her day-to-day activities?
15        A.   It was very hard.
16        Q.   How old was your daughter at the
17   time that the incident occurred?
18        A.   I would say she was around six or
19   seven.
20        Q.   Okay.  So she was still school
21   age at that time?
22        A.   Yes, ma'am.
23        Q.   Was she going to school

---

44  (Pages 173 to 176)

Alexandria Bennett                                                    6/14/2023

Page 177

1   physically, or she was homeschooled due to
2   the pandemic?
3       A.   She was homeschooled.
4       Q.   Okay.  And with her -- who
5   homeschooled her during the pandemic and
6   after the accident?
7       A.   Me and my mom.
8       Q.   Okay.  And so were you able to
9   assist her with her schoolwork the same
10  after the accident as you were before the
11  accident?
12      A.   No, ma'am.
13      Q.   What changed?  What were the
14  differences?
15      A.   I would have to get up with her
16  every morning and try to get her ready to be
17  at school on time.  And the morning time was
18  the worst because that's when my ankle hurt
19  the worse, when I first woke up.
20      Q.   Okay.  And so to get to school on
21  time, did that mean that she was being
22  supplemented through, like, a Zoom where she
23  had to be logged in to go to school?  Even

Page 178

1   though she was at home, she had to be
2   physically prepared to be on video?
3       A.   Yes, ma'am.
4       Q.   Okay.  And you had to assist her
5   with what in the morning?  Tell us your
6   average morning before the accident being
7   able to get your daughter ready for school.
8   How did that go?
9       A.   I had to get her up, get her
10  ready, hair, breakfast, make sure she does
11  what she is supposed to do, get her to where
12  she needed to be.
13      Q.   Okay.  And after the accident,
14  how did that change?  How did that affect
15  your ability to get her prepared to start
16  school?
17      A.   It was hard.
18      Q.   How?  How was it hard?
19      A.   Because I couldn't move like I
20  used to move.
21      Q.   Okay.  Did that mean you were
22  having issues with, I guess, getting her
23  settled to stop and do her hair and wash her

Page 179

1   face and --
2       A.   Yes, ma'am.
3       Q.   -- brush her teeth?
4       A.   Uh-huh (affirmative).
5       Q.   Okay.  And so did you yourself
6   have any anxiety?  Were you ever diagnosed
7   with anxiety, sleeplessness or anything like
8   that before the accident?
9       A.   I had a lot of sleepless and
10  restless nights.
11      Q.   Before the accident or after?
12      A.   After.
13      Q.   Okay.  But before the accident,
14  did you have any anxiety or restlessness or
15  sleeplessness?
16      A.   No, ma'am.
17      Q.   Okay.  I know, also, earlier you
18  talked about your work life before and after
19  the accident.  After the accident, why were
20  you let go from Outback Steakhouse?
21      A.   Because I wasn't able to perform
22  the duties of a back of the house kitchen
23  manager anymore like I was.

Page 180

1       Q.   And is that what your manager
2   told you was the reason he was letting you
3   go?
4       A.   Mainly, that's what it summed up
5   to be.
6       Q.   Okay.  And after that -- tell
7   us -- I guess, let's start with why you did
8   that.  You worked at Outback for how long
9   before the accident?  How long did you work
10  there?
11      A.   About three -- three to four
12  years.
13      Q.   Okay.  And did you like your job
14  at Outback?
15      A.   Yes, ma'am.
16      Q.   And you stated that you were
17  named the star of the kitchen at Outback
18  when you worked there; correct?
19      A.   Yes, ma'am.
20      Q.   And so did you have a good
21  working relationship with your coworkers?
22      A.   Yes, ma'am.
23      Q.   Okay.  And right after the

Alexandria Bennett                                           6/14/2023

Page 181

1    accident, did you try to go back to work at
2    Outback?
3        A.   Yes, ma'am.
4        Q.   Okay.  And I know you said when
5    you left the hospital you were given
6    crutches.  Did you ever have to go to work
7    at Outback with crutches?
8        A.   I had to go -- I had a boot.
9        Q.   You had a boot?
10       A.   Yes, ma'am.
11       Q.   Okay.  So when did you get a boot
12   after the accident?
13       A.   I'm not sure.
14       Q.   So when you went to Shelby
15   Baptist after -- when the ambulance took you
16   to Shelby Baptist, did they give you a boot
17   there?
18       A.   They may have.
19       Q.   Okay.  And so you remember going
20   to Outback with a boot on?
21       A.   Uh-huh (affirmative).
22       Q.   And how did that affect your
23   ability to perform your duties at Outback?

Page 182

1        A.   I wasn't able to move around, for
2    real, in a rush like I was supposed to.
3    Everything was --
4        Q.   Okay.  What do you mean?  What
5    kind of rush did you have to move around in?
6        A.   Everything was supposed to be,
7    like, fast-paced.  And stuff was supposed to
8    be done.
9             So, like you said, A.M. prep, I
10   would prep up everything that needed to be
11   done.  And sometimes I didn't have it -- I
12   didn't have it done.
13       Q.   Okay.  So you believe that you
14   were slower in getting things done because
15   of your mobility --
16       A.   Yes, ma'am.
17       Q.   -- is that accurate?
18            Okay.  Let's talk about when you
19   were let go.  Were you let go before
20   Thanksgiving of 2020 or after Thanksgiving
21   of 2020?
22       A.   Before.
23       Q.   Okay.  So you were unemployed

Page 183

1    before Thanksgiving and Christmas?
2        A.   Yes, ma'am.
3        Q.   Okay.  And when did you move from
4    your apartment in Homewood to the apartment
5    in Ensley?  Did you move before Christmas?
6        A.   I think so.  I'm not sure.
7        Q.   Do you recall if you spent
8    Christmas at the Ensley apartment or the
9    Homewood apartment?
10       A.   Ensley apartment, yes.
11       Q.   Okay.  So you did move to Ensley
12   before Christmas?
13       A.   Yes, ma'am.
14       Q.   And how was that for you and your
15   daughter being at the apartment in Ensley,
16   spending your holidays there?
17       A.   It was depressing.
18       Q.   How?
19       A.   Because Ensley is, like,
20   considered the -- you know, the ghetto over
21   there.  I wasn't brought up like that.  I
22   went to Hoover High School and Spain Park.
23   So I wasn't used to being in that type of

Page 184

1    living situation.
2             And when I say "living
3    situation," it was times where, you know,
4    it's rats running around there.  And me and
5    ███████ are on the couch, because both of us
6    are scared.  And, you know, it's just how it
7    is on that side of town.
8        Q.   Okay.  And you stated that after
9    your emergency room visit you tried to get
10   healthcare?
11       A.   Uh-huh (affirmative).
12       Q.   Why were you seeking treatment
13   after the accident?  Why were you looking to
14   get more treatment after the emergency room
15   visit?
16       A.   Because I knew something was
17   wrong.
18       Q.   How?  How did you know something
19   was wrong?
20       A.   It was hurting.  My ankle was
21   hurting every day.  I couldn't perform like
22   I was able to perform.
23       Q.   Okay.  So why didn't you get

Alexandria Bennett                                    6/14/2023

Page 185

1    treatment again after the emergency room
2    visit?
3        A.   Because I didn't have insurance.
4        Q.   Okay.  And how did you get
5    insurance when you finally did get insurance
6    after the accident?
7        A.   My mom helped me out.
8        Q.   So your mom helped you pay for
9    insurance?
10       A.   Yes, ma'am.
11       Q.   And did she help you pay for that
12   because she knew you needed some help with
13   that ankle?
14       A.   Yes, ma'am.
15       Q.   Okay.  And you did move from
16   Ensley back to Homewood in another apartment
17   around 2022; is that accurate?
18       A.   Yes, ma'am.
19       Q.   Why did you move -- how did you
20   move?  How were you able to move?
21       A.   I had switched fields.  And I
22   think I just moved by the grace of God
23   carrying me through this journey.

Page 186

1        Q.   Okay.  Do you still have issues
2    with not being able to work in the
3    restaurant industry anymore?
4        A.   Yes, ma'am.
5        Q.   And you want to go back to that
6    field?
7        A.   I like cooking.
8        Q.   Okay.  So once you get the
9    ability to do so, are you going to look for
10   ways to be able to return to that industry?
11       A.   I would like to, yes, ma'am.
12          MS. WASHINGTON:  Okay.  Well,
13   that's all I have for now.  Do you have
14   any --
15          MS. GORDON:  Nothing else.
16   That's it.  You are finished.
17          THE WITNESS:  Yes, ma'am.
18          MS. WASHINGTON:  All right.
19          (Whereupon, the deposition ended
20          at 4:45 p.m.)
21
22
23

Page 187

1                CERTIFICATE
2
3    STATE OF ALABAMA)
4    JEFFERSON COUNTY)
5
6        I hereby certify that the above and
7    foregoing proceedings were taken down by me
8    in stenotype, and the questions and answers
9    thereto were reduced to computer print under
10   my supervision, and that the foregoing
11   represents a true and correct transcript of
12   the testimony given by said witness upon
13   said proceedings.
14       I further certify that I am neither of
15   counsel nor of kin to the parties to the
16   action, nor am I anywise interested in the
17   results of said cause.
18       Signed the 14th day of June, 2023.
19
20
     /s/ Diana B. Williams, CCR
21   DIANA B. WILLIAMS, CCR
     Alabama CCR No. 104, Expires 09/30/2023
22
     Commissioner for the State of Alabama at
23   Large, Commission expires 04/11/2027

BIRMINGHAM REPORTING SERVICE
(205) 326-4444

Alexandria Bennett                                      6/14/2023

**A**

**A-l-l-e-n** 10:6,13
**A-l-l-y-s-o-n**
  10:7
**a.m** 20:8 55:12
  55:16 182:9
**ability** 9:8,13
  178:15 181:23
  186:9
**able** 27:20 34:22
  35:3,4 36:5,8
  36:14,19,22,23
  37:1,3,16
  39:21,23 48:19
  48:21 51:6
  74:16 75:22
  106:5 119:10
  124:6 137:17
  139:12 149:3
  149:15,16,18
  152:15,21
  154:1 155:12
  176:6,10,13
  177:8 178:7
  179:21 182:1
  184:22 185:20
  186:2,10
**abuse** 152:18
**accident** 27:22
  35:17 41:6
  50:10 59:12
  60:4,22 61:12
  61:19 62:12
  63:21 64:2,6,9
  65:2,15 66:4,9
  66:13 67:4,8
  67:11,15,19
  68:22 69:3
  150:19 169:15
  177:6,10,11
  178:6,13 179:8
  179:11,13,19
  179:19 180:9
  181:1,12
  184:13 185:6

**accidents** 67:22
  68:4,17
**accurate** 90:16
  95:7 115:9
  166:17 173:14
  182:17 185:17
**accurately**
  125:15
**acting** 6:4
**action** 1:6
  187:16
**active** 144:22
  145:4
**activities** 58:19
  148:17 149:1
  176:14
**actual** 166:16
**additional** 67:10
  133:9 137:8
  141:22 142:2
**address** 9:19,20
  11:7,14,23
  12:3 13:3
  153:19 166:11
**advances** 163:15
**affect** 9:8,12
  176:5 178:14
  181:22
**affiliated** 70:6
**affirmative**
  47:15 53:3
  68:14 77:10,18
  104:15 114:22
  123:14 130:3
  139:23 156:16
  179:4 181:21
  184:11
**age** 10:17 17:15
  176:21
**agencies** 25:13
  25:18 26:17,21
  27:8 28:4
**agency** 25:9,12
**ago** 11:1,2,3
  22:17 144:18
**agreed** 2:2,13,20

39:4
**ahead** 97:13
  136:13
**aid** 109:8,13,23
  110:16
**aisle** 75:8,12,15
  81:10,13 82:20
  82:21 83:8,13
  83:18,22 84:5
  84:11,15,19,20
  85:5 87:12,18
  87:19,23 88:3
  89:2 90:5 92:3
  92:8 96:7,18
  100:9,11
  102:16,23
  107:23 108:6
  108:20,22
  109:4 110:22
  111:23 113:11
  118:22,23
  119:3,8 121:16
  121:19 122:1
  125:4 130:20
  169:1,3 170:22
  171:4,5 173:17
  173:19,20,23
  174:2,3
**aisles** 82:19 83:1
  83:5,8 100:3
**Alabama** 1:2 2:7
  2:10 5:7,13 6:2
  6:3,10 9:21
  11:12 12:8
  14:3 15:13
  19:4,8 59:19
  60:2 162:11
  187:3,21,22
**alcohol** 150:17
**Alex** 9:1 154:8
**Alexandria** 1:9
  1:17 2:4 6:12
  6:16 8:19,21
  8:23
**Alexis** 163:20
**alkaline** 88:11

**Allen** 10:9,11,19
  10:21 13:11
  79:4 116:2
**allow** 38:10
**Allyson** 10:5,8
  133:7 184:5
**Allyson's** 78:5
**ambulance**
  62:22 111:1,3
  111:15,18
  113:1,3,8,14
  131:9 147:14
  168:16 181:15
**amount** 161:2,5
  161:16
**ankle** 26:3 35:10
  37:5,8 40:20
  42:22 62:16,20
  63:17 64:20
  65:1,9,16,18
  66:8,11 68:18
  117:3,7,8,12
  132:16,18
  135:18,22
  136:2,22 138:8
  139:3 140:14
  141:9 142:3,11
  142:13,22
  143:13,16,18
  144:14 145:14
  148:11,14,22
  150:12 177:18
  184:20 185:13
**ankles** 59:6,7
  64:15 68:8
**answer** 7:14 8:8
  93:8,9,11,17
  164:3
**answered** 93:8
**answers** 187:8
**antianxiety**
  156:22
**antidepressant**
  156:22
**anxiety** 157:3,13
  179:6,7,14

**anybody** 28:6
  60:14 64:12
  104:18 109:1
**anymore** 24:19
  35:5 36:10
  37:14 38:23
  149:13 179:23
  186:3
**anytime** 110:20
**anywise** 187:16
**apartment**
  11:16,18 12:4
  12:5 153:11
  183:4,4,8,9,10
  183:15 185:16
**apartments**
  13:12
**apologize** 31:17
**appear** 7:18
**application**
  47:10 154:13
**applications**
  47:8
**applied** 47:4
  48:1 51:21
  52:3 149:23
  163:14
**apply** 52:1 150:3
**appointment**
  139:22 140:3
  140:11,15
  145:9 159:3,6
**appointments**
  141:17 158:4
  165:14
**approximately**
  2:11 6:11
**April** 22:19
**area** 18:21 78:9
  78:12 97:19,20
  98:9,11,13,16
  99:6 104:13
  105:12,15,16
  123:21 124:16
  125:4,5,11,20
  126:14 129:2,5

Alexandria Bennett                                         6/14/2023

Page 189

129:10 168:21
169:14 171:7
172:9,10,14
173:5
**areas** 19:1
125:11 128:20
**arm** 119:12
**arrested** 56:10
**arrived** 113:5
118:10,12
**asked** 73:14
93:8 112:23
159:10
**asking** 56:21
68:11 93:14
151:23
**asserting** 7:8
**assign** 3:2
**assist** 176:14
177:9 178:4
**assume** 8:8
30:22 90:4
105:23 138:12
**attached** 52:15
80:21 104:4
114:18 123:1
127:10 160:22
170:9
**attempting**
166:21
**attend** 139:7,10
158:3,20
159:19
**attendance**
49:19
**attended** 139:14
**attorney** 75:19
166:13 167:12
171:22
**August** 25:3
28:1 158:8,16
**Automation**
26:13
**automobile**
61:23 62:12
63:21 64:2,6

65:2,14 66:4,9
66:12 67:4,8
67:11,15,18,22
68:4,22 69:2
**Avadian** 88:12
**available** 38:15
**Avenue** 5:6
**average** 178:6
**avoid** 7:17
**aware** 126:14

―――――――――
**B**

**B** 1:23 2:6 6:1
187:20,21
**back** 12:9 13:5
13:18 15:7
33:21 34:12,21
36:6 46:3
47:11,18 58:22
62:1 64:15,20
66:6 67:18
68:8,18 69:2
70:8,9 84:6,8
91:5 101:9
104:12 106:4
118:4,6 133:4
136:10,18
139:17 172:14
179:22 181:1
185:16 186:5
**background** 7:7
**backing** 12:2
**bad** 51:17 156:5
156:5
**bandages**
132:12
**bankruptcy**
56:13
**Baptist** 71:14
181:15,16
**bare** 49:1
**basically** 135:20
151:21 155:1
**basis** 53:13
57:13 58:3
164:6

**Bates-labeled**
122:16
**becoming** 22:13
35:14
**bed** 146:11
**beer** 173:19,22
174:3
**beginning** 59:16
160:11
**believe** 22:17
24:2 45:12
46:16 59:15,15
61:8 67:6 78:1
82:14,17 84:9
88:13 91:2,2
98:15 102:15
102:21 107:10
108:14 109:7
109:22 112:5
112:22 113:2
118:11 122:6
132:1,3,6
140:13 148:8
169:12 171:6
175:12 182:13
**believed** 105:5
**bells** 70:15
**belt** 61:15
**benefits** 51:22
58:15 150:1
**Bennett** 1:9,17
2:5 6:12,16 7:2
8:19
**Bessemer** 14:3
77:4,16,17,20
78:3,16
**best** 39:2 61:2
**big** 26:5 74:8
117:21,21
152:17,18
**biggest** 65:3
66:19,20
**bill** 147:8,9,15
**bills** 51:12 147:6
147:17,22
152:3 160:19

163:6,7 164:22
176:11
**Birmingham**
5:7 6:2 19:1
59:19,23 60:1
61:5,9
**birth** 15:9
**bit** 175:7
**biweekly** 53:12
**black** 98:2 99:13
128:14
**bleeding** 63:11
**blocking** 84:10
84:14
**blood** 57:20 58:4
65:6
**Blount** 17:15
18:7 56:17
57:9
**blue** 42:11,12
43:9,9 124:10
135:9 165:5
**body** 92:12,12
94:7,10 96:1,5
**Bone** 162:11
**bones** 63:6 72:6
72:18
**boot** 145:14,21
146:5 181:8,9
181:11,16,20
**bottle** 89:5
90:14,15,20
166:22 167:3
**bottled** 81:11
96:14,21
**bottom** 94:14,16
94:20 95:7
106:1 114:21
120:22
**box** 90:22
**brace** 150:23
**braces** 65:9
132:13 146:22
**brain** 31:18
**brand** 88:6
89:12 120:15

**brand-new**
121:5
**Brandon** 60:20
**brands** 88:8,10
**bread** 100:17
**break** 8:1 14:17
43:1 73:11,12
**breakfast**
178:10
**brief** 43:3 73:16
**briefly** 120:13
**bright** 119:3
**bring** 130:19
**broke** 72:20
**broken** 63:6
72:6,18 137:5
**brought** 183:21
**brush** 179:3
**buggy** 81:19
**burgundy** 82:6

―――――――――
**C**

**C** 5:1
**calculated**
161:12
**call** 47:18,21
51:10 111:12
**called** 30:10
47:11 63:15
111:3 113:4
**calm** 109:14
**camera** 75:12
100:8,10
**cameras** 75:14
**car** 59:12 60:8
60:10,12,14
150:19
**care** 69:19 70:4
70:10,20
100:21 152:4
176:6,10
**cares** 71:16
**carrying** 81:22
185:23
**cart** 81:20,20
**case** 44:13,16

89:5,7,8 144:6
160:11
**cases** 97:3
**cause** 6:13 65:15
65:15 148:14
148:17 187:17
**caused** 37:5,9
68:21 83:9
91:16 95:11
104:23 105:1
145:2 157:9
**CCR** 1:23
187:20,21,21
**certain** 39:14
88:6,8 94:19
101:14,16,19
120:7 148:13
148:17
**CERTIFICA...**
4:8 187:1
**Certified** 2:6 6:1
**certify** 6:4 187:6
187:14
**chance** 123:6,12
**change** 30:13
31:6 33:9 36:1
55:23 143:13
161:22 178:14
**changed** 30:16
32:4 53:16
56:2 131:17
144:21 177:13
**changing** 28:7
**Charles** 5:16
**chart** 160:15
**check** 32:22
**children** 11:4
**chiropractor**
72:9
**chiropractors**
72:13
**Christmas**
183:1,5,8,12
**chronic** 57:16
58:1
**church** 56:20,23

**churches** 56:15
57:7
**circle** 124:10,12
127:18
**circled** 124:14
125:5,11
129:11
**citations** 61:11
**city** 61:6
**Civil** 1:6 6:6
**claim** 50:1 124:2
124:7 127:16
165:8
**claiming** 7:9
48:5,13 50:4
50:18,22 51:9
68:13 129:7,14
129:18 151:3
158:1 160:1,14
165:12
**claims** 7:7 22:23
46:10 162:23
166:1
**clarify** 43:7
173:3
**cleaning** 122:8
122:11
**clear** 7:23 130:7
171:12
**clearly** 171:12
173:18
**clerk** 23:9
**close** 32:1,6,11
108:11,12
149:5
**close-up** 16:23
**closer** 53:21
76:22
**closing** 44:7
**clothes** 130:12
**clubs** 56:16 57:7
**collision** 60:6,7
**color** 4:17,18,19
4:21,22 99:10
99:11 128:11
**colored** 82:6

**come** 21:17
24:16 26:23
27:2 31:3 36:7
51:10 61:2
109:23 110:15
110:21 113:10
113:18 122:11
130:14 145:6
168:19,23
169:2,22 175:6
175:18,20,22
175:22,23
**comes** 175:2
**comfortable**
153:18
**comforted**
109:16
**coming** 77:21
78:9,11,13
**commencing**
2:11 6:10
**Commission**
187:23
**Commissioner**
6:4 187:22
**commotion**
169:6 172:12
**company** 23:5
27:2 28:2
42:10 158:11
163:18
**compensation**
58:15
**complaint**
136:22
**complaints**
118:13 131:12
135:16
**complete** 114:10
**completed** 60:22
61:3
**completing**
113:23
**compliance** 2:17
**computer** 187:9
**concern** 83:9

**concerned** 86:13
86:22
**conditions** 9:12
57:16 58:1
**cone** 101:6
**cones** 121:19,23
168:20
**confirmed**
170:22
**confusing** 7:20
96:18
**consider** 69:18
70:9
**considered**
183:20
**consumed**
150:16
**contact** 14:21
**contacts** 15:19
15:22 16:8
17:5,7 85:1
**contained** 98:13
98:17
**continuous**
68:10
**contracted**
23:18 24:7,8
**control** 60:6
**convicted** 56:10
**cook** 29:18 30:1
30:14 55:19
149:20 151:9
151:10 154:2,5
**cooking** 37:22
38:5 149:19
151:12 154:3
154:14,17,21
186:7
**coordinator**
21:1
**copy** 52:9
103:11 115:5
**corner** 173:6
**corporate** 2:9
5:12 6:9 23:10
**correct** 7:21

46:18 51:15
52:20 55:1
75:13 89:2
167:8 168:6
173:12 180:18
187:11
**couch** 184:5
**counsel** 2:4,22
3:1 6:7 187:15
**counselors**
155:4
**County** 17:16,16
17:16,19 18:4
18:7 56:17
57:9,9 187:4
**couple** 79:20
103:18 134:13
162:18
**court** 1:1,22
2:18 6:20 7:12
49:3
**cover** 74:8
**covered** 164:19
**COVID** 73:5,9
**coworkers**
180:21
**cracked** 62:15
65:5
**crime** 56:10
**Cross** 42:12
43:9 135:9
165:5
**crutches** 132:1
132:10,15
150:21 181:6,7
**Crystal** 20:14
**curious** 75:22
**curl** 149:7
**current** 9:19,20
14:4 21:14
53:20 56:4
**currently** 19:10
150:11
**Customer** 4:20
**customers** 37:21
108:21

cut 138:15
CVS 69:11,12

**D**

D 4:1
dad 10:18,19
damaged 61:18
damages 160:13
dangers 168:12
168:21 169:14
169:16
dark 79:6
Data 23:9
date 6:5 12:21
15:9 24:9
39:13,15 56:5
68:15 85:21
166:17
daughter 10:3
11:8,21 12:15
71:22 78:16,19
120:8 146:7
151:19 161:23
176:6,16 178:7
183:15
daughter's 77:2
77:9
Daughtry
115:17 116:4
day 17:8 31:23
50:23 51:2
63:9 66:12,12
76:8,18 78:6
79:17 83:17
84:20,22 85:6
88:19 103:5,9
111:6 114:4
115:3 118:23
120:8 121:3,10
123:22 124:2
126:9 127:16
128:14 129:2
132:5 133:11
136:8 138:1,7
146:3,10 147:9
158:2 159:3,13

163:11 174:16
184:21 187:18
day-to-day
176:14
days 20:4 31:21
32:10,18,19,23
44:8,11,12,18
50:5,17,23
51:9 54:23
63:10 148:22
Dazzio 2:9 5:11
6:8
decide 51:5
decided 38:16
decision 39:2
Dedicated 25:14
26:20 27:1,5
49:18
Defendant 1:13
5:9
Defendant's
4:15 52:8,14
80:13,14,19
103:22 104:3
105:8 114:14
114:17 122:15
122:23 123:21
124:5 125:15
125:23 126:1,2
126:6,23 127:1
127:5,9 128:21
129:11 131:4
160:5,21
degenerative
162:16
deliver 71:21
72:1
delivered 71:23
72:1
department
21:3 61:6,7
depict 105:8
deposition 1:16
2:4,15,16 3:4
7:11 8:14 9:17
186:19

depositions 2:19
depressing
151:15 183:17
depression
157:3
describe 82:10
83:16 92:14
99:2 112:10
143:6
description
55:20,22 115:8
173:14
desk 20:2
detail 83:16
details 95:9,12
95:14
determine 106:5
determined 56:6
develop 157:10
diabetes 57:20
58:4
diagnosed 16:21
57:19,23 63:5
157:2 162:16
179:6
diagnoses 132:4
diagnosis 65:1
137:4
Diana 1:23 2:5
6:1 7:12
187:20,21
died 151:11
differences
177:14
different 14:12
25:6,13 106:15
124:17,19,23
126:22
dinner 76:20
81:5 88:23
directly 90:21
91:1
dirty 85:10
91:18 92:1,2,5
97:20 98:1
99:18 100:1,19

101:14,19
105:2 107:19
107:19 175:2
disability 150:1
150:8
disclosures 4:23
160:7
discuss 156:18
discussed
106:11 155:2
166:11
discussion 15:6
disease 162:16
displays 84:18
distinguish
166:23
DISTRICT 1:1
1:2
DIVISION 1:3
doctor 16:13
17:10,11 40:1
40:8 41:3 64:1
69:19 70:10
134:18 142:11
doctor's 159:2,6
159:19
doctors 39:8
64:19 67:9
70:21 140:22
141:7,13,18
142:10 150:8
158:3,20 160:2
165:14
document 52:7
103:20 160:13
doing 28:10 58:9
73:10 76:17
77:1 107:1
114:8 151:14
downhill 135:19
downtown
155:16
Dr 70:13 162:10
drastic 161:22
drips 98:23 99:3
99:9,10

Drive 2:10 5:12
6:9 9:21 11:7
11:11 12:3
153:6,19
driver 60:10
67:23
driver's 15:11
driving 16:2
77:20
drugs 150:16
due 177:1
DUI 61:16
duly 6:17
duties 20:16
26:8 28:7 35:2
35:15 36:2,11
36:19,21 38:2
49:15 50:9
179:22 181:23

**E**

E 4:1 5:1,1
earlier 95:17
126:7 128:9
142:4 179:17
Earliest 20:8
early 70:9
earn 45:10
48:22
earning 29:20
earnings 55:11
eased 143:14
144:8,9,15
East 7:4
edge 91:4
education 18:15
effect 2:16
efforts 122:8
either 17:15
18:3,6 34:9
40:17 56:16
57:8 59:2,5,7
64:14 65:16
68:7 80:15
90:19 96:2
104:10 128:17

166:23 167:6
**electronic** 115:4
169:21
**Ellise** 5:4
**email** 170:7
**emergency**
66:16 133:8
184:9,14 185:1
**emotional** 157:8
157:16
**emotionally**
151:5 155:4
156:3 157:22
165:17
**employed** 19:11
46:16 57:4
**employee**
111:22 112:4
112:12,23
113:4,19,23
118:9 122:4
175:6
**employees** 83:11
102:21 108:22
109:4 110:12
110:13,15
**employment**
21:21
**EMTs** 113:10
116:10,14
118:10,12
130:16
**EMW** 5:5
**ended** 23:19
27:17 28:14
29:13 33:8
46:16 49:10
78:14 186:19
**Ensley** 11:12,15
12:7 13:3
153:7 183:5,8
183:10,11,15
183:19 185:16
**enter** 84:5 87:11
**entered** 87:20
**entire** 33:10,17

35:21 44:13,16
81:16 158:2
159:3
**entity** 43:8 61:2
**entrance** 80:2,4
80:12,16,17
81:2
**entry** 23:9
**ER** 64:4 66:12
67:7,13 72:23
131:13 133:18
135:4 136:8,19
147:9
**Erica** 17:21
162:20
**ERs** 71:6,8
**Esq** 5:4,10
**estimate** 82:16
175:8
**evening** 82:4,8
**events** 9:9,13
**eventually**
134:23
**everybody** 7:20
**everyday** 148:19
**evidence** 3:4
102:14
**exact** 169:8
**exactly** 167:21
**examination** 4:3
6:13 7:1 166:7
**examined** 6:17
**exercise** 58:18
**Exhibit** 52:8,14
80:13,14,19
103:22 104:3
105:8,17 106:4
114:14,17
122:15,23
123:21 124:5
125:15,23
126:1,6,7
127:1,1,5,9,22
128:6 129:11
160:6,21 170:5
170:8

**Exhibits** 4:10,12
4:15 128:22
131:4
**exit** 131:2
**expect** 142:13
**expenses** 160:2
164:18,21
165:13,19
**experience**
118:2 143:18
154:15
**experiencing**
135:21 143:7
143:15 150:11
**expires** 187:21
187:23
**explain** 8:6 50:3
**extra** 32:22
**eye** 16:13 17:10
17:11
**eyeglasses** 16:8

---

**F**

**face** 179:1
**fair** 8:9 90:15
121:13
**fall** 82:13 91:17
94:21 95:10,11
95:13 104:13
104:18,20,23
105:1 106:12
107:6,12,21
108:1,23 109:5
109:7,12,18
110:12,13,16
110:21 111:9
111:22 116:7
116:18,21
117:13,17
118:22 128:18
134:4,11
135:13 136:4,8
138:10 139:15
140:23 141:15
141:19,23
143:3 146:23

147:3,7 148:7
149:2,16
150:14,17
151:3 154:2
155:3,21
156:18,23
157:3,6,9,20
162:21,22
164:15,22
165:21 168:5
**fallen** 68:15
**falls** 68:6
**familiar** 14:8
85:20 115:17
**family** 176:4
**far** 16:22 79:14
83:21 84:1
**farsighted** 16:21
**fast** 93:2 95:3
112:20
**fast-forward**
172:5
**fast-paced** 182:7
**February** 15:10
**Federal** 6:5
**feel** 62:8 92:22
93:5,14,20
95:5 116:20
123:8 144:11
**feet** 38:6 40:18
40:23 41:1,4
92:19,20,22
93:5,15,20,23
94:4 95:6
108:13,13,15
108:15,17
154:16
**fell** 68:13 83:20
88:21 89:16,18
89:19 90:1,12
91:7,9,14 92:4
92:9,13,14,17
92:21,23 93:4
93:6,12,21
94:6 95:2,18
97:16 98:10

99:16 101:15
102:4,8,17,23
103:4,4,9
105:9,10 106:9
107:4 116:20
116:23 117:10
117:18,20
118:2,3 119:18
120:1 121:10
121:14,20
122:9 123:22
125:20 126:15
130:12 131:18
163:12 167:5
167:20 168:14
174:4 175:5,10
175:15
**felt** 94:1 117:10
**female** 112:14
**field** 186:6
**fields** 155:1
185:21
**figure** 36:17
98:20 140:19
**figured** 154:7
**filed** 7:4 56:12
58:14
**filled** 69:4 134:1
134:7
**finally** 41:19
185:5
**find** 42:20 75:7
103:21 109:21
110:6,7 119:20
152:5 154:8
175:14
**fine** 17:4 31:19
31:19 70:17
76:6 79:11
80:23 112:16
117:2 123:10
124:13 157:18
162:3 170:3
**finished** 24:11
162:2 186:16
**first** 5:6 6:17

29:1,10,17
39:11 80:13
83:2 94:17
112:3,11,11
113:19 118:23
121:6 135:14
135:17 138:6
143:20 155:18
156:8 168:1,3
177:19
**fist** 149:10
**five** 24:1,2 44:7
44:11,18
**five-four** 73:22
73:23
**flare** 148:15
**flatfooted**
119:12,23
**flip** 123:4
**floor** 84:15 85:5
85:7,8 91:19
91:21 92:3,8
92:16,18 93:2
94:6,8,17
95:19 96:3,4
96:17,20 97:6
97:9,15,17,21
98:9 99:3,10
99:15,18 100:1
100:19 101:15
102:12,16,22
105:9 106:1,9
113:7,17
121:16 122:5
125:4,9,10,16
128:19 130:2,9
167:13,16,20
168:2,4,15
169:2 174:18
**flu** 69:23
**follow** 133:14
**follow-up** 66:23
166:8
**following** 6:14
39:7 41:20
65:2 134:4

138:19 139:2
144:12 150:19
**follows** 6:18
**footage** 75:14
171:15,18
172:16,21
**force** 2:16
**foregoing** 6:6
187:7,10
**forget** 7:16
**form** 2:23
169:17
**four** 44:11,12
180:11
**fourth** 87:23
**fractures** 63:6
**frame** 168:18
169:9 172:1
**free** 62:9 123:8
**freezer** 26:12
**Friday** 20:6 32:7
**Friedman** 2:8
5:11 6:8
**friend** 60:17
**friends** 57:1,1
**front** 84:6 87:15
126:16 129:8
129:11,15
130:1
**full** 2:17 8:17
50:23 51:2
**full-time** 45:19
45:23 46:7
**fun** 10:17
**funny** 62:6
**further** 2:13,20
91:5 141:8
187:14
**future** 142:13

――――――――
**G**
**gap** 27:22
**gas** 161:3
**gather** 123:10
**getting** 31:11,14
36:7 74:4

79:22 88:5
107:2 111:1
144:1 178:22
182:14
**ghetto** 151:21
183:20
**girl** 117:21
**give** 21:8 39:8
52:9 61:14
124:9 133:17
142:11 148:11
181:16
**given** 8:14 14:7
29:23 33:1
38:21 40:18
61:11 64:23
68:20 103:11
131:22 132:4
137:3 145:14
145:23 146:21
181:5 187:12
**giving** 150:8
**glasses** 15:21,23
16:1,2 17:5
**go** 8:20 15:1,4
16:19 18:9
20:8 21:7,9
22:2,6,21 24:5
25:7 26:6 29:7
35:23 38:19,20
38:22 39:5
48:18,20 49:11
49:14 50:5,12
50:17,18 51:13
52:2 56:20
63:9 65:21
66:15,18 69:5
69:11 70:2,3
77:4,5 80:7
81:3 82:19,21
85:17 86:2
93:20 95:6
97:12 109:20
133:2,6 136:13
137:23 146:11
154:11 155:7

158:5 171:19
177:23 178:8
179:20 180:3
181:1,6,8
182:19,19
186:5
**God** 185:22
**going** 7:12 14:23
15:2 25:13
38:17 42:22
52:6,9 71:1
76:19 77:6
78:1 83:4
88:22 89:17
91:6 107:2
122:14 124:9
135:19 140:14
140:16 142:8
144:1 152:1,7
152:12,12
155:18,19
156:1 159:5
160:2,4 164:1
166:9 170:4
172:4,19
176:23 181:19
186:9
**good** 73:13
180:20
**Gordon** 4:4,6
5:10 6:22 7:1,3
15:4,7,8 43:2,6
49:6 52:17
73:19 80:23
93:11,19 104:6
114:20 123:3
127:12 161:1
164:4 166:4
167:12 169:17
169:22 170:3
170:14 171:22
173:1,10,13
174:6,10
186:15
**gotten** 135:9
**grace** 185:22

**graduate** 18:12
**grandma's** 77:7
78:5
**grandmother**
77:3,9 151:10
151:11
**grandmother's**
120:7
**Grandview** 63:4
63:6,20 64:19
71:1,6 147:8
164:23
**great** 107:1
170:15
**Green** 5:17
**grew** 18:21
**grocery** 81:20
**ground** 8:13
98:21 120:1
**grounds** 3:2
**guaranteed**
21:20
**guess** 66:1 119:5
157:12 159:8
178:22 180:7
**guessing** 94:18
98:23 111:19
**Gwen** 7:2 174:9
**Gwendolyn** 5:10

――――――――
**H**
**hair** 82:6 128:8
178:10,23
**halfway** 84:2,3,4
**hand** 105:20,22
**hands** 91:14
**happen** 81:9
106:19 107:15
144:3
**happened** 12:23
13:6 46:12
59:18 60:4
67:5,19 74:3
75:9 82:13
83:17,22,23
95:3,13 106:12

Alexandria Bennett                                    6/14/2023

106:16 114:4,6
140:6 167:4
172:2
**happening**
172:11
**happenings**
169:8
**hard** 35:6 41:9
74:19 176:15
178:17,18
**hazard** 87:3
**head** 7:15,16
25:15 26:10
60:6 149:22
155:13
**head-on** 60:7
**headed** 77:22
**heal** 138:18,20
**healed** 66:19
67:4
**healing** 138:22
**health** 34:1,3,6
41:14,17 42:3
42:5,7,13 43:8
51:15,19,20
67:17 148:3
**healthcare**
184:10
**hear** 95:19
**heard** 75:11
100:7 163:22
**heart** 14:6
**heel** 120:23
**held** 15:6,15
33:12
**Helena** 16:16
76:15,23 77:1
77:6,15,21
78:3,3,15,20
78:23 85:12
86:20
**help** 36:7 41:12
109:11 110:10
132:15 137:17
175:15 185:11
185:12

**helped** 42:19,20
152:17 163:2,5
163:9 185:7,8
**helps** 131:5
**Hey** 154:8
**hidden** 129:19
129:21
**high** 18:10,11
57:20 58:3,6
183:22
**Highway** 69:14
**Hills** 2:10 5:13
6:10
**hip** 64:15,20
68:7,18 95:1
117:3,5,16
136:1,3,7
**hips** 59:2
**hire** 56:8 154:12
**hired** 22:5,7
**hit** 93:1,1 94:8
94:16 117:13
**holding** 96:20
**holidays** 34:11
34:15 152:11
183:16
**hollering** 109:15
**home** 63:9 133:3
133:7 137:23
178:1
**homeschooled**
177:1,3,5
**Homewood** 9:21
12:8,9,11 13:7
13:15 76:23
78:9,11 151:20
152:22 183:4,9
185:16
**Hoover** 18:17,18
19:4 29:6,9,14
29:17 30:5,12
30:14,20 31:12
31:15,20 34:13
69:17 183:22
**hopes** 22:12
**hospital** 39:17

41:7 48:3 63:2
63:10 71:13
118:16,18
131:9 132:21
181:5
**hospitalized**
138:3
**hospitals** 154:10
**hour** 20:12
**hours** 20:7 31:7
31:22 32:4,5
44:1,20 54:2,4
54:5,10 55:3,7
150:17 159:9
**house** 11:17
12:3 36:6 77:7
78:5 120:7
179:22
**hurt** 66:8 116:23
117:3,7 143:11
148:18 177:18
**hurting** 65:17
94:13 95:1
117:4 118:4
184:20,21
**husband's** 18:1
**Hyundai** 60:13
61:18

---

**I**

**idea** 24:1 32:23
82:7 84:3
102:3 112:6
127:13 135:12
161:1
**identify** 75:21
124:6 171:14
171:17 172:15
172:20
**immediate**
117:9
**immediately**
35:18 116:21
118:1
**impact** 176:3
**important** 7:14

**incident** 4:20
7:9 12:21
20:17 36:13
40:22 46:13
48:7 50:6,19
51:3 67:5 71:4
73:1 74:2 81:8
86:12 95:14
112:21 113:23
114:13 115:9
122:21 130:15
164:5,11
166:14,16
167:4 171:2,8
171:23 172:10
174:16 176:2
176:17
**incision** 138:12
138:18,22
**increase** 32:3
**increased** 53:23
**incurred** 160:1
**indicating** 54:17
149:9 171:5
**individual**
112:11 156:14
**industry** 149:19
186:3,10
**infection** 138:22
**information**
101:23 162:22
**initial** 4:23 64:4
136:18 160:7
166:12
**injured** 58:9
62:11,14
117:13,17
**injuries** 7:8
20:17 40:21
50:19 51:2
58:22 59:2,6
64:1,14 67:1,3
67:11 68:7,18
68:21 71:3
133:10 134:10
138:9 140:22

141:14,19,22
145:1 146:22
148:6 164:10
164:14 176:4,5
**injury** 58:12
**inside** 66:21
80:7 81:2
**instructions**
145:23
**insurance** 34:2,4
34:6 39:22
41:9,11,15,18
41:19 42:3,7,9
42:10,14,15
43:8 51:15,19
51:20 61:15,23
67:18 134:14
134:22 136:16
139:13 140:9
140:18 142:7
147:21 148:3
163:2 185:3,5
185:5,9
**interested**
187:16
**interfere** 159:7
**Intern** 5:16,17
**internally** 62:15
63:11 65:5
**interrupt** 62:9
**interstate** 59:20
**interview** 47:11
47:13
**interviews** 47:17
**Inverness** 54:13
**involved** 9:15
58:18 67:21
68:16
**iPad** 114:9,11
115:3
**issue** 95:15
140:8
**issues** 140:12
178:22 186:1
**item** 90:21
**items** 79:20 81:5

88:23

---

**J**

**January** 41:20
  41:21 42:4,14
  42:17
**Jefferson** 17:16
  18:7 56:17
  57:8 187:4
**job** 19:20,22
  20:2,16,22
  21:14 22:8,8
  22:12,13,16,22
  23:17 24:5,7
  24:20 26:8,12
  27:9,21,23
  28:7,9 29:13
  29:16 30:4,13
  32:16 33:8,8
  33:13 34:2,8
  34:20 35:1,15
  36:1,11,18,21
  37:13 38:2,9
  38:13 42:1,20
  43:15 45:2,5
  46:15 48:10
  49:15 50:9
  55:11,20,22
  56:4 140:19
  152:6,8,9
  154:9,21
  180:13
**jobs** 21:23 25:6
  25:16,17,19
  26:15,16,16
  27:16 28:14,18
  38:15 42:20
  45:7 46:21,23
  47:3,14 48:1,3
  48:4,14,20,23
  49:7,14,20
  50:13 158:17
  159:16,19
  161:6
**Johnson** 162:11
  162:12

**joint** 162:11,16
**journey** 185:23
**jug** 89:7 90:2,17
  90:21 166:22
  167:3
**July** 137:19
  158:8
**jumping** 31:17
**June** 1:19 2:11
  6:11 52:19,19
  53:8,16 54:1
  187:18
**jury** 56:22 57:2
  57:5

---

**K**

**keep** 100:4,5
  132:18 139:12
  152:5
**keeping** 100:19
**Kellie** 107:10,20
  108:22 109:8
  110:1 112:2
  113:19 115:15
  115:16,17
  116:4,6,16
  118:9 174:20
  174:22
**Kelsie** 5:17
**kept** 100:3,12
  175:4
**Kevin** 10:19,21
  13:10 79:3,4
  80:7 81:15
  87:11 103:10
  103:11 104:7
  104:10,21
  106:11 107:5
  108:3,23
  109:17 110:1,3
  116:2,17
  118:10 126:19
  126:22 131:16
  132:23 171:17
  175:14,19,21
**Kevin's** 77:11

77:12,13
**kin** 187:15
**kind** 29:7 54:14
  56:6 89:11
  115:4 117:20
  117:21 120:19
  121:11 137:2
  145:5 150:23
  157:15 166:21
  182:5
**kitchen** 35:4,8
  36:15 37:12,19
  151:12,17
  179:22 180:17
**knee** 62:16,18
  63:17 65:3,9
  65:16,17,21
  66:20
**knew** 37:13 39:1
  41:10 42:21
  85:22 102:15
  102:21 103:1
  154:5,7 184:16
  185:12
**know** 8:2,5 14:2
  14:4 22:1
  24:14 26:4,9
  26:10 29:4
  31:16 32:21
  36:7 37:11,12
  41:12 42:9
  44:11 46:2
  52:4 55:12
  56:7 60:19
  62:9 68:12
  70:23 74:4,4
  74:18 77:4
  81:4 82:1,5
  85:7,10 89:8
  91:23 92:15,17
  94:3,13 97:3
  97:20 98:2,6
  99:14 100:9,20
  101:20 102:7
  102:11 103:2
  103:17 104:7,8

107:1,17
  108:16,19
  117:12,14,16
  117:20,23
  120:17 129:21
  134:20 144:10
  145:21 146:4
  148:20 149:4
  149:18 151:15
  151:22 152:3,8
  152:12 154:5
  154:13 156:20
  157:13 161:11
  163:7 165:6
  166:13 167:2
  167:20 169:20
  174:17 175:1,9
  179:17 181:4
  183:20 184:3,6
  184:18
**knowledge**
  162:21
**knows** 152:11

---

**L**

**L** 2:1
**labeled** 151:16
  173:18
**lady** 104:11
  107:9
**laid** 126:15
  152:23
**Lakeshore**
  23:15
**land** 94:11
**landed** 92:13
  94:12,14,14
  127:23 128:5
**Large** 2:8 6:4
  187:23
**Lashun** 8:19
**latest** 20:9
**law** 2:8 5:5 6:8
**laws** 2:18
**lawsuit** 7:4 9:16
  23:1 46:10

95:15 122:19
  160:14 163:1
  163:16 164:7
  166:2
**lawsuits** 64:8
**lawyer** 74:14
  160:11
**leading** 2:23
**leave** 24:4 44:5
  44:7 123:8
  132:12,20
  162:7
**leaving** 46:8
**led** 68:17
**left** 62:19,19
  66:16 101:4
  108:7,10 132:1
  132:9 133:1
  181:5
**leg** 143:11
**lessened** 143:2
**let's** 29:1 104:12
  137:18 157:19
  164:18 180:7
  182:18
**letting** 21:9
  38:22 180:2
**license** 15:11,13
  15:15,19
**life** 19:1,8
  148:19 156:2,6
  179:18
**lifestyle** 144:22
**lifting** 40:18
**lighting** 119:2
**liked** 154:4
**linger** 66:17
**link** 170:6
**liquid** 92:7
  128:19 129:8
  130:8 167:15
  168:1
**liquor** 173:18,22
  174:3
**listed** 115:10,15
  116:2 162:19

162:20
**lists** 55:10,11
  115:12 160:13
**little** 8:13 31:12
  76:22 101:6
  112:1 115:13
  116:1 160:8
**live** 10:1 11:10
  12:7 14:1
**lived** 9:22 11:6
  11:14,19 13:10
  13:11 18:23
  19:3 153:15
**lives** 77:15,16
**living** 13:2,17
  17:15 76:11
  184:1,2
**Lloyd** 162:10,12
**loans** 163:15
**located** 16:15
  26:11 89:23
  90:11 134:18
**location** 29:5,6
  29:10,11 35:21
  43:19 54:13,20
  69:7
**logged** 177:23
**long** 9:22 11:22
  12:12 19:20
  24:20 27:6,19
  30:19 35:5,12
  36:14 40:12
  42:16 65:20,22
  82:12,15,16
  102:3,7 106:8
  110:9 111:21
  134:3 135:12
  136:3,11
  143:22 144:18
  146:18 168:15
  175:5 180:8,9
**longer** 36:21
  149:3
**look** 14:18 74:18
  101:9 103:14
  105:10 123:6

123:13 126:22
  172:11 186:9
**looked** 74:19
  75:20,23
  125:16,22
**looking** 88:2,7
  89:4 97:1
  106:4 119:7
  124:4 128:23
  184:13
**looks** 52:20 53:9
  54:11 74:7
  105:19 115:14
  124:15,20
  128:13 129:10
**lost** 27:9 60:5
  152:9,10 161:4
  161:6 165:8
**lot** 48:3 54:2,5
  79:14 97:12
  142:18 144:16
  152:18 155:20
  169:5 179:9
**loud** 7:14
**love** 149:19
**loved** 152:9
**low** 106:23
**LP** 7:4

_____

**M**

**M** 5:4
**ma'am** 8:10,16
  9:4,6,10,14,18
  10:10,22 11:5
  11:9 12:17,19
  13:1,4,9,23
  14:13,16,19,22
  15:14,17,20
  16:9,17 17:1,3
  17:9,12,17,23
  18:5,8,16,22
  19:2,9,12 20:1
  20:3,19 21:16
  22:10,14 23:2
  23:7,12 24:10
  24:13 25:10

26:18,22 27:14
  27:18 28:20,22
  29:9,15 30:2,8
  30:16 32:15
  33:4,15 34:7
  34:14,16,19
  35:13,19,22
  36:3 37:7,23
  38:4,7 39:4,6
  40:7 41:16,22
  42:2,8 43:10
  43:13 44:15,19
  44:21 45:6,9
  46:11,14,19,22
  47:2,6,12 48:8
  48:12,16 49:9
  49:12,16,21
  50:15,21 51:12
  51:16 52:13,22
  53:5,11,14,18
  53:22 54:18,21
  55:2,6,9,14,18
  56:2,11,14
  57:10,14,18,22
  58:5,10,13,16
  58:20,23 59:4
  59:9 60:9,11
  60:15,23 61:4
  61:10,17,20,22
  62:4,10,13
  63:1,7,15,18
  63:22 64:3,7
  64:10,13,17,22
  65:13 66:10
  67:2,20 68:2,5
  68:19,23 70:7
  70:22 71:9,18
  72:5,8,11,22
  73:3 74:11,15
  76:5,5,10,13
  76:16 77:14
  78:17,21 79:1
  79:5,13,16,23
  80:3,6,8 81:14
  81:18 82:11,23
  83:3,6,10

84:13,17,21,23
  85:3,16 86:1,7
  86:23 87:5,9
  87:13,18,21
  88:1,18 89:3
  89:14,21 90:9
  90:18 91:2
  92:10 93:22
  94:5,9,18 95:8
  95:16,21 96:12
  96:15,22 97:7
  99:4,8,12
  101:18,22
  102:2,5,9,13
  103:6 104:2,17
  104:19 105:5
  105:11,14,18
  106:2,7,13,17
  106:20,22,23
  107:7,13,22
  108:2,14 109:2
  109:6,10,19
  110:2,14,17,23
  111:7,11,13,16
  112:5,9,13,19
  113:9,12,15
  114:2,16 115:1
  115:11 116:5,8
  116:11,15,19
  116:22 117:11
  117:15 119:1,9
  119:13,16,19
  119:22 120:2,5
  121:1,4,8,17
  123:16,23
  124:3,8 125:2
  125:13,18
  126:17 127:2,8
  127:14,17
  128:1,3,7,10
  128:16 129:3,6
  129:13 130:5
  130:21 131:1
  131:10,20
  132:11,17,19
  133:12,19

134:2 135:2,11
  135:15 136:9
  136:20 137:1
  137:11,14,21
  138:2,5,11,14
  138:17,23
  139:4,9,16
  140:2 141:6,16
  141:20 142:1,5
  142:9 143:1,14
  143:17 144:5
  144:15 145:7
  145:12,16
  146:17,20
  147:1,5,11,13
  147:16,20
  148:5,9,16,23
  149:12,14
  150:2,5,10,15
  150:18,22
  151:1,6 153:7
  153:9,12,17,20
  154:19 155:9
  155:23 156:5
  157:1,4,7
  158:18,22
  160:3 161:10
  161:19 163:13
  163:17 164:8
  164:12,16
  165:3,7,11,15
  165:22 166:3
  166:18 167:10
  167:14,17,22
  168:7,10,13,22
  169:5,11,18
  170:20 171:1,9
  171:13,16
  172:3,17
  173:16 174:1,5
  175:16 176:8
  176:22 177:12
  178:3 179:2,16
  180:15,19,22
  181:3,10
  182:16 183:2

183:13 185:10
185:14,18
186:4,11,17
**making** 22:23
29:21 33:21,23
46:10 149:10
157:14 162:23
166:1
**Male** 112:14
**manage** 35:3
36:9,15
**managed** 29:10
30:17
**manager** 30:23
31:11 33:10,14
33:14 36:6
56:1 179:23
180:1
**managing** 35:8
38:11
**March** 21:5
22:18,18
**Mario** 30:6,10
31:2 32:13
35:20,23 38:8
39:5
**mark** 52:6 80:12
103:21,22
114:14 122:15
127:5 170:5
**marked** 52:15
80:20 104:4
105:8 114:18
123:1,20 124:5
125:15,23
126:6,7,23
127:10 128:21
160:5,22
162:18 170:9
**market** 42:5
**marks** 85:8,10
91:23 92:1
97:21,22 98:1
98:4 100:2,16
**married** 9:5
17:22

**mean** 39:10 45:4
54:19 61:13
68:9 71:12
81:12 85:7
93:2 99:22
100:5 135:5
177:21 178:21
182:4
**meaning** 137:23
**mechanism**
94:21
**medical** 9:12
57:16 58:1
142:19 155:6
160:19 164:22
**medication** 9:7
57:13 68:21
133:18,20
134:4 148:21
156:23
**medicine** 58:3
**meet** 131:15
**meeting** 170:18
**member** 56:15
57:7
**members** 56:23
**memory** 79:9
128:15
**mental** 152:18
**mentally** 151:4
155:3,20
157:21 165:18
**mention** 70:13
**mentioned**
95:17 128:9
141:12 154:1
**Mercedes** 26:13
**messed** 26:3
**middle** 54:14,15
84:19
**mileage** 160:1
161:2 165:13
**Milo's** 23:5,6
24:5 25:5
27:21 28:2
47:1 49:8

158:11,15,16
158:20 159:4,9
**mind** 14:18
**mine** 52:10
**minimum** 49:1
**minute** 95:4
110:7 162:8
**minutes** 82:18
106:10 110:8,9
168:17 169:4
175:9,12,18
**missed** 48:6,10
48:13 49:23
161:8 165:9
**mixed** 98:2
**mobility** 154:9
182:15
**molded** 100:18
**mom** 17:19 19:6
42:18 77:12,13
151:23 152:16
152:16 177:7
185:7,8
**Monday** 20:6
32:7
**money** 31:8
**Montgomery**
69:14
**month** 24:1
101:10,11
151:11 153:23
**months** 24:1,3
24:21,22 40:3
41:5 42:18
43:12 65:23
144:19,23
145:1
**Morgan** 23:14
**morning** 32:1
46:2,3 55:17
143:21 144:4
144:11 159:16
177:16,17
178:5,6
**mother** 162:20
**motion** 92:11

**mouths** 24:15
**move** 37:1 52:5
151:20,20
152:1,20
178:19,20
182:1,5 183:3
183:5,11
185:15,19,20
185:20
**moved** 13:13,21
21:3 31:5
112:20 128:2
153:5 185:22
**movement**
148:20
**movements**
92:12 148:13
**multiple** 90:5

―――――――
**N**
―――――――
**N** 2:1 4:1 5:1
**name** 7:2 8:18
8:20 10:4,5,9
17:20 18:1
25:11 26:9
30:7 60:18,19
62:6,7 70:13
70:18 107:10
155:13
**named** 180:17
**names** 8:23 9:3
**Nash** 5:16
**nearby** 19:1
**nearest** 75:14
**nearsighted**
16:21
**necessary** 2:21
**need** 8:1 24:19
73:11
**needed** 25:23
29:8 37:20
41:13 42:21
111:15,16,17
112:23 133:14
178:12 182:10
185:12

**negative** 33:2
47:22 65:11
75:1 89:9 90:7
112:7 121:1
145:3 154:23
**negatively**
149:22
**neither** 187:14
**never** 34:12
140:14 142:14
149:4
**new** 19:16 22:12
**night** 32:1 46:3
46:4 81:17
132:21 159:14
**nights** 46:4
179:10
**nighttime** 44:3
44:20 74:5
**nine** 10:15
**nine-year-old**
10:16
**nod** 7:15
**North** 5:6
**NORTHERN**
1:2
**Nos** 80:20
**Notary** 2:7 6:3
**notes** 74:9
158:14,15
**notice** 95:22
100:22
**noticed** 95:18
96:3 97:11,15
100:11,15,16
100:17,19
140:10 166:19
**noticing** 149:6
**number** 1:6 14:5
14:11 15:3,11
55:3
**numbers** 160:17
**numerous** 47:8

―――――――
**O**
―――――――
**O** 2:1

Alexandria Bennett                                                    6/14/2023

**OASIS** 163:19
163:21,22
**object** 164:2
169:17
**Objection** 93:7
93:16
**objections** 2:22
3:2
**observe** 83:7
121:18,23
122:7 128:18
**observed** 86:21
107:15 129:2
**occasion** 86:5
156:15
**occasions** 68:16
86:9,11
**occurred** 171:8
171:23 176:17
**October** 12:22
13:18 17:5
33:22 34:5
36:13,20 38:3
39:7,19 43:7
45:14 48:7,15
50:2 53:1,16
53:21 54:1
57:12,17,21
58:17,21 59:3
59:7 64:15,21
68:1,4,8,13
71:7,17 72:4,7
72:10,12,18
74:1 85:13,18
86:6,20 87:4,7
87:10 89:12,13
101:12 125:17
125:21 128:17
166:16
**odor** 130:8
**off-the-record**
15:5
**offered** 3:4
**office** 19:18
23:11 134:18
155:14

**officer** 130:14
130:18
**offices** 2:8 6:8
**oh** 21:11 24:8
33:4 74:20
98:6 124:13
162:3
**okay** 8:11,17
10:11,23 11:13
11:16 13:2,8
13:17,21 14:12
15:21 16:4,13
16:18 17:4,10
17:14 18:20
19:5,10 21:6
22:7,11,15,21
23:8,16 24:4
24:18 25:11,16
27:6,15 28:3
28:17,23 29:12
30:3,9,11,19
31:5,10,16
32:10 33:16
34:12 35:1
38:1 40:1,8,12
42:16 43:6,11
46:1,8,23
47:23 48:9,17
48:22 50:11,16
51:14,21 52:5
52:17,23 53:6
53:8,15 56:4,9
57:11 59:14,17
59:23 60:3,21
61:18 62:11,18
64:4,18 65:8
66:8,15 67:17
68:3,20 69:1
69:10,15 70:8
70:19,23 71:19
72:3,17,23
73:4,10,10,15
73:19 74:16,22
75:3,16 76:6
76:17,21 77:8
78:8,14,18

81:1,8 82:7
83:15 84:22
85:4,12,17
86:4 87:19
89:4,22 90:10
90:14,19 91:11
93:3,13,19
94:7 95:4,17
95:22 96:5
97:2,5 98:8
99:2,5,14,19
100:14 101:11
101:20 102:20
103:11,19
104:12,18
105:12,23
106:3,21 107:4
108:3,7,13,18
109:11 110:18
111:5,21
112:16 113:3
113:16 115:2,7
115:23 116:1,3
119:2,10 120:6
121:2,5,13,18
121:22 122:3,7
122:14,22
123:7,11,12,17
123:19 124:1,4
124:9 125:3,14
125:19 126:18
127:3,20 128:5
128:17 129:4,7
129:14,23
130:6,11 131:7
132:9 134:6,23
136:10 137:2,7
137:22 139:7
139:14 140:3
141:2,12 142:2
143:15 145:5
145:19 146:9
146:21 147:14
148:6 149:13
149:23 153:10
153:21 154:20

155:10 157:18
158:1,7,13,19
159:8,13,23
160:4 161:1,14
161:20 162:1,9
163:4,14 164:9
165:4,23
167:23 168:5
168:14,23
169:7,19
170:15,21
171:6,10,14
172:15,18,21
173:17 174:6,8
174:21 175:3
175:13 176:1
176:13,20
177:4,8,20
178:4,13,21
179:5,13,17
180:6,13,23
181:4,11,19
182:4,13,18,23
183:3,11 184:8
184:23 185:4
185:15 186:1,8
186:12
**old** 10:14 14:11
176:16
**older** 17:15
**Olympia** 9:20
11:7,11 12:2
153:6,19
**on-the-job**
58:12
**once** 7:20 24:11
30:16 71:17
81:2 91:21
96:4 98:5
100:7 105:5
118:12 131:11
144:1,9 154:7
186:8
**oncology** 19:19
**ones** 75:17,18
125:21 134:20

160:10
**open** 32:1,6,10
138:16
**opened** 37:21
**oral** 6:13
**orange** 101:6
**order** 158:3
**organizations**
56:16 57:2,8
**original** 52:16
80:21 104:5
114:19 123:2
127:11 160:23
170:10
**orthopedic** 41:8
64:1 133:15
134:17 140:22
**Orthopedics**
134:16
**Outback** 27:9
27:12 28:19
29:1,13,17,22
30:13,15 31:20
32:2,6,17
33:18,22 34:2
34:9,21 35:16
38:3,19 43:19
45:20,22 46:4
46:7,16 47:1
48:11 49:8,23
50:6 51:15,18
52:12 53:20
54:2,8 78:10
154:6,13,22
158:3 179:20
180:8,14,17
181:2,7,20,23
**outpatient**
137:22
**outside** 79:6
**overheard**
121:15
**overnight** 63:8
138:4 159:7,11
159:12
**overtime** 54:9

**P**

**P** 2:1 5:1,1
**P.C** 2:9 5:11 6:9
**p.m** 1:20 2:12
  6:11 20:9 43:4
  43:5 73:17,18
  186:20
**pad** 115:4
**page** 4:3,12,15
  160:12,16
**paid** 20:10 32:17
  32:18,19,23
  53:12 147:8,10
  147:12,15,19
  152:3 165:5,20
**pain** 37:10 41:1
  51:11 64:20
  65:15,21 66:11
  66:15 68:10
  116:21 117:9
  118:1,2 131:17
  132:16 133:20
  135:18,21
  136:1,3,7,11
  136:23 142:21
  143:2,7,13,16
  143:19 144:11
  144:14 145:2
  145:10 148:14
  148:22 150:12
  150:12 161:16
  161:21
**painful** 151:13
  151:18
**pains** 140:16
**pallet** 90:22 96:8
  96:9,10,13,17
  96:20 97:1,10
  98:19 99:6
  119:20 129:9
  129:12,16,19
  129:19 130:2
**pandemic** 24:14
  25:1 177:2,5
**pantry** 45:3

**paper** 115:4,18
**Pappadeaux**
  27:10,13 28:19
  43:15,21 44:1
  44:23 45:8,13
  45:18,22 46:5
  46:9 154:6
**Park** 18:11,18
  183:22
**parking** 79:14
**Parsons** 20:14
**part** 10:12 32:16
  38:16 52:7
  59:23 94:7,10
  103:20 105:19
  105:23 118:6
  122:21
**part-time** 45:22
**particular** 19:17
  19:21 26:9
  112:21
**parties** 2:3 3:1
  187:15
**pass** 83:11
**passenger** 67:23
**patient** 19:16
  21:1 162:4
**pause** 42:23
  171:20 172:19
**pay** 4:16 31:6
  32:3 33:16
  42:19,21 52:6
  52:11,18 53:9
  53:15,20,23
  54:19,22 55:1
  55:23 56:3,3
  67:14 152:21
  153:21,23
  176:11 185:8
  185:11
**paycheck** 26:23
**paychecks** 21:17
**paying** 153:2,13
**payments**
  147:22
**payroll** 49:19

**Pearl** 12:11 13:8
  13:15 76:11
  133:5 152:22
  153:2,5
**Pelham** 16:17
  17:11 26:11
  69:9 86:2
**people** 56:22
  57:3 134:14
  172:16
**people's** 24:15
**perform** 25:22
  25:23 26:5
  28:6 34:22
  35:2 36:12,19
  36:22 39:1,2
  48:19,21 49:15
  50:9,13 179:21
  181:23 184:21
  184:22
**performed**
  137:13,16
  138:1,8 139:18
  142:11,23
**performing**
  20:16 26:8
  38:2
**period** 23:21,22
  27:6,11,15
  33:10 37:4
  41:4 43:12
  46:17 47:5
  52:18 54:22
  55:1,4,8
  144:13 146:15
  150:20
**periods** 35:5,12
  36:14
**permanent** 22:8
  22:13 148:8
**person** 112:17
  113:21
**Personnel** 25:14
  26:20 27:1,5
  49:18
**pharmacy** 69:1

69:6
**phone** 14:4,15
  81:23 111:5,10
**photograph**
  4:17,18,19,22
  103:20,23
  105:7 106:3,6
  127:21
**photographed**
  129:5
**photographs**
  4:21 103:3
  122:18 123:20
  124:4,16
  125:14,20
  126:5,9,11,14
  126:21,23
  127:4,7 128:21
  129:1
**photos** 103:7,10
  103:12
**physical** 139:5,7
  139:11,14
  141:11 147:2
  157:10,15
**physically** 177:1
  178:2
**pick** 120:8
  132:21
**picked** 16:11
  78:18 89:6,15
**picking** 7:22
  56:22
**picture** 74:20,21
  104:9 124:15
**pictures** 105:4,6
**place** 100:4,6
  122:8 148:3
  165:1 168:19
**places** 47:9
  161:3
**Plaintiff** 1:10
  5:3
**Plaintiff's** 4:12
  170:5,8
**plans** 141:21

150:3
**play** 58:6
**please** 8:5,18
  17:18 59:11
  127:19 151:8
**pocket** 67:14
  165:20
**point** 30:12 33:9
  33:19 40:14
  41:14 46:5
  47:14 54:16
  71:2 73:14
  115:21 122:3
  145:13 146:12
  155:9 156:6
  163:6 171:3,11
  176:7
**pointed** 171:7
**pointing** 173:4,5
  173:11,15
**police** 60:21
  61:1,6,6
  130:14,17
**policy** 42:14
**policyholder**
  42:6
**portions** 130:11
**position** 30:4
  38:12 127:23
  128:4 154:21
**possibly** 78:10
**potential** 163:15
  168:12
**prep** 29:18 30:1
  30:14 55:12,16
  55:17,19 182:9
  182:10
**prepared** 178:2
  178:15
**prescribed** 16:8
  156:21
**prescription**
  16:5,12 134:3
**prescriptions**
  69:3 133:18,23
  134:7

**PRESENT** 5:15
**pressure** 57:20
58:4
**prevented** 35:7
35:11
**prevents** 154:2
**previous** 175:13
**PrideStaff** 25:14
26:20 27:1,4
49:17
**primary** 69:19
70:10,20
**print** 187:9
**prior** 3:4 70:20
168:5
**probably** 8:12
12:13 31:9,12
44:10 45:11
54:3 57:3 61:8
73:21 76:22
78:9 82:1,17
82:18 89:7
94:14 117:22
117:23 133:6
153:3 175:11
**problem** 35:15
154:17
**problems** 37:6,9
64:20 83:4
87:6 138:21
148:12
**procedure** 6:6
137:23
**proceedings**
6:14 187:7,13
**proceeds** 163:15
**process** 89:19
163:10
**produced**
122:19
**production** 52:8
103:21
**prognosis**
142:12
**promise** 107:3
162:1

**promotion**
30:23
**prompt** 175:21
**prompted**
175:23
**pronounced**
99:17,20
**property** 12:18
**provide** 51:18
**provided** 41:23
51:14 75:13
103:19 122:20
**providers** 155:6
**psychiatrist**
155:7 156:4
157:5
**psychiatrists**
155:5
**psychiatry**
20:21 22:3,16
22:22 23:4
**psychologist**
157:6
**psychologists**
155:5
**Public** 2:7 6:3
**purposes** 56:22
**purse** 81:23 82:1
**pursuant** 6:5
**put** 32:21 162:5

───── **Q** ─────
**quantify** 161:20
**question** 50:3
51:17 157:17
173:2
**questioned**
167:12
**questioning**
166:12
**questions** 2:23
3:1 7:6,14 8:4
123:5 151:23
164:3 166:9
187:8
**quickly** 166:10

**quit** 146:13
**quite** 175:7

───── **R** ─────
**R** 5:1
**radiation** 19:19
21:3
**raggedy** 97:1
**rain** 79:12
**raining** 60:5
79:16
**raise** 33:19
**ran** 58:8
**rate** 53:9 56:3
**rating** 150:9
**rats** 184:4
**reach** 83:19
89:17 91:6,8
119:10,15
120:4
**reached** 92:15
108:4 167:3
**reaching** 89:20
89:23 90:12,16
90:20 95:5
119:11
**reading** 2:14
16:1
**ready** 144:2
146:7 177:16
178:7,10
**real** 26:5 85:9
182:2
**realized** 28:5
**really** 24:13
38:12 68:11
**reason** 8:2 21:8
28:13 38:21
77:1 102:15,20
147:4 155:17
180:2
**recall** 9:9,13
33:6 45:12
68:23 70:11,20
78:7 86:10
109:1 121:11

132:14 166:20
169:7,10
170:17,21
174:16 175:19
183:7
**receive** 32:17
34:1 47:18,20
63:19 136:17
139:1
**received** 136:7
160:10 164:14
**recess** 43:3
73:16
**recipes** 37:2,16
37:17,19
**recognize** 80:15
105:20
**recollection**
12:22 76:21
80:11
**recommend**
67:9 133:9
137:7 141:8
**recommended**
137:9
**record** 7:19,23
8:18 15:1,3,7
93:10 173:3
**records** 49:19
**red** 128:8
**reduced** 187:9
**REEXAMIN...**
173:1 174:14
**referred** 41:7
**refresh** 80:11
128:14
**regard** 65:1
**regular** 14:21
57:13 58:3
59:22
**relate** 20:17
40:22 50:19
51:2 71:4
134:11 138:9
140:22 141:15
141:19,22

146:22 147:7
148:7 150:13
157:9 164:15
164:21 165:21
**related** 64:5
73:1
**relating** 2:18
**relation** 95:23
96:1 108:4
**relationship**
10:20 180:21
**relatives** 17:14
18:6
**relevance** 164:2
**remain** 106:8
**remember**
11:13 16:20
17:2 23:23
27:22 30:7
47:23 61:1
62:7 70:18
76:2 79:8,15
79:21 80:4,17
81:6,7 83:12
83:14 87:16
89:11 90:10
92:17 112:15
114:8 115:2,6
116:12 117:7
120:15,19
130:9,17 131:2
131:5,6,23
132:7 133:21
133:22 134:5
134:17,19,20
145:15 146:16
153:1 155:14
156:7 164:5
167:7,9 181:19
**remembering**
127:3
**remind** 7:16
**rent** 152:22
153:22
**repeat** 86:16
**rephrase** 8:6

Alexandria Bennett                                    6/14/2023

**report** 4:20
  60:21 66:11
  114:1,13
  122:21
**reporter** 1:22
  2:6 6:2,20 7:12
  49:3
**represent** 7:3
  75:7 122:20
  160:6
**represents**
  187:11
**require** 58:2
**required** 159:20
**resign** 38:18
  49:6
**respective** 2:3
**responses** 7:18
**restaurant**
  33:14 38:12
  154:18 186:3
**restless** 179:10
**restlessness**
  179:14
**restriction** 40:9
**restrictions**
  15:18 39:9
  40:19
**result** 7:9 20:16
  48:6,15 50:1
  60:22 61:12
  63:21 66:4
  157:15 164:11
**results** 187:17
**return** 39:13
  40:15 144:17
  145:2 148:14
  186:10
**returned** 110:3
  145:11
**ride** 131:8
**right** 12:6,20
  14:10,23 18:9
  18:14 19:7
  20:10 21:2
  22:9,19 23:16

23:20 25:4
  29:14 31:16
  32:2,4 34:6,8
  34:11 40:21
  43:12,14,23
  46:13,15,21
  49:22 50:14
  52:20 53:2,10
  53:19 54:17
  55:5,8 57:11
  62:21 66:16,18
  69:18 71:15
  74:10 76:7,9
  77:6 78:3,4
  79:12 80:1
  83:15 85:2
  87:10 89:1,15
  90:4,6 91:16
  91:22 92:11
  95:19 98:14
  99:7 104:14
  107:11,17
  108:8 109:9
  110:3,19 111:8
  112:17 113:14
  115:12 117:8
  118:3,22
  120:16 126:5
  126:21 127:12
  129:12 130:4
  131:8,21 134:9
  135:7 136:23
  137:20 140:5
  143:7,10 150:6
  158:6,15
  159:23 160:4
  161:8 162:15
  163:23 164:23
  165:10 166:4
  166:19 167:11
  172:1 173:6,7
  173:21 174:3
  180:23 186:18
**ring** 70:15
**road** 18:19
  23:14 59:21,22

78:4
**Robert** 18:2
**room** 66:16
  133:8 184:9,14
  185:1
**rude** 112:17
**rules** 2:18 6:6
  8:13
**running** 184:4
**rush** 120:10,12
  182:2,5

────────────
        **S**
────────────
**S** 2:1 5:1
**s/** 187:20
**safety** 87:3
**saturated** 62:16
  65:4
**saw** 52:21 54:16
  70:12 87:2
  88:13 96:17,19
  97:5,9 98:9,21
  99:10,16
  101:15 102:11
  104:20 105:9
  107:12 130:9
  135:3 168:1,3
**saying** 51:4 98:3
  98:7 107:18
  110:5,19
  122:10 126:20
  142:4 151:23
**says** 52:23 54:12
  160:9
**scared** 184:6
**scene** 62:23
**schedule** 137:10
  139:19,21
  140:7,11,15
  145:8
**scheduled** 51:1
  140:4 141:18
**scheduler** 19:16
**school** 18:10,11
  18:17 58:7
  146:7 176:20

176:23 177:17
  177:20,23
  178:7,16
  183:22
**schoolwork**
  177:9
**screaming**
  109:16
**screen** 171:3
  173:5,6
**screenshots** 80:9
**scuff** 85:8,10
  91:23 92:1
  97:21,22 98:1
  98:4 100:2,16
**scuffed** 85:9
**seat** 61:15
**second** 80:14
  section 26:12
  45:4 55:11
  101:2 115:13
  115:14
**security** 15:2
  150:1
**see** 14:8 16:7
  21:11 29:12
  39:22 41:6
  42:22 54:12
  63:23 73:6
  85:4,8,11 92:5
  97:20 100:10
  104:13,18
  106:18 109:3
  110:11 122:10
  122:13 124:13
  125:3,7,10
  131:4 134:21
  135:1 136:15
  136:15 137:18
  140:10,15
  141:1,3 155:10
  155:12,18,22
  156:3,8,14,19
  162:10 168:6,8
  168:11,19
  169:2 170:13

171:11,12
  172:5 173:11
  175:18
**seeing** 16:22
  119:7 130:17
  167:13
**seek** 67:9 133:9
  134:10 141:21
**seeking** 184:12
**seen** 39:20,21,23
  41:10,12 72:9
  72:13 74:12,22
  75:2,23 86:13
  91:22 92:2
  101:5 103:23
  107:20,23
  114:15 122:5
  125:19 126:8
  126:11 127:6
  135:6,8 140:21
  141:3 156:17
  157:5 160:15
  160:17,19
  169:5
**sell** 81:11
**sent** 47:9 74:13
  75:18
**served** 37:21
**service** 21:1,10
  21:11,15 25:6
  28:9,15 48:20
  56:7 154:11
**services** 21:13
  21:19 28:18
  152:8
**settled** 178:23
**seven** 24:22
  32:10 176:19
**shake** 7:15
**shakes** 149:22
**share** 170:1,6
**Sharpie** 124:10
**Shelby** 17:16,19
  18:3,7 56:17
  57:8 71:13,14
  72:1 118:20

131:11,15,19
131:22 132:5
133:1 136:19
164:23 181:14
181:16
**shelf** 89:16
90:11,13,22,23
91:1,4 100:18
119:11
**Shelley** 70:13
**shelves** 90:5
96:1,6
**shelving** 96:10
**Shield** 42:12
43:9
**shifts** 159:14
**shocking** 92:18
**shoe** 120:22
**shoes** 82:7,9
120:14 121:2,6
121:9
**shopper** 174:17
**shoppers** 169:2
**shopping** 76:19
85:23 86:14
87:3,7 88:4,14
88:17,20,22
89:11,12 103:5
103:9 107:9
**short** 9:1
**Shorthand** 2:6
6:2
**shoulder** 82:2
**show** 122:14
123:21 124:1
125:16 127:15
127:22 129:1
160:5 169:20
172:9,10
**showed** 171:15
**showing** 105:12
131:3 170:17
**shown** 74:17
75:23 76:3
105:16 128:6
128:20 173:18

173:20
**shows** 54:6
128:3
**sic** 62:16 88:12
**sick** 32:18,19,23
84:22
**side** 59:21 60:2
75:5 87:14,14
94:19 101:3,3
101:4 184:7
**sign** 114:11
**signage** 168:8,11
168:19
**signature** 2:14
114:21
**Signed** 187:18
**signing** 115:2
**signs** 121:19,23
**single** 89:5
**sit** 38:10
**sit-down** 38:13
38:15 48:4
**sitting** 70:19
89:10 90:21
91:1 101:13
104:11
**situation** 184:1
184:3
**six** 24:22,22
176:18
**size** 97:8 98:16
98:19
**sleeping** 157:14
**sleepless** 179:9
**sleeplessness**
179:7,15
**slides** 120:18
**slip** 92:20,20,22
93:5
**slipped** 83:20
92:21,21 93:4
93:12 124:2,7
127:16 129:8
129:15
**slippery** 93:14
94:1

**slower** 182:14
**Smartwater**
88:12,14,20
**social** 15:2 56:16
57:7 150:1
**sole** 120:19
**solely** 155:21
**somebody** 88:16
88:19 99:20
132:21 135:1
**Sonata** 60:13
**sorry** 45:4 53:7
70:3 73:5
86:18 90:9
97:13 102:19
104:17 106:22
117:1,19
123:18 134:5
172:7,9
**sort** 68:17
142:12 146:22
156:22
**sorts** 170:6
**sought** 143:9
**sound** 14:10
53:10 74:10
115:9,17
137:20 172:1
**sounds** 14:8
**SOUTHERN**
1:3
**Southlake** 135:8
135:10,13,17
135:23 136:22
137:3 138:7
139:17 140:11
140:23 141:5,7
142:10 145:9
147:18,22
158:4,5 165:1
**Spain** 18:11,18
183:22
**span** 74:8
**speak** 110:22
113:18,22
118:8 175:6

**speaking** 175:19
**specific** 36:21
64:23
**Specifically** 35:1
**speeding** 61:16
**spell** 10:11
**spending** 183:16
**spent** 183:7
**spill** 100:22
101:7
**spleen** 62:15
63:12,14 65:5
66:21
**split** 13:16
**spoke** 174:16,17
**spoken** 116:6
**sports** 58:6,18
**spot** 97:8,15
**sprained** 62:17
65:19 66:14
**spread** 123:9
**sprung** 65:18
**stable** 27:23
152:8
**stacked** 96:23
**stand** 35:5 36:14
36:23 37:10
51:6 55:15
119:14,17,20
**stand-up** 45:5
**standing** 35:12
119:12,23
154:19
**stands** 55:12
**star** 37:11
151:17 180:17
**start** 22:15 24:8
28:23 29:1,2
31:8 35:14
43:15 122:11
178:15 180:7
**started** 19:21
22:12 25:1
29:14,17 33:7
46:20 47:1
70:14

**starting** 158:16
**state** 2:7 6:3
8:17 171:22
187:3,22
**stated** 180:16
184:8
**statement** 4:16
53:20 54:20
55:23
**states** 1:1 15:16
**station** 45:4
**stay** 20:9 33:16
51:5 63:8
81:15 109:18
113:7 116:9
146:5
**stayed** 11:12
12:8 19:4
**staying** 13:13
**stays** 17:19
**Steakhouse**
179:20
**stenotype** 187:8
**step** 143:9,11
**stepdad** 152:16
**steps** 169:13
**sticker** 127:22
**STIPULATED**
2:2,13,20
**stipulation** 6:7
**stipulations**
6:21
**stitched** 66:2
**stool** 119:21
**stop** 45:17 65:6
77:5 151:13
152:4 178:23
**stopped** 45:15
46:6 65:7
77:20,22 78:19
78:23 79:7
**stopping** 73:13
79:18
**store** 30:18,20
31:1,3,4,6,11
31:13,15,20

Alexandria Bennett                                      6/14/2023

Page 203

| | | | |
|---|---|---|---|
| 32:3,14,17 | 58:22 59:1,6 | 155:11 156:10 | 152:4 158:2 |
| 33:8,11,13,14 | 68:6 72:17 | 156:13,20 | 159:3,11 |
| 33:18 34:9,13 | 144:23 | 159:1,8,22 | 176:10 |
| 35:16 38:3 | **suffering** 9:11 | 162:14,17 | **taken** 2:5 43:4 |
| 80:2 82:13 | 57:15 161:17 | 163:8 164:19 | 62:22 63:2 |
| 84:6,7,8 85:13 | 161:21 | 174:10 178:10 | 73:17 100:21 |
| 87:7 100:12 | **summarize** | 181:13 183:6 | 106:6 113:13 |
| 101:5 104:11 | 164:18 | **surgeries** 72:4 | 118:16 125:21 |
| 107:10,19 | **summed** 180:4 | **surgery** 40:11 | 126:9 130:22 |
| 109:22 113:13 | **supervision** | 40:15 63:13,16 | 187:7 |
| 113:17 130:15 | 187:10 | 137:9,10,12,15 | **talk** 28:6 37:15 |
| 175:1 | **supervisor** | 138:7,13,16,19 | 38:8 71:2 |
| **Stores** 7:3 | 20:13 30:3 | 139:2,18 140:1 | 110:12 155:19 |
| **straight** 82:21 | 32:14 35:20 | 141:9,14 | 166:14,15 |
| 94:20 | 44:22 | 142:11,22 | 174:22 176:3 |
| **Street** 11:15 | **supplemented** | 143:4,8,12 | 182:18 |
| 153:8 | 177:22 | 144:7,9,12 | **talked** 104:14 |
| **strep** 70:1 | **supposed** 22:5 | 145:20,22 | 116:13 120:13 |
| **stress** 157:8,16 | 37:3 39:1 | 147:23 148:4 | 130:1 150:7 |
| **stretcher** 130:19 | 40:10 44:6 | 156:12 158:9 | 151:2 164:17 |
| 130:23 131:3 | 50:10 71:23 | 165:2 | 165:16,23 |
| **structures** | 139:4 141:10 | **surprise** 88:15 | 167:12 179:18 |
| 168:20 | 146:4,18 | 88:21 | **talking** 39:16 |
| **struggling** | 178:11 182:2,6 | **surprised** 75:10 | 72:19 90:2 |
| 176:12 | 182:7 | **surprising** | 98:18 100:15 |
| **stub** 52:6 | **sure** 21:21 36:17 | 152:13 | 106:23 110:20 |
| **stubs** 52:11 | 39:11,18 40:13 | **surveillance** | 115:16 121:15 |
| **stuff** 24:15 | 40:16 42:11 | 74:6,13 80:10 | 126:13 173:3 |
| 26:14 36:8 | 43:2 44:12 | **sustained** | **tall** 73:19 |
| 37:20 48:4 | 50:4 52:3 | 164:10 | **Tea** 23:5 28:2 |
| 100:3,12 | 56:19 62:2 | **swab** 24:15 | 158:11 |
| 140:17 144:2 | 67:12,12,16 | **switch** 155:1 | **teeth** 179:3 |
| 146:7 151:13 | 70:16 72:16 | **switched** 185:21 | **tell** 17:18 28:9 |
| 152:1 154:10 | 73:13 78:12 | **sworn** 6:17 | 28:16 36:4,18 |
| 154:14,14 | 81:4,21 82:5 | **symptoms** | 38:14 39:12,14 |
| 160:20 161:7 | 86:17 91:10,12 | 157:10,15 | 43:14 47:7 |
| 163:3 182:7 | 94:2,12,13,15 | | 49:22 59:10 |
| **sturdy** 82:9 | 95:2 99:1 | **————— T —————** | 60:3 74:1 |
| **style** 120:15 | 111:4 113:20 | **T** 2:1,1 | 92:11 95:10,23 |
| **substance** 92:8 | 113:21 114:12 | **take** 8:1 14:17 | 99:20 105:3 |
| 99:15 124:1,6 | 117:6 118:7 | 24:16 28:9 | 107:14 111:14 |
| 124:11 127:15 | 120:9 129:17 | 43:1 58:3 | 111:17 114:3 |
| 128:19 167:15 | 130:6,10,13 | 65:20 73:12 | 116:23 133:13 |
| 167:19 168:2 | 134:8 136:5,12 | 78:4 103:3,6,8 | 142:16 151:7 |
| **sued** 64:11,12 | 139:6 142:18 | 103:16 118:18 | 174:22 178:5 |
| **suffered** 58:11 | 145:18 148:1 | 146:10 148:21 | 180:6 |

| | | | |
|---|---|---|---|
| | | | **temp** 21:10,11 |
| | | | 21:13,15,19,23 |
| | | | 22:8,12,16,22 |
| | | | 25:6,17 26:17 |
| | | | 27:8 28:4,9,14 |
| | | | 28:18 46:20 |
| | | | 48:19,23 49:7 |
| | | | 49:19 56:7,8 |
| | | | 152:7 154:11 |
| | | | **temps** 24:17 |
| | | | 140:18 |
| | | | **ten** 86:8 108:13 |
| | | | 108:15 |
| | | | **terminology** |
| | | | 142:19 |
| | | | **test** 79:9 |
| | | | **testified** 6:18 |
| | | | **testify** 9:8,13 |
| | | | **testimony** 1:16 |
| | | | 49:13 50:12 |
| | | | 171:21 175:14 |
| | | | 187:12 |
| | | | **testing** 167:18 |
| | | | **thank** 10:8,14 |
| | | | 14:20 33:5 |
| | | | 65:14 112:10 |
| | | | 128:12 162:4 |
| | | | 166:5 173:8 |
| | | | 174:8,11 |
| | | | **Thanksgiving** |
| | | | 182:20,20 |
| | | | 183:1 |
| | | | **therapy** 139:5,8 |
| | | | 139:11,15 |
| | | | 141:11 147:3 |
| | | | **thereto** 3:5 |
| | | | 187:9 |
| | | | **thing** 65:3 66:20 |
| | | | **things** 16:22 |
| | | | 28:5 36:8 58:2 |
| | | | 85:22 100:14 |
| | | | 156:1 157:13 |
| | | | 162:18 166:11 |
| | | | 182:14 |
| | | | **thingy** 97:1 |
| | | | **think** 8:11 21:4 |

| | | | | |
|---|---|---|---|---|
| 25:2,15 32:3 | 142:17 | 177:17,17,21 | 114:19 123:2 | 140:6 145:8 |
| 32:20,20 45:15 | **three** 11:2 12:1 | **times** 146:9 | 127:11 160:23 | 152:5 |
| 47:2 48:18,20 | 12:1 29:3,12 | 184:3 | 170:10 187:11 | **turned** 98:2 |
| 52:3,10 53:15 | 40:3 41:4,5 | **tiny** 115:21 | **transferred** 31:2 | 134:13,15 |
| 54:3 60:1 61:9 | 44:12,18 | 116:1 | **travel** 160:1 | 154:10 |
| 62:8 65:17 | 153:16 180:11 | **tippy-toes** 120:4 | 165:13 | **twice** 156:17 |
| 66:19 69:16 | 180:11 | **tips** 29:23 | **treated** 64:19 | **twisted** 95:2 |
| 70:4 71:20 | **throat** 70:1 | **title** 10:22 29:16 | 71:1,3 73:6 | 117:14 |
| 73:8 74:8 75:1 | **throw** 157:14 | 30:13 33:9 | **treatment** 63:19 | **two** 12:13,14 |
| 76:7 78:8,14 | **ticket** 61:14 | 45:2 | 64:5,18 66:23 | 127:4,6 153:4 |
| 84:1,9 89:7 | **tickets** 61:12 | **titles** 33:13 | 67:10 131:22 | 166:23 167:6 |
| 91:15,18,20 | **time** 3:3,3 13:20 | **today** 7:5 9:7 | 133:10 134:10 | **two-week** 55:1,4 |
| 96:23 97:22 | 27:11,15 28:21 | 69:19,20 70:19 | 134:13 136:6,7 | 55:8 |
| 98:3,22 99:17 | 29:19 33:7,10 | 74:3 76:3 | 136:18 137:3,8 | **type** 25:16 60:12 |
| 99:23 101:18 | 33:17 35:5,12 | 89:10 101:13 | 138:9 139:2 | 88:10 100:14 |
| 103:1 108:9 | 35:21 36:14 | 106:15 107:16 | 141:8,18,22 | 131:21 143:7 |
| 109:15 110:5 | 37:2,16,20 | 125:22 126:10 | 142:3 145:10 | 162:21 183:23 |
| 112:19 113:3 | 39:18 41:8,11 | 130:1 143:16 | 147:6,18 | **typed** 7:19 |
| 114:6 115:13 | 44:4,5,7,16 | **toes** 149:5,11 | 164:14 174:19 | **typical** 54:7 |
| 115:15 118:4 | 46:17 47:5 | **told** 39:3 40:14 | 184:12,14 | **typo** 160:8 |
| 118:20 120:14 | 48:6,10,14 | 40:17 46:16 | 185:1 | |
| 132:9 133:3,15 | 49:23 52:1,2 | 47:16 56:5 | **trial** 3:3 | **U** |
| 133:19 135:8 | 66:5,17 67:4 | 66:5 73:8 | **tried** 25:19 | **U** 2:1 |
| 135:18 136:9 | 74:2 76:12 | 88:16,19 102:6 | 39:20,22 48:3 | **UAB** 19:14 |
| 137:5 139:5,12 | 77:2 78:19 | 102:10 104:22 | 74:18 75:7 | 20:20,21 21:13 |
| 139:19,20 | 81:16 87:12,20 | 105:13 106:14 | 109:14 139:19 | 21:19 22:3,15 |
| 140:8 141:10 | 108:23 110:9 | 106:15,19 | 141:1 154:20 | 22:22 23:3,19 |
| 142:14 146:14 | 111:9,20 | 107:11,16 | 184:9 | 70:6 72:2 73:8 |
| 146:14 148:5 | 118:13,23 | 114:5 116:17 | **trip** 101:8 | 73:8 |
| 148:11,19 | 120:7,11 121:7 | 140:13 146:4 | **trips** 86:19 | **UAB's** 70:3 |
| 151:18 152:9 | 131:18 133:5 | 146:13 150:13 | **trouble** 16:22 | **uh-huh** 7:18 |
| 152:14,15,16 | 135:10,14,17 | 157:20,23 | 20:15 26:8 | 47:15 53:3 |
| 152:17 153:14 | 136:21 139:13 | 164:4,9,13 | 119:6 | 68:14 77:10,18 |
| 155:11,12 | 142:22 143:9 | 180:2 | **true** 187:11 | 104:15 114:22 |
| 156:16 157:23 | 143:11 144:13 | **top** 52:20 54:14 | **Truitt** 17:21 | 123:14 130:3 |
| 158:10,11,13 | 146:15 150:20 | 54:15 90:13 | 18:2 162:20 | 139:23 156:16 |
| 159:10 160:7 | 152:2 155:18 | 119:11 160:8 | **try** 7:17 8:6 | 179:4 181:21 |
| 161:15 162:17 | 156:3,9 158:12 | 173:6,6 | 37:12 41:9 | 184:11 |
| 162:19 166:9 | 158:19,23 | **topic** 52:6 | 139:21 152:2,3 | **uh-uh** 7:18 33:2 |
| 169:15 172:11 | 159:17,18 | **total** 55:3 | 154:8 176:11 | 47:22 65:11 |
| 175:17,23 | 161:8 165:9 | **totaled** 61:21 | 177:16 181:1 | 75:1 89:9 90:7 |
| 183:6 185:22 | 168:1,3,18 | **town** 184:7 | **trying** 27:7 | 112:7 121:1 |
| **thinking** 42:11 | 169:8,9 171:19 | **track** 58:8 | 36:17 42:20 | 145:3 154:23 |
| **thinks** 104:23 | 172:1,5,13 | **tragic** 152:10 | 94:20 98:20 | **unable** 35:2 |
| **thought** 69:23 | 175:7,10 | **transcript** 52:16 | 109:21 110:6 | **undergone** 72:3 |
| 87:1,2 100:9 | 176:11,17,21 | 80:22 104:5 | 134:12 136:14 | **understand** 8:3 |

8:5,7 30:11
41:2 50:11
94:21 102:18
142:20
**understood** 8:9
**unemployed**
27:12,16
182:23
**unemployment**
51:22
**unit** 54:12 96:11
**UNITED** 1:1
**urgent** 70:4
71:16
**use** 16:2,3
150:20
**Usual** 6:20
**Usually** 69:5

───── **V** ─────

**vacation** 32:18
**Valleydale**
18:19
**vantage** 171:10
**vehicle** 60:6
**verify** 172:20
**versus** 115:4
**Vestavia** 2:10
5:13 6:10
**video** 4:13 75:2
75:8,8,14
80:10 94:23
169:20 170:12
170:17,18
172:12 173:4
173:19 178:2
**videos** 74:6,13
74:17,23 76:1
76:4 103:8
**view** 84:10,15
170:22
**visit** 64:5 67:13
72:23 100:13
136:19 138:6
184:9,15 185:2
**visits** 158:21

159:19 160:2
**vs** 1:11

───── **W** ─────

**W** 70:14
**wages** 161:5,6
165:8
**waited** 113:8
**waiting** 116:13
142:6 174:18
**waived** 2:15
**wake** 143:20,23
144:4 146:6
**Wal-Mart** 7:3
7:10 16:15
17:6,11 20:18
40:22 50:7,20
51:3 57:4 67:5
69:6,9 71:4
73:1 74:7
76:14,22 77:21
78:20,23 79:19
81:16 83:12
85:13 86:3,12
86:20 100:10
101:9 102:15
102:21 109:3
110:11,13,15
111:22 112:4
112:12,22
113:4,19,22
118:9 120:11
122:4,16
123:22 125:6
125:12 139:15
140:23 146:23
147:3 149:2
151:4 157:21
160:9 163:11
164:6,11
166:15 168:2
168:12 169:13
175:6 176:2
**Wal-Mart's**
122:21
**walk** 26:4 109:4

**walked** 84:11,16
85:6 118:21
**walking** 87:14
108:20
**WALMART**
1:12
**want** 8:3 23:18
40:2 41:4
56:23 57:3
73:23 95:23
101:11 123:9
129:17 140:10
155:16 162:5
164:19 166:15
169:20 176:3
186:5
**wanted** 31:3
65:6 130:6
166:10 172:19
**warehouse**
25:19 26:7,16
28:14,17
158:17 159:14
159:19
**warehouses**
26:1,4 27:7
28:4 46:21
48:23
**warn** 168:20
169:13,16
**warning** 121:19
121:23
**Warren** 45:1
**wash** 178:23
**Washington** 4:5
4:7 5:4 6:23
42:23 93:7,16
164:1 166:7
169:19 170:1,4
170:11,13,15
170:16 172:7,8
172:18 173:8
173:12 174:8
174:11,14
186:12,18
**wasn't** 34:22

35:3,4 36:5,8,9
36:23 37:1,3
37:13,13 38:23
39:21,23 40:10
48:19,21 51:6
78:11 79:14,16
84:4 94:22
100:20 101:3
120:12 129:4,5
139:12 151:22
152:21 176:10
179:21 182:1
183:21,23
**water** 81:10,12
81:12 82:20,21
83:8,13,18,20
83:21 84:5,11
84:15,20 85:5
87:11 88:4,5,9
88:11,12 89:2
89:2,5,5,8,16
89:18,20,22
90:3,3,11,14
90:15,17,20,20
91:7,8,18,22
92:1,2,3,6,7,8
92:16 95:5,18
95:23 96:3,14
96:16,18,19,21
96:23 97:4,5,9
97:12,15 98:1
98:6,9,17,21
99:4,18 100:1
101:4,14,19
102:3,7,11,16
102:16,22,22
104:13 105:1,2
105:13,15
108:5 109:4
110:22 111:23
113:11 118:21
118:23 119:3,8
119:11,15
121:15,16,19
122:1,4 125:3
125:4,8,10

128:19 129:2
129:15,18,23
130:20 166:20
166:21 167:13
167:19 168:6,9
**way** 31:9,14,18
36:15 76:2
77:4,5 78:2,15
87:23 94:8
96:2 101:13
125:16 140:20
149:5 157:19
165:6
**ways** 38:16
155:3 157:20
186:10
**we've** 104:14
116:2 126:23
162:19 164:19
**wear** 15:21,23
17:7 65:8
145:14 146:1
146:19
**wearing** 17:5
82:3,8 120:14
121:6,10
128:13,15
146:2,2,3,5,13
**weather** 79:10
**week** 20:4 31:22
32:10 44:8,18
54:7
**weekends** 32:8,9
44:11
**weeks** 41:5
65:23 66:1
**weight** 40:18
117:23
**Weisen-somet...**
70:14
**went** 18:11
34:12 36:4
39:16 41:7
42:5 45:19
46:3,5 50:8
66:6 67:7

71:12,16 80:5
80:12,16,18
81:1,4 82:20
83:1,8,12,19
85:21 86:12
89:1 93:2 94:4
100:10,23
101:10 131:3
133:3,6,7
135:5,10,13,17
135:23 136:21
141:4 147:9
155:22 156:3,8
156:19 166:20
168:15 175:14
181:14 183:22
**weren't** 13:19
38:14 120:17
121:5,21 122:2
138:3 151:21
**west** 60:2
**wet** 79:14
100:22 130:12
**Whereabouts**
115:20
**Williams** 1:23
2:6 6:1 187:20
187:21
**witness** 2:15
6:12 107:5
149:22 186:17
187:12
**witnessed**
116:17
**witnesses**
115:14
**woke** 177:19
**woman** 151:16
**wondering** 41:3
**Woods** 2:9 5:12
6:9
**word** 61:2
**wore** 136:1
**work** 18:3 19:13
19:14,17 20:5
20:20 21:2,12

23:3,21 24:11
25:20,21,23
27:7 28:8
31:23 35:6
36:5 37:3 39:8
39:13,14 40:2
40:9,10,15
44:2 46:3 48:6
48:14 49:23
50:6,8,18,23
51:1,13 66:3,7
149:19 154:20
158:2,20
159:15 161:9
165:9 179:18
180:9 181:1,6
186:2
**worked** 21:4
23:5,19 26:11
28:1 29:3 31:9
31:23 32:6
43:17,20 44:14
44:17,17,20,23
45:3 52:12
54:5 55:4,7
78:6 110:6
159:6 180:8,18
**worker** 111:19
**workers'** 58:14
**working** 20:21
25:2,5,8 27:3
28:3,19 31:21
43:20 45:13,15
45:17,21 46:6
51:23 54:9
140:17 152:5
154:6 158:7,10
159:4,13
180:21
**works** 21:22
31:18
**worn** 121:2
**worse** 177:19
**worsened** 143:2
143:5
**worst** 177:18

**wouldn't** 57:3
89:6 134:21
141:3 154:12
**write** 114:7
**written** 7:23
**wrong** 39:23
41:10 133:16
158:14 184:17
184:19
**wrote** 114:6

---
**X**
---

**X** 4:1 39:13
**X-rays** 132:2

---
**Y**
---

**y'all** 13:17 87:14
87:20 116:12
152:19 172:7
**yeah** 54:5
139:20 149:8
**year** 9:23 16:12
17:13 18:12
21:5 22:5,17
22:19 30:21
34:18 41:20
43:18 44:13
152:14 158:6
**years** 11:1,2,3
12:1,13,14
29:4,13 153:16
180:12
**you-all** 75:11
100:7 174:22
**young** 151:16

---
**Z**
---

**Zoom** 170:18
177:22
**zooms** 124:18,19
125:1
**Zulanas** 2:9
5:11 6:9

---
**0**
---

04/11/2027

187:23
**09/30/2023**
187:21

---
**1**
---

**1** 4:13,16 52:8
52:15 170:5,9
**1,000** 153:4
**1,200** 153:23
**1:30** 1:20 2:12
6:11
**10** 82:18
**104** 4:19 187:21
**11** 122:16
**114** 4:20
**12** 49:1
**123** 4:21
**127** 4:22
**13** 49:2 54:23
**135** 9:20
**14** 1:19 2:11
6:11 45:11
125:6,12
**14th** 187:18
**15** 12:22 13:18
17:5 33:22
34:5 36:13,20
38:3 39:7,19
45:14 48:7,15
50:2 53:1
57:12,17,21
58:17,21 59:3
59:7 64:15,21
68:1,4,8,13
71:7,17 72:4,7
72:10,12,18
74:1 82:18
85:13 86:6,20
87:4,7,10
101:12 122:17
125:17,21
128:17 166:16
175:12,18
**15.25** 53:10
**15th** 85:18 89:12
89:13

**16** 29:21,22 31:8
31:12 33:20,23
52:19
**160** 4:23
**166** 4:5
**170** 4:13
**173** 4:6
**174** 4:7
**18** 20:12
**187** 4:8
**19** 17:15
**1993** 15:10

---
**2**
---

**2** 4:17 80:13,20
131:4
**2:08** 43:4
**2:11** 43:5
**2:22-CV-0130...**
1:7
**2:42** 73:17
**2:49** 73:18
**2011** 18:13
**2019** 52:19,19
53:9,16 54:1
**2020** 12:22
13:18 17:6
24:23 27:23
33:22 34:5,15
34:18 36:13,20
38:3 39:7,19
40:5 43:7
45:14 48:7,15
50:2 53:2,17
53:21 54:1
57:12,17,21
58:17,21 59:3
59:8,16 63:21
64:16,21 65:2
68:1,4,8,13
70:9 71:7,10
71:17 72:4,7
72:10,13,18
74:1 85:13
86:6,20 87:4,8
87:11 101:12

Alexandria Bennett                                     6/14/2023

Page 207

125:17,21
128:17 166:16
182:20,21
**2021** 25:3 28:1
40:6 41:21
42:14,17
137:19 158:8
158:16
**2022** 185:17
**2023** 1:19 2:11
6:11 19:23
187:18
**205)396-6607**
14:10
**21** 42:4
**2100** 5:6
**2312** 11:15
**24** 150:17
**280** 29:6,10
30:17,23 31:5
31:11 32:2,14
32:16 33:8,11
33:13,17 34:9
35:16,21 38:3
43:22 48:11
50:1 54:9,12
54:13,20

**3**

**3** 4:18 52:19
80:14,20 131:4
**30** 106:10
137:19 168:17
169:4
**30-** 169:9
**31st** 11:15 153:8
**35203** 5:7
**35209** 9:21
**35242** 5:13
**36** 54:10
**36.5** 55:7
**36.5667** 54:6
**3800** 2:9 5:12
6:9

**4**

**4** 4:19 103:22
104:4 105:8,17
106:4 126:1,2
126:7 127:1
128:22
**4:45** 186:20
**40** 106:10 110:8
110:9 168:17
169:4
**40-minute** 169:9

**5**

**5** 4:20 114:14,18
**500,000** 161:17
**52** 4:16

**6**

**6** 4:21,21 20:9
122:15 123:1
123:21 124:5
125:15,23
126:4,6 127:1
128:22
**600** 153:14

**7**

**7** 4:4,22 20:8
127:5,10,22
128:6,22
129:11
**7:11** 172:6
**7:15** 171:23
**7:20** 74:9 76:8
171:23

**8**

**8** 4:23 49:2,4
160:6,22
**8.75** 49:5
**80** 4:17,18
**800** 153:4
**8273156** 15:12

**9**

**911** 111:12
**9th** 15:10

FILED
2023-Sep-29 PM 03:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

# Customer Incident Report



I N C R

| Facility #:<br>4189 | Date of Incident:<br>10 / 15 / 2020 | Time of Incident:<br>07:20    am / pm   **X** |
|---|---|---|

| Legal Name:<br>Alexandra Bennett |
|---|

| Date of Birth:<br>   /    / | SSN: |
|---|---|

| Mailing Address:<br>2027 village ridge circle |
|---|

| City:<br>Calera | State:<br>AL | Zip Code:<br>35040 |
|---|---|---|

| Home Phone #:<br>( 205 ) 3298792 | Cell Phone #:<br>( 205 ) 3298792 | Alternate Phone #:<br>( 205 ) 3298792 |
|---|---|---|

| Email Address: |
|---|

Describe in your own words, the events leading up to the incident:

Reaching for water on shelf slipped and fell on floor pain in right hip and ankle. Hip hit pallet

Identify and describe the location of the incident:

DEPT92-DRY GROCERY

List name, address, and phone number of any witness(es) to the incident:

Kevin Allen: 2053966607 626 carter ave
Bessemer,AL 35020

Kellie Daughtry: 2055656622 940 Old Cahaba Drive
Helena,AL 35080

Name of associate the incident was reported to and/or other associates in the area:

Glenda Washnurn, Roman Cooper

**IT IS UNLAWFUL FOR ANY PERSON TO OBTAIN ANY BENEFIT BY FRAUD. ANY PERSON KNOWINGLY DOING SO MAY BE EXPOSED TO POTENTIAL CRIMINAL AND/OR CIVIL PENALTIES.**

Customer Signature: _____ Date: 2020-10-15

Management Signature: _____ Date: 2020-10-15

A copy of this statement will be made available to you upon request.

Revised: 11/20/2019

FILED
2023 Sep-29  PM 03:48
U.S. DISTRICT COURT
N.D. OF ALABAMA



Alexandria Bennett vs Walmart
PARKER, ELIZABETH on 06/22/2023

1               IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF ALABAMA

3                     SOUTHERN DIVISION

4    _____

5    Alexandria Bennett

6          Plaintiff,

7       v.                            Case No.

8    Walmart, Inc.,                   2:22-cv-01306-AMM

9          Defendant.

10   _____

11       AUDIOVISUAL DEPOSITION OF ELIZABETH PARKER

12   DATE:

13   TIME:

14   LOCATION:      Zoom, Remote

15   REPORTED BY:   Freya Amis, Remote Online Notary Public

16   JOB No.:       12416

17

18

19

20

21

22

23

24

25

```
1          A P P E A R A N C E S
2   ON BEHALF OF PLAINTIFF:
3        ELLISE WASHINGTON, ESQUIRE
4        EMS LAW, LLC
5        2100 First Avenue, North, Suite 300
6        Birmingham, Alabama, 35203
7        ellise@emwlawllc.com
8        (205)938-4369
9
10  ON BEHALF OF DEFENDANTS:
11       GWENDOLYN GORDON, ESQUIRE
12       Friendman, Dazzio & Zulanas, P.C.
13       3800 Corporate Woods Drive
14       Birmingham, Alabama 35242
15       ggordon@friedman-lawyers.com
16       (205) 278-7000
17
18  ALSO PRESENT:
19       Louise Palker, Observer
20       Charles Nash, Observer
21       Rivers Dorey, Observer
22
23
24
25
```

```
1                 I N D E X
2   EXAMINATION:                                  PAGE
3       By Ms. Washington                        5 / 61
4       By Ms. Gordon                              59
5
6             E X H I B I T S
7   NO.       DESCRIPTION                          PAGE
8   1    Customer Incident Report                   26
9   2    Photos                                     32
10  3    Witness Statement - Kevin Allen            39
11  4    Witness Statement - Kellie Daughtry        38
12  5    Witness Statement - Glenda Washburn        37
13  6    Witness Statement - Roman Cooper           36
14  7    Claim Report                               39
15  8    Bennett Letter                             42
16  9    Incident Procedures                        45
17  10   Workplace Safety                           52
18  11   Spill Cleanup                              52
19         (Exhibits attached.)
20
21
22
23
24
25
```

```
1             P R O C E E D I N G
2          THE REPORTER:  We are on the record.
3   Today's date is June 22, 2023, and the time is now
4   10:04 a.m., Central Standard Time.
5          Good morning.  My name is Freya Amis.  I'm
6   the officer designated by DepoDirect to take the
7   record of this proceeding.  I request all parties
8   stipulate and agree that by video conference
9   technology, this will be the remote deposition of
10  Elizabeth Parker in the matter of Alexandria Bennett
11  versus Walmart, Inc., Case No. 2:22-cv-01306-AMM.
12         Counsel, will you please state your
13  appearance for the record, your firm, who you
14  represent, and that you agree to stipulate that I may
15  place this witness under oath and report this
16  proceeding remotely.
17         MS. WASHINGTON:  I'm attorney Ellise
18  Washington.  I represent the plaintiff in this action,
19  Ms. Alexandria Bennett, and I do consent to placing
20  the witness under oath and the usual stipulations to
21  be put in place.
22         MS. GORDON:  Gwen Gordon for Walmart Stores
23  East LP, and I also consent to putting the witness
24  under oath and usual stipulations.
25         THE REPORTER:  Thank you.  Before going on
```

```
1   the record, the witness positively identified herself
2   as Elizabeth Parker by driver's license issued in
3   Alabama State, and the witness is presently located in
4   Birmingham, Alabama.
5   WHEREUPON,
6               ELIZABETH PARKER,
7   called as a witness, and having been first duly sworn
8   to tell the truth, the whole truth and nothing but the
9   truth, was examined and testified as follows:
10         THE REPORTER:  Thank you.  The witness is
11  sworn in, and this proceeding may begin.
12         MS. WASHINGTON:  Okay.  Great.
13              EXAMINATION
14  BY MS. WASHINGTON:
15      Q   Again, I am Ellise Washington.  I represent
16  Ms. Bennett, the plaintiff in this action.  And before
17  we get started, I wanted to go through a few ground
18  rules, depositions with you, just so that we're on the
19  same page; is that okay, Ms. Parker?
20      A   Yes.
21      Q   So the court reporter is going to take down
22  everything we say.  And it's important that you answer
23  with words, rather than with a nod or shake of the
24  head, do you understand?
25      A   Yes.
```

1  Q   So I just want to prequalify that if I ask
2  you to make a verbal statement, it's not me being
3  rude, it's just to conserve the record.
4      A   Okay.
5      Q   Okay.  Also, it's going to be very important
6  that you and I do not speak over one another.  So it's
7  important that you wait for me to finish asking the
8  question before answering, do you understand?
9      A   I do.
10     Q   And if you don't understand any of my
11 questions, please let me know, and I'll rephrase it;
12 is that okay?
13     A   Yes.
14     Q   And if you need to take a break, let me
15 know, and we can take a break, you understand?
16     A   I do.
17     Q   All right.  So are you prepared to answer my
18 questions today?
19     A   Yes, ma'am.
20     Q   Is there any reason that you won't be able
21 to give me full, complete, and truthful answers to my
22 questions today?
23     A   No, ma'am.
24     Q   All right.  And you understand that you are
25 under oath and sworn to tell the truth and that your

1  testimony provided here today has the same force and
2  effect as if we were in front of a judge or jury, do
3  you understand that?
4      A   Yes.
5      Q   All right.  So just to get started, I want
6  to ask you a few preliminary questions, such as where
7  do you currently live?
8      A   I live in Bedford, Alabama.
9      Q   And how close do you live to the Helena
10 Walmart location where the incident in this case
11 happened?
12     A   Approximately 35 minutes.
13     Q   Okay.  And have you ever given a deposition
14 before?
15     A   I have not.
16     Q   Okay.  And did you review any documents to
17 prepare for this deposition today?
18     A   Yes, ma'am.
19     Q   Can you tell me, generally, what documents
20 you reviewed to prepare?
21     A   I reviewed the information that we provided,
22 the incident report, the photographs, the video, and
23 the policies that we have.
24     Q   Okay.  And what policies do you -- what
25 policies did you review that you, and I'm assuming

1  you're meaning Walmart, have?  What policies exactly
2  did you review?
3      A   I reviewed our safety policy, our accident
4  reporting policy.
5      Q   Okay.  Are those the only two policies you
6  reviewed in preparation for today?
7      A   That I remember, yes.
8      Q   Oh, just that you recall at this time.
9  Okay.  That's not a problem.  And so were you at the
10 Helena Walmart location when this accident occurred?
11     A   I work there.  I wasn't physically at the
12 store when it happened.
13     Q   Okay.  What was your title at the time of
14 this incident on October 5th -- I'm so sorry, October
15 15th, 2020, what was your title at Walmart at the
16 time?
17     A   I was the store manager.
18     Q   Okay.  And who all did you speak to who was
19 present at the location about this accident?
20     A   I spoke to Roman Cooper who was the manager
21 on duty at the time who took the report.
22     Q   Okay.  Did you speak to any other employees
23 of Walmart about the incident who were there that day?
24     A   Not that I remember.
25     Q   Okay.  So before we go into too much more

1  detail about the incident and what happened that day,
2  I wanted to get some more information about Walmart's
3  policies and your role there.
4      So how long have you been employed with
5  Walmart?
6      A   Twenty-three years.
7      Q   Okay.  And have you always been at the
8  Helena location?
9      A   No, ma'am.  I've been there since 2017.
10     Q   Okay.  And what other Walmart locations have
11 you worked at?
12     A   I've worked at Sylacauga, Trussville,
13 Talladega, Gardendale, Leeds, and Vestavia.
14     Q   Oh, so over the course of over 20 years,
15 what all roles did you play at Walmart, what all
16 positions did you hold?
17     A   I've worked in the shoe department; I've
18 been a cashier; I've been a manager on the front end;
19 I've been assistant manager; I worked DSD, which is
20 the back door; I was a co-manager and a store manager.
21     Q   Okay.  And so the progression of your
22 employment positions, I guess, the most recent is the
23 highest position you've held at Walmart?
24     A   The store manager?
25     Q   Yes.

1    A    Yes, ma'am.
2    Q    Okay.  And how long have you been a store
3  manager, not just at Helena, but just at any store?
4  How long have you been a store manager at a Walmart?
5    A    Eight years.
6    Q    Okay.  And what all stores have you been a
7  store manager at?
8    A    Helena and Vestavia Hills.
9    Q    Okay.  And I understand that the Helena
10  location is a neighborhood market Walmart location?
11    A    Yes, ma'am.
12    Q    And is the Vestavia Hills location also a
13  neighborhood market location?
14    A    Yes, ma'am.
15    Q    And so can you tell me about your duties as
16  a store manager, what are your roles?
17    A    Basically, overseeing the entire store and
18  ensuring that, you know, we do the day-to-day duties
19  of the store.  Whether that's stocking the shelves,
20  ringing people up at the front.  Whatever, you know,
21  is necessary in the day-to-day operations.  I'm in
22  charge of all of it.
23    Q    And what kind of training were you required
24  if any to go through to be a store manager?
25    A    I don't know that I had a -- I had on-the-

1  job training, you know, shadowing other people.  And I
2  had a mentor that came in and worked with me some.  I
3  didn't go to any official store manager training
4  besides being a co-manager, which was kind of a step
5  between an assistant and a store manager, where you
6  learn how do to run the store.
7    Q    Okay.  Are there any employment handbooks or
8  manuals that you have for being a store manager?
9    A    There are -- we have e-learners that are
10  specific to store managers, which are computer-based
11  learning that I completed.  And there -- back when I
12  got promoted, I think I did a training plan on the
13  computer as well.
14    Q    Okay.  And these computer trainings, do you
15  get any type of written material before or after these
16  trainings to retain for your own records?
17    A    Not that I recall.  I'm sure there's
18  something that I could print out, but I don't know
19  that I have anything.
20    Q    Okay.  And I want to talk about just your
21  employment generally with Walmart.  Do you all have a
22  Walmart employee handbook or manual or policies-and-
23  procedures book that is in writing that's given to
24  employees?
25    A    We do have a new hire orientation guide that

1  they get on their first day of employment.
2    Q    Okay.  And what information is contained in
3  that document?
4    A    As far as I recall, I mean, it had their
5  information that they're going to need to, like, log
6  into the computers and stuff.  It has information on
7  benefit.  It has a few policies in it.
8    Q    And what kind of policies are in it?
9    A    Off the top of my head, I know it has
10  alcohol and drug free workplace policies.  And
11  there's, like, an equal opportunity employment policy,
12  but that's probably all I remember.
13    Q    Okay.  And so you don't recall there being
14  any policies on daily tasks or worksheets that must be
15  completed during shifts or anything like that?
16    A    Not that they get in orientation, no.
17    Q    Okay.  And they'd get an orientation, can
18  you walk me through the orientation process?
19    A    I can walk you through it right now if
20  that's okay?
21    Q    Okay.
22    A    Like, current.  Okay.  So, basically, their
23  very first day of Walmart they're going to come to
24  work, and they're going to prove that they are allowed
25  to work in the United States by completing an I-9.

1  And then they have a couple of hours where they go
2  through this handbook with the people lead, and they
3  talk about policies.
4         Then they do a safety tour with a member of
5  management, which is going to be a tour of the
6  building, point out emergency exits, talk about what
7  to do for different things that could happen.  And
8  then they're going to spend a couple of hours with a
9  team lead, like, kind of shadowing them.
10    Q    Okay.  And are there any, I guess,
11  checklists that the orientation leaders use to check
12  off evidence and that someone completed these
13  trainings?
14    A    The only thing that we would have that we
15  retain right now is the safety checklist.  When they
16  walk around, they check once they learn certain
17  things, and then they sign it.
18    Q    Okay.  And do you all maintain those records
19  for set amounts of time?  Are they placed in -- or are
20  they placed in employees' personnel records?
21    A    They are.  They're downloaded into a digital
22  toolbox for that associate.
23    Q    So you all have access to the sheets that
24  evidence their completion of that safety worklist?
25    A    For current associates, yes.

1    Q   For current.  But so if someone is, I guess,
2  terminated or they resigned from their position, then
3  their personnel file is also destroyed?
4    A   I'm sure it's somewhere in corporate, but I
5  don't have access to it.
6    Q   Okay.  So you have access to current
7  employees' personnel files?
8    A   Yes, ma'am.
9    Q   All right.  And can you tell me about that
10  safety checklist, what all is included on that
11  checklist?
12    A   So we point out spill stations, which are
13  throughout the store and are to be stocked with
14  certain supplies:  pocket pads, the spill cleanup
15  stuff, a broom, a dustpan, a safety phone.  And, you
16  know, we talk about what to do when we see a spill.
17  You don't leave it.  You -- if you can clean it up
18  right then, you clean it up.  If not, you stand with
19  it until you can get someone to help you clean it up.
20        We point out all the fire exits in the
21  building and talk about what to do in the event of a
22  fire or another emergency when we have to evacuate.
23  We go to the hazmat station, which is -- we have
24  different color buckets that we have to dispose of
25  different items in, so we about how to dispose of

1  different things.
2        We go to the compactor and the baler to talk
3  about how to use those.  And we talk about top stock
4  safety, which is the shelf on the tops of the
5  counters.  And about how we don't stack things too
6  high on there, and we don't put heavy things on there
7  because all of this can be dangerous to customers or
8  associates.
9        THE REPORTER:  May I just interrupt, I'm
10  sorry.  What microphone are you using?  It's just a
11  little muddled where I'm just not getting a few --
12  there's a couple words I'm not hearing well.  Are you
13  close to it?  Or --
14        MS. GORDON:  She's about 12 inches from it,
15  yeah.  It's sitting on the table.  It's one that sits
16  on the table.  I'm not sure if I can get it any
17  closer.
18        THE REPORTER:  Okay.  You can't use the one
19  from Zoom, like a computer one?
20        MS. GORDON:  We have it up on a screen.
21        THE REPORTER:  Okay.
22        MS. GORDON:  We're all connected, the
23  speaker, and everything else.
24        THE WITNESS:  I can try to talk more into it
25  if that helps?

1        MS. WASHINGTON:  I was having a few issues
2  with hearing as well.  Like, some words they sound a
3  little muddled.
4        MS. GORDON:  Yeah.  This is the tricky part
5  about Zoom.  You can't ever count on it.  I don't know
6  how to get it any closer.  I mean --
7        THE REPORTER:  Okay.
8        MS. GORDON:  I don't know.
9        THE REPORTER:  We'll keep going forward.
10        MS. GORDON:  It's up here in front of her.
11  And so I don't know how to --
12        MS. WASHINGTON:  If I have a question where
13  I didn't understand the answer.  I think I'm
14  understanding just enough to, you know, go from here.
15  I think we'll be fine, but I may ask you to repeat if
16  it gets too much of an issue; is that okay?
17        MS. GORDON:  Sure.  That's fine.
18        MS. WASHINGTON:  And I do want to make one
19  stipulation on the record.  I am the full-time
20  caregiver for my father, and he is currently having a
21  procedure done.  So I am on-call.  So if I get a phone
22  call, I am definitely -- that's the only reason I
23  would answer.
24        MS. GORDON:  That's fine.
25        MS. WASHINGTON:  Okay.  All right.  So going

1  back -- thank you so much for going over those safety
2  checklist that you all maintain.
3  BY MS. WASHINGTON:
4    Q   Moving forward, as far as reporting spills.
5  I do want to ask specifically about that.  Is there a
6  particular chain of command that spills are reported?
7  Can you go over just in detail how those are reported
8  and handled and resolved?
9    A   Basically, any associate who sees a spill is
10  pretty much trained to clean it up if they can.  You
11  know, if it's a small spill, you know, they should
12  have a pocket pad, which is a little orange, 3 by 5, I
13  guess, absorbent pad.  It cleans up an awful lot of
14  moisture.  And so if they have that and they can clean
15  it easily, they're to do that.
16        If it's larger and they can't clean it up
17  themselves, they can call someone else to help them,
18  to assist them.  And, you know, we can use paper
19  towels, if it's, you know -- if that's good enough.
20  Or we can use the All-Absorb that I talked earlier.
21  It's basically this kind of clumping stuff that you
22  just sprinkle over your spill, and then you can just
23  sweep it up.
24    Q   Okay.  And do you all have any written logs
25  for spills, where spills were reported to someone?

Alexandria Bennett vs Walmart
PARKER, ELIZABETH on 06/22/2023                                    Pages 18..21

1      A    No, ma'am.
2      Q    Okay.  Do you all have a, I guess, store
3  policy on maintenance or cleaning or repairs, do you
4  all keep any written policies on that?
5           MS. GORDON:  Object to the form.
6           MS. WASHINGTON:  She objected to form, but
7  you can still answer, or did you understand or need me
8  to rephrase?
9           THE WITNESS:  Can you rephrase it?
10          MS. WASHINGTON:  Sure.
11 BY MS. WASHINGTON:
12     Q    So do you all maintain written logs of
13 maintenance, repairs, or requests for maintenance or
14 repairs?
15          MS. GORDON:  Object to the form.  Are you
16 talking about just with regard to floors, or I just --
17 can you narrow it a little bit, or are you talking
18 about the whole store maintenance?
19          MS. WASHINGTON:  I'm starting generally, and
20 I am going to kind of niche in --
21          MS. GORDON:  Okay.
22          MS. WASHINGTON:  -- as we go forward, but I
23 wanted a general response.
24          MS. GORDON:  Sure.
25          THE WITNESS:  We have a portal, I guess,

1  that we use to request maintenance, and I have a
2  technician that comes in and fixes things that are
3  broken.
4           MS. WASHINGTON:  Okay.
5  BY MS. WASHINGTON:
6      Q    And who is responsible for cleaning the
7  Helena store?
8      A    We have maintenance associates that do basic
9  maintenance tasks.  And then, you know, things like
10 dusting or cleaning shelves, pretty much everybody's
11 responsible for doing certain parts.  Say if you
12 change an end cap, you're responsible for cleaning the
13 end cap.
14     Q    Are those individuals who are responsible
15 for the cleaning tasked with doing so at set
16 intervals?
17     A    No, not necessarily.
18     Q    So how are they tasked with -- how often or
19 in what manner are they tasked with doing those
20 duties?
21     A    Mostly as needed.  I mean, the floors get
22 swept and scrubbed -- now it's every night; it used to
23 be every morning.  But we didn't have overnight back
24 in 2020, we do now.
25          I mean, the registers are cleaned once a day

1  and as needed.  Carts are gotten off the lot as
2  needed.  So it's not really something based on a set
3  time just everything is done as it's needed.
4      Q    Okay.  And as far as the standard of
5  cleanliness for the store, are there certain, I guess,
6  check marks of cleanliness that must be made?  Such as
7  dust levels or, I guess, the floors, are they to be
8  buffed or moped?  What are you all's cleaning
9  standards when it comes to just the upkeep of the
10 store?
11          MS. GORDON:  Object to the form.
12          THE WITNESS:  Can you rephrase the question?
13          MS. WASHINGTON:  Sure.
14 BY MS. WASHINGTON:
15     Q    Like, what would you say is the level of
16 cleanliness that you all require?  Or if any, do you
17 all require that the floors are kept to, like I said,
18 they are there to be buffed, or are they to be mopped
19 on a consistent basis?  Is there, like, a no
20 stickiness policy for, you know, regular wear and
21 tear?  I just wanted a general response as to what are
22 you all's cleanliness policy, if any?
23          MS. GORDON:  Object to the form.  Answer if
24 you have an answer.
25          THE WITNESS:  There's not really a

1  cleanliness policy.  The store is, you know, cleaned
2  every morning before we open.  And then as needed,
3  throughout the day, if somebody notices something, we
4  stop and fix it.
5           MS. WASHINGTON:  Okay.
6  BY MS. WASHINGTON:
7      Q    As far as spills as well, I know that you
8  stated that spills are to be cleaned, if possible,
9  immediately by whatever employee sees it first; is
10 that correct?
11     A    Yes.  But not if possible, like, they're
12 responsible.  If you see it, you're responsible for
13 it.  So you're not going to leave it.  If you can't
14 clean it up, you're going to call somebody to help
15 you.
16     Q    And how do you call someone to help you?
17     A    Either with a walkie-talkie or -- some
18 associates don't have a walkie-talkie.  They all have
19 cell phones; they can reach out.  We have a Me@Walmart
20 system that associates can use to communicate with
21 each other in an app.  Or often people just walk by
22 us.
23     Q    Okay.  And are there any, I guess,
24 procedures that will require the placement of warning
25 signs or I guess warning devices to warn customers

| | |
|---|---|

1    about potential hazards?
2         A    We do have wet floor signs.  You know, say
3    we just mopped or something, and the floor may be a
4    little slippery, we would put a wet floor sign out.
5    But, usually, we can dry the floor, and we don't need
6    that.
7         Q    Okay.  You can dry -- I'm sorry, I couldn't
8    hear that.  You said that you could dry the floor?
9         A    You can dry it.  You can just use a wet mop
10   and then a dry mop, and it's usually dry.
11        Q    Thank you.  And so as far as spills that are
12   large and, I guess, require significant cleanup
13   endeavors, how do you all handle those particular
14   areas?
15        A    We have a scrubber, a big machine that will
16   kind of go through and suck up water, so or, you know,
17   kind of liquid.  So if we had something big, we could
18   use that.
19        Q    Now I want to switch to, I guess, slip-and-
20   fall incidents at this particular Helena store.  Are
21   you aware of the number of slip-and-falls that have
22   happened at this particular location since you've been
23   employed there?
24             MS. GORDON:  Object to the form.
25             THE WITNESS:  I'm not aware of the total

1    number.  No, ma'am.
2    BY MS. WASHINGTON:
3         Q    But are you aware of some slip-and-falls
4    that have occurred since you've been employed at the
5    Helena Walmart location?
6         A    I am.
7         Q    Okay.  About how many do you recall?
8         A    Probably three.
9         Q    Okay.  And can you give me -- I guess, let's
10   talk about them generally, can you tell me how those
11   happened.
12        A    I don't remember specifics.  I remember two
13   in 2020.  There was one in October, I think, where
14   somebody just fell.
15        Q    Okay.  I know that Ms. Bennett's fall
16   happened in October 2020, do you remember if there was
17   another incident of a fall in October of 2020?
18        A    Not that I recall.
19        Q    Okay.  So the one you recall from October of
20   2020 is the one of Ms. Bennett?
21        A    Yes, ma'am.
22        Q    All right.  Have you ever been at the store
23   when a slip-and-fall occurred?
24        A    I'm sure I have.
25        Q    Okay.  And when slip-and-falls occur at the

1    store, are they resolved?  How long does it take for
2    them to be, I guess, resolved?
3         A    What do you mean by resolved?
4         Q    How long does it take to, I guess, address
5    the slip-and-fall and to ensure that, you know, any
6    injuries have been addressed, an incident report made
7    and, I guess, the cause cleaned up or cleared so that,
8    you know, no further injuries occur?
9             MS. GORDON:  Object to the form.
10            THE WITNESS:  I mean, when we -- when we
11   hear about it, we get a tablet and take an incident
12   report.  Our first concern would be for the customer
13   to make sure that, you know, they're okay.  Once we've
14   done that, we would clean up the spill.
15            MS. WASHINGTON:  Okay.
16   BY MS. WASHINGTON:
17        Q    And I understand that as a part of you all's
18   procedures on addressing slip-and-falls, employees are
19   to take an incident report, correct?
20        A    Yes, ma'am.
21        Q    Okay.  And that incident report is taken
22   electronically?
23        A    Yes, ma'am.
24        Q    Okay.  And how long are those reports kept
25   in you all's records?

1         A    I don't know.  We send it to our claims
2    agency.  And it's  -- I mean, there's an incident
3    number, and I'm sure they can look it up for however
4    long, but I don't know how long it would be.
5         Q    Okay.  And the claims agency, is it an
6    internal Walmart claims agency or some external agency
7    that you're submitting this to?
8         A    It's Walmart.  It's Walmart's clients.
9         Q    Okay.  All right.  And so all reports are
10   just submitted to that claims agency, which is with
11   Walmart Corporate; is that correct?
12        A    Yes.
13        Q    Okay.  So do you all have access to those
14   reports internally, like, can you personally, as store
15   manager, look up those reports?
16        A    I personally cannot, no.
17        Q    Is there anyone else in your store who does
18   have access to those records?
19        A    No.
20            MS. WASHINGTON:  Okay.  So sorry.  My
21   computer just froze.  I'm trying to pull up some
22   records.  Give me one second.
23            MS. GORDON:  You're fine.  Can we go off the
24   record one second?  Let me see if I can figure out how
25   to make you bigger so that when you share the -- right

1 now, you're just one of the tiles, and I was going to
2 try to expand you so that we can see the records you
3 put up.
4        MS. WASHINGTON: Okay.
5        THE REPORTER: Yes. So I have the witness
6 spotlighted for our firm has that. And then when she
7 shows a -- shares her screen, it'll take up the whole
8 screen.
9        MS. GORDON: Perfect. Thank you so much.
10       MS. WASHINGTON: Okay. All right. Here we
11 go. I am going to share my screen to present what is
12 being admitted as Plaintiff's Exhibit 1. It is the
13 accident report that you all submitted to us in your
14 initial disclosures.
15       (Plaintiff's Exhibit 1 marked for
16 identification.)
17 BY MS. WASHINGTON:
18    Q    So does this form look familiar?
19    A    Yes, ma'am.
20    Q    Okay. And so on this is when -- it states
21 here that, "Describe in your own words the events
22 leading up to this incident." This particular
23 statement is written by the actual, I guess, person
24 who was involved in the accident, or is this written
25 by a Walmart employee as told to them by the

1 individual?
2    A    It could be either one. Either the customer
3 will take the tablet and type in what they say, or
4 sometimes they dictate it to the manager on duty and
5 they type it.
6    Q    Okay. And in Ms. Bennett's incident report
7 form here, do you know which of those happened? Do
8 you know if she typed this in or if one of your
9 employees typed it in?
10   A    No, ma'am, I don't know.
11   Q    It has two names listed here as the
12 associates who the incident was reported to or who
13 were in the area, are you familiar with Glenda
14 Washnurn or Roman Cooper?
15   A    Yes, ma'am.
16   Q    Okay. And is Glenda's name here correct,
17 Washnurn, or is it Washburn?
18   A    It's Washburn with a B.
19   Q    Okay. Okay. Just want to verify that's the
20 same person that we had seen in other documents. Did
21 you speak with either -- first, do both of them still
22 work at the Helena store?
23   A    No, ma'am. Neither of them are employed
24 anymore.
25   Q    Either of them are employed. Are you still

1 in contact with either of them?
2    A    No, ma'am.
3    Q    Could you get in contact with either of
4 them?
5    A    Yes, ma'am. If I needed to, I could.
6    Q    Okay. Do you recall speaking with either of
7 them or both of them after this incident?
8    A    No, ma'am, I don't.
9    Q    Okay. I'm going to stop sharing my screen
10 here. So I guess I want to ask, after the report is
11 made, you know, after an incident occurs, is there any
12 meeting between associates who were involved in the
13 reporting of the incident and store management?
14   A    Well, the highest earnings manager on duty
15 would take the report, so sometimes there's not. But
16 in this case, there would have been because we would
17 have had to pull video; neither of them would have had
18 access to the video.
19        So somebody would have talked to them about
20 what happened and found out more details so that we
21 could pull the video and, you know, get all --
22 everything sent out to the claims people that we
23 talked about earlier.
24   Q    Okay. And do you know who that particular
25 person was in this case, that spoke with Glenda or

1 Roman?
2    A    I know that Nathan French burned the video.
3    Q    Nathan French did what to the video, I'm
4 sorry?
5    A    He made the video, DVD disc.
6    Q    Okay. And I am going to be doing some flip
7 flopping with the questions here. I know that we're
8 talking about Walmart procedures, this particular
9 incident, what happened at the store. So please bear
10 with me as I do this.
11        So when it comes to video surveillance at
12 the Helena location, are there video surveillance
13 cameras that can see down every aisle at the store?
14   A    No.
15   Q    Okay. Are you aware of all of the aisles
16 that are not, I guess, viewable in video surveillance?
17   A    Not off the top of my head, no.
18   Q    So do you all keep a, I guess -- I guess, do
19 you all keep any internal communications that list
20 those particular aisles that are not within video
21 surveillance view?
22   A    Not that I know of.
23   Q    Okay. And do you know why there aren't
24 video surveillance?
25   A    No, ma'am.

1    Q    Have you ever, as store manager, requested
2 that there be video surveillance on every aisle?
3    A    I have asked my market asset protection
4 manager if we could possibly get more video.
5    Q    And when did you ask that asset protection
6 person that?
7    A    I don't know.
8    Q    Oh, I mean, what was their response?
9    A    That we couldn't add any more.
10    Q    Okay.  Did he give you a reason as to why
11 they could not add any more?
12    A    Not that I remember.
13    Q    Okay.  And so in Ms. Bennett's case on
14 October 15, 2020, did she fall in the, I guess, water
15 aisle?
16    A    That is --
17    MS. GORDON:  Object to the form.  You can
18 answer, if you know.
19    THE WITNESS:  That is what the report says,
20 yes, ma'am.
21 BY MS. WASHINGTON:
22    Q    Okay.  Do you know what aisle -- like, what
23 the aisle is called?  Because I call it the water
24 aisle because there were pallets of water bottles
25 there and jugs and such, but do you all have an

1 internal name for particular aisle?
2    A    I call it the water aisle.
3    Q    Okay.  And so in relation to video
4 surveillance cameras, where is the nearest camera to
5 that aisle?
6    A    I believe the nearest one would be on the
7 beer aisle, which is the next aisle.
8    Q    Okay.  So if I am facing the back of the
9 store.  So when I walk into the Helena store, and I'm
10 facing the back towards where the refrigerators are in
11 the very back --
12    A    Uh-huh.
13    Q    -- would that aisle be to the left or right
14 of the water aisle?
15    A    To the left.
16    Q    Okay.  And would that camera be facing the
17 front of the store or the back of the store?
18    A    The back, I believe.
19    Q    Okay.  And how much of the water aisle, if
20 any, does that nearest camera capture?
21    A    Not much to the best of my memory.
22    Q    And so, would it be safe to say that there
23 is no video surveillance footage of Ms. Bennett's fall
24 from Walmart's surveillance camera?
25    A    Not that we found, no, ma'am.

1    Q    Did you all receive any photos or videos
2 from others in the store that day?
3    A    Not that I'm aware of.
4    MS. WASHINGTON:  Okay.  I am going to share
5 my screen again, you all.  And this is going to show
6 what has been marked as Plaintiff's Exhibit No. 2.
7 And it is photos that were sent to the plaintiff in
8 the defendant's initial disclosures.
9    (Plaintiff's Exhibit 2 marked for
10 identification.)
11 BY MS. WASHINGTON:
12    Q    Do any of these photos look familiar to you?
13    A    I think those are the pictures that we
14 submitted with the accident report.
15    Q    Okay.  Do you know who took these pictures?
16    A    Not a hundred percent, but I would think it
17 was Roman.
18    Q    Okay.  And why do you think it was Roman?
19    A    Because Roman took the report.
20    Q    Glenda also was listed on that report, could
21 these potentially have been taken by Glenda as well?
22    A    They could have.
23    Q    Okay.  And so I want to kind of go through
24 each photo.  There are five of them that were
25 submitted.  This first one, do you believe this

1 depicts the area where or nearby where Ms. Bennett
2 fell that day?  Is this photo from that actual day?
3    MS. GORDON:  Object to the form.  Answer if
4 you know.
5    THE WITNESS:  I don't know when the photo is
6 from, but that is the water aisle.
7    MS. WASHINGTON:  Okay.
8 BY MS. WASHINGTON:
9    Q    And do you know if these -- I guess I'm
10 going to go through all five of them, that first one,
11 but we confirmed that they're all from the water
12 aisle.  But do you believe these were taken on the day
13 of the incident?
14    MS. GORDON:  Object to the form.
15    THE WITNESS:  If they were in the incident
16 report, then they would have been taken the day of the
17 incident.
18    MS. WASHINGTON:  Okay.
19 BY MS. WASHINGTON:
20    Q    So they are potentially taken on the day of
21 the incident.  And can you tell me, in this second
22 photo that's on your screen  -- and I don't know if
23 you see my cursor circling this area by what appears
24 to be wetness in the area.  Can you see that, the area
25 where I'm circling with my cursor?

1    A    I can.
2    Q    Okay.  Was it noted anywhere in you all's
3  files or told to anyone verbally what this wet
4  substance was on the floor?
5    A    Do you mean before the accident happened or
6  after?
7    Q    Yes.  From on the photos, I don't know about
8  when, where, how, I'm just asking.  The substance that
9  we see on this photo, do you know if it was clearly
10  identified as a particular type of liquid?
11        MS. GORDON:  Object to the form.
12        THE WITNESS:  Not that I know of off the top
13  of my head.
14        MS. WASHINGTON:  Okay.
15  BY MS. WASHINGTON:
16    Q    Was this substance referred to as water by
17  anyone at Walmart?
18    A    It could have been.
19    Q    Okay.  And in this area, where the photos is
20  taken, do you know what this is, what this particular
21  substance on the floor is?
22    A    It looks like dirt.  It was the end of the
23  day -- well, it was toward the end of the day.  It's a
24  high-traffic aisle, so it looks like the floor was
25  dirty and needed to be scrubbed.

1    Q    Okay.  And so is this, I guess, dirt that
2  you've stated, is any of this permanent, or is any of
3  this permanent on the floor?
4        MS. GORDON:  Object to the form.
5        THE WITNESS:  That shouldn't be permanent.
6  Sometimes that comes off with scrubbing or mopping
7  even, but not usually.  It usually takes the scrubber.
8  Sometimes, the floor has to be waxed to get marks out
9  of the floor.
10        MS. WASHINGTON:  Okay.  And do you know --
11  I'll come back to that.  I'm going to finish sharing
12  my screen on this, but we will return to the status of
13  the floor at some point.  I'm sorry, you guys, had to
14  get back to my screen.  I don't know why when I switch
15  applications on my computer today, it freezes, like,
16  from application to application.  So sorry.  Okay.
17  BY MS. WASHINGTON:
18    Q    So going back to the -- I guess, the day of
19  the incident, you were not there, but you did review
20  the reports and statements that were made that day,
21  correct?
22    A    Yes, ma'am.
23        MS. WASHINGTON:  Okay.  I am going to share
24  my screen, and I'm going to have quite a few
25  statements here that were taken by you all.  They're

1  going to be exhibits:  3, is going to be a statement
2  from Roman Cooper, Walmart associate; there's going to
3  be Plaintiff's Exhibit 4, which is a witness statement
4  from customer Kellie Daughtry; there's going to be
5  Exhibit 5, which is a statement by Walmart Associate
6  Glenda Washburn; and there is going to be -- no,
7  Exhibit 3 is going to be a statement by customer Kevin
8  Allen, and Exhibit 6 is going to be a statement by
9  Walmart Associate Roman Cooper.  I have those correct
10  now.
11        All right.  So I want to start with the
12  associates.  So this is going to be Exhibit 6, Roman
13  Cooper.
14        (Plaintiff's Exhibit 6 marked for
15  identification.)
16  BY MS. WASHINGTON:
17    Q    Do you recall reviewing this statement?
18    A    I don't have, like, memory of it, but I'm
19  certain I looked at it and read it.
20    Q    Okay.  And his role in the incident is
21  listed as reporter, correct?
22    A    Yes, ma'am.
23    Q    Okay.  And there are a few typos, but I
24  think we can kind of surmise that he says in his
25  observation, when he arrived at the scene at the

1  incident, "The customer in question was on the floor
2  and in considerable discomfort and was unable to move
3  her ankle."
4        So to your knowledge, did Roman Cooper
5  actually see the incident occur?
6    A    No, ma'am, I don't believe he did.
7    Q    Okay.  And moving on to Glenda Washburn.
8  Her observation here says that she observed the
9  customer sitting on the floor complaining of right hip
10  and ankle pain.  And she said, "She was reaching for
11  water on the top shelf, slipped, and hit her hip
12  against a water pallet and twisted her ankle.  I did
13  see water on the floor.  The customer had on sturdy
14  running shoes and shorts."
15        And so based on this report and from -- in
16  your knowledge, do you believe that Ms. Washburn
17  actually saw the incident occur?
18        (Plaintiff's Exhibit 5 marked for
19  identification.)
20        THE WITNESS:  No, ma'am.  I don't think she
21  saw it occur.
22  BY MS. WASHINGTON:
23    Q    Okay.  I'm moving on to the incident report
24  of witness Kellie Daughtry.  It is my understanding
25  that -- is Ms. Daughtry a Walmart associate?

1     (Plaintiff's Exhibit 4 marked for
2  identification.)
3          THE WITNESS:  No, ma'am.
4  BY MS. WASHINGTON:
5     Q    Okay.  And was she a customer at the store
6  that day?
7     A    Yes, ma'am, I believe so.
8     Q    Okay.  It just says here that her
9  observation was that the fall had just happened as she
10 was passing by.  "It was in front of the bottled
11 water.  Water was on the floor, and the young lady
12 slipped and hit her hip on a crate on the way down.
13 She was in pain and crying.  She said her hip and
14 ankle were hurting."
15         So based on this report, does it appear to
16 you that Kellie actually saw the fall happen?
17         MS. GORDON:  Object to the form.
18         THE WITNESS:  No, ma'am, it doesn't appear
19 that she saw it happen.
20         MS. WASHINGTON:  Okay.
21 BY MS. WASHINGTON:
22    Q    And last but certainly not least is Kevin
23 Allen.  His observation just says, "She slipped and
24 fell after trying to pick up water from aisle."
25         So from his statement, can you tell if Kevin

1  saw the fall happening?
2          (Plaintiff's Exhibit 3 marked for
3  identification.)
4     A    From his statement, I wouldn't know.
5     Q    Yes.  So that's what I'm asking.  Does it
6  appear from his statement to you that he saw the fall
7  happen?
8          MS. GORDON:  Object to the form.
9          THE WITNESS:  I can't make a determination
10 from what he wrote.
11         MS. WASHINGTON:  Okay.  I am going to stop
12 sharing my screen.  And I want to ask about -- so
13 sorry, you guys.  When I switch, this just get ready
14 for a freeze.  It's going to happen.  Every time I
15 switch it out, it's going to freeze.  So let's let it
16 recoup, and now my fan is going super fast on my
17 computer.  So let's see if this works.  Okay.  Here we
18 go, unfrozen.
19         All right.  We're almost done, Ms. Parker, I
20 promise you.  And I thank you so much for your
21 patience here with us today.  This is what's being
22 marked as Plaintiff's Exhibit 7, it is the claim
23 report submitted by the defendant in their initial
24 disclosures.
25         (Plaintiff's Exhibit 7 marked for

1  identification.)
2  BY MS. WASHINGTON:
3     Q    Does this claim report look familiar to you?
4     A    Yes, ma'am.
5     Q    Okay.  And I just wanted to go over certain
6  components that I don't know if it was completely
7  filled out or if not.  So I wanted to ask particular
8  questions about it.  In the section here entitled,
9  "Slip-and-Fall Information," do you know why these
10 items are blank?
11    A    I think -- I don't remember when we started
12 taking reports on the tablet, but that -- this is the
13 old way we did reports, kind of, and the tablet is the
14 new way we do reports.  And I -- I think in 2020, we
15 were just starting to use the tablets, and I think
16 that's -- it didn't ask him for all that, but it's
17 still on the old reporting, if that makes sense.
18    Q    No, it does.  So you're saying that this
19 information is generated in the report even though it
20 wasn't asked to the person who filled it out
21 initially.  So it comes out blank; is that --
22    A    That's what I think happened, yes.
23    Q    Thank you so much.  I mean, that's a
24 possibility as to why it's blank, so thank you for
25 that.  Sorry, I'm going down because the pages are

1  different sizes, so we're having to go here.
2          And so this is generated from tablet
3  prompts, correct?
4     A    Yes.
5     Q    Okay.  Then I would say the first two pages
6  are, correct?
7     A    Yes.
8     Q    And so this incident reporting system page
9  here on the third page of my document, where it lists
10 the claim number, and there is QR -- I guess a barcode
11 here where you can scan internally or something like
12 that.  Is this form also automatically generated from
13 those tablet prompts?
14    A    Yes, ma'am.
15    Q    Okay.  And they contain primarily the same
16 information, correct?
17    A    Yes, ma'am.
18         MS. WASHINGTON:  Okay.  All right.  I'm
19 going to stop sharing screen on that one.  Okay.  I'm
20 also going to -- I don't know why this won't open on
21 that -- share my screen again.  This is going to be
22 Plaintiff's Exhibit 8, which was submitted, not in the
23 initial disclosure, but in Walmart's response to our
24 request for production of documents.  And it appears
25 to be -- my screen froze again, y'all.  Give me one

1  second. Okay.
2          Tell me if you all see this.
3          THE WITNESS: Yes.
4          MS. WASHINGTON: Okay. This is a letter
5  that was, I guess, sent to Ms. Bennett. It's dated
6  for October 16, 2020. And it's in relation to the
7  claim, and it gives her, you know, ways in which she,
8  I guess, follows up with this.
9          (Plaintiff's Exhibit 8 marked for
10 identification.)
11 BY MS. WASHINGTON:
12     Q    Do you all also at the actual store receive
13 a copy of this particular letter?
14     A    No, ma'am.
15         MS. WASHINGTON: Okay. Stop sharing my
16 screen for now. All right. I just need to call back
17 my brother about something, he just called me. Can I
18 take a quick three-, five-minute recess?
19         MS. GORDON: Sure.
20         MS. WASHINGTON: All right.
21         THE REPORTER: We'll go off the record. The
22 time is 10:56 a.m., Central Standard Time.
23         (Off the record.)
24         THE REPORTER: We are back on the record.
25 It is 11:06 a.m., Eastern Standard Time.

1          MS. WASHINGTON: Okay. So I'm going to
2  share my screen and kind of go over some of the things
3  we discussed. Just, I guess, illustrating some of the
4  procedures that you mentioned based on documents
5  Walmart shared with us. So give me one second.
6  BY MS. WASHINGTON:
7      Q    So does this form look correct? This is the
8  What To Do In The Event Of A Customer Incident Form
9  that was submitted to the plaintiff by the defendant.
10 Is this a complete and accurate depiction of you all's
11 procedures on what to do in the event of a customer
12 incident, Ms. Parker?
13     A    Yes, it looks like it.
14     Q    Okay. And so I'm not going to read through
15 this and go over it in detail, but there are certain
16 parts of it that I wanted to, I guess, mention and
17 break down, and see if you could tell us if this
18 happened in Ms. Bennett's case, okay?
19     A    Okay.
20     Q    So here it says that in addition to caring
21 for the customer, which is what I believe you said is
22 the first thing you all do; is that correct?
23     A    Yes, ma'am.
24     Q    Okay. And then there is this section where
25 it says, "Lockdown the accident scene." I want to

1  talk about that. What it means to secure the area,
2  what does that mean from your -- in your knowledge, to
3  your training, what does secure the area mean?
4      A    I mean, you want to make sure that you don't
5  have people just going through it constantly so that
6  you can get the photos that you need.
7      Q    Okay. And it says, "Take photos," which is
8  pretty self-evident. And, "Describe the scene on the
9  Reversible File Folder," do you know if the scene was
10 described in the Reversible File Folder?
11     A    We don't use the file folders anymore since
12 we started using the tablet.
13     Q    Okay. And so the description of the scene
14 on the Reversible File Folder, is there a prompt on
15 the tablet that requests you all to describe the scene
16 on the -- describe the scene?
17     A    I don't remember. I don't -- I don't
18 remember.
19     Q    Okay. This is what I believe is the
20 incident report, is this, all of this information,
21 requested via the tablet?
22     A    Yes, ma'am. That's an old incident report.
23 That's what we used before we used the tablet.
24     Q    So --
25     A    So you write that out with, like, pen and

1  paper.
2          MS. WASHINGTON: So we already looked at
3  this. Hold on one second, y'all. So you're seeing
4  what I've been going through every couple of seconds.
5  So I'm sorry. It's going to do that for whatever
6  reason. Let me stop my screen share because maybe
7  that'll let me fix it. I do apologize.
8          THE REPORTER: Did you want to mark this as
9  Plaintiff's Exhibit 9 or --
10         MS. WASHINGTON: I do. I do. Can you
11 assist me in keeping those numbers right because I
12 think I'm going out of order now than what I
13 intentionally planned. So we can keep those, and I'll
14 make sure I do that with you to kind of level up.
15         THE REPORTER: Absolutely.
16         MS. WASHINGTON: All right.
17         (Plaintiff's Exhibit 9 marked for
18 identification.)
19 BY MS. WASHINGTON:
20     Q    So this is the form that is automatically
21 generated from the tablet, correct? Of course, it's
22 not a blank copy, this is the one for Ms. Bennett, but
23 this is the information that is requested in the
24 tablet, correct?
25     A    That's -- so the old form that you've just

Alexandria Bennett vs Walmart
PARKER, ELIZABETH on 06/22/2023

Pages 46..49

1  had up, we would write everything on, and then we
2  would key it into the incident reporting screen, which
3  would then generate that that you just -- that you
4  had up again.  Yes.  So that --
5     Q   Okay.
6     A   -- they would fill everything out, and we
7  would go to the computer, and we would type it all in.
8     Q   Okay.
9     A   Then the screen with a smiley face on it is
10 what we would get.
11    Q   Okay.  All right.  So this form is old and
12 out of date.  So this is not what's completed, but the
13 information here is what's asked of you all on the
14 tablet to complete, and this is what is shot out at
15 the end, right?
16    A   Kind of.  The next two pages are actually
17 what came out of the tablet.
18    Q   This?
19    A   Yes.
20    Q   Okay.
21    A   The first two pages are going to be --
22 sorry.
23    Q   Not so fast.
24    A   See right there.  Yes.  So that would have
25 been what we printed to send in with the video so that

1  we weren't just sending a disk.
2     Q   Okay.  So this is an internal document that
3  is basically attached to your video request?
4     A   Yes.
5     Q   It's the information that is the product of
6  what's input into the tablet when a claim is made?
7     A   Yes.
8     Q   Thank you for that clarification.  Because I
9  was confused when I was reading it because I didn't
10 know if, you know, you all just had different
11 duplicative reports made, etcetera.  So now that we
12 have that, I'm good with that.  Thank you so much.
13    A   You're welcome.
14    Q   I guess, let's go back to this and try to
15 clarify what was in place at the time of the incident.
16 So at the time of Ms. Bennett's incident, you
17 obviously were using the tablet, correct?
18    A   Correct.
19    Q   And the prompt to describe the scene on the
20 Reversible File Folder is void?
21    A   I believe so, yes.  I know there's no file
22 folder.
23    Q   Okay.  But in you all's policy on what to do
24 in the event of a customer incident is describing the
25 scene of the incident still important or plays a role

1  in some way?
2     A   Yes.  And, I mean, Glenda did describe the
3  scene, didn't she, on her statement?
4     Q   Back to Glenda's statement.  I'm sorry.  I'm
5  getting confused about my broken tidbits.  I know what
6  I can do because I have hers parcel out.  Give me one
7  second.  Here is Glenda's.  She gave her observation
8  of what happened, but I don't think she described the
9  scene.  It says that she saw water on the floor --
10    A   Okay.
11    Q   -- in it.  But she didn't do a complete
12 scene description, from my knowledge.  Have you seen
13 another document where she may have provided a
14 description of the scene?
15    A   No.  This is what I've seen.
16    Q   Okay.  Going back.  Next up on the what to
17 do in the event of a customer incident, it says,
18 "Alert management."  So members are to notify a
19 salaried member of management.
20    A   So -- go ahead.
21    Q   Oh, you can go ahead.
22    A   In neighborhood markets, at the time, 2020,
23 we had two salaried members of management in the
24 building.  So that's not actually applicable to our
25 store because we leave our leads as the manager on

1  duty.  So it would be to notify the manager on duty,
2  which would have been Roman.
3     Q   That makes sense.  Thank you for that
4  clarification because that was going to be my very
5  next question to ask.  So that was well clarified.
6  And so after we've locked down the scene, alerted
7  management, cared for the customer, we move into the
8  investigation.  But before I do that, I want to kind
9  of go back to the lockdown of the scene.
10    Do you know if the accident scene was locked
11 down?
12    A   No, ma'am, I'm not aware.
13    Q   Okay.  So during the investigation, these
14 particular -- again, I'm not going to read all to you
15 the who, what, whens, wheres, and whys.  The
16 investigation includes these particular matters, are
17 you aware that the investigation points here were all
18 completed in Ms. Bennett's case?
19    A   As far as I know, yes.
20    Q   Okay.  Next up is to make the report, we
21 know that a report was made, and then you save and
22 submit evidence.  So saving evidence.  You mentioned
23 earlier a portal that you all use to submit this
24 information, is the information saved to that portal,
25 or is it saved to a different location?

1     A    It goes into the accident app.  It's not --
2  it's not saved on that tablet or anything.  It goes to
3  claims management.
4     Q    Okay.  So it's submitted via the Internet?
5     A    Via the app, yes, ma'am.
6     Q    So the application on the tablet which has
7  Internet access, and it is submitted or transmitted to
8  that location you mentioned?
9     A    Yes.
10    Q    Okay.  Just wanted to verify that.  Okay.
11 So I kind of want to go back to the safety training
12 that all associates receive.  And I'm not going to go
13 into detail about how you're to maintain your stations
14 and all that.  I just wanted to speak about a few
15 applicable situations here, and I want to talk about
16 the standard operating procedure.
17         Is this particular step an action required
18 what is involved in the safety training that you
19 mentioned earlier for associates?
20    A    So that's an -- a standard operating
21 procedure.  That wouldn't have been -- I mean, we
22 would have discussed it in a safety tour.  And then
23 associates -- that's on OneWalmart, which is our
24 online portal, I guess.
25    Q    Okay.

1     A    And any associate has access to go search
2  for SOPs or -- now they're called process guides, to
3  learn how to do pretty much anything in the store.
4     Q    Okay.  So that is the just SOP, the standard
5  operating procedure for that particular matter, but it
6  is not a checklist or point of reference during the
7  safety training --
8         MS. GORDON:  Object to the form.
9         THE WITNESS:  It's not -- I mean, they don't
10 have to sign it or anything or check anything off, but
11 they do hear about how to clean up spills.
12        MS. WASHINGTON:  Okay.
13 BY MS. WASHINGTON:
14    Q    And so, obviously, the course module here
15 that's on workplace safety, is this model animated?
16 Because I see where it says, "2470 plus 8 minutes of
17 video," can you tell me about this module on safety?
18    A    Sure.  It's going to be part of your
19 computer learning, which every associate does.
20 Basically, you sit down at the computer, you have
21 headphones, and there's going to be things you read,
22 and there's going to be videos.  A lot of times there
23 are questions during the module, and sometimes there's
24 a test at the end that they have to pass.
25        MS. WASHINGTON:  And so for, I guess, the

1  court reporter, this is going to be our next exhibit,
2  and it is the printout of the workplace safety
3  learning module that was given to the plaintiff and
4  the defendant's responses to our request for
5  production of documents.
6         THE REPORTER:  Okay.
7         (Plaintiff's Exhibit 10 marked for
8  identification.)
9         MS. WASHINGTON:  Okay.  Next up, we are
10 going to go over some more of safety and spill-related
11 procedures that must be handled -- or, you know, is
12 how it's shown.  I wanted to look at this diagram.
13 This is also going to be an exhibit.
14        (Plaintiff's Exhibit 11 marked for
15 identification.)
16 BY MS. WASHINGTON:
17    Q    Is this diagram provided to employees at the
18 Walmart Helena store?
19    A    We have that at the spill stations.
20    Q    Okay.  So this is posted at the spill
21 stations in the store?
22    A    Yes.  It's supposed to be.
23    Q    Okay.  Do you know if it was posted the day
24 of Ms. Bennett's accident?
25    A    I mean, I don't know 100 percent.  It should

1  have been.
2     Q    Okay.  And I know you mentioned the -- I'll
3  go back to that.
4         So we've talked about different types of
5  spills earlier.  But can you tell us, I guess, about
6  spill cleanup procedures and the training that is done
7  on those procedures with you all's associates.  So is
8  this particular safety awareness and education an
9  online learning module as well, or is this done in
10 some other way?
11        MS. GORDON:  Object to the form.
12        THE WITNESS:  I don't think that's an online
13 learning.  I think that's in the process guide or an
14 SOP.  But it -- I mean, they learn about spill
15 cleanups in the u-learn, and also during the safety
16 tour, like, we talk about it.
17 BY MS. WASHINGTON:
18    Q    Okay.  So during the safety tour that you
19 all do in person at the store location, certain
20 aspects of this is discussed?
21    A    Correct.
22    Q    So we don't have to go into detail about
23 those particular items.  Thank you.  I'm going to stop
24 sharing my screen here.  All right.  And we are almost
25 done, Ms. Parker, but I did want to go back to you

1  all's store.
2           And so to your knowledge, the flooring in
3  the water aisle, does it contain permanent scuff marks
4  that are on the floor?
5           MS. GORDON:  Object to the form.
6           THE WITNESS:  I can answer?
7           MS. GORDON:  If you can, yes.
8           THE WITNESS:  I think there are some marks
9  on the floor that are burn marks that we can't get
10 out.
11 BY MS. WASHINGTON:
12     Q    And do those marks sometimes obscure, I
13 guess, other substances that may be on the floor?
14          MS. GORDON:  Object to the form.
15          THE WITNESS:  Not that I know of.
16          MS. WASHINGTON:  Okay.
17 BY MS. WASHINGTON:
18     Q    And what about the condition of the pallets
19 that contain -- that hold the water in that aisle, are
20 you aware of the condition of those pallets at the
21 time of Ms. Bennett's accident?
22     A    No, ma'am, I'm not.
23     Q    Okay.  I do want to go back, I guess, to the
24 photos.  I'm going to share my screen again.  These
25 were previously shown to you earlier, but I want to

1  kind of just -- kind of look at these pallets a little
2  closer.  So here, this pallet that's on the screen
3  now, does it appear like a jagged edge to the pallet?
4           MS. GORDON:  Object to the form.
5           THE WITNESS:  It appears that there's a
6  small piece out of the front.
7           MS. WASHINGTON:  That there's a small piece
8  out of the front, okay.
9  BY MS. WASHINGTON:
10     Q    And do you think that this affects the
11 safety of that pallet at all with that chunk of -- a
12 piece, not chunk.  I'm sorry, that was my terminology
13 -- but the piece missing?
14          MS. GORDON:  Object to the form.  Answer if
15 you know.
16          THE WITNESS:  I don't think so.
17          MS. WASHINGTON:  Okay.
18 BY MS. WASHINGTON:
19     Q    And are you aware of customers complaining
20 about the cleanliness of this store?
21     A    When?
22     Q    On any --
23     A    I mean, some customers have complained about
24 cleaning on certain days.
25     Q    Okay.  And how often would you say spills

1  happen on the store on a daily basis, how often would
2  you say there are spills?
3           MS. GORDON:  Object to the form.
4           THE WITNESS:  I don't know.  I mean, I
5  wouldn't say that we have spills every single day.
6           MS. WASHINGTON:  Okay.
7  BY MS. WASHINGTON:
8      Q    Are you aware of any structural issues with
9  you all's building?
10     A    None that I'm aware of, no, ma'am.
11     Q    Okay.  Are you aware of any leaking lights
12 or ceiling?
13     A    No, ma'am, not that I'm aware of.
14     Q    Are you aware of any leaking refrigerators?
15     A    No, ma'am.
16     Q    Okay.  And in the event that you became
17 aware of a leaking refrigerator or a leaking roof,
18 what would be your next steps to resolve that issue?
19     A    If a refrigerated case is leaking, we take
20 the product out and clean it and clean the fan to make
21 sure there's nothing wrong with it and see if that
22 helps.  If not, we open a ticket and get our
23 refrigeration people out.
24          If the roof is leaking, we open a ticket.
25 We put a bucket to collect any water that's dripping

1  and put in a ticket so that someone can come out and
2  repair the roof.
3      Q    Okay.  And do you all put up any cautionary
4  signs or materials like cones or --
5      A    Yes.  If you couldn't, like, clean
6  everything, we would put a cone out to alert
7  customers.
8      Q    Okay.  And do you recall anyone stating
9  anything about the weather the day of this incident,
10 what the weather was like?  Have you seen any
11 statements or reports mentioning the weather the day
12 of Ms. Bennett's accident?
13     A    No, ma'am, I have not.
14     Q    Okay.  Are you aware of any investigations
15 that looked for or, I guess, try to uncover the source
16 of the water that was on the floor when Ms. Bennett
17 fell?
18     A    No, ma'am, I'm not aware of any.
19     Q    And are you aware of any statement as to how
20 the water got on the floor when Ms. Bennett fell?
21     A    No, ma'am.
22     Q    And do you know if Walmart is self-insured?
23     A    Yes.  We are self-insured up to something.
24     Q    Okay.  Could you find that amount or --
25     A    I probably --

1    Q    -- are you ever made aware of that amount
2    that you all are self-insured for?
3    A    I could probably find it if I called
4    somebody, called CMI or somebody.
5    Q    Okay.  And who is that?
6    A    That's our claims department.
7    Q    Okay.  And does your store have a particular
8    claims manager or claims handler?
9    A    Usually, we have the same people for -- one
10   for customer incidents and one for associate, I
11   believe.
12   Q    Okay.  And do you know who that person is
13   for a customer?
14   A    No, ma'am, not off the top of my head.  I
15   did see Matthew Fowler's name on that letter you
16   showed earlier.
17   Q    Okay.  And are you familiar with Mr. Fowler?
18   A    I'm sure I've spoken to him before, but
19   beyond talking to him on the phone, not really.
20   Q    Okay.  But generally, when you all have
21   incidents, you deal with the same handlers?
22   A    Pretty much, yes.
23        MS. WASHINGTON:  Okay.  All right.  I
24   believe that's all the questions that I have for you
25   at this time.

1        MS. GORDON:  And I just have a few
2    questions.
3        THE REPORTER:  Okay.
4        MS. GORDON:  Let me sit over here so you're
5    still facing them.
6                    EXAMINATION
7    BY MS. GORDON:
8    Q    All right.  Ms. Parker, before Plaintiff
9    reported her fall on October 15th, 2020, had anyone
10   notified you about any water or liquid substance on
11   the floor of the water aisle?
12   A    No.
13   Q    Has any employee ever told you that they
14   were notified of water or a liquid substance on the
15   floor of the water aisle before Plaintiff's fall on
16   October 15, 2020?
17   A    No.
18   Q    Has anyone told you they observed water or a
19   liquid substance on the water aisle before Plaintiff's
20   fall on October 15, 2020?
21   A    No.
22   Q    Before Plaintiff's fall on October 15, 2020,
23   had others been down the water aisle that day?
24   A    Yes.  I'm sure other people were down the
25   aisle.

1    Q    Had there been vendors down that aisle
2    before her fall?
3    A    Yes.  Coke and Pepsi would have stocked
4    their pallets that day.
5    Q    Did any of the vendors report to you any
6    safety concerns on the water aisle?
7    A    No.
8    Q    Have they reported safety concerns to you in
9    the past?
10   A    Yes.
11   Q    What about, had other employees been down
12   the water aisle before Plaintiff's fall on October 15,
13   2020?
14   A    Yes.
15   Q    And none of the employees reported any water
16   or liquid substance on the aisle --
17   A    No, ma'am.
18   Q    -- or any safety concerns?
19   A    No, ma'am.
20   Q    And I assume there've been other customers
21   throughout the day on that aisle?
22   A    Yes.
23   Q    It was later in the day, correct?
24   A    Yes, ma'am.
25   Q    What time did y'all open that morning?

1    A    6 a.m., I believe.
2    Q    So probably a full day's worth of customers
3    before the incident happened?
4    A    Yes.
5    Q    Were you notified of any other customer
6    incidents, either slips, falls, or injuries on the
7    water aisle on October 15, 2020, besides Plaintiff's?
8    A    No, ma'am.
9    Q    Were you aware of any leaks on the water
10   aisle prior to Plaintiff's fall on October 15, 2020?
11   A    No.
12   Q    You aware of any roof leaks or refrigerator
13   leaks that would have breached the water aisle around
14   October 15, 2020?
15   A    No.
16        MS. GORDON:  That's all that I have.
17        THE REPORTER:  Okay.  Any further questions,
18   Ms. Washington?
19        MS. WASHINGTON:  Yeah.  I have a few follow
20   ups, and I promise it's going to be short.
21                   EXAMINATION
22   BY MS. WASHINGTON:
23   Q    As far as the reports to employees, are you
24   aware of any other employees who were notified of a
25   leak in the water aisle before Ms. Bennett's fall?

1    A    No, ma'am.
2    Q    Do you know how long it took an associate to
3  see Ms. Bennett after her incident?
4    A    No, ma'am, I'm not aware.
5    Q    Okay.  And do you know if any precautionary
6  measures were taken to prevent others from falling
7  after Ms. Bennett's fall?
8    A    After her fall and she left, we -- Roman
9  would have cleaned up the water so that there was no
10 more water in the floor, and there were no more risks
11 of anyone falling.
12   Q    Okay.  But you believe after she left, the
13 area was cleaned?
14   A    Yes, ma'am, I do.
15   Q    And while Ms. Bennett was there, was there
16 anything done to prevent other falls?
17   A    I'm not sure.  But I'm sure that, you know,
18 they were focused on taking care of her, and then they
19 also had to take photographs.  But as far as I could
20 tell from the video that I saw, there were a lot of
21 people on the aisle, so nobody was going to go on that
22 aisle anyway.
23   Q    You believe no one would have gone on that
24 aisle anyway?
25   A    Correct.

1    Q    But there are chances that people, despite
2  commotion, would still wander down that aisle?
3    A    It could happen.
4    Q    And as far as the matters to prevent others
5  from falling and cleaning the spill, that did not
6  occur until after Ms. Bennett had left the store,
7  correct?
8    A    Well, if associates are there with her
9  still, we always warn customers, hey, be careful,
10 there's something in the floor here.
11   Q    Do you know if that was done?
12   A    As Roman was standing there, he would have
13 told people not to walk through the water or to be
14 careful.
15   Q    He would have, but do you know if he did
16 that?  Is there any indication from any of your
17 statements with Roman or any of the written reports
18 that we've shown here today where that was done?
19        MS. GORDON:  Object to the form.  Answer if
20 you know.
21        THE WITNESS:  I don't.  I don't know if he
22 did or didn't, but that's what he was trying to do.
23        MS. WASHINGTON:  Correct.
24 BY MS. WASHINGTON:
25   Q    But are you aware of anyone other than Roman

1  who would have warned others of the situation --
2        MS. GORDON:  Object --
3        MS. WASHINGTON:  -- where it was located?
4  No, you're fine.
5        THE WITNESS:  I don't know who was on the
6  aisle with Glenda and Roman.
7        MS. WASHINGTON:  Okay.  So that's all I
8  have.  Thank you so much for speaking with me today.
9        MS. GORDON:  Thank you, Ellise.
10       MS. WASHINGTON:  Thank you.
11       THE REPORTER:  Okay.  Just before going off
12 the record, Ms. Washington, did you want to order a
13 transcript of this proceeding?
14       MS. WASHINGTON:  Oh, of course.
15       THE REPORTER:  Yes?  Okay.
16       MS. WASHINGTON:  Yes.
17       THE REPORTER:  And Ms. Gordon?
18       MS. GORDON:  We just need the e-transcript.
19       THE REPORTER:  E-transcript?
20       MS. GORDON:  Thank you.
21       THE REPORTER:  Okay.  Thank you.  We are
22 going off the record.  The time is now 11:36 a.m.,
23 Central Standard Time.
24       (Signature Waived.)
25       (Whereupon, at 11:36 a.m., the proceeding

1  was concluded.)

|  |  |
|---|---|
| 1          CERTIFICATE OF NOTARY PUBLIC | 1           CERTIFICATE OF TRANSCRIBER |

Column 1 (Certificate of Notary Public):

1             CERTIFICATE OF NOTARY PUBLIC

2       I, Freya Amis, A Remote Online Notary of the

3  State of Ohio, duly authorized to administer oaths, do

4  hereby certify:

5       That I am a disinterested person herein;

6  that the witness, Elizabeth Parker, named in the

7  foregoing deposition, was by me duly sworn to testify

8  the truth, the whole truth, and nothing but the truth;

9  that the deposition was reported by me, Freya Amis,

10  and is a true and correct record of the testimony so

11  given.

12      IN WITNESS WHEREOF, I hereby certify this

13  transcript at my office in the State of Ohio on this

14  29th day of June 2023.

15

16

17

18

19                    Freya Amis

20      Remote Online Notary Public in and for the

21                 State of Ohio

22

23

24

25

Column 2 (Certificate of Transcriber):

1             CERTIFICATE OF TRANSCRIBER

2       I, FREYA AMIS, do hereby certify that this

3  transcript was prepared from the digital audio

4  recording of the foregoing proceeding, that said

5  transcript is a true and accurate record of the

6  proceedings to the best of my knowledge, skills, and

7  ability; that I am neither counsel for, related to,

8  nor employed by any of the parties to the action in

9  which this was taken; and, further, that I am not a

10  relative or employee of any counsel or attorney

11  employed by the parties hereto, nor financially or

12  otherwise interested in the outcome of this action.

13

14

15

16

17                     FREYA AMIS

18

19

20

21

22

23

24

25

## Exhibits

**Ex. 1** 26:12,15
**Ex. 2** 32:6,9
**Ex. 3** 36:7 39:2
**Ex. 4** 36:3 38:1
**Ex. 5** 36:5 37:18
**Ex. 6** 36:8,12,14
**Ex. 7** 39:22,25
**Ex. 8** 41:22 42:9
**Ex. 9** 45:9,17
**Ex. 10** 52:7
**Ex. 11** 52:14

### 1

**1** 26:12,15
**10** 52:7
**100** 52:25
**10:04** 4:4
**10:56** 42:22
**11** 52:14
**11:06** 42:25
**11:36** 64:22,25
**12** 15:14
**15** 30:14 59:16,20,22 60:12 61:7,10,14
**15th** 8:15 59:9
**16** 42:6

### 2

**2** 32:6,9
**20** 9:14
**2017** 9:9
**2020** 8:15 19:24 23:13,16, 17,20 30:14 40:14 42:6 48:22 59:9,16,20,22 60:13 61:7,10,14

**2023** 4:3
**22** 4:3
**2470** 51:16
**2:22-cv-01306-amm** 4:11

### 3

**3** 17:12 36:1,7 39:2
**35** 7:12

### 4

**4** 36:3 38:1

### 5

**5** 17:12 36:5 37:18
**5th** 8:14

### 6

**6** 36:8,12,14 61:1

### 7

**7** 39:22,25

### 8

**8** 41:22 42:9 51:16

### 9

**9** 45:9,17

### A

**a.m.** 4:4 42:22,25 61:1 64:22,25
**Absolutely** 45:15
**absorbent** 17:13

**access** 13:23 14:5,6 25:13,18 28:18 50:7 51:1
**accident** 8:3,10,19 26:13,24 32:14 34:5 43:25 49:10 50:1 52:24 54:21 57:12
**accurate** 43:10
**action** 4:18 5:16 50:17
**actual** 26:23 33:2 42:12
**add** 30:9,11
**addition** 43:20
**address** 24:4
**addressed** 24:6
**addressing** 24:18
**admitted** 26:12
**affects** 55:10
**agency** 25:2,5,6,10
**agree** 4:8,14
**ahead** 48:20,21
**aisle** 29:13 30:2,15,22,23, 24 31:1,2,5,7,13,14,19 33:6,12 34:24 38:24 54:3, 19 59:11,15,19,23,25 60:1, 6,12,16,21 61:7,10,13,25 62:21,22,24 63:2 64:6
**aisles** 29:15,20
**Alabama** 5:3,4 7:8
**alcohol** 12:10
**alert** 48:18 57:6
**alerted** 49:6
**Alexandria** 4:10,19
**all's** 20:8,22 24:17,25 34:2 43:10 47:23 53:7 54:1 56:9
**All-absorb** 17:20
**Allen** 36:8 38:23
**allowed** 12:24
**Amis** 4:5
**amount** 57:24 58:1
**amounts** 13:19

**animated** 51:15
**ankle** 37:3,10,12 38:14
**answering** 6:8
**answers** 6:21
**anymore** 27:24 44:11
**apologize** 45:7
**app** 21:21 50:1,5
**appearance** 4:13
**appears** 33:23 41:24 55:5
**applicable** 48:24 50:15
**application** 35:16 50:6
**applications** 35:15
**Approximately** 7:12
**area** 27:13 33:1,23,24 34:19 44:1,3 62:13
**areas** 22:14
**arrived** 36:25
**aspects** 53:20
**asset** 30:3,5
**assist** 17:18 45:11
**assistant** 9:19 11:5
**associate** 13:22 17:9 36:2,5,9 37:25 51:1,19 58:10 62:2
**associates** 13:25 15:8 19:8 21:18,20 27:12 28:12 36:12 50:12,19,23 53:7 63:8
**assume** 60:20
**assuming** 7:25
**attached** 47:3
**attorney** 4:17
**automatically** 41:12 45:20
**aware** 22:21,25 23:3 29:15 32:3 49:12,17 54:20 55:19 56:8,10,11,13,14,17 57:14,18,19 58:1 61:9,12, 24 62:4 63:25
**awareness** 53:8

**awful** 17:13

---

**B**

**back** 9:20 11:11 17:1
19:23 31:8,10,11,17,18
35:11,14,18 42:16,24
47:14 48:4,16 49:9 50:11
53:3,25 54:23

**baler** 15:2

**barcode** 41:10

**based** 20:2 37:15 38:15
43:4

**basic** 19:8

**basically** 10:17 12:22
17:9,21 47:3 51:20

**basis** 20:19 56:1

**bear** 29:9

**Bedford** 7:8

**beer** 31:7

**begin** 5:11

**benefit** 12:7

**Bennett** 4:10,19 5:16
23:20 33:1 42:5 45:22
57:16,20 62:3,15 63:6

**Bennett's** 23:15 27:6
30:13 31:23 43:18 47:16
49:18 52:24 54:21 57:12
61:25 62:7

**big** 22:15,17

**bigger** 25:25

**Birmingham** 5:4

**bit** 18:17

**blank** 40:10,21,24 45:22

**book** 11:23

**bottled** 38:10

**bottles** 30:24

**breached** 61:13

**break** 6:14,15 43:17

**broken** 19:3 48:5

**broom** 14:15

**brother** 42:17

**bucket** 56:25

**buckets** 14:24

**buffed** 20:8,18

**building** 13:6 14:21
48:24 56:9

**burn** 54:9

**burned** 29:2

---

**C**

**call** 16:22 17:17 21:14,16
30:23 31:2 42:16

**called** 5:7 30:23 42:17
51:2 58:3,4

**camera** 31:4,16,20,24

**cameras** 29:13 31:4

**cap** 19:12,13

**capture** 31:20

**care** 62:18

**cared** 49:7

**careful** 63:9,14

**caregiver** 16:20

**caring** 43:20

**Carts** 20:1

**case** 4:11 7:10 28:16,25
30:13 43:18 49:18 56:19

**cashier** 9:18

**cautionary** 57:3

**ceiling** 56:12

**cell** 21:19

**Central** 4:4 42:22 64:23

**chain** 17:6

**chances** 63:1

**change** 19:12

**charge** 10:22

**check** 13:11,16 20:6
51:10

**checklist** 13:15 14:10,
11 17:2 51:6

**checklists** 13:11

**chunk** 55:11,12

**circling** 33:23,25

**claim** 39:22 40:3 41:10
42:7 47:6

**claims** 25:1,5,6,10 28:22
50:3 58:6,8

**clarification** 47:8 49:4

**clarified** 49:5

**clarify** 47:15

**clean** 14:17,18,19 17:10,
14,16 21:14 24:14 51:11
56:20 57:5

**cleaned** 19:25 21:1,8
24:7 62:9,13

**cleaning** 18:3 19:6,10,
12,15 20:8 55:24 63:5

**cleanliness** 20:5,6,16,
22 21:1 55:20

**cleans** 17:13

**cleanup** 14:14 22:12
53:6

**cleanups** 53:15

**cleared** 24:7

**clients** 25:8

**close** 7:9 15:13

**closer** 15:17 16:6 55:2

**clumping** 17:21

**CMI** 58:4

**co-manager** 9:20 11:4

**Coke** 60:3

**collect** 56:25

**color** 14:24

**command** 17:6

**commotion** 63:2

**communicate** 21:20

**communications**
29:19

**compactor** 15:2

**complained** 55:23

**complaining** 37:9
55:19

**complete** 6:21 43:10
46:14 48:11

**completed** 11:11 12:15
13:12 46:12 49:18

**completely** 40:6

**completing** 12:25

**completion** 13:24

**components** 40:6

**computer** 11:13,14
15:19 25:21 35:15 39:17
46:7 51:19,20

**computer-based**
11:10

**computers** 12:6

**concern** 24:12

**concerns** 60:6,8,18

**condition** 54:18,20

**cone** 57:6

**cones** 57:4

**conference** 4:8

**confirmed** 33:11

**confused** 47:9 48:5

**connected** 15:22

**consent** 4:19,23

**conserve** 6:3

**considerable** 37:2

**consistent** 20:19

**constantly** 44:5

**contact** 28:1,3

**contained** 12:2

**Cooper** 8:20 27:14 36:2,
9,13 37:4

**copy** 42:13 45:22

**corporate** 14:4 25:11

**correct** 21:10 24:19
25:11 27:16 35:21 36:9,21
41:3,6,16 43:7,22 45:21,24

Alexandria Bennett vs Walmart
PARKER, ELIZABETH on 06/22/2023

Index: Counsel..fast

47:17,18 53:21 60:23 62:25 63:7,23

**Counsel** 4:12

**count** 16:5

**counters** 15:5

**couple** 13:1,8 15:12 45:4

**court** 5:21 52:1

**crate** 38:12

**crying** 38:13

**current** 12:22 13:25 14:1,6

**cursor** 33:23,25

**customer** 24:12 27:2 36:4,7 37:1,9,13 38:5 43:8, 11,21 47:24 48:17 49:7 58:10,13 61:5

**customers** 15:7 21:25 55:19,23 57:7 60:20 61:2 63:9

## D

**daily** 12:14 56:1

**dangerous** 15:7

**date** 4:3 46:12

**dated** 42:5

**Daughtry** 36:4 37:24,25

**day** 8:23 9:1 12:1,23 19:25 21:3 32:2 33:2,12, 16,20 34:23 35:18,20 38:6 52:23 56:5 57:9,11 59:23 60:4,21,23

**day's** 61:2

**day-to-day** 10:18,21

**days** 55:24

**deal** 58:21

**defendant** 39:23 43:9

**defendant's** 32:8 52:4

**department** 9:17 58:6

**depiction** 43:10

**depicts** 33:1

**Depodirect** 4:6

**deposition** 4:9 7:13,17

**depositions** 5:18

**describe** 26:21 44:8,15, 16 47:19 48:2

**describing** 47:24

**description** 44:13 48:12,14

**designated** 4:6

**destroyed** 14:3

**detail** 9:1 17:7 43:15 50:13 53:22

**details** 28:20

**determination** 39:9

**devices** 21:25

**diagram** 52:12,17

**dictate** 27:4

**digital** 13:21

**dirt** 34:22 35:1

**dirty** 34:25

**disc** 29:5

**disclosure** 41:23

**disclosures** 26:14 32:8 39:24

**discomfort** 37:2

**discussed** 43:3 50:22 53:20

**disk** 47:1

**dispose** 14:24,25

**document** 12:3 41:9 47:2 48:13

**documents** 7:16,19 27:20 41:24 43:4 52:5

**door** 9:20

**downloaded** 13:21

**dripping** 56:25

**driver's** 5:2

**drug** 12:10

**dry** 22:5,7,8,9,10

**DSD** 9:19

**duly** 5:7

**duplicative** 47:11

**dust** 20:7

**dusting** 19:10

**dustpan** 14:15

**duties** 10:15,18 19:20

**duty** 8:21 27:4 28:14 49:1

**DVD** 29:5

## E

**e-learners** 11:9

**e-transcript** 64:18,19

**earlier** 17:20 28:23 49:23 50:19 53:5 54:25 58:16

**earnings** 28:14

**easily** 17:15

**East** 4:23

**Eastern** 42:25

**edge** 55:3

**education** 53:8

**effect** 7:2

**electronically** 24:22

**Elizabeth** 4:10 5:2,6

**Ellise** 4:17 5:15 64:9

**emergency** 13:6 14:22

**employed** 9:4 22:23 23:4 27:23,25

**employee** 11:22 21:9 26:25 59:13

**employees** 8:22 11:24 24:18 27:9 52:17 60:11,15 61:23,24

**employees'** 13:20 14:7

**employment** 9:22 11:7,21 12:1,11

**end** 9:18 19:12,13 34:22, 23 46:15 51:24

**endeavors** 22:13

**ensure** 24:5

**ensuring** 10:18

**entire** 10:17

**entitled** 40:8

**equal** 12:11

**etcetera** 47:11

**evacuate** 14:22

**event** 14:21 43:8,11 47:24 48:17 56:16

**events** 26:21

**everybody's** 19:10

**evidence** 13:12,24 49:22

**EXAMINATION** 5:13 59:6 61:21

**examined** 5:9

**exhibit** 26:12,15 32:6,9 36:3,5,7,8,12,14 37:18 38:1 39:2,22,25 41:22 42:9 45:9,17 52:1,7,13,14

**exhibits** 36:1

**exits** 13:6 14:20

**expand** 26:2

**external** 25:6

## F

**face** 46:9

**facing** 31:8,10,16 59:5

**fall** 22:20 23:15,17 30:14 31:23 38:9,16 39:1,6 59:9, 15,20,22 60:2,12 61:10,25 62:7,8

**falling** 62:6,11 63:5

**falls** 61:6 62:16

**familiar** 26:18 27:13 32:12 40:3 58:17

**fan** 39:16 56:20

**fast** 39:16 46:23

**father** 16:20

**fell** 23:14 33:2 38:24 57:17,20

**figure** 25:24

**file** 14:3 44:9,10,11,14 47:20,21

**files** 14:7 34:3

**fill** 46:6

**filled** 40:7,20

**find** 57:24 58:3

**fine** 16:15,17,24 25:23 64:4

**finish** 6:7 35:11

**fire** 14:20,22

**firm** 4:13 26:6

**five-minute** 42:18

**fix** 21:4 45:7

**fixes** 19:2

**flip** 29:6

**floor** 22:2,3,4,5,8 34:4,21, 24 35:3,8,9,13 37:1,9,13 38:11 48:9 54:4,9,13 57:16,20 59:11,15 62:10 63:10

**flooring** 54:2

**floors** 18:16 19:21 20:7, 17

**flopping** 29:7

**focused** 62:18

**folder** 44:9,10,14 47:20, 22

**folders** 44:11

**follow** 61:19

**footage** 31:23

**force** 7:1

**form** 18:5,6,15 20:11,23 22:24 24:9 26:18 27:7 30:17 33:3,14 34:11 35:4 38:17 39:8 41:12 43:7,8 45:20,25 46:11 51:8 53:11 54:5,14 55:4,14 56:3 63:19

**forward** 16:9 17:4 18:22

**found** 28:20 31:25

**Fowler** 58:17

**Fowler's** 58:15

**free** 12:10

**freeze** 39:14,15

**freezes** 35:15

**French** 29:2,3

**Freya** 4:5

**front** 7:2 9:18 10:20 16:10 31:17 38:10 55:6,8

**froze** 25:21 41:25

**full** 6:21 61:2

**full-time** 16:19

### G

**Gardendale** 9:13

**gave** 48:7

**general** 18:23 20:21

**generally** 7:19 11:21 18:19 23:10 58:20

**generate** 46:3

**generated** 40:19 41:2, 12 45:21

**get all** 28:21

**give** 6:21 23:9 25:22 30:10 41:25 43:5 48:6

**Glenda** 27:13 28:25 32:20,21 36:6 37:7 48:2 64:6

**Glenda's** 27:16 48:4,7

**good** 4:5 17:19 47:12

**Gordon** 4:22 15:14,20, 22 16:4,8,10,17,24 18:5, 15,21,24 20:11,23 22:24 24:9 25:23 26:9 30:17 33:3,14 34:11 35:4 38:17 39:8 42:19 51:8 53:11 54:5,7,14 55:4,14 56:3 59:1,4,7 61:16 63:19 64:2, 9,17,18,20

**Great** 5:12

**ground** 5:17

**guess** 9:22 13:10 14:1 17:13 18:2,25 20:5,7 21:23,25 22:12,19 23:9 24:2,4,7 26:23 28:10 29:16,18 30:14 33:9 35:1, 18 41:10 42:5,8 43:3,16 47:14 50:24 51:25 53:5 54:13,23 57:15

**guide** 11:25 53:13

**guides** 51:2

**guys** 35:13 39:13

**Gwen** 4:22

### H

**handbook** 11:22 13:2

**handbooks** 11:7

**handle** 22:13

**handled** 17:8 52:11

**handler** 58:8

**handlers** 58:21

**happen** 13:7 38:16,19 39:7,14 56:1 63:3

**happened** 7:11 8:12 9:1 22:22 23:11,16 27:7 28:20 29:9 34:5 38:9 40:22 43:18 48:8 61:3

**happening** 39:1

**hazards** 22:1

**hazmat** 14:23

**head** 5:24 12:9 29:17 34:13 58:14

**headphones** 51:21

**hear** 22:8 24:11 51:11

**hearing** 15:12 16:2

**heavy** 15:6

**held** 9:23

**Helena** 7:9 8:10 9:8 10:3, 8,9 19:7 22:20 23:5 27:22 29:12 31:9 52:18

**helps** 15:25 56:22

**hey** 63:9

**high** 15:6

**high-traffic** 34:24

**highest** 9:23 28:14

**Hills** 10:8,12

**hip** 37:9,11 38:12,13

**hire** 11:25

**hit** 37:11 38:12

**hold** 9:16 45:3 54:19

**hours** 13:1,8

**hundred** 32:16

**hurting** 38:14

### I

**I-9** 12:25

**identification** 26:16 32:10 36:15 37:19 38:2 39:3 40:1 42:10 45:18 52:8,15

**identified** 5:1 34:10

**illustrating** 43:3

**immediately** 21:9

**important** 5:22 6:5,7 47:25

**inches** 15:14

**incident** 7:10,22 8:14,23 9:1 23:17 24:6,11,19,21 25:2 26:22 27:6,12 28:7, 11,13 29:9 33:13,15,17,21 35:19 36:20 37:1,5,17,23 41:8 43:8,12 44:20,22 46:2 47:15,16,24,25 48:17 57:9 61:3 62:3

**incidents** 22:20 58:10, 21 61:6

**included** 14:10

**includes** 49:16

**indication** 63:16

**individual** 27:1

**individuals** 19:14

**information** 7:21 9:2 12:2,5,6 40:9,19 41:16 44:20 45:23 46:13 47:5 49:24

**initial** 26:14 32:8 39:23 41:23

**initially** 40:21

**injuries** 24:6,8 61:6

**input** 47:6

**intentionally** 45:13

**internal** 25:6 29:19 31:1 47:2

**internally** 25:14 41:11

**Internet** 50:4,7

**interrupt** 15:9

**intervals** 19:16

**investigation** 49:8,13, 16,17

**investigations** 57:14

**involved** 26:24 28:12 50:18

**issue** 16:16 56:18

**issued** 5:2

**issues** 16:1 56:8

**items** 14:25 40:10 53:23

---

**J**

**jagged** 55:3

**job** 11:1

**judge** 7:2

**jugs** 30:25

**June** 4:3

**jury** 7:2

---

**K**

**keeping** 45:11

**Kellie** 36:4 37:24 38:16

**Kevin** 36:7 38:22,25

**key** 46:2

**kind** 10:23 11:4 12:8 13:9 17:21 18:20 22:16,17 32:23 36:24 40:13 43:2 45:14 46:16 49:8 50:11 55:1

**knowledge** 37:4,16 44:2 48:12 54:2

---

**L**

**lady** 38:11

**large** 22:12

**larger** 17:16

**lead** 13:2,9

**leaders** 13:11

**leading** 26:22

**leads** 48:25

**leak** 61:25

**leaking** 56:11,14,17,19, 24

**leaks** 61:9,12,13

**learn** 11:6 13:16 51:3 53:14

**learning** 11:11 51:19 52:3 53:9,13

**leave** 14:17 21:13 48:25

**Leeds** 9:13

**left** 31:13,15 62:8,12 63:6

**letter** 42:4,13 58:15

**level** 20:15 45:14

**levels** 20:7

**license** 5:2

**lights** 56:11

**liquid** 22:17 34:10 59:10, 14,19 60:16

**list** 29:19

**listed** 27:11 32:20 36:21

**lists** 41:9

**live** 7:7,8,9

**located** 5:3 64:3

**location** 7:10 8:10,19 9:8 10:10,12,13 22:22 23:5 29:12 49:25 50:8 53:19

**locations** 9:10

**lockdown** 43:25 49:9

**locked** 49:6,10

**log** 12:5

**logs** 17:24 18:12

**long** 9:4 10:2,4 24:1,4,24 25:4 62:2

**looked** 36:19 45:2 57:15

**lot** 17:13 20:1 51:22 62:20

**LP** 4:23

---

**M**

**machine** 22:15

**made** 20:6 24:6 28:11 29:5 35:20 47:6,11 49:21 58:1

**maintain** 13:18 17:2 18:12 50:13

**maintenance** 18:3,13, 18 19:1,8,9

**make** 6:2 16:18 24:13 25:25 39:9 44:4 45:14 49:20 56:20

**makes** 40:17 49:3

**management** 13:5 28:13 48:18,19,23 49:7 50:3

**manager** 8:17,20 9:18, 19,20,24 10:3,4,7,16,24 11:3,5,8 25:15 27:4 28:14 30:1,4 48:25 49:1 58:8

**managers** 11:10

**manner** 19:19

**manual** 11:22

**manuals** 11:8

**mark** 45:8

**marked** 26:15 32:6,9 36:14 37:18 38:1 39:2,22, 25 42:9 45:17 52:7,14

**market** 10:10,13 30:3

**markets** 48:22

**marks** 20:6 35:8 54:3,8, 9,12

**material** 11:15

**materials** 57:4

**matter** 4:10 51:5

**matters** 49:16 63:4

**Matthew** 58:15

**Me@walmart** 21:19

**meaning** 8:1

**means** 44:1

**measures** 62:6

**meeting** 28:12

**member** 13:4 48:19

**members** 48:18,23

**memory** 31:21 36:18

**mention** 43:16

**mentioned** 43:4 49:22 50:8,19 53:2

**mentioning** 57:11

**mentor** 11:2

**microphone** 15:10

**minutes** 7:12 51:16

**missing** 55:13

**model** 51:15

**module** 51:14,17,23 52:3 53:9

**moisture** 17:14

**mop** 22:9,10

**moped** 20:8

**mopped** 20:18 22:3

**mopping** 35:6

**morning** 4:5 19:23 21:2 60:25

**move** 37:2 49:7

**moving** 17:4 37:7,23

**muddled** 15:11 16:3

---

### N

**names** 27:11

**narrow** 18:17

**Nathan** 29:2,3

**nearby** 33:1

**nearest** 31:4,6,20

**necessarily** 19:17

**needed** 19:21 20:1,2,3
21:2 28:5 34:25

**neighborhood** 10:10,
13 48:22

**niche** 18:20

**night** 19:22

**nod** 5:23

**noted** 34:2

**notices** 21:3

**notified** 59:10,14 61:5,
24

**notify** 48:18 49:1

**number** 22:21 23:1 25:3
41:10

**numbers** 45:11

---

### O

**oath** 4:15,20,24 6:25

**Object** 18:5,15 20:11,23
22:24 24:9 30:17 33:3,14
34:11 35:4 38:17 39:8 51:8
53:11 54:5,14 55:4,14 56:3
63:19 64:2

**objected** 18:6

**obscure** 54:12

**observation** 36:25
37:8 38:9,23 48:7

**observed** 37:8 59:18

**occur** 23:25 24:8 37:5,17,
21 63:6

**occurred** 8:10 23:4,23

**occurs** 28:11

**October** 8:14 23:13,16,
17,19 30:14 42:6 59:9,16,
20,22 60:12 61:7,10,14

**officer** 4:6

**official** 11:3

**on-call** 16:21

**on-the-** 10:25

**Onewalmart** 50:23

**online** 50:24 53:9,12

**open** 21:2 41:20 56:22,24
60:25

**operating** 50:16,20 51:5

**operations** 10:21

**opportunity** 12:11

**orange** 17:12

**order** 45:12 64:12

**orientation** 11:25
12:16,17,18 13:11

**overnight** 19:23

**overseeing** 10:17

---

### P

**pad** 17:12,13

**pads** 14:14

**pages** 40:25 41:5 46:16,
21

**pain** 37:10 38:13

**pallet** 37:12 55:2,3,11

**pallets** 30:24 54:18,20
55:1 60:4

**paper** 17:18 45:1

**parcel** 48:6

**Parker** 4:10 5:2,6,19
39:19 43:12 53:25 59:8

**part** 16:4 24:17 51:18

**parties** 4:7

**parts** 19:11 43:16

**pass** 51:24

**passing** 38:10

**past** 60:9

**patience** 39:21

**pen** 44:25

**people** 10:20 11:1 13:2
21:21 28:22 44:5 56:23
58:9 59:24 62:21 63:1,13

**Pepsi** 60:3

**percent** 32:16 52:25

**Perfect** 26:9

**permanent** 35:2,3,5
54:3

**person** 26:23 27:20
28:25 30:6 40:20 53:19
58:12

**personally** 25:14,16

**personnel** 13:20 14:3,7

**phone** 14:15 16:21 58:19

**phones** 21:19

**photo** 32:24 33:2,5,22
34:9

**photographs** 7:22
62:19

**photos** 32:1,7,12 34:7,19
44:6,7 54:24

**physically** 8:11

**pick** 38:24

**pictures** 32:13,15

**piece** 55:6,7,12,13

**place** 4:15,21 47:15

**placement** 21:24

**placing** 4:19

**plaintiff** 4:18 5:16 32:7
43:9 52:3 59:8

**plaintiff's** 26:12,15
32:6,9 36:3,14 37:18 38:1
39:2,22,25 41:22 42:9
45:9,17 52:7,14 59:15,19,

22 60:12 61:7,10

**plan** 11:12

**planned** 45:13

**play** 9:15

**plays** 47:25

**pocket** 14:14 17:12

**point** 13:6 14:12,20 35:13
51:6

**points** 49:17

**policies** 7:23,24,25 8:1,5
9:3 12:7,8,10,14 13:3 18:4

**policies-and-** 11:22

**policy** 8:3,4 12:11 18:3
20:20,22 21:1 47:23

**portal** 18:25 49:23,24
50:24

**position** 9:23 14:2

**positions** 9:16,22

**positively** 5:1

**possibility** 40:24

**possibly** 30:4

**posted** 52:20,23

**potential** 22:1

**potentially** 32:21 33:20

**precautionary** 62:5

**preliminary** 7:6

**preparation** 8:6

**prepare** 7:17,20

**prepared** 6:17

**prequalify** 6:1

**present** 8:19 26:11

**presently** 5:3

**pretty** 17:10 19:10 44:8
51:3 58:22

**prevent** 62:6,16 63:4

**previously** 54:25

**primarily** 41:15

**print** 11:18

**printed** 46:25

**printout** 52:2

**prior** 61:10

**problem** 8:9

**procedure** 16:21 50:16, 21 51:5

**procedures** 11:23 21:24 24:18 29:8 43:4,11 52:11 53:6,7

**proceeding** 4:7,16 5:11 64:13,25

**process** 12:18 51:2 53:13

**product** 47:5 56:20

**production** 41:24 52:5

**progression** 9:21

**promise** 39:20 61:20

**promoted** 11:12

**prompt** 44:14 47:19

**prompts** 41:3,13

**protection** 30:3,5

**prove** 12:24

**provided** 7:1,21 48:13 52:17

**pull** 25:21 28:17,21

**put** 4:21 15:6 22:4 26:3 56:25 57:1,3,6

**putting** 4:23

---

**Q**

**QR** 41:10

**question** 6:8 16:12 20:12 37:1 49:5

**questions** 6:11,18,22 7:6 29:7 40:8 51:23 58:24 59:2 61:17

**quick** 42:18

---

**R**

**reach** 21:19

**reaching** 37:10

**read** 36:19 43:14 49:14 51:21

**reading** 47:9

**ready** 39:13

**reason** 6:20 16:22 30:10 45:6

**recall** 8:8 11:17 12:4,13 23:7,18,19 28:6 36:17 57:8

**receive** 32:1 42:12 50:12

**recent** 9:22

**recess** 42:18

**record** 4:2,7,13 5:1 6:3 16:19 25:24 42:21,23,24 64:12,22

**records** 11:16 13:18,20 24:25 25:18,22 26:2

**recoup** 39:16

**reference** 51:6

**referred** 34:16

**refrigerated** 56:19

**refrigeration** 56:23

**refrigerator** 56:17 61:12

**refrigerators** 31:10 56:14

**regard** 18:16

**registers** 19:25

**regular** 20:20

**relation** 31:3 42:6

**remember** 8:7,24 12:12 23:12,16 30:12 40:11 44:17,18

**remote** 4:9

**remotely** 4:16

**repair** 57:2

**repairs** 18:3,13,14

**repeat** 16:15

**rephrase** 6:11 18:8,9 20:12

**report** 4:15 7:22 8:21 24:6,12,19,21 26:13 27:6 28:10,15 30:19 32:14,19, 20 33:16 37:15,23 38:15 39:23 40:3,19 44:20,22 49:20,21 60:5

**reported** 17:6,7,25 27:12 59:9 60:8,15

**reporter** 4:2,25 5:10,21 15:9,18,21 16:7,9 26:5 36:21 42:21,24 45:8,15 52:1,6 59:3 61:17 64:11, 15,17,19,21

**reporting** 8:4 17:4 28:13 40:17 41:8 46:2

**reports** 24:24 25:9,14,15 35:20 40:12,13,14 47:11 57:11 61:23 63:17

**represent** 4:14,18 5:15

**request** 4:7 19:1 41:24 47:3 52:4

**requested** 30:1 44:21 45:23

**requests** 18:13 44:15

**require** 20:16,17 21:24 22:12

**required** 10:23 50:17

**resigned** 14:2

**resolve** 56:18

**resolved** 17:8 24:1,2,3

**response** 18:23 20:21 30:8 41:23

**responses** 52:4

**responsible** 19:6,11, 12,14 21:12

**retain** 11:16 13:15

**return** 35:12

**Reversible** 44:9,10,14 47:20

**review** 7:16,25 8:2 35:19

**reviewed** 7:20,21 8:3,6

**reviewing** 36:17

**ringing** 10:20

**risks** 62:10

**role** 9:3 36:20 47:25

**roles** 9:15 10:16

**Roman** 8:20 27:14 29:1 32:17,18,19 36:2,9,12 37:4 49:2 62:8 63:12,17,25 64:6

**roof** 56:17,24 57:2 61:12

**rude** 6:3

**rules** 5:18

**run** 11:6

**running** 37:14

---

**S**

**safe** 31:22

**safety** 8:3 13:4,15,24 14:10,15 15:4 17:1 50:11, 18,22 51:7,15,17 52:2,10 53:8,15,18 55:11 60:6,8,18

**salaried** 48:19,23

**save** 49:21

**saved** 49:24,25 50:2

**saving** 49:22

**scan** 41:11

**scene** 36:25 43:25 44:8, 9,13,15,16 47:19,25 48:3, 9,12,14 49:6,9,10

**screen** 15:20 26:7,8,11 28:9 32:5 33:22 35:12,14, 24 39:12 41:19,21,25 42:16 43:2 45:6 46:2,9 53:24 54:24 55:2

**scrubbed** 19:22 34:25

**scrubber** 22:15 35:7

**scrubbing** 35:6

**scuff** 54:3

**search** 51:1

**seconds** 45:4

**section** 40:8 43:24

**secure** 44:1,3

**sees** 17:9 21:9

**self-evident** 44:8

**self-insured** 57:22,23 58:2

**send** 25:1 46:25

**sending** 47:1

**sense** 40:17 49:3

**set** 13:19 19:15 20:2

**shadowing** 11:1 13:9

**shake** 5:23

**share** 25:25 26:11 32:4 35:23 41:21 43:2 45:6 54:24

**shared** 43:5

**shares** 26:7

**sharing** 28:9 35:11 39:12 41:19 42:15 53:24

**sheets** 13:23

**shelf** 15:4 37:11

**shelves** 10:19 19:10

**shifts** 12:15

**shoe** 9:17

**shoes** 37:14

**short** 61:20

**shorts** 37:14

**shot** 46:14

**show** 32:5

**showed** 58:16

**shown** 52:12 54:25 63:18

**shows** 26:7

**sign** 13:17 22:4 51:10

**signature** 64:24

**significant** 22:12

**signs** 21:25 22:2 57:4

**single** 56:5

**sit** 51:20 59:4

**sits** 15:15

**sitting** 15:15 37:9

**situation** 64:1

**situations** 50:15

**sizes** 41:1

**slip-and-** 22:19

**slip-and-fall** 23:23 24:5 40:9

**slip-and-falls** 22:21 23:3,25 24:18

**slipped** 37:11 38:12,23

**slippery** 22:4

**slips** 61:6

**small** 17:11 55:6,7

**smiley** 46:9

**SOP** 51:4 53:14

**SOPS** 51:2

**sound** 16:2

**source** 57:15

**speak** 6:6 8:18,22 27:21 50:14

**speaker** 15:23

**speaking** 28:6 64:8

**specific** 11:10

**specifically** 17:5

**specifics** 23:12

**spend** 13:8

**spill** 14:12,14,16 17:9,11, 22 24:14 52:19,20 53:6,14 63:5

**spill-related** 52:10

**spills** 17:4,6,25 21:7,8 22:11 51:11 53:5 55:25 56:2,5

**spoke** 8:20 28:25

**spoken** 58:18

**spotlighted** 26:6

**sprinkle** 17:22

**stack** 15:5

**stand** 14:18

**standard** 4:4 20:4 42:22,25 50:16,20 51:4 64:23

**standards** 20:9

**standing** 63:12

**start** 36:11

**started** 5:17 7:5 40:11 44:12

**starting** 18:19 40:15

**state** 4:12 5:3

**stated** 21:8 35:2

**statement** 6:2 26:23 36:1,3,5,7,8,17 38:25 39:4, 6 48:3,4 57:19

**statements** 35:20,25 57:11 63:17

**states** 12:25 26:20

**stating** 57:8

**station** 14:23

**stations** 14:12 50:13 52:19,21

**status** 35:12

**step** 11:4 50:17

**steps** 56:18

**stickiness** 20:20

**stipulate** 4:8,14

**stipulation** 16:19

**stipulations** 4:20,24

**stock** 15:3

**stocked** 14:13 60:3

**stocking** 10:19

**stop** 21:4 28:9 39:11 41:19 42:15 45:6 53:23

**store** 8:12,17 9:20,24 10:2,3,4,7,16,17,19,24 11:3,5,6,8,10 14:13 18:2, 18 19:7 20:5,10 21:1 22:20 23:22 24:1 25:14,17 27:22

**28:13 29:9,13 30:1 31:9,17 32:2 38:5 42:12 48:25 51:3 52:18,21 53:19 54:1 55:20 56:1 58:7 63:6**

**stores** 4:22 10:6

**structural** 56:8

**stuff** 12:6 14:15 17:21

**sturdy** 37:13

**submit** 49:22,23

**submitted** 25:10 26:13 32:14,25 39:23 41:22 43:9 50:4,7

**submitting** 25:7

**substance** 34:4,8,16,21 59:10,14,19 60:16

**substances** 54:13

**suck** 22:16

**super** 39:16

**supplies** 14:14

**supposed** 52:22

**surmise** 36:24

**surveillance** 29:11,12, 16,21,24 30:2 31:4,23,24

**sweep** 17:23

**swept** 19:22

**switch** 22:19 35:14 39:13,15

**sworn** 5:7,11 6:25

**Sylacauga** 9:12

**system** 21:20 41:8

### T

**table** 15:15,16

**tablet** 24:11 27:3 40:12, 13 41:2,13 44:12,15,21,23 45:21,24 46:14,17 47:6,17 50:2,6

**tablets** 40:15

**takes** 35:7

**taking** 40:12 62:18

**talk** 11:20 13:3,6 14:16,21 15:2,3,24 23:10 44:1 50:15 53:16

**talked** 17:20 28:19,23 53:4

**talking** 18:16,17 29:8 58:19

**Talladega** 9:13

**tasked** 19:15,18,19

**tasks** 12:14 19:9

**team** 13:9

**tear** 20:21

**technician** 19:2

**technology** 4:9

**terminated** 14:2

**terminology** 55:12

**test** 51:24

**testified** 5:9

**testimony** 7:1

**that'll** 45:7

**there've** 60:20

**thing** 13:14 43:22

**things** 13:7,17 15:1,5,6 19:2,9 43:2 51:21

**three-** 42:18

**ticket** 56:22,24 57:1

**tidbits** 48:5

**tiles** 26:1

**time** 4:3,4 8:8,13,16,21 13:19 20:3 39:14 42:22,25 47:15,16 48:22 54:21 58:25 60:25 64:22,23

**times** 51:22

**title** 8:13,15

**today** 6:18,22 7:1,17 8:6 35:15 39:21 63:18 64:8

**Today's** 4:3

**told** 26:25 34:3 59:13,18 63:13

**toolbox** 13:22

**top** 12:9 15:3 29:17 34:12 37:11 58:14

**tops** 15:4

**total** 22:25

**tour** 13:4,5 50:22 53:16, 18

**towels** 17:19

**trained** 17:10

**training** 10:23 11:1,3,12 44:3 50:11,18 51:7 53:6

**trainings** 11:14,16 13:13

**transcript** 64:13

**transmitted** 50:7

**tricky** 16:4

**Trussville** 9:12

**truth** 5:8,9 6:25

**truthful** 6:21

**Twenty-three** 9:6

**twisted** 37:12

**type** 11:15 27:3,5 34:10 46:7

**typed** 27:8,9

**types** 53:4

**typos** 36:23

## U

**u-learn** 53:15

**Uh-huh** 31:12

**unable** 37:2

**uncover** 57:15

**understand** 5:24 6:8, 10,15,24 7:3 10:9 16:13 18:7 24:17

**understanding** 16:14 37:24

**unfrozen** 39:18

**United** 12:25

**upkeep** 20:9

**ups** 61:20

**usual** 4:20,24

## V

**vendors** 60:1,5

**verbal** 6:2

**verbally** 34:3

**verify** 27:19 50:10

**versus** 4:11

**Vestavia** 9:13 10:8,12

**video** 4:8 7:22 28:17,18, 21 29:2,3,5,11,12,16,20,24 30:2,4 31:3,23 46:25 47:3 51:17 62:20

**videos** 32:1 51:22

**view** 29:21

**viewable** 29:16

**void** 47:20

## W

**wait** 6:7

**Waived** 64:24

**walk** 12:18,19 13:16 21:21 31:9 63:13

**walkie-talkie** 21:17,18

**Walmart** 4:11,22 7:10 8:1,10,15,23 9:5,10,15,23 10:4,10 11:21,22 12:23 23:5 25:6,8,11 26:25 29:8 34:17 36:2,5,9 37:25 43:5 52:18 57:22

**Walmart's** 9:2 25:8 31:24 41:23

**wander** 63:2

**wanted** 5:17 9:2 18:23 20:21 40:5,7 43:16 50:10, 14 52:12

**warn** 21:25 63:9

**warned** 64:1

**warning** 21:24,25

**Washburn** 27:17,18 36:6 37:7,16

**Washington** 4:17,18 5:12,14,15 16:1,12,18,25 17:3 18:6,10,11,19,22 19:4,5 20:13,14 21:5,6 23:2 24:15,16 25:20 26:4, 10,17 30:21 32:4,11 33:7, 8,18,19 34:14,15 35:10,17, 23 36:16 37:22 38:4,20,21 39:11 40:2 41:18 42:4,11, 15,20 43:1,6 45:2,10,16,19 51:12,13,25 52:9,16 53:17 54:11,16,17 55:7,9,17,18 56:6,7 58:23 61:18,19,22 63:23,24 64:3,7,10,12,14, 16

**Washnurn** 27:14,17

**water** 22:16 30:14,23,24 31:2,14,19 33:6,11 34:16 37:11,12,13 38:11,24 48:9 54:3,19 56:25 57:16,20 59:10,11,14,15,18,19,23 60:6,12,15 61:7,9,13,25 62:9,10 63:13

**waxed** 35:8

**ways** 42:7

**wear** 20:20

**weather** 57:9,10,11

**wet** 22:2,4,9 34:3

**wetness** 33:24

**whens** 49:15

**wheres** 49:15

**whys** 49:15

**words** 5:23 15:12 16:2 26:21

**work** 8:11 12:24,25 27:22

**worked** 9:11,12,17,19 11:2

**worklist** 13:24

**workplace** 12:10 51:15 52:2

**works** 39:17

**worksheets** 12:14

**worth** 61:2

Alexandria Bennett vs Walmart
PARKER, ELIZABETH on 06/22/2023

Index: write..Zoom

**write** 44:25 46:1

**writing** 11:23

**written** 11:15 17:24 18:4,
12 26:23,24 63:17

**wrong** 56:21

**wrote** 39:10

---

### Y

---

**y'all** 41:25 45:3 60:25

**years** 9:6,14 10:5

**young** 38:11

---

### Z

---

**Zoom** 15:19 16:5

DOCUMENT 35
SEALED

# DOCUMENT 36

FILED

2023 Oct-12  PM 05:25
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| ALEXANDRIA BENNETT, | ) | |
| Plaintiff, | ) | |
| | ) | CASE 2:22-cv-01306-AMM |
| v. | ) | ORAL ARGUMENT REQUESTED |
| | ) | |
| WALMART, INC., | ) | |
| Defendants. | ) | |

## DEFENDANT WAL-MART STORES EAST, L.P.'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant **Wal-Mart Stores East, L.P.** ("Wal-Mart") and files its Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Opposition"). Notwithstanding Wal-Mart's position that plaintiff's Opposition to Defendant's Motion for Summary Judgment is due to be stricken because of its untimely filing, Wal-Mart responds as follows:

## I.   WAL-MART'S FACTS ARE DEEMED ADMITTED.

Pursuant to this Court's Initial Order (Doc. 3), "[a]ll material facts set forth in the statement required of the moving party will be deemed admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment." (Doc. 3: 19 ¶ 2). Plaintiff's Opposition does not dispute any of the material facts set forth in Wal-Mart's statement of facts such that all facts are deemed admitted for purposes of the instant summary judgment. (Doc. 29).

## II.   <u>DISPUTED FACTS</u>

Of the "facts" included in the "Narrative of Undisputed Facts" section of Plaintiff's Opposition, Wal-Mart disputes the following:

- Plaintiff fails to cite any evidence establishing that "another customer . . . saw the fall" as alleged. (Doc. 29:1). In fact, the customer named by plaintiff in her deposition (Doc. 16-2, 109:7-16), Ms. Kellie, gave a statement in which she said "[t]he fall *had just happened* as I was passing by." (Doc. 18-1, 8).

- While plaintiff alleges that "[n]o one on Walmart's staff came to address [her] fall for approximately 40 minutes" (Doc. 29: 1-2), plaintiff admits the alleged fall occurred at 7:20 pm and surveillance footage shows an EMT and/or firefighter arrived at the store by 7:45 pm, making it impossible for plaintiff to have waited on staff for 40 minutes. (Doc. 16-2, 74:6-11, 111:12-20, 112:22-23, 113:1-6)(the 911 call was made after a Wal-Mart employee arrived); (Doc. 18-1, 30; Exh. G, Video (Doc. 34-1, 7:45:00-7:47:00; Exh. H, Screenshots (Doc. 34-2)).

- Plaintiff fails to cite any evidence establishing that water was "on the floor near the chipped pallets." (Doc. 29, 2). Plaintiff admits she does not know what substance formed the drips, and plaintiff did not offer any testimony about the condition of any pallets on the water aisle. (Doc. 16-2, 167:11-22).

- Plaintiff did not testify that the water was "difficult to differentiate from the numerous skid marks on the floor" as alleged. (Doc. 29, 2). Instead, plaintiff's

relevant testimony on the pages cited was as follows:

> Q.    All right. And what caused you to fall?
> A.    I think it was dirty water on the floor.
> Q.    What makes you think that?
> A.    Because once I was on the floor, I seen it was right there. So you know how I said "scuff marks"? It was, like dirty water, scuff marks."
> Q.    Had you seen any dirty water on the floor of the water aisle before you fell?
> A.    You said did I see any dirty water?
> Q.    Or any water or any liquid substance on the floor of the water aisle before you fell?
> A.    No, ma'am.

(Doc. 16-2, 91:16-23, 92:1-10).

- The pages cited from Ms. Parker's deposition do not mention a request for more cameras. (Doc. 29, 2). On another page (not cited in Plaintiff's Opposition), Ms. Parker testified that *at some unknown time* she requested additional cameras for the Helena store. (Doc. 16-3, 30:1-12). Despite plaintiff's insinuations, there is no evidence showing Ms. Parker made this request *prior* to the incident made the basis of this lawsuit. (Doc. 16-3, 30:1-12).

- Plaintiff fails to cite any evidence indicating Wal-Mart's handling of the subject incident was in "semi compliance" with its policies, procedures or manuals. (Doc. 29, 3). The evidence shows the incident was investigated and documented by Wal-Mart, in compliance with its policies, procedures and training manuals. (Doc. 16-3, 24:4-25, 28:9-23, 43:7-25, 44:1-25, 45:1-18; Doc. 16-6).

- Plaintiff fails to cite any evidence showing there were "puddles" of water on the

water aisle. (Doc. 29, 3). Plaintiff described the substance she observed as "drips" concentrated in one area. (Doc. 16-2, 98:8-23, 99:1-8, 129:23, 130:1-5). Plaintiff inaccurately states, "no one from Walmart ever made any effort to find out why there were puddles of water." (Doc. 29, 3). Wal-Mart thoroughly investigated the subject incident. (Doc.16-3, 43:7-25, 44:1-25, 45:1-18; Doc. 16-6).

- Plaintiff does not cite any evidence showing Wal-Mart failed to follow its policies and procedures or that "[i]f Walmart's written policies and procedures had been followed, Ms. Bennett's slip and fall would have been prevented" as suggested and alleged. (Doc. 29, 3). This statement constitutes nothing more than unsupported speculation, which is not an "undisputed material fact."

- Plaintiff inaccurately states that "[w]ithin 6 months of Ms. Bennett's incident, there were 3 reported slip and falls at the Helena Neighborhood Market." (Doc. 29, 3). The evidence shows that, during the three years preceding the subject incident, there were only *two* slip and fall incidents at the subject store. (Exh. I, Wal-Mart's Int. Resps. (Doc. 34-3), Resp. 6).

- Plaintiff fails to cite any evidence showing that "[t]he actual functioning of the Safety Team is vastly different from what Walmart's policies, procedures and handbooks state should happen." (Doc 29, 4).

- Plaintiff fails to cite any evidence showing her alleged injury "could have been prevented if there was a functioning Safety Team . . . or if the Walmart home

office had put these subjects on their topic lists to be discussed by store
management." (Doc. 29, 4-5). It is unclear what "topic lists" she is referring to;
regardless, there is no evidence showing the subject store lacked a safety team or
that management failed to discuss slip and fall prevention with associates. Wal-
Mart had training methods, policies, and procedures in place – and which were
being utilized - to prevent slip and falls. (Doc. 16-4, ¶3, 5; Doc. 16-3, 11:20-25,
12:1-12, 14:9-25, 15:1-8, 17:4-23, 19:6-13, 19:18-25, 20:1-3, 21:1-22, 24:4-25,
28:9-23, 35:1-9, 50:10-25, 51:1-24, 52:1-22, 53:2-21).

- In a footnote, plaintiff argues that if one of the "thousands of Walmart stores"
  "experienced spills, many other locations also experienced spills." (Doc. 29, 4,
  fn 1). This statement is unsupported by evidence and constitutes nothing more
  than speculation.

- In the same footnote, without citing any evidence, plaintiff further argues that
  "the Walmart home office did not want a local store Safety Team to address
  issues involving maintenance or inspections (proactive maintenance) because
  that was its job – it only wanted the local Walmart to clean up spills and repair
  leaks as they happened (reactive maintenance)." (Doc. 29, 4 fn 1). Wal-Mart was
  both proactive in its slip and fall prevention and reactive in cleaning any spills
  upon discovery. (Doc. 16-4, ¶3, 5; Doc. 16-3, 11:20-25, 12:1-12, 14:9-25, 15:1-
  8, 17:4-23, 19:6-13, 19:18-25, 20:1-3, 21:1-22, 24:4-25, 28:9-23, 35:1-9, 50:10-

5

25, 51:1-24, 52:1-22, 53:2-21).

## III.   <u>NOTICE IS NOT PRESUMED</u>.

### A.   <u>Plaintiff's *new* chipped pallet theory is not supported by evidence.</u>

In her Complaint, plaintiff alleges that she "fell in a pool of a slippery substance that was hidden behind stacked bottles of water on a wooden pallet." (Doc. 1, 2, ¶ 9). In her deposition, plaintiff claims her feet "went out from under her" and speculates that "drips" of "dirty water" caused her to slip. (Doc. 16-2, 92:19-23, 93:1-23, 94:1-6, 119:23, 120:1-2). However, in Plaintiff's Opposition, for the very first time plaintiff proffers a theory that a pallet constituted a defective condition due to a "chipped" edge, the chipped edge somehow pierced a bottle of water, the water from the pierced bottle somehow caused drips to be deposited outside of the plastic wrap and in front of the pallet (but not under the pallet), plaintiff stepped on these very drips, and the drips caused plaintiff's feet to go out from under her while standing flatfooted. (Doc. 29, 6-8).

Plaintiff fails to cite any evidence establishing a pallet was "chipped," the pallet constituted a defective condition or that a pallet had anything whatsoever to do with the incident made the basis of this lawsuit. Plaintiff offers no evidence as to when or how the pallet allegedly became chipped, and the evidence shows it was likely a result of plaintiff's fall such that it could not have pierced a water bottle prior to plaintiff's fall. (Doc. 16-2, 114:13-23, 115:1-11; Doc. 16-6; Doc. 18-1, 8)(noting

in plaintiff's signed statement, as well as a witness statement, that plaintiff hit her hip on a pallet as she fell). Furthermore, plaintiff admits she is not aware of any water under the pallet, which is contrary to a theory that a bottle was pierced by the pallet. (Doc. 16-2, 129:23, 130:1-5). Plaintiff further admits she does not know the origin or identity of the substance which formed the drips. (Doc. 16-2, 101:20-23, 102:1-13). It is therefore impossible for plaintiff to support her proffered argument; namely, that the drips came from a water bottle pierced by a "chipped" pallet.

Without evidence to support her theory, it remains nothing more than speculation and requires the Court to make impermissible inferences to conclude the pallet was a defective condition which caused plaintiff's alleged injuries. *Moore v. Dean*, 520 F.Supp. 2d 1359, 1362-63 (N.D. Ala. 2007)("[A]n inference is not reasonable if it is only a guess or a possibility . . . "); *Systrends, Inc. v. Group 8760, LLC*, 959 So. 2d 1052, 1074 (Ala. 2006)(holding that "[A]n inference cannot be derived from another inference. An inference must be based on a known or proved fact."); *Hurst v. Ala. Pwr. Co.*, 675 So. 2d 397, 400 (Ala. 1996)(holding that **"mere conclusory allegations or speculation that fact issues exist will not defeat a properly supported summary judgment motion, and bare argument or conjecture does not satisfy the nonmoving party's burden to offer facts to defeat the motion"**)(citation omitted). Plaintiff's theory is pure speculation and her lack of citations to the record to support this theory is telling. "Plaintiff cannot create a

genuine issue of material fact by failing to offer evidence that was available to her by reasonable investigation of the facts relevant to her claim." *Black v. Mapco Exp., Inc.*, 2011 WL 13287075, *7 (N.D. Ala. 2011)(recognizing "the express proscription against courts presuming negligence where an invitee is injured on defendant's property.")(citations omitted).

As was recognized in *Black*, *supra.*, the *Weeks*, *Norris*, and *Mims* cases cited by plaintiff (Doc. 29, 6-8), "provide that, if the plaintiff establishes that her injury was caused by a defective fixture on the premises, **as opposed to a slip-and-fall case** involving a foreign substance on the floor, the question whether the defendant knew & should have known the fixture was defective is reserved for a jury." *Id.* at *6 (emphasis added). The instant matter involves a slip and fall claim and is not analogous to the cases relied upon by plaintiff.

**B.   Plaintiff fails to produce substantial evidence showing Wal-Mart affirmatively created any alleged hazard.**

In arguing that Wal-Mart affirmatively created a hazard, plaintiff returns to her chipped pallet theory. (Doc. 29, 14). As noted above, plaintiff cites no evidence showing the pallet was chipped or, even if it was chipped, that the wooden pallet could pierce a plastic water bottle. Moreover, plaintiff cites no evidence establishing when or how the pallet became chipped or who placed the pallet on the water aisle. Consequently, there is no evidence that, at the time the pallet was placed on the water aisle, it was in a defective or dangerous condition. Likewise, there is no evidence

showing Wal-Mart deposited the drips which were observed by plaintiff on the water aisle after she fell. Plaintiff admits as much. (Doc. 16-2, 101:20-23, 102:1-13, 102:20-23, 103:1-2). Without evidence that Wal-Mart affirmatively created the alleged hazardous condition(s), **notice is not presumed**[1].

## IV.   NO EVIDENCE OF NOTICE

Plaintiff does not argue that Wal-Mart had actual notice of the drips which allegedly caused her fall, and she fails to meet her burden of providing substantial evidence indicating Wal-Mart had constructive notice of the drips. (Doc. 16-2, 102:20-23, 103, 1-2).

### A.   There is no evidence showing Wal-Mart failed to perform "reasonable inspections and/or maintenance" as alleged by plaintiff.

**Plaintiff cites no evidence** to support her allegation that Wal-Mart failed to conduct safety sweeps on October 15, 2020. (Doc. 29, 8). Likewise, plaintiff cites no evidence suggesting Wal-Mart failed to perform "reasonable inspections and/or maintenance" – whatever that means to her – of the aisles and pallets at the subject store. Plaintiff's bare allegations do not constitute substantial evidence showing a genuine issue of material fact exists. *Bald Mtn. Park, Ltd. v. Oliver*, 863 F.2d 1560, 1563 (11th Cir. 1989)("Mere conclusions and unsupported factual allegations are

---

[1] *Cf.* the *Rolin*, *McClinton*, and *Denmark* cases cited by plaintiff (Doc. 29, 14-15) which involve injuries caused when customers tripped over items protruding into the store aisle, items that were placed in the customers' walking path by Wal-Mart employees.

legally insufficient to create a dispute to defeat summary judgment.").

Furthermore, plaintiff does not refute the evidence proffered by Wal-Mart which shows the following: Wal-Mart's employees were charged with constant monitoring for potential safety hazards as they perform their job duties which take them throughout the store; Wal-Mart employees were trained to clean as they go, immediately remedying situations upon discovery or otherwise standing guard over a potential hazard until it could be remedied; the subject store was stocked with spill stations and employees are instructed to keep a towel in their pockets for quick removal of any spills; and maintenance personnel performed regular walks through the store monitoring for potential hazards. (Doc. 16-3, 14:4-25, 15:1-8, 17:4-23, 19:6-13, 18-25, 20:1-3, 21:7-22, 52:9-22; Doc. 16-4, ¶3, 5). Additionally, multiple employees, vendors and customers had been on the subject aisle prior to plaintiff's fall, and no one reported any drips of liquid on the floor. (Doc. 16-3, 59:8-25, 60:1-25, 61:1-8). Plaintiff has not presented any evidence indicating that Wal-Mart's inspection or cleaning procedures were inadequate or that they were performed inadequately on the day of plaintiff's fall such that constructive notice should be imputed to Wal-Mart.

Plaintiff cites *Wal-Mart Stores v. Tuck*, 671 So. 2d 101 (Ala. Civ. App. 1995); however, the evidence in the *Tuck* case showed that plaintiff tripped over shelf fencing which had been placed on the floor against store policy because it was in a

location where shelf fencing was not needed. *Id.* at 103-104. Because it was determined that Wal-Mart's *affirmative act* – namely, leaving the shelf fencing in the customer's walking path – was the cause of plaintiff's trip and fall, plaintiff was not required to introduce evidence that Wal-Mart had actual or constructive notice of the shelf fencing. *Id.* at 103-105.

However, here, the alleged hazardous condition (at least up until Plaintiff's Opposition was filed) was the drips of water plaintiff allegedly observed on the floor after she fell. (Doc. 1, 2, ¶ 9; Doc. 16-2, 92:19-23, 93:1-23, 94:1-6, 119:23, 120:1-2). As discussed in Section III(B) of this Reply, and unlike the *Tuck* case, there is no evidence that Wal-Mart affirmatively created the alleged hazardous condition (e.g., deposited the drips on the floor) and therefore notice is *not* presumed. Similarly, there is no evidence that Wal-Mart placed a pallet with a "chipped" edge on the water aisle prior to plaintiff's fall or that the pallet had anything to do with plaintiff's fall.

**B.**   **Unrelated incidents do not impute constructive notice.**

Plaintiff argues that evidence of *two* slip and falls during the three-year period preceding the subject incident somehow creates a presumption of notice on the part of Wal-Mart despite the undisputed fact that the other two incidents occurred in different areas of the store and have not been tied in any way to the subject incident. (Doc. 34-3, Resp. 6). While plaintiff classifies these two occurrences as "recurring incidents" (Doc. 29, 10), one incident involved a water spill in the checkout aisle

and the other involved a "pink substance" spill in the dairy section of the store. (Doc. 34-3, Resp. 6). This is not evidence of some recurring problem. Even if plaintiff claims the spills had something to do with "chipped" pallets, there is no evidence establishing pallets were present on the checkout aisle or in the dairy section when these incidents occurred. These incidents do not give rise to constructive notice that plaintiff would later slip on drips of an unidentified substance on the water aisle.

Furthermore, while plaintiff summarizes several cases in support of her "recurring incident" argument, each of these cases involve allegedly dangerous conditions created by permanent fixtures (i.e., a leaking roof, an automatic door, an escalator). However, this case involves a slip and fall claim which is not analogous to the cases cited by plaintiff[2]. Furthermore, the *Ferguson v. Wal-Mart*, 2011 WL 3739157 (E.D. TN 2011) case cited by plaintiff applied Tennessee law and involved evidence showing the following: a prior slip and fall on action alley (the same aisle where plaintiff fell) two months earlier due to *water from a roof leak*; prior slippery

---

[2] *Cf. Kmart Corp. v. Peak*, 757 So. 2d 1138 (Ala. 1999) which arose out of an injury *caused by an automatic door closing on a customer*. The evidence showed there had been two other incidents where *automatic doors closed on customers* at the same store. Furthermore, the issue on appeal was whether the trial court erred in allowing evidence of other incidents. *Id.* at 1144. The *Peak* case does *not* hold that constructive notice is imputed under facts such as those in the instant case. In the *McCorvey v. Alabama River Cellulose*, 2014 WL 5092952 (S.D. Ala. 2014) case, the evidence showed that the very machine which shot a piece of wood out and thereby injured plaintiff was responsible for shooting wood out on other occasions. *Id.* at *5-6; *see also Kirksey v. Schindler Elevator Corp.*, 2016 WL 3189242 (S.D. Ala. 2016)(in a case arising out of the death of an 11-year-old boy who fell over the side of an escalator, there was a jury question as to Sears' notice where there was evidence showing multiple previous incidents of children falling over the side of escalators at Sears).

floors during rainstorms and evidence it was raining at the time of Ferguson's fall; and evidence of emergency roof repair requests two months before Ferguson's fall. *Id.* at *4 (holding that "Wal-Mart was on notice of the possibility of dangerously slippery floors in Action Alley caused by roof leaks . . .").

Here, there is no evidence of any roof leaks, or any other leaks for that matter, on the water aisle prior to plaintiff's alleged fall. In fact, Ms. Parker specifically testified that there were no roof leaks in the area where plaintiff fell and no structural problems with the building. (Doc. 16-3, 56:8-15). There is also no evidence that either of the other two slip and falls were caused by leaks, versus spills. Furthermore, since there is no evidence showing where the subject drips originated, it is impossible to establish there was some systematic problem which put Wal-Mart on notice that drips may appear on the water aisle on October 15, 2020.

## V.   PLAINTIFF'S WANTONNESS CLAIM STILL FAILS.

Plaintiff offers only speculation in her effort to rebut Wal-Mart's showing that no issue of material fact exists as to plaintiff's wantonness claim. Plaintiff argues that Wal-Mart was wanton in failing to discover the "root cause" of the three spills – which occurred in three separate areas of the store - in the three-year period prior to and including October 15, 2020. (Doc. 29, 17). However, the evidence shows that Wal-Mart investigated each of these instances and created records of the same. (Doc. 34-3, Resp. 6; Doc. 16-3, 43:7-25, 44:1-25, 45:1-18). Moreover, Wal-Mart

confirmed that there were no roof leaks or any other kind of leaks on the water aisle (Doc. 16-3, 56:8-15).

While plaintiff claims periodic safety sweeps were not performed, the evidence shows otherwise. (Doc. 16-4, ¶3, 5; Doc. 16-3, 11:20-25, 12:1-12, 14:9-25, 15:1-8, 17:4-23, 19:6-13, 19:18-25, 20:1-3, 21:1-22, 24:4-25, 28:9-23, 35:1-9, 50:10-25, 51:1-24, 52:1-22, 53:2-21). Similarly, plaintiff alleges that Wal-Mart failed to have a "Safety Team" in place but fails to show that there was, in fact, no Safety Team at the time of the subject incident. Furthermore, there is no evidence that Ms. Parker's request for additional surveillance cameras was made *before* October 15, 2020 or that, had she been provided additional cameras, the subject incident would not have occurred.

## VI.   PLAINTIFF FAILS TO PRESENT SUBSTANTIAL EVIDENCE REBUTTING WAL-MART'S SHOWING THAT THE DRIPS WERE OPEN AND OBVIOUS.

Plaintiff allegation that Wal-Mart attempts to mislead this Court by asserting an open and obvious defense is inaccurate and unfounded. Defendant has merely relied on Plaintiff's own testimony as to the color of the drips at issue. (Doc. 16-2, 99:9-10). Assuming, *arguendo*, the drips which plaintiff claims caused her to fall were black in color, Wal-Mart breached no duty to Plaintiff as the drips were open and obvious on the white tile floor. This is true regardless of whether Wal-Mart had any alleged notice of the presence of the alleged drips and regardless of the origin of

the drips.

Applying the objective standard for determining whether an object is open and obvious, black drips on a white tile floor were readily apparent and should have been observed by plaintiff in the exercise of ordinary care. *Douglas v. Devonshire Apts., LLC.,* 833 So. 2d 72, 74 (Ala. Civ. App. 2002)(holding that a condition is "obvious" if the risk is apparent to, and of the type that would be recognized by, a reasonable person in the position of the invitee.); *Jones Food Co. v. Shipman*, 981 So. 2d 355, 362 (Ala. 2006)(stating that, in applying the objective standard for open and obvious hazards, "the question is whether the danger should have been observed, not whether in fact it was consciously appreciated."). This conclusion is supported by the holdings of *Browder*, *Melton*, and *Sheikh* as set forth in detail in Wal-Mart's Brief (Doc. 17). Wal-Mart had no duty to warn plaintiff of, or protect plaintiff from, the presence of black drips on the water aisle because they were not a hidden defect.

WHEREFORE, PREMISES CONSIDERED, Defendant Wal-Mart Stores East, LP respectfully requests that this Honorable Court enter an Order granting Summary Judgment in its favor as there are no genuine issues of material fact.

Respectfully submitted,

s/ *Gwen A. Gordon*
Christopher J. Zulanas (ASB-1572-U82C)
Gwendolyn A. Gordon (ASB-2775-O74A)
*Counsel for Defendant, Wal-Mart Stores East, LP (incorrectly named as Walmart, Inc. in complaint)*

15

<u>OF COUNSEL</u>:
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
czulanas@friedman-lawyers.com
ggordon@friedman-lawyers.com
P 205.278.7000 | F 205.278.7001

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have caused a copy of the foregoing document to be electronically filed and issued to counsel via CM/ECF electronic mail notification on this date: October 12, 2023.

Ellise M. Washington
EMW LAW
2100 1st Avenue North
Birmingham, AL 35203
ellise@emwlawllc.com

_____
        s/ *Gwen A. Gordon*
OF COUNSEL

# DOCUMENT 38



FILED
2024 Mar-19  AM 09:43
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **ALEXANDRIA BENNETT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 2:22-cv-1306-AMM** |
| | ) | |
| **WALMART, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## JUDGMENT

This case comes before the court on a motion for summary judgment filed by Defendant Walmart, Inc. ("Walmart"). Doc. 15. For the reasons stated in the memorandum opinion entered contemporaneously herewith, the motion is **GRANTED**. Judgment is **ENTERED** in favor of Walmart and against Plaintiff Alexandria Bennett, costs taxed as paid. The Clerk of Court is **DIRECTED** to close the case.

**DONE** and **ORDERED** this 19th day of March, 2024.



**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE

## Certificate of Service

I hereby certify that on September 20, 2024, I electronically filed and mailed two copies of the Appellant's Appendix to the clerk of court via USPS certified mail, and one copy to all counsel of record including the following:

Gwendolyn A. Gordon
Christopher J. Zulanas
***Counsel for Appellee Wal-Mart, Inc.***
Friedman, Dazzio & Zulanas, P.C.
3800 Corporate Woods Drive
Birmingham, AL 35242
czulanas@friedman-lawyers.com
ggordon@friedman-lawyers.com

Ellise M. Washington, Esq.
*Attorney for Appellant Alexandria Bennett*

Dated: September 20, 2024